1  MICHAEL P. MURPHY, COUNTY COUNSEL (SBN 83887)
   By: David A. Levy, Deputy (SBN 77181)
2  By: Glenn M. Levy, Deputy (SBN 219029)
   Hall of Justice and Records
3  400 County Center, 6th Floor
   Redwood City, CA  94063
4  Telephone: (650) 363-4250
   Facsimile:  (650) 363-4034
5  E-mail:  dlevy@co.sanmateo.ca.us; glevy@co.sanmateo.ca.us

6  Attorneys for Defendant
   COUNTY OF SAN MATEO

7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10

11

12 | MONTARA WATER AND SANITARY DISTRICT, | Case No. 5:08-cv-02814-JF |
   |                                       |                           |
   |              Plaintiff,               | **DEFENDANT COUNTY OF SAN MATEO'S** |
13 |                                       | **OPPOSITION TO MWSD'S MOTION TO** |
   |        vs.                            | **REMAND**                |
14 |                                       |                           |
   | COUNTY OF SAN MATEO, a political subdivision | Date:       September 19, 2008 |
15 | of the State of California; and Does 1 to 20, inclusive, | Time:       9:00 a.m. |
   |                                       | Courtroom:  3 (Hon. Jeremy Fogel) |
16 |              Defendants.              |                           |
   |                                       | Action Filed: May 17, 2007 |
17 |                                       | Trial Date:   None set    |
   | THE UNITED STATES OF AMERICA,         |                           |
18 |                                       |                           |
   |              Intervenor.              |                           |
19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page(s)**

I. INTRODUCTION ...............................................................................................1

II. RELEVANT BACKGROUND ...........................................................................2

    A. The Half Moon Bay Airport and its History. ...........................................2

    C. Montara Water and Sanitary District. ......................................................4

    D. MWSD's Efforts To Take The Property By Eminent Domain. ................4

III. THERE WAS NO WAIVER BY THE UNITED STATES DURING ITS EFFORT TO INTERVENE. .........................................................................5

IV. FEDERAL JURISDICTION IS APPLICABLE NOTWITHSTANDING MWSD'S OVERSIMPLIFICATIONS. ...............................................................6

    A. Federal Jurisdiction is Conferred By Sections 1331 and 1441. ..............6

    B. MWSD Incorrectly Argues That it Can Obtain Title to the Airport Wells "Subject to" the Interests of the United States ..............................7

        1. MWSD's Own Board Did Not Authorize Taking the Airport Wells Subject to Any Restrictions. ......................................................7

        2. The 1948 Deed and Related Federal Laws and Regulations Prohibit MWSD's Efforts to Take the Subject Property "Subject to" the Interests of the United States. ..............................................8

            a. The 1948 Deed Restrictions Prohibit a Partial Taking in the Manner Suggested by MWSD. ..........................................9

            b. The Surplus Property Act of 1944 and Current Law Prohibit the Partial Taking Sought by MWSD. ..........................11

                i. The Surplus Property Act of 1944. ...............................12

                ii. Current Law. ................................................................13

            c. Federal Rules, Regulations, and Other Authorities Prohibit MWSD's Proposed Partial Taking. ...............................15

                i. Part 155 Of Title 14 Of The Code Of Federal Regulations. ........15

                ii. FAA Airport Grant Assurances. ...................................17

                iii. FAA Order 5190.6A. ....................................................18

    C. Federal Jurisdiction is Conferred By Sections 1346 and 2409a. ............6

    D. MWSD's Jury Trial Argument Ignores the Court's Ability to Permit a Jury to Try Certain Issues. ...................................................................19

**TABLE OF CONTENTS:** (continued)                                    **Page(s)**

V.    CONCLUSION.................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**California Cases**

*People v. Simon Newman Co.*
  37 Cal. App. 3d 398 (1974) ...............................................................................................6

**California Statutes**

Code Civ. Proc. § 1240.040 ...............................................................................................8

Code Civ. Proc. § 1245.230 ...............................................................................................8

**Federal Statutes**

28 U.S.C. § 1346(f) .............................................................................................................7

28 U.S.C. § 1331 .............................................................................................................1, 6

28 U.S.C. § 1346 ................................................................................................................1

28 U.S.C. § 1441 .............................................................................................................1, 6

28 U.S.C. § 2409a ..............................................................................................................1

49 U.S.C. § 47107(b) .......................................................................................................19

49 U.S.C. § 47151(a)(1)(A)-(C) ......................................................................................14

49 U.S.C. § 47152(1) .......................................................................................................14

49 U.S.C. § 47152(8) .......................................................................................................15

49 U.S.C. §§ 47151-47153 ..............................................................................................13

**Other Federeal Authorities**

14 C.F.R. § 155.11 ...........................................................................................................15

14 C.F.R. § 155.11(c)(10) ................................................................................................16

14 C.F.R. § 155.11(c)(4), (c)(7) ......................................................................................16

14 C.F.R. § 155.3(a)(1) ....................................................................................................16

64 Fed. Reg. 7696 .........................................................................................................3, 17

Act of July 30, 1947, Pub. L. No. 80-289 ..................................................................12, 13

FAA Airport Assurances (3/2005) ...................................................................................17

FAA Order 5190.6A ...........................................................................................10, 18, 19

# I.    INTRODUCTION

Montara Water and Sanitary District ("MWSD"), by way of its motion to remand, seeks to prevent this Court from addressing the numerous federal issues that are implicated by MWSD's eminent domain action to take title to the wells at the Half Moon Bay Airport.  MWSD argues that the United States has no interest in the subject property and accordingly that no removal jurisdiction exists. However, at the center of MWSD's argument is a fallacy that must be rejected by this Court:  namely, that there are no federal issues that relate to MWSD's eminent domain action simply because MWSD claims it is taking the wells "subject to" federal interests.  As shown below, MWSD is well-aware of the complicated federal issues implicated by its efforts to take the subject property "subject to the interest of the federal government."  Mot. at 3 (emphasis omitted).  Any such attempt to take the property while carving-out federal interests implicates federal law in a manner that prohibits MWSD's eminent domain action in the first instance.  The 1948 deed by which the subject property was originally granted to the County of San Mateo (the "County") contains a reversionary clause that unambiguously gives the United States an interest in the property when a party like MWSD seeks to obtain it without the approval of the federal government.  Because of this reversionary interest, which is triggered by *any* attempt to transfer *any* interest in the subject property without federal approval, it is nonsensical for MWSD to argue that it can take the property "subject to" the federal government's interests.  Because the federal government has not given its approval for any such transfer, as a matter of law MWSD cannot take any interest in the subject property—there is simply no interest to be had without federal approval.  This reality is bolstered by other federal laws, rules, and regulations, all of which prohibit the very kind of transfer that MWSD is attempting by way of its eminent domain action.

Accordingly, the federal government unquestionably has an interest in this litigation, such interest being sufficient under Sections 1331 and 1441 of Title 28 of the United States Code to confer federal jurisdiction.  And the United States's mere *claim* of an interest in the subject property, regardless of whether such a claim is eventually substantiated, is sufficient to confer federal jurisdiction under Sections 1346 and 2409a of Title 28 of the United States Code.  For these reasons, MWSD's motion to remand this case must be denied.

## II.    RELEVANT BACKGROUND

### A.    The Half Moon Bay Airport and its History.

The Half Moon Bay Airport (the "Airport") is located on the Northern California coast about twenty miles south of San Francisco, and it has served a variety of roles over the years. It is and will continue to be an important business, transportation, and emergency service asset to San Mateo County and the Bay Area.

The Airport was originally constructed by the California State Highway Department for the United States Army in 1942. The County acquired the relevant portion of the Airport from the United States—pursuant to the Surplus Property Act of 1944—by way of a deed dated September 26, 1947, and recorded on May 25, 1948 (the "1948 Deed", attached as Exhibit A to the Declaration of Glenn M. Levy In Support Of San Mateo County's Opposition to Motion to Remand (the "Levy Decl."), filed concurrently herewith). The deed provides that the County's acceptance of the deed evidenced the County's acceptance of covenants that "shall run with the land," including a requirement that "the property transferred [by the deed] may be successively transferred *only with the approval of the Civil Aeronautics Administration* ('*CAA*') *or its successor agency*…." Levy Decl. Ex. A at 6:31-32, 8:12-14 (emphasis added). The deed goes on to state that upon the breach of any its restrictions, the title, right of possession, and any and other rights transferred to the County by the United States "shall at the option of the party of the first part revert to the party of the first part." *Id.* at 8:24-26. In other words, the United States still maintains a revisionary interest in the property.

At the time of the 1948 transfer, and at all times since, the federal government has restricted the use of the airport land and the County's authority to further transfer *any* of the Airport property. The deed-based, statutory, and rule-based restrictions discussed in more detail below include requirements that the land be used to support the airport and that any attempt to transfer the land or otherwise remove the land from the restrictions be done only upon request of the County *and* with subsequent written approval from the United States Secretary of Transportation. No such request or approval has been made or given here. *See* Levy Decl. ¶ 2.

### B.    The Airport's Finances and Associated Grant Restrictions.

The Airport receives no money from the County General Fund. *See* Levy Decl. Ex. B [Decl. of

Airport Manager] at ¶ 5.  Its operation and maintenance are primarily paid for by an "Enterprise Fund," the revenues for which come primarily from fees and rent obtained from airport users and related business.  *Id.*  Those revenues include fees paid until recently by MWSD for the use of property on the Airport.  *Id.*  The FAA requires that the County charge fair market value for all services that the County provides at the Airport.

In addition to its "self-supporting" activities, the Airport historically has received and currently receives federal funds for Airport operation and maintenance.  *Id.* Ex. B at ¶ 6.  Receipt of those funds, as discussed below, is subject to "grant assurances" that include restrictions similar to those in the 1948 Deed regarding the uses to which Airport property may be made.  For example, the United States Department of Transportation, through the Federal Aviation Administration, has promulgated regulations requiring that the Airport have a fee and rental structure "that will make the airport as self-sustaining as possible under the particular airport circumstances, in order to minimize the airport's reliance on Federal funds and local tax revenues."  64 Fed. Reg. 7696, 7710 (Feb. 16, 1999), attached to Levy Decl. as Ex. C.  As stated by the FAA, "[t]he County, as a recipient of numerous federal grant agreements under the Airport Improvement Program (AIP) must operate and maintain the airport in compliance with FAA airport design and planning criteria."  Levy Decl. Ex. B [Airport Manager Decl.] at p. 2 of Ex. A thereto [Apr. 19, 2007 letter from FAA to Half Moon Bay Airport Manager].  Other grant assurances upon which the Airport's receipt of federal funding is conditioned include requirements that the County **maintain clear title** to the Airport and that the Airport be self-sustaining, such as through collection of revenues from non-airport uses like revenues generated by the wells.

Despite the County's objection to the condemnation of this property by MWSD, despite federal regulations mandating that the Airport be as self-sustaining as possible, despite the restrictions in the deed, statutes, and rules, and notwithstanding the Federal Aviation Administration's objection to the eminent domain action, MWSD seeks title to the wells and the related easements for one main purpose: to reduce the amount of money it pays the County to obtain the water from the wells.  There is no dispute that the County has been willing to continue to let MWSD have access to the water it extracts from the wells, yet MWSD is not content to pay the fees which is has paid for years.  In fact, the County has offered and MWSD has rejected the offer of negotiating a long term lease to MWSD, and the FAA has

1  said that it would approve the concept of a long-term lease.

2      **C.     Montara Water and Sanitary District.**

3      According to its 2004 Water System Master Plan, MWSD provides water, sewer, and trash

4  disposal services to the coastal communities of Montara, Moss Beach, and adjacent areas located north of

5  Half Moon Bay and south of Pacifica, in San Mateo County, California.  Three of the wells from which

6  MWSD has obtained water are located on Airport property (the "Airport Wells" or "subject property").

7  *See* Complaint ¶ 2 & Ex. B at 4.  Each of those wells is located on property transferred to the Airport by

8  the federal government pursuant to the 1948 Deed.  *See* Levy Decl. Ex. D [Public Works Decl.] at ¶¶ 2-

9  17 & Ex. A thereto [Airport map]; *see also* Complaint ¶ 3 & Ex. B at 4.

10     Use of the Airport Wells by MWSD has been pursuant to a revocable encroachment permit issued

11 to MWSD's predecessor in interest and assigned to MWSD in 2004.  *See* Complaint ¶ 3 ("Plaintiff has a

12 *Revocable Encroachment Permit* (REP) from the Defendant to operate and maintain the Airport Wells on

13 County land"); *see also* Levy Decl. at Ex. B ¶ 7; Levy Decl. Ex. E at 3, 12 [document titled "Revocable

14 Encroachment Permits" and attached as part of Exhibit B to MWSD's Complaint].  The permit allows

15 MWSD to use the property to extract water from the wells in exchange for a fee that is determined by

16 multiplying a rate times the number of "acre feet" of water that MWSD extracts.  *See* Levy Decl. Ex. E

17 at 7.  In the most recent year for which it paid the full amount owed (2006), MWSD paid the County

18 $60,267.00 for the water extracted from the property.  *See* Levy Decl. Ex. B at ¶ 8.  All fees paid by

19 MWSD pursuant to the Revocable Encroachment Permits are deposited into the Airport Enterprise Fund

20 and are used by the County to support the operation and maintenance of the Airport.  *Id.*  Per the terms of

21 the revocable encroachment permit, "the Airport Enterprise Fund will receive approximately $70,000 to

22 $80,000 per year, based on the current amount of water extracted from the wells each year."  Levy Decl.

23 Ex. E at 13.

24     **D.     MWSD's Efforts To Take The Property By Eminent Domain.**

25     On April 19, 2007, the MWSD Board considered and adopted a Resolution of Necessity

26 authorizing institution of eminent domain proceedings against the County to obtain title to the property

27 upon which the Airport Wells exist and related access easements.  *See* Levy Decl. Ex. F.  The County

28 opposed adoption of the Resolution of Necessity and pointed out that condemnation was inappropriate

1  because of the deed restrictions, the federal government's opposition, and the fact that the County's

2  ownership and use of the property constituted a "more necessary public use." *Id.* ¶ 9.  The County also

3  advised that the FAA, the successor agency to the CAA and now a part of the federal Department of

4  Transportation, has expressly withheld its approval of the transfer of the airport well sites, whether by

5  eminent domain or any other transfer of title.  *Id.*  (As stated by the FAA, "The Federal Aviation

6  Administration (FAA) is the successor federal agency responsible for the federal oversight of the lands

7  conveyed under the War Assets Administration (WAA) deed dated September 26, 1947," and "[t]he

8  FAA is not in favor of a sale of the property for the well sites identified in the County's facsimile

9  transmittal [regarding MWSD's eminent domain proceedings.]"  Levy Decl. Ex. B at pp. 1-2 of Ex. A

10  thereto.)  However, after the County refused to sell the Airport Wells to MWSD for approximately

11  $5,000, MWSD filed its complaint, which seeks title to the Airport Wells through a single cause of

12  action.

13      Following the Superior Court's issuance of an Order of Possession in December 2007, the FAA

14  issued a "Notice of Intent to Exercise Reverter" to the well sites.  On March 21, 2008, the FAA

15  submitted to the County Recorder a "Notice of Reverter," which made clear to MWSD and the County

16  its intent to exercise the reverter.  And most recently, the FAA's motion for leave to intervene in this

17  case, expressing its intent to directly oppose MWSD's efforts, was granted, subsequent to which the FAA

18  removed this case to the United States District Court for the Northern District of California.

19

20  **III.    THERE WAS NO WAIVER BY THE UNITED STATES DURING ITS EFFORT TO
         INTERVENE.**

21      The County agrees with the arguments contained in the Part A of the United States of America's

22  Memorandum in Opposition to Plaintiff's Motion to Remand the Action to Superior Court of California,

23  Santa Clara County (the "U.S. Opposition") regarding the lack of a waiver by the United States of its

24  right to removal.  The County also points out that during proceedings before the Santa Clara County

25  Superior Court that occurred *before* the United States was granted leave to intervene, even the Judge

26  setting the trial date understood that the United States was likely to remove the case.  During the course

27  of a trial setting conference, a discussion of the United States's pending motion to intervene occurred, in

28  response to which the Honorable Mary Jo Levinger suggested that if leave to intervene were granted, the

1   United States was likely to immediately remove the case to federal court. *See* Levy Decl. ¶ 3. It is

2   simply not credible to suggest that the United States "unequivocal[ly] inten[ded] to concede to the

3   jurisdiction of the Santa Clara County Superior Court" and consented to waive its right to remove the

4   action when a judge of that very same court understood that removal was a likely outcome if leave to

5   intervene was granted. Opp. at 9.

6   **IV.     FEDERAL JURISDICTION IS APPLICABLE NOTWITHSTANDING MWSD'S**
7   **         OVERSIMPLIFICATIONS.**

8       In trying to argue that no federal jurisdiction exists, MWSD misstates the law and grossly

9   oversimplifies the nature of this dispute. Neither its misstatement of the law nor its oversimplification

10  supports granting the requested remand, and, as shown below, federal law is at the heart of whether

11  MWSD can even attempt to obtain the subject property.

12      **A.     Federal Jurisdiction is Conferred By Sections 1331 and 1441.**

13      As is shown by the motion to remand and the U.S. Opposition, both MWSD and the United States

14  claim fee simple ownership of the subject property in relation to their respective arguments for and

15  against remand. *See* Mot. at 5 n.1; U.S. Opposition at 7-9. Regardless of who currently has title to the

16  subject property, the arguments made by the United States in Part B of its opposition show at a minimum

17  that the United States has an interest of some kind in the subject property. Accordingly, jurisdiction is

18  proper under Sections 1331 and 1441 of Title 28 of the United States Code and related authorities.[1]

19      **B.     Federal Jurisdiction is Conferred By Sections 1346 and 2409a.**

20      The discussion below makes clear that the United States clearly has a reversionary interest in the

21

22  [1]  In relationship to MWSD's arguments, the County unconditionally rejects the claim by MWSD that
23  the Order of Possession grants MWSD fee title in the subject property. *See* Mot. at 5 n.1. The
    authority is clear that an Order of Possession in the context of state eminent domain proceedings
24  confers a right of occupation and use but not of fee title. The very case cited by MWSD, *People v.
    Simon Newman Co.*, 37 Cal. App. 3d 398 (1974), notes that the rule being discussed is strictly applied
25  and that the exception—which itself does not transfer actual title—is applicable only where sufficient
    consequences such as removal of buildings and construction of new structures on the land at issue
26  occurs. *People v. Simon Newman Co.*, 37 Cal. App. 3d at 404-05. Here, no such sufficient
    consequences exist. Although MWSD was erroneously granted an Order of Possession, it certainly
27  does not have fee ownership in a manner that would defeat federal jurisdiction. The County also
    objects to MWSD's conclusory statement regarding the 1987 well site. *See* Mot. at 6 n.3.
28

subject property on account of MWSD's actions.  Based on this interest, there is therefore no doubt that the Quiet Title Act accordingly confers federal jurisdiction.  Furthermore, it is not relevant whether the United States is ultimately found to actually have title or even to have an interest in the property:  "The district courts shall have exclusive original jurisdiction of civil actions under section 2409a to quiet title to an estate or interest in real property *in which an interest is claimed by the United States*."  28 U.S.C. § 1346(f) (emphasis added).  Here, MWSD cannot contest that the Untied States is *claiming* an interest.  *See* U.S. Opposition, *passim*.  Because Section 1346 confers jurisdiction where the United States merely claims an interest, regardless of whether that claim is eventually found to be meritorious, removal was proper and the motion to remand should be denied.  As argued by the United States in Part C of its opposition, based on this claim of an interest, federal jurisdiction is proper.

## C.    MWSD Incorrectly Argues That it Can Obtain Title to the Airport Wells "Subject to" the Interests of the United States.

In support of its argument, MWSD points out that its complaint purports to take the property at issue "subject to the interest of the federal government" and accordingly that the United States has no interest in this litigation.  Mot. at 3 (emphasis omitted); *see also id.* at 4, 7.  MWSD also decries that "[t]here is no construction or application of federal law involved in the underlying Eminent Domain state law case" and that "[f]ederal law has no relevance to the State Eminent Domain action."  *Id.* at 2, 4.  Both of these assertions are based on the same false premise.  Contrary to MWSD's hopes, by operation of the original quitclaim deed by which the subject property was granted to the County, as well as the related federal regulatory scheme, it is legally impossible for MWSD to obtain fee interest in the subject property while purporting to carve-out certain rights belonging to the United States.  Put another way, federal law prohibits MWSD from obtaining the subject property at all, let alone in a manner that is "subject to the interest of the federal government."  Accordingly, MWSD's related arguments that the United States has no interest in this litigation and therefore that the case should be remanded are false.

### 1.    MWSD's Own Board Did Not Authorize Taking the Airport Wells Subject to Any Restrictions.

To begin with, MWSD's own board did authorize limiting its acquisition of the subject property in the manner claimed by MWSD in its motion.  Under California law, in order to claim land through

1    eminent domain a public entity must first adopt a resolution of necessity setting forth the need for the

2    acquisition. *See* Cal. Code Civ. Proc. § 1240.040. The resolution also most state "the extent of the

3    property to be taken…." *Id.* § 1245.230. MWSD adopted such a resolution in April 2007. *See* Levy

4    Decl. Ex. F. That resolution makes clear that MWSD was directed by its board to take title *in fee simple*

5    to the *entirety* of the subject property and that no carving-out of the federal government's interest was

6    authorized:

7              [P]ublic interest and necessity require the acquisition and continual
               operation by MWSD of **all right, title and interest in and to the lands,**
8              **easements, property, water, water rights, if any, rights and interests in**
               **and to the real property**, including access to real property…

9

10   *Id.* at 1 (emphasis added). Accordingly, it is clear that MWSD's subsequent attempt to carve-out the

11   federal government's interests is an unauthorized attempt to avoid permitting the United States to

12   intervene.[2]

13               2.    **The 1948 Deed and Related Federal Laws and Regulations Prohibit MWSD's**
                      **Efforts to Take the Subject Property "Subject to" the Interests of the United**
14                    **States.**

15         At a more fundamental level, MWSD's efforts to carve-out federal rights from its attempted

16   taking are simply not permitted, regardless of whether any such effort was authorized by the MWSD

17   board. As outlined below, the original quitclaim deed that transferred the subject property from the

18   United States to the County includes a revisionary interest that prohibits the subsequent transfer of any

19   interest in the subject property from the County to any other party without the express consent of the

20   United States. When the transfer of such interests in the subject property occurs, the United States has a

21   unilateral right to exercise a reverter to reclaim fee title in the subject property. Here, it is clear that both

22   the County and the United States repeatedly opposed any attempt by MWSD to take the property.

23   Federal rules and regulations also prohibit this kind of piecemeal taking of airport property from the

24

25   [2]    Accordingly, MWSD's argument that California law limits the scope of what it can obtain through
           eminent domain is a red herring. *See* Mot. at 10-11. The adoption of the resolution of necessity by
26         MWSD's board already set forth the scope of the taking—title in fee simple *without any*
           *restrictions*—and accordingly it does not make sense that MWSD, by operation of the removal to
27         federal court, is somehow being forced to take something more than what it already stated it required
           when adopting the resolution of necessity.
28

1  County.  Accordingly, it is legally impossible for MWSD to obtain *any* interest in the land without

2  having the entirety of the subject property revert to the United States at the option of the United States.

3  As such, there is no property that is not subject to federal interests which can be taken by MWSD by way

4  of eminent domain.

5          The County has already filed a summary judgment motion arguing that MWSD's entire eminent

6  domain proceeding is preempted both by the express language of the 1948 Deed and by a comprehensive

7  federal statutory and regulatory scheme that predates even that quitclaim deed.  *See* Levy Decl. Ex. G

8  [Memorandum in Support of Summary Judgment Motion].  Although the hearing on the summary

9  judgment motion, which was filed in state court, was taken off-calendar by operation of the removal,

10  MWSD has already agreed to have a new version of the County's preemption-based summary judgment

11  motion heard by this Court on October 31, 2008.  *See* Levy Decl. ¶ 10.  The County is not arguing that

12  the preemption defense asserted in the summary judgment motion confers jurisdiction for purposes of

13  removal.  Rather, the purpose of raising the preemption argument is to flesh out how the 1948 Deed and

14  associated regulatory scheme prohibit MWSD's efforts to take the subject property in the first instance

15  (let alone "subject to the interest of the federal government"), showing both that the dispute as to the

16  ownership of the property is still very much at issue and that MWSD's argument in support of remand

17  that the United States has no interest is false as a matter of law.

18                    a.     **The 1948 Deed Restrictions Prohibit a Partial Taking in the Manner**
19                           **Suggested by MWSD.**

20          The transfer of land from the United States to the County by way of the 1948 Deed was

21  predicated on restrictions that run with the land.  Among those restrictions are limitations on the use to

22  which the land in question can be put, as well as restrictions on the manner in which any interest in that

23  land subsequently can be transferred by the County.  MWSD's attempt to claim title to the property by

24  way of eminent domain violates both the limitations on use and the restriction on how interests in the

25  property can be transferred.

26          Any application of California eminent domain law must include consideration of the content of

27  the original deed granting the land to the County.  The 1948 Deed was entered into by the "UNITED

28  STATES OF AMERICA, acting by and through the War Assets Administration, *under and pursuant to*

1    *... the powers and authority contained in the provisions of the Surplus Property Act of 1944, as amended*,

2    and applicable rules, regulations and orders ...." Levy Decl. Ex. A at 2:4-7 (emphasis added). Thus, the

3    1948 Deed, both in being entered into by the United States pursuant to Congressional authorization and

4    rulemaking and in mirroring statutory language adopted by Congress (discussed in the next subsection),

5    reflects the purposes and objectives of Congress in relation to restrictions placed upon the subject

6    property. Those purposes and objectives are spelled out in detail by the deed.

7        Specifically, the 1948 Deed states that "all of the property transferred hereby, together with the

8    adjacent flight strip under the jurisdiction of the Public Roads Administrations, hereafter in this

9    instrument called the 'airport', *shall be used for public airport purposes, and only for such purposes*..."

10   Levy Decl. Ex. A at 5:27-30 (emphasis added). Thus, use for non-airport purposes of land transferred to

11   the County by the deed, as is sought by MWSD, is prohibited. As discussed in more detail in subsection

12   *b.i* below, such authorized purposes include use of the land to raise money to support the Airport. *See,*

13   *e.g.*, Levy Decl. Ex. H at 26, 28-29, ¶¶ 4-17(g), 4-18(f) [FAA Order 5190.6A] (noting that "income from

14   such use [be applied] to development, operation, and maintenance of airport facilities" and that "such

15   property, if not needed to directly support an aviation use, [be] available for use to produce income for

16   the airport"). Given that the land is currently being used for that purpose—*i.e.*, obtaining funds from

17   MWSD that are used by the County to support the Airport—MWSD's attempt to take title to the property

18   will frustrate this purpose. The five-thousand dollars offered by MWSD for title to the land does not

19   satisfy this requirement.[3]

20       Further, the 1948 Deed expressly states that "[b]y the acceptance of this deed or any rights

21   hereunder, [the County] also assumes the obligations of, covenants to abide by and agrees to, and this

22   transfer is made subject to, the following reservations and restrictions," including "[t]hat the property

23

---

24   [3]    Federal regulations refer to the ongoing use of land to generate revenues, not to the one-time sale of
        the land for a low fee. *See, e.g.*, Levy Decl. Ex. H at ¶ 4-17.g [FAA Order 5190.6A] ("The FAA may
25      approve *the interim use* of aeronautical property for nonaviation purposes *until such time as it is*
        *needed for its primary purpose*") (emphasis added). The FAA has also stated its opposition to the
26      sale in this case. *See* Levy Decl. Ex. B [Airport Manager Decl.] at p. 2 of Ex. A thereto [Apr. 19,
        2007 letter from FAA to Half Moon Bay Airport Manager] ("The FAA is not in favor of a sale of the
27      property for the well sites identified in the County's facsimile transmittal").

28

1   transferred hereby may be successively transferred *only with the approval of the Civil Aeronautics*

2   *Administration* or the successor Government agency *and* with the proviso that any such subsequent

3   transferee assumes all the obligations imposed upon [the County] by the provisions of [the 1948 Deed]"

4   Levy Decl. Ex. A at 6:28-31, 8:12-17 (emphasis added).  Not only has MWSD failed to obtain approval

5   from the FAA (the successor agency to the CAA), and not only has the FAA stated that it opposes

6   MWSD's efforts to obtain title to the land (*see* Levy Decl. Ex. B [Airport Manager Decl.] at p. 2 of Ex. A

7   thereto [Apr. 19, 2007 letter]), but in seeking to claim the land by way of eminent domain MWSD is

8   seeking to circumvent the requirements of this section of the deed.  Because this deed is the

9   implementation of federal policy regarding transfer of surplus federal property for public airports,

10  MWSD's complaint therefore seeks to directly frustrate federal policy.  Accordingly, MWSD's action

11  squarely implicates federal law.

12          Finally, the 1948 Deed states that "upon a breach of any of the aforesaid reservations or

13  restrictions by the [County] or any subsequent transferee, whether caused by the legal inability of [the

14  County] or subsequent transferee to perform any of the obligations herein set out, or otherwise, the title,

15  right of possession and all other rights transferred to [the County], or any portion thereof, shall at the

16  option of [the United States] revert to [the United States] upon demand made in writing by the War

17  Assets Administration or its successor Government agency…."  Levy Decl. Ex. A at 8:19-26.  By

18  seeking to obtain title to the land through eminent domain, MWSD is seeking to circumvent this clause

19  of the 1948 Deed (the "Reversion Clause").  Because the Reversion Clause is an express condition of the

20  federal government's transfer of the property to the County, any effort to take that property without

21  abiding by these terms constitutes an effort to frustrate Congress's purpose in making the original grant

22  and again implicates federal law.

23                      **b.      The Surplus Property Act of 1944 and Current Law Prohibit the**
                                  **Partial Taking Sought by MWSD.**
24

25          Not only does the language of the 1948 Deed prohibit MWSD's claimed partial taking, but both

26  the federal legislation that originally authorized the grant of the property by way of the 1948 Deed and all

27  subsequent modifications of that legislation confirm Congress's intent to prohibit entities like MWSD

28  from circumventing restrictions imposed on the use of land deeded to local government for public airport

1   use.  Given that the purposes shown by this legislation—namely, to support the creation, operation, and

2   maintenance of public airports by local governments, including by the imposition of restrictions on the

3   subsequent transfer of any property or interests given to those local governments by the federal

4   government—are the same as those discussed in the previous subsection, and given that those restrictions

5   have been in place for over sixty years, MWSD's attempt to use the land for other than Airport purposes

6   is directly in conflict with Congress's intent.  Accordingly, there is no question regarding the legal

7   prohibition on MWSD's efforts to take the property "subject to the interest of the federal government."

8                   i.        **The Surplus Property Act of 1944.**

9           As set out in the 1948 Deed, the property that was deeded to the County was transferred pursuant

10  to "the powers and authority contained in the provisions of the Surplus Property Act of 1944, as

11  amended…."  Levy Decl. Ex. A at 1:6-7.  The Surplus Property Act of 1944 ("the Act" or "the 1944

12  Act", a copy of which is attached as Exhibit M to the Levy Decl.) therefore provides both the context

13  under which the grant was made as well as the controlling federal law at the time of the transfer.  This

14  controlling federal law reflects the same policies that are implemented by the 1948 Deed.

15          The 1947 amendment to the Act states that the federal government may transfer property to any

16  local government for a public airport where (1) the transfer is "subject to the terms, conditions,

17  reservations, and restrictions hereinafter provided for" and (2) the transfer of the interest in that property

18  is "essential, suitable, or desirable for the development, improvement, operation, or maintenance of a

19  public airport … or [is] reasonably necessary to fulfill the immediate and foreseeable future requirements

20  of the grantee for the development, improvement, operation, or maintenance of a public airport, including

21  property needed to develop sources of revenue…."  Act of July 30, 1947, Pub. L. No. 80-289, as

22  reprinted in 1947 United States Code Congressional Service 673, 673-74, attached to Levy Decl. as Ex. I.

23  This provision mirrors the language in the 1948 Deed that the property was transferred to the County

24  subject to specific limitations on non-airport use of the property.  Moreover, this language indicates that

25  the transfer to the County was made for the development, improvement, operation, or maintenance of the

26  Airport and that one permissible use for the land was to develop a revenue stream to support the airport.

27  MWSD's effort to obtain the wells—which would have the effect of depriving the County from one of

28  the major airport-supporting revenue sources—would contradict this express federal purpose.

1    Also mirroring the language in the deed, the 1947 amendment to the Act states:

2    No property disposed of under the authority of this subsection shall be
used, leased, sold, salvaged, or disposed of by the grantee or transferee for
3    other than airport purposes without the written consent of the
Administrator of Civil Aeronautics, which consent shall be granted *only if*
4    *the Administrator of Civil Aeronautics determines that the property can be*
*used, leased, sold, salvaged, or disposed of for other than airport purposes*
5    *without materially and adversely affecting the development, improvement,*
*operation, or maintenance of the airport at which such property is*
6    *located...*

7    *Id.* at 674 (emphasis added).   Not only does this requirement track the one in the deed, meaning that

8    MWSD, as a party seeking to take the land from the County, cannot have the property without obtaining

9    written permission from the federal government, but it also indicates that permission *shall* not be granted

10   where the anticipated transfer would adversely affect the development, improvement, operation, or

11   maintenance of the airport.  As noted above, MWSD has not obtained such consent, and MWSD's

12   litigation, if successful, would deprive the County of this source of revenue, said revenue being an

13   important—and federally-mandated—source of financial support for the Airport.

14          Finally, the 1947 amendment to the Act also contains a reversion requirement similar to the 1948

15   Deed's Reversion Clause, stating that "[i]n the event that any of the terms, conditions, reservations, and

16   restrictions upon or subject to which the property disposed of is not met, observed, or complied with, all

17   the property so disposed of or any portion thereof, shall, at the option of the United States, revert to the

18   United States in its then existing condition." *Id.* at 675.  Again, MWSD's eminent domain action would,

19   if successful, read this requirement out of both the statute authorizing the transfer and the 1948 Deed that

20   memorialized it.

21                              **ii.    Current Law.**

22          Congressional intent in this regard has not changed in the sixty-one years since the 1947

23   amendment of the Act.  Although various aspects of the 1944 Act have been amended in the intervening

24   years, the relevant restriction reflected by the 1948 Deed and discussed above are still in effect today.

25   Specifically, Subchapter II of Chapter 471 of Section 49 of the United States Code covers the transfer

26   and use of surplus federal property for public airports.  *See* 49 U.S.C. §§ 47151-47153.  The first section

27   of that Subchapter discusses the purposes for which such land grants can be made, and the second section

28   discusses limitations that are required to be placed on such grants.  Both sections, as discussed below,

1    mirror the same strict limits found in the 1944 Act, and these policies consequently show Congress's

2    continuing intent to prevent state law—such as an exercise of eminent domain here—from frustrating the

3    Congressional purpose of restricting local government use of deeded airport property to uses benefitting

4    an airport.

5        At the outset, Section 47151 grants federal agencies the ability to transfer interest in surplus

6    federal property to local governments for airport use *only* where the Secretary of Transportation decides

7    that one of the following three conditions is present:

8            (1) the property interest to be transferred is "desirable for developing,

9                improving, operating, or maintaining a public airport";

10           (2) the transfer is "reasonably necessary to fulfill the immediate and

11               foreseeable future requirements for developing, improving, operating, or

12               maintaining a public airport"; or

13           (3) the transfer is "needed for developing sources of revenue from

14               nonaviation businesses at a public airport…."

15   49 U.S.C. § 47151(a)(1)(A)-(C).  These are the same conditions included in the 1944 Act discussed

16   above.

17       Section 47152, meanwhile, limits how local governments can dispose of an interest obtained from

18   the federal government for "other than airport purposes."  49 U.S.C. § 47152(1).  That section, just as the

19   Act, mandates that a local government can use such property "for other than airport purposes only after

20   the Secretary of Transportation gives written consent that the interest can be used, leased, salvaged or

21   disposed of without materially and adversely affecting the development, improvement, operation, or

22   maintenance of the airport at which the property is located."  *Id.*   Thus, current statutes show that even

23   non-airport uses of the land must not adversely affect the airport-related uses, and the Secretary of

24   Transportation must provide approval before any such non-airport use is permitted.  Here, MWSD has

25   not obtained such consent.  Moreover, the federal government, through the FAA, intervened for the

26   express purpose of objecting to MWSD's efforts to obtain the Airport Wells through eminent domain.

27   Yet in trying to obtain title to the Airport Wells, MWSD seeks to circumvent this federal restriction.

28       Finally, Section 47152 provides that "[w]hen a term under this section is not satisfied, any part of

1   the interest in the property reverts to the [federal] Government….” 49 U.S.C. § 47152(8).  This

2   reversionary policy mirrors the reversion in the 1948 Deed and the 1944 Act.  MWSD cannot obtain the

3   property in question by eminent domain without directly violating this reversionary restriction.

4          MWSD’s efforts, if successful, would directly frustrate the purpose of these restrictions by

5   depriving the Airport of important revenue used solely for support of the Airport.  Such attempted

6   circumvention of federal policy by MWSD is precisely what puts federal law at issue in this case (and is

7   why MWSD cannot take title “subject to the interest of the federal government”).

8                          c.      **Federal Rules, Regulations, and Other Authorities Prohibit MWSD’s**

9                                  **Proposed Partial Taking.**

10         As discussed in the next three subsections, federal rules implementing federal legislation in

11  relation to locally-owned airports further reflect restrictions on MWSD’s eminent domain effort, yet

12  again showing both how MWSD cannot take the property “subject to” the interests of the United States

13  and why federal law is squarely presented by its eminent domain action.

14                         i.      **Part 155 Of Title 14 Of The Code Of Federal Regulations.**

15         Part 155 of Title 14 of the Code of Federal Regulations is titled “Release of Airport Property from

16  Surplus Property Disposal Restrictions” and addresses efforts to remove restrictions of the kind placed by

17  the original 1948 Deed on the land at issue.  Section 155.11 requires that “[a] request for the release of

18  surplus airport property from a term, condition, reservation, or restriction in an instrument of disposal …

19  must be in writing and *signed by an authorized official of the public agency that owns the airport*.”  14

20  C.F.R. § 155.11 (emphasis added), attached to Levy Decl. as Ex. J.  Here, MWSD seeks title to property

21  that is subject to the reversion restriction in the 1948 Deed, and that property is currently owned *by the*

22  *County*.  Not only has MWSD not submitted a written request for release to the FAA, but it does not have

23  standing to do so since it is not “the public agency that owns the airport.”  *Id.*  In other words, MWSD

24  cannot, by definition, request a release.  And only MWSD contends the property at issue is surplus to the

25  Airport’s function.

26         Because MWSD seeks title without first seeking approval from the FAA, it is consequently

27  seeking a release in direct contravention of Section 155.11.  The County, as owner of the Airport Wells,

28  is the only entity authorized by federal law to request release of the applicable deed restrictions, and the

1    County has not sought such a release.  The FAA has also stated that it does not consider the Airport

2    Wells surplus in a manner that would warrant a release from these restrictions, even if properly

3    requested.  *See* Levy Decl. Ex. B [Airport Manager Decl.] at p. 2 of Ex. A thereto ("The FAA is not in

4    agreement that the land is no longer need for an airport purpose[,] … [and] [t]herefore, the land is not

5    considered surplus property and the FAA San Francisco Airports District Office would not recommend a

6    release of the federal agreement obligations to permit the sale of the property").  Use of California

7    eminent domain law as a vehicle for obtaining the land is thus inconsistent with the federal regulatory

8    requirement that the County request a release as a condition precedent to any transfer of such airport

9    property.

10    Section 155.11 provides additional bases for finding MWSD's purported carve-out of federal

11    rights improper.  "Each request for a release must include … [t]he purpose for which the property was

12    transferred, such as for use as a part of, or in connection with, operating the airport or for producing

13    revenues from nonaviation business," as well as "[a] statement of the circumstances justifying the release

14    on the basis" either that the property "no longer serves the purpose for which it was made subject to the

15    terms, conditions, reservations, or restrictions concerned" or that the requested release from those

16    conditions "will not prevent accomplishing the purpose for which the property was made subject to

17    [those conditions]…."  14 C.F.R. § 155.11(c)(4), (c)(7), 14 C.F.R. § 155.3(a)(1), (a)(2), attached to Levy

18    Decl. as Exs. J-K.  Because the land was originally deeded to the County for the purpose of the creation

19    and maintenance of a civil airport, because that is still the purpose of the use of that land, and specifically

20    because the County uses the money paid by MWSD for the water obtained from the wells for the purpose

21    of "producing revenues [for the airport] from nonaviation business," MWSD cannot show that its taking

22    of title will not frustrate the Congressional purpose in granting this land to the County in 1948.

23    Finally, Section 155.11 also requires that "[i]f the release would allow sale of any part of the

24    property," the party seeking the release must provide "a certified copy of a resolution or ordinance of the

25    governing body of the public agency that owns the airport obligating itself to use the proceeds of the sale

26    exclusively for developing, improving, operating, or maintaining a public airport."  14 C.F.R.

27    § 155.11(c)(10).  Again, MWSD cannot provide such a statement both because it does not own the

28    property at issue and because the County has not requested a release.  More importantly, in seeking title

1    for the land—even subject to some kind of carve-out of federal rights—MWSD is attempting to deprive

2    the County of the very kind of proceeds that this rule shows must be devoted to the Airport.  MWSD is

3    not proposing that it will make the realized gain from the taking of the property available to the County

4    for the development, improvement, operation, and/or maintenance of the Airport.  Rather, it seeks to

5    deprive the County of that ongoing source of revenue supporting the Airport, a goal that is directly

6    contrary to the Congressional intent.  Accordingly, federal regulations, along with the 1948 Deed and

7    federal statutes, show that MWSD cannot take the property subject to federal interests.

8                              **ii.    FAA Airport Grant Assurances.**

9            Other federal rules contain the same kinds of restrictions.  As noted above, the Airport

10   traditionally has received and continues to receive federal funds for its operation and maintenance.  The

11   Department of Transportation, through the FAA, has promulgated regulations that limit the uses to which

12   airport property can be used.  Such regulations include restrictions on uses of airport property where the

13   Airport receives federal funds:  "Each federally assisted airport owner/operator is required by statute and

14   grant assurance to have an airport fee and rental structure that will make the airport as self-sustaining as

15   possible under the particular airport circumstances, in order to minimize the airport's reliance on Federal

16   funds and local tax revenues."  64 Fed. Reg. 7696, 7710 (Feb. 16, 1999), attached to Levy Decl. as Ex. C.

17   Similarly, any federal grant for airport development or planning requires assurances from the airport

18   receiving such funds, including that the Airport "will maintain a fee and rental structure for the facilities

19   and services at the airport which will make the airport as self-sustaining as possible under the

20   circumstances existing at the particular airport…."  Levy Decl. Ex. L at 1, 10 [FAA Airport Assurances

21   (3/2005)].  The assurances also require that the Airport "not take or permit any action which would

22   operate to deprive [the Airport] of any of the rights and powers necessary to perform any or all of the

23   terms, conditions, and assurances in the grant agreement without the written approval of the Secretary [of

24   Transportation]", including that the Airport "not sell, lease, encumber, or otherwise transfer or dispose of

25   any part of its title or other interests in the property [referenced by the] application…."  *Id.* at 4.  And the

26   FAA has stated that MWSD's efforts, if successful, would threaten the Airport's ongoing federal support:

27   "Failure to comply with the notification and approval requirement procedures [as a result of MWSD's

28   eminent domain action] would subject the County to FAA enforcement action that could include the

1 | suspension of grant payments and withholding of future grant funding for [the Airport]."  Levy Decl. Ex.

2 | B [Airport Manager Decl.] at p. 2 of Ex. A thereto.

3 | **iii.    FAA Order 5190.6A.**

4 | Finally, in this regard the FAA has issued an order that "contains basic guidance for FAA

5 | personnel in interpreting and administering the various continuing commitments made to the United

6 | States by airport owners as a condition for the grant of Federal funds or the conveyance of Federal

7 | property for airport purposes."  Levy Decl. Ex. H at 13, ¶ 4-1 [FAA Order 5190.6A – Airport

8 | Compliance Requirements, dated Oct. 2, 1989].  Here, because the Airport is both subject to conditions

9 | to the conveyance of federal property and the required grant assurances, the FAA's order providing

10 | guidance is applicable.

11 | That order states in relation to "surplus property" conveyed to a local government under the

12 | Surplus Property Act, and specifically the 1947 amendment of the Act:

13 | 4-18. USE OF SURPLUS PROPERTY.

14 | **a.   General.**  Surplus airport properties conveyed under the authority of
15 | the Surplus Property Act, as amended by P.L. 80-289, impose upon the
    | grantee certain continuing obligations that are generally more
16 | comprehensive than the covenants and conditions discussed in previous
    | parts of this section. …  P.L.80-289 authorizes the conveyance of property
17 | over and above the required aeronautical facilities in order to permit the
    | grantees to have a source of continuing airport revenue.  To assure that this
18 | is accomplished, **the FAA insists that surplus properties associated with**
    | **a public airport including revenue generated therefrom be used to**
19 | **support the development, maintenance and operation of the**
    | **aeronautical facilities**.  (See paragraph f. below.)

20 | **b.   Obligations Run with the Land.**        There is a further distinction
    | between the obligations assumed under a grant project and those assumed
21 | by the recipient of a surplus airport Grant agreements are contracts with the
    | Government relating to airport facilities.  These run far a maximum
22 | specified term of years, or for the time the land is used for an airport,
    | whereas **the covenants of a surplus airport conveyance are in fact**
23 | **restrictions and encumbrances which condition the title to the land.**
    | **Thus, every acre of a surplus airport is held in trust for a specific**
24 | **purpose and usage.  The Surplus Property Act provides that property**
    | **shall not be used, leased, sold, salvaged or disposed of for other than**
25 | **airport purposes without the consent of the Administrator.**  This
    | reflects a degree of administrative flexibility to adjust the usage in a
26 | surplus property deed for specific areas of a surplus airport within the
    | spirit, intent and objectives of the law.

27 | *        *        *

28 | **f.  Leasing of Surplus Airport Properties.**

Case No. 5:08-cv-02814-JF                    -18-

… **<u>At airports which include Federal surplus property acquired for airport purposes, there is a further obligation to ensure that such property, if not needed to directly support an aviation use, is available for use to produce income for the airport</u>**.

*Id.* Ex. H at 28-29, ¶¶ 4-18(a), (b), (f) (bold in original, underlined bold added). Thus, the FAA's order regarding interpretation of federal statutes and regulations is clear that surplus land of the type at issue here is subject to strict controls, including that the land and revenues gained therefrom be used solely for Airport purposes. These rules are authorized by federal statutes, which also require the same restrictions on the uses to which airport property may be made. *See* 49 U.S.C. § 47107(b) ("The Secretary of Transportation may approve a project grant application under this subchapter for an airport development project only if the Secretary receives written assurances, satisfactory to the Secretary, that … the revenues generated by a public airport will be expended for the capital or operating costs of – (A) the airport; (B) the local airport system; or (C) other local facilities owned or operated by the airport owner or operator and directly and substantially related to the air transportation of passengers or property").

\*        \*        \*

In light of the deed restrictions, federal laws, and this body of federal rulemaking, the federal government has a reversionary interest in any portion of the property that MWSD seeks to obtain by way of its eminent domain action. Because by definition all such interests are subject to the 1948 Deed's reversionary clause, no interest remains that MWSD can claim "subject to" the federal government's interests. For this reason, MWSD's argument that no federal issues are implicated and that the United States has no place in this litigation are false. That argument accordingly does not defeat removal or require remand.

### D.    MWSD's Jury Trial Argument Ignores the Court's Ability to Permit a Jury to Try Certain Issues.

Finally, MWSD's argument that its "absolute right to a trial by jury on the issue of just compensation in [its] eminent domain case" requires remand of this case is nonsensical. Mot. at 13. To the extent that Section 2409a(f) prohibits a jury trial on certain issues, that section does not prohibit the Court from bifurcating for jury trial issues that require a jury trial under California law. Accordingly, this argument does not mandate remand of this case.

1  **V.    CONCLUSION**

2          As shown above, MWSD's motion for remand is predicated on the false claim that the United

3  States has no interest in the subject property.  Whether looking at the federal government's

4  unquestionable reversionary interest with respect to Sections 1331 and 1441 or merely its good-faith

5  claim to have an interest with respect to Sections 1346 and 2409a, either way the Court has jurisdiction to

6  hear this case.  MWSD's other arguments to the contrary are unavailing.  For these reasons, the motion

7  should be denied.

8
   Dated:  August 29, 2008                        Respectfully submitted,
9
10                                                 MICHAEL P. MURPHY, COUNTY COUNSEL
                                                    David A. Levy, Deputy
11                                                  Glenn M. Levy, Deputy

12
13                                                 By: _____/s/_____
                                                       Glenn M. Levy, Deputy
14
15                                                 Attorneys for Defendant
                                                   COUNTY OF SAN MATEO
16
17
18
19
20
21
22
23
24
25
26
27
28