MICHAEL P. MURPHY, COUNTY COUNSEL (SBN 83887)
By: David A. Levy, Deputy (SBN 77181)
By: Glenn M. Levy, Deputy (SBN 219029)
Hall of Justice and Records
400 County Center, 6th Floor
Redwood City, CA  94063
Telephone: (650) 363-4250
Facsimile:  (650) 363-4034
E-mail:  dlevy@co.sanmateo.ca.us; glevy@co.sanmateo.ca.us

Attorneys for Defendant
COUNTY OF SAN MATEO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONTARA WATER AND SANITARY DISTRICT,<br><br>   Plaintiff,<br><br> vs.<br><br>COUNTY OF SAN MATEO, a political subdivision of the State of California; and Does 1 to 20, inclusive,<br><br>   Defendants.<br>―――――――――――――――――――<br>THE UNITED STATES OF AMERICA,<br><br>   Intervenor. | Case No. 5:08-cv-02814-JF<br><br>**DECLARATION OF GLENN M. LEVY IN SUPPORT OF DEFENDANT COUNTY OF SAN MATEO'S OPPOSITION TO MWSD'S MOTION TO REMAND**<br><br>Date:   September 19, 2008<br>Time:   9:00 a.m.<br>Courtroom: 3 (Hon. Jeremy Fogel)<br><br>Action Filed: May 17, 2007<br>Trial Date: None set |

I, Glenn M. Levy, hereby declare as follows:

1.    I am a Deputy County Counsel for the County of San Mateo.  I submit this declaration in support of the Opposition to MWSD's Motion to Remand, filed concurrently with this declaration by the County of San Mateo.  The following is within my personal knowledge, and if called as a witness, I could and would testify competently as to these matters.

2.    I am familiar with the background of this case, including communications between Montara Water and Sanitary District ("MWSD") and the County of San Mateo (the "County").  Federal rules and regulations of which I am aware include requirements that the land at issue in this case be used to support the Half Moon Bay Airport (the "Airport") and that any attempt to transfer that land or otherwise remove that land from the restrictions contained in the deed that conveyed the Airport to the County be done only upon request of the County *and* with subsequent written approval from the United States Secretary of Transportation.  No such request or approval has been made or given here.

3.    On April 29, 2008, I attended a trial setting conference held before the Honorable Mary Jo Levinger of the Santa Clara County Superior Court in relation to the proceeding originally brought by MWSD.  During those proceedings, which occurred *before* the United States was granted leave to intervene, the Judge setting the trial date understood that the United States was likely to remove the case.  Specifically, during the course of a trial setting conference, a discussion of the United States's pending motion to intervene occurred, in response to which the Judge Levinger suggested that if leave to intervene were granted, the United States was likely to immediately remove the case to federal court.

4.    Attached as Exhibit A to this declaration is a true and correct copy of a deed dated September 26, 1947, executed by the United States of America, and the accompanying San Mateo County Board of Supervisors Resolution No. 3454 accepting the deed, both of which were recorded with and copies of which were obtained from the Office of the County Clerk-Recorder, San Mateo County, California.

5.    Attached as Exhibit B to this declaration is a true and correct copy of the declaration of Mark Larson, filed by the County with the San Mateo Superior Court in relation to this action on April 21, 2008.

1      6.      Attached as <u>Exhibit C</u> to this declaration is a true and correct copy of 64 Fed. Reg. 7696

2   (Feb. 16, 1999).

3      7.      Attached as <u>Exhibit D</u> to this declaration is a true and correct copy of the declaration of

4   James Colin Porter, filed by the County with the San Mateo Superior Court in relation to this action on

5   April 21, 2008.

6      8.      Attached as <u>Exhibit E</u> to this declaration is a true and correct copy of an excerpt of Exhibit

7   B to the Complaint filed by MWSD with the San Mateo Superior Court on May 17, 2007, in relation to

8   this action, said excerpt containing a document titled "Revocable Encroachment Permits."

9      9.      Attached as <u>Exhibit F</u> to this declaration is a true and correct copy of the Resolution of

10   Necessity adopted by MWSD on April 19, 2007, in relation to this action.  I am familiar with the

11   background relating to the adoption of that resolution by MWSD.  The County opposed adoption of the

12   Resolution of Necessity and pointed out that the requested condemnation was inappropriate because of

13   the restrictions contained in the deed that transferred the Airport to the County, the federal government's

14   opposition, and the fact that the County's ownership and use of the property constituted a "more

15   necessary public use."  At the time of the adoption of the Resolution of Necessity, the County also

16   advised MWSD that the FAA has expressly withheld its approval of the transfer of the Airport well sites,

17   whether by eminent domain or any other transfer of title.

18      10.     Attached as <u>Exhibit G</u> to this declaration is a true and correct copy of the memorandum of

19   points and authorities in support of the County's motion for summary judgment filed by the County with

20   the San Mateo Superior Court in relation to this action on April 21, 2008.  Although the hearing on the

21   County's summary judgment motion was taken off-calendar by operation of the removal of this action by

22   the United States, MWSD has already agreed to have a new version of the County's preemption-based

23   summary judgment motion heard by this Court on October 31, 2008.

24      11.     Attached as <u>Exhibit H</u> to this declaration is a true and correct copy of FAA Order 5190.6A

25   – Airport Compliance Requirements, dated Oct. 2, 1989.

26      12.     Attached as <u>Exhibit I</u> to this declaration is a true and correct copy of the Act of July 30,

27   1947, Pub. L. No. 80-289, as reprinted in 1947 United States Code Congressional Service 673.

28      13.     Attached as <u>Exhibit J</u> to this declaration is a true and correct copy of 14 C.F.R. § 155.11.

1    14.    Attached as <u>Exhibit K</u> to this declaration is a true and correct copy of 14 C.F.R. § 155.3.

2    15.    Attached as <u>Exhibit L</u> to this declaration is a true and correct copy of the FAA Airport

3    Assurances (3/2005).

4    16.    Attached as <u>Exhibit M</u> to this declaration is a true and correct copy of the Surplus

5    Property Act of 1944, Pub. L. No. 78-457, as reprinted in 1944 United States Code Congressional

6    Service 764.

7

8    I declare under penalty of perjury of the laws of the State of California that the foregoing is true

9    and correct and is executed at Redwood City, California, this 29th day of August 2008.

10

11    _ _____
                              /s/
12                        Glenn M. Levy

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **<u>Exhibit A</u>**

VOL 1521 PAGE 1

IN THE BOARD OF SUPERVISORS,
COUNTY OF SAN MATEO, STATE OF CALIFORNIA.

RESOLUTION NO. 8454

BE IT RESOLVED that the attached **QUITCLAIM DEED** dated **September 26, 1947** from **UNITED STATES OF AMERICA Acting by and Through War Assets Administration** to the COUNTY OF SAN MATEO, be and it is hereby accepted, and that the Recorder of the County of San Mateo, be and he is hereby requested and authorized to place said **QUITCLAIM DEED** of record.

Regularly passed and adopted by order of the Board of Supervisors this **24th** day of **May** , 19 **48** .

Chairman, Board of Supervisors,
County of San Mateo, State of
California.

ATTEST: W. H. AUGUSTUS (SEAL)
Clerk.

(Endorsed)
BOARD OF SUPERVISORS
F I L E D
MAY 24 1948
W. H. AUGUSTUS, Clerk
PAGE

STATE OF CALIFORNIA,)
                     ) ss.
County of San Mateo.)

I, W. H. AUGUSTUS, County Clerk and ex-officio Clerk of the Board of Supervisors of the County of San Mateo, State of California, do hereby certify that the foregoing is the true and correct copy of the original resolution as adopted by the Board of Supervisors **May 24th, 1948** , accepting deed from **UNITED STATES OF AMERICA Acting by and Through War Assets Administration** .

WITNESS my hand and seal this 24th day of **May** 19 **48** .

County Clerk and ex-officio Clerk
of the Board of Supervisors.

**32951H**

(31)

RECORDED AT REQUEST OF
W. H. Agustus
MAY 25 1948
AT 30 MIN. PAST 9 A.M
VOL 1521 OFFICIAL PAGE 1
SAN MATEO COUNTY RECORDS
W. H. RECORDER
BY
DEPUTY RECORDER

VOL 1521 PAGE 2

Half Moon Bay Flight Strip
W-Calif-184

1
2

### QUITCLAIM DEED

3    THIS INDENTURE, made this 26 day of Sept ,1947,

4  between the UNITED STATES OF AMERICA, acting by and through the War Assets

5  Administration, under and pursuant to Executive Order 9689, dated January 31,

6  1946, and the powers and authority contained in the provisions of the Surplus

7  Property Act of 1944, as amended, and applicable rules, regulations and

8  orders, party of the first part, and COUNTY OF SAN MATEO, a body politic under

9  the laws of the State of California, acting by and through its Board of

10  County Supervisors, party of the second part;

11    WITNESSETH:  That the said party of the first part, for and in

12  consideration of the assumption by the party of the second part of all the

13  obligations and its taking subject to certain reservations, restrictions and

14  conditions, and its covenant to abide by and agree to certain other

15  reservations, restrictions, and conditions, all as set out hereinafter, has

16  remised, released, and forever quitclaimed and by these presents does remise,

17  release and forever quitclaim to the said party of the second part, its

18  successors and assigns, under and subject to the reservations, restrictions

19  and conditions, exceptions, and reservation of property and rights herein-

20  after set out, all its right, title, and interest in the following described

21  property situated in the County of San Mateo, State of California, to wit:

22    BEGINNING at a point in the southeasterly line of
23  Marine View Terrace Tract, which bears N. 29° 19' E.,
     1110.54 ft. and N. 43° 00' W., 1579.39 ft. from the most
24  easterly corner of Lot 1 in Block 26 of the Riviera Ocean
     Villa Tract, as per map thereof filed for record in Book
25  6 of Maps at page 20, Records of San Mateo County, thence
     N. 28° 42' 45" E. 1700 ft. more or less to the southwesterly
26  line of the County Road (now a State Highway) from Half Moon
     Bay to Marine View; thence in a general southeasterly
27  direction, following the meander of the southwesterly line
     of said road, 4237 feet, more or less, to a one inch iron
28  pipe, which is at the most northerly corner of a Portion
     of Francisco Heights, as designated on the map entitled
29  "Map of Francisco Heights Near Half Moon Bay, San Mateo
     County, California", which map was filed in the office of
30  the Recorder of the County of San Mateo, State of California,
     on March 5, 1908 in Book 6 of Maps at pages 5 and 8, thence
31  continuing along the southwesterly line of the Highway,
     1125 feet, more or less, to a point on the southeasterly
32  line of Francisco Heights Subdivision, thence N. 29° 57' E.
     50 ft., to the intersection of the center line of the

County Road (now a State Highway) from which intersection
a witness post marked AXVI bears North 26° East, 0.54
chains; thence southeasterly along the center line of
said Highway to a point, from which bears North 71° 00'
West, 1000 feet, more or less, which is the most northerly
corner of the lands of Danieri, thence South 71° East,
65 feet more or less to a point in the center of the
Denniston Creek; from which a witness post marked AV
bears North 71° W., distant 19.80 ft., thence up said
creek in the center of the same and following the
meanderings thereof as follows: South 18° East, 194.28
feet; thence South 14° 45' East, 132 feet; thence South
18° West, 89.10 feet; thence South 8° 30' West, 165.0
feet; thence South 31° 30' West 72.80 feet; thence
South 66 feet; thence South 13° East, 88.44 feet; thence
South 23° East, 75.90 feet; thence leaving center line
of said creek South 85° 30' East, 2640 feet, from which
a witness post marked AXIII bears North 27° 30' East,
distant 24.42 feet; thence South 60° East, 51.48 feet,
from which a witness post marked AXII bears North 27° 30'
East, distant 24.42 feet; thence South 11° 30' East,
419.76 feet; thence North 27° 30' East, 24.92 feet to a
fence corner post marked AXI; thence South 25° 30' East
87.02 feet, to a post marked AK, standing in line of
fence on the westerly side of the tract of land belonging
to Patrick McMahon; thence North 71° West 1598.23 feet,
from which a post marked AVII bears North 71° West 100.61
feet, thence North 47° East, 64.93 feet; thence North
43° 00' West, 5889.74' to a point from which the most
easterly corner of Lot 1 in Block 26 of the Riviera Ocean
Villa Tract, as per map thereof filed for record in Book
6 of Maps, at page 20, Records of San Mateo County; thence
North 43° 00' West, 1193.27 feet; thence South 47° 00' West,
625.0 feet; thence North 43° 00' West, 186.85 feet to the
point of beginning.

Containing 217.68 acres of land.

TOGETHER WITH improvements described as follows:

Buildings:  T-1, T-2, T-3, T-4, T-5, T-6, T-14, T-15,
T-16, T-17, T-18, T-19, T-7, T-9, T-101, and T-102.

Improvements:  Taxiways, field drainage, and field
markings.
Fueling system - 3 underground tanks
Existing surplus utility systems

RESERVING HOWEVER, a perpetual easement for a water pipeline, more

particularly described as follows:

BEGINNING at a point on the northwesterly boundary
of that land conveyed by Riviera Land Company to the United
States of America by Deed dated 14 April 1943, recorded
15 April 1943 in Volume 1056, Page 307 in the Official
Records of San Mateo County, State of California, said point
bearing S 28° 42' 45" W along said northwesterly boundary
line a distance of 469.35 feet from the most northerly point
of said land, said point being also the most southerly point
on the center line of a revocable permit granted by the

VOL 1521 PAGE 4

Board of Supervisors, County of San Mateo, State of California to the United States of America, said revocable permit being in the files of the County Clerk of San Mateo, State of California, and running thence N 28° 42' 45" E along the aforementioned northwesterly boundary line, 5.46 feet; thence S 57° 35' 45" E, 186.34 feet; thence S 35° 25' 30" E, 119.26 feet; thence S 57° 45' 10" E, 138.86 feet; thence S 59° 24' 05" E, 130.11 feet; thence S 55° 51' 20" E, 134.42 feet; thence S 45° 37' 40" E, 107.80 feet; thence S 37° 56' 40" E, 103.86 feet; thence S 35° 14' 55" E, 641.23 feet; thence S 36° 29' 45" E, 102.49 feet; thence S 56° 57' 30" E., 124.00 feet; thence S 49° 13' 10" E, 583.95 feet; thence S 48° 31' 25" E, 188.44 feet; thence S 61° 27' 35" E, 724.94 feet; thence S 58° 11' 25" E, 526.02 feet; thence S 57° 03' 25" E, 162.07 feet; thence S 45° 23' 45" E, 136.85 feet; thence S 47° 56' 25" E, 129.04 feet; thence S 52° 24' 05" E, 95.09 feet; thence S 55° 09' 25" E, 642.87 feet; thence N 30° 12' 35" E, 127.56 feet; thence N 56° 05' 25" W, 60.81 feet; thence N 33° 54' 35"  E, 12.00 feet to a point on the boundary line of that property conveyed by Pietro, Petrocchi et al., to the United States of America by Deed dated 12 March 1943, recorded 18 March 1943 in Volume 1050, Page 474 in the Official Records of San Mateo County, State of California; thence S 56° 05' 25" E, 70.06 feet; thence S 30° 12' 35" W, 139.76 feet; thence S 55° 09' 25" E, 697.02 feet; thence N 34° 50' 35" E, 5.00 feet; thence S 55° 09' 25" E, 21.00 feet; thence S 34° 50' 35" W, 26.00 feet; thence N 55° 09' 25" W, 21.00 feet; thence N 34° 50' 35" E 4.98 feet; thence N 56° 40' 25" W, 704.59 feet; thence N 30° 12' 35" E, 24.75 feet; thence N 55° 09' 25" W, 643.93 feet; thence N 52° 24' 05" W, 95.71 feet; thence N 47° 56' 25" W, 129.64 feet; thence N 45° 23' 45" W, 136.05 feet; thence N 57° 03' 25" W, 160.95 feet; thence N 58° 11' 25" W, 525.64 feet; thence N 61° 27' 35" W, 725.80 feet; thence N 48° 31' 25" W, 189.52 feet; thence N 49° 13' 10" W, 583.21 feet; thence N 56° 57' 30" W, 125.12 feet; thence N 36° 29' 45" W, 104.39 feet; thence N 35° 14' 55" W, 641.09 feet; thence N 37° 56' 40" W, 102.94 feet; thence N 45° 37' 40" W, 108.22 feet; thence N 58° 51' 20" W, 133.22 feet; thence N 59° 24' 05" W, 129.95 feet; thence N 57° 45' 10" W, 140.70 feet; thence N 38° 25' 30" W, 121.04 feet; thence N 37° 35' 45" W, 182.04 feet to a point on the boundary line of the aforementioned land conveyed by Riviera Land Company to the United States of America; thence N 28° 42' 45" E along the said boundary line, 5.46 feet to the point of beginning, containing 1.62 acres, more or less.

BEING the property acquired by the United States of America by condemnation proceedings titled United States of America vs. 33.22 acres of land, San Mateo County, and Giovanni Patroni, et al., Southern Division of the United States District Court for the Northern District of California.

The above described premises are transferred subject to existing easements for roads, highways, public utilities, railways and pipelines, and all other easements and encumbrances of record.

1    EXCEPTING, HOWEVER, from this conveyance all right, title and

2    interest in and to all property in the nature of equipment, furnishings

3    and other personal property which can be removed from the land without

4    material injury to the land or structures located thereon other than property

5    of such nature located on the premises conveyed hereby which is required

6    for the efficient operation for airport purposes of the structures and im-

7    provements specifically listed hereinabove as being transferred hereby; and

8    further excepting from this conveyance all structures on the above described

9    premises other than structures specifically described or enumerated above

10   as being conveyed hereunder, and reserving to the party of the first part

11   the right of removal from the premises of the property and structures except-

12   ed hereby, within a reasonable period of time after the date hereof, which

13   shall not be construed to mean any period less than one (1) year after the

14   date of this instrument.

15       Said property transferred hereby was duly declared surplus and

16   was assigned to the War Assets Administration for disposal, acting pursuant

17   to the provisions of the above mentioned Act, as amended, Executive Order

18   9689, and applicable rules, regulations and orders.

19       By the acceptance of this deed or any rights hereunder, the said

20   party of the second part, for itself, its successors and assigns, agrees

21   that transfer of the property transferred by this instrument is accepted

22   subject to the following restrictions set forth in subparagraphs (1) and (2)

23   of this paragraph, which shall run with the land, imposed pursuant to the

24   authority of Article 4, Section 3, Clause 2 of the Constitution of the United

25   States of America, the Surplus Property Act of 1944, as amended, Executive

26   Order 9689, and applicable rules, regulations and orders:

27       (1)  That all of the property transferred hereby, together with the

28   adjacent flight strip under the jurisdiction of the Public Roads Administration,

29   hereafter in this instrument called the "airport", shall be used for public

30   airport purposes, and only for such purposes, on reasonable terms and without

31   unjust discrimination and without grant or exercise of any exclusive right for

32   use of the airport within the meaning of Section 303 of the Civil Aeronautics

VOL 1521 PAGE 6

1    Act of 1938. As used herein, "public airport purposes" shall be deemed to

2    exclude use of the structures conveyed hereby, or any portion thereof, for

3    manufacturing or industrial purposes.  However, until in the opinion of

4    Civil Aeronautics Administration or its successor Government agency, it is

5    needed for public airport purposes, any particular structure transferred

6    hereby may be utilized for non-manufacturing or non-industrial purposes in

7    such manner as the party of the second part deems advisable, provided that

8    such use does not interfere with operation of the remainder of the airport

9    as a public airport.

10         (2)  That the entire landing area, as defined in WAA Regulation

11   16, dated June 26, 1946, and all structures, improvements, facilities and

12   equipment of the airport shall be maintained at all times in good and service-

13   able condition to assure its efficient operation, provided, however, that

14   such maintenance shall be required as to structures, improvements, facilities

15   and equipment only during the remainder of their estimated life, as determined

16   by the Civil Aeronautics Administration or its successor Government agency,

17   with the exception, however, that the Grantee shall maintain only that part of

18   the existing hardstand shaded in green on the attached photostat copy of the

19   plat of Half Moon Bay Army Airbase Flight Strip prepared by the United States

20   Engineering Office, San Francisco, California, and dated February 1, 1944.

21   In the event materials are required to rehabilitate or repair certain of the

22   aforementioned structures, improvements, facilities or equipment, they may be

23   procured by demolition of other structures, improvements, facilities or equip-

24   transferred hereby and located on the above described premises, which have

25   outlived their use as airport property in the opinion of the Civil Aeronautics

26   Administration or its successor Government agency.

27         By the acceptance of this deed or any rights hereunder, the said

28   party of the second part for itself, its successors and assigns, also assumes

29   the obligations of, covenants to abide by and agrees to, and this transfer is

30   made subject to, the following reservations and restrictions set forth in

31   subparagraphs (1) to (6) of this paragraph, which shall run with the land,

32   imposed pursuant to the authority of Article 4, Section 3, Clause 2 of the

Constitution of the United States of America, the Surplus Property Act of
1944, as amended, Executive Order 9689 and applicable rules, regulations and
orders:

    (1)  That insofar as is within its power and reasonably possible,
the party of the second part, and all subsequent transferees shall prevent
any use of land either within or outside the boundaries of the airport,
including the construction, erection, alteration, or growth of any structure
or other object thereon, which use would be a hazard to the landing, taking-
off, or maneuvering of aircraft at the airport, or otherwise limit its useful-
ness as an airport.

    (2)  That the building areas and non-aviation facilities, as such
terms are defined in WAA Regulation 16, dated June 26, 1946, of or on the
airport shall be used, altered, modified, or improved only in a manner which
does not interfere with the efficient operation of the landing area and of
the airport facilities, as defined in WAA Regulation 16, dated June 26, 1946.

    (3)  That itinerant aircraft owned by the United States of
America (hereinafter sometimes referred to as the "Government") or operated
by any of its employees or agents on Government business shall at all times
have the right to use the airport in common with others; provided, however,
that such use may be limited as may be determined at any time by the Civil
Aeronautics Administration or the successor Government agency to be necessary
to prevent interference with use by other authorized aircraft, so long as
such limitation does not restrict Government use to less than twenty-five
(25) per centum of capacity of the landing area of the airport.  Government
use of the airport by virtue of the provisions of this subparagraph shall be
without charge of any nature other than payment for damage caused by such
itinerant aircraft.

    (4)  That during the existence of any emergency declared by the
President of the United States of America or the Congress thereof, the
Government shall have the right without charge, except as indicated below,
to the full, unrestricted possession, control and use of the landing area,
building areas, and airport facilities, as such terms are defined in WAA

VOL 1521 PAGE 8

Regulation 16, dated June 25, 1946, or any part thereof, including any additions or improvements thereto made subsequent to the declaration of any part of the airport as surplus; provided, however, that the Government shall be responsible during the period of such use for the entire cost of maintaining all such areas, facilities and improvements, or the portions used, and shall pay a fair rental for the use of any installations or structures which have been added thereto without Federal aid.

(5) That no exclusive right for the use of any landing area or air navigation facilities, as such terms are defined in WAA Regulation 16, dated June 26, 1946, included in or on the airport shall be granted or exercised.

(6) That the property transferred hereby may be successively transferred only with the approval of the Civil Aeronautics Administration or the successor Government agency and with the proviso that any such subsequent transferee assumes all the obligations imposed upon the party of the second part by the provisions of this instrument.

By acceptance of this instrument or any rights hereunder, the party of the second part further agrees with the party of the first part as follows:

(1) That upon a breach of any of the aforesaid reservations or restrictions by the party of the second part or any subsequent transferee, whether caused by the legal inability of said party of the second part or subsequent transferee to perform any of the obligations herein set out, or otherwise, the title, right of possession and all other rights transferred to the party of the second part, or any portion thereof, shall at the option of the party of the first part revert to the party of the first part upon demand made in writing by the War Assets Administration or its successor Government agency at least sixty (60) days prior to the date fixed for the revesting of such title, right of possession, and other rights transferred, or any portion thereof; provided, that, as to installations or structures which have been added to the premises without Federal aid, the Government shall have the option to acquire title to or use of the same at the then fair market value of the rights therein to be acquired by the Government.

Case 3:07-cv-02747-WHP   Document 306-4   Filed 08/21/2009   Page 14 of 14

(2) That if the construction as covenants of any of the foregoing reservations and restrictions recited herein as covenants or the application of the same as covenants in any particular instance is held invalid, the particular reservations or restrictions in question shall be construed instead merely as conditions upon the breach of which the Government may exercise its option to cause the title, right of possession and all other rights transferred to the party of the second part, or any portion thereof, to revert to it, and the application of such reservations or restrictions as covenants in any other instance and the construction of the remainder of such reservations and restrictions as covenants shall not be affected thereby.

TO HAVE AND TO HOLD the said premises, with appurtenances, except the property and rights excepted and reserved above, and under and subject to the aforesaid reservations, restrictions, and conditions, unto the said party of the second part, its successors and assigns forever.

IN WITNESS WHEREOF, the party of the first part has caused these presents to be executed as of the day and year first above written.

UNITED STATES OF AMERICA
Acting by and Through
War Assets Administration

By _DONN A. BIGGS_
DONN A. BIGGS
Associate Deputy Zone Administrator
Office of Real Property Disposal
Zone VI
San Francisco, California

VOL **1521** PAGE **10**

1   STATE OF CALIFORNIA
2   CITY AND COUNTY OF SAN FRANCISCO } ss.
3
4   On this 16 day of Sept. 1947, before me,
5   _____ a Notary Public in and for the City and
6   County of San Francisco, State of California, personally appeared DONN A. BIGGS,
    known to me to be the Acting Deputy Zone Administrator, Office of Real Property
    Disposal, Zone VI, San Francisco, California, and known to me to be the person
7   who executed the within instrument on behalf of the United States of America,
    and acknowledged to me that he subscribed to the said instrument the name of
8   the United States of America, and the name of the War Assets Administration on
    behalf of the United States of America, and further that the United States of
9   America executed said instrument.

10      WITNESS my hand and Official Seal.

11  (SEAL)

12
                                    _____
13                                  Notary Public
                                    in and for the City and County of
14                                  San Francisco, State of California

15

16  My Commission expires: Dec. 24 - 1950

17

18

19

20

21

22

23

24

25

26

27

28

29

30

31

32

**Exhibit B**

1    MICHAEL P. MURPHY, COUNTY COUNSEL (SBN 083887)
     Deborah Penny Bennett, Chief Deputy (SBN 072282)
2    David A. Levy, Deputy (SBN 077181)
     Glenn M. Levy, Deputy (SBN 219029)
3    Hall of Justice and Records
     400 County Center, 6th Floor
4    Redwood City, CA 94063
     Telephone: (650) 363-1965
5    Facsimile: (650) 363-4034
     E-mail: glevy@co.sanmateo.ca.us
6

7    Attorneys for Defendant
     COUNTY OF SAN MATEO

8

ENDORSED

2008 APR 21 A 8: 48

KIRI TORRE, CLERK OF THE SUPERIOR COURT
COUNTY OF SANTA CLARA, CALIFORNIA
BY:_____
       DEPUTY CLERK

9            IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

10              IN AND FOR THE COUNTY OF SANTA CLARA

11

12    MONTARA WATER AND SANITARY DISTRICT,

13           Plaintiffs,

14        vs.

15    COUNTY OF SAN MATEO, et al.,

16           Defendants.

17

18

19

Case No. 1-07-CV-088793

**DECLARATION OF MARK LARSON IN SUPPORT DEFENDANT COUNTY OF SAN MATEO'S MOTION FOR SUMMARY JUDGMENT**

Date:   August 7, 2008
Time:   9:00 a.m.
Dept.:   5 (Hon. Mary Jo Levinger)

Action filed:   May 17, 2007
Trial date:     none set

20

21

22

23

24

25

26

27

28

DECLARATION OF MARK LARSON IN SUPPORT DEFENDANT COUNTY OF SAN MATEO'S
MOTION FOR SUMMARY JUDGMENT

I, Mark Larson, hereby declare as follows:

1.    I am the Airports Manager for the County of San Mateo (the "County") and have been employed in that capacity since 2001. I submit this declaration in support of the County's motion for summary judgment, filed concurrently with this declaration. The following is within my personal knowledge, and if called as a witness, I could and would testify competently as to these matters.

2.    My job responsibilities include serving as manager of the Half Moon Bay Airport (the "Airport"). In the context of those responsibilities I have gained general knowledge about the Airport's history, finances, and operation, and I am also responsible for managing the Airport's interaction with the federal government and federal agencies that regulate the Airport.

3.    The Airport is located on the Northern California coast about twenty miles south of San Francisco. The Airport is a public airport, and it has served a variety of roles over the years. It is an important business, transportation, and emergency service asset to the San Mateo County and Bay Area communities. Among other roles, the Airport provides a variety of emergency service and response functions including Air-Ambulance and Medivac flights; law enforcement and homeland security patrols; Coast Guard sea-rescue operations; and use as a disaster relief staging site for the airlifting of emergency supplies in the event that roads are closed during a disaster or emergency. The Airport is home to approximately eighty aircraft and several aviation related businesses. Aviation is the top employer in San Mateo County, and the Airport provides an important source of education and training for the pilots, mechanics, and Airport employees that fill jobs in the industry.

4.    The Airport was originally constructed by the California State Highway Department for the United States Army in 1942. The Army turned the Airport over to the Navy following the end of World War II, and the County acquired the relevant portion of the Airport from the United States—acting by and through the War Assets Administration and pursuant to the Surplus Property Act of 1944, as amended, and applicable rules, regulations, and orders—by way of a deed dated September 26, 1947, and recorded on May 25, 1948 (the "1948 Deed").

5.    The Airport is self-funded through airport user and business fees and receives no money from the County's General Fund. Its operation and maintenance are primarily paid for by an Enterprise Fund, the revenues for which come primarily from fees and rent obtained from airport users and related

DECLARATION OF MARK LARSON IN SUPPORT DEFENDANT COUNTY OF SAN MATEO'S
MOTION FOR SUMMARY JUDGMENT

1  business.  Those revenues include fees paid until recently by Montara Water and Sanitary District

2  ("MWSD") for the use of property on the Airport, as discussed in more detail below in paragraph 7.

3       6.    The Airport also historically has received and currently receives federal funds for Airport

4  operation and maintenance.  Receipt of those funds is subject to grant assurances that include restrictions

5  on the uses to which Airport property may be made.  For example, the United States Department of

6  Transportation, through the Federal Aviation Administration (the "FAA"), has promulgated regulations

7  requiring that the Airport have a fee and rental structure "that will make the airport as self-sustaining as

8  possible under the particular airport circumstances, in order to minimize the airport's reliance on Federal

9  funds and local tax revenues." 64 Fed. Reg. 7696, 7710 (Feb. 16, 1999).

10       7.    For the past several years, the MWSD has enjoyed a permit to encroach on County land at

11  the Airport for the purpose of extracting water from three wells located at the Airport (the "Airport

12  Wells").  MWSD and its predecessors in interest, Citizen's Utility District and CalAm Water Company,

13  have been extracting water from the Airport Wells since 1964 without interruption.  Use of the Airport

14  Wells by MWSD has been pursuant to a revocable encroachment permit issued to MWSD's predecessor

15  in interest and assigned to MWSD in 2004.  The revocable encroachment permit specifies the rates for

16  extraction of the well water.  The rates have not increased since August 2003, and it is the County's view

17  that the rates are among the lowest paid by other water purveyors on the Coast.

18       8.    In the most recent year for which it paid the full amount owed (2006), MWSD paid the

19  County $60,267.00 for the water extracted from the Airport Wells.  The entirety of the fees paid by

20  MWSD pursuant to the revocable encroachment permit are deposited into the Airport Enterprise Fund

21  and are used by the County to support the operation and maintenance of the Airport.

22       9.    MWSD has failed to cooperate in a study to determine the rate of payment for extraction

23  of water under the Revocable Encroachment Permit, which study would be a viable means of

24  maintaining the relationship between the County and MWSD (including through its predecessors in

25  interest) that has existed since 1964.

26       10.    It is the County's view that should MWSD gain title to the property where the Airport

27  Wells are currently located and the associated access easement requested by MWSD, the County's ability

28  to use the property as well as to maintain security and ensure the orderly operation of the Airport will be

1    negatively impacted.  Accordingly, the County has offered to work with MWSD to locate other well sites

2    on County land, including locations on Airport property that would not impair the County's public use of

3    Airport property.  Although the County has offered to assist MWSD in identifying other suitable

4    locations, these offers have been rejected or ignored by MWSD.  In light of the County's concerns about

5    the impact of MWSD's efforts to obtain title to the Airport Wells, and given the opposition of the FAA

6    described in the following paragraphs, the County has not sought a release from the restrictions in the

7    1948 Deed from the FAA.

8         11.    Both before and after MWSD filed its complaint in eminent domain to obtain title to the

9    Airport Wells and related access easements, I have been in contact with employees of the FAA regarding

10   MWSD's efforts to take title to that property.  For example, in April 2007, I received a letter from Joseph

11   R. Rodriguez, FAA Supervisor – Environmental Planning and Compliance Section, dated April 19, 2007,

12   regarding MWSD's efforts to obtain title to the property at issue.  A true and correct copy of that letter is

13   attached to this declaration as <u>Exhibit A</u>.  As stated in that letter, "[t]he FAA is not in favor of a sale of

14   the property for the well sites identified in the County's facsimile transmittal [regarding MWSD's

15   eminent domain proceedings.]"

16        12.    In subsequent conversations I had in October and November 2007 with Mr. Rodriguez,

17   Gretchen Kelly, and George Aiken of the FAA, they indicated that the FAA intended to exercise its

18   reversionary interest under the 1948 Deed in the event that MWSD takes ownership of the property at the

19   Airport upon which the three wells are located.

20        I declare under penalty of perjury of the laws of the State of California that the foregoing is true

21   and correct and is executed at San Carlos, California, this 16th day of April 2008.

22

23

24                                                                    Mark Larson

25

26

27

28

DECLARATION OF MARK LARSON IN SUPPORT DEFENDANT COUNTY OF SAN MATEO'S
MOTION FOR SUMMARY JUDGMENT

# Exhibit A

U.S. Department
Of Transportation
**Federal Aviation
Administration**

**San Francisco Airports District Office
831 Mitten Road, Room 210
Burlingame, California 94010-1303**

April 19, 2007

Mr. Mark Larson
Airport Manager
620 Airport Drive
San Carlos, California 94070

Dear Mr. Larson,

Subject: Facsimile Transmittal Dated 4/12/2007, Montara Water & Sanitation District
Notice of Intent to Initiate Eminent Domain Proceedings, Half Moon Bay Airport
Request for FAA Opinion

Our office has reviewed the San Mateo County transmittal regarding the pending action
of the Montara Water and Sanitation District Notice of Intention to initiate eminent
domain proceedings to transfer airport property interest for a non-aeronautical purpose.
The Half Moon Bay Airport (HAF) is part of a national transportation system of public
airports. The Federal Aviation Administration (FAA) is the successor federal agency
responsible for the federal oversight of the lands conveyed under the War Assets
Administration (WAA) deed dated September 26,1947. Under the terms of the transfer
document San Mateo County is obligated to maintain the property for the benefit and use
as a public airport. The FAA has included HAF in the National Plan of Integrated Airport
Systems (NPIAS) as a general aviation reliever airport. The airport is a valuable
transportation link for interstate and intrastate air transportation.

Federal legislation has been established after the transfer of the federal interest in HAF to
provide funding for the continuation of the public use of the property for the airport
purposes specified in the 1947 deed. The FAA has assigned the airport a site number,
(01638.A), to identify the airport and disclose the type of federal agreements that affect
the title to the airport property. Enclosed for your information are select pages of FAA
Order 5190.2R, *List of Public Airports Affected by Agreements with the Federal
Government*. The County, as a recipient of numerous federal grant agreements under the
Airport Improvement Program (AIP) must operate and maintain the airport in compliance
with FAA airport design and planning criteria.

The AIP grant agreements include a list of Airport Sponsor Assurances (Assurances) that
mandate specific performance. The Grant Agreement Assurances are not severable. The

1

County must maintain rights and powers to ensure that the public benefit derived from the use of the airport property complies with current FAA Orders and Advisory Circulars. The County cannot sell, or entered into long-term lease agreements that would encumber the title to the airport without FAA review and approval of the use of airport property. Assurance Number 29, Airport Layout Plan, requires the County to keep an accurate record of the boundary of the airport at all times. Any proposed change of the airport property boundary must be approved by the FAA to assure that the public benefit for airport purposes is not impacted.

The FAA is not in favor of a sale of the property for the well sites identified in the County's facsimile transmittal. The sale of the well sites would encumber the County's ability to provide for future aviation development should the demand for leasehold occur in the future. The property in question is suitable for aircraft storage, (open tie-down or hangar space), a fixed based operator (FBO) aviation business, or other aviation compatible non-aeronautical business development. Additional airport property would be lost due to the need to install perimeter fencing of the well sites and three separate access right-of-ways. The County must restrict access to the airfield to authorized users/tenants of HAF to remain in compliance with the grant agreement Assurances. The Montara Water & Sanitation District and its authorized employees cannot access airport property if they are no longer a tenant of the HAF.

The FAA policy and procedure for federal oversight of airport land use is contained in FAA Order 5190.6A, Airport *Compliance Requirements*. The FAA is not in agreement that the land is no longer needed for an airport purpose. The wells can be capped and relocated to another area. The surface area may be then returned for use for airport development as identified above. **Therefore, the land is not considered surplus property and the FAA San Francisco Airports District Office would not recommend a release of the federal agreement obligations to permit the sale of the property. The proposed taking does not recognize the reverter clause in the 1947 deed. The County must follow the notification requirements in the 1947 deed and the land release procedures specified in FAA Order 5190.6A. Failure to comply with the notification and approval requirement procedures would subject the County to FAA enforcement action that could include the suspension of grant payments and withholding of future grant funding for HAF.**

In closing the County must subordinate all airport lease agreements to the conditions, covenants, and reservations specified in the federal agreements to remain in good standing with the FAA. We are of the opinion that the federal interest in the land for air transportation purposes continues to be the primary need for the use of the property. The existing Revocable Encroachment Agreement (REA) is not in conflict with the airport purposes specified in the federal agreements. The FAA recommends that the County continue the use of the REA or consider relocation the well sites to another section of airport property that is remote from prime aviation development use. The FAA would have no objection to well site(s) located off airport property.

If you have any additional questions please contact me at (650) 876-2778, extension 610.

2

Sincerely,

*Original signed by*
*Joseph R. Rodriguez*

Joseph R. Rodriguez
Supervisor Environmental Planning and Compliance Section

# ORDER

**5190.2R**

# LIST OF PUBLIC AIRPORTS AFFECTED BY AGREEMENTS WITH THE FEDERAL GOVERNMENT (RIS: 5190-1)



April 30, 1990

## U.S. DEPARTMENT OF TRANSPORTATION
## FEDERAL AVIATION ADMINISTRATION

Distribution:   A-W-1 (minus A-W (AS/PP/FS/AT));
                A-W (AS/PP/FS/AT)-3; A-X (AS/ES/AT)-2;
                A-FAS-1; A-FFS-1; A-FFS-7 (STD)

Initiated By: AAS-310

SECTION 3.    MASSACHUSETTS .................................................................................... 46
SECTION 4.    NEW HAMPSHIRE ................................................................................... 47
SECTION 5.    RHODE ISLAND ....................................................................................... 48
SECTION 6.    VERMONT ................................................................................................. 49

CHAPTER 8.    LIST OF PUBLIC AIRPORTS IN THE NORTHWEST MOUNTAIN REGION ............. 50
SECTION 1.    COLORADO ............................................................................................... 50
SECTION 2.    IDAHO ...................................................................................................... 51
SECTION 3.    MONTANA ................................................................................................ 52
SECTION 4.    OREGON .................................................................................................... 54
SECTION 5.    UTAH ......................................................................................................... 56
SECTION 6.    WASHINGTON .......................................................................................... 57
SECTION 7.    WYOMING ................................................................................................. 59

CHAPTER 9.    LIST OF PUBLIC AIRPORTS IN THE SOUTHERN REGION .......................... 60
SECTION 1.    ALABAMA ................................................................................................. 60
SECTION 2.    FLORIDA ................................................................................................... 62
SECTION 3.    GEORGIA .................................................................................................. 64
SECTION 4.    KENTUCKY ............................................................................................... 67
SECTION 5.    MISSISSIPPI .............................................................................................. 68
SECTION 6.    NORTH CAROLINA ................................................................................... 70
SECTION 7.    PUERTO RICO ........................................................................................... 72
SECTION 8.    SOUTH CAROLINA ................................................................................... 73
SECTION 9.    TENNESSEE .............................................................................................. 75
SECTION 10.   VIRGIN ISLANDS ...................................................................................... 77

CHAPTER 10.   LIST OF PUBLIC AIRPORTS IN THE SOUTHWEST REGION ...................... 78
SECTION 1.    ARKANSAS ............................................................................................... 78
SECTION 2.    LOUISIANA .............................................................................................. 80
SECTION 3.    NEW MEXICO ........................................................................................... 81
SECTION 4.    OKLAHOMA ............................................................................................. 83
SECTION 5.    TEXAS ....................................................................................................... 86

CHAPTER 11.   LIST OF PUBLIC AIRPORTS IN THE WESTERN-PACIFIC REGION ............. 91
SECTION 1.    AMERICAN SAMOA .................................................................................. 91
SECTION 2.    ARIZONA .................................................................................................. 92
SECTION 3.    CALIFORNIA ............................................................................................ 94
SECTION 4.    GUAM ....................................................................................................... 98
SECTION 5.    HAWAII ..................................................................................................... 99
SECTION 6.    MARSHALL ISLANDS ............................................................................... 100
SECTION 7.    N. MARIANA ISLANDS .............................................................................. 101
SECTION 8.    NEVADA .................................................................................................... 102
SECTION 9.    STATES OF MICRONESIA .......................................................................... 103
SECTION 10.   TRUST TERRITORY ................................................................................... 104

CHAPTER 12.   TABULATION OF AIRPORT LISTINGS ....................................................... 105

CHAPTER 13.   CIVIL AIRPORTS REQUIRED BY DEPARTMENT OF DEFENSE ................... 109

# APPENDICES

APPENDIX 1—ALPHABETICAL INDEX OF STATES (1 page)
APPENDIX 2—FAA REGIONAL BOUNDARIES MAP (1 page)

iv

# CHAPTER 1.   GENERAL

**1-1  PURPOSE**  This Order contains a listing of all publicly and privately owned public–use airports that are affected by agreements with the Federal Government.

**1-2  DISTRIBUTION**  This Order is distributed to Director level in Washington headquarters, except the Office of Airport Standards, Office of Airport Planning and Programming, Office of Flight Standards, and Air Traffic Service to branch levels; Regional Airports, Air Traffic, and Flight Standards Divisions; Airports District/Field Offices, Flight Standards District Offices, and General Aviation District Offices.

**1-3  CANCELLATION**  Order 5190.2Q, List of Public Airports Affected by Agreements with the Federal Government (RIS: AP 5190–1), dated June 2, 1986, is canceled.

**1-4  EXPLANATION OF CHANGES**  This Order has been updated to reflect changes in the type(s) of agreement(s) and in the airport status and to add new obligated airports. Chapter 13 shows the civil airports required by the Department of Defense for national emergency use. (See release requirement in Order 5190.6A, Airports Compliance Requirements, paragraph 7-7d.)

**1-5  ACTION**  Airports Divisions shall accumulate changes to this Order and note them on a computer run which will be furnished during the month of January beginning in 1988. These revised computer runs will be returned to the Office of Airport Safety & Standards, Attention: AAS–310, no later than the last day of February. Transmit these changes by letter under the subject: "Corrections to List of Airports Affected by Agreements (RIS: 5190–1)."

**1-6  SCOPE**

    **a.**  This Order contains a listing of all publicly and privately owned public–use airports in the United States, Puerto Rico, the Virgin Islands, American Samoa, the Trust–Territory of the Pacific Islands, and Guam that are affected by agreements with the Federal Government under the following programs:

        (1)  Airport Development Aid Program (ADAP)
            Agreement:  Grant Agreement

        (2)  Federal–Aid Aiprort Program (FAAP)
            Agreement:  Grant Agreement or Advance Planning Agreement

        (3)  Development Landing Areas National Defense (DLAND), Development Civil Landing Areas (DCLA), and AP–4 Agreements (Resolution by Governing Jurisdiction)

        (4)  Surplus Property Act of 1944, as amended
            Agreement:  Conveyance Pursuant to Section 13 (War Assets Administration (WAA) Regulation 16 or Public Law 80–289)

        (5)  Federal Airport Act of 1946, as amended
            Agreement:  Deed or Conveyance Pursuant to Section 16

        (6)  Federal Aviation Act of 1958, as amended
            Agreement:  Instrument of Conveyance Pursuant to Section 303(c)

        (7)  Civil Rights Act of 1964, as amended
            Agreement:  Assurances Pursuant to Title VI: Reference Department of Transportation Regulations, Part 23

        (8)  Airport and Airway Development Act of 1970
            Agreement:  Deed of Conveyance Pursuant to Section 23

5190.2R                                                                    4/30/90

(9)   An agreement executed by the owner of a privately owned public–use airport for navigational facilities installed under the F&E program. (See FAA Order 6030.40, FAA Policy for Receiving Assurances when establishing F&E Facilities at Privately–Owned, Public–Use Airports, dated November 15, 1973.)

b.   In some instances a listed airport is affected by more than one grant agreement or more than one surplus property agreement, The Obligations of an airport owner or sponsor are substantially the same whether one or more of these agreements are involved. For the purposes of this order, an indication that an airport is affected by either a grant agreement or a surplus property agreement means that it may be affected by one or more agreements.

**1–7   VARIANCES AMONG AGREEMENTS**   Provisions of the agreement(s) entered into under the above programs are not uniform. Differences also exist among the agreements under a particular program; therefore, examine the specific agreement(s) concerned to ascertain the terms applying to any individual airport.

**1–8   RESERVED**

# CHAPTER 2. HEADINGS, ABBREVIATIONS, AND CODES USED IN AIRPORTS LISTING

**2–1  HEADINGS**  The following headings are used to set apart columnar data to enable users easy identification of the type(s) of agreement(s) affecting each airport as well as the airport's status relative to its agreements. Airports are grouped by state within each region. The number of Federal agreement airports within each region is provided in parentheses following each chapter heading. Within each chapter, the number within each state is provided at the end of each state listing.

  **a.  FAA Site Number**  The number assigned to a particular airport by the FAA for positive identification and statistical purposes. Each site number contains a suffix. "A" identifies an airport, "C" identifies a seaplane base, and "H" identifies a heliport.

  **b.  Location**  The associated city or town which the airport normally serves and as reported on the Airport Master Record, FAA Form 5010–1. This location does not necessarily identify the airport owner or sponsor.

  **c.  Official Airport Name**  The airport name specified by the airport owner or sponsor and as reported on the Airport Master Record, FAA Form 5010–1.

  **d.  Type(s) of Agreement(s)**  Those agreements identified in Chapter 1-6a, paragraph 2-2, and paragraph 2-2 of this Chapter.

  **e.  Status**  The airport's situation with respect to those items listed under the numerical code for status, paragraph 2-2b of this Chapter.

**2–2  CODES**  Use the following alphabetical and numerical code(s) to identify the type(s) of agreement(s) affecting each airport and the airport status:

  **a.  Type(s) of Agreement(s):**

| CODE | DEFINITION |
|---|---|
| B | Privately owned airport obligated by agreement, Order 6030.40. |
| M | Privately owned airport obligated by grant agreement under AIP. |
| G | Grant agreement under FAAP, ADAP, or AIP |
| P | Surplus Property Agreement under Public Law 80–289 (real property only) |
| R | Surplus Property Agreement under Regulation 16–WAA. |
| S | Conveyance under Section 16 or Section 23. |
| V | Advance Planning Agreement under FAAP. |
| X | Obligations assumed by transfer. |
| Y | Assurance pursuant to Title VI, Civil Rights Act. |
| Z | Conveyance under Section 303, Federal Aviation Act. |
| 1 | Expired Grant Agreement; however, statutory Exclusive Rights Prohibition (Federal Aviation Act, Section 308A) remains in force for as long as the property is used as an airport. |
| 2 | Expired Section 303 Conveyance; however, Statutory Exclusive Rights Prohibition (Federal Aviation Act, Section 308A) remains in force for as long as the property is used as an airport. |

<table>
<tr><td>3</td><td>Expired AP–4 Agreement (under the DLAND or DCLA Programs); however, Statutory Exclusive Rights Prohibition (Federal Aviation Act, Section 308A) remains in force for as long as the property is used as an airport.</td></tr>
</table>

b.  **Status:**

| CODE | DEFINITION |
|------|------------|
| 1 | Airports certificated under FAR Part 139. |
| 2 | A civil airport where military use is subject to a lease. |
| 3P | The airport is PARTIALLY released from National Emergency Use Provision. |
| 3E | The airport is ENTIRELY released from National Emergency Use Provision. |
| 4 | The airport includes surplus real property which has been conveyed for, or converted to, revenue production. |
| 5 | An exclusive military use airport. |
| 6 | The airport is in the process of disposal or reversion. |
| 7P | A ''Letter of Intent'' has been issued to release a PART of the airport property. |
| 7E | A ''Letter of Intent'' has been issued to release the ENTIRE airport property. |
| 8 | An exclusive right has been granted (whether or not in violation of an agreement). |
| 8P | An exclusive right has been granted (whether or not in violation of an agreement); however, this exclusive right is of the ''proprietary'' type. |
| 8N | An exclusive right exists through a P.L. 80–289 deed providing an exemption for fuel and oil sales (not overridden by prior or subsequent grant agreement); however, and exclusive right for fuel and oil sales has not been granted. |

**2–3  RESERVED**

04/30/90

5190.2R

SECTION 3.  CALIFORNIA

| FAA SITE NO. | LOCATION | OFFICIAL AIRPORT NAME | DIST CODE | TYPES OF AGREEMENTS | STATUS |
|---|---|---|---|---|---|
| 01217.*A | ADIN | ADIN | SFO | 1 | |
| 01236.*A | ALTURAS | ALTURAS MUNI | SFO | G/Y | |
| 01248.1*A | APPLE VALLEY | APPLE VALLEY | | G/P/Y | |
| 01255.1*A | ARCATA/EUREKA | ARCATA VALLEY | | G/Y | |
| 01273.*A | AUBURN | AUBURN MUNI | | G/Y | |
| 01291.*A | BAKERSFIELD | BAKERSFIELD MUNICIPAL | SFO | G/P/Y | 1/2/3P/4/8P |
| 01297.*A | BAKERSFIELD | MEADOWS FIELD | | G/Y | |
| 01307.*A | BANNING | BANNING MUNI | | G/Y/1/3 | |
| 01323.*A | BIG BEAR | BIG BEAR CITY | | G/Y/1/3 | 1/3E |
| 01356.*A | BISHOP | BISHOP | | G/Y | |
| 01340.3*A | BLYTHE | BLYTHE | SFO | G/P/Y/3 | |
| 01346.*A | BORREGO SPRINGS | BORREGO VALLEY | | G/Y | 1/3E/4 |
| 01353.1*A | BRIDGEPORT | BRYANT FIELD | | G/Y | |
| 01358.*A | BURBANK | BURBANK-GLENDALE-PASADENA | | G/Y | 1 |
| 01369.1*A | BUTTONWILLOW | ELK HILLS-BUTTONWILLOW | | G/Y | |
| 01376.1*A | CALEXICO | CALEXICO INTL | SFO | G/P/Y | 1 |
| 01386.*A | CAMARILLO | CAMARILLO | | G/Y | |
| 01395.*A | CARLSBAD | MC CLELLAN-PALOMAR | | G/P/Y | |
| 01398.*A | CEDARVILLE | CEDARVILLE | | G/Y | 1 |
| 01399.*A | CHICO | CHICO MUNI | | G/Y | |
| 01400.5*A | CHINO | CHINO | SFO | G/P/R/Y | |
| 01411.*A | CHIRIACO SUMMIT | CHIRIACO SUMMIT | SFO | G/P/Y* | 1/3E/4 |
| 01420.*A | CHOWCHILLA | CHOWCHILLA | | P | 3E |
| 01431.1*A | CLOVERDALE | CLOVERDALE MUNI | SFO | Y/1 | 8N |
| 01434.*A | COLUSA | COLUSA COUNTY | SFO | G/Y | |
| 01437.*A | COMPTON | COMPTON | SFO | G/Y | |
| 01446.*A | CONCORD | BUCHANAN FIELD | SFO | G/Y | |
| 01457.*A | CORNING | CORNING MUNI | | G/Y | |
| 01466.*A | CRESCENT CITY | JACK MC NAMARA FIELD | SFO | G/R/Y | 1 |
| 01479.*A | DAGGETT | BARSTOW-DAGGETT | SFO | G/R/Y | 3E/4/8N |
| 01497.*A | DELANO | DELANO MUNI | SFO | P/S | 4 |
| 01507.*A | DESERT CENTER | DESERT CENTER | | G/Y | 8N |
| 01521.*A | DORRIS | BUTTE VALLEY | | P/Y | |
| 01524.*A | DUNSMUIR | DUNSMUIR MUNI-MOTT | | S/1 | 1 |
| 01539.*A | EL MONTE | EL MONTE | | P/Y | 3E/4/8N |
| 01560.*A | EUREKA | MURRAY FIELD | | G/Y | 4 |
| 01561.*A | FALLBROOK | FALLBROOK COMMUNITY AIRPARK | | P/Y | |
| 01568.5*A | FALL RIVER MILLS | FALL RIVER MILLS | | R | |
| 01569.*A | FANSHO | POSO-KERN COUNTY | | P/R/Y | 8P |
| 01578.9*A | FORT BIDWELL | FORT BIDWELL | | G/Y | |
| 01583.*A | FORT JONES | SCOTT VALLEY | | P/S/Y | |
| 01585.*A | FORTUNA | ROHNERVILLE | | G/Y | |
| 01588.*A | FRANKLIN | FRANKLIN FIELD | | R | |
| 01590.*A | FRESNO | FRESNO-CHANDLER DOWNTOWN | SFO | G/Y | 3P |

CHAP 11

PAGE 094

04/30/90

CHAP 11

SECTION 3.  CALIFORNIA

5190.2R

PAGE 095

| FAA SITE NO. | LOCATION | OFFICIAL AIRPORT NAME | DIST CODE | TYPES OF AGREEMENTS | STATUS |
|---|---|---|---|---|---|
| 01591.*A | FRESNO | FRESNO AIR TERMINAL | SFO | G/P/Y | 1/2/3P/4 |
| 01593.*A | FULLERTON | FULLERTON MUNI | | G/Y | |
| 01595.1*A | GARBERVILLE | GARBERVILLE | | G/Y | |
| 01608.7*A | GEORGETOWN | GEORGETOWN | | G/Y | |
| 01626.*A | GRASS VALLEY | NEVADA COUNTY AIR PARK | SFO | G/Y | 8P |
| 01635.61*A | GROVELAND | PINE MOUNTAIN LAKE | SFO | G/Y | |
| 01635.*A | GUSTINE | GUSTINE | SFO | G/R/Y | 8P |
| 01638.*A | HALF MOON BAY | HALF MOON BAY | SFO | G/Y | 8P |
| 01641.*A | HANFORD | HANFORD MUNI | SFO | G/Y | |
| 01645.*A | HAPPY CAMP | HAPPY CAMP | SFO | G/S/Y | |
| 01647.01*A | HAWTHORNE | HAWTHORNE MUNI | SFO | G/P/R/Y | 2/3E/4 |
| 01651.*A | HAYFORK | HAYFORK | SFO | G/P/R/Y | 8 |
| 01654.*A | HAYWARD | HAYWARD AIR TERMINAL | SFO | G/P/R/Y | 3E |
| 01651.*A | HEMET | HEMET-RYAN | SFO | G/P/R/Y | |
| 01668.*A | HOLLISTER | HOLLISTER MUNI | | G/Y | |
| 01671.*A | HOLTVILLE | HOLTVILLE | | G/Y | |
| 01683.*A | IMPERIAL | IMPERIAL COUNTY | SFO | G/Y | 1 |
| 01695.*A | INYOKERN | INYOKERN | | G/P/Y/3 | 3E |
| 01701.*A | JACKSON | WESTOVER FIELD AMADOR COUNTY | SFO | G/Y | |
| 01704.*A | JACUMBA | JACUMBA | | G/P/Y | |
| 01723.*A | KING CITY | MESA DEL REY | SFO | G/P/Y | 8N |
| 01743.*A | LAKEPORT | LAMPSON | SFO | G/Y | 3P/8N |
| 01754.2*A | LANCASTER | GENERAL WM J FOX AIRFIELD | SFO | G/Y | |
| 01757.*A | LA VERNE | BRACKETT FIELD | SFO | G/Y | |
| 01764.1*A | LEE VINING | LEE VINING | SFO | G/Y | |
| 01772.*A | LINCOLN | LINCOLN MUNI | | G/R/Y | |
| 01779.*A | LITTLE RIVER | LITTLE RIVER | | G/Y | |
| 01788.2*A | LIVERMORE | LIVERMORE MUNI | SFO | G/S/Y | |
| 01788.*A | LOMPOC | LOMPOC | | G | 1 |
| 01791.*A | LONE PINE | LONE PINE | | P | 8P |
| 01794.*A | LONG BEACH | LONG BEACH /DAUGHERTY FIELD/ | | G/P/Y/3 | |
| 01818.1*A | LOS ANGELES | LOS ANGELES INT'L | | G/P/Y/3 | 1/2 |
| 01839.*A | LOS BANOS | LOS BANOS MUNI | | G/Y | |
| 01845.*A | LOST HILLS | LOST HILLS-KERN COUNTY | SFO | G/Y | 3E/8N |
| 01857.*A | MADERA | MADERA MUNI | SFO | G/R/Y | 1/2 |
| 01866.*A | MAMMOTH LAKES | MAMMOTH JUNE LAKES | SFO | G/Y | 1 |
| 01873.*A | MARIPOSA | MARIPOSA-YOSEMITE | SFO | G/Y | |
| 01882.2*A | MARKLEEVILLE | ALPINE COUNTY | SFO | G/S/Y | |
| 01864.*A | MARYSVILLE | YUBA COUNTY | SFO | G/P/R.V/Y | 3P |
| 01886.*A | MENDOTA | MENDOTA | SFO | G/Y | |
| 01882.*A | MERCED | MERCED MUNICIPAL/MACREADY FIELD | SFO | G/Y | 8P |
| 01896.*A | MODESTO | MODESTO CITY-COUNTY-HARRY SHAM FIELD | SFO | G/Y | 1/8P |
| 01899.*A | MOJAVE | MOJAVE | SFO | G/Y | 1/3P/4/8N |
| 01906.*A | MONTAGUE | SISKIYOU COUNTY | SFO | G/P/Y/3 | 4 |
| 01914.*A | MONTEREY | MONTEREY PENINSULA | SFO | G/P/Y | 1/2 |

04/30/90

CHAP 11

SECTION 3.  CALIFORNIA

5190.2R

PAGE 096

| FAA SITE NO. | LOCATION | OFFICIAL AIRPORT NAME | DIST CODE | TYPES OF AGREEMENTS | STATUS |
|---|---|---|---|---|---|
| 01933.*A | NAPA | NAPA COUNTY | | G/Y | 1 |
| 01938.*A | NEEDLES | NEEDLES | | G/S/Y/3 | |
| 01967.*A | NOVATO | GNOSS FIELD | | | |
| 01971.*A | OAKDALE | OAKDALE | | | |
| 01971.7*A | OAKLAND | METROPOLITAN OAKLAND INTL | SFO | G/P/Y | 1/3P/8P |
| 01972.*A | OCEANO | OCEANO COUNTY | SFO | G/P/R/Y | |
| 01995.8*A | OCOTILLO WELLS | OCOTILLO | SFO | P | |
| 01998.*A | ONTARIO | ONTARIO INTL | SFO | G/Y | 8N |
| 01998.B*A | ORLAND | HAIGH FIELD | SFO | G/P/R/Y | 1/2/3P/4 |
| 02001.*A | OROVILLE | OROVILLE MUNI | SFO | G/Y | 3P/4/8P |
| 02013.*A | OXNARD | OXNARD | SFO | G/P/R/Y | |
| 02022.*A | PALMDALE | PALMDALE PRODN FLT/TEST INSTLN AF PLANT 42 | | G/Y | 1/3P |
| 02052.*A | PALM SPRINGS | PALM SPRINGS REGIONAL | | G/P/Y/3 | 1 |
| 02062.4*A | PALO ALTO | PALO ALTO ARPT OF SANTA CLARA CO | | G/Y | 1/3P |
| 02069.5*A | PASO ROBLES | PASO ROBLES MUNI | | G/P/Y/3 | 1 |
| 02062.*A | PETALUMA | PETALUMA MUNI | | G/Y | 1/3E/4/8P |
| 02062.*A | PIXLEY | PIXLEY | | G/Y | |
| 02076.*A | PLACERVILLE | PLACERVILLE | | 1 | |
| 02076.*A | PORTERVILLE | PORTERVILLE MUNI | | G/R/Y | |
| 02078.*A | QUINCY | GANSNER FIELD | | G/Y | 3P/8P |
| 02083.51*A | RAMONA | RAMONA | | G/P/Y | 1 |
| 02089.*A | RANCHO CALIFORNIA | FRENCH VALLEY | | G/Y | |
| 02092.*A | RED BLUFF | RED BLUFF MUNI | | G/Y | 3E/4/8N |
| 02099.*A | REDDING | REDDING MUNI | SFO | G/P/R/Y | |
| 02102.*A | REDLANDS | REDLANDS MUNI | SFO | G/P/R/N/Y | 1/3P |
| 02124.*A | REEDLEY | REEDLEY MUNI | | G/Y | |
| 02124.2*A | RIALTO | RIALTO MUNI/MIRO FLD/ | | G/Y | |
| 02127.*A | RIVERSIDE | RIVERSIDE MUNI | SFO | G/Y | |
| 02137.1*A | SACRAMENTO | SACRAMENTO METROPOLITAN | SFO | G/Y | 1 |
| 02137.1*A | SACRAMENTO | SACRAMENTO EXECUTIVE | SFO | G/P/Y/3 | 1 |
| 02165.*A | SALINAS | SALINAS MUNI | SFO | G/Y | 3P/4 |
| 02166.1*A | SAN ANDREAS | CALAVERAS CO-MAURY RASMUSSEN FIELD | SFO | G/P/Y | |
| 02165.*A | SAN CARLOS | SAN CARLOS | SFO | G/P/Y/3 | |
| 02180.*A | SAN DIEGO/EL CAJON/ | GILLESPIE FIELD | | G/Y | 3E/4 |
| 02187.*A | SAN DIEGO | MONTGOMERY FIELD | | G/P/Y | 1/2 |
| 02203.*A | SAN DIEGO | SAN DIEGO INTL-LINDBERGH FLD | | G/S/Y | 1/3E/4/8N |
| 02205.*A | SAN DIEGO | BROWN FIELD MUNI | | G/P/R/Y | 1/2 |
| 02211.*A | SAN FRANCISCO | SAN FRANCISCO INTL | SFO | G/Y | |
| 02230.*A | SAN JOSE | REID-HILLVIEW OF SANTA CLARA COUNTY | SFO | G/P/Y | 1/8P |
| 02213.2*A | SAN JOSE | SAN JOSE INTERNATIONAL | SFO | G/Y | |
| 02255.*A | SAN LUIS OBISPO | SAN LUIS OBISPO COUNTY-MC CHESNEY FIELD | SFO | G/P/Y | 1/8P |
| 02251.*A | SAN MARTIN | SOUTH COUNTY ARPT OF SANTA CLARA COUNTY | | G/Y | |
| 02253.*A | SANTA BARBARA | SANTA BARBARA MUNI | | G/P/Y | 1/3E/4 |
| 02253.*A | SANTA BARBARA | JOHN WAYNE AIRPORT-ORANGE COUNTY | | G/P/Y | 1/3E/4 |
| 02251.*A | SANTA MARIA | SANTA MARIA PUBLIC | | G/P/Y | |
| 02253.*A | SANTA MARIA | SANTA MARIA PUBLIC | | G/P/Y/3 | 1/3E/4/8 |
| 02251.*A | SANTA MONICA | SANTA MONICA MUNI | | G/P/Y/3 | 1/3E |
| 02260.*A | SANTA ROSA | SONOMA COUNTY | SFO | G/P/R/Y | 1/3E |

04/30/90

## SECTION 3.  CALIFORNIA

5190.2R

| FAA SITE NO. | LOCATION | OFFICIAL AIRPORT NAME | DIST CODE | TYPES OF AGREEMENTS | STATUS |
|---|---|---|---|---|---|
| 02264.*A | SANTA YNEZ | SANTA YNEZ | | G/Y | 3E/4/8 |
| 02292.*A | SHAFTER | SHAFTER-MINTER FIELD | | G/Y | 1 |
| 02303.*A | SOUTH LAKE TAHOE | LAKE TAHOE | | G/P/Y | 1/2/3P/4 |
| 02314.*A | STOCKTON | STOCKTON METROPOLITAN | SFO | G/Y | |
| 02332.*A | SUSANVILLE | SUSANVILLE MUNI | SFO | G/Y | |
| 02341.*A | TEHACHAPI | TEHACHAPI MUNI | SFO | G/P/Y | |
| 02352.*A | THERMAL | THERMAL MUNI | SFO | Y/I | |
| 02351.*A | TORRANCE | TORRANCE MUNI | SFO | P | 3E/4/8N |
| 02358.*A | TRACY | NEW JERUSALEM | SFO | G/R/Y | |
| 02359.*A | TRACY | TRACY MUNI | SFO | 1 | 4/8N |
| 02350.*A | TREED | | SFO | G/R/Y | |
| 02362.1*A | TRINITY CENTER | TRINITY CENTER | SFO | 1 | |
| 02366.*A | TRUCKEE | TRUCKEE-TAHOE | SFO | G/S/Y | |
| 02371.*A | TULARE | MEFFORD FIELD | SFO | S/I | |
| 02376.*A | TULELAKE | TULELAKE MUNI | SFO | R | |
| 02379.2*A | TURLOCK | TURLOCK MUNI | SFO | G/S/Y | |
| 02383.*A | TWENTYNINE PALMS | TWENTYNINE PALMS | SFO | G/Y | 1/8P |
| 02385.*A | UKIAH | UKIAH MUNI | SFO | G/Y | |
| 02389.*A | UPLAND | CABLE | M/Y | | |
| 02413.*A | VACAVILLE | NUT TREE | SFO | G/P/Y | 2/3P/4 |
| 02416.*A | VAN NUYS | VAN NUYS | SFO | G/R/Y | 1/3P |
| 02422.*A | VISALIA | VISALIA MUNI | | 3 | 7E |
| 02429.*A | VISALIA | SEQUOIA FIELD | SFO | G/Y | |
| 02455.1*A | WASCO | WASCO-KERN COUNTY | SFO | G/P/Y | |
| 02455.*A | WATSONVILLE | WATSONVILLE MUNI | SFO | 1 | |
| 02461.*A | WEED | WEED | SFO | Y/I | 3P |
| 02462.2*A | WILLITS | ELLS FIELD-WILLITS MUNI | SFO | G/Y/3 | 8P |
| 02494.*A | WILLOWS | WILLOWS-GLENN COUNTY | SFO | G/P/Y | |
| | WINTERS/DAVIS/WOODLAND | YOLO COUNTY | SFO | G/Y | 4 |
| | YUBA CITY | SUTTER COUNTY | SFO | | |

TOTAL AIRPORTS: 170

CHAP 11

# **Exhibit C**



**Tuesday**
**February 16, 1999**

Part II

# Department of Transportation

Federal Aviation Administration

**Policy and Procedures Concerning the Use of Airport Revenue; Notice**

# DEPARTMENT OF TRANSPORTATION

## Federal Aviation Administration

[Docket No. 28472]

## Policy and Procedures Concerning the Use of Airport Revenue

**AGENCY:** Federal Aviation Administration (FAA) DoT

**ACTION:** Policy statement.

**SUMMARY:** This document announces the final publication of the Federal Aviation Administration policy on the use of airport revenue and maintenance of a self-sustaining rate structure by Federally-assisted airports. This statement of policy ("Final Policy") was required by the Federal Aviation Administration Authorization Act of 1994, and incorporates provisions of the Federal Aviation Administration Reauthorization Act of 1996. The Final Policy is also based on consideration of comments received on two notices of proposed policy issued by the FAA in February 1996, and December 1996, which were published in the **Federal Register** for public comment. The Final Policy describes the scope of airport revenue that is subject to the Federal requirements on airport revenue use and lists those requirements. The Final Policy also describes prohibited and permitted uses of airport revenue and outlines the FAA's enforcement policies and procedures. The Final Policy includes an outline of applicable record-keeping and reporting requirements for the use of airport revenue. Finally, the Final Policy includes the FAA's interpretation of the obligation of an airport sponsor to maintain a self-sustaining rate structure to the extent possible under the circumstances existing at each airport.

**DATES:** This Final Policy is effective February 16, 1999.

**FOR FURTHER INFORMATION CONTACT:** J. Kevin Kennedy, Airport Compliance Specialist, Airport Compliance Division, AAS–400, Office of Airport Safety and Standards, 800 Independence Avenue, SW., Washington, DC 20591, telephone (202) 267–8725; Barry L. Molar, Manager, Airport Compliance Division, AAS–400, Office of Airport Safety and Standards, 800 Independence Avenue, SW., Washington, DC 20591, telephone (202) 267–3446.

**SUPPLEMENTARY INFORMATION:**

## Outline of Final Policy

The Final Policy implements the statutory requirements that pertain to the use of airport revenue and the maintenance of an airport rate structure

that makes the airport as self-sustaining as possible. The Final Policy generally represents a continuation of basic FAA policy on airport revenue use that has been in effect since enactment of the Airport and Airway Improvement Act of 1982 (AAIA), currently codified at 49 U.S.C. § 47107(b). The FAA issued a comprehensive statement of this policy in the Notice of Proposed Policy dated February 26, 1996 (Proposed Policy), and addressed four particular issues in more detail in the Supplemental Notice of Proposed Policy dated December 18, 1996 (Supplemental Notice). The Final Policy includes provisions required by the Federal Aviation Administration Authorization Act of 1994, Public Law 103–305 (August 23, 1994) (FAA Authorization Act of 1994), and the Airport Revenue Protection Act of 1996, Title VIII of the Federal Aviation Administration Reauthorization Act of 1996, Public Law 104–264 (October 9, 1996), 110 Stat. 3269 (FAA Reauthorization Act of 1996). The Final Policy also includes changes adopted in response to comments on the Proposed Policy and Supplemental Notice.

The Final Policy contains nine sections. Section I is the Introduction, which explains the purpose for issuing the Final Policy and lists the statutory authorities under which the FAA is acting.

Section II, "Definitions," defines federal financial assistance, airport revenue and unlawful revenue diversion.

Section III, "Applicability of the Policy," describes the circumstances that make an airport owner or operator subject to this Final Policy.

Section IV, "Statutory Requirements for the Use of Airport Revenue," discusses the statutes that govern the use of airport revenue.

Section V, "Permitted Uses of Airport Revenue," describes categories and examples of uses of airport revenue that are considered to be permitted under 49 U.S.C. 47107(b). The discussion is not intended to be a complete list of all permitted uses but is intended to provide examples for practical guidance.

Section VI, "Prohibited Uses of Airport Revenue," describes categories and examples of uses of airport revenue not considered to be permitted under 49 U.S.C. 47107(b). The discussion is not intended to be a complete list of all prohibited uses but is intended to provide examples for practical guidance.

Section VII, "Policies Regarding Requirement for a Self-Sustaining Airport Rate Structure," describes policies regarding the requirement that

an airport maintain a self-sustaining airport rate structure. This is a new section of the policy, which provides more complete guidance on the subject than appeared in either the Proposed Policy or Supplemental Notice.

Section VIII, "Reporting and Audit Requirements," addresses the requirement for the filing of annual airport financial reports and the requirement for a review and opinion on airport revenue use in a single audit conducted under the Single Audit Act, 31 U.S.C. §§ 7501–7505.

Section IX, "Monitoring and Compliance," describes the FAA's activities for monitoring airport sponsor compliance with the revenue-use requirements and the requirement for a self-sustaining airport rate structure and the range of actions that the FAA may take to assure compliance with those requirements. Section IX also describes the sanctions available to FAA when a sponsor has failed to take corrective action to cure a violation of the revenue-use requirement.

## Background

### Governing Statutes

Four statutes govern the use of airport revenue: the AAIA; the Airport and Airway Safety and Capacity Expansion Act of 1987; the FAA Authorization Act of 1994; and the FAA Reauthorization Act of 1996. These statutes are codified at 49 USC 47101, *et seq.*

Section 511(a)(12) of the AAIA, part of title V of the Tax Equity and Fiscal Responsibility Act, Public Law 97–248, (now codified at 49 USC 47107(b)) established the general requirement for use of airport revenue. As originally enacted, the revenue-use requirement directed public airport owners and operators to "use all revenues generated by the airport * * * for the capital or operating costs of the airport, the local airport system, or other local facilities which are owned or operated by the owner or operator of the airport and directly related to the actual transportation of passengers or property."

The original revenue-use requirement also contained an exception, or "grandfather" provision, permitting certain uses of airport revenue for non-airport purposes that predate the AAIA.

The Airport and Airway Safety and Capacity Expansion Act of 1987, Public Law 100–223 (December 30, 1987), narrowed the permitted uses of airport revenues to nonairport facilities that are "substantially" as well as directly related to actual air transportation; required local taxes on aviation fuel enacted after December 30, 1987, to be

spent on the airport or, in the case of state taxes on aviation fuel, state aviation programs or noise mitigation on or off the airport; and slightly modified the grandfather provision.

The FAA Authorization Act of 1994 Act included three sections regarding airport revenue.

Section 110 added a policy statement to Title 49, Chapter 471, ''Airport Development,'' concerning the preexisting requirement that airports be as self-sustaining as possible, 49 USC § 47101(a)(13).

Section 111 added a new sponsor assurance requiring airport owners or operators to submit to the Secretary and to make available to the public an annual report listing all amounts paid by the airport to other units of government, and the purposes for the payments, and a listing of all services and property provided to other units of government and the amount of compensation received. Section 111 also requires an annual report to the Secretary containing information on airport finances, including the amount of any revenue surplus and the amount of concession-generated revenue.

Section 112(a) requires the Secretary to establish policies and procedures that will assure the prompt and effective enforcement of the revenue-use requirement and the requirement that airports be as self-sustaining as possible.

Section 112(b) amends 49 USC § 47111, ''Payments under project grant agreements,'' to provide the Secretary, with certain limitations, to withhold approval of a grant application or a new application to impose a Passenger Facility Charge (PFC) for violation of the revenue-use requirement. Section 112(c) authorizes the Secretary to impose civil penalties up to a maximum of $50,000 on airport sponsors for violations of the revenue retention requirement. Section 112(d) requires the Secretary, in administering the 1994 Authorization Act's revenue diversion provisions and the AIP discretionary grants, to consider the amount being lawfully diverted pursuant to the grandfathering provision by the sponsor compared to the amount being sought in discretionary grants in reviewing the grant application. Consequently, in addition to the prohibition against awarding grants to airport sponsors that have illegally diverted revenue, the FAA considers the lawful diversion of airport revenues by airport sponsors under the grandfather provision as a factor militating against the distribution of discretionary grants to the airport, if the amounts being lawfully diverted exceed the amounts so lawfully diverted in the airport's first year after August 23, 1994.

Section 112(e), which amended the Anti-Head Tax Act, 49 USC § 40116(d)(2)(A), prohibits a State, political subdivision, or an authority acting for a State or political subdivision from collecting a new tax, fee, or charge which is imposed exclusively upon any business located at a commercial service airport or operating as a permittee of the airport, other than a tax, fee, or charge utilized for airport or aeronautical purposes.

Title VIII of the FAA Reauthorization Act of 1996 included new provisions on the use of airport revenue. Among other things, section 804 codifies the preexisting grant-assurance based revenue-use requirement as 49 U.S.C. § 47133. Section 804 also expands the application of the revenue-use restriction to any airport that is the subject of Federal assistance.

Section 805, codified as 49 U.S.C. § 47107(m) *et seq.*, requires recipients of Federal assistance for airports who are subject to the Single Audit Act to include a review and opinion on airport revenue use in single audit reports.

Under section 47107(n), the Secretary, acting through the Administrator of the FAA, will perform fact finding and conduct hearings in certain cases; may withhold funds that would have otherwise been made available under Title 49 of the U.S. Code to a sponsor including another public entity of which the sponsor is a member entity, and may initiate a civil action under which the sponsor shall be liable for a civil penalty, if the Secretary receives a report disclosing unlawful use of airport revenue. Section 47107(n) also includes a statute of limitations that prevents the recovery of funds illegally diverted more than six years after the illegal diversion occurs. The Secretary is also authorized to recover civil penalties in the amount of three times the unlawfully diverted airport revenue under 49 U.S.C. § 46301(n)(5).

Section 47107(o) requires the Secretary to charge a minimum annual rate of interest on the amount of any illegal diversion of revenues. Interest is due from the date of the illegal diversion.

Section 47107(l)(5) imposes a statute of limitation of six years after the date on which the expense is incurred for repayment of sponsor claims for reimbursement of past expenditures and contributions on behalf of the airport. A sponsor may claim interest on the amount due for reimbursement, but only from the date the Secretary determines that the airport owes a sponsor.

*Procedural History*

In response to provisions in the 1994 Authorization Act, the FAA issued the Proposed Policy. (61 FR 7134, February 26, 1996) After reviewing all comments received in response to the notice, the FAA issued the Supplemental Notice on December 11, 1996, and requested further public comment. (61 FR 66735, December 18, 1996) Although the FAA published both documents as proposed policies, both notices stated that the FAA would apply the policies in reviewing revenue-use issues pending publication of a final policy.

The Department received 32 comments on the Proposed Policy and received 50 comments on the Supplemental Notice. Comments were received from airport owners and operators, airline organizations, transit authorities, and affected businesses and organizations. Most of the commenters were airport owners and operators. The Airport Council International-North America and the American Association of Airport Executives also provided comments supporting the sponsor/operator positions. Two major groups commented on behalf of the airlines—the Air Transport Association of America and the International Air Transport Association.

The Aircraft Owners and Pilots Association and the National Air Transportation Association commented on behalf of the general aviation and private aircraft owners. AOPA was primarily concerned with sponsor/airport accountability and the prompt and effective enforcement of the revenue diversion prohibitions.

Several port authorities, transit authorities, environmental groups, other public interest groups, trade associations, private businesses and individuals commented on a variety of specific issues.

The following discussion of comments is organized by issue rather than by commenter. Issues are discussed in the order they arise in the Final Policy. Airport proprietors and their representatives who took similar positions on an issue are collectively referred to as ''airport operators.'' Airlines and airline trade associations are referred to as ''air carriers'' when the organizations took common positions. The summary of comments is intended to represent the general divergence or correspondence in commenters' views on various issues. It is not intended to be an exhaustive restatement of the comments received.

In addition, many comments on the original notice of proposed policy were addressed in the supplemental notice.

Those comments are not addressed again in this discussion.

The FAA considered all comments received, even if they are not specifically identified in this summary.

**Discussion of Comments by Issue**

*1. Applicability*

a. Applicability of Policy to Privately Owned Airports

In accordance with the statutes in effect at the time it was published, the Proposed Policy applied only to public agencies that had received AIP grants for airport development. The Proposed Policy included a specific statement that it did not apply to privately owned airports that had taken AIP grants while under private ownership. The Supplemental Notice did not modify these provisions.

*The Comments:* A public interest group concerned about reducing airport noise and mitigating its impacts recommended that the policy should apply to operators of privately owned airports.

*Final Policy:* The new statutory provision added by the Reauthorization Act of 1996, governing the restriction on the use airport revenue, 49 U.S.C. § 47133, does not differentiate between publicly or privately owned airports. The statute applies to all airports that have received Federal assistance. Under the AAIA certain privately-owned airports that are available for public use are eligible to receive airport development grants. As a result, any privately owned airport that receives an AIP grant after October 1, 1996, (the effective date of the FAA Reauthorization Act of 1996), is subject to the revenue use requirements. The applicability section of the Final Policy, Section III, is modified to reflect the expansion of the revenue-use requirement to include privately-owned airports.

b. Applicability of Policy to Publicly and Privately Owned Airports Subject to Federal Assistance

As a result of the same change in the law, recipients of Federal assistance provided after October 1, 1996, other than AIP grants, are also subject to the revenue-use restrictions. However, the Reauthorization Act of 1996 did not define Federal assistance, and the legislative history does not provide guidance on the meaning of this term. In addition, it did not explicitly address the status of airports that received Federal assistance other than AIP airport development grants before October 1, 1996, and therefore were not already bound by the revenue use

restrictions. These issues are addressed in the Final Policy, based on the FAA's review of the statute, its legislative history and relevant judicial decisions.

Applicability of the revenue-use requirement under § 47133 depends on the definition of the term "Federal assistance." In the absence of guidance in the statute and legislative history, the FAA has relied on the interpretation given to the similar term "Federal financial assistance" in Federal regulations and court decisions. 28 CFR part 41, "Implementation of Executive Order 12250, Non-discrimination on the Basis of Handicap in Federally Assisted Programs," section 41.4(e) establishes the definition of "Federal financial assistance" for all Federal agencies implementing § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. That definition is in turn subject to the limitation of the Department of Transportation v. Paralyzed Veterans, 477 U.S. 597 (1986) (Paralyzed Veterans), which specifically addressed the issue of whether certain facilities and services provided by the FAA in managing the national airspace system constituted federal assistance. That decision held that the provision of air navigation services and facilities to airlines by the FAA did not make the commercial airline passenger service a Federally assisted program within the meaning of § 504.

The FAA's interpretation of the term "Federal assistance" is included in Section II of the Final Policy, Definitions. The Final Policy's definition of "Federal assistance" adapts the generalized language of 28 CFR § 41.4(e) to the specific circumstances of airports receiving Federal support and reflects the holding of the Paralyzed Veterans decision. The definition lists as Federal Assistance the following:

(1) Airport development and noise mitigation grants;

(2) Transfers, under various statutory provisions, of Federal property at no cost to the airport sponsors; and

(3) Planning grants related to a specific airport.

Under this definition, FAA installation and operation of navigational aids and FAA operation of control towers are not considered Federal assistance, based on the Supreme Court decision in Paralyzed Veterans. Similarly, the FAA does not consider passenger facility charges (PFCs) to be Federal assistance even though PFCs may be collected only with approval of the FAA.

Airport development and noise mitigation grants are considered Federal assistance because they apply to a

specific airport, and that airport is, therefore, "subject to Federal assistance" under the statute. Transfers of Federal property to an airport are considered Federal assistance because they also apply to a specific airport. Planning grants may apply to a specific airport or may be more general in nature. Under § 47133, the FAA considers only planning grants related to a specific airport to be Federal assistance.

However, not all airports that are the subject of Federal assistance are necessarily bound to the revenue-use assurance simply by the passage of § 47133. Established Federal grant law prevents a statute from being construed to modify unilaterally the terms of preexisting grant agreements absent a clear showing of legislative intent to do so. *Bennett* v. *New Jersey* 470 U.S. 632 (1985), 84 L.Ed 2d 572, 105 S.Ct. 1555. Neither the statutory language nor its legislative history indicates an intent by Congress to apply § 47133 to impose the revenue-use requirement on airports that were not already subject to it. By contrast, a recent example of Congressional intent to modify preexisting grant agreements exists in § 511(a)(14) of the Airport and Airway Improvement Act of 1982, 49 USC App. 2210(a)(14), which was recodified at 49 USC 47107(c)(2)(B). That subsection, which was added to the AAIA in 1987, established requirements for the disposal of land acquired with Federal grants that is no longer needed for airport purposes. The statute by its terms applied to an "airport owner or operator [who] receives a grant before on or after December 31, 1987" for the purchase of land for airport development purposes. This language demonstrated a clear Congressional intent to modify preexisting grant agreements. The language of § 47133 and its legislative history lacks any such express direction.

Therefore, the FAA does not interpret § 47133 to impose the revenue-use requirements on an airport that was not already subject to the revenue-use assurance on October 1, 1996. An airport that had accepted Surplus Property from the Federal government, but did not have an AIP grant in place on October 1, 1996, would not be subject to the revenue-use requirement by operation of § 47133. If that airport accepted additional Federal property or accepted an AIP grant on or after October 1, 1996, the airport would be subject to the revenue-use requirement. As discussed below, by operation of § 47133, the revenue-use requirement would remain in effect as long as the airport functioned as an airport.

For airports that were already subject to the revenue-use requirement on October 1, 1996, and those that become subject to the requirement after that date, the effect of § 47133 is to extend the duration of the requirement indefinitely. This application is not explicit in the statute and reference to the legislative history of the statute is necessary to determine congressional intent and the specific meaning and application of the statutory language. The legislative history of § 47133 makes it clear that Congress enacted § 47133 to extend the duration of the revenue-use requirement for airports that are already subject to it. In describing an earlier version of § 47133, the Committee on Transportation and Infrastructure of the House of Representatives stated that the reason for the change was because "revenue diversion burdens interstate commerce even if the airport is no longer receiving grants. In recognition of this fact, the bill applies the exact same revenue diversion prohibition to airports that have a FAA certificate [modified to airports that are subject to Federal assistance in conference] as now applied to airports that receive AIP grants. For the most part, these will be the same airports." H.R. Rep. 104–714 (July 26, 1996) at 38, reprinted at 1996 US Code, Congressional and Administrative News at 3675. The report further stated that broadening the prohibition would "make it clear that an airport cannot escape this prohibition [on revenue diversion] by refusing to accept AIP grants[;]" remove "this perverse incentive to refuse AIP grants * * *[;]," and "once again [encourage] all airports to use available Federal money to increase safety, capacity, and reduce noise." *Id.*

Any airport that had an outstanding AIP grant agreement in effect on October 1, 1996, was already bound to the same revenue use assurance that is contained in § 47133. Because § 47133 is extending the duration of an existing obligation, there is no conflict with the principle of Federal grant law outlined above.

c. Relationship of Final Policy to Airport Privatization

In the applicability and definition section of the Proposed Policy, the FAA stated that proceeds from the sale of the entire airport as well as from individual parcels of land would be considered as airport revenue. The FAA also stated that it did not intend "to effectively bar airport privatization initiatives," and that the FAA would take into account "the special conditions and constraints imposed by the fact of a change in ownership of the airport." 61 Fed. Reg. at 7140. The FAA proposed to remain

"open and flexible in specifying conditions on the use of revenue that will protect the public interest and fulfill the requirements and objectives of § 47107(b) without unnecessarily interfering with the appropriate privatization of airport infrastructure." *Id.*

*Airport operators:* A number of airport operators expressed concern that the guidance in the Proposed Policy was too ambiguous to encourage privatization and might discourage privatization initiatives. One operator suggested that the FAA should adopt a flexible approach to the proceeds of a privatization transaction when an airport's concession revenues are sufficient to allow a public owner to use some sales proceeds for nonairport purposes without increasing fees charged to aeronautical users and without continuing a need for Federal subsidy. Another airport operator suggested that the financial terms of a transaction would reflect the local circumstances in which the transaction was negotiated and recommended that the FAA account for this fact in reviewing revenue diversion claims.

*Air carriers:* ATA adamantly opposed the sale or transfer of a public use airport in a situation when such an action would cause airport revenue to be taken off the airport. ATA believes that the FAA does not have the flexibility or the statutory authority to require anything less than 100% compliance under 49 USC § 47107(b).

*General aviation:* The AOPA is concerned that the policy gives the impression that airport privatization is a fully resolved issue. The AOPA believes that the policy must avoid any implication that the issue is resolved or that the FAA endorses privatization.

*Other commenters:* Three public interest organizations addressed the issue of privatization from different perspectives. A group concerned with preventing and mitigating airport noise suggests that the FAA must ensure that adequate funds remain available to meet current and future airport noise mitigation needs. This group recommended that, before approving a transfer, the FAA should conduct a thorough audit of the airport's compliance with noise compatibility requirements, plans, and promises, and that the FAA should assess the adequacy of resources to address noise compatibility problems. The FAA should also require enforcement mechanisms to ensure implementation of noise compatibility and mitigation measures as a condition of the sale or transfer.

Two other groups supported a policy that does not discourage airport privatization. One of these suggested that the FAA consider defederalization of airports. The comments regarding defederalization are beyond the scope of this proceeding, because they would require statutory changes.

*Final Policy:* The Final Policy adopts the basic approach of the Proposed Policy toward privatization, with some language changes for clarity and readability. In addition, the Final Policy explicitly acknowledges the Airport Privatization Pilot Program.

Guidance on the process for obtaining FAA approval of the sale or lease of an airport is contained in FAA Order 5190.6a, Airport Compliance Requirements. The Final Policy is not intended to modify the process in any way. FAA approval is required for any transfer, including those between government entities. The Final Policy makes clear, however, that in processing an application for approval the FAA will: (a) treat proceeds from the sale or lease as airport revenue; and (b) apply the revenue-use requirement flexibly, taking into consideration the special conditions and constraints imposed by a change in ownership of the airport. For example, as is noted in the Final Policy, if the owner of a single airport is selling the airport, it may be inappropriate to require the seller to simply return the proceeds to the private buyer to use for operation of the airport.

The FAA requires the transfer document to bind the new operator to all the terms and grant assurances in the sponsor's grant agreement. The FAA retains sufficient authority and power through its grant assurances to ensure compliance by the new owner with all of its obligations, including any grant-based obligations relating to mitigation of environmental impacts of the airport; to conduct sponsor audits and to take other appropriate action to ensure that the airport is self-sustaining.

The Final Policy's approach to privatization does not represent, as ATA suggests, less than 100 percent compliance with the revenue-use requirement. The FAA agrees with the ATA that we cannot waive that requirement. Rather, the FAA has committed to exercise its authority to interpret the requirement in a flexible way to account for the unique circumstances presented by a change of ownership.

The Final Policy is not an endorsement of privatization and it does not resolve the policy debate about privatization. FAA will continue to review the sale or lease of an airport on

a case-by-case basis, including transfers proposed under the Airport Privatization Pilot Program, 49 U.S.C. 47134, created by § 149 of the FAA Reauthorization Act of 1996. The demonstration program authorizes the FAA to exempt five airports from Federal statutory and regulatory requirements governing the use of airport revenue. Under the program, the FAA can exempt an airport sponsor from its obligations to repay Federal grants, to return property acquired with Federal assistance, and to use the proceeds of the sale or lease exclusively for airport purposes. The latter exemption is also subject to approval by the air carriers serving the airport.

The FAA notes the concerns that the revenue-use requirement may discourage privatization. Congress addressed this prospect by enacting the Privatization Pilot Program, which authorizes the FAA to grant exemptions from sections 47107(b) and 47133 to permit the sponsor to use sales or lease proceeds for nonairport purposes, on certain conditions. That exemption would not be required unless sales or lease proceeds were airport revenue. In addition, the FAA will consider the unique circumstances—financial and otherwise—of individual transactions in determining compliance with section 47107(b), and this should address to some degree the commenters' concerns about privatization.

**d. Effect of § 47133 on Return on Investment for Private Airport Owners or Operators That Accept Federal Assistance**

By extending the revenue-use requirement to privately-owned airports, § 47133 requires the FAA to consider a new issue—the extent to which a private owner that assumes the revenue-use obligation may be compensated from airport revenue for the ownership of the airport. Section 47133 prohibits all such private airport owners or operators from using airport revenue for any purpose other than the capital and operating costs of the airport. However, the FAA does not consider section 47133 to preclude private owners or operators from being paid or reimbursed reasonable compensation for providing airport management services. Private operators, presently, provide airport management services at a number of airports. In many cases, these airports are publicly owned and subject to the revenue-use requirement. The private operator is providing these services under some form of contract with the public owner. These services are considered part of the operating cost of the airport owner, and

the fees can be paid from airport revenue.

It is reasonable to equate private operators managing publicly owned airports with private owner/operators managing privately owned or leased airports. To avoid any confusion of the issue, reasonable compensation for management services provided by the owner of a privately-owned airport is identified as a permitted use of airport revenue in the Final Policy.

Private airport owners may typically expect a return on their capital investment. Such investment could be considered a capital cost of the airport. In the case of private owners or operators of airports who have assumed the revenue-use obligation, that obligation would limit the ability to use the return on capital invested in the airport for nonairport purposes. In particular, the FAA expects private owners to be subject to the same requirements governing a self-sustaining airport rate structure and the recovery of unreimbursed capital contributions and operating expenses from airport revenue as public sponsors. Under section 47107(l)(5), private sponsors—like public sponsors—may recover their original investment within the six-year statute of limitation. In addition, they are entitled to claim interest from the date the FAA determines that the sponsor is entitled to reimbursement under section 47107(p). Any other profits generated by a privately-owned airport subject to section 47133 (after compensating the owner for reasonable costs of providing management services) must be applied to the capital and operating costs of the airport.

This interpretation is required by provisions of 49 U.S.C. 47134, the airport privatization pilot program. Section 47134 authorizes the FAA to grant exemptions from the revenue-use requirement to permit the private operator to "earn compensation from the operations of the airport." This exemption would not be necessary if section 47133 did not restrict the freedom of the private owner of a Federally-assisted airport to use the profits from the investment in the airport for nonairport purposes. This interpretation does not unreasonably burden private owners, because they receive a benefit (in the form of either Federal property added to the airport or Federal grant funds) in exchange for assuming the restrictions on the use of their profit.

**e. Grandfather Provisions**

The Proposed Policy included a discussion of the grandfather provisions of section 47107(b) in the section on

permitted uses of airport revenue. That discussion included a list of examples of financing obligations and statutory provisions that had been previously found by the Department of Transportation to confer grandfather status.

*The Comments:* Two airport operators commented on this issue. One is an airport operator whose status under the grandfather provisions was under consideration by the FAA when the Proposed Policy was published. Its concerns were addressed by the FAA's consideration of its individual situation.

The second commenter is airport operator already established as a grandfathered airport operator. This commenter recommends that the Final Policy continue to recognize the rights of grandfathered airports.

*Final Policy:* The Final Policy continues to recognize the rights of grandfathered airport owners set forth at title 49 U.S.C. 47107(b)(2) and 47133. To qualify an airport for grandfathered status, the statute requires that local covenants, assurances or governing laws pre-dating September 2, 1982, must specifically pledge the use of airport generated revenues to support not only the airport but also the general debt obligations or other facilities of the owner or operator. However, the Final Policy is modified to reflect the requirement in the 1996 FAA Reauthorization Act that the FAA consider the increase in grandfathered payments of airport revenue as a factor militating against the award of discretionary grants.

**f. Applicability to Non-municipal Airport Authorities**

*Lehigh-Northampton Airport Authority (LNAA):* LNAA asserted that the airport revenue-use requirement does not allow FAA to regulate airport transactions with non-governmental parties and does not empower FAA to override state and local laws governing the use of airport revenue for airport marketing and promotional activities. The commenter advanced a number of arguments as to why FAA does not have authority to restrict such transactions. First, Congress has shaped the revenue diversion statute to identify financial irregularities in dealings between an airport enterprise account and another unit of government. The statute does not contemplate FAA regulation of airport financial relationships with non-government parties. Second, Congress did not intend the "capital or operating costs" language in the revenue diversion statute to authorize a new Federal regulatory scheme to narrow the types or levels of airport expenditures beyond

what is legal under applicable state and local law. Third, there is no statutory requirement for FAA to regulate airport expenditures for community events or charitable contributions in the absence of facts suggesting that such expenditures are the result of undue influence by a governmental unit.

The LNAA currently has a case pending before the FAA under FAR Part 13, in which certain expenditures that LNAA characterizes as marketing and promotional expenses are being examined for consistency with the revenue-use requirement. LNAA's assertions with respect to its own promotional activities will be addressed by the FAA in that proceeding. To the extent that LNAA's practices were inconsistent with this Final Policy, LNAA will have an opportunity to argue that the Final Policy should not be applied to its situation.

The general issues of the use of airport revenue for marketing and promotional expenses and charitable donations are discussed separately below.

The FAA is not modifying the applicability of the Final Policy based on LNAA's other concerns. The language of section 47107(b) explicitly states that revenue generated by the airport may only be expended for the capital or operating costs of the airport or local airport system; it contains no limiting language concerning "financial irregularities." The statute further defines expenditures for general economic development and promotion as unlawful use of airport revenue, providing specific authority over transactions that do not involve transfers of airport revenue to other governmental entities. See 49 U.S.C. 47107(l)(2). This provision grants authority for regulation of expenditures for charitable and community-use purposes.

In addition, the Congressional mandate to establish policies and procedures to "assure the prompt and effective enforcement" of the revenue use and self-sustainability requirements (49 U.S.C. 47107(l)(1)) provides statutory authority to adopt more detailed guidance on permitted and prohibited uses of airport revenue. Many airport operators have expressed concern over the difficulty of responding to OIG findings of unlawful revenue use without clear and specific FAA guidance on permitted and prohibited practices.

Finally, the grandfathering provision establishes Congressional intent to prohibit certain airport revenue practices authorized by state or local law that do not satisfy the specific requirements of the grandfather provisions of the AAIA.

### 2. Definition of Airport Revenue

#### a. Proceeds From Sale of Airport Property

The Proposed Policy included proceeds from the sale of airport property in the proposed definition of airport revenue. No distinction was made between property acquired with airport revenue and property acquired with other funds provided by the sponsor. In the explanatory statement, the FAA discussed alternatives it had considered, including limiting the definition to property acquired with airport revenue. (61 FR 7138) The FAA also stated that a sponsor would be able to recoup any funds it contributed to finance the acquisition of airport property as an unreimbursed capital contribution.

*Airport operators:* Airport operators objected to defining proceeds from the sale of airport property as airport revenue. ACI/AAAE argued that the definition would reduce incentives for airport sponsors to pursue legitimate airport endeavors. One airport operator argued that the definition constitutes a transfer of wealth from the taxpayers to the airport users, and that cities would be less willing to contribute to future airport projects. Another individual operator argued that the policy should not apply to property acquired with the sponsor's own funds and to property acquired with airport revenue before 1982. This airport operator further argues that application of the policy to property acquired before 1982 amounts to a taking of airport property without just compensation and without Congressional authorization. Finally, this operator argued that the proposed definition appears to contradict a portion of the FAA Compliance Handbook, Order 5190.6A (October 2, 1989), Paragraph 7–18, that states there is no required disposition of net revenues from sale or disposal of land not acquired with Federal assistance.

*Air carriers:* The ATA commented that the use of airport revenue for repayment of contributions from prior years should be limited. According to ATA, reimbursements should be permitted only when the sponsor and airport enter into a written agreement concerning the terms of reimbursement before the service or expenditure is provided.

*Other commenters:* A public interest organization opposed the treatment of proceeds from the sale of airport property as airport revenue. This commenter argued that the sponsor, as the principal provider of airport's land and capital, has a legitimate claim to cash-out the value of its investments and to use the proceeds for other purposes.

*The Final Policy:* The Final Policy does not modify the treatment of proceeds from the sale, lease or other disposal of airport property. Proceeds from the sale lease or other disposal of all airport property are considered airport revenue subject to the revenue-use requirement and this policy, unless the property was acquired with Federal funds or donated by the Federal government. While proceeds from disposal of Federally-funded and Federally-donated property are also airport revenue, these proceeds are subject to separate legal requirements that are even more restrictive than the revenue-use requirement.

As discussed in the Proposed Policy, this definition is consistent with the language of the original version of section 47107(b), which applies to "all revenues generated by the airport."

In addition, the Airport Privatization Pilot Program, 49 U.S.C. 47134, permits the FAA to grant exemptions from the revenue-use requirements to permit a sponsor to keep the proceeds from a sale or lease transaction, but only to the extent approved by 65 percent of the air carriers. An exemption would not be required unless the proceeds from the sale or lease of the entire airport were airport revenue within the meaning of section 47107(b) and 47133. Since the proceeds from the sale of an entire airport are airport revenue, it follows that the proceeds from the sale of individual pieces of airport property are also airport revenue.

Further, section 47107(l)(5)(A) establishes a six-year period during which sponsors may claim reimbursement for their capital and operating contributions. This limitation on seeking reimbursement could be avoided through the process of disposing of airport property, if the proceeds of sales were not themselves considered airport revenue. Through section 47107(l)(5)(A) Congress has defined the rights of airport owners and operators to recover their investments in airport property for use for nonairport purposes. Subject to the six-year statute of limitations, the sponsor is entitled to use airport revenues for reimbursement of such contributions. Section 47107(p) provides that a sponsor may also claim interest if the FAA determines that a sponsor is entitled to reimbursement, but interest runs only from the date on which the FAA makes the determination. As discussed below, the Final Policy provides flexibility to

**7702**    **Federal Register** / Vol. 64, No. 30 / Tuesday, February 16, 1999 / Notices

structure future contributions to permit reimbursement over a longer period of time in order to promote the financial stability of the airport. The six-year limitation, which is incorporated in the Final Policy, also addresses ATA's request for a time limit on the airport owner or operator's ability to claim recoupment for past unreimbursed requests.

The FAA does not accept the suggestion that the definition is an unauthorized taking of sponsor property without just compensation. First, as noted, the definition is supported by the 1996 FAA Reauthorization Act, which included an express provision for an exemption from the revenue use restriction for sale and lease proceeds. Second, all airport sponsors, including the airport commenters, voluntarily agreed to their restrictions on the use of airport revenue when they accepted grants-in-aid under the AIP program. Finally, the definition does not deprive the commenter of its property. The proceeds from the disposal will still flow to the commenter sponsor to be used for a legitimate local public purpose—operation and development of the commenter's airport.

The FAA acknowledged in the Proposed Policy that existing FAA internal orders contain provisions on the status of proceeds from the disposal of airport property that are inconsistent with this Final Policy. As stated in the Proposed Policy, this inconsistency does not preclude the FAA from defining proceeds from the disposal of airport property as airport revenue in this Final Policy. Rather, ''the Policy takes precedence, and the orders will be revised to reflect the policies in this statement.'' 61 FR 7138. In addition, the provisions in the FAA internal orders are in conflict with the 1996 FAA Reauthorization Act. Because of this statutory conflict, the FAA cannot continue to apply them.

### b. Revenue Generated by Off-airport Property

The Proposed Policy defined as airport revenue the revenue received for the use of property owned and controlled by a sponsor and used for airport-related purposes, but not located on the airport.

*Airport operators:* The ACI–NA/ AAAE and two individual airport operators objected to this definition of airport revenue. The ACI–NA/AAAE stated that revenues received from off-airport activities should ordinarily not be counted as airport revenue. One airport operator argued that this definition is inconsistent with the statutory definition of airport in the

AAIA. The other airport operator (the State of Hawaii) is especially concerned about revenue generated by off-airport duty fee shops.

No other comments were received.

*Final Policy:* The Final Policy does not modify the definition of airport revenue as it pertains to off-airport revenue. This definition is consistent with FAA's prior interpretation, which has defined as airport revenue the revenues received by the airport owner or operator from remote airport parking lots, downtown airport terminals, and off-airport duty free shops.

After enactment of the original revenue-use requirement, the FAA initiated an administrative action to require the State of Hawaii to use its revenue from off-airport duty free sales in a manner consistent with section 47107(b). In response, Congress amended the revenue-use requirement to provide a specific and limited exemption to the State of Hawaii to permit up to $250 million in off-airport duty-free sales revenue to be used for construction of highways that are part of the Federal-Aid highway system and that are located in the vicinity of an airport. See, 49 U.S.C. § 47107(j). The statutory exemption would only be necessary if the revenue from off-airport duty free shops is airport revenue within the meaning of the statute.

### c. Royalties From Mineral Extraction

The Proposed Policy included royalties from mineral extraction on airport property earned by a sponsor as airport revenue.

*Airport operators:* One airport operator objected to including revenue from the sale of sponsor-owned mineral, natural, or agricultural products or water to be taken from the airport in the definition of airport revenue. The operator stated that the retention of mineral rights as airport property would represent a windfall to the airport at the sponsor's expense; that the Proposed Policy is contrary to congressional intent and that it would take, without compensation, valuable property rights from the sponsor. The operator also cited a prior decision where FAA concluded the production of natural gas at Erie, Pennsylvania, does not serve either the airport or any air transportation purpose. The royalties generated by such production were determined to be outside the scope of the revenue-use requirement.

*Final Policy:* The Final Policy retains the proposed definition of airport revenue to include the sale of sponsor-owned mineral, natural, agricultural products or water to be taken from the airport. On further review of the Erie

interpretation in this proceeding, the FAA no longer considers the analogy drawn in that interpretation—between mineral extraction and operation of a convention center or water treatment plant—to be appropriate. Rather, mineral and water rights represent a part of the airport property and its value. Just as proceeds from the sale or lease of airport property constitute airport revenue, proceeds from the sale or lease of a partial interest in the property—i.e. water or mineral rights—should also be considered airport revenue. The FAA will not require an airport owner or operator to reimburse the airport for past mineral royalty payments used for nonairport purposes based on the Erie interpretation. However, all airport owners and operators will be required to treat these payments as airport revenue prospectively, starting on the publication date of the Final Policy.

With respect to agricultural products, the FAA has always treated lease revenue from agricultural use of airport property as airport revenue, even if that revenue is calculated as a portion of the revenue generated by the crops grown on the airport property. The definition in the Final Policy will assure that the airport gets the full benefit of agricultural leases of airport property, regardless of the form of compensation it receives for agricultural use of airport property.

The FAA does not consider this interpretation to create a taking of airport owner or operator property. As discussed in other contexts, the limitation on the use of airport revenue was voluntarily undertaken by the airport operator upon receiving AIP grants. In addition, the revenues generated by these activities will still flow to the sponsor for its use for a legitimate local governmental activity, the operation and development of its airport.

### d. Other Issues

The Final Policy includes a discussion of the requirement of 49 U.S.C. § 40116(d)(2)(A). This provision requires that taxes, fees or charges first taking effect after August 23, 1994, assessed by a governmental body exclusively upon businesses at a commercial service airport or upon businesses operating as a permittee of the airport be used for aeronautical, as well as airport purposes. This addition is included, at the suggestion of a commenter, to comply with the statutory provision, which was enacted as section 112(d) of the 1994 FAA Authorization Act.

*3. Permitted Uses of Airport Revenue*

a. Promotion/marketing of the Airport

Congress, in the FAA Authorization Act of 1994, permitted the use of airport revenues for promotion of the airport by expressly prohibiting ''use of airport revenues for general economic development, marketing, and promotional activities unrelated to airports or airport systems.'' The Supplemental Proposed Policy cited this law and recognized that many airport sponsors engage in some form of promotional effort, to encourage use of the airport and increase the level of service. Accordingly, the Supplemental Notice provided that ''[a]irport revenue may be used for * * * [c]osts of activities directed toward promoting public and industry awareness of airport facilities and services, and salary and expenses of employees engaged in efforts to promote air service at the airport.'' 61 FR 66470.

However, the preamble to the Supplemental Notice stated that promotional/marketing expenditures directed toward regional economic development, rather than specifically toward promotion of the airport, would not be considered a permitted use of airport revenue. In addition, the FAA proposed to prohibit the use of airport revenue for a direct purchase of air service or subsidy payment to air carriers because the FAA does not consider these payments to be capital or operating costs of the airport.

*Airport operators:* In their comments to the original proposed policy, ACI–NA/AAAE requested that FAA establish a ''safe harbor,'' or a maximum dollar amount (perhaps based on a percentage of airport costs), under which an airport could spend airport revenue on certain promotional and marketing activities. Greater percentage amounts would be allowed for the costs of airport-specific activities, while lower amounts would be allowed for joint efforts for campaigns and organizations that have broader, regional marketing missions.

Several airport operators supported this ''safe harbor'' concept in their comments to the docket for the original Proposed Policy. One such commenter, without reference to ACI/AAAE's remarks, suggested a cap of 5% of an airport's budget as a ''safe harbor'' for marketing expenses that are not directly related to the airport or airport system. Furthermore, this commenter would limit the use of airport revenue to a maximum share of 20 percent of the overall cost of any joint-project budget.

ACI/AAAE did not pursue the concept of ''safe harbor'' in their comments to the docket for the

Supplemental Policy, focusing instead on the discretion of the airport operator to use reasonable business judgment to determine potential benefits to the airport. Several airports concurred with the ACI–NA/AAAE position, and one airport operator added that joint-marketing expenses, if reasonable and clearly related to aviation, should be considered an operating cost of the airport.

The ACI/AAAE and several individual airport operators commented that an airport cannot be distinguished from the region served by the airport. ACI/AAAE commented that the policy should permit reasonable spending for marketing of communities and regions because airports are not ultimate destinations of passengers. Therefore, airport operators must be free to make a reasonable attempt to increase revenues by investing in the promotion of their community as a destination.

Some airports specifically opposed the ATA's suggestion of a cap, described below.

*Air carriers:* In its comments to the Supplemental Notice, the ATA mentioned the concept of a maximum or ''cap'' under which expenditures would be considered reasonable, but would apply it to efforts to promote the services of the airport itself. The ATA would have the policy prohibit entirely the use of airport revenue for the promotion of regional development, because ''expenditures by an airport to promote local or regional economic development—as opposed to the services and functionality of an airport—should not be considered legitimate airport costs.'' In regard to cooperative or joint-marketing expenses, the ATA focused on airport participation in joint-marketing of new airline services, suggesting that these activities be limited to a 60-day promotional period. ATA also warned against abuses of cooperative marketing, in particular programs that result in promotion of a particular airline.

The ATA rejected the airport position that use of airport revenue to fund regional promotional activities is acceptable, because airports themselves are not destinations. They stated, ''[l]ocal governments that are also airport sponsors should not be permitted to pass off local and regional promotional activities in order to charge such costs to an airport. Indeed, many civic organizations and chambers of commerce undertake such activities directly, since continued economic development directly benefits the local businesses that constitute such organizations.''

*The Final Policy:* The FAA has modified the provisions on permitted uses of airport revenue in regard to promotion and marketing in the Final Policy. The FAA has applied the sections 47107(b) and 47107(l) to determine to what extent various kinds and amounts of promotional and marketing activities can be considered legitimate operating costs of the airport. The permitted uses of airport revenue for marketing and promotion are split into two paragraphs, V.A.2 and V.A.3., in the Final Policy—one addressing costs that may be fully paid with airport revenue, and one addressing costs that may be shared. The issues of general economic development, direct subsidies of air carriers, the waiving of fees to airport users and airport participation in airline marketing and promotion is further addressed in Section VI.

The Final Policy provides, under V.A.2, that expenditures for the promotion of an airport, promotion of new air service and competition at the airport, and marketing of airport services are legitimate costs of an airport's operation. These expenditures may be financed entirely with airport revenue, and the expenditures may include the costs of employees engaged in the promotion of airport services. In addition, cooperative airport-airline advertising of air service at the airport may be financed with airport revenue, with or without matching funds. The FAA is prepared to rely on airport management to assure that the level of expenditures for such purposes would be reasonable in relation to the airport's specific financial situation. In addition, cooperative airport-airline advertising of air service must be conducted in compliance with applicable grant assurances prohibiting unjust discrimination in providing access to the airport.

For other advertising and promotional activities, such as regional or destination marketing, airport revenue may be used to pay a share of the costs only if the advertising or promotional material includes a specific reference to the airport. The share must be reasonable, based on the benefits to the airport of participation in the activity. The FAA construes the prohibition on ''use of airport revenues for general economic development, marketing, and promotional activities unrelated to airports or airport systems' to preclude the reliance on airport management judgment to support the use of airport revenue for general destination advertising containing no references to the airport. Likewise, the prohibition precludes adoption of a safe-harbor

provision for general promotional expenses.

Except as discussed above, the Final Policy does not limit the amounts of airport revenue that can be spent for all permitted promotional marketing and advertising activities. The FAA expects that expenditure of airport revenues for these purposes would be reasonable in relation to the airport's specific financial situation. Disproportionately high expenditures for these activities may cause a review of the expenditures on an *ad hoc* basis to verify that all expenditures actually qualify as legitimate airport costs. Examples of permissible and prohibited expenditures are included in the Final Policy itself.

b. Reimbursement of Past Contributions

The Proposed Policy permitted airport revenue to be used to reimburse a sponsor for past unreimbursed capital or operating costs of the airport. The Proposed Policy did not include a limit on how far back in time a sponsor could go to claim reimbursement, in accordance with the law in effect at the time. In addition, the Preamble noted that the FAA had not to date permitted a sponsor to claim reimbursement for more than the principal amount actually contributed to the airport. The FAA requested comment on whether the FAA should permit recoupment of interest or an inflationary adjustment or whether, in the case of contributed land, recoupment should be based on current land values.

*Airport operators:* ACI–NA/AAAE and a number of individual airport operators supported recoupment of interest or inflation adjustment on previous contributions or subsidies to the airport.

*Air carriers:* The ATA objected to the Proposed Policy and commented that recoupment should be subject to a number of requirements to prevent abuses.

*The Final Policy:* After the proposed policy was issued, Congress enacted legislation to limit the use of airport revenue for reimbursement of past contributions, and to limit claims for interest on past contributions. 49 U.S.C. §§ 47107(l)(5), 47107(p). The Final Policy incorporates these statutory provisions. Based on Congressional intent evidenced by the legislative history of these provisions, airport revenue may be used to reimburse a sponsor only for contributions or expenditures for a claim made after October 1, 1996, when the claim is made within six years of the contribution or expenditure. In addition, a sponsor may claim interest

only from the date the FAA determines that the sponsor is entitled to reimbursement, pursuant to section 47107(p). The FAA interprets these statutory provisions to apply to contributions or expenditures made before October 1, 1996, so long as the claim is made after that date.

If an airport is unable to generate sufficient funds to repay the airport owner or operator within six years, the Final Policy permits repayment over a longer period, with interest, if the contribution is structured and documented as an interest bearing loan to the airport when it is made. The interest rate charged to the airport should not exceed a rate that the sponsor received for other investments at the time of the contribution.

c. Donations of Airport Revenue to Charitable/Community Service Organizations

The Supplemental Proposed Policy addressed the use of airport property for public recreational purposes, and addressed the use of airport funds to support community activities and for participation in community events. The FAA proposed that the use of airport revenue for such donations would not be considered a cost of operating the airport, unless the expenditure is directly related to the operation of the airport. For example, expenditures to support participation in the airport's federally approved disadvantaged business enterprise program would be considered permissible as supporting a use directly related to the operation of the airport. In contrast, expenditures to support a sponsor's participation in a community parade would not be considered to be directly related to the operation of the airport.

*Airport operators:* ACI–NA/AAAE contended that the expenditure of airport revenue for community or charitable purposes is appropriate and should be recognized as legitimate. Airports, regardless of their size, type, and certification or lack thereof, are important members of their local communities and, therefore, must be able to maintain their prominent, highly visible roles in their respective communities. Airports are regarded by their communities as local business enterprises and, consequently, are expected to contribute to local non-profit charitable concerns in the same manner as other local business enterprises.

Individual airport operators generally supported the position of ACI–NA/AAAE, although some individual operators acknowledged that some limitation on the expenditures may be

appropriate. One suggested a *de minimis* standard; another proposed a "safe harbor" based on a percentage of the airport's total budget. Another urged that airport owners/operators be allowed leeway to make contributions of airport funds, in reasonable amounts and consistent with the local circumstances, and to use airport property for charitable purposes on the same basis.

Other airport operators commented that the Final Policy should give comparable treatment to the use of airport funds and airport property for community goodwill by recognizing the limited use of airport revenue to support charitable and community organizations as a legitimate operating cost of the airport.

*Air carriers:* Air carriers did not comment specifically on charitable contributions, although they commented extensively on the use of airport property for community or charitable purposes. Generally the air carriers suggested that use of airport property should be subject to strict conditions to avoid abuse.

*Other commenters:* An advocacy group in support of a particular airport commented that, in order for an airport to be as self-sustaining as possible, the use of each income dollar is critical, and that federally assisted airports must be fully responsive to the citizens of the community by providing information on the use of airport funds.

*Final Policy:* The Final Policy generally follows the approach of the Supplemental Notice. Airport funds may be used to support community activities, or community organizations, if the expenditures are directly and substantially related to the operation of the airport. In addition, the policy provides explicitly that where the amount of the contribution is minimal, the airport operator may consider the "directly and substantially related to air transportation" standard to be met if the contribution has the intangible benefit of enhancing the airport's acceptance in local communities impacted by the airport.

Expenditures that are directly and substantially related to the operation of the airport qualify inherently as operating costs of the airport. The FAA recognizes that contributions for community or charitable purposes can provide a direct benefit to the airport through enhanced community acceptance, but that benefit is intangible and not quantifiable. Where the amount of the contribution is minimal, the value of the benefit will not be questioned as long as there is a reasonable connection between the recipient organization and

the benefit of community acceptance for the airport.

However, if there is no clear relationship between the charitable or community expenditure and airport operations, the use of airport revenue may be an expenditure for the benefit of the community, rather than an operating cost of the airport. The different treatment of the use of airport funds (direct payments to charitable and community organizations) and the use of airport property (less than FMV leases for charitable or community purposes) is grounded in the applicable laws: the revenue-use requirement (section 47107(b)), which governs the use of airport funds, provides far less flexibility than the requirement for a self-sustaining rate structure (section 47107(a)(13)), which applies to the use of airport property.

Examples of permitted and prohibited expenditures are included in the Final Policy.

### d. Use of Airport Revenue to Fund Mass Transit Airport Access Projects

The Supplemental Proposed Policy addressed in Part VII.C., the circumstances in which an airport sponsor could provide airport property at less than fair market value to a transit operator. The Supplemental Proposed Policy did not address the use of airport revenue to finance the construction of transit facilities. That issue, however, was raised in the comments.

*Airport Operators:* Two airport operators supported the use of airport revenue for the construction of transit facilities. One commenter stated that an airport should be permitted to use airport revenues and assets to provide mass transit service to on-airport commercial uses. Another commenter referred to the AIP Handbook, FAA Order 5100.38A § 555, which provides AIP project eligibility for rapid transit facilities.

*Air carriers:* Air carriers did not specifically discuss the use of airport revenue to finance transit facilities. However, as discussed below, they objected to providing airport property for transit facilities at nominal lease rates.

*Other Commenters:* Two commenters representing transit operator interests supported the expenditure of airport revenues to finance transit facilities. A transit operator stated that in order to create a better balance between transit and highway interests, transit facilities should be totally eligible expenses, paid for in the same manner as other road and parking enhancements. A transit trade association urged the FAA to take appropriate actions to ensure that

passenger fees and other airport revenues are widely eligible to fund a range of airport surface transportation modes, including public transportation.

The FAA also received extensive comments on providing airport property for use by transit providers at less than FMV rents. These comments are addressed separately below.

*Final Policy:* The Final Policy has been modified to provide guidance on the use of airport revenues to finance airport ground access projects. The Final Policy states that airport revenue may be used for the capital or operating costs of such a project if it can be considered an airport capital project, or is part of a facility owned or operated by the airport sponsor and directly and substantially related to air transportation of passengers or property, relying directly on the statutory language of § 47107(b).

As an example, the Final Policy summarizes the FAA's decision on the use of airport revenue to finance construction of the rail link between San Francisco International Airport and the Bay Area Rapid Transit (BART) rail system extension running past the airport. In that decision, the FAA approved the use of airport revenues to pay for the actual costs incurred for structures and equipment associated with an airport terminal building station and a connector between the airport station and the BART line. The structures and equipment were located entirely on airport property, and were designed and intended exclusively for use of airport passengers. The BART extension was intended for the exclusive use of people travelling to or from the airport and included design features to discourage use by through passengers. Based on these considerations, the FAA determined that the possibility of incidental use by nonairport passengers did not preclude airport revenues from being used to finance 100 percent of the otherwise eligible cost items. For purposes of this analysis, the FAA considered "airport passengers" to include airport visitors and employees working at the airport.

### 4. Accounting Issues

#### a. Principles for Allocation of Indirect Costs

Based on the comments to the Proposed Policy, the FAA addressed the principles of indirect cost allocation in its Supplemental Notice. The Supplemental Notice made clear that the allocation of indirect costs is allowable under 49 USC § 47107(b), and that no particular method of cost allocation will be required, including

OMB Circular A–87. To ensure, however, that indirect costs are limited to allowable capital and operating costs, the FAA proposed to apply certain general principles and prohibitions to the allocation of costs. The Supplemental Notice did not limit significantly the development of local cost allocation methodologies, or interfere with the application of Generally Accepted Accounting Principles (GAAP) and other accounting industry recognized standards.

In the Supplemental Notice, the FAA stated that it would expect that a Federally approved cost allocation plan that complied with OMB Circular A–87 or other Federal guidance and was consistent with GAAP would be reasonable and transparent, and would generally meet the requirements of section 47107(b). However, the use of a Federally approved cost allocation plan does not rule out the possibility that a particular cost item allowable under that guidance would be in violation of the airport revenue retention requirement if allocated to the airport.

The Supplemental Notice also required specifically that indirect cost allocations be applied consistently across departments to the sponsoring government agency, and not unfairly burden the airport account. The general sponsor cost allocation plan could not result in an over-allocation to an enterprise fund. In addition, the sponsor would have to charge comparable users, such as enterprise accounts, for indirect costs on a comparable basis.

Lastly, the Supplemental Notice proposed to prohibit the allocation of general costs of the sponsoring government to the airport. However, this prohibition would not affect direct or indirect billing for actual services provided to the airport by local government.

*Airport Operators:* Generally, airport operators agreed with the proposal to acknowledge that the allocation of indirect costs as allowable under 49 USC § 47107(b), and to provide that no particular allocation methodology, including OMB Circular A–87, be required.

One airport operator requested the FAA to further clarify that it is not imposing on airport sponsors all of the specific elements of OMB Circular A–87. The operator was concerned that the statement in the Supplemental Notice that the FAA "believe[s] the specific principles identified by the OIG are an appropriate construction of the revenue retention requirement" may lead to confusion over whether adherence to OMB Circular A–87 is mandatory for

allocating costs to be paid by airport revenue.

Several airport operators were concerned that the FAA would not accept the allocation of costs in accordance with a Federally-approved cost allocation plan, but could review the plan to ensure that allocation of specific cost items meet the special revenue retention requirements. For example, one airport operator commented that the FAA's approach would impose on airport sponsors burdens and requirements in excess of the detailed requirements of OMB-Circular A–87, which are designed to ensure a reasonable and consistent cost allocation system. The airport proprietor proposed that such compliance with a federally-approved cost allocation plan be considered sufficient to satisfy the revenue retention requirement.

Another airport operator proposed that the FAA revise the policy to clarify that a specific cost, as opposed to a type of cost, cannot be treated as both a direct and an indirect cost. The airport operator offered as an example a city-owned and operated airport at which some police services are provided by officers assigned exclusively to the airport and other services are provided by general duty police officers. The commenter suggested that it should be permissible to charge the airport for the officers assigned exclusively to the airport as a direct cost and to charge the general duty officers as an indirect cost allocation.

Additionally, this commenter proposed revising the policy to clarify that costs that are chargeable to one city department on a direct basis may be charged to other city departments on an indirect basis. The airport operator offered an example in which police are exclusively assigned to a city-owned airport, but are not exclusively assigned to other city departments. The commenter argued that it would be reasonable to charge the airport for police services as a direct cost, and to charge the other departments as an indirect cost allocation.

Several airport operators were also concerned that the supplemental policy implied that a local cost allocation plan must provide that all users for a service be billed equally. For example, ACI-NA and AAAE suggested that the requirement for consistent application should be interpreted to require the local government to go through the exercise of assessing indirect costs against all governmental departments, including those wholly funded by that governmental entity. Likewise, an airport operator requested that the FAA clarify that the supplemental policy

does not mean that an airport sponsor must actually bill all of its General Fund agencies for certain municipal costs in order to be able to charge such costs to its airports. All of those airport proprietors that expressed concern over this proposed policy generally commented that this issue was considered and rejected by the Department of Transportation in the Second Los Angeles International Airport Rates Proceeding, Docket OST–95–474. According to the airport proprietors, the DOT recognized that in many cases sponsor agency operations are paid from a common General Fund. Under those circumstances, it is illogical and unnecessary for one General Fund agency to bill another General Fund agency for municipal services.

One airport operator proposed that the word "equally" be removed from VII.B.4 of the proposed policy. The commenter urged that the FAA allow airport sponsors the flexibility to allocate costs to various users on a reasonable, equitable basis relative to the benefits received, even though specific users may sometimes be treated differently. Returning to its example of police services, the commenter suggested that if the sponsor chooses not to charge a housing authority for costs of a special police unit assigned to that authority, it should be of no concern to the FAA as long as those costs are not then charged to the airport.

Another airport operator argued that each of its proprietary departments are unique and governed by different City Charter provisions; that they make different uses of city services; and have different financial arrangements with the sponsor's general fund. This commenter argued that treating the departments the same for cost allocation purposes because the departments are enterprise funds would, therefore, serve no valid purpose.

Several airport operators disagreed with FAA's proposed policy to prohibit the indirect cost allocation of general costs of government. Several commenters stated that the proposed policy would reverse longstanding practice at many airports and could be inconsistent with federally-approved cost allocation plans, which provide for the allocation of a share of indirect costs of various local government functions. One airport operator argued that there is no statutory basis for prohibiting the allocation of general costs of government, other than costs for particular identified services.

Finally, one airport operator commented that the proposed policy does not sufficiently clarify the

appropriate allocations for fire and police stations that do not serve the airport exclusively. The airport operator proposed that policy explicitly permit a sponsor to allocate costs based on the intended purpose and value of the station to the airport, not its actual use. The airport operator argues that a more flexible approach could better implement the applicable statutory provision that prohibits "direct payments or indirect payments, other than payments reflecting the value of services and facilities provided to the airport."

Airlines: ATA supports the proposed policy clarification that no particular cost allocation methodology for indirect costs is preferred.

*The Final Policy:* The Final Policy reflects a different and simplified approach to indirect cost allocation that is intended to facilitate development of permissible cost allocation plans and the review of those plans in the single audit process. The Final Policy specifies that the cost allocation plans must be consistent with Attachment A of OMB Circular A–87. Attachment A sets forth general principles for developing cost allocation plans. Those principles are essentially a restatement of the principles proposed in the Supplemental Policy. By referring to Attachment A, the Final Policy establishes a standard that is well understood by airport cost accountants and by airport operators' independent auditors. The Final Policy does not require compliance with the other attachments to OMB Circular A–87, which include more rigid requirements and defines categories of grant recipient costs that are eligible and ineligible for reimbursement with Federal grant funds.

The Final Policy continues to specify that the costs allocated must themselves be eligible for expenditure of airport revenue under section 47107(b). Attachment A to OMB Circular A–87 provides principles for cost allocation methodologies. The cost items that may be charged to airport revenue are determined by the requirements of section 47107(b). Therefore, sponsors, and the FAA, cannot rely solely on compliance with OMB Circular A–87 to assure that the costs items charged to the airport in a Federally approved cost allocation plan are consistent with section 47107(b).

The Final Policy continues to specify that the airport must not be charged directly and indirectly for the same costs. The FAA is not persuaded that the example of police services offered by an airport sponsor requires a modification of this requirement. This

provision is not intended to preclude both the direct and indirect billing in the situation cited by the commenter—where police services are provided to the airport on both an exclusive-use and a shared-use basis. In the cited example, it would be preferable to bill for police exclusively assigned to the Airport on a direct cost basis. It would be impossible, however, to bill for the shared-use police without engaging in some form of indirect cost allocation. The FAA did not intend the supplemental policy to preclude treatment of police services as both direct and indirect costs in these circumstances, only to preclude double billing on both a direct and indirect basis, for the same police costs.

Similarly, with respect to the second example of police services where the airport receives exclusive-use police services and other sponsor departments receive shared-use police services, the FAA did not intend the Supplemental Notice to preclude disparate billing methodologies. Inherent in Attachment A is that comparable units of a sponsoring government making comparable uses of the sponsor's services should have costs allocated and billed in a comparable fashion. The clarification noted above should address this situation as well. In the second example sited, the FAA would consider the sponsor departments receiving shared-use police services not to be comparable to the airport receiving exclusive use police services.

The Final Policy also provides that the allocation plan must not burden the airport with a disproportionate share of allocated costs, and requires that all comparable units of the airport owner or operator be billed for indirect costs billed to the airport. The FAA is unwilling to accept the suggestion that comparable users of a service may sometimes be treated differently for billing purposes, so long as the costs attributed to one unit of government are not then charged to the airport. The FAA believes that such practices would result in an unfair burden being placed upon the airport simply because of the airport's ability to pay.

This provision, however, is not intended to require a sponsor's General Fund activities to bill other General Fund activities for indirect costs that are properly allocable to those activities, if the airport is billed. The policy is clear that comparable billing for services is required only for comparable users.

Enterprise funds need not be treated as comparable to units of a sponsoring government financed from the sponsor's general fund, and comparable billing between enterprise funds and other units of government is not required.

While the FAA may presume that enterprise funds are comparable to each other, an airport sponsor is free to demonstrate that particular enterprise funds are sufficiently different in material ways—such as the way they consume sponsor services or their overall financial relationships with the sponsor—to justify different practices in charging for indirect costs. The Final Policy does not further define comparability because decisions on comparability will depend on the specific circumstances of a sponsor. The Final Policy also explicitly permits the allocation of general costs of government and central services costs to the airport, if the cost allocation plans meets the Final Policy's requirements. As specified in the Final Policy, however, the allocation of these costs to the airport may require special scrutiny to assure that the airport is not being burdened with a disproportionate share of the allocated costs.

In addition, the FAA continues to recognize that use of airport revenue to pay some expenses not normally considered to be allowable pursuant to OMB Circular A–87, such as fire and police services, is consistent with the revenue retention requirement. If such costs are allocated as an indirect cost in accordance with the Final Policy, they will be considered by the FAA as acceptable charges.

The Final Policy is modified to permit the allocation of certain categories of a sponsor's general cost of government as an indirect charge to the airport. Such charges include indirect expenses of the Office of Governor of a State, State legislatures, offices of mayors, county supervisors, city councils, etc. An airport owner's or operator's central service costs may also be allocated to the airport. The Final Policy specifies that allocation of these categories of costs to the airport may require special scrutiny to assure that the airport is not being burdened with a disproportionate share of the costs.

The FAA proposed to prohibit the allocation of all general costs to the airport on the grounds that the payment of such costs with airport revenue would be inconsistent with the purpose of the revenue use restriction—to avoid subsidy of general sponsor governmental activity. It is clear from the comments that airports routinely pay for a share of the general costs the legislative and executive branches of the governmental unit of which the airport is a part under cost allocation plans prepared in accordance with GAAP. Further, the comments demonstrate that the payment of legislative and executive branch costs by airport revenue can be

justified as a cost of the airport because the legislative and executive branches have direct, tangible oversight and control responsibilities for the airport, and their activities provide direct benefits to the airport, such as in the areas of funding, capital development, and marketing.

In addition, under the Final Policy, the costs of shared-use facilities must be allocated to all users of the facility, even if the original purpose of constructing the facility was to provide exclusive use or benefit to the airport. While a sponsor-owned facility may have originally been established for the benefit of the airport, the FAA believes that the purpose of the facility can change from time to time based on local circumstances and that allocation of costs should be based on current purpose, as well as use. The FAA may consider a number of factors in determining current purpose, including current use, design and functionality.

b. Standard of Documentation for the Reimbursement of Cost of Services and Contributions to Government Entities

In its administration of airport agreements, the FAA is not normally concerned with the internal management or accounting procedures used by airport owners. As a matter of policy and procedure, the FAA has consistently required that reimbursement of capital and operating costs of an airport made by a government entity must be clearly supportable and documented.

Neither the Proposed Policy nor the Supplemental Notice explicitly discussed a standard of documentation that must be achieved for a sponsor to claim reimbursement for services and/or contributions it provided to the airport. However, events subsequent to the issuance of both documents indicate a need for FAA to provide specific guidance on the standard of documentation that will support the expenditure of airport revenues.

In the examination of a possible diversion of airport revenue by the City of Los Angeles at Los Angeles International, Ontario, Van Nuys and Palmdale Airports (FAA Docket No. 16–01–96), the FAA reviewed the underlying documentation which the City of Los Angeles offered to support the payment of approximately $31 million in airport revenue to the Los Angeles' general fund as the reimbursement of sponsor contributions and services provided to the airport. In the Director's Determination dated March 17, 1997, the FAA stated its standard of documentation to justify such reimbursements. Accordingly, the

FAA is including that standard in the Final Policy.

The Final Policy requires that reimbursements for capital and operating costs of the airport made by a government entity, both direct and indirect, be supported by adequate documentary evidence. Adequate documentation consists of underlying accounting records and corroborating evidence, such as invoices, vouchers and cost allocation plans, to support all payments of airport revenues to other government entities. If this underlying accounting data is not available, the Final Policy allows reimbursement to a government entity based on audited financial statements, if such statements clearly identify the expenses as having been incurred for airport purposes consistent with the Final Policy statement. In addition, the Final Policy provides that budget estimates are not a sufficient basis for reimbursement of government entities. Budget estimates are just that—estimates of projected expenditures, not records of actual expenditures. Therefore, budget estimates cannot be relied on as documentary evidence to show that the funds claimed for reimbursement were actually expended for the benefit of the airport.

Indirect cost allocation plans, however, may use budget estimates to establish pre-determined indirect cost allocation rates. Such estimated rates must, however, be adjusted to actual expenses in the subsequent accounting period.

## 5. Prohibited Uses of Airport Revenue

### a. Impact Fees/Contingency Fees

The Proposed Policy prohibited the payment of impact fees assessed by a nonsponsoring governmental body that the airport sponsor is not obligated to pay or that exceed such fees assessed against commercial or other governmental entities. The Supplemental Notice did not modify this provision. The term "impact fees" was not defined in the Proposed Policy.

*Airport operators:* One Florida airport sponsor stated that impact fees should be allowable to either a sponsoring or non-sponsoring governmental body. Another commented that the language referring to a "non-sponsoring" governmental body was vague and confusing. Within the state of Florida, impact fees are typically administered by a non-sponsoring government body. It was stated that the wording did not seem to prohibit impact fee payments when assessed by a "sponsoring" agency, or impact fees that an airport sponsor is obligated to pay.

*The Final Policy:* For clarity, the Final Policy is modified to delete the reference to "non-sponsoring" governmental body and to delete the reference to fees the sponsor is not obligated to pay. In addition, the Final Policy is adding a statement that in appropriate circumstances, airport revenue may be used to reimburse a governmental body for expenditures that the imposing government will incur as a result of on-airport development, based on actual expenses incurred.

The effect of the deletions is to broaden the prohibition to all impact fees, within the meaning of the term used in the policy statement. As such, the deletions are consistent with the statutory prohibition on payment of airport revenues that do not reflect the value of services or facilities actually provided to the airport. Until a governmental unit undertakes the activity for which the impact fee is intended to compensate, it is impossible to know with certainty whether the impact fee is an accurate reflection of the cost of the activity attributable to the airport or its value to the airport, or even that the activity will occur. This situation is true regardless of both the status of the governmental unit as airport sponsor and the status of the fee as discretionary. The FAA understands that many local laws or regulations authorizing impact fees do not require the fees to be spent to mitigate or accommodate the results of the airport action that triggers the fee. The FAA has no basis for assuring the payment of impact fees would be consistent with the purpose of section 47107(b)—to prevent an airport sponsor who received Federal assistance from using airport revenues for expenditures unrelated to the airports.

The broader prohibition is consistent with applicable FAA policies. Longstanding FAA policy has permitted a sponsor to claim reimbursement from airport revenue only for "clearly supportable and documented charges, * * * supported by documented evidence." FAA Order 5190.6A, par. 4–20.a(2)(c)(ii). An impact fee assessed before the imposing government incurred any expenses to accommodate airport growth would not meet this standard.

In addition, a standard of documentation required by the Final Policy applies to all expenditures of airport revenues subject to section 47107(b), including impact fee payments. That standard requires that expenditures of airport revenues be supported by data on the actual costs incurred for the benefit of the airport, not by budget or other estimates, which

impact fees essentially are. The Final Policy will allow submission of those assessed fees resulting from the proposed development when the amount of the fees become fully quantifiable, as provided for in Section IV of the Final Policy, following implementation by the imposing government of the mitigation measures for which the impact fee is assessed. At that time, the FAA can best determine whether the fees assessed against airport revenue satisfy the requirements of section 47107(b) and this policy. In unusual circumstances, the FAA may permit a prepayment of estimated impact fees at the commencement of a mitigation project, if the funds are necessary to permit the mitigation project to go forward, so long as there is a reconciliation process that assures the airport is reimbursed for any overpayments, based on actual project costs, plus interest.

However, the Final Policy does take into account the potential that an airport operator may be required by state or local law to finance the costs of mitigating the impact of certain airport development projects undertaken by the airport sponsor. Therefore, where airport development causes a government agency to take an action, such as constructing a new highway interchange in the vicinity of the airport, airport revenues may be used equal to the prorated share of the cost. In all cases, the action must be shown to be necessitated by the airport development. In the case of infrastructure projects, such impact mitigation must also be located in the vicinity of the airport. This proximity requirement is not being applied to all mitigation measures because some mitigation measures—especially certain environmental mitigation measures—may not occur in the vicinity of the airport.

The Final Policy also acknowledges the possibility that an airport operator may be bound by local or state law to use airport revenue to pay an impact fee that is prohibited by this policy. The Final Policy states that the FAA will consider any such local circumstances in determining appropriate corrective action.

### b. Subsidy of Air Carriers

As discussed in Section V "Permitted Uses," the Supplemental Notice acknowledged the fact that Congress, in the 1994 FAA Authorization Act, effectively authorized the use of airport revenue for promotion of the airport by expressly prohibiting "use of airport revenues for general economic development, marketing, and

**Federal Register** / Vol. 64, No. 30 / Tuesday, February 16, 1999 / Notices

promotional activities unrelated to airports or airport systems.'' At the same time, that statutory provision also limited the scope of acceptable promotional activity.

In the Supplemental Notice, the FAA proposed new policy language that more clearly addressed the kinds of promotional and marketing activities that are and are not legitimate operating costs of the airport under 47107(b). In the Supplemental Notice, Section VIII(l), the FAA proposed that ''[d]irect subsidy of air carrier operations'' is a prohibited use of airport revenue because it is not considered a cost of operating the airport. The FAA drew a distinction between methods of encouraging new service. Supplemental Notice proposed to allow the use of airport revenue to encourage passengers to use the airport through promotional activities, including cooperative promotional activities with airlines and to allow airport operators to enhance the viability of new service through fee incentives, on the one hand. As noted, the FAA proposed to prohibit the use of airport revenue to simply buy increased use of the airport by paying an air carrier to operate aircraft, on the other. The FAA considered the former activities to be a permitted expenditure for the promotion and marketing of the airport and the latter to be a prohibited expenditure for general economic development. The FAA explained in the preamble to the Supplemental Notice that neither promotional activities nor promotional fee discounts would be considered a prohibited direct subsidy of airline operations. 61 FR at 66738.

*Airport operators:* In their comments on the Supplemental Notice, ACI–NA/AAAE state that, generally, an expenditure or activity should not be considered revenue diversion if there is a reasonable expectation that such an expenditure or activity will benefit the airport. Furthermore, they note that the law does not single out direct air carrier subsidy or fee waivers for more stringent scrutiny than other marketing activities. This argument in favor of the reasonable business judgement of the airport management should be applied to the use of airport revenue for promotion and marketing not unrelated to the airport, including direct air carrier subsidies and fee waivers. ACI/ AAAE stated ''both forms of financial assistance should be permitted, if an airport has a reasonable expectation that the subsidy will benefit the airport and the subsidy or discount is made available on a non-discriminatory basis.''

ACI/AAAE further stated that there is no real distinction between direct

subsidy and fee waivers, as well as none between direct subsidy and the residual airport costing methodologies, making the distinction in the policy illogical. They predicted that the proposed policy is likely to promote detrimental effects, including eliminating air service to some small airports, increasing congestion at dominant hubs at the expense of medium-sized airports, reducing potential competition and raising fares.

Several individual airport operators concurred with the ACI–NA/AAAE position. One operator commented that any subsidies should be permitted, as long as the airport remains self-sustaining and the subsidies are not included in airline costs in calculating landing fees, terminal rents and other user charges.

Another airport operator, the LNAA, which is engaged as a party in a 14 CFR Part 13 investigation regarding its former air carrier subsidy program, commented that there is no real difference between an airport making a direct subsidy to an air carrier or waiving fees.

Two airport operators expressed different views. One operator agreed that airport revenues should not be used to subsidize new air carrier service because the practice of subsidization could lead to destructive competition for air service among airports. Another airport operator stated that it ''does not currently engage in nor does it contemplate any form of direct subsidy to air carriers in exchange for air service.'' This operator considers the Supplemental Notice to provide adequate flexibility to airport operators to foster and promote air service development.

*Air carriers:* The ATA strongly opposed the assertion that direct subsidies of airline operations with airport revenue may be considered to be operating costs of the airport and would extend the prohibition to indirect subsidies. They argued that the distinction in the proposed policy that allows fee waivers under certain circumstances, but prohibits direct subsidy is illogical. Both result in revenue diversion, whether the beneficiary is ''a start up carrier, a new entrant in a market, or an existing carrier at an airport.'' The ATA further commented, in connection with joint marketing endeavors, that the permissible ''promotional period'' should be defined, as should the scope of permissible marketing activities.

*The Final Policy:* The FAA has clarified the policy provision on the direct subsidy of air carriers with airport revenue; however, the prohibition

remains, as does the distinction between direct subsidy and the waiving of fees and the joint promotion of new service. The FAA has applied the test of section 47107(b) to determine to what extent various kinds and amounts of promotional and marketing activities can be considered legitimate operating costs of the airport.

In pursuit of uniformity, the FAA has integrated references to the section on the permitted uses of airport revenue, as well as to the section on self-sustainability, to assist airport operators in pursuing reasonable strategies to promote the airport and provide incentives to encourage new air service. Among other things, marketing of air service to the airport, and expenditures to promote the airport to potential air service providers can be treated as operating costs of the airport. Of course, support for marketing of air service to the airport must be provided consistently with grant assurances prohibiting unjust discrimination.

The setting of fees is a recognized management task, based on a number of considerations, including the airport management's assessment of the services needed by airport consumers, and the airport management's assessment of the financial arrangements necessary to secure that service. The FAA has consistently maintained that fee waivers or discounts involving no expenditure of airport funds raise issues of compliance with the self-sustaining rate structure requirement, not the revenue-use requirement. The Final Policy therefore, permits fee waivers and discounts during a promotional period. The waiver or discount must be offered to all users that are willing to provide the type and level of new service that qualifies for the promotional period. The Policy limits the fee waiver or discount to promotional periods because of the requirement that the airport maintain a self-sustaining airport rate structure. In addition, indefinite fee waivers or discounts could raise questions of compliance with grant assurances prohibiting unjust discrimination. The Final Policy does not define a permitted promotional period. There is too much variation in the circumstances of individual airports throughout the country to permit adoption of a single national definition of a suitable promotional period.

In contrast, the direct payment of subsidies to airline involves the expenditure of airport funds and hence raises questions under the revenue-use requirements. The FAA continues to believe that the costs of operating aircraft, or payments to air carriers to

operate certain flights, are not reasonably considered an operating cost of an airport. In addition, payment of subsidy for air service can be viewed as general regional economic development and promotion, rather than airport promotion. Use of airport revenue for these purposes is expressly prohibited under the terms of the 1994 FAA Authorization Act. The Final Policy does not preclude a sponsor from using funds other than airport revenue to pay airline subsidies for new service, and it does not preclude other community organizations— such as chambers of commerce or regional economic development agencies—from funding a program to support new air service. Therefore, the Final Policy maintains the distinction between direct subsidy of air carriers and the waiving of fees, and prohibits the former.

*6. Policies Regarding the Requirement for a Self-Sustaining Rate Structure*

As noted in the summary, the Final Policy contains a separate section on the requirement that an airport maintain a rate structure that makes the airport as self-sustaining as possible under the circumstances at the airport, to provide more comprehensive guidance in a single document. The 1994 FAA Authorization Act directed the FAA to adopt policies and procedures to assure compliance with both the revenue uses and self-sustaining airport rate structure requirement. The general guidance repeats the guidance appearing in the Department of Transportation Policy Statement Regarding Airport Rates and Charges, 61 FR 31994 (June 21, 1996). The Final Policy interprets the basic requirement and addresses exceptions to the basic rule for leases of airport property at nominal or less-than fair market value (FMV) to specific categories of users.

Each federally assisted airport owner/operator is required by statute and grant assurance to have an airport fee and rental structure that will make the airport as self-sustaining as possible under the particular airport circumstances, in order to minimize the airport's reliance on Federal funds and local tax revenues. The FAA has generally interpreted the self-sustaining assurance to require airport sponsors to charge FMV commercial rates for nonaeronautical uses of airport property. However, in the case of aeronautical uses, user charges are also subject to the standard of reasonableness. In applying the two standards together for aeronautical property, the FAA has considered it acceptable for an airport operator to charge fees to aeronautical users that are

less than FMV, but more than nominal charges. The FAA defines "aeronautical use" as any activity which involves, makes possible, or is required for the operation of aircraft, or which contributes to or is required for the safety of such operations. Policy Statement Regarding Airport Fees, Statement of Applicability, 61 FR at 32017.

Many entities lease airport property for aeronautical and nonaeronautical uses at nominal lease rates. The FAA has determined that nominal leases to many of these entities is consistent with the requirement to maintain a self-sustaining airport rate structure. The Final Policy provides specific guidance regarding nominal leases for six categories of users. This guidance is discussed below.

a. Use of Property at Less Than FMV for Community/Charitable/Recreational Use

*Airport operators:* The ACI–NA/AAAE agree with the general conclusion that use of airport property for community and charitable purposes at less than FMV should be permissible. However, they argued that the criteria listed in the Supplemental Notice are too narrow. Other criteria should be considered, and an airport should be required to provide no more than one justification. The ACI–NA/AAAE specifically mentioned aeronautical higher education institutions and not-for-profit air and space museums as additional permitted uses, based on H.R. Rep. 104–714, 104th Cong. 2nd Sess. at 39 (1996) reprinted in 1996 USCC.A.N. 3676.

Individual airport operators also requested more flexibility in various forms. One operator suggested that the Supplemental Notice establishes an unnecessary two-part test which many community uses of airport property will fail to satisfy. Another operator argued that such airport property use should not be limited to temporary arrangements, e.g., parks and baseball fields, which indicates that only uses that allow property to be returned rather quickly to the airport inventory would be permitted.

In contrast, another airport operator suggested that, in order to place less burden on the airport operator, such uses should be limited in scope and that the below-market value amount that an airport operator could charge for such usage should be established as some percentage of the appraised value of the property.

*Air carriers:* The ATA agrees in principle with the concept of limited use of airport property for certain specified community purposes at less

than FMV. However, ATA stated that the Supplemental Notice lacks specificity and that its application would consequently be inconsistent with the self-sustaining and revenue-use requirements. The ATA proposed to narrow the first element of the standard to permit contribution of property if the property is put to a general public use desired by the local community and the use does not adversely affect the capacity, safety or operations of the airport. The ATA would narrow the second test by permitting the use of property that is expected to generate no more than minimal revenue, which the ATA would define as minimal revenue equal to or less than 20 percent of revenue that could be earned by similar airport property in commercial or air carrier use. When the property could be expected to earn more than this defined minimal amount, the ATA would permit less than FMV rental if the revenue earned by the community use approximates the revenue that would otherwise be generated.

The ATA would also require that the community use be subject to periodic review and renewed justification and that the airport proprietor retain absolute discretion to reclaim the property for airport use.

*Other commenters:* A member of the United States House of Representatives expressed concern that the policy, if adopted as proposed, does not provide sufficient flexibility to airport operators to be good neighbors within their community. This commenter suggested that in rural areas, requiring community organizations to pay FMV could reduce airport revenue as paying community organizations are forced off of the airport by higher rents and no new tenants are found.

*Final Policy:* The Final Policy generally permits below-FMV-rental of airport property for community uses, but generally limits the uses to property that is not potentially capable of producing substantial income and not needed for aeronautical use. Consistent with the suggestions of the ATA, the permitted community uses of such property will be limited to those that are compatible with the safe and efficient operation of the airport and which are for general local use. In addition, the community use should not preclude reuse of the property for airport purposes, if the airport operator determines that such reuse will provide greater benefits to the airport than the continued community use. Leases to private, non-profit organizations generally will be required to be at market rates unless the sponsor can demonstrate a "community goodwill"

Case 5:08-cv-02814-JF     Document 20-4     Filed 08/29/2008     Page 18 of 30

*Federal Register* / Vol. 64, No. 30 / Tuesday, February 16, 1999 / Notices     **7711**

purpose to the lease, or can demonstrate a benefit to aviation and the airport, as discussed below.

While the Final Policy states that property provided for community use at no charge should be expected to produce no more than minimal revenue, we are not adopting a definition of minimal. For property that is capable of generating more than minimal revenue, a sponsor could charge less than FMV rental rates for community use, if the revenue earned from the community use approximates that revenue that could otherwise be generated. Providing such property for community use at no charge would not be appropriate.

The FAA has determined that this approach to community use strikes an appropriate balance between the needs of the airport to be a good neighbor and the Federal requirements on the use of airport revenue and property. This formulation provides substantial flexibility to airport operators. At the same time, the self-sustaining requirement and the policy goal of the revenue-use requirement justify some limitation on local discretion in this area.

The requirement that community use not preclude reversion to airport use is based on both the self-sustaining requirement and the airport sponsor's basic AIP obligation to operate a grant-obligated airport as an airport.

Under the Final Policy, the lease of airport property to a unit of the sponsoring government for nonaeronautical use at less than fair market value is considered a prohibited revenue diversion unless one of the specific exceptions permitting below-market rental rates applies. If a sponsor's use of airport property qualifies as community use, and the other requirements for community-use leases are satisfied, the FAA would not object to a lease at less than fair market value. Qualified uses could include park or recreational uses or other public service functions. However, such use would be subject to special scrutiny to ensure that the requirements for below-FMV community use is satisfied. The community use provision of the Final Policy does not apply to airport property used by a department or subsidiary agency of the sponsoring government seeking an alternative site for the sponsor's general governmental purposes at less-than-commercial value. For example, a city cannot claim the community use exception for a nominal value lease of airport property for a municipal vehicle maintenance garage. Such usage, while beneficial to the taxpaying citizens of the sponsoring government, would be difficult to justify

as benefiting the airport by improving the airport's acceptance in the community.

### b. Not for Profit Aviation Museums

The DOT OIG has cited instances in which an aviation museum at a federally assisted airport is leasing airport property at less than a fair market rental rate. In clarifying the revenue diversion prohibitions recommended for inclusion in the FAA Authorization Act of 1996, the House Transportation and Infrastructure Committee urged the FAA to take a flexible approach to the lease of airport property at below-market rates to not-for-profit air and space museums located on airport property. H.R. Rep. No. 104–714, 104th Cong. 2nd Sess. at 39 (1996) reprinted in 1996 U.S.C.C.A.N. 3676 (House Report). The Committee recommended that this type of rental arrangement should not be considered revenue diversion because of the contribution that such museums make to the understanding and support of aviation.

One airport operator commented that long-term, less-than-market value rental arrangements, particularly for leaseholds encompassing permanent facilities, should be permitted when such arrangements serve a clear and valuable aviation-related purpose. This comment could include aviation museums.

One operator of a not-for-profit aviation museum urged the FAA to permit nominal rate leases. This operator stated that a FMV-based lease for its museum property would double its current operating budget.

*The Final Policy:* The Final Policy permits airport operators to charge reduced rental rates and fees, including nominal rates, to not-for-profit aviation museums, to the extent that the reduction is reasonably justified by the tangible and intangible benefits to the airport or civil aviation. This provision recognizes the potential for aviation museums to provide benefits to the airport by stimulating understanding and support of aviation, consistent with the suggestion contained in the House Report, U.S.C.C.A.N. 3676. Benefits to the airport may include any in-kind services provided to the airport and airport users by the aviation museum. The limitation to not-for profit museums is consistent with the requirement for a self-sustaining airport rate structure, because there is no reason to give for-profit aviation museums preferential treatment over other commercial aeronautical activities. All for-profit aeronautical activities provide some benefit to the airport, by making it more

attractive for potential airport users. If this benefit were a sufficient reason to permit reduced rental rates to commercial aviation businesses on a routine basis, the requirement for a self-sustaining airport rate structure would be virtually unenforceable.

The Final Policy permits but does not require below-market rental rates, including nominal rates. The airport operator is free to treat a qualified aviation museum as it would any other aeronautical activity in setting rental rates and other fees to be paid by the museum.

### c. Aeronautical Higher Education Programs

The DOT OIG has cited instances in which aeronautical secondary and post-secondary education programs at federally assisted airports are leasing airport property at less than a fair market rental rate.

In the House Report, 1996 U.S.C.C.A.N. 3676, the House Transportation and Infrastructure Committee also urged the FAA to take a flexible approach to aeronautical higher education programs located on airports. The Committee recognized that some federally obligated airports have leased property to non-profit, accredited collegiate aviation programs, and that facilitating these programs will help build a base of support for airport operations by giving students, who will be the future users of the national airspace system, easy access to aviation facilities.

*The Final Policy:* The Final Policy permits reduced rental rates, including nominal rates, to not-for-profit aeronautical secondary and post-secondary education programs conducted by accredited educational institutions, to the extent that the reduction is justified by tangible or intangible benefits to the airport or to civil aviation. This treatment is justified for the same reason that reduced rental rates and fees to certain aviation museums are permitted. Again, the benefits may include in-kind services provided to the airport and airport users. As with aviation museums, the educational institution and education program must be not-for-profit. For-profit aviation education, such as flight-training, is a standard commercial aeronautical activity at many airports. Permitting reduced rental rates and fees to for-profit aviation education programs would seriously undermine compliance with the self-sustaining requirement and could raise questions of compliance with the grant assurances prohibiting unjust discrimination.

The Final Policy permits but does not require below-market rental rates, including nominal rates. The airport operator is free to treat a qualified not-for-profit aeronautical education program as it would any other aeronautical activity in setting rental rates and other fees to be paid by the education program.

### d. Civil Air Patrol Leases

Reduced-rental leases, including nominal leases, to the Civil Air Patrol/ United States Air Force Auxiliary (CAP) at a number of airports have also been criticized in OIG audits. As a result of this criticism, some airport operators have been seeking higher rents from the CAP when leases have come up for renewal.

In its comments, the CAP contends that the current standard airport industry practice of permitting CAP use of airport property for a nominal rent confers substantial benefits to the airport and, in general, to the aviation community. The CAP, therefore, requests that a policy be adopted which would formally permit CAP units to continue to occupy facilities on federally obligated airports at a nominal rent, whether under formal lease arrangements, or otherwise, at the discretion of the airport owner/operator.

*The Final Policy:* The Final Policy permits reduced rental rates and fees to CAP units operating at the airport, in recognition of the benefits to the airport and benefits to aviation similar to those provided by not-for-profit aviation museums and aeronautical secondary education programs. As with other not-for profit-aviation entities, the reduction must be reasonably justified by benefits to the airport or to civil aviation. In-kind services to the airport and airport users may be considered in determining the benefits that the CAP unit provides. In addition, this treatment of the CAP, which has been conferred with the status of an auxiliary to the United States Air Force, is not identical to the treatment provided to military units in the Final Policy, as discussed below, but is consistent with that treatment.

The reduced rental rates and fees are available only to those CAP units operating aircraft at the airport. For CAP units without aircraft, a presence at the airport is not critical. The airport operator can accommodate those CAP units with property that is not subject to Federal requirements on maintaining a self-sustaining rate structure, without compromising the effectiveness of the CAP units. Of course, if such units provide in-kind services that benefit the airport, the value of those services may be recognized as an offset to FMV rates.

The Final Policy permits but does not require nominal rental rates. The airport operator is free to treat a qualified not-for-profit aeronautical CAP lease as it would any other aeronautical activity in setting rental rates and other fees to be paid by the education program.

### e. Police/Firefighting Units Operating Aircraft at the Airport

Many airports host police or fire-fighting units operating aircraft (often helicopters). The OIG has frequently criticized reduced rate or no-cost leases to these units of government as inconsistent with the self-sustaining and revenue-use requirements.

The Final Policy requires the airport operator to charge reasonable rental rates and fees to these units of government. In effect, these units of government must be treated the same as other aeronautical tenants of the airport. This treatment is consistent with the policy's general approach toward dealings between units of government— fees should be set at the level that would be produced by arm's-length bargaining. The treatment is also justified because police and fire-fighting aircraft units provide benefits to the community as a whole, and not necessarily to the airport. However, as with other police and fire-fighting units located at an airport, the policy does allow rental payments to be offset to reflect the value of services actually provided to the airport by the police and fire-fighting aircraft units.

### f. Use of Property by Military Units

The US Air Force Reserve and the Air National Guard both have numerous flying units located on federally obligated, public-use airports. The majority of these aircraft-operating units are located on leased property at civilian airports established on former military airport land transferred by the US Government to the airport owner/ operator under the Surplus Property Act of 1944, as amended, or under other statutes authorizing the conveyance of surplus Federal property for use as a public airport. Frequently, the favorable lease terms were contemplated in connection with the transfer of the former military property and may have been incorporated in property conveyance documents as obligations of the civilian airport sponsor. As with other reduced-rate leases, these arrangements have been criticized in individual OIG audits.

*The Final Policy:* The Final Policy provides that leasing of airport property at nominal lease rates to military units with aeronautical missions is not inconsistent with the requirement for a

self-sustaining rate structure. The Department of Defense (DOD) has a substantial investment in facilities and infrastructure at these locations, and its operating budgets are based on the existence of these leases. Moving those facilities upon expiration of a lease or the payment of FMV rent for facilities to support military aeronautical activities required for national defense and public safety would be beyond the capability of the DOD without additional legislation and enlargement of the DOD operating budget. In all of the enactments on the self-sustaining rate structure requirement and use of airport revenue and the accompanying legislative history, the FAA can find no indication that Congress intended the airport revenue requirements to be applied in a way to disrupt the United States' defense capabilities or add significantly to the cost of maintaining those capabilities. Moreover, Congress specifically charged the FAA, in 49 U.S.C. § 47103, with developing a national plan of integrated airport systems (NPIAS) to meet, among other things, the country's national defense needs. Inclusion in the NPIAS is a prerequisite for eligibility for AIP funding. Thus, Congress clearly contemplated a military presence at civil airports. Therefore, the FAA will not construe the requirement for a self-sustaining airport rate structure to prohibit nominal leases to military units operating aircraft at an airport.

The Final Policy permits but does not require nominal rental rates. The airport operator is free to treat a qualified military unit as it would any other aeronautical activity in setting rental rates and other fees to be paid by the military unit.

### 7. Lease of Airport Property at Less Than FMV for Mass Transit Access to Airports

The Supplemental Notice proposed that airport property could be made available at less than fair rental value for public transit terminals, rights-of-way, and related facilities, without being considered in violation of the requirements governing airport finances, under certain conditions. The transit system would have to be publicly owned and operated (or privately operated by contract on behalf of the public owner) and the transit facilities directly related to the transportation of air passengers and airport visitors and employees to and from the airport. Twenty-one responses addressed this issue.

*Airport commenters:* The airport operators concur with the principle of making airport land available for mass

**Federal Register** / Vol. 64, No. 30 / Tuesday, February 16, 1999 / Notices

transit at rates below fair market value. ACI–NA/AAAE stated that the determination to use airport property for a transit terminal, transit right-of-way, or related facilities at less than fair rental value is consistent with the grant assurance requiring airports to be self-sustaining.

*Air carriers:* The ATA asserted that FAA has exceeded its statutory authority in the proposal. ATA's considers transit facilities to be like commercial business enterprises, because they occupy airport property and charge their customers for their services. ATA also stressed that airport transit facilities are non-aeronautical facilities which are not "directly and substantially related to the air transportation of passengers or property."

*Other commenters:* Transit operators, including a transit operator trade association generally supported the position in the Supplemental Notice.

Another commenter stated that making airport property available at less than fair market rental value or making airport revenue available for transit facilities equates to the airport paying a hidden taxation. This commenter argued that it was not the intention of Congress, when it passed the AAIA, to have grant funds used to subsidize, either directly or indirectly, any activity that provides no benefit to air travel.

*The Final Policy:* The Final Policy incorporates the provision proposed in the Supplemental Notice, with a technical correction to include transit facilities use for the transportation of property to or from the airport. The FAA does not consider public transit terminals to be the equivalent of commercial business enterprises. Rather, they are more like public and airport roadways providing ground access to the airport. Generally speaking, the FAA does not construe the self-sustaining assurance to require an airport owner or operator to charge for roadways and roadway rights-of-way at FMV.

Moreover, even though publicly-owned transit systems charge passengers for their services, they generally operate at a loss and are subsidized by general taxpayer revenue. Charging fair market value for on airport facilities would thus burden general taxpayers with the costs of providing facilities used exclusively by transit passengers visiting the airport. Therefore, a requirement to charge FMV would not further the purpose of the self-sustaining assurance—to avoid burdening local taxpayers with the cost of operating the airport system.

### a. Private Transit

ACI–NA/AAAE and four airport operators commented that private transit operators should have treatment equal to public transit operators. They argued that the concepts of public-private partnerships, and privatization of transportation facilities, may be realities in the not-too-distant future. Moreover, private ownership would not detract in the least from the functions identified in the Notice for these facilities, such as bringing passengers to and from the airport. They also noted that the language in the AIP Handbook (Order 5100.38A, Section 6) does not specifically exclude private operators. The language states transit facilities will be allowable provided they will primarily serve the airport.

One state Department of Transportation also urged that reduced rental rates should be offered to privately-owned and operated transit systems on the same basis as publicly-owned systems.

*Final Policy.* The Final Policy retains some distinctions between privately and publicly owned systems. In general, privately-owned systems are more analogous to other ground transportation providers—private taxis and limousine services, rental car companies—and even private parking lot operators. These entities are commercial enterprises that operate for profit and are a significant source of revenue for the airport. Most importantly, they are not supported by general taxpayer funds, and charging FMV would not raise questions of burdening local taxpayers with the cost of the airport.

However, the FAA is aware that, in many communities with no publicly-owned bus systems or very limited systems, privately-owned bus systems fulfill the role of providing public transit services to the airport. Accordingly, the FAA is revising the Final Policy to permit an airport operator to provide airport property at less than FMV rates to privately-owned systems in these limited circumstances.

### b. Airport Passengers

Nine airport commenters addressed the proposed requirement that transit facilities be directly related to the transportation of air passengers and airport visitors and employees to and from the airport to qualify for less-than-FMV rentals. The commenters argue that the provision is too narrow by restricting the transit service to air-passengers and airport visitors and employees. One airport operator states that airport sponsors must have the

flexibility to build airport transit systems that principally serve airport passengers, employees and other users but which may also secondarily transport some nonairport users. Two airport operators with general-use rail transit systems planned or operating on or near their airports argue that the airport benefits from improved ground access, reduced traffic congestion and improved air quality of general use systems and that rent-free property should, therefore, be provided to general use systems.

*Final Policy:* The Final Policy incorporates the language of the Supplemental Notice. That language does not preclude any use of transit facilities constructed on airport property by nonairport passengers if the property is to be leased at less-than-FMV. The requirement that the facilities be "directly related" to the airport does not equate to a requirement that the facilities be "exclusively used" for airport purposes. However, if the intended use of a facility is not exclusive airport use, some rental charge may be necessary to reflect the benefits provided to the general public. The determination on whether the facilities are "directly related" will be made on a case-by-case basis.

It appears that some of the concern about this issue was generated by the language in the preamble, which referred to transit facilities "necessary for the transportation of air passengers, airport visitors and airport employees to and from the airport." The preamble offered a maintenance/repair facility as an example of facilities that would not qualify. The FAA is not convinced that the benefits to the airport of having such facilities on the airport is sufficient to justify less-than-FMV rental rates. However, as noted, the FAA does not construe the policy language "facilities directly related the transportation of [airport passengers]" to require that the facilities be used exclusively by airport passengers.

### 8. Military Base Conversions Issues

In its comments to the Proposed Policy, one airport operator argued that using airport revenue to assist in development of revenue-generating properties on former airport bases that are converted to civil airports should not be considered a prohibited use of revenue.

In addition, ACI–NA/AAAE state that a base closure and conversion to civilian use often results in the existence of significant recreational facilities on property owned by an airport. In regard to these facilities on converted military bases, ACI/AAAE stated, "[a] leasing

arrangement whereby a municipality assumes all liability and operating expenses in exchange for a no-revenue lease is beneficial to the airport and should not be prohibited.''

*Final Policy:* The Final Policy provides for no special treatment of converted military bases with respect to airport revenue use, and no special provisions are included in the final policy.

The FAA policy on the use of public and recreational use of property will be consistently applied to airports whether or not they are former military bases. Ordinarily, airport revenue may not be used to finance the costs of public and recreational facilities at the airport, just as airport revenue may not be used to develop other facilities not needed for the airport, even if those facilities will generate revenue for the airport. In addition, unless the recreational facilities qualify under the community-use exception, the airport operator would be expected to receive FMV-based rental payments for the recreational or public property. Operational costs borne by a municipality as a result of a base conversion can be considered in the analysis of whether a reduced rent is justified by tangible or intangible benefits to the airport.

## 9. Enforcement Policy, Whether to Impose Civil Penalty Even if Funds are Returned

The Proposed Policy provided that if the FAA received information that improper use of airport revenue had occurred, the FAA would investigate the matter and attempt to resolve the issue informally. The matter could be resolved if the sponsor persuaded the FAA that the use of airport revenue was not improper, or if the sponsor took corrective action (which usually would involve crediting the diverted amount to the airport account with interest). The proposed policy provided that the FAA would propose enforcement action only if the FAA made a preliminary finding of noncompliance and the sponsor had failed to take corrective action. The Proposed Policy outlined the enforcement actions available to the FAA as of the date of publication. The actions included: (1) withholding of new AIP grants and payments under existing grants (49 USC §§ 47111(e) and (d), respectively); (2) withholding of new authority to impose PFCs (49 USC 47111(e)); (3) withholding of all Federal transportation funds appropriated in Fiscal Years 1994 and 1995 (as provided in the Department of Transportation appropriation legislation for those years); (4) assessment of civil penalties

not to exceed $50,000 (49 USC § 46301); and (5) initiation of a civil action to compel compliance with the grant assurances (49 USC § 47111(f)).

The Proposed Policy outlined the administrative procedural rules applicable to airport compliance matters at the time of publication, 14 C.F.R., Part 13 ''Investigation and Enforcement Procedures.''

*Airport operators:* ACI–NA and AAAE strongly urged the FAA to provide in the final policy that remittance of any diverted amounts, together with associated interest, should be sufficient to ''cure'' instances of revenue diversion, regardless of how those instances come to the attention of the FAA. In particular, a non-airport party should not be given the capacity, through the filing of a formal compliant, to eliminate an airport's ability to cure the problem.

*Air carriers:* ATA suggested that the proposed policy should be strengthened, backed up by a stronger enforcement policy and aggressive monitoring and vigorous enforcement action. ATA additionally argued that FAA should promulgate one rule that sets forth in detail the substantive requirements regarding revenue retention and diversion and a separate compliance and enforcement policy document.

ATA objected that the proposed policy continues to provide a passive monitoring procedure and this approach is not sufficient to provide prompt and efficient enforcement. IATA objected that the Proposed Policy does not promote prompt or effective enforcement.

ATA suggested that the FAA establish a formal compliance monitoring and inspection program that includes compliance monitoring and audits/ inspections similar to those it conducts at certificated airlines, such as for drug and alcohol testing. Further, ATA stated that FAA's enforcement policy should result in civil penalties being assessed with the same vigor with which they are assessed against airlines for alleged regulatory violations. In addition, ATA urged that FAA should maintain the threat of assessing civil penalties for each day an airport or sponsor is in violation of the revenue-use requirement and for each day a sponsor fails to repay amounts determined to have been diverted unlawfully. IATA similarly supported assessment of the maximum civil penalty for each instance of unlawful revenue use.

*The Final Policy:* After publication of the Proposed Policy, the FAA Reauthorization Act of 1996 mandated new remedies for improper use of

airport revenues and new compliance monitoring programs. The Final Policy has been modified to reflect the new requirements. Implementation of the requirements will result in more active and systematic monitoring of airport revenue use and more systematic resolution of questionable airport practices, as requested by the ATA and the IATA. It should be noted that the FAA had already assumed a more active role in monitoring through the implementation of the financial reporting requirements of the 1994 FAA Authorization Act.

In accordance with the requirements of the 1996 FAA Reauthorization Act, the Final Policy reflects the clear congressional intent that the FAA focus compliance efforts on the lawful use of airport revenue. The FAA will use all means at its disposal to monitor and enforce the revenue-use requirements and will take appropriate action when a potential violation is brought to the FAA's attention by any means. To detect whether airport revenue has been diverted from an airport, the FAA will use four primary sources of information: (1) the annual airport financial reports submitted by the sponsor; (2) findings from a single audit conducted in accordance with OMB Circular A–133 (including the audit review and opinion required by the 1996 Reauthorization Act); (3) investigation following a third-party complaint, and, (4) DOT Office of Inspector General audits.

The FAA will seek penalties for the diversion of airport funds if the airport sponsor is not willing to correct the diversion and make restitution, with interest, in a timely manner. This approach is consistent with the FAA's objective of achieving compliance with a sponsor's obligations. Moreover, it is consistent with section 805 of the 1996 Reauthorization Act, which provides for imposition of administrative and civil penalties only after a sponsor has been given an opportunity to take corrective action and failed to do so.

## 10. Form of Policy

As is reflected in the Proposed Policy and Supplemental Notice, the FAA proposed to implement section 112 of the 1994 Act by publishing a policy statement, rather than adopting a regulation.

*The Comments:* The ATA argued that the FAA should promulgate a regulation establishing substantive requirements for use of airport revenue and a separate enforcement policy. The ATA argued that a substantive regulation will provide more clarity on prohibited and permitted practices and be less

**Federal Register** / Vol. 64, No. 30 / Tuesday, February 16, 1999 / Notices

susceptible to conflicts over interpretation.

The AOPA also raised concerns over the prompt and effective enforcement of airport revenue diversion within the terms of this Proposed Policy.

*The Final Policy:* The FAA will publish policy guidance on airport revenue use and enforcement as a policy rather than as a regulation. Section 112 of the 1994 FAA Authorization Act directs the Secretary to "establish policies and procedures" to assure "prompt and effective enforcement" of the revenue retention grant assurances, which clearly contemplates the issuance of a policy statement for this purpose.

As discussed in connection with specific issues, the wide variation in airport situations makes it impractical for the FAA to promulgate standards with the specificity and inflexibility urged by ATA. Moreover, a regulation is not required to obtain compliance with the revenue-use requirement. Airports are obligated by the statutory assurance in AIP grant agreements pursuant to § 47107(b)(2), or directly under § 47133, and rulemaking is not required to implement those statutes.

On the issue raised by ATA and AOPA concerning the prompt and effective enforcement mechanism to address specific revenue diversion issues, the FAA had been using 14 CFR Part 13. However, on December 16, 1996, 14 CFR Part 16, Rules of Practice for Federally Assisted Airport Proceedings, took effect. Part 16 established new investigation and enforcement procedures for airport compliance matters, including compliance with the revenue-use requirement. Part 16 includes time deadlines and processes to assure that FAA promptly and effectively investigates and adjudicates specific airport compliance matters involving Federally Assisted Airports. The FAA considers the procedural requirements of the Reauthorization Act of 1996 to be self-executing and will apply the statutory provisions in the case of any conflict with Part 16. However, the FAA is in the process of revising Part 16 to incorporate those new procedural requirements.

**Paperwork Reduction Act Requirements**

The Office of Management and Budget (OMB) has previously approved, pursuant to the Paperwork Reduction Act, the annual airport financial reports described in Section VIII.A of the Final Policy under OMB Number 2120–0569.

**Policy Statement**

For the reasons discussed above, the Federal Aviation Administration adopts the following statement of policy concerning the use of airport revenue:

**Policies and Procedures Concerning the Use of Airport Revenue**

Table of Contents

Section I—Introduction
Section II—Definitions
  A. Federal Financial Assistance
  B. Airport Revenue
  C. Unlawful Revenue Diversion
  D. Airport Sponsor
Section III—Applicability of the Policy
  A. Policy and Procedures on the Use of Airport Revenue and State or Local Taxes on Aviation Fuel
  B. Policies and Procedures on the Requirement for a Self-Sustaining Airport Rate Structure
  C. Application of the Policy to Airport Privatization
Section IV—Statutory Requirements for the Use of Airport Revenue
  A. General Requirements, 49 USC §§ 47107(b) and 47133
  B. Exception for Certain Preexisting Arrangements (Grandfather Provisions)
  C. Application of 49 USC § 47133
  D. Specific Statutory Requirements for the Use of Airport Revenue
  E. Passenger Facility Charges and Revenue Diversion
Section V—Permitted Uses of Airport Revenue
  A. Permitted Uses of Airport Revenue
  B. Allocation of Indirect Costs
  C. Standard of Documentation for the Reimbursement to Government Entities of Costs of Services and Contributions Provided to Airports
  D. Expenditures of Airport Revenue by Grandfathered Airports
Section VI—Prohibited Uses of Airport Revenue
  A. Lawful and Unlawful Revenue Diversion
  B. Prohibited Uses of Airport Revenue
Section VII—Policies Regarding Requirement for a Self-Sustaining Airport Rate Structure
  A. Statutory Requirements
  B. General Policies Governing the Self-Sustaining Rate Structure Assurance
  C. Policy on Charges for Nonaeronautical Facilities and Services
  D. Providing Property for Public Community Purposes
  E. Use of Property by Not-for-Profit Aviation Organizations
  F. Use of Property by Military Units
  G. Use of Property for Transit Projects
  H. Private Transit Systems
Section VIII—Reporting and Audit Requirements
  A. Annual Financial Reports
  B. Single Audit Review and Opinion
Section IX—Monitoring and Compliance
  A. Detection of Airport Revenue Diversion
  B. Investigation of Revenue Diversion Initiated Without Formal Complaint
  C. Investigation of Revenue Diversion Precipitated by Formal Complaint
  D. The Administrative Enforcement Process
  E. Sanctions for Noncompliance
  F. Compliance with Reporting and Audit Requirements

**Section I.—Introduction**

The Federal Aviation Administration (FAA) issues this document to fulfill the statutory provisions in section 112 of the Federal Aviation Administration Authorization Act of 1994, Pub.L. No. 103–305, 108 Stat. 1569 (August 23, 1994), 49 USC 47107(l), and Federal Aviation Administration Reauthorization Act of 1996, Public Law 104–264, 110 Stat. 3213 (October 9, 1996), to establish policies and procedures on the generation and use of airport revenue. The sponsor assurance prohibiting the unlawful diversion of airport revenues, also known as the revenue-use requirement, was first mandated by Congress in 1982. Simply stated, the purpose of that assurance, now codified at 49 USC §§ 47107(b) and 47133, is to provide that an airport owner or operator receiving Federal financial assistance will use airport revenues only for purposes related to the airport. The Policy Statement implements requirements adopted by Congress in the FAA Reauthorization Acts of 1994 and 1996, and takes into consideration comments received on the interim policy statements issued on February 26, 1996, and December 18, 1996.

**Section II—Definitions**

*A. Federal Financial Assistance*

Title 49 USC § 47133, which took effect on October 1, 1996, applies the airport revenue-use requirements of § 47107(b) to any airport that has received "Federal assistance." The FAA considers the term "Federal assistance" in § 47133 to apply to the following Federal actions:

1. Airport development grants issued under the Airport Improvement Program and predecessor Federal grant programs;

2. Airport planning grants that relate to a specific airport;

3. Airport noise mitigation grants received by an airport operator;

4. The transfer of Federal property under the Surplus Property Act, now codified at 49 USC § 47151 *et seq.*; and

5. Deeds of conveyance issued under Section 16 of the Federal Airport Act of 1946, under Section 23 of the Airport and Airway Improvement Act of 1970, or under Section 516 of the Airport and Airway Improvement Act of 1982 (AAIA).

*B. Airport Revenue*

1. All fees, charges, rents, or other payments received by or accruing to the sponsor for any one of the following reasons are considered to be airport revenue:

a. Revenue from air carriers, tenants, lessees, purchasers of airport properties, airport permittees making use of airport property and services, and other parties. Airport revenue includes all revenue received by the sponsor for the activities of others or the transfer of rights to others relating to the airport, including revenue received:

i. For the right to conduct an activity on the airport or to use or occupy airport property;

ii. For the sale, transfer, or disposition of airport real property (as specified in the applicability section of this policy statement) not acquired with Federal assistance or personal airport property not acquired with Federal assistance, or any interest in that property, including transfer through a condemnation proceeding;

iii. For the sale of (or sale or lease of rights in) sponsor-owned mineral, natural, or agricultural products or water to be taken from the airport; or

iv. For the right to conduct an activity on, or for the use or disposition of, real or personal property or any interest therein owned or controlled by the sponsor and used for an airport-related purpose but not located on the airport (e.g., a downtown duty-free shop).

b. Revenue from sponsor activities on the airport. Airport revenue generally includes all revenue received by the sponsor for activities conducted by the sponsor itself as airport owner and operator, including revenue received:

i. From any activity conducted by the sponsor on airport property acquired with Federal assistance;

ii. From any aeronautical activity conducted by the sponsor which is directly connected to a sponsor's ownership of an airport subject to 49 U.S.C. §§ 47107(b) or 47133; or

iii. From any nonaeronautical activity conducted by the sponsor on airport property not acquired with Federal assistance, but only to the extent of the fair rental value of the airport property. The fair rental value will be based on the fair market value.

2. State or local taxes on aviation fuel (except taxes in effect on December 30, 1987) are considered to be airport revenue subject to the revenue-use requirement. However, revenues from state taxes on aviation fuel may be used to support state aviation programs or for noise mitigation purposes, on or off the airport.

3. While not considered to be airport revenue, the proceeds from the sale of land donated by the United States or acquired with Federal grants must be used in accordance with the agreement between the FAA and the sponsor. Where such an agreement gives the FAA discretion, FAA may consider this policy as a relevant factor in specifying the permissible use or uses of the proceeds.

*C. Unlawful Revenue Diversion*

Unlawful revenue diversion is the use of airport revenue for purposes other than the capital or operating costs of the airport, the local airport system, or other local facilities owned or operated by the airport owner or operator and directly and substantially related to the air transportation of passengers or property, when the use is not ''grandfathered'' under 49 U.S.C. § 47107(b)(2). When a use would be diversion of revenue but is grandfathered, the use is considered lawful revenue diversion. See Section VI, Prohibited Uses of Airport Revenue.

*D. Airport Sponsor*

The airport sponsor is the owner or operator of the airport that accepts Federal assistance and executes grant agreements or other documents required for the receipt of Federal assistance.

**Section III—Applicability of the Policy**

*A. Policy and Procedures on the Use of Airport Revenue and State or Local Taxes on Aviation Fuel*

1. With respect to the use of airport revenue, the policies and procedures in the Policy Statement are applicable to all public agencies that have received a grant for airport development since September 3, 1982, under the Airport and Airway Improvement Act of 1982 (AAIA), as amended, recodified without substantive change by Public Law 103–272 (July 5, 1994) at 49 § U.S.C. 47101, et seq., and which had grant obligations regarding the use of airport revenue in effect on October 1, 1996 (the effective date of the FAA Authorization Act of 1996). Grants issued under that statutory authority are commonly referred to as Airport Improvement Program (AIP) grants. The Policy Statement applies to revenue uses at such airports even if the sponsor has not received an AIP grant since October 1, 1996.

2. With respect to the use of state and local taxes on aviation fuel, this Policy Statement is applicable to all public agencies that have received an AIP development grant since December 30, 1987, and which had grant obligations regarding the use of state and local taxes

on aviation fuel in effect of October 1, 1996.

3. Pursuant to 49 U.S.C. § 47133, this Policy Statement applies to any airport for which Federal assistance has been received after October 1, 1996, whether or not the airport owner is subject to the airport revenue-use grant assurance, and applies to any airport for which the airport revenue-use grant obligation is in effect on or after October 1, 1996. Section 47133 does not apply to an airport that has received Federal assistance prior to October 1, 1996, and does not have AIP airport development grant assurances in effect on that date.

4. Requirements regarding the use of airport revenue applicable to a particular airport or airport operator on or after October 1, 1996, as a result of the provisions of 49 U.S.C. § 47133, do not expire.

5. The FAA will not reconsider agency determinations and adjudications dated prior to the date of this Policy Statement, based on the issuance of this Policy Statement.

*B. Policies and Procedures on the Requirement for a Self-Sustaining Airport Rate Structure*

1. These policies and procedures apply to the operators of publicly owned airports that have received an AIP development grant and that have grant obligations in effect on or after the effective date of this policy.

2. Grant assurance obligations regarding maintenance of a self-sustaining airport rate structure in effect on or after the effective date of this policy apply until the end of the useful life of each airport development project or 20 years, whichever is less, except obligations under a grant for land acquisition, which do not expire.

*C. Application of the Policy to Airport Privatization*

1. The Airport Privatization Pilot Program, codified at 49 U.S.C. § 47134, provides for the sale or lease of general aviation airports and the lease of air carrier airports. Under the program, the FAA is authorized to exempt up to five airports from Federal statutory and regulatory requirements governing the use of airport revenue. The FAA can exempt an airport sponsor from its obligations to repay Federal grants, in the event of a sale, to return property acquired with Federal assistance and to use the proceeds of the sale or lease exclusively for airport purposes. The exemptions are subject to a number of conditions.

2. Except as specifically provided by the terms of an exemption granted under the Airport Privatization Pilot

**Federal Register** / Vol. 64, No. 30 / Tuesday, February 16, 1999 / Notices

Program, this policy statement applies to a privatization of airport property and/or operations.

3. For airport privatization transactions not subject to an exemption under the Pilot Program:

FAA approval of the sale or other transfer of ownership or control, of a publicly owned airport is required in accordance with the AIP sponsor assurances and general government contract law principles. The proceeds of a sale of airport property are considered airport revenue (except in the case of property acquired with Federal assistance, the sale of which is subject to other restrictions under the relevant grant contract or deed). When the sale proposed is the sale of an entire airport as an operating entity, the request may present the FAA with a complex transaction in which the disposition of the proceeds of the transfer is only one of many considerations. In its review of such a proposal, the FAA would condition its approval of the transfer on the parties' assurances that the proceeds of sale will be used for the purposes permitted by the revenue-use requirements of 49 U.S.C. §§ 47107(b) and 47133. Because of the complexity of an airport sale or privatization, the provisions for ensuring that the proceeds are used for the purposes permitted by the revenue-use requirements may need to be adapted to the special circumstances of the transaction. Accordingly, the disposition of the proceeds would need to be structured to meet the revenue-use requirements, given the special conditions and constraints imposed by the fact of a change in airport ownership. In considering and approving such requests, the FAA will remain open and flexible in specifying conditions on the use of revenue that will protect the public interest and fulfill the objectives and obligations of revenue-use requirements, without unnecessarily interfering with the appropriate privatization of airport infrastructure.

4. It is not the intention of the FAA to effectively bar airport privatization initiatives outside of the pilot program through application of the statutory requirements for use of airport revenue. Proponents of a proposed privatization or other sale or lease of airport property clearly will need to consider the effects of Federal statutory requirements on the use of airport revenue, reasonable fees for airport users, disposition of airport property, and other policies incorporated in Federal grant agreements. The FAA assumes that the proposals will be structured from the outset to comply with all such

requirements, and this proposed policy is not intended to add to the considerations already involved in a transfer of airport property.

**Section IV—Statutory Requirements for the Use of Airport Revenue**

*A. General Requirements, 49 U.S.C. §§ 47107(b) and 47133*

1. The current provisions restricting the use of airport revenue are found at 49 U.S.C. §§ 47107(b), and 47133. Section 47107(b) requires the Secretary, prior to approving a project grant application for airport development, to obtain written assurances regarding the use of airport revenue and state and local taxes on aviation fuel. Section 47107(b)(1) requires the airport owner or operator to provide assurances that local taxes on aviation fuel (except taxes in effect on December 30, 1987) and the revenues generated by a public airport will be expended for the capital or operating costs of—

a. The airport;
b. The local airport system; or
c. Other local facilities owned or operated by the airport owner or operator and directly and substantially related to the air transportation of passengers or property.

*B. Exception for Certain Preexisting Arrangements (Grandfather Provisions)*

Section 47107(b)(2) provides an exception to the requirements of Section 47107(b)(1) for airport owners or operators having certain financial arrangements in effect prior to the enactment of the AAIA. This provision is commonly referred to as the ''grandfather'' provision. It states:

Paragraph (1) of this subsection does not apply if a provision enacted not later than September 2, 1982, in a law controlling financing by the airport owner or operator, or a covenant or assurance in a debt obligation issued not later than September 2, 1982, by the owner or operator, provides that the revenues, including local taxes on aviation fuel at public airports, from any of the facilities of the owner or operator, including the airport, be used to support not only the airport but also the general debt obligations or other facilities of the owner or operator.

*C. Application of 49 U.S.C. § 47133*

1. Section 47133 imposes the same requirements on all airports, privately-owned or publicly-owned, that are the subject of Federal assistance. Subsection 47133(a) states that:

Local taxes on aviation fuel (except taxes in effect on December 30, 1987) or the revenues generated by an airport that is the subject of Federal assistance may not be expended for any purpose other than the capital or operating costs of—

(a) the airport;
(b) The local airport system; or
(c) Other local facilities owned or operated by the person or entity that owns or operates the airport that is directly and substantially related to the air transportation of persons or property.

2. Section 47133(b) contains the same grandfather provisions as section 47107(b).

3. Enactment of section 47133 resulted in three fundamental changes to the revenue-use obligation, as reflected in the applicability section of this policy statement.

a. Privately owned airports receiving Federal assistance (as defined in this policy statement) after October 1, 1996, are subject to the revenue-use requirement.

b. In addition to airports receiving AIP grants, airports receiving Federal assistance in the form of gifts of property after October 1, 1996, are subject to the revenue-use requirement.

c. For any airport or airport operator that is subject to the revenue-use requirement on or after October 1, 1996, the revenue-use requirement applies indefinitely.

4. This section of the policy refers to the date of October 1, 1996, because the FAA Authorization Act of 1996 is by its terms effective on that date.

*D. Specific Statutory Requirements for the Use of Airport Revenue*

1. In section 112 of the FAA Authorization Act of 1994, 49 U.S.C. § 47107(l)(2) (A–D), Congress expressly prohibited the diversion of airport revenues through:

a. Direct payments or indirect payments, other than payments reflecting the value of services and facilities provided to the airport;

b. Use of airport revenues for general economic development, marketing, and promotional activities unrelated to airports or airport systems;

c. Payments in lieu of taxes or other assessments that exceed the value of services provided; or

d. Payments to compensate non-sponsoring governmental bodies for lost tax revenues exceeding stated tax rates.

2. Section 47107(l)(5), enacted as part of the FAA Authorization Act of 1996, provides that:

(A) Any request by a sponsor to any airport for additional payments for services conducted off of the airport or for reimbursement for capital contributions or operating expenses shall be filed not later than 6 years after the date on which the expense is incurred; and

(B) Any amount of airport funds that are used to make a payment or

reimbursement as described in subparagraph (a) after the date specified in that subparagraph shall be considered to be an illegal diversion of airport revenues that is subject to subsection (n).

3. 49 U.S.C. § 40116(d)(2)(A) provides, among other things, that a State, political subdivision of a State or authority acting for a State or a political subdivision may not: ''(iv) levy or collect a tax, fee or charge, first taking effect after August 23, 1994, exclusively upon any business located at a commercial service airport or operating as a permittee of such an airport other than a tax, fee or charge wholly utilized for airport or aeronautical purposes.''

**E. Passenger Facility Charges and Revenue Diversion**

The Aviation Safety and Capacity Expansion Act of 1990 authorized the imposition of a passenger facility charge (PFC) with the approval of the Secretary.

1. While PFC revenue is not characterized as ''airport revenue'' for purposes of this Policy Statement, specific statutory and regulatory guidelines govern the use of PFC revenue, as set forth at 49 U.S.C. 40117, ''Passenger Facility Fees,'' and 14 CFR Part 158, ''Passenger Facility Charges.'' (For purposes of this policy, the terms ''passenger facility fees'' and ''passenger facility charges'' are synonymous.) These provisions are more restrictive than the requirements for the use of airport revenue in 49 U.S.C. 47107(b), in that the PFC requirements provide that PFC collections may only be used to finance the allowable costs of approved projects. The PFC regulation specifies the kinds of projects that can be funded by PFC revenue and the objectives these projects must achieve to receive FAA approval for use of PFC revenue.

2. The statute and regulations prohibit expenditure of PFC revenue for other than approved projects, or collection of PFC revenue in excess of approved amounts.

3. As explained more fully below under enforcement policies and procedures in Section IX, ''Monitoring and Compliance,'' a final FAA determination that a public agency has violated the revenue-use provision prevents the FAA from approving new authority to impose a PFC until corrective action is taken.

**Section V—Permitted Uses of Airport Revenue**

*A. Permitted Uses of Airport Revenue*

Airport revenue may be used for:
1. The capital or operating costs of the airport, the local airport system, or other local facilities owned or operated by the airport owner or operator and directly and substantially related to the air transportation of passengers or property. Such costs may include reimbursements to a state or local agency for the costs of services actually received and documented, subject to the terms of this policy statement. Operating costs for an airport may be both direct and indirect and may include all of the expenses and costs that are recognized under the generally accepted accounting principles and practices that apply to the airport enterprise funds of state and local government entities.

2. The full costs of activities directed toward promoting competition at an airport, public and industry awareness of airport facilities and services, new air service and competition at the airport (other than direct subsidy of air carrier operations prohibited by paragraph VI.B.12 of this policy), and salary and expenses of employees engaged in efforts to promote air service at the airport, subject to the terms of this policy statement. Other permissible expenditures include cooperative advertising, where the airport advertises new services with or without matching funds, and advertising of general or specific airline services to the airport. Examples of permitted expenditures in this category include: (a) a Superbowl hospitality tent for corporate aircraft crews at a sponsor-owned general aviation terminal intended to promote the use of that airport by corporate aircraft; and (b) the cost of promotional items bearing airport logos distributed at various aviation industry events.

3. A share of promotional expenses, which may include marketing efforts, advertising, and related activities designed to increase travel using the airport, to the extent the airport share of the promotional materials or efforts meets the requirements of V.A.2. above and includes specific information about the airport.

4. The repayment of the airport owner or sponsor of funds contributed by such owner or sponsor for capital and operating costs of the airport and not heretofore reimbursed. An airport owner or operator can seek reimbursement of contributed funds only if the request is made within 6 years of the date the contribution took place. 49 U.S.C. 47107(l).

a. If the contribution was a loan to the airport, and clearly documented as an interest-bearing loan at the time it was made, the sponsor may repay the loan principal and interest from airport funds. Interest should not exceed a rate which the sponsor received for other investments for that period of time.

b. For other contributions to the airport, the airport owner or operator may seek reimbursement of interest only if the FAA determines that the airport owes the sponsor funds as a result of activities conducted by the sponsor or expenditures by the sponsor for the benefit of the airport. Interest shall be determined in the manner provided in 49 U.S.C. 47107(o), but may be assessed only from the date of the FAA's determination.

5. Lobbying fees and attorney fees to the extent these fees are for services in support of any activity or project for which airport revenues may be used under this Policy Statement. See Section VI: Prohibited Uses of Airport Revenue.

6. Costs incurred by government officials, such as city council members, to the extent that such costs are for services to the airport actually received and documented. An example of such costs would be the costs of travel for city council members to meet with FAA officials regarding AIP funding for an airport project.

7. A portion of the general costs of government, including executive offices and the legislative branches, may be allocated to the airport indirectly under a cost allocation plan in accordance with V.B.3. of this Policy Statement.

8. Expenditure of airport funds for support of community activities, participation in community events, or support of community-purpose uses of airport property if such expenditures are directly and substantially related to the operation of the airport. Examples of permitted expenditures in this category include: (a) the purchase of tickets for an annual community luncheon at which the Airport director delivers a speech reviewing the state of the airport; and (b) contribution to a golf tournament sponsored by a ''friends of the airport'' committee. The FAA recognizes that contributions for community or charitable purposes can provide a direct benefit to the airport through enhanced community acceptance, but that a benefit of that nature is intangible and not quantifiable. Where the amount of contribution is minimal, the value of the benefit will not be questioned as long as there is a reasonable connection between the recipient organization and the benefit of local community acceptance for the airport. An example of a permitted expenditure in this category was participation in a local school fair with a booth focusing on operation of the airport and career opportunities in aviation. The expenditure in this example was $250.

9. Airport revenue may be used for the capital or operating costs of those

portions of an airport ground access project that can be considered an airport capital project, or of that part of a local facility that is owned or operated by the airport owner or operator and directly and substantially related to the air transportation of passengers or property, including use by airport visitors and employees. The FAA has approved the use of airport revenue for the actual costs incurred for structures and equipment associated with an airport terminal building station and a rail connector between the airport station and the nearest mass transit rail line, where the structures and equipment were (1) located entirely on airport property, and (2) designed and intended exclusively for the use of airport passengers.

*B. Allocation of Indirect Costs*

1. Indirect costs of sponsor services may be allocated to the airport in accordance with this policy, but the allocation must result in an allocation to the airport only of those costs that would otherwise be allowable under 49 U.S.C. § 47107(b). In addition, the documentation for the costs must meet the standards of documentation stated in this policy.

2. The costs must be allocated under a cost allocation plan that meets the following requirements:

a. The cost is allocated under a cost allocation plan that is consistent with Attachment A to OMB Circular A–87, except that the phrase "airport revenue" should be substituted for the phrase "grant award," wherever the latter phrase occurs in Attachment A;

b. The allocation method does not result in a disproportionate allocation of general government costs to the airport in consideration of the benefits received by the airport;

c. Costs allocated indirectly under the cost allocation plan are not billed directly to the airport; and

d. Costs billed to the airport under the cost allocation plan must be similarly billed to other comparable units of the airport owner or operator.

3. A portion of the general costs of government, such as the costs of the legislative branch and executive offices, may be allocated to the airport as an indirect cost under a cost allocation plan satisfying the requirements set forth above. However, the allocation of these costs may require special scrutiny to assure that the airport is not paying a disproportionate share of these costs.

4. Central service costs, such as accounting, budgeting, data processing, procurement, legal services, disbursing and payroll services, may also be allocated to the airport as indirect costs under a cost allocation plan satisfying the requirements set forth above. However, the allocation of these costs may require special scrutiny to assure that the airport is not paying a disproportionate share of these costs.

*C. Standard of Documentation for the Reimbursement to Government Entities of Costs of Services and Contributions Provided to Airports*

1. Reimbursements for capital and operating costs of the airport made by a government entity, both direct and indirect, must be supported by adequate documentary evidence. Documentary evidence includes, but is not limited to:

a. Underlying accounting data such as general and specialized journals, ledgers, manuals, and supporting worksheets and other analyses; and corroborating evidence such as invoices, vouchers and indirect cost allocation plans, or

b. Audited financial statements which show the specific expenditures to be reimbursed by the airport. Such expenditures should be clearly identifiable on the audited financial statements as being consistent with section VIII of this policy statement.

2. Documentary evidence to support direct and indirect charges to the airport must show that the amounts claimed were actually expended. Budget estimates are not sufficient to establish a claim for reimbursement. Indirect cost allocation plans, however, may use budget estimates to establish pre-determined indirect cost allocation rates. Such estimated rates should, however, be adjusted to actual expenses in the subsequent accounting period.

*D. Expenditures of Airport Revenue by Grandfathered Airports*

1. Airport revenue may be used for purposes other than capital and operating costs of the airport, the local airport system, or other local facilities owned or operated by the sponsor and directly and substantially related to the air transportation of passengers or property, if the "grandfather" provisions of 49 U.S.C. § 47107(b)(2) are applicable to the sponsor and the particular use. Based on previous DOT interpretations, examples of grandfathered airport sponsors may include, but are not limited to the following:

a. A port authority or state department of transportation which owns or operates other transportation facilities in addition to airports, and which have pre-September 3, 1982, debt obligations or legislation governing financing and providing for use of airport revenue for non-airport purposes. Such sponsors may have obtained legal opinions from

their counsel to support a claim of grandfathering. Previous DOT interpretations have found the following examples of pre-AAIA legislation to provide for the grandfather exception:

b. Bond obligations and city ordinances requiring a five percent "gross receipts" fee from airport revenues. The payments were instituted in 1954 and continued in 1968.

c. A 1955 state statute for the assessing of a five percent surcharge on all receipts and deposits in an airport revenue fund to defray central service expenses of the state.

d. City legislation authorizing the transfer of a percentage of airport revenues, permitting an airport-air carrier settlement agreement providing for annual payments to the city of 15 percent of the airport concession revenues.

e. A 1957 state statutory transportation program governing the financing and operations of a multi-modal transportation authority, including airport, highway, port, rail and transit facilities, wherein state revenues, including airport revenues, support the state's transportation-related, and other, facilities. The funds flow from the airports to a state transportation trust fund, composed of all "taxes, fees, charges, and revenues" collected or received by the state department of transportation.

f. A port authority's 1956 enabling act provisions specifically permitting it to use port revenue, which includes airport revenue, to satisfy debt obligations and to use revenues from each project for the expenses of the authority. The act also exempts the authority from property taxes but requires annual payments in lieu of taxes to several local governments and gives it other corporate powers. A 1978 trust agreement recognizes the use of the authority's revenue for debt servicing, facilities of the authority, its expenses, reserves, and the payment in lieu of taxes fund.

2. Under the authority of 49 U.S.C. § 47115(f), the FAA considers as a factor militating against the approval of an application for AIP discretionary funds, the fact that a sponsor has exercised its rights to use airport revenue for nonairport purposes under the grandfather clause, when in the airport's fiscal year preceding the date of application for discretionary funds, the FAA finds that the amount of airport revenues used for nonairport purposes exceeds the amount used for such purposes in the airport's first fiscal year ending after August 23, 1994, adjusted by the Secretary for changes in the Consumer Price Index of All Urban

Consumers published by the Bureau of Labor Statistics of the Department of Labor.

## Section VI—Prohibited Uses of Airport Revenue

### A. Lawful and Unlawful Revenue Diversion

Revenue diversion is the use of airport revenue for purposes other than the capital or operating costs of the airport, the local airport system, or other local facilities owned or operated by the airport owner or operator and directly and substantially related to the air transportation of passengers or property, unless that use is grandfathered under 49 U.S.C. § 47107(b)(2) and the use does not exceed the limits of the 'grandfather' clause. When such use is so grandfathered, it is known as lawful revenue diversion. Unless the revenue diversion is grandfathered, the diversion is unlawful and prohibited by the revenue-use restrictions.

### B. Prohibited Uses of Airport Revenue

Prohibited uses of airport revenue include but are not limited to:

1. Direct or indirect payments that exceed the fair and reasonable value of those services and facilities provided to the airport. The FAA generally considers the cost of providing the services or facilities to the airport as a reliable indicator of value.

2. Direct or indirect payments that are based on a cost allocation formula that is not consistent with this policy statement or that is not calculated consistently for the airport and other comparable units or cost centers of government.

3. Use of airport revenues for general economic development.

4. Marketing and promotional activities unrelated to airports or airport systems. Examples of prohibited expenses in this category include participation in program to provide hospitality training to taxi drivers and funding an airport operator's float containing no reference to the airport, in a New Years Day parade.

5. Payments in lieu of taxes, or other assessments, that exceed the value of services provided or are not based on a reasonable, transparent cost allocation formula calculated consistently for other comparable units or cost centers of government;

6. Payments to compensate non-sponsoring governmental bodies for lost tax revenues to the extent the payments exceed the stated tax rates applicable to the airport;

7. Loans to or investment of airport funds in a state or local agency at less than the prevailing rate of interest.

8. Land rental to, or use of land by, the sponsor for nonaeronautical purposes at less than fair rental/market value, except to the extent permitted by Section VII.D of this policy.

9. Use of land by the sponsor for aeronautical purposes rent-free or for nominal rental rates, except to the extent permitted by Section VII.E of this policy.

10. Impact fees assessed by any governmental body that exceed the value of services or facilities provided to the airport. However, airport revenue may be used where airport development requires a sponsoring agency to take an action, such as undertaking environmental mitigation measures contained in an FAA record of decision approving funding for an airport development project, or constructing a ground access facility that would otherwise be eligible for the use of airport revenue. Payments of impact fees must meet the general requirement that airport revenue be expended only for actual documented costs of items eligible for use of airport revenue under this Policy Statement. In determining appropriate corrective action for an impact fee payment that is not consistent with this policy, the FAA will consider whether the impact fee was imposed by a non-sponsoring governmental entity and the sponsor's ability under local law to avoid paying the fee.

11. Expenditure of airport funds for support of community activities and participation in community events, or for support of community-purpose uses of airport property except to the extent permitted by this policy. See Section V, Uses of Airport Revenue. Examples of prohibited expenditures in this category include expenditure of $50,000 to sponsor a local film society's annual film festival; and contribution of $6,000 to a community cultural heritage festival.

12. Direct subsidy of air carrier operations. Direct subsidies are considered to be payments of airport funds to carriers for air service. Prohibited direct subsidies do not include waivers of fees or discounted landing or other fees during a promotional period. Any fee waiver or discount must be offered to all users of the airport, and provided to all users that are willing to provide the same type and level of new services consistent with the promotional offering. Likewise prohibited direct subsidies do not include support for airline advertising or marketing of new services to the extent permitted by Section V of this Policy Statement.

## Section VII—Policies Regarding Requirement for a Self-Sustaining Airport Rate Structure

### A. Statutory Requirements

49 U.S.C. § 47107(a)(13) requires airport operators to maintain a schedule of charges for use of the airport: ''(A) that will make the airport as self-sustaining as possible under the circumstances existing at the airport, including volume of traffic and economy of collection.''

The requirement is generally referred to as the ''self-sustaining assurance.''

### B. General Policies Governing the Self-Sustaining Rate Structure Assurance

1. Airport proprietors must maintain a fee and rental structure that in the circumstances of the airport makes the airport as financially self-sustaining as possible. In considering whether a particular contract or lease is consistent with this requirement, the FAA and the Office of the Inspector General (OIG) generally evaluate the individual contract or lease to determine whether the fee or rate charged generates sufficient income for the airport property or service provided, rather than looking at the financial status of the entire airport.

2. If market conditions or demand for air service do not permit the airport to be financially self-sustaining, the airport proprietor should establish long-term goals and targets to make the airport as financially self-sustaining as possible.

3. At some airports, market conditions may not permit an airport proprietor to establish fees that are sufficiently high to recover aeronautical costs and sufficiently low to attract and retain commercial aeronautical services. In such circumstances, an airport proprietor's decision to charge rates that are below those needed to achieve a self-sustaining income in order to assure that services are provided to the public is not inherently inconsistent with the obligation to make the airport as self-sustaining as possible in the circumstances.

4. Airport proprietors are encouraged, when entering into new or revised agreements or otherwise establishing rates, charges, and fees, to undertake reasonable efforts to make their particular airports as self sustaining as possible in the circumstances existing at such airports.

5. Under 49 U.S.C. § 47107(a)(1) and the implementing grant assurance, charges to aeronautical users must be reasonable and not unjustly discriminatory. Because of the limiting effect of the reasonableness requirement, the FAA does not consider the self-sustaining requirement to require airport sponsors

to charge fair market rates to aeronautical users. Rather, for charges to aeronautical users, the FAA considers the self-sustaining assurance to be satisfied by airport charges that reflect the cost to the sponsor of providing aeronautical services and facilities to users. A fee for aeronautical users set pursuant to a residual costing methodology satisfies the requirement for a self-sustaining airport rate structure.

6. In establishing new fees, and generating revenues from all sources, airport owners and operators should not seek to create revenue surpluses that exceed the amounts to be used for airport system purposes and for other purposes for which airport revenues may be spent under 49 U.S.C. § 47107(b)(1), including reasonable reserves and other funds to facilitate financing and to cover contingencies. While fees charged to nonaeronautical users are not subject to the reasonableness requirement or the Department of Transportation Policy on airport rates and charges, the surplus funds accumulated from those fees must be used in accordance with 49 U.S.C. § 47107(b).

*C. Policy on Charges for Nonaeronautical Facilities and Services*

Subject to the general guidance set forth above and the specific exceptions noted below, the FAA interprets the self-sustaining assurance to require that the airport receive fair market value for the provision of nonaeronautical facilities and services, to the extent practicable considering the circumstances at the airport.

*D. Providing Property for Public Community Purposes*

Making airport property available at less than fair market rental value for public recreational and other community uses, for the purpose of maintaining positive airport-community relations, can be a legitimate function of an airport proprietor in operating the airport. Accordingly, in certain circumstances, providing airport land for such purposes will not be considered a violation of the self-sustaining requirement. Generally, the circumstances in which below-market use of airport land for community purposes will be considered consistent with the grant assurances are:

1. The contribution of the airport property enhances public acceptance of the airport in a community in the immediate area of the airport; the property is put to a general public use desired by the local community; and the public use does not adversely affect the capacity, security, safety or operations of the airport. Examples of acceptable uses include public parks, recreation facilities, and bike or jogging paths. Examples of uses that would not be eligible are road maintenance equipment storage; and police, fire department, and other government facilities if they do not directly support the operation of the airport.

2. The property involved would not reasonably be expected to produce more than *de minimis* revenue at the time the community use is contemplated, and the property is not reasonably expected to be used by an aeronautical tenant or otherwise be needed for airport operations in the foreseeable future. When airport property reasonably may be expected to earn more than minimal revenue, it still may be used for community purposes at less than FMV if the revenue earned from the community use approximates the revenue that could otherwise be generated, provided that the other provisions of VII. D. are met.

3. The community use does not preclude reuse of the property for airport purposes if, in the opinion of the airport sponsor, such reuse will provide greater benefits to the airport than continuation of the community use.

4. Airport revenue is not to be used to support the capital or operating costs associated with the community use.

*E. Use of Property by Not-for-Profit Aviation Organizations*

1. An airport operator may charge reduced rental rates and fees to the following not-for-profit aviation organizations, to the extent that the reduction is reasonably justified by the tangible or intangible benefits to the airport or to civil aviation:

a. Aviation museums;

b. Aeronautical secondary and post-secondary education programs conducted by accredited educational institutions; or

c. Civil Air Patrol units operating aircraft at the airport;

2. Police or fire-fighting units operating aircraft at the airport generally will be expected to pay a reasonable rate for aeronautical use of airport property, but the value of any services provided by the unit to the airport may be offset against the applicable reasonable rate.

*F. Use of Property by Military Units*

The FAA acknowledges that many airports provide facilities to military units with aeronautical missions at nominal lease rates. The FAA does not consider this practice inconsistent with the requirement for a self-sustaining airport rate structure. Military units with aeronautical missions may include the Air National Guard, aviation units of the Army National Guard, U.S. Air Force Reserve, and Naval Reserve air units operating aircraft at the airport. Reserve and Guard units typically have an historical presence at the airport that precedes the Airport and Airway Improvement Act of 1982, and provide services that directly benefit airport operations and safety, such as snow removal and supplementary ARFF capability.

*G. Use of Property for Transit Projects*

Making airport property available at less than fair market rental for public transit terminals, right-of-way, and related facilities will not be considered a violation of 49 U.S.C. §§ 47107(b), 47133 or 47107(a)(13) if the transit system is publicly owned and operated (or operated by contract on behalf of the public owner), and the facilities are directly and substantially related to the air transportation of passengers or property, including use by airport visitors and employees. A lease of nominal value in the circumstances described in this section would be considered consistent with the self-sustaining requirement.

*H. Private Transit Systems*

Generally, private ground transportation services are charged as a nonaeronautical use of the airport. In cases where publicly-owned transit services are extremely limited and where a private transit service (i.e., bus, rail, or ferry) provides the primary source of public transportation, making property available at less than fair market rental to this private service would not be considered inconsistent with 49 U.S.C. §§ 47107(b), 47133 or 47107(a)(13).

**Section VIII—Reporting and Audit Requirements**

The Federal Aviation Administration Authorization Act of 1994 established a new requirement for airports to submit annual financial reports to the Secretary, and the Act required the Secretary to compile the reports and to submit a summary report to Congress. The Federal Aviation Reauthorization Act of 1996 established a new requirement for airports to include, as part of their audits under the Single Audit Act, a review and opinion on the use of airport revenue.

*A. Annual Financial Reports*

Section 111(a)(4) of the 1994 Authorization Act, 49 U.S.C. § 47107(a)(19), requires airport owners or operators to submit to the Secretary

and to make available to the public an annual financial report listing in detail (1) all amounts the airport paid to other government units and the purposes for which each payment was made, (2) all services and property the airport provided to other government units and compensation received for each service or unit of property provided. Additionally, Section 111(b) of the 1994 Authorization Act requires a report, for each fiscal year, in an uniform simplified format, of the airport's sources and uses of funds, net surplus/loss and other information which the Secretary may require.

FAA Forms 5100–125 and 126 have been developed to satisfy the above reporting requirements. The forms must be filed with the FAA 120 days after the end of the sponsor's fiscal year. Extensions of the filing date may be granted if audited financial information is not available within 120 days of the end of the local fiscal year. Requests for extension should be filed in writing with the FAA Airport Compliance Division, AAS–400.

*B. Single Audit Review and Opinion*

1. General requirement and applicability. The Federal Aviation Reauthorization Act of 1996, Section 805; 49 U.S.C. § 47107(m) requires public agencies that are subject to the Single Audit Act, 31 U.S.C. § 7501–7505, and that have received Federal financial assistance for airports to include, as part of their single audit, a review and opinion of the public agency's funding activities with respect to their airport or local airport system.

2. Federal Financial Assistance. For the purpose of complying with 49 U.S.C. § 47107(m), Federal financial assistance for airports includes any interest in property received, by a public agency since October 1, 1996, for the purpose of developing, improving, operating, or maintaining a public airport, or an AIP grant which was in force and effect on or after October 1, 1996, either directly or through a state block grant program.

3. Frequency. The opinion will be required whenever the auditor under OMB Circular A–133 selects an airport improvement program grant as a major program. In those cases where the airport improvement program grant is selected as a major program the requirements of 49 U.S.C. § 47107(m) will apply.

4. Major Program. For the purposes of complying with 49 U.S.C. § 47107(m), major program means an airport improvement program grant determined to be a major program in accordance with OMB Circular A–133, § 520 or an

airport improvement program grant identified by FAA as a major program in accordance with OMB A–133 § 215(c); except additional audit costs resulting from FAA designating an airport improvement program grant as a major program are discussed at paragraph 9 below.

5. FAA Notification. When FAA designates an airport improvement program grant as a major program, FAA will generally notify the sponsor in writing at least 180 days prior to the end of the sponsor's fiscal year to have the grant included as a major program in its next Single Audit.

6. Audit Findings. The auditor will report audit findings in accordance with OMB Circular A–133.

7. Opinion. The statutory requirement for an opinion will be considered to be satisfied by the auditor's reporting under OMB Circular A–133. Consequently when an airport improvement program grant is designated as a major program, and the audit is conducted in accordance with OMB Circular A–133, FAA will accept the audit to meet the requirements of 49 USC § 47107(m) and this policy.

8. Reporting Package. The Single Audit reporting package will be distributed in accordance with the requirements of OMB Circular A–133. In addition when an airport improvement program grant is a major program, the sponsor will supply, within 30 days after receipt by the sponsor, a copy of the reporting package directly to the FAA, Airport Compliance Division (AAS–400), 800 Independence Ave. SW 20591. The FAA regional offices may continue to request the sponsor to provide separate copies of the reporting package to support their administration of airport improvement program grants.

9. Audit Cost. When an opinion is issued in accordance with 47107(m) and this policy, the costs associated with the opinion will be allocated in accordance with the sponsor's established practice for allocating the cost of its Single Audit, regardless of how the airport improvement program grant is selected as a major program.

10. Compliance Supplement. Additional information about this requirement is contained in OMB Circular A–133 Compliance Supplement for DOT programs.

11. Applicability. This requirement is not applicable to (a) privately-owned, public-use airports, including airports accepted into the airport privatization program (the Single Audit Act governs only states, local governments and non-profit organizations receiving Federal assistance); (b) public agencies that do not have a requirement for the single

audit; (c) public agencies that do not satisfy the criteria of paragraph B.1 and 2; above; and Public Agencies that did not execute an AIP grant agreement on or after June 2, 1997.

**Section IX—Monitoring and Compliance**

*A. Detection of Airport Revenue Diversion*

To detect whether airport revenue has been diverted from an airport, the FAA will depend primarily upon four sources of information:

1. Annual report on revenue use submitted by the sponsor under the provisions of 49 U.S.C. § 47107(a)(19), as amended.

2. Single audit reports submitted, pursuant to 49 U.S.C. § 47107(m), with annual single audits conducted under 31 U.S.C. §§ 7501–7505. The requirement for these reports is discussed in Part IX of this policy.

3. Investigation following a third party complaint filed under 14 CFR. Part 16, FAA Rules of Practice for Federally Assisted Airport Proceedings.

4. DOT Office of Inspector General audits.

*B. Investigation of Revenue Diversion Initiated Without Formal Complaint*

1. When no formal complaint has been filed, but the FAA has an indication from one or more sources that airport revenue has been or is being diverted unlawfully, the FAA will notify the sponsor of the possible diversion and request that it respond to the FAA's concerns. If, after information and arguments submitted by the sponsor, the FAA determines that there is no unlawful diversion of revenue, the FAA will notify the sponsor and take no further action. If the FAA makes a preliminary finding that there has been unlawful diversion of airport revenue, and the sponsor has not taken corrective action (or agreed to take corrective action), the FAA may issue a notice of investigation under 14 CFR § 16.103.

If, after further investigation, the FAA finds that there is reason to believe that there is or has been unlawful diversion of airport revenue that the sponsor refuses to terminate or correct, the FAA will issue an appropriate order under 14 CFR § 16.109 proposing enforcement action. However, such action will cease if the airport sponsor agrees to return the diverted amount plus interest.

2. Audit or investigation by the Office of the Inspector General. An indication of revenue diversion brought to the attention of the FAA in a report of audit or investigation issued by the DOT Office of the Inspector General (OIG)

**Federal Register**/Vol. 64, No. 30/Tuesday, February 16, 1999/Notices

will be handled in accordance with paragraph B.1 above.

## C. Investigation of Revenue Diversion Precipitated by Formal Complaint

When a formal complaint is filed against a sponsor for revenue diversion, the FAA will follow the procedures in 14 CFR Part 16 for notice to the sponsor and investigation of the complaint. After review of submissions by the parties, investigation of the complaint, and any additional process provided in a particular case, the FAA will either dismiss the complaint or issue an appropriate order proposing enforcement action.

If the airport sponsor takes the corrective action specified in the order, the complaint will be dismissed.

## D. The Administrative Enforcement Process

1. Enforcement of the requirements imposed on sponsors as a condition of the acceptance of Federal grant funds or property is accomplished through the administrative procedures set forth in 14 CFR part 16. Under part 16, the FAA has the authority to receive complaints, conduct informal and formal investigations, compel production of evidence, and adjudicate matters of compliance within the jurisdiction of the Administrator.

2. If, as a result of the investigative processes described in paragraphs B and C above, the FAA finds that there is reason to proceed with enforcement action against a sponsor for unlawful revenue diversion, an order proposing enforcement action is issued by the FAA and under 14 CFR 16.109. That section provides for the opportunity for a hearing on the order.

## E. Sanctions for Noncompliance

1. As explained above, if the FAA makes a preliminary finding that airport revenue has been unlawfully diverted and the sponsor declines to take the corrective action, the FAA will propose enforcement action. A decision whether to issue a final order making the action effective is made after a hearing, if a hearing is elected by the respondent. The actions required by or available to the agency for enforcement of the prohibitions against unlawful revenue diversion are:

a. Withhold future grants. The Secretary may withhold approval of an application in accordance with 49 USC § 47106(d) if the Secretary provides the sponsor with an opportunity for a hearing and, not later than 180 days

after the later of the date of the grant application or the date the Secretary discovers the noncompliance, the Secretary finds that a violation has occurred. The 180-day period may be extended by agreement of the Secretary and the sponsor or in a special case by the hearing officer.

b. Withhold approval of the modification of existing grant agreements that would increase the amount of funds available. A supplementary provision in section 112 of the 1994 Authorization Act, 49 USC § 47111(e), makes mandatory not only the withholding of new grants but also withholding of a modification to an existing grant that would increase the amount of funds made available, if the Secretary finds a violation after hearing and opportunity to cure.

c. Withhold payments under existing grants. The Secretary may withhold a payment under a grant agreement for 180 days or less after the payment is due without providing for a hearing. However, in accordance with 49 USC § 47111(d), the Secretary may withhold a payment for more than 180 days only if he or she notifies the sponsor and provides an opportunity for a hearing and finds that the sponsor has violated the agreement. The 180-day period may be extended by agreement of the Secretary and the sponsor or in a special case by the hearing officer.

d. Withhold approval of an application to impose a passenger facility charge. Section 112 also makes mandatory the withholding of approval of any new application to impose a passenger facility charge under 49 USC § 40117. Subsequent to withholding, applications could be approved only upon a finding by the Secretary that corrective action has been taken and that the violation no longer exists.

e. File suit in United States district court. Section 112(b) provides express authority for the agency to seek enforcement of an order in Federal court.

f. Withhold, under 49 USC § 47107(n)(3), any amount from funds that would otherwise be available to a sponsor, including funds that would otherwise be made available to a State, municipality, or political subdivision thereof (including any multi-modal transportation agency or transit agency of which the sponsor is a member entity) as part of an apportionment or grant made available pursuant to this title, if the sponsor has failed to reimburse the airport after receiving notification of the requirement to do so.

g. Assess civil penalties.

(1) Under section 112(c) of Public Law 103–305, codified at 49 USC § 46301(a) and (d), the Secretary has statutory authority to impose civil penalties up to a maximum of $50,000 on airport sponsors for violations of the AIP sponsor assurance on revenue diversion. Any civil penalty action under this section would be adjudicated under 14 CFR Part 13, Subpart G.

(2) Under section 804 of Public Law 104–264, codified at 49 USC § 46301((a)(5), the Secretary has statutory authority to obtain civil penalties of up to three times the amount of airport revenues that are used in violation of 49 USC §§ 47107(b) and 47133. An action for civil penalties in excess of $50,000 must be brought in a United States District Court.

(3) The Secretary may, under 49 USC § 47107(n)(4), initiate a civil action for civil penalties in the amount equal to the illegal diversion in question plus interest calculated in accordance with 49 USC § 47107(o), if the airport sponsor has failed to take corrective action specified by the Secretary and the Secretary is unable to withhold sufficient grant funds, as set forth above.

(4) An action for civil penalties under this provision must be brought in a United States District Court. The Secretary intends to use this authority only after the airport sponsor has been given a reasonable period of time, after a violation has been clearly identified to the airport sponsor, to take corrective action to restore the funds or otherwise come into compliance before a penalty is assessed, and only after other enforcement actions, such as withholding of grants and payments, have failed to achieve compliance.

## F. Compliance With Reporting and Audit Requirements

The FAA will monitor airport sponsor compliance with the Airport Financial Reporting Requirements and Single Audit Requirements described in this Policy Statement. The failure to comply with these requirements can result in the withholding of future AIP grant awards and further payments under existing AIP grants.

Issued in Washington, DC on February 8, 1999.

**Susan L. Kurland,**

*Associate Administrator for Airports.*

[FR Doc. 99–3529 Filed 2–11–99; 8:45 am]

**BILLING CODE 4910–13–P**

**<u>Exhibit D</u>**

1 MICHAEL P. MURPHY, COUNTY COUNSEL (SBN 083887)
Deborah Penny Bennett, Chief Deputy (SBN 072282)
2 David A. Levy, Deputy (SBN 077181)
Glenn M. Levy, Deputy (SBN 219029)
3 Hall of Justice and Records
400 County Center, 6th Floor
4 Redwood City, CA 94063
Telephone: (650) 363-1965
5 Facsimile: (650) 363-4034
E-mail: glevy@co.sanmateo.ca.us
6
Attorneys for Defendant
7 COUNTY OF SAN MATEO

(ENDORSED)
F I L E D
APR 2 1 2008

Chief ...
Superior Court ... of Santa Clara
BY _____ DEPUTY
J. Wendel

8

9               IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                  IN AND FOR THE COUNTY OF SANTA CLARA

11

12 MONTARA WATER AND SANITARY DISTRICT,          Case No. 1-07-CV-088793

13                Plaintiffs,                     **DECLARATION OF JAMES COLIN
                                                  PORTER IN SUPPORT DEFENDANT
14          vs.                                   COUNTY OF SAN MATEO'S MOTION
                                                  FOR SUMMARY JUDGMENT**
15 COUNTY OF SAN MATEO, et al.,
                                                  Date:   August 7, 2008
16                Defendants.                     Time:   9:00 a.m.
                                                  Dept.:  5 (Hon. Mary Jo Levinger)
17
                                                  Action filed:  May 17, 2007
18                                                Trial date:    none set

19

20

21

22

23

24

25

26

27

28

1    I, James Colin Porter, hereby declare as follows:

2    1.    I am the Director of Public Works for the County of San Mateo (the "County") and have

3    been employed in that capacity since 2007. I submit this declaration in support of the County's motion

4    for summary judgment, filed concurrently with this declaration. The following is within my personal

5    knowledge, and if called as a witness, I could and would testify competently as to these matters.

6    2.    In conjunction with the motion for summary judgment, the Department of Public Works

7    prepared a map of the Half Moon Bay Airport (the "Airport") showing the current boundary of the

8    Airport, the location of the three wells (the "Airport Wells") and associated access easements being

9    sought by Montara Water and Sanitary District ("MWSD") by way of this litigation, and the sections of

10   land conveyed to the County by the United States by way of the 1948 Deed and the 1957 Deed (as

11   defined below). A true and correct copy of this map (the "Airport Map") is attached to this declaration as

12   Exhibit A. The Airport Map was prepared as described in paragraphs 3 through 16 below.

13   3.    First, a map created in October 1999 by the Department of Public Works showing the Half

14   Moon Bay Airport and surrounding areas was used as a template. In relation to this litigation and for the

15   purpose of showing the location of the Airport Wells and requested access easements, this map is an

16   accurate representation of the property upon which the Airport sits as well as other nearby property

17   boundaries. The map being used as the template exists in County computer systems with other official

18   information relating to various aspects of County-recorded property rights. Using official records and

19   information in the computer system, including materials recorded with the San Mateo County Assessor-

20   County Clerk-Recorder, an accurate map is able to be drawn of property boundaries associated with the

21   Airport.

22   4.    Using these resources, the current boundary of the Airport was drawn on the template

23   map. The boundaries are marked with a dashed magenta line, as indicated in the Airport Map's legend

24   ("CURRENT AIRPORT BOUNDARY").

25   **The Airport Wells**

26   5.    Using the description and maps attached by MWSD to its Complaint (*see* Complaint ¶ 2

27   & Exs. A-C thereto), the Department of Public Works plotted the location of both the Airport Wells and

28   the associated access easements on the Airport Map. Specifically, three red rectangles on the Airport

DECLARATION OF JAMES COLIN PORTER IN SUPPORT DEFENDANT COUNTY OF SAN MATEO'S
MOTION FOR SUMMARY JUDGMENT

1  Map mark the location of the Airport Wells, as indicated in the Airport Map's legend ("THREE WELL

2  LOCATIONS"). The Airport Wells are also marked with red text as follows, from south to north:

3  "PAR. 1 / South Airport Well"; "PAR. 2 / North Airport Well"; and "PAR 3 / Airport Well No. 3".

4       6.      Green areas mark the location of the access easements requested by MWSD, as indicated

5  in the Airport Map's legend ("ACCESS AND PIPELINE EASEMENTS"). These access easements

6  overlap the location of current existing roads at the Airport, with the road leading to the well marked

7  "South Airport Well" being secured by an electronic gate that requires a security code be entered for

8  access. I am informed by Mark Larson, the airport manager, that the area inside this fence is the secured

9  "Airport Operations Area (AOA)."

10              **The 1948 Deed**

11      7.      Attached to the Declaration of Glenn M. Levy (the "Levy Decl.", filed concurrently with

12 this declaration) as Exhibit A is a copy of the deed (the "1948 Deed") by which the United States

13 government transferred to the County the majority of the land upon which the Airport is located.

14 Included in that deed is a metes-and-bounds description of the property that was being given to the

15 County by the United States in 1948. *See* Levy Decl. Ex. A at 2:22-3:19. A metes-and-bounds

16 description is a surveyor's description of a parcel of real property using carefully-measured distances,

17 angles, and directions and references to existing landmarks in order to provide a legal description of

18 property being described.

19      8.      The Department of Public Works, in analyzing the metes-and-bounds description and

20 comparing it to the County's resources, has plotted the area of land conveyed to the County by way of

21 the 1948 Deed. In marking the boundaries of this parcel of land on the Airport Map, the Department of

22 Public Works relied upon County records and referenced various landmarks described in the metes-and-

23 bounds description. In order to assist the Court with understanding the metes-and-bounds description,

24 the Department of Public Works has included on the Airport Map various landmarks in red print showing

25 landmarks contained in the metes-and-bounds description. The area conveyed by the 1948 Deed is

26 marked in yellow on the map, as indicated in the Airport Map's legend ("RESOL No 3454

27 ( 1521 O.R. 1 ) 1948"). The area conveyed by this deed can be understood by reference to the landmarks

28 and the metes-and-bounds description as follows:

**The Northwest Boundary Of The 1948 Deed Property**

8.1.    The metes-and-bounds description begins with reference to "the most easterly corner of Lot 1 in Block 26 of the Riviera Ocean Villa Tract, as per map thereof filed for record in Book 6 of Maps at page 20, Records of San Mateo County…." Levy Decl. Ex. A at 2:23-25. This point is marked on the Airport Map in red as the "most easterly corner / Lot 1, Block 26 / Rivera Ocean Villa Tr / (1521 OR 2, Line 23)".

8.2.    The Point of Beginning of the metes-and-bound description is located northwest of this described corner of Lot 1 in Block 26 of the Riviera Ocean Villa Tract. Specifically, the Point of Beginning of the property conveyed by the 1948 Deed is located "at a point in the southeasterly line of Marine View Terrace Tract, which bears N. 29° 19' E., 1110.54 ft. and N. 43° 00' W., 1579.39 ft." from the described corner of Lot 1 in Block 26 of the Riviera Ocean Villa Tract. Levy Decl. Ex. A at 2:22-23. This point is marked on the Airport Map in red as the "Point of Beginning / (1521 OR 2, Line 25)".

8.3.    The boundary then continues "thence N. 28° 42' 45″ E. 1700 ft. more or less to the southwesterly line of the County Road (now a State Highway) from Half Moon Bay to Marine View…." Levy Decl. Ex. A at 2:25-26. This point is marked on the Airport Map in red as the "POINT ON THE SOUTHWESTERLY LINE OF THE COUNTY ROAD". The Map shows this distance along the dotted arrow labeled "N 28° 42' 45″ E 1700' ±".

8.4.    The line between the points described in paragraphs 12.2 and 12.3 forms the northwest boundary of the land conveyed by the 1948 Deed.

**The Northeast Boundary Of The 1948 Deed Property**

8.5.    The boundary next continues "thence in a general southeasterly direction, following the meander of the southwesterly line of said road, 4287 feet, more or less, to a one inch iron pipe, which is at the most northerly corner of a Portion of Francisco Heights, as designated on the map entitled 'Map of Francisco Heights Near Half

Moon Bay, San Mateo, California', which map was filed in the office of the Recorder of the County of San Mateo, State of California, on March 3, 1908 in Book 6 of Maps at pages 5 and 6...." Levy Decl. Ex. A at 2:26-30. This point is marked on the Airport Map in red as the "1″ IRON PIPE AT NLY CORNER FRANCISCO HTS".

8.6. The boundary continues "thence continuing along the southeasterly line of the Highway, 1125 feet, more or less, to a point on the southeasterly line of Francisco Heights Subdivision...." Levy Decl. Ex. A at 2:30-31. This point is marked on the Airport Map in red as the "POINT ON THE SOUTHEASTERLY LINE OF FRANDCISCO HTS".

8.7. The boundary continues "thence N. 25° 57′ E. 30 ft., to the intersection of the center line of the County Road (now a State Highway) from which intersection a witness post marked AXVI bears North 26° East, 0.34 chains...." Levy Decl. Ex. A at 2:31-3:2. This point is marked on the Airport Map in red as the "WITNESS POST AXVI".

8.8. The boundary continues "thence southeasterly along the center line of said Highway to a point, from which bears North 71° 00′ West, 1000 feet, more or less, which is the most northerly corner of the lands of Danieri...." Levy Decl. Ex. A at 3:2-4. This point is marked on the Airport Map in red as the "NORTHERLY CORNER / LANDS OF DANIERI".

8.9. The boundary continues "thence South 71° East, 65 feet more or less to a point in the center of the Denniston Creek; from which a witness post marked AV bears North 71° W., distant 19.80 ft...." Levy Decl. Ex. A at 3:4-5. This point is marked on the Airport Map in red as the "WITNESS POST AV".

8.10. The boundary next follows the route of the creek: "thence up said creek in the center of the same and following the meanderings thereof as follows: South 18° East, 104.28 feet; thence South 14° 45′ East, 132 feet; thence South 18° West, 89.10 feet; thence South 8° 30′ West, 165.0 feet; thence South 31° 30′ West 72.60

feet; thence South 66 feet; thence South 13° East, 88.44 feet; thence South 23° East, 75.90 feet; thence leaving center line of said creek South 85° 30′ East, 26[.]40 feet, from which a witness post marked AXIII bears North 27° 30′ East, distant 24.42 feet...."[1] Levy Decl. Ex. A at 3:5-10. This point is slightly west of the point marked on the Airport Map in red as the "WITNESS POST AXIII".

8.11.  The boundary then continues "thence South 50° East, 51.48 feet, from which a witness post marked AXII bears North 27° 30′ East, distant 24.42 feet...." Levy Decl. Ex. A at 3:10-11. This point is slightly south of the point marked on the Airport Map in red as the "WITNESS POST AXII".

8.12.  The boundary then continues "thence South 11° 30′ East, 419.76 feet...." Levy Decl. Ex. A at 3:11. This point is slightly west of the point marked on the Airport Map in red as the "WITNESS POST AX".

8.13.  Two sides of a small triangle are then formed as the boundary continues "thence North 27° 30′ East, 24.92 feet to a fence corner post marked AXI; thence South 25° 30′ East 87.02 feet, to a post marked AX, standing in line of fence on the westerly side of the tract of land belonging to Patrick McMahon...." Levy Decl. Ex. A at 3:14. This point is marked on the Airport Map in red as the "WITNESS POST AX".

8.14.  The curving line between the points described in paragraphs 12.3 and 12.13 forms the northeast boundary of the land conveyed by the 1948 Deed.

**The Southeast Boundary Of The 1948 Deed Property**

8.15.  The boundary next continues "thence North 71° West 1598.23 feet, from which a post marked AVII bears North 71° West 100.61 feet...." Levy Decl. Ex. A at 3:14-

---

[1] The description contains a typo at Vol. 1521, Page 3, Line 9, where it states "2640 feet." The specific reference being discussed in relation to that length mentions "a witness post marked AXIII" at a distance of 24.42 feet, and the County's records show that witness post to have indicated that the correct number from Line 9 should be "26.40 feet," indicating omission of the decimal point. In light of the reference to the witness post marked AXIII, this description is unambiguous.

15. This point is slightly east of a point marked on the Airport Map in red as the "WITNESS POST AVII". The line between the points described in paragraphs 12.13 and 12.15 forms the southeast boundary of the land conveyed by the 1948 Deed, and the Airport Map shows this distance along the line labeled "N 70° 51' 45″ W (N 71° W) 1598.23' ".

**The Southwest Boundary Of The 1948 Deed Property**

8.16. The boundary continues "thence North 47° East, 64.93 feet" (Levy Decl. Ex. A at 3:15) to a point just east of the point marked on the Airport Map in red as the "WITNESS POST AVII". The Map shows this distance along the line labeled "N 47° E 64.93' ".

8.17. The longest straight portion of the boundary continues from this point in two segments along the same line of direction: "thence North 43° 00' West, 5889.74' to a point from which the most easterly corner of Lot 1 in Block 26 of the Riviera Ocean Villa Tract, as per map thereof filed for record in Book 6 of Maps, at page 20, Records of San Mateo County; thence North 43° 00' West, 1193.27 feet", forming a line with a total length of 7,083.01 feet. Levy Decl. Ex. A at 3:15-17. This point is some distance east of the point marked on the Airport Map in red as the "Point of Beginning / (1521 OR 2, Line 25)". The Map shows this total distance along the line labeled "7083.01' (total) / N 43° 00' 00″ W   5889.74' ".

8.18. The boundary then continues "thence South 47° 00' West, 625.0 feet…." Levy Decl. Ex. A at 3:17. The Map shows this distance along the line labeled "S 47° 00' W   625.00' ". This point is just southeast of the point marked on the Airport Map in red as the "Point of Beginning / (1521 OR 2, Line 25)".

8.19. The boundary then reaches the Point of Beginning by going "thence North 43° 00' West, 186.85 feet to the point of beginning." Levy Decl. Ex. A at 3:17-18. The Map shows this distance along the line labeled "186.85' ".

9. The yellow area on the Airport Map fills the area enclosed by this metes-and-bounds description from the 1948 Deed, as indicated in the Airport Map's legend ("RESOL"). Thus, as shown

by the above description, the yellow area on the Airport Map is an accurate representation of the land conveyed to the County by way of the 1948 Deed.

**The 1957 Deed**

10.     Attached to the Levy Decl. as Exhibit B is a copy of the deed (the "1957 Deed") by which the United States government transferred to the County the bulk of the remainder of the land upon which the Airport is located. The 1957 Deed, unlike the 1948 Deed, does not contain a metes-and-bound description of the land being conveyed. Instead, the 1957 Deed includes two descriptions of various land parcels that were conveyed to the County. The first is a table that is found on page 535 of the recorded deed. *See* Levy Decl. Ex. B at 5 [Vol. 3161, Page 535]. This section lists specific "tracts of land acquired by warranty deeds recorded in the Office of the County Recorder of San Mateo County, California, as indicated...." *Id.* There are sixteen listed tracts of land in this section of the deed.

11.     The second set of descriptions of land conveyed by the 1957 Deed is a paragraph stating that the lands being transferred include "[t]he land acquired by virtue of Declarations of Taking Nos. 2 and 4 in the condemnation proceedings entitled The United States of America, Plaintiff, vs. 332.22 Acres of Land in San Mateo County, California, Giovanni Patroni, et al., Defendants, Civil Action No 22348-R, with the exceptions of Tracts 35 and 43, photostatic copies of which are attached hereto and by reference made a part hereof." *Id.* at 6 [Vol. 3161, Page 536]. Declaration of Taking No. 2 is attached to the 1957 Deed and was recorded along with the deed. *See id.* at 9-19 [Vol. 3161, Pages 539-49]. Declaration of Taking No. 4 is also attached to the 1957 Deed and was also recorded along with the deed. *See id.* at 20-24 [Vol. 3161, Pages 550-54].

12.     The Department of Public Works, in analyzing the properties referenced by the 1957 Deed, has used official County records and the Department's computer resources to plot the area of land conveyed to the County by way of the 1957 Deed. In marking the boundaries of this parcel of land on the Airport Map, the Department of Public Works relied upon County records and the tract maps attached to the deed. *See id.* at 14-19, 23-24 [Vol. 3161, Pages 544-49, 553-54]. Based on these records, the Airport Map shows the land conveyed to the County by way of the 1957 Deed in blue, as indicated in the Airport Map's legend ("RESOL No 11374 ( 3161 O.R. 531 ) 1957").

13.    In relation to the land referenced by the table that is found on page 535 of the recorded deed, the Department of Public Works has checked each tract number against official records and determined that these parcels make up the majority of the area marked in blue on the Airport Map. The Map generally lists by tract number the portions in blue that are comprised of the tracts listed on page 535 of the 1957 Deed.

14.    In relation to the land transferred by Declaration of Taking No. 2, the description of those lands and the associated records show that Tract No. 2 (Lot 54), Tract No. 4 (Lot 56), Tract No. 5 (Lot 57), Tract No. 6 (Lot 58), Tract No. 12 (Lot 12), and Tract No. 29 (Lot 7) are all located within the blue area on the Airport Map. Specifically, Tract No. 2 (Lot 54), Tract No. 4 (Lot 56), Tract No. 5 (Lot 57), and Tract No. 6 (Lot 58) are located along the eastern portion of the blue area on the Airport Map. These tracts are listed on the Airport Map in red, and their location is confirmed by the attachments to the 1957 Deed, which show all four as being adjacent to Stanford Avenue on the eastern side of the Airport. *See* Levy Decl. Ex. B at 14-17 [Vol. 3161, Pages 544-47]. Tract No. 12 (Lot 12) is located slightly east of the middle portion of the blue area of the Airport Map, as shown in red on the Airport Map. The street listed on the associated attachment to the 1957 Deed—Park Avenue—does not exist given its location near the current Airport's runway. *See* Levy Decl. Ex. B at 18 [Vol. 3161, Page 548]. Tract No. 29 (Lot 7) is located on the westernmost edge of the blue area of the Airport Map, as shown in red on the Airport Map. The street listed on the associated attachment to the 1957 Deed—Rose Avenue—also does not exist given its location near the current Airport's runway. *See* Levy Decl. Ex. B at 19 [Vol. 3161, Page 549].

15.    In relation to the land transferred by Declaration of Taking No. 4, the description of those lands and the associated records show that Tract No. 10 (Lot 7) and Tract No. 11 (Lots 8 and 9) are also located within the blue area on the Airport Map. These adjacent tracts are located slightly east of the middle portion of the blue area of the Airport Map, as shown in red on the Airport Map. The street listed on the associated attachments to the 1957 Deed—Aloha Avenue—does not exist given its location near the current Airport's runway. *See* Levy Decl. Ex. B at 23-24 [Vol. 3161, Pages 553-54].

16.     The blue area on the Airport Map comprises the area referenced by the tract numbers discussed in paragraphs 10 through 15 above.  Thus, the blue area on the Airport Map is an accurate representation of the land conveyed to the County by way of the 1957 Deed.

17.     That the Airport Wells and associated access easements are located where indicated on the Map is confirmed by reference to the exhibits attached to MWSD's Complaint.  Specifically, the metes-and-bounds description of the land being claimed in this lawsuit by MWSD is described in relation to the location just south of "the westerly line of State Highway No. 1," and the map provided by MWSD shows the three wells and associated easements as being located on the north side of the Airport just south of "STATE HIGHWAY NO. 1."  Levy Decl. Ex. E at 6 [Complaint Ex. A], Ex. F at 4 [Complaint Ex. B].  MWSD's own description and map reference thus show the Airport Wells and access easements to be located south of Highway 1 on the north side of the Airport, as indicated on the Map attached to this declaration.  Consequently, MWSD's materials show that those wells and access easements are located in the yellow section of the Map.

        I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct and is executed at Redwood City, California, this 16th day of April 2008.



James Colin Porter

DECLARATION OF JAMES COLIN PORTER IN SUPPORT DEFENDANT COUNTY OF SAN MATEO'S
MOTION FOR SUMMARY JUDGMENT

# Exhibit A



RIGHT-OF-WAY MAP

# HALF MOON BAY AIRPORT AND VICINITY

OCTOBER 1999    SCALE: 1" = 300'

SAN MATEO COUNTY DEPARTMENT OF PUBLIC WORKS

SHEET 1 OF 3

# **Exhibit E**

MAR 2 2002

C.U.C.

ENERAL

Resolution No. 65 12

Board of Supervisors, County of San Mateo, State of California

\* \* \* \* \*

**Resolution Authorizing Execution of a Revocable Encroachment Permit with Citizens
Utilities Company to Operate and Maintain Wells at the Half Moon Bay Airport**

RESOLVED, by the Board of Supervisors of the County of San Mateo, State of
California, that

WHEREAS, there has been presented to this Board of Supervisors for its consideration
and acceptance a Revocable Encroachment Permit with Citizens Utilities Company to operate
and maintain wells at Half Moon Bay Airport;

WHEREAS, The Director of Public Works has recommended that said Revocable
Encroachment Permit be authorized and this Board has considered the recommendation of the
Director of Public Works; and

WHEREAS, this Board has determined that it is necessary and desirable to grant said
permit to Citizens Utilities Company.

NOW THEREFORE, IT IS HEREBY DETERMINED AND ORDERED that the
President of this Board of Supervisors be, and is hereby, authorized and directed to execute said
Revocable Encroachment Permit for and on behalf of the County of San Mateo, and the Clerk of
this Board shall attest to the signature hereto.

\* \* \* \* \*

3/27 cc: S Warner  PW
         B Kings  Allen Matkins
         EGB  PWC
    Faxed  B kindly  + S Warner

**EXHIBIT C** (13 PAGES)

1

AYES and in favor of said resolution
Supervisors:

MARK CHURCH

JERRY HILL

ROSE JACOBS GIBSON

MICHAEL D. NEVIN

NOES and against said resolution.
Supervisors:

NONE

Absent Supervisors:

RICHARD S. GORDON

JERRY HILL
President, Board of Supervisors
County of San Mateo
State of California

### Certificate of Delivery

I certify that a copy of the original resolution filed in the Office of the Clerk of the Board of Supervisors of San Mateo County hsa been delivered to the President of the Board of Supervisors

*Ashnita Narayan*
Ashnita Narayan, Deputy
Clerk of the Board of Supervisors

REVOCABLE ENCROACHMENT PERMITS

The COUNTY OF SAN MATEO, a political subdivision of the State of California, hereinafter referred to as "County", hereby grants to CITIZENS UTILITIES COMPANY OF CALIFORNIA and its successors and assigns, hereinafter referred to as "Citizens" or "Permittee", a non-exclusive Revocable Encroachment Permit for the purpose of operating and maintaining three existing wells and other appurtenant improvements on a portion of the lands shown on the map contained in Exhibit "B" attached hereto and by this reference incorporated herein.

For the consideration set forth below, County acting only in its capacity as a property owner, grants to Permittee a Revocable Encroachment Permit authorizing Permittee to extract water from said airport wells for a period of ten (10) years from date of approval by Board of Supervisors unless terminated as hereinafter provided. This Permit may be extended for an additional ten (10) year term upon mutual agreement in writing of the Director of Public Works and the Manager of Citizens.

As consideration for this Permit, Permittee shall pay County the initial fee of $1,000 and further Permittee shall pay County, as compensation for the water extracted, the rates as shown below:

> August 1, 2001 - July 31, 2002 - $154.00 per acre foot
> August 1, 2002 - July 31, 2003 - $268.00 per acre foot
> August 1, 2003 - July 31, 2006 - $382.00 per acre foot

The above rates will be reviewed between August 1, 2005 and July 31, 2006 and recommendations will be made to the Board of Supervisors to adjust said rates as of August 1, 2006. The adjusted rates will be based upon, inter alia, certified production meter readings obtained by the Permittee and submitted to the County with the quarterly payments, effective August 1, 2003. Payments for the water pumped shall be paid by the Permittee to the County on a quarterly basis and delivered to the Director of Public Works at the hereinafter address.

This Permit is to be strictly construed and no work other than the work specifically set forth herein is authorized hereby.

This Permit is subject to all of the terms, conditions and restrictions set forth in the Special Provisions attached hereto in Exhibit "A" and by this reference incorporated herein.

The work authorized herein will be hereinafter known as the Encroachment".

The approximate location of the Encroachment is shown on Exhibit "B" attached hereto and made a part hereof. Exhibit B may be updated from time to time by Citizens with the approval of the County's Director of Public Works, provided that Citizens complies with the procedures set forth in Exhibit "A".

All approvals required of County by the terms of this Permit shall be subject to the

1

approval of the Local Office of the Federal Aviation Administration.

This Permit shall be subject to such approval of the California Public Utilities Commission as may be required by law and to all other local applicable procedures and/or permits.

Terms Accepted

CITIZENS UTILITIES COMPANY OF CALIFORNIA

Date

By: _____
                Vice-President

witness:
~~Attest:~~ _____

Secretary

Approved:                              COUNTY OF SAN MATEO

Date 3/19/02                           By: _____
                                            President, Board of Supervisors

Attest: _____

Clerk of said Board

COUNTY OF SAN MATEO
COUNTY GOVERNMENT CENTER
Redwood City, California

2

Special Provisions

"Exhibit A"

1. ACCEPTANCE OF SPECIAL PROVISIONS. It is understood and agreed by the Permittee that doing of any work under this Permit shall constitute an acceptance of these Special Provisions.

2. **NO PRECEDENT ESTABLISHED.** This Permit is granted with the understanding that the action is not to be considered as establishing any precedent on the question of the expediency of permitting any certain kind of encroachment to be erected within County property. It is understood that this is a non-exclusive Permit.

3. **MAINTENANCE:** Permittee agrees to exercise reasonable care to maintain properly any encroachment placed on County property and to exercise reasonable care in inspecting for and immediately repairing and making good any injury to any portion of the property which occurs as a result of the maintenance of encroachment on the property, or as a result of the work done under this Permit, including any and all injury to the property which wold not have occurred had such work not been done or such encroachment not placed therein.

4. **REFURBISHING ELECTED TO BE DONE BY PERMITTEE.,** In the event major refurbishing of any or all of the three wells is required, Permittee shall notify County of the nature and extent of the work required and Permittee shall obtain written approval of County before commencing said work. All work shall be done at sole expense of Permittee. County shall not unreasonably withhold or delay approval of said proposed work. However, emergency work required to maintain water production may be authorized by the airport manager via telephone with written confirmation to follow.

5. **REPLACEMENT WELLS.** In the event water production from the existing three wells should decrease more than twenty-five percent (25%) from their rated pumping capacity, which is 100 gallons per minute, and the wells cannot be reasonably refurbished, Permittee may, at its expense and with the permission of the County and in compliance with all applicable permit requirements, drill replacement wells for existing three wells as required. The existing wells, with the Permission of the County, may continue to be pumped. Such replacement wells shall be located within the encroachment shown on Exhibit "B". Prior to commencement of work Permittee shall comply with all other applicable terms of this Permit.

6. **ADDITIONAL WELLS.** Permittee may, upon obtaining the written approval of County and in accordance with provisions contained herein, drill additional wells.

7. **NOTICE PRIOR TO STARTING WORK.** In addition to obtaining all other necessary permits before starting work, Permittee shall notify the County Director of Public Works. Such notice shall be given at least three weeks in advance of

3

the date work is to begin. Any work begun prior to said notification will be subject to rejection. County reserves the right to approve of qualifications of the Contractor who proposes to do the work under this Permit. Emergency work required to maintain water production shall be authorized as provided in paragraph 4 hereof.

8.  **PERMIT FROM OTHER AGENCIES**. Permittee shall, whenever the same is required by law, secure the written order or consent for any work hereunder from any public body having jurisdiction including the County, and this Permit shall be suspended in operation unless and until such order or consent is obtained.

9.  **PROTECTION OF THE PUBLIC**. Adequate provision shall be made for the protection of the Public.

10. **STORAGE OF MATERIALS**. No materials shall be stored in any location not approved by the County.

11. **GENERAL CLEAN UP**. All debris shall be entirely removed and the area shall be left in a presentable condition and to the satisfaction of the Director of Public Works.

12. **SUPERVISION BY THE COUNTY**. All the work shall be done to the reasonable satisfaction of the Director of Public Works.

13. **LIABILITY FOR DAMAGES**. Permittee is responsible for all liability for personal injury or property damage which may arise out of work herein permitted or which may arise out of failure on Permittee's part to perform his obligations under this Permit in respect to maintenance. In the event any claim of such liability is made against the County of San Mateo or any Department, officer or employee thereof, Permittee shall defend, indemnify and hold them and each of them harmless from such claim.

    Permittee shall provide at its sole expense, and furnish evidence to County prior to commencement of this Permit, combined public liability and property damage insurance in the amount of one million dollars ($1,000,000) per occurrence in a form satisfactory to the Director to be kept in force during the term of this Permit or any extension hereof.

    County shall be named as "Additional Insured" on said policy which shall contain a provision that the insurance afforded thereby to County, its officers, agents, servants and employees, shall be primary insurance to the full limits of liability of the policy and that if County, or its officers, agents, servants, or employees have other insurance against a loss covered by such policy, such other insurance shall be excess insurance only. Said policy shall also provide that County shall be furnished thirty (30) days' notice of cancellation.

14. **MAKING REPAIRS**. If the Director of Public Works shall so elect, repairs to

4

wells and other appurtenant facilities which have been disturbed shall be made by employees or contractors of the County and the expenses therefore, shall be borne by Permittee. County shall require a deposit before starting repairs in an amount sufficient to cover the estimated cost thereof. County will give reasonable notice of its election to make such repairs. If County does not so elect, the Permittee shall make repairs in accordance with County's construction standards and shall provide County with plans and specifications for approval prior to initiating repairs. In every case the Permittee shall restore any portion of any street, road or other areas which have been excavated or otherwise disturbed to its former condition, except where County elects to make repairs as above provided in this Permit. Permittee shall contact the Airports Manager prior to excavating or disturbing any portion of the airport and shall coordinate all work and contractor access onto the airport with the Airports Manager, in advance.

15. **CARE OF DRAINAGE**. If the work herein contemplated shall interfere with the established drainage, ample provision shall be made by Permittee to provide for Drainage as may be directed by County.

16. **FUTURE REMOVAL OF INSTALLATION**. It is understood by Permittee that whenever construction, maintenance or any work on the property may be required, the installation provided herein including appurtenances shall, upon request of County, be immediately moved by and at the sole expense of Permittee. Upon expiration or revocation of this Permit, Permittee as directed by the Director of Public Works shall remove its above-ground facilities and cap the wells in a manner satisfactory to County.

17. **REVOCATION**. County shall have the right to revoke this Permit immediately upon the failure by Permittee to perform, keep and observe any or all terms and conditions on the part of Permittee to be performed, kept or observed after the expiration of thirty (30) days from the date of written notice has been given by County to Permittee to correct such default or breach and such default or breach has not been cured or corrected. County shall have the right to revoke this Permit for any reason by delivering six (6) months' written notice to Permittee.

18. **NON-DISCRIMINATION**. Permittee contractor, etc., for himself, his personal representatives, successors in interest, and assigns, as a part of the consideration hereof, does hereby covenant and agree that (1) no person on the grounds of race, color, or national origin shall be excluded from participation, denied the benefits of, or be otherwise subjected to discrimination in the use of said facilities, (2) that in the construction of any improvements, on, over, or under such land and the furnishing of services thereon, no person on the grounds of race, color, or national origin shall be excluded from participation in, denied the benefits of, or otherwise be subjected to discrimination, (3) that Permittee shall use the premises in compliance with all other requirements imposed by or pursuant to Title 49, Code of Federal Regulations, Department of Transportation, Subtitle A, Office of the Secretary, Part 21, Nondiscrimination in Federally-assisted programs of the Department of Transportation-Effectuation of Title VI of

the Civil Rights Act of 1964, and as said Regulations may be amended.

19. **RIGHT TO DEVELOP OR IMPROVE**. County reserves the right to further develop or improve the airport as it sees fit, regardless of the desires or view of Permittee, and without interference or hindrance by Permittee. Permittee shall move or relocate at its sole expense any of its wells or other appurtenant improvements that may need to be relocated as a result of County improvements or development on the airport.

20. **COUNTY'S RIGHT TO MAINTAIN**. County reserves the right, but shall not be obligated to Permittee, to maintain and keep in repair the airport and all publicly-owned facilities of the airport, together with the right to direct and control all activities of Permittee in this regard. Permittee shall move or relocate at its sole expense any of its wells or other appurtenant improvements that may need to be relocated as a result of County maintenance or repairs on the airport.

21. **AGREEMENTS WITH UNITED STATES**. Permittee shall be subordinate to the provisions and requirements of any existing or future agreement between County and the United States, relative to the development, operation or maintenance of airport.

22. **COMPLIANCE WITH PART 77 OF FAA REGULATIONS**. Permittee agrees to comply with the notification and review requirements covered in part 77 of the Federal Aviation Regulations in the event a future structure or building is planned for the encroachment area, or in the event of any planned modification or alteration of any present or future building or structure situated on the premises.

23. **PERMIT DOES NOT GRANT EXCLUSIVE RIGHT**. It is understood and agreed that nothing herein contained shall be construed to grant or authorize the granting of an exclusive right within the meaning of Section 308 of the Federal Aviation Act.

24. **RESERVATION OF RIGHT OF FLIGHT**. There is hereby reserved to County, its successors and assigns, for the use and benefits of the public, a right of flight for the passage of aircraft in the airspace above the surface of the encroachment area. This public right of flight includes the right to cause any noise inherent in the operation of any aircraft used for navigation or flight through the airspace or while landing at, taking off from or other operation on the Half Moon Bay Airport.

25. **HEIGHT LIMITATIONS**. Permittee, by accepting this Permit expressly agrees for itself, its successors and assigns that if will not erect nor permit the erection of any permanent structure or object nor permit the growth of any tree on the land leased hereunder above a mean sea level elevation of 75 feet. In the event the aforesaid covenants are breached, County reserves the right to enter upon the encroachment area hereunder and to remove the offending structure or object and cut the offending tree, all of which shall be at the expense of Permittee.

26. **NON-INTERFERENCE WITH AIRCRAFT**. Permittee by accepting this Permit

agrees for itself, its successors and assigns that it will not make use of the encroachment area in any manner which might interfere with the landing and taking off of aircraft from Half Moon Bay Airport or otherwise constitute a hazard. In the event, the aforesaid covenant is breached, County reserves the right to enter upon the premises and cause the abatement of such interference at the expense of Permittee. This Permit and all the provisions hereof shall be subject to whatever right the United States Government now has or in the future may have or acquire affecting the control, operation, regulation and taking over of said airport or the exclusive or non-exclusive use of the airport by the United States during the time of war or national emergency

27. **ASSIGNMENT OF RIGHTS**. The parties acknowledge the pending sale of the assets of Citizens to California-American Water Company ("Cal -Am"). Citizens may assign its rights and obligations under this Permit to Cal-Am on ten (10) days notice without the County's consent upon closing of the asset sale. In this event, Cal-Am shall be bound by the terms of this Permit from and after the effective date of the assignment and Citizens shall be discharged from any further duty or responsibility under the permit relating to the period from and after the effective date of the assignment. Citizens shall remain responsible for all obligations and liabilities under this Permit arising from events or circumstances occurring prior to the closing of the sale of assets by Citizens to Cal-Am. Permitee may assign its rights and obligations under this agreement to a third party only with the County's prior written consent, which consent will not be unreasonably withheld.

28. **COMMUNICATIONS**. Communications hereunder shall be sent to County addressed as follows:

Director of Public Works
County of San Mateo
555 County Center, 5th Floor
Redwood City, CA 94063

Or to such other address as County may advise Citizens in writing, and to Citizens at:

Citizens Utilities Company of California
P.O. Box 15468
Sacramento, CA 95813

With a copy to:

Citizens Utilities Company of California
High Ridge Park
Stanford, CT 06905

Or to such other address as Citizens may advise County in writing.

430191

7

## Resolution No. _____

### Board of Supervisors, County of San Mateo, State of California

* * * * * *

### Resolution Approving the Assignment of the Revocable Encroachment Permit Relating to Wells at the Half Moon Bay Airport from the California-American Water Company to the Montara Water and Sanitary District

**RESOLVED,** by the Board of Supervisors of the County of San Mateo, State of California, that

**WHEREAS,** a Revocable Encroachment Permit (Permit) dated March 19, 2002, was issued to the Citizens Utilities Company of California (Citizens) which provides for the operation and maintenance of water wells at the Half Moon Bay Airport; and

**WHEREAS,** as provided by its terms, the Permit was assigned to the California-American Water Company (Cal-Am), which acquired Citizens; and

**WHEREAS,** Cal-Am assets consisting of the water system that serves generally the Montara and Moss Beach areas of the County, have been acquired by the Montara Water and Sanitary District (MWSD); and

**WHEREAS,** as part of the transfer of its assets to MWSD, Cal-Am has purported to assign the Permit to MWSD; and

**WHEREAS,** the terms of the Permit require the consent of the County to the assignment of the Permit; and

**WHEREAS,** this Board has considered the assignment of the Permit to MWSD including all rights and responsibilities thereunder.

**NOW THEREFORE, IT IS HEREBY DETERMINED THAT**

this Board approves the assignment of the Permit to the Montara Water and Sanitary District with the express provision that the Montara Water and Sanitary District will abide by all the terms and conditions of the Permit.

\* \* \* \* \* \*



# COUNTY OF SAN MATEO
## Inter-Departmental Correspondence
### County Counsel

|  |  |
|---|---|
| **DATE:** | September 9, 2004 |
| **BOARD MEETING DATE:** | September 14, 2004 |

**TO:**      Honorable Board of Supervisors

**FROM:**    Thomas F. Casey III, County Counsel

**SUBJECT:** **Resolution Approving the Assignment of the Revocable Encroachment Permit Relating to Wells at the Half Moon Bay Airport from the California-American Water Company to the Montara Water and Sanitary District**

## Recommendation

Adopt a resolution approving the assignment of the Revocable Encroachment Permit (Permit) from the California-American Water Company (Cal-Am) to the Montara Water and Sanitary District (MWSD) which will allow MWSD to continue to operate and maintain three water wells at the Half Moon Bay Airport.

## Previous Board Action

Adopted a resolution on March 19, 2002, authorizing the President of the Board to execute a Permit with Citizens Utilities Company of California (Citizens) which:

a) allowed Citizens to operate and maintain three water wells at the Half Moon Bay Airport;

b) provided for the assignment of the Permit to the Cal-Am, as acquisition of the water system by Cal-Am was being negotiated at that time; and

c) set the rate charged for water extracted from the Half Moon Bay Airport wells.

## Key Facts

1.   Citizens was acquired by Cal-Am in January 15, 2002, and the Permit was assigned to Cal-Am as provided by the terms of the Permit.

2.   Certain of Cal-Am assets were purchased by MWSD, effective August 1, 2003. In connection with this purchase, Cal-Am purported to assign the Permit to MWSD. However, pursuant to its terms, any assignment of the Permit requires the approval of this Board.

## Discussion

Consenting to the assignment of the non-exclusive Permit will allow MWSD to continue to operate and maintain three (3) existing wells on the Half Moon Bay Airport pursuant to the Permit through March 19, 2012, with a possible ten-year extension thereafter.

## Vision Alignment

We believe our recommendation is consistent with Goal Number 7, "Maintain and Enhance the Public Safety of all Residents and Visitors" of the Shared Vision Commitment to "Ensure Basic Health and Safety for All" because authorizing the assignment of the Permit will allow MWSD to continue to use the Half Moon Bay Airport wells as a source of water through 2012, or until such time as other sources of water are developed by MWSD.

## Fiscal Impact

Under the Permit's terms, the Airport Enterprise Fund will receive approximately $70,000 to $80,000 per year, based on the current amount of water extracted from the wells each year.

There is no impact to the General Fund.

MWSD has submitted a request for assignment of the Permit from Cal-Am to MWSD, together with supporting documents, including evidence of the necessary insurance which names the County as an additional insured.

THOMAS F. CASEY III, COUNTY COUNSEL

TFC:JDN/ag

cc:    Montara Water and Sanitary District
       John Nibbelin, Deputy
       Mark Larson, Airport Manager

L:\CLIENT\P_DEPTS\PUBWORKS\Airport General\MSWDpermit Board Report 9-8-04rev1.doc

# COPY CERTIFICATION

State of California
County of San Mateo

I, _Penny Little_ , hereby swear that the attached reproduction of

_Resolution No. 1387_ is a true, correct, and complete

photocopy of a document in my possession.

_Penny Yvonne Little_

_April 23, 2007_



# <u>Exhibit F</u>

RESOLUTION NO. _13̲3̲7̲ ___

RESOLUTION OF THE BOARD OF THE MONTARA WATER AND SANITARY
DISTRICT AUTHORIZING ACQUISITION OF PROPERTY, THE EXPENDING OF
FUNDS THEREFOR, THE DESIGNATION OF PERSONNEL TO ACCEPT DEEDS
AND GRANTS ON BEHALF OF THE MONTARA SANITARY DISTRICT AND THE
INSTITUTION OF EMINENT DOMAIN PROCEEDINGS

**Property Owner:** County of San Mateo, a political subdivision of the State of California
**Property Location:** Half Moon Bay Municipal Airport
9850 Cabrillo Highway, Moss Beach, CA
Portions of APN: 037-292-030 (*Airport Wells Sites*)

WHEREAS, Montara Water and Sanitary District ("MWSD") is a public agency formed
as a special district and authorized under California law, by a special election of August 11, 1992
and MWSD Resolution 978 to exercise all powers of a county water district to provide water,
including the power to acquire, operate and control water and water rights and property for any
useful purpose; and,

WHEREAS, California Code of Civil Procedure, Title VII, Sections 1230.020, 1240.010,
1240.020, 1240.110, 1240.120, 1240.125, 1240.510, 1240.610 and 1240.650, and Sections
6512.7 and 6514 of the Health and Safety Code, and Sections 31021, 31040, 31041 and 31042 of
the Water Code authorize MWSD to exercise the power of eminent domain for the purpose of
acquiring water, water rights, property or property interests in order to carry out any of the
powers or functions or for any useful purpose, including the supply of water, for the public use
described herein; and,

WHEREAS, public interest and necessity require the acquisition and continual operation
by MWSD of all right, title and interest in and to the lands, easements, property, water, water
rights, if any, rights and interests in and to the real property, including access to the real property, as
more particularly defined and described in Exhibits A, B and C, attached hereto and incorporated
herein by reference (hereinafter the "Airport Wells Sites"), for the reasonable beneficial use of
MSWD and for a more necessary public use;

WHEREAS, the acquisition of the Airport Wells Sites is necessary for the purpose of
securing the MWSD water system's presently existing water supply generated from the
production wells owned and operated by MWSD and located on the Airport Wells Sites which
requires an assured and stable interest in the Airport Wells Sites necessary for the continual
operation, improvement and maintenance of MWSD's water system (hereinafter the "Project");
and,

WHEREAS, pursuant to Government Code Section 7267.2, as the owner of record, the
County of San Mateo was offered just compensation for the Airport Wells Sites; the owner was
also provided with a proper Appraisal Summary Statement as the basis for the offer of just
compensation; and,

EXHIBIT A

WHEREAS, pursuant to Code of Civil Procedure 1263.025, as the owner of record, the County of San Mateo was offered the reasonable costs of an independent appraisal ordered by the owner not to exceed five thousand dollars ($5,000); and,

WHEREAS, pursuant to the Code of Civil Procedure Section 1245.235, subd. (d), reasonable written personal notice and a reasonable opportunity to appear and be heard on the matters referred to in Code of Civil Procedure Section 1240.030 was given to the County of San Mateo as the record owner of the property; and,

WHEREAS, the Project was and is designated to be the most advantageous to the public and is planned in such a way as to secure access to MWSD's major water source, acquire water rights, if any, and impair and obstruct as little private property as possible and to provide the substantial cost savings to local customers, halt rapidly escalating water rates, improve service to the public, improve the supply and the quality of water to the public by, *inter alia*, removal of contaminants, provide the required basis for obtaining funding necessary for continual operation, upgrading and improvement of the MWSD water system, and benefit local control of water operations in the interest of the public health and economy, all as more fully set forth in MWSD's Memorandum to the Board from the District Manager George F. Irving entitled "Review and Possible Action Concerning Adoption of a Resolution of Necessity for the Acquisition of Existing Well Sites at the Half Moon Bay Airport", including the estimated cost to remove contaminants from the water produced by the Airport Wells, as well as the report entitled "Staff Report Re Initiation of Eminent Domain Proceedings" from the office of MWSD's special eminent domain counsel for the meeting of April 19, 2007 (collectively referred to as the "Staff Reports"), which are on file with MWSD, and duly considered at the aforesaid April 19, 2007 Resolution hearing; the Staff Reports are made a part of the Administrative Record and incorporated herein by reference; as such, the acquisition will accomplish the plan objectives of the public, including the mandate of the State of California; and,

WHEREAS, a *Notice of Exemption* for the proposed acquisition of the Airport Wells Sites was filed with the Clerk of the County of San Mateo by MWSD on March 27, 2007 in compliance with the California Environmental Qualify Act of 1970 ("CEQA"), as amended, and the State CEQA Guidelines adopted by the Secretary of Resources; said Notice concludes that the acquisition of property for the purpose of transferring title to preserve existing water supply is determined to be categorically exempt from CEQA requirements under State CEQA Guidelines 15301(b), 15302, 15305, 15306 and 15325, and Public Resources Code Section 21084; and,

WHEREAS, additionally, the transfer of ownership of the Airport Wells Sites is an activity that does not have adverse environmental consequences and, therefore, is not subject to CEQA (CEQA Guideline, section 15061(b)(3)); and,

WHEREAS, MWSD has determined that all requirements of the CEQA and the Public Resources Code have been met; and,

WHEREAS, the Staff Reports forming the basis of the proposed consideration of this Resolution, *inter alia*, sets forth facts establishing that the acquisition of the Airport Wells Sites by MWSD is a more necessary public use than the existing use by the County of San Mateo; and,

NOW, THEREFORE, IT IS FOUND, DETERMINED AND RESOLVED by the Members of the Board of the Montara Water and Sanitary District as follows:

1.  The real property, easements, property interests, rights and interests consisting of real property, access, water and water rights, if any, including those obtained by prescription and/or permit, together with surface, above-surface and below-surface land/water and land/water rights, including, without limitation, all rights and interests under Resolution No. 65123 entitled, "Resolution Authorizing Execution of a Revocable Encroachment Permit With Citizens Utility Company to Operate and Maintain Wells at the Half Moon Bay Airport," passed and adopted by the Board of Supervisors, County of San Mateo, State of California, on or about the 19th day of March 2002, and Resolution No. 066924 entitled, "Resolution Approving the Assignment of the Revocable Encroachment Permit Relating to Wells at the Half Moon Bay Airport from the California-American Water Company to the Montara Water and Sanitary District," passed and adopted by the Board of Supervisors, County of San Mateo, State of California, on or about the 14th day of September 2004, to be acquired are located within the County of San Mateo, State of California, and are more particularly described in Exhibits A (5 pages) and B (4 pages) and C (13 pages) which are attached hereto and incorporated herein by reference.

2.  The public interest and necessity require the acquisition and continual operation by the MWSD of the Airport Wells Sites and the real property and interests in real property, access easements and water rights, if any, as more fully defined in Finding #1 of this Resolution.

3.  The acquisition and continual operation of the Airport Wells Sites sought to be acquired herein will result in a substantial cost savings to local customers, halt rapidly escalating water rates, improve the service to the public, improve the supply and the quality of water to the public by, *inter alia*, removal of contaminants, provide the required basis for obtaining funding necessary for continual operation, upgrading and improvement of the MWSD water system, and benefit local control of water operations in the interest of the public health and economy, thus benefiting the general public, all as more fully set forth in the Staff Reports on file with the MWSD, including the documents referred to therein, all of which are incorporated herein by reference and comprise the Administrative Record for this Resolution.

4.  The acquisition and continual operation of the Airport Wells Sites by MWSD is planned and located in the manner that will be most compatible with the greatest public good and the least private injury.

5.  That the property, property interests and rights as defined and described in Finding #1 of this Resolution are necessary for the proposed project acquisition,

including the required basis for funding and continual operation by MWSD of the Airport Wells Sites.

6.    Pursuant to California Code of Civil Procedure Sections 1240.610 and 1240.650, the proposed public use by the MWSD is a more necessary public use than the existing public use, if any, by the County of San Mateo.

7.    The offer required by Section 7267.2 of the Government Code and Section 1263.025 of the Code of Civil Procedure has been made to the owner of record.

8.    That all the property to be acquired herein forms an integral part of the entire Airport Wells Sites, the overwhelming majority of which, if not all, is within the territorial boundaries of the MWSD and, to a possible limited extent a small portion outside the territorial boundaries of the MWSD which portion is being acquired pursuant to Civil Code of Procedure 1240.125, the acquisition of which by MWSD is found to be a more necessary use than the existing use, if any, by the County of San Mateo.

9.    That MWSD has complied with the environmental review process under the provisions of the California Environmental Quality Act of 1970, found in Public Resources Code Sections 21000, et. seq. and the State CEQA Guidelines adopted by the Secretary of Resources.

10.    That MWSD finds and determines that the acquisition of property for the purpose of transferring title to three well sites to preserve existing water supply is categorically exempt from CEQA requirements under State CEQA Guidelines 15301(b), 15302, 15305, 15306 and 15325, and Public Resources Code Section 21084.

11.    The District Manager of MWSD, George F. Irving, and the General Counsel of MWSD, David E. Schricker, are authorized and directed to perform all acts necessary on behalf of MWSD for the acquisition of said interests in the Montara Water System and said District Manager and General Counsel are further authorized to instruct Special Condemnation Counsel Christine C. Fitzgerald and/or Herman H. Fitzgerald to prepare, institute, and prosecute to conclusion on behalf of MWSD, a proceeding in eminent domain, or any such proceedings as may be required for the acquisition of the property described above which cannot be acquired through negotiation and purchase and to do any and all other things in connection with such proceedings as in his/her judgment may be necessary or convenient to the successful conclusion of said proceeding or proceedings, including obtaining an order for immediate possession, and the preparation, filing, amendment, dismissal, etc. of all pleadings and stipulations that in the opinion of Special Counsel are necessary for the processing of the litigation.

12.    The District Manager is hereby authorized to expend funds available to MWSD for the acquisition of the Airport Wells Sites, including any and all land, access and water rights, if any;

13.    The District Manager is hereby individually authorized and directed to consent to and accept, on behalf of MWSD, all deeds and grants conveying any interest in the property as hereinabove described;

14.    The District Manager is hereby authorized and directed to record a certified copy of this Resolution in the Office of the County Recorder of the County of San Mateo. It may thereafter be referred to in any acceptance by any of the officers or agents referred to herein with the same effect as though a certified copy of this Resolution were attached to the document accepted.

DULY AND REGULARLY ADOPTED by the Board of the Montara Water and Sanitary

District this 19th day of April, 2007.

AYES:  Ptacek, Boyd, Slater-Carter, Harvey, Perkovic

NOES:  N/A

ABSENT:  N/A

ABSTAINED:  N/A

Secretary    Kathryn Slater-Carter

APPROVED:

President,
Montara Water and Sanitary District
        Bob Ptacek

APPROVED AS TO FORM:

CHRISTINE C. FITZGERALD
Special Eminent Domain Counsel

Resolution.doc

# <u>Exhibit G</u>

1 | MICHAEL P. MURPHY, COUNTY COUNSEL (SBN 083887)
Deborah Penny Bennett, Chief Deputy (SBN 072282)
2 | David A. Levy, Deputy (SBN 077181)
Glenn M. Levy, Deputy (SBN 219029)
3 | Hall of Justice and Records
400 County Center, 6th Floor
4 | Redwood City, CA 94063
Telephone: (650) 363-1965
5 | Facsimile: (650) 363-4034
E-mail: glevy@co.sanmateo.ca.us
6 |
Attorneys for Defendant
7 | COUNTY OF SAN MATEO

ENDORSED

2008 APR 21 A 8: 46

KIRI TORRE, CLERK OF THE SUPERIOR COURT
COUNTY OF SANTA CLARA, CALIFORNIA
BY_____
DEPUTY CLERK

8

9                    IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                        IN AND FOR THE COUNTY OF SANTA CLARA

11

| | |
|---|---|
| 12  MONTARA WATER AND SANITARY DISTRICT, | Case No. 1-07-CV-088793 |
| 13            Plaintiffs, | **DEFENDANT COUNTY OF SAN MATEO'S MEMORANDUM OF POINTS AND** |
| 14     vs. | **AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| 15  COUNTY OF SAN MATEO, et al., | Date:   August 7, 2008 |
| 16            Defendants. | Time:   9:00 a.m. |
| 17 | Dept.: 5 (Hon. Mary Jo Levinger) |
| 18 | Action filed:   May 17, 2007 |
| 19 | Trial date:     none set |

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page(s)**

I.  INTRODUCTION ...................................................................................................1

II.  BACKGROUND ....................................................................................................2

    A.  The Half Moon Bay Airport And Its History..................................................2

    B.  Montara Water And Sanitary District. ............................................................4

    C.  MWSD's Efforts To Take The Property By Eminent Domain..........................5

III.  DISCUSSION .......................................................................................................7

    A.  Applicable Legal Standard For Granting Summary Judgment........................7

    B.  MWSD's Complaint Is Preempted By Federal Law........................................7

        1.  State Law Eminent Domain Claims Are Subject To Federal Preemption
            Analysis Under The United States Constitution. .......................................7

        2.  Restrictions In The Deed Show Implied Preemption Of MWSD's Eminent
            Domain Cause Of Action. ..........................................................................9

        3.  Federal Statutes Regulate Property Granted To Local Governments For
            Airport Use, And MWSD's Efforts To Obtain The Property In Violation
            Of Such Restrictions Requires Application Of Preemption. ...............12

            a.  The Surplus Property Act Of 1944. ...............................................12

            b.  Current Law. ..................................................................................14

        4.  Preemption Is Also Implied By Federal Rulemaking That MWSD Seeks To
            Violate Through Its Eminent Domain Action....................................15

            a.  Part 155 Of Title 14 Of The Code Of Federal Regulations. ....................16

            b.  FAA Airport Grant Assurances. ...................................................18

            c.  FAA Order 5190.6A. .....................................................................18

IV.  CONCLUSION....................................................................................................20

1

## TABLE OF AUTHORITIES

2                                                                                       **Page(s)**

3

### California Cases

4

*Armstrong v. Optical Radiation Corp.*
5    50 Cal. App. 4th 580 (1996) ................................................................. 8

6   *Bronco Wine Company v. Jolly*
    33 Cal. 4th 943 (2004) ....................................................................... 9
7
   *Burbank v. Burbank-Glendale-Pasadena Airport Authority*
8    72 Cal. App. 4th 366 (1999) ............................................................. 15

9   *Mirzada v. Department of Transportation*
    111 Cal. App. 4th 802 (2003) .............................................................. 7
10
   *Viva! International Voice for Animals v. Adidas Promotional Retail Operations, Inc.*
11    41 Cal. 4th 929 (2007) ................................................................. passim

12  ### California Statutes

13  Code Civ. Proc. § 437c(c) .................................................................. 7

14  Code Civ. Proc. § 437c(p)(2) ............................................................... 7

15  ### Federal Cases

16  *Burbank v. Lockheed Air Terminal, Inc.*
    411 U.S. 624 (1973) ........................................................................ 15
17
   *Crosby v. National Foreign Trade Council*
18    530 U.S. 363 (2000) ............................................................... 11, 14, 15

19  *Jones v. Rath Packing Co.*
    430 U.S. 519 (1977) ......................................................................... 9
20
   *Massachusetts v. Bartlett*
21    266 F. Supp. 390 (D. Mass. 1967) ........................................................ 8

22  *Morgan City v. South Louisiana Elec. Co-op. Ass'n*
    31 F.3d 319 (5th Cir. 1994) .............................................................. 8
23
   *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm.*
24    461 U.S. 190 (1983) ........................................................................ 7

25  *San Diego Unified Port Dist. v. Gianturco*
    651 F. 2d 1306 (9th Cir. 1981) ......................................................... 16
26
   ### Federal Statutes

27  49 U.S.C. § 47107(b) ....................................................................... 19

28  49 U.S.C. § 47151 .......................................................................... 14

1

**TABLE OF AUTHORITIES**: (continued)                                                    **Page(s)**

2 49 U.S.C. § 47151(a)(1)(A)-(C) ...................................................................................... 14

3 49 U.S.C. § 47152 ........................................................................................................ 14, 15

4 49 U.S.C. § 47152(1) ........................................................................................................ 15

5 49 U.S.C. § 47152(8) ........................................................................................................ 15

6 49 U.S.C. § 47153 ............................................................................................................ 14

7 Act of July 30, 1947, Pub. L. No. 80-289 ....................................................................... 13

8 Surplus Property Act of 1944, Pub. L. No. 78-457, as reprinted in 1944 United States Code Congressional Service 764 ........................................................................................ passim

9 **Other Authorities**

10 14 C.F.R. § 155.3(a)(1) ..................................................................................................... 17

11 14 C.F.R. § 155.3(a)(2) ..................................................................................................... 17

12 14 C.F.R. § 155.11 ...................................................................................................... 16, 17

13 14 C.F.R. § 155.11(c)(4) ................................................................................................... 17

14 14 C.F.R. § 155.11(c)(7) ................................................................................................... 17

15 14 C.F.R. § 155.11(c)(10) ................................................................................................. 17

16 64 Fed. Reg. 7696 (Feb. 16, 1999) ............................................................................... 4, 18

17 FAA Airport Assurances (3/2005) .................................................................................... 18

18 FAA Order 5190.6A – Airport Compliance Requirements, dated Oct. 2, 1989 .......... 1, 10, 18

19

20

21

22

23

24

25

26

27

28

1  I.   **INTRODUCTION**

2        Plaintiff Montara Water and Sanitary District ("MWSD") seeks by way of its complaint in

3  eminent domain to take title to real property belonging to the County of San Mateo (the "County").

4  MWSD specifically seeks through its single cause of action title to three well sites and associated access

5  easements at the Half Moon Bay Airport (the "Airport").  The Airport has been owned by the County

6  since it was transferred from the federal government in 1948 pursuant to the Surplus Property Act of

7  1944.  The well sites are within the Airport boundaries, and one of the wells is within the Airport's

8  restricted Airport Operations Area ("AOA").  In recent years, the County has permitted MWSD to

9  operate the wells on this property subject to a revocable encroachment permit and in exchange for a fee

10  based on the volume of water extracted from the wells.

11        At the time of the 1948 transfer from the United States—as show by the deed recorded with the

12  San Mateo County Recorder—and at all times since, the federal government has imposed restrictions on

13  the use of this airport land.  The deed-based, statutory, and rule-based restrictions include requirements

14  that the land be used to support the airport and that any attempt to transfer the land or otherwise remove

15  the land from the restrictions be done only upon request of the County and with subsequent written

16  approval from the United States Secretary of Transportation.  The Federal Aviation Administration has

17  gone so far as to interpret the grant of properties like the Airport to the County to be such that "*every*

18  *acre* of surplus airport [that was granted] is held in trust for a specific purpose and useage." *See*

19  Appendix Of Non-California Authorities (the "Appendix"), filed concurrently herewith, Ex. Q at 28, ¶ 4-

20  18(f) [FAA Order 5190.6A – Airport Compliance Requirements, dated Oct. 2, 1989] (emphasis added).

21        The Airport also receives federal grant monies, the receipt of which is conditioned on compliance

22  with similar restrictions ("grant assurances"), including that the County maintain clear title to the Airport

23  and that the Airport be self-sustaining, such as through collection of revenues from non-airport uses like

24  revenues generated by the wells.  Despite the County's objection to the condemnation of this property by

25  MWSD, despite federal regulations mandating that the Airport be as self-sustaining as possible, despite

26  the restrictions in the deed, statutes, and rules, and notwithstanding the Federal Aviation

27  Administration's objection to the eminent domain action, MWSD seeks title to the wells and the related

28  easements for one main purpose:  to cut the costs associated with obtaining the water from the wells.

There is no dispute that the County has been willing to continue to let MWSD pay for access to the water it extracts from the wells, yet MWSD is not content to pay the fees which is has paid for years.  And MWSD's efforts are not without a risk of grave consequence to the County and the Airport.  The FAA has stated that if MWSD succeeds, all of the funding received by the County for support of the Airport from the federal government will be at risk.

Maintaining ownership of the property is both a requirement placed on the County by federal rules and a security concern given the location of the wells adjacent to and within the restricted AOA. More importantly, the restrictions included in the original deed, as well as restriction included in the Surplus Property Act of 1944 and subsequent federal rulemaking, would be violated should MWSD obtain title to the land through eminent domain.  Put simply, since before the land was transferred to the County the United States Congress has made clear its intent to ensure this property is used for only one purpose:  the creation, operation, and support of a public airport by the County.  MWSD's efforts to obtain title in violation of this purpose therefore runs afoul of the Supremacy Clause of the United States Constitution.  California's eminent domain law cannot be used to supplant federal law, and therefore MWSD's efforts in this case require application of the doctrine of obstacle preemption.

Because MWSD seeks to frustrate Congressional intent by using eminent domain to nullify the restrictions in the deed, federal statues, federal rules, and federal grant assurances, its cause of action is preempted.  Accordingly, summary judgment should be granted and this action should be dismissed with prejudice.

## II.    BACKGROUND

### A.    The Half Moon Bay Airport And Its History.

The Airport is located on the Northern California coast about twenty miles south of San Francisco.  The Airport is a public airport, and it has served a variety of roles over the years.  It is an important business, transportation, and emergency service asset to the San Mateo County and Bay Area communities.  Among other roles, the Airport provides a variety of emergency service and response functions including Air-Ambulance and Medivac flights; law enforcement and homeland security patrols; Coast Guard sea-rescue operations; and use as a disaster relief staging site for the airlifting of emergency supplies in the event that roads are closed during a disaster or emergency.  The Airport is home to

1    approximately eighty aircraft and several aviation related businesses.   Aviation is the top employer in

2    San Mateo County, and the Airport provides an important source of education and training for the pilots,

3    mechanics, and Airport employees that fill jobs in the industry.  *See* Declaration of Mark Larson (the

4    "Larson Decl."), filed concurrently herewith, ¶ 3.

5        The Airport was originally constructed by the California State Highway Department for the

6    United States Army in 1942.  The Army turned the Airport over to the Navy following the end of World

7    War II, and the County acquired the relevant portion of the Airport from the United States—acting by

8    and through the War Assets Administration and pursuant to the Surplus Property Act of 1944, as

9    amended, and applicable rules, regulations, and orders—by way of a deed dated September 26, 1947, and

10   recorded on May 25, 1948 (the "1948 Deed").[1]  *Id.* ¶ 4; *see also* Declaration of Glenn M. Levy (the

11   "Levy Decl."), filed concurrently herewith, Ex. A [Recorded 1948 Deed, including San Mateo County

12   Board of Supervisors Resolution 3454 accepting the deed].  The deed defines the United States of

13   America as the "party of the first part," and defines the County of San Mateo as the "party of the second

14   part."  The 1948 Deed includes many restrictions on the use of the land by the County.[2]

15       The deed states that the land "shall be used for public airport purposes, and only for such

16   purposes..." Levy Decl. Ex. A at 4:27-30.  As discussed below, federal guidelines show that such

17   airport-related uses include funding the Airport through lease of the land.  The deed also provides that the

18   County's acceptance of the deed evidenced the County's acceptance of covenants that "shall run with the

19   land," including a requirement that "the property transferred [by the deed] may be successively

20   transferred only with the approval of the Civil Aeronautics Administration ('CAA') or its successor

21   agency...." *Id.* at 6:31-32, 8:12-14.  The deed goes on to state that upon the breach of any its restrictions,

22   _____

23   [1]  The entire airport was not deeded to the County by way of the 1948 Deed.  Various parcels of land
         were obtained by the County after 1948 to complete the airport, most notably the runway itself
24       having been deeded to the County by the federal government by way of a deed dated September 20,
         1956, and recorded January 16, 1957 (the "1957 Deed").  *See* Levy Decl. Ex. B [Recorded 1957
25       Deed, including San Mateo County Board of Supervisors Resolution 11374 accepting the deed].

26   [2]  For the Court's convenience a map of the Half Moon Bay Airport is submitted with this motion.  *See*
         Declaration of James Colin Porter (the "Porter Decl.") Ex. A.  The map shows the current boundary
27       of the Airport, the location of the Airport Wells and requested access easements, and the sections of
         land conveyed to the County by the United States by way of the 1948 Deed and the 1957 Deed.  *Id.*
28

1    the title, right of possession, and any and other rights transferred to the County by the United States

2    "shall at the option of the party of the first part revert to the party of the first part." *Id.* at 8:24-26. In

3    other words, the United States still maintains a revisionary interest in the property.

4       The Airport is primarily self-funded through airport user and business fees and receives no money

5    from the County's General Fund. *See* Larson Decl. ¶ 5. Its operation and maintenance are primarily paid

6    for by an Enterprise Fund, the revenues for which come primarily from fees and rent obtained from

7    airport users and related business. *Id.* Those revenues include fees paid until recently by MWSD for the

8    use of property on the Airport. *Id.*

9       The Airport also historically has received and currently receives federal funds for Airport

10    operation and maintenance. *See id.* ¶ 6. Receipt of those funds, as discussed below, is subject to grant

11    assurances that include similar restrictions on the uses to which Airport property may be made. For

12    example, the United States Department of Transportation, through the Federal Aviation Administration,

13    has promulgated regulations requiring that the Airport have a fee and rental structure "that will make the

14    airport as self-sustaining as possible under the particular airport circumstances, in order to minimize the

15    airport's reliance on Federal funds and local tax revenues." 64 Fed. Reg. 7696, 7710 (Feb. 16, 1999),

16    attached to Appendix as Ex. O. As stated by the FAA, "[t]he County, as a recipient of numerous federal

17    grant agreements under the Airport Improvement Program (AIP)[,] must operate and maintain the airport

18    in compliance with FAA airport design and planning criteria." Larson Decl. Ex. A at 2 [Apr. 19, 2007

19    letter from FAA to Half Moon Bay Airport Manager]. Other federal statutes and rules restricting the

20    Airport's use of its property are discussed in more detail below.

21       **B.    Montara Water And Sanitary District.**

22       According to its 2004 Water System Master Plan, MWSD provides water, sewer, and trash

23    disposal services to the coastal communities of Montara, Moss Beach, and adjacent areas located north of

24    Half Moon Bay and south of Pacifica, in San Mateo County, California. *See* Levy Decl. Ex. C at 1-1

25    [excerpt of MWSD 2004 Water System Master Plan]. According to that document, MWSD owns and

26    operates water storage, treatment, and distribution facilities that provide potable water to about five

27    thousand people. The water system serves approximately 1,650 accounts, over 90 percent of them

28    residential connections, distributed among seven pressure zones. The water served comes from one

1  surface source, Montara Creek, and several wells that withdraw water from the Montara Creek and

2  Denniston Creek groundwater basins.  The system includes a surface water source, a water treatment

3  plant, ten groundwater wells (eight active and two standby), three portable water storage tanks, and over

4  15,000 feet of distribution pipelines.  *See id.*; *see also* Complaint ¶¶ 2-3.

5        Three of the wells from which MWSD has obtained water are located on Airport property (the

6  "Airport Wells").  *See* Complaint ¶ 2 & Ex. B at 4 [map of wells and requested easements].  Specifically,

7  those wells are located on property transferred to the Airport by the federal government pursuant to the

8  1948 Deed.  *See* Porter Decl. at ¶¶ 2-17 & Ex. A [Airport map]; *see also* Complaint ¶ 3 & Ex. B at 4;

9  Levy Decl. Exs. D-G [attaching MWSD Complaint and exhibits thereto].  Plaintiff MWSD admits that

10  the land upon which those wells sit is owned by the County pursuant to the transfer of land to the County

11  by the federal government in 1948 by way of the 1948 Deed.  *See* Complaint ¶ 3 (the Airport Wells are

12  on property transferred "to the Defendant County of San Mateo by the Federal government in 1948").

13        Use of the Airport Wells by MWSD has been pursuant to a revocable encroachment permit issued

14  to MWSD's predecessor in interest and assigned to MWSD in 2004.  *See* Complaint ¶ 3 ("Plaintiff has a

15  *Revocable Encroachment Permit* (REP) from the Defendant to operate and maintain the Airport Wells on

16  County land"); *see also* Larson Decl. ¶ 7; Levy Decl. Ex. F at 7, 16 [document titled "Revocable

17  Encroachment Permits" and attached as part of Exhibit B to MWSD's Complaint].  The permit allows

18  MWSD to use the property to extract water from the wells in exchange for a fee that is determined by

19  multiplying a rate times the number of "acre feet" of water that MWSD extracts.  *See* Levy Decl. Ex. F at

20  7 [Complaint Ex. B].  In the most recent year for which it paid the full amount owed (2006), MWSD paid

21  the County $60,267.00 for the water extracted from the property.  *See* Larson Decl. ¶ 8.  The entirety of

22  the fees paid by MWSD pursuant to the Revocable Encroachment Permits are deposited into the Airport

23  Enterprise Fund and are used by the County to support the operation and maintenance of the Airport.  *Id.*;

24  *see also* Levy Decl. Ex. F at 17 [Complaint Ex. B] ("Under the Permit's terms, the Airport Enterprise

25  Fund will receive approximately $70,000 to $80,000 per year, based on the current amount of water

26  extracted from the wells each year").

27        **C.    MWSD's Efforts To Take The Property By Eminent Domain.**

28        On April 19, 2007, the Board of the MWSD adopted a resolution authorizing institution of

1  eminent domain proceedings against the County to obtain title to the property upon which the Airport

2  Wells exist and related access easements.[3] *See* Levy Decl. Ex. E at 1-5 [Complaint Ex. A]. The legal

3  description of the three wells and the associated easements is attached to that resolution. *Id.* at 6-10 [2-

4  page "Exhibit 'A'" describing "Airport Well Sites" and 3-page "Exhibit 'A'" describing "Access and

5  Pipeline Easements at Airport Well Sites"]; *see also* Levy Decl. Ex. G at 2-6 [Complaint Ex. C]. After

6  the County refused to sell the Airport Wells to MWSD for approximately five-thousand dollars, MWSD

7  filed its complaint, which seeks title to the Airport Wells through a single cause of action.

8  However, the Federal Aviation Administration ("FAA"), which is the successor agency to the

9  CAA and now a part of the federal Department of Transportation, has expressly withheld its approval of

10  the transfer of the airport well sites, whether by eminent domain or any other transfer of title. *See* Larson

11  Decl. ¶ 11 & Ex. A at 1, 2 [Apr. 19, 2007 letter from FAA to Half Moon Bay Airport Manager] ("The

12  Federal Aviation Administration (FAA) is the successor federal agency responsible for the federal

13  oversight of the lands conveyed under the War Assets Administration (WAA) deed dated September 26,

14  1947," and "[t]he FAA is not in favor of a sale of the property for the well sites identified in the County's

15  facsimile transmittal [regarding MWSD's eminent domain proceedings]"). On March 21, 2008, the FAA

16  made clear to MWSD and the County its intent to exercise the reverter in the event that MWSD is

17  successful in its effort to obtain title to the Airport Wells. *See* Levy Decl. Ex. H at 1, 3-4 [Mar. 21, 2008

18  email to San Mateo Director of Public Works and attached letter titled "Notice of Intent to Revert"]. And

19  most recently, the United States of America, on behalf of the FAA, filed a motion for leave to intervene

20  in this case, expressing its intent to fight MWSD's efforts. *See* Levy Decl. Ex. I at 2 ("From the time the

21  Plaintiff filed this action and even prior, the FAA made attempts to amicably resolve this dispute by

22  stating its objection to condemnation, reminding Plaintiff of the reversion clause, and urging the parties

23  to enter a long-term lease of the subject parcels, as an alternative to the Plaintiff's action to take an

24  interest in the Property").

25  Despite the opposition by both the County and the FAA to the requested transfer of title, MWSD

---

[3] The access easements are included in the term "Airport Wells" in this memorandum.

DEFENDANT COUNTY OF SAN MATEO'S MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1 | nevertheless seeks by way of this action to circumvent the restrictions placed on the property by the 1948

2 | Deed and federal law.

3 | **III.    DISCUSSION**

4 |     **A.    Applicable Legal Standard For Granting Summary Judgment.**

5 |       A motion for summary judgment "shall be granted if all the papers submitted show that there is

6 | no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of

7 | law." Code Civ. Proc. § 437c(c). "A defendant or cross-defendant has met his or her burden of showing

8 | that a cause of action has no merit if that party has shown that one or more elements of the cause of

9 | action, even if not separately pleaded, cannot be establish[ed], or that there is a complete defense to that

10 | cause of action. Once the defendant or cross-defendant has met that burden, the burden shifts to the

11 | plaintiff or cross-complainant to show that a triable issue of one or more material facts exists as to that

12 | cause of action or a defense thereto." Code Civ. Proc. § 437c(p)(2); *see also Mirzada v. Department of*

13 | *Transportation*, 111 Cal. App. 4th 802, 806-807 (2003) (once defendant establishes the existence of an

14 | affirmative defense, burden on summary judgment shifts to the plaintiff to produce evidence establishing

15 | a triable issue of material fact refuting the defense).

16 |     **B.    MWSD's Complaint Is Preempted By Federal Law.**

17 |       As shown below, MWSD's claim is preempted by the Supremacy Clause of the United States

18 | Constitution based on the limitations placed in the deed that originally transferred the property in

19 | question to the County, as well as by contemporaneous and subsequent federal legislation and

20 | rulemaking. Accordingly, summary judgment is warranted.

21 |         **1.    State Law Eminent Domain Claims Are Subject To Federal Preemption**

22 |           **Analysis Under The United States Constitution.**

23 |       "The supremacy clause of the United States Constitution establishes a constitutional choice-of-

24 | law rule, makes federal law paramount, and vests Congress with the power to preempt state law." *Viva!*

25 | *International Voice for Animals v. Adidas Promotional Retail Operations, Inc.*, 41 Cal. 4th 929, 935

26 | (2007) [hereafter "*Viva! International*"]. The existence of preemption is primarily a legal question and is

27 | therefore a proper question for summary judgment. *See Pacific Gas & Elec. Co. v. State Energy*

28 | *Resources Conservation & Dev. Comm.*, 461 U.S. 190, 201 (1983) ("The question of preemption is

1   predominantly legal"). Where preemption is established relating to all of plaintiff's causes of action,

2   summary judgment should be granted. *See Armstrong v. Optical Radiation Corp.*, 50 Cal. App. 4th 580,

3   584-85 (1996) ("If [plaintiff's] claims are preempted, [defendant] 'has established a complete defense

4   and summary judgment [is] appropriate'"). Here, because MWSD's complaint sounds only in eminent

5   domain, a successful preemption challenge to that cause of action requires that summary judgment be

6   granted in the County's favor.

7       Federal law preempts a plaintiff's state law causes of action where Congressional action and/or

8   federal rulemaking, whether express or implied, shows that Congress intended to preempt state law. *See*

9   *Viva! International*, 41 Cal. 4th at 935. "There are four species of federal preemption: express, conflict,

10  obstacle, and field." *Id.*

11          First, express preemption arises when Congress "define[s] explicitly the
            extent to which its enactments pre-empt state law. Pre-emption
12          fundamentally is a question of congressional intent, and when Congress has
            made its intent known through explicit statutory language, the courts' task
13          is any easy one." Second, conflict preemption will be found when
            simultaneous compliance with both state and federal directives is
14          impossible. *Third, obstacle preemption arises when "'under the*
            *circumstances of [a] particular case, [the challenged state law] stands as*
15          *an obstacle to the accomplishment and execution of the full purposes and*
            *objectives of Congress.'"* Finally, field preemption, i.e., "Congress' intent
16          to pre-empt all state law in a particular area," applies "where the scheme of
            federal regulation is sufficiently comprehensive to make reasonable the
17          inference that Congress 'left no room' for supplementary state regulation."

18  *Id.* at 936 (emphasis added and citations omitted). Eminent domain, which in California is governed by

19  statute, is a proper subject of preemption. *See, e.g., Morgan City v. South Louisiana Elec. Co-op. Ass'n*,

20  31 F.3d 319, 320-21, 324 (5th Cir. 1994) (affirming dismissal of state-law based eminent domain action

21  due to federal preemption); *Massachusetts v. Bartlett*, 266 F. Supp. 390, 392-93 (D. Mass. 1967)

22  ("[Eminent domain, like] other powers of the state[,] … is subject to the [federal] supremacy clause,

23  Constitution, Article VI, Clause 2, and the state's exercise of its [eminent domain] power must yield

24  when it conflicts with a paramount federal statute"). Here, as discussed below, application of state

25  eminent domain law would act to frustrate the purpose of the 1948 Deed and related Congressional

26  action and as such "stands as an obstacle to the accomplishment and execution of the full purposes and

27  objectives of Congress." *Viva! International*, 41 Cal. 4th at 936. Although courts are reluctant to infer

28  preemption (*id*), and although it is the County's burden to prove such implied preemption (*id.*), this

1  frustration of Congressional purpose requires the application of obstacle preemption.

2    **2.    Restrictions In The Deed Show Implied Preemption Of MWSD's Eminent**
3    **Domain Cause Of Action.**

4        That MWSD's complaint seeks to frustrate Congressional intent is first shown by the language of

5  the 1948 Deed. The transfer of land from the United States to the County by way of that deed was

6  predicated on restrictions that run with the land. Among those restrictions are limitations on the use to

7  which the land in question can be put, as well as restrictions on the manner in which any interest in that

8  land subsequently can be transferred by the County. MWSD's attempt to claim title to the property by

9  way of eminent domain violates both the limitations on use and the restriction on how interests in the

10  property can be transferred. To permit MWSD's eminent domain action to proceed any further would be

11  to allow MWSD to frustrate the very purpose for which the land was deeded to the County, and this is

12  precisely what obstacle preemption forbids.

13        The California Supreme Court has recognized the instruction of the United States Supreme Court

14  that the preemption analysis requires consideration of "'the relationship between state and federal law *as*

15  *they are interpreted and applied not merely as they are written.*'" *Bronco Wine Company v. Jolly*, 33

16  Cal. 4th 943, 992 (2004) (quoting *Jones v. Rath Packing Co.*, 430 U.S. 519, 526 (1977)) (emphasis in

17  original). In other words, the application of California eminent domain law must be considered in light

18  of the application of the original deed granting the land to the County. "The crucial question is …

19  whether the state rule would stand as an obstacle to the accomplishment and execution of the full

20  purposes and objectives of Congress." *Id.* at 992-93.

21        Here, the deed itself shows Congressional intent because the transfer—and consequently the

22  language in the deed—was specifically authorized by an act of Congress. As the 1948 Deed notes, the

23  deed was entered into by the "UNITED STATES OF AMERICA, acting by and through the War Assets

24  Administration, *under and pursuant to … the powers and authority contained in the provisions of the*

25  *Surplus Property Act of 1944, as amended*, and applicable rules, regulations and orders …." Levy Decl.

26  Ex. A at 2:4-7 (emphasis added). Thus, the 1948 Deed, both in being entered into by the United States

27  pursuant to Congressional authorization and rulemaking and in mirroring statutory language adopted by

28  Congress (discussed in the next section), reflects the purposes and objectives of Congress in this field.

1   Those purposes and objectives are spelled out in detail by the deed. (And as discussed in more detail in

2   subsection 3 below, the federal legislation authorizing such transfers imposed the same restrictions on

3   any subsequent transfer of such land.)

4           Specifically, the 1948 Deed states that "all of the property transferred hereby, together with the

5   adjacent flight strip under the jurisdiction of the Public Roads Administrations, hereafter in this

6   instrument called the 'airport', *shall be used for public airport purposes, and only for such purposes…*"

7   Levy Decl. Ex. A at 5:27-30 (emphasis added). Thus, use for non-airport purposes of land transferred to

8   the County by the deed, as is anticipated by MWSD, is prohibited. As discussed in more detail in

9   subsection 4 below, such purposes include use of the land to raise money to support the Airport. *See,*

10  *e.g.*, Appendix Ex. P at 26, 28-29, ¶¶ 4-17(g), 4-18(f) [FAA Order 5190.6A] (noting that "income from

11  such use  [be applied] to development, operation, and maintenance of airport facilities" and that "such

12  property, if not needed to directly support an aviation use, [be] available for use to produce income for

13  the airport"). Given that the land is currently being used for that purpose—*i.e.*, obtaining funds from

14  MWSD that are used by the County to support the Airport—MWSD's attempt to take title to the property

15  will frustrate this purpose. The five-thousand dollars offered by MWSD for title to the land does not

16  satisfy this requirement.[4]

17          Further, the 1948 Deed expressly states that "[b]y the acceptance of this deed or any rights

18  hereunder, [the County] also assumes the obligations of, covenants to abide by and agrees to, and this

19  transfer is made subject to, the following reservations and restrictions," including "[t]hat the property

20  transferred hereby may be successively transferred *only with the approval of the Civil Aeronautics*

21  *Administration* or the successor Government agency *and* with the proviso that any such subsequent

22  transferee assumes all the obligations imposed upon [the County] by the provisions of [the 1948 Deed]."

---

24  [4]  Federal regulations refer to the ongoing use of land to generate revenues, not to the one-time sale of
25       the land for a low fee. *See, e.g.*, Appendix Ex. P at ¶ 4-17.g [FAA Order 5190.6A] ("The FAA may
         approve *the interim use* of aeronautical property for nonaviation purposes *until such time as it is*
26       *needed for its primary purpose*") (emphasis added). The FAA has also stated its opposition to the
         sale in this case. *See* Larson Decl. Ex. A at 2 [Apr. 19, 2007 letter from FAA to Half-Moon Bay
27       Airport Manager] ("The FAA is not in favor of a sale of the property for the well sites identified in
         the County's facsimile transmittal").
28

1    Levy Decl. Ex. A at 6:28-31, 8:12-17 (emphasis added). Not only has MWSD failed to obtain approval

2    from the FAA (the successor agency to the CAA), and not only has the FAA stated that it opposes

3    MWSD's efforts to obtain title to the land (*see* Larson Decl. Ex. A at 1-2 [Apr. 19, 2007 letter]; Levy

4    Decl. Ex. H at 1, 3-4 [Mar. 21, 2008 notice of intent to exercise reverter]), but in seeking to claim the

5    land by way of eminent domain MWSD is seeking to circumvent the requirements of this section of the

6    deed. Because this deed is the implementation of federal policy regarding transfer of surplus federal

7    property for public airports, MWSD's complaint therefore seeks to directly frustrate federal policy. This

8    MWSD cannot do. *See Viva! International*, 41 Cal. 4th at 936; *see also Crosby v. National Foreign*

9    *Trade Council*, 530 U.S. 363, 372-73 (2000) ("We will find preemption where ... 'under the

10   circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the

11   accomplishment and execution of the full purposes and objectives of Congress'").

12        Finally, the 1948 Deed states that "upon a breach of any of the aforesaid reservations or

13   restrictions by the [County] or any subsequent transferee, whether caused by the legal inability of [the

14   County] or subsequent transferee to perform any of the obligations herein set out, or otherwise, the title,

15   right of possession and all other rights transferred to [the County], or any portion thereof, shall at the

16   option of [the United States] revert to [the United States] upon demand made in writing by the War

17   Assets Administration or its successor Government agency...." Levy Decl. Ex. A at 8:19-26. By

18   seeking to obtain title to the land through eminent domain, MWSD is seeking to circumvent this clause

19   of the 1948 Deed (the "Reversion Clause"). Because the Reversion Clause is an express condition of the

20   federal government's transfer of the property to the County, any effort to take that property without

21   abiding by these terms constitutes an effort to frustrate Congress's purpose in making the original grant. [5]

22   Again, under the doctrine of preemption, MWSD cannot do this. *See Viva! International*, 41 Cal. 4th at

23   936; *Crosby*, 530 U.S. at 372-73.

24

25   [5]  There is also no doubt regarding the FAA's interpretation of this language. The FAA, through its
         motion for leave to intervene, has made clear its opposition to MWSD's effort to obtain the Airport
26       Wells through eminent domain. *See* Levy Decl. Ex. I at 2 ("From the time the Plaintiff filed its
         action and even prior, the FAA ... stat[ed] its objection to condemnation"). And the FAA has also
27       shown its intent to exercise the reverter should MWSD succeed in obtaining full title to the land at
         issue. *See id.* Ex. H at 1, 3-4.
28

1    **3.    Federal Statutes Regulate Property Granted To Local Governments For Airport Use, And MWSD's Efforts To Obtain The Property In Violation Of**
2    **Such Restrictions Requires Application Of Preemption.**

3    Not only does the language of the 1948 Deed require that MWSD's claim be preempted, but both

4    the federal legislation that originally authorized the grant of the property by way of the 1948 Deed and all

5    subsequent modifications of that legislation confirm Congress's intent to prohibit entities like MWSD

6    from circumventing restrictions imposed on the use of land deeded to local government for public airport

7    use.  Given that the purposes shown by this legislation—namely, to support the creation, operation, and

8    maintenance of public airports by local governments, including by the imposition of restrictions on the

9    subsequent transfer of any property or interests given to those local governments by the federal

10    government—are the same as those discussed above, and given that those restrictions have been in place

11    for over sixty years, MWSD's attempt to use the land for other than Airport purposes is directly in

12    conflict with Congress's intent.  Accordingly, there is no question regarding the applicability of obstacle

13    preemption.

14    **a.    The Surplus Property Act Of 1944.**

15    As noted  by the 1948 Deed, the property that was deeded to the County was transferred pursuant

16    to "the powers and authority contained in the provisions of the Surplus Property Act of 1944, as

17    amended...." Levy Decl. Ex. A at 1:6-7.  The Surplus Property Act of 1944 ("the Act" or "the 1944

18    Act") therefore provides both the context under which the grant was made as well as the controlling

19    federal law at the time of the transfer.[6]  This controlling federal law reflects the same policies that are

20    implemented by the 1948 Deed.

21    The 1947 amendment to the Act states that the federal government may transfer property to any

22    local government for a public airport where (1) the transfer is "subject to the terms, conditions,

23    reservations, and restrictions hereinafter provided for" and (2) the transfer of the interest in that property

24    is "essential, suitable, or desirable for the development, improvement, operation, or maintenance of a

25

26    [6]    The Surplus Property Act of 1944, as passed on October 3, 1944, and the relevant subsequent
27    amendment to the Act in 1947, are attached for the Court's convenience as Exhibits K and L,
     respectively, to the Appendix (copied from the United States Code Congressional Service, 78th and
28    80 Congresses).

1  public airport … or [is] reasonably necessary to fulfill the immediate and foreseeable future requirements

2  of the grantee for the development, improvement, operation, or maintenance of a public airport, including

3  property needed to develop sources of revenue….” Act of July 30, 1947, Pub. L. No. 80-289, as

4  reprinted in 1947 United States Code Congressional Service 673, 673-74, attached to Appendix as Ex. L.

5  This provision mirrors the language in the 1948 Deed that the property was transferred to the County

6  subject to specific limitations on non-airport use of the property.  Moreover, this language indicates that

7  the transfer to the County was made for the development, improvement, operation, or maintenance of the

8  Airport and that one permissible use for the land was to develop a revenue stream to support the airport.

9  MWSD’s effort to obtain the wells—which would have the effect of depriving the County from one of

10 the major airport-supporting revenue sources—would contradict this express federal purpose.

11        Also mirroring the language in the deed, the 1947 amendment to the Act states:

12             No property disposed of under the authority of this subsection shall be
               used, leased, sold, salvaged, or disposed of by the grantee or transferee for
13             other than airport purposes without the written consent of the
               Administrator of Civil Aeronautics, which consent shall be granted *only if*
14             *the Administrator of Civil Aeronautics determines that the property can be*
               *used, leased, sold, salvaged, or disposed of for other than airport purposes*
15             *without materially and adversely affecting the development, improvement,*
               *operation, or maintenance of the airport at which such property is*
16             *located...*

17 *Id.* at 674 (emphasis added).  Not only does this requirement track the one in the deed, meaning that

18 MWSD, as a party seeking to take the land from the County, cannot have the property without obtaining

19 written permission from the federal government, but it also indicates that permission *shall* not be granted

20 where the anticipated transfer would adversely affect the development, improvement, operation, or

21 maintenance of the airport.  As noted above, MWSD has not obtained such consent, and MWSD’s

22 litigation, if successful, would deprive the County of this source of revenue, said revenue being an

23 important—and federally-mandated—source of financial support for the Airport.

24        Finally, the 1947 amendment to the Act also contains a reversion requirement similar to the 1948

25 Deed’s Reversion Clause, stating that “[i]n the event that any of the terms, conditions, reservations, and

26 restrictions upon or subject to which the property disposed of is not met, observed, or complied with, all

27 the property so disposed of or any portion thereof, shall, at the option of the United States, revert to the

28 United States in its then existing condition.” *Id.* at 675.  Again, MWSD’s eminent domain action would,

1   if successful, read this requirement out of both the statute authorizing the transfer and the 1948 Deed that

2   memorialized it.  The Supremacy Clause of the Constitution does not permit state law to have that effect.

3   *See Viva! International*, 41 Cal. 4th at 936; *Crosby*, 530 U.S. at 372-73.

### b.    Current Law.

5   Congressional intent in this regard has not changed in the sixty-one years since the 1947

6   amendment of the Act.  Various aspects of the 1944 Act have been amended in the intervening years, but

7   the relevant restriction reflected by the 1948 Deed and discussed above are still in effect today.

8   Specifically, Subchapter II of Chapter 471 of Section 49 of the United States Code covers the transfer

9   and use of surplus federal property for public airports.  *See* 49 U.S.C. §§ 47151-47153, attached to

10  Appendix as Exs. H-J.  The first section of that Subchapter discusses the purposes for which such land

11  grants can be made, and the second section discusses limitations that are required to be placed on such

12  grants.  Both sections, as discussed below, mirror the same strict limits found in the 1944 Act, and these

13  policies consequently show Congress's continuing implied intent to prevent state law from frustrating the

14  Congressional purpose of restricting local government use of deeded airport property to uses benefitting

15  an airport.

16  To begin with, Section 47151 grants federal agencies the ability to transfer interest in surplus

17  federal property to local governments for airport use *only* where the Secretary of Transportation decides

18  that one of the following three conditions is present:

19          (1) the property interest to be transferred is "desirable for developing,

20          improving, operating, or maintaining a public airport";

21          (2) the transfer is "reasonably necessary to fulfill the immediate and

22          foreseeable future requirements for developing, improving, operating, or

23          maintaining a public airport"; or

24          (3) the transfer is "needed for developing sources of revenue from

25          nonaviation businesses at a public airport…."

26  49 U.S.C. § 47151(a)(1)(A)-(C).  These are the same conditions included in the 1944 Act discussed

27  above.

28  Section 47152, meanwhile, limits how local governments can dispose of an interest obtained from

1    the federal government for "other than airport purposes." 49 U.S.C. § 47152(1). That section, as with

2    the Act, mandates that a local government can use such property "for other than airport purposes only

3    after the Secretary of Transportation gives written consent that the interest can be used, leased, salvaged

4    or disposed of without materially and adversely affecting the development, improvement, operation, or

5    maintenance of the airport at which the property is located." *Id.* Thus, current statutes show that even

6    non-airport uses of the land must not adversely affect the airport-related uses, and the Secretary of

7    Transportation must provide approval before any such non-airport use is permitted. Here, MWSD has

8    not obtained such consent. Moreover, the federal government, through the FAA, is seeking to intervene

9    in this case for the express purpose of objecting to MWSD's efforts to obtain the Airport Wells through

10   eminent domain. Yet in trying to obtain title to the Airport Wells, MWSD seeks to circumvent this

11   federal restriction. Such circumvention of federal policy is precisely what the preemption doctrine

12   prohibits. MWSD's efforts, if successful, would directly frustrate the purpose of these restrictions by

13   depriving the Airport of important revenue used solely for support of the Airport.

14          Finally, Section 47152 also states that "[w]hen a term under this section is not satisfied, any part

15   of the interest in the property reverts to the [federal] Government...." 49 U.S.C. § 47152(8). This

16   reversionary policy mirrors the reversion in the 1948 Deed and the 1944 Act, as well as the FAA's notice

17   of intent to exercise the reverter if MWSD is successful in this lawsuit. MWSD cannot obtain the

18   property in question by eminent domain without doing harm to this reversionary restriction, and therefore

19   MWSD is preempted from the course of action it now pursues. *See Viva! International*, 41 Cal. 4th at

20   936; *Crosby*, 530 U.S. at 372-73.

21          **4.    Preemption Is Also Implied By Federal Rulemaking That MWSD Seeks To
22                 Violate Through Its Eminent Domain Action.**

23          Federal rules implementing the federal legislation further reflect Congressional intent in this area,

24   and courts have routinely found this kind of aviation-related rulemaking to be evidence of implied

25   Congressional intent to preempt local laws that affect airport operations. *See, e.g., Burbank v. Lockheed*

26   *Air Terminal, Inc.*, 411 U.S. 624, 633 (1973) (holding that Congressional legislation regarding airport

27   noise levels impliedly preempted local regulation of airport noise); *Burbank v. Burbank-Glendale-*

28   *Pasadena Airport Authority*, 72 Cal. App. 4th 366, 379 (1999) ("Preemption of noise regulations which

1  directly affect aircraft and flight operations is not express, but implied from the structure and purpose of

2  federal aviation regulation"); *San Diego Unified Port Dist. v. Gianturco*, 651 F. 2d 1306, 1316 (9th Cir.

3  1981) (federal statutes and regulations regarding airport noise levels led to holding that local ordinances

4  were impliedly preempted).

5                         **a.**    **Part 155 Of Title 14 Of The Code Of Federal Regulations.**

6        Here, among the rules promulgated by the federal government relating to the use of airport

7  property obtained from the federal government, one rule specifically limits the kind of acquisition being

8  attempted by MWSD.  Part 155 of Title 14 of the Code of Federal Regulations is titled "Release of

9  Airport Property from Surplus Property Disposal Restrictions" and addresses efforts to remove

10  restrictions of the kind placed by the original 1948 Deed on the land at issue.  Section 155.11 requires

11  that "[a] request for the release of surplus airport property from a term, condition, reservation, or

12  restriction in an instrument of disposal … must be in writing and *signed by an authorized official of the*

13  *public agency that owns the airport*."  14 C.F.R. § 155.11 (emphasis added) , attached to Appendix as

14  Ex. N. Here, MWSD seeks title to property that is subject to the reversion restriction in the 1948 Deed,

15  and that property is currently owned *by the County*.  Not only has MWSD not submitted a written request

16  for release to the FAA, but it does not have standing to do so since it is not "the public agency that owns

17  the airport."  *Id.*  In other words, MWSD cannot, by definition, request a release.  And only MWSD

18  contends the property at issue is surplus to the Airport's function.

19        Because MWSD seeks title without first seeking approval from the FAA, it is consequently

20  seeking a release in direct contravention of Section 155.11.  The County, as owner of the Airport Wells,

21  is the only entity authorized by federal law to request release of the applicable deed restrictions, and the

22  undisputed evidence is that the County has not sought such a release.  *See* Larson Decl. ¶ 10.  The FAA

23  has also stated that it does not consider the Airport Wells surplus in a manner that would warrant a

24  release from these restrictions, even if properly requested.  *See id.* Ex. A at 2 ("The FAA is not in

25  agreement that the land is no longer need for an airport purpose[,] … [and] [t]herefore, the land is not

26  considered surplus property and the FAA San Francisco Airports District Office would not recommend a

27  release of the federal agreement obligations to permit the sale of the property").  Use of California

28  eminent domain law as a vehicle for obtaining the land is thus inconsistent with the federal regulatory

1  requirement that the County request a release as a condition precedent to any transfer of such airport

2  property.

3     Although these facts alone show a frustration of Congressional intent requiring preemption of

4  MWSD's claim, Section 155.11 provides additional bases for finding preemption. "Each request for a

5  release must include … [t]he purpose for which the property was transferred, such as for use as a part of,

6  or in connection with, operating the airport or for producing revenues from nonaviation business," as

7  well as "[a] statement of the circumstances justifying the release on the basis" either that the property "no

8  longer serves the purpose for which it was made subject to the terms, conditions, reservations, or

9  restrictions concerned" or that the requested release from those conditions "will not prevent

10  accomplishing the purpose for which the property was made subject to [those conditions]…." 14 C.F.R.

11  § 155.11(c)(4), (c)(7), 14 C.F.R. § 155.3(a)(1), (a)(2), attached to Appendix as Exs. N, M. Because the

12  land was originally deeded to the County for the purpose of the creation and maintenance of a civil

13  airport, because that is still the purpose of the use of that land, and specifically because the County uses

14  the money paid by MWSD for the water obtained from the wells for the purpose of "producing revenues

15  [for the airport] from nonaviation business," MWSD cannot show that its taking of title will not frustrate

16  the Congressional purpose in granting this land to the County in 1948.

17     Finally, Section 155.11 also requires that "[i]f the release would allow sale of any part of the

18  property," the party seeking the release must provide "a certified copy of a resolution or ordinance of the

19  governing body of the public agency that owns the airport obligating itself to use the proceeds of the sale

20  exclusively for developing, improving, operating, or maintaining a public airport." 14 C.F.R.

21  § 155.11(c)(10). Again, MWSD cannot provide such a statement because it does not own the property at

22  issue and because the County has not requested a release. More importantly, in seeking title for the land

23  MWSD is attempting to deprive the County of the very kind of proceeds that this rule shows should be

24  devoted to the Airport. MWSD is not proposing that it will make the realized gain from the taking of the

25  property available to the County for the development, improvement, operation, and/or maintenance of the

26  Airport. Rather, it seeks to deprive the County of that ongoing source of revenue supporting the Airport,

27  a goal that is directly contrary to the Congressional intent. Accordingly, federal regulations, along with

28  the 1948 Deed and federal statutes, show the need to apply obstacle preemption.

### b.    FAA Airport Grant Assurances.

Other federal rules contain the same kinds of restrictions. As noted above, the Airport traditionally has received and continues to receive federal funds for its operation and maintenance. *See* Larson Decl. ¶ 6. The United States Department of Transportation, through the Federal Aviation Administration, has promulgated regulations that limit the uses to which airport property can be used. Such regulations include restrictions on uses of airport property where the Airport receives federal funds: "Each federally assisted airport owner/operator is required by statute and grant assurance to have an airport fee and rental structure that will make the airport as self-sustaining as possible under the particular airport circumstances, in order to minimize the airport's reliance on Federal funds and local tax revenues." 64 Fed. Reg. 7696, 7710 (Feb. 16, 1999), attached to Appendix as Ex. O. Similarly, any federal grant for airport development or planning requires assurances from the airport receiving such funds, including that the Airport "will maintain a fee and rental structure for the facilities and services at the airport which will make the airport as self-sustaining as possible under the circumstances existing at the particular airport...." Appendix Ex. Q at 1, 10 [FAA Airport Assurances (3/2005)]. The assurances also require that the Airport "not take or permit any action which would operate to deprive [the Airport] of any of the rights and powers necessary to perform any or all of the terms, conditions, and assurances in the grant agreement without the written approval of the Secretary [of Transportation]", including that the Airport "not sell, lease, encumber, or otherwise transfer or dispose of any part of its title or other interests in the property [referenced by the] application...." *Id.* at 4. And the FAA has stated that MWSD's efforts, if successful, would threaten the Airport's ongoing federal support: "Failure to comply with the notification and approval requirement procedures [as a result of MWSD's eminent domain action] would subject the County to FAA enforcement action that could include the suspension of grant payments and withholding of future grant funding for [the Airport]." Larson Decl. Ex. A at 2.

### c.    FAA Order 5190.6A.

Likewise, the FAA has issued an order that "contains basic guidance for FAA personnel in interpreting and administering the various continuing commitments made to the United States by airport owners as a condition for the grant of Federal funds or the conveyance of Federal property for airport purposes." Appendix Ex. P at 13, ¶ 4-1 [FAA Order 5190.6A – Airport Compliance Requirements, dated

1   Oct. 2, 1989].  Here, because the Airport is both subject to conditions to the conveyance of federal

2   property and the required grant assurances, the FAA's order providing guidance is applicable.

3           That order states in relation to "surplus property" conveyed to a local government under the

4   Surplus Property Act, and specifically the 1947 amendment of the Act:

5                   4-18. USE OF SURPLUS PROPERTY.

6                   **a.  General.**  Surplus airport properties conveyed under the authority of
                    the Surplus Property Act, as amended by P.L. 80-289, impose upon the
7                   grantee certain continuing obligations that are generally more
                    comprehensive than the covenants and conditions discussed in previous
8                   parts of this section.  …  P.L.80-289 authorizes the conveyance of property
                    over and above the required aeronautical facilities in order to permit the
9                   grantees to have a source of continuing airport revenue.  To assure that this
                    is accomplished, **the FAA insists that surplus properties associated with**
10                  **a public airport including revenue generated therefrom be used to**
                    **support the development, maintenance and operation of the**
11                  **aeronautical facilities**.  (See paragraph f. below.)

12                  **b.  Obligations Run with the Land.**        There is a further distinction
                    between the obligations assumed under a grant project and those assumed
13                  by the recipient of a surplus airport Grant agreements are contracts with the
                    Government relating to airport facilities.  These run far a maximum
14                  specified term of years, or for the time the land is used for an airport,
                    whereas **the covenants of a surplus airport conveyance are in fact**
15                  **restrictions and encumbrances which condition the title to the land.**
                    **Thus, every acre of a surplus airport is held in trust for a specific**
16                  **purpose and usage.  The Surplus Property Act provides that property**
                    **shall not be used, leased, sold, salvaged or disposed of for other than**
17                  **airport purposes without the consent of the Administrator.**  This
                    reflects a degree of administrative flexibility to adjust the usage in a
18                  surplus property deed for specific areas of a surplus airport within the
                    spirit, intent and objectives of the law.

19                                  *        *        *

20                  **f.  Leasing of Surplus Airport Properties.**

21                  … **At airports which include Federal surplus property acquired for**
                    **airport purposes, there is a further obligation to ensure that such**
22                  **property, if not needed to directly support an aviation use, is available**
                    **for use to produce income for the airport**.

23

24   *Id.* Ex. P at 28-29, ¶¶ 4-18(a), (b), (f) (bold in original, underlined bold added).  Thus, the FAA's order

25   regarding interpretation of federal statutes and regulations is clear that surplus land of the type at issue

26   here is subject to strict controls, including that the land and revenues gained therefrom be used solely for

27   Airport purposes.  These rules are authorized by federal statutes, which also require the same restrictions

28   on the uses to which airport property may be made.  *See* 49 U.S.C. § 47107(b) ("The Secretary of

1  Transportation may approve a project grant application under this subchapter for an airport development

2  project only if the Secretary receives written assurances, satisfactory to the Secretary, that … the

3  revenues generated by a public airport will be expended for the capital or operating costs of – (A) the

4  airport; (B) the local airport system; or (C) other local facilities owned or operated by the airport owner

5  or operator and directly and substantially related to the air transportation of passengers or property"),

6  attached to Appendix as Ex. G.

7      In light of this body of federal rulemaking, there is no doubt that Congress, both through statutes

8  and rules authorized by Congress, has assumed regulation of the use of this kind of property and

9  impliedly preempted any attempt to obtain the Airport Wells in a manner that violates the numerous

10  restrictions placed upon the land.

11  **IV.    CONCLUSION**

12      In summary, if MWSD's action is allowed to move forward, MWSD will be successful in an

13  effort to substitute its judgment for that of Congresses spanning more than sixty years and for the federal

14  agencies interpreting that Congressional judgment.  The Court should not permit MWSD to go any

15  further with its effort to rewrite the 1948 Deed, the Surplus Property Act of 1944, federal legislation,

16  federal rules, and FAA orders and grant assurances.  The Supremacy Clause of the United States

17  Constitution simply does not permit California's eminent domain law to be used in this manner.  For this

18  reason, and for the reasons discussed above, the County respectfully asks that judgment be entered in

19  favor of Defendant and that this case be dismissed with prejudice.

20

21  Dated:  April 18, 2008                    Respectfully submitted,

22                                            MICHAEL P. MURPHY, COUNTY COUNSEL

23

24                                            By: _____

25                                                Glenn M. Levy, Deputy

26                                            Attorneys for Defendant
                                              COUNTY OF SAN MATEO

27

28

DEFENDANT COUNTY OF SAN MATEO'S MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# **Exhibit H**

**ORDER**

$$\boxed{\textbf{5190.6A}}$$

# AIRPORT COMPLIANCE
# REQUIREMENTS



## OCTOBER 2, 1989

## DEPARTMENT OF TRANSPORTATION
### FEDERAL AVIATION ADMINISTRATION

---

**Distribution:** A-W(PP/AS)-3; A-X(AS)-4; A-FAS-1(MAX)          **Initiated By:** AAS-300

# RECORD OF CHANGES

DIRECTIVE NO.

5190.6A

| CHANGE TO BASIC | SUPPLEMENTS | | | OPTIONAL | CHANGE TO BASIC | SUPPLEMENTS | | | OPTIONAL |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

# FOREWORD

**1. PURPOSE.** This Order provides the policies and procedures to be followed in carrying out the Federal Aviation Administration's (FAA) functions related to airport compliance. It is of interest to other Government agencies, both Federal and state, who are concerned with actions associated with Federal real and personal property.

**2. DISTRIBUTION.** This Order is distributed to the branch level of the Office of Airport Safety and Standards, the Office of Airport Planning and Programming, to the section level of all regional Airports division, and all Airport District Offices/Field Offices.

**3. CANCELLATION.** Order 5190.6, Airports Compliance Requirements, dated August 24, 1973, is canceled, except for the enforcement provision (see Chapter 6, Section 2 of this Order).

*Leonard E. Mudd*

Leonard E. Mudd
Director, Office of Airport Safety & Standards

# TABLE OF CONTENTS

## CHAPTER 1.   SCOPE AND AUTHORITY

1–1.   General ....................................................................................................................................... 1
1–2.   Scope ......................................................................................................................................... 1
1–3.   Background of Airport Obligations ......................................................................................... 1
1–4.   Sources of Obligations ............................................................................................................. 1
1–5.   Authority ................................................................................................................................... 1

## CHAPTER 2.   TYPES OF AGREEMENTS

### Section 1.   Grant Agreements

2–1.   Sponsor's Obligations .............................................................................................................. 3
2–2.   Duration of Grant Agreements ................................................................................................ 3
2–3.   Physical Life of Facilities ....................................................................................................... 3
2–4.–2–5.   RESERVED ....................................................................................................................... 3

### Section 2.   Surplus Property Instruments

2–6.   Background ................................................................................................................................ 3
2–7.   Types of Instruments of Disposal ........................................................................................... 4
2–8.   Duration of Obligations ........................................................................................................... 4
2–9.–2–10.   RESERVED ................................................................................................................... 5

### Section 3.   Conveyance of NonSurplus Federal Land

2–11.  Background ................................................................................................................................ 5
2–12.  Covenants .................................................................................................................................. 5
2–13.  Reverter Provision .................................................................................................................... 5
2–14.  Duration of Covenants and Obligations .................................................................................. 6
2–15.–2–17.   RESERVED ................................................................................................................... 6

### Section 4.   AP–4 Agreements

2–18.  Background ................................................................................................................................ 6
2–19.  Continuing Obligation .............................................................................................................. 6

## CHAPTER 3.   EXCLUSIVE RIGHTS

### Section 1.   Background

3–1.   General ....................................................................................................................................... 7
3–2.   Legislative History ................................................................................................................... 7
3–3.   Development of Agency Policy ................................................................................................ 7
3–4.–3–7.   RESERVED ....................................................................................................................... 8

### Section 2.   Policy

3–8.   Basis of Policy ......................................................................................................................... 8
3–9.   Interpretation ............................................................................................................................. 8

3–10. Implementation of Policy ........................................................................................ 11
3–11. Improvements by Other Federal Agencies ............................................................ 11
3–12. Administration of Policy ......................................................................................... 12
3–13.–3–16.  RESERVED .................................................................................................. 12

### Section 3.   Qualifications and Standards

3–17. Use of Minimum Standards ..................................................................................... 12

## CHAPTER 4.   OBLIGATIONS OF AIRPORT OWNERS

### Section 1.   General

4–1.  Purpose ...................................................................................................................... 13
4–2.  Assignment of Obligations ...................................................................................... 13
4–3.–4–4.  RESERVED ........................................................................................................ 14

### Section 2.   Maintenance and Operation

4–5.  Scope of Maintenance Obligation ........................................................................... 14
4–6.  Physical Maintenance .............................................................................................. 14
4–7.  Requirement to Operate the Airport ..................................................................... 15
4–8.  Restrictions on Aeronautical Use of Airport ........................................................ 16

### Section 3.   Approach Protection and Compatible Land Use

4–9.  Protection of Approaches ......................................................................................... 19
4–10. Compatible Use Of Adjacent Land ......................................................................... 20
4–11.–4–12.  RESERVED ..................................................................................................... 20

### Section 4.   Availability on Fair and Reasonable Terms

4–13. General ....................................................................................................................... 20
4–14. Terms Applied to Airport Users ............................................................................. 20
4–15. Availability of Leased Space ................................................................................... 22
4–16. Civil Rights ............................................................................................................... 23

### Section 5.   Use of Airport Property

4–17. Adherence to Airport Layout Plan and Airport Property Map ........................... 23
4–18. Use of Surplus Property ........................................................................................... 28
4–19. Use of Lands Transferred from the United States ................................................ 29
4–20. Income Accountability ............................................................................................. 30
4–21. Management of Grant Acquired Personal Property .............................................. 32

### Section 6.   Use by the Government

4–22. Joint Use by Federal Government Aircraft ............................................................ 33
4–23. Space for Air Traffic Control Activities, Communications, Weather and Navaids ................... 33
4–24. Government Use During a National Emergency or War ......................................... 34

## CHAPTER 5.   THE AIRPORT COMPLIANCE PROGRAM

5–1.  Basis and Objectives ................................................................................................ 35
5–2.  Program Elements ..................................................................................................... 35
5–3.  Priorities and Emphasis ........................................................................................... 36
5–4.  Responsibilities ......................................................................................................... 37
5–5.  Types of Compliance Status ..................................................................................... 37

5–6.   Analyzing Compliance Status ..................................................................................... 37
5–7.   Compliance Determination ......................................................................................... 37
5–8.   Record of Compliance Status ...................................................................................... 38

## CHAPTER 6.   ANALYSIS AND ENFORCEMENT

### Section 1.   Analysis of Leases and Use Agreements

6–1.   General ....................................................................................................................... 41
6–2.   Basic Airport Relationships ........................................................................................ 41
6–3.   Review of Leases and Use Agreements ...................................................................... 41
6–4.   Agreements Covering Services to the Public .............................................................. 42
6–5.   Use Agreements Involving an Entire Airport ............................................................. 43
6–6.   Agreements Granting Access to Landing Area from Adjacent Property (Through–the–Fence Operator). 44
6–7.   Air Carrier Agreements and Leases ............................................................................ 44
6–8.–6–30.   RESERVED ...................................................................................................... 45

### Section 2.   Enforcement

RESERVED ........................................................................................................................... 45

## CHAPTER 7.   RELEASE, MODIFICATION, REFORMATION OR AMENDMENT OF AIRPORT AGREEMENTS

### Section 1.   General Guidance

7–1.   Authority to Release, Modify, Reform, or Amend ...................................................... 47
7–2.   General Principles ...................................................................................................... 47
7–3.–7–5.   RESERVED ........................................................................................................ 47

### Section 2.   Surplus Property Agreements

7–6.   General ....................................................................................................................... 47
7–7.   Release from Specific Conditions ............................................................................... 48
7–8.   Releases for Sale or Disposal ..................................................................................... 48
7–9.   Application of Proceeds .............................................................................................. 50
7–10.  Releases Involving Personal Property, Structures or Facilities .................................. 50
7–11.–7–15.   RESERVED ...................................................................................................... 51

### Section 3.   Grant Agreements

7–16.  General ....................................................................................................................... 51
7–17.  Release from Specific Conditions or Assurances ....................................................... 51
7–18.  Total Release to Permit Sale and Disposal ................................................................. 52
7–19.  Sale or Other Disposal of Airport Land Acquired with FAAP/ADAP Funds ............ 52
7–20.  Release of Entire Airport ............................................................................................ 53
7–21.–7–25.   RESERVED ...................................................................................................... 53

### Section 4.   Release of Section 16, 23, and 516

7–26.  General ....................................................................................................................... 54
7–27.  Procedures .................................................................................................................. 54
7–28.–7–35.   RESERVED ...................................................................................................... 54

### Section 5.   Procedures

7–36.  Documentation ............................................................................................................ 54
7–37.  FAA Action on Owner Requests ................................................................................. 55

# CHAPTER 8.   REVERSION OF AIRPORT PROPERTY – REVESTMENT OF TITLE IN THE UNITED STATES

## Section 1.   General Guidance

8–1.   General .................................................................................................................... 59
8–2.   Right to Revert ......................................................................................................... 59
8–3.   Authority to Exercise Reverter ................................................................................ 59
8–4.   Instruments of Conveyance Involved ....................................................................... 59
8–5.   Constructive Severance ............................................................................................ 59
8–6.   Forfeiture by Voluntary Reconveyance ..................................................................... 59
8–7.   Transfer of Title by Grantee ..................................................................................... 59
8–8.   Piecemeal Reversions ............................................................................................... 60
8–9.   Effect of Outstanding Leases of Airport Property ................................................... 60
8–10.  Legal Proceedings to Effect Reversion .................................................................... 60
8–11.  Contact with the Reversioner Federal Agency ........................................................ 60
8–12.  Contact with the General Services Administration (GSA) ....................................... 60
8–13.  FAA as Reversioner Federal Agency ........................................................................ 60
8–14.  Repossession ............................................................................................................ 60
8–15.–8–20.   RESERVED ................................................................................................... 60

## Section 2.   General Procedures

8–21. Determination of Default ........................................................................................... 60
8–22. Notice of Intent to Revert Property ........................................................................... 60
8–23. Voluntary Reconveyance to Correct a Default .......................................................... 61
8–24. Voluntary Reconveyance Documentation .................................................................. 61
8–25. Notice of Reverter of Property and Revestment of Title in the United States ............ 61
8–26. Recording Notice of Reverter of Property and Revestment of Title in the United States ..... 61
8–27. Certificate of Inspection and Possession ................................................................... 62
8–28. Posting or Marking of Property .................................................................................. 62

## FIGURES

Figure 1.   Summary Status of Airport Compliance .......................................................... 40

## APPENDICES

Appendix 1.     Instrument of Reconveyance (1 page)
Appendix 2.     Certificate of Inspection and Possession (1 page)
Appendix 3.     Notice of Reversion of Title (4 pages)
Appendix 4.     Form of Release Deed (3 pages)
Appendix 5.     Definitions (3 pages)
Appendix 6.     Formal Compliance Inspection (5 pages)
Appendix 7.     Federal Land Inventory (2 pages)
    Figure A–1.   Compliance Worksheet (FAA Form 5190–7)
Appendix 8.     Flying Club (1 page)

# CHAPTER 1.   SCOPE AND AUTHORITY

**1-1.  GENERAL.**  The airport compliance function is a contractually–based program. It does not attempt to control and direct the operation of airports. Rather it is a program to administer valuable rights obtained for the people of the United States at a substantial cost in direct grants of funds and in donations of Federal property.

Such grants and donations are made in exchange for binding commitments designed to assure that the public interest would be served. The FAA bears the important responsibility of seeing that these commitments are met. What these commitments are, how they apply to airports, and what FAA personnel are required to do about them are discussed in the following chapters.

**1-2.  SCOPE.**  A description of the several types of basic obligating documents is contained in Chapter 2. The background and guidance for implementing the statutory prohibition against exclusive rights at airports are covered by Chapter 3. An analysis of the various compliance obligations is contained in Chapter 4 together with guidance as to how they will be interpreted and applied. Chapter 5 outlines the procedures for carrying out an effective compliance program. Chapter 6 covers review of leases and enforcement procedures. Chapter 7 provides guidance for amending or releasing airport obligations, and Chapter 8 covers the reverting of airport lands to the Federal Government.

**1-3.  BACKGROUND OF AIRPORT OBLIGATIONS.**  The Federal Aviation Act of 1958 and the Civil Aeronautics Act of 1938 which preceded it charges the Administrator with broad responsibilities for the regulation of air commerce in the interests of safety and national defense and for the promotion, encouragement, and development of civil aeronautics. Under these broad powers the FAA seeks to achieve safety and efficiency of the total airspace system through direct regulation of airman, aircraft, and the airspace. The Federal interest in promoting civil aviation has been augmented by various legislative actions which authorize programs for granting property, funds, and other assistance to local communities for the development of airport facilities. In each program the recipient assumes certain obligations, either by contract or by restrictive covenants in property deeds, to maintain and operate its airport facilities safely and efficiently and in accordance with specified conditions. Commitments assumed by airport owners in deeds or grant agreements have been generally successful in maintaining a high degree of safety and efficiency in

airport design, construction, operation and maintenance. The Airports Compliance Program embraces the policy and guidelines of the FAA for monitoring the performance of airport owners under its obligations to the Federal Government.

**1-4.  SOURCES OF OBLIGATIONS.**  The obligations that airport owners assume in consideration of Federal aid flow from various agreements and statutes, including but not limited to:

    **a.**  Grant agreements issued under the various Federal grant programs.

    **b.**  Surplus airport property instruments of transfer issued under the provisions of Section 13g of the Surplus Property Act of 1944.

    **c.**  Deeds of conveyance issued under Section 16 of the Federal Airport Act of 1946, under Section 23 of the Airport and Airway Development Act of 1970, or under Section 516 of the Airport and Airway Improvement Act of 1982 (AAIA).

    **d.**  Section 308(a) of the Federal Aviation Act of 1958 (exclusive rights).

    **e.**  Title VI of the Civil Rights Act of 1964.

**1-5.  AUTHORITY.**  Responsibility to ensure compliance with airport owner obligations is vested in, or imposed on, the FAA by law or through FAA contractual authority.

    **a.  Surplus Property Transfers.**  Surplus property instruments of transfer were, and are, issued by the War Assets Administration (WAA) and its successor, the General Services Administration (GSA). However, Public Law (P.L.) 81–311 specifically imposes upon FAA the sole responsibility for determining and enforcing compliance with the terms and conditions of all instruments of transfer by which surplus airport property is or has been conveyed to non–Federal public agencies pursuant to the Surplus Property Act of 1944.

    **b.  Section 16/23/516 Conveyances.**  Deeds of conveyance issued under Section 16, Section 23, or Section 516 are also issued by agencies other than the FAA. The conveyance document places the administration and enforcement responsibility on the FAA Administrator.

    **c.  Grant Agreements.**  FAA is vested with jurisdiction over grant agreements because such agree-

# CHAPTER 2.   TYPES OF AGREEMENTS

## SECTION 1.   GRANT AGREEMENTS.

**2-1. SPONSOR'S OBLIGATIONS.**

   **a.** Under the various Federal grant programs, the sponsor of a project agrees to assume certain obligations pertaining to the operation, use and maintenance of the airport. These obligations are embodied in the application for Federal assistance as sponsor's assurances and become a part of the grant offer, and bind the grant recipient upon acceptance. The grant assurances in the several development programs (Federal Airport Aid Program (FAAP), Airport Development Aid Program (ADAP), and Airport Improvement Program (AIP)) are somewhat varied; therefore, each grant agreement should be reviewed in order to determine the airport owner's obligations.

   **b.** Some agreements contain special covenants or conditions directed to an individual situation. This Order is generally not concerned with any special conditions under which the project is to be carried out; such as withholding of funds due to nonacquisition of clear zone areas, acquisition of additional land within a prescribed time limit, etc. However, in unusual circumstances where an assurance was contained as a special covenant or condition, the interpretation in this Order will apply.

**2-2. DURATION OF GRANT AGREEMENTS.**

   **a.** Obligations relating to the use, operation, and maintenance of the airport remain in full force and effect throughout the useful life of the facilities developed under the project but in no event to exceed 20 years. However, there shall be no limit on the duration of the assurance against exclusive rights or the terms, conditions, and assurances with respect to real property acquired with Federal funds. These provisions remain in effect so long as the airport is used as an airport. The Chief Counsel has indicated that the useful life of an airport or airport facility may be determined to have expired if it is no longer used or needed for the purpose for which it was developed, as well as if the physical life of the facility has expired. Furthermore, the duration of the Civil Rights assurances shall be as specified in the assurance.

   **b.** The preceding subparagraph a. also applies to a private sponsor except that the useful life of project items installed within a facility or the useful life of facilities developed or equipment acquired under an airport development or noise program implementation project shall be no less than 10 years from the date of acceptance of Federal aid for the project.

**2-3. PHYSICAL LIFE OF FACILITIES.** The physical, useful life of a facility extends only for the period of time during which it is serviceable and usable with ordinary day-to-day maintenance. Reconstruction, rehabilitation, or major repair of a facility without Federal aid does not extend the duration of its useful life within the meaning of that term as used in grant agreements. When a facility needs reconstruction, rehabilitation or major repair in order that it may continue to serve the purpose for which it was developed, its useful life has expired. Regional Airports offices will make this determination. If new grants are issued for reconstruction, rehabilitation, or major repair, a new useful life period begins.

**2-4.-2-5.   RESERVED**

## SECTION 2.   SURPLUS PROPERTY INSTRUMENTS

**2-6. BACKGROUND.** Surplus property instruments of disposal are issued under Section 13 of the Surplus Property Act of 1944. The Act authorizes conveyance of property surplus to the needs of the Federal Government. The FAA (or its predecessor CAA) recommends to the GSA which property should be transferred for airport purposes to public agencies. Such deeds are issued by the GSA which has jurisdiction over the disposition of properties that are declared to be surplus to the needs of the Federal Government.

Prior to the establishment of the GSA in 1949, instruments of disposal were issued by the WAA.

   **a. Statutory Authority.** P.L. 80-289, approved July 30, 1947, amended Section 13 of the Surplus Property Act of 1944. This authorized the Administrator of WAA (now GSA) to convey to any state, political subdivision, municipality or tax-supported institution, surplus real and personal property for airport purposes without monetary consideration to the United States. These conveyances are subject to the terms, conditions, reservations and restrictions prescribed

therein. Real property cannot be transferred for airport use if a determination has been made by GSA that the highest and best use of the land is industrial. In order for any surplus real or personal property to be transferred, the FAA must determine that it is essential, suitable or desirable for the development, improvement, operations or maintenance of a public airport. This includes property needed to develop sources of revenue from nonaviation businesses at a public airport. Refer to Order 5150.2, Federal Surplus Property for Public Airport Purposes, for guidance on transferring Federal surplus property for public airport purposes.

Prior to the enactment of P.L. 80–289 surplus airport properties were conveyed to public agencies under general authority granted WAA by the Surplus Property Act. The terms and conditions subject to which surplus airport properties were conveyed under this authority were administratively established by WAA and prescribed in its Regulation No. 16, generally referred to as WAA – Reg. 16.

**b. Nonairport Property Prior to P.L. 80–289.** Prior to the enactment of P.L. 80–289, the WAA took the position that it had no authority to convey to public agencies any property other than that which had been and was intended to be used solely for operation and maintenance of the airport. This precluded the transfer of some types of buildings, facilities, and other nonairport properties comprising parts of an air base as operated by the Government.

**c. Revenue–Producing Property.** The provision in P.L. 80–289 that includes among the types of airport property, property needed to develop sources of revenue from nonaviation businesses at a public airport, constitutes specific authorization for the transfer of such properties. This is authorized where it has been determined that they are needed and will be used as sources of revenue to defray the cost of operation, maintenance and development of the airport. Originally the form of instrument used to transfer surplus airport properties under P.L. 80–289 made no distinction between obligations imposed where property was conveyed for airport use and those imposed with respect to property conveyed for revenue purposes. The FAA takes the position that each conveyance of revenue–producing property obligates the transferees to use the revenues derived from nonairport use of the property for operation, maintenance or development of the airport. If the land has been identified and agreed upon by the FAA as revenue–producing property (even if it was not so identified on the transfer document) then the revenue must be used on the airport or put into the airport fund.

**2–7. TYPES OF INSTRUMENTS OF DISPOSAL.** Three basic forms of instruments of disposal have been used to convey surplus airport properties: (1) the form used under WAA – Reg 16 prior to the amendment of the Surplus Property Act of 1944 by P.L. 80–289; (2) the form issued under P.L. 80–289 to convey real or a combination of real and related personal property; and (3) the form issued to convey only personal property. Each individual instrument of disposal must be examined to determine the particular obligations of the grantee or rights of the Government.

**a. Conditions Peculiar to Various Instruments.** Instruments of disposal under P.L. 80–289 are all substantially similar. In a few cases the National Emergency Use Provision (NEUP) has been omitted (see paragraph c. below). One or more special conditions or restrictions other than those required by law may have been included in some instruments. The instruments of disposal under WAA – Regulation 16, however, are not uniform. One variation in WAA – Regulation 16 instruments is the provision relating to joint military use of the airport. Some give the Government the right to unlimited use without charge, and in others the Government use may not exceed a specified percentage of the capacity of the airport if such use interferes with other authorized use of the airport.

**b. Obligation to Operate and Maintain Airport.** Practically all the WAA – Regulation 16 and P.L. 80–289 instruments conveying real and related personal property contain provisions obligating the grantees to operate and maintain the entire airport where the property is located, regardless of the amount of property conveyed by the instrument. However, instruments of disposal (SF–123) for only personal property contain provisions obligating the grantee only with respect to the use and maintenance of the specific property conveyed.

**c. National Emergency Use Provision (NEUP).** Practically all WAA – Regulation 16 and P.L. 80–289 instruments of disposal of real and related personal property also contain the NEUP under which the United States has the right to make exclusive or non-exclusive use of the airport or any portion thereof during a war or national emergency. This provision is similar in all such instruments.

**2–8. DURATION OF OBLIGATIONS.** The duration of the obligation depends upon the properties conveyed.

**a. Real Property.** All surplus airport property instruments of disposal, except those conveying only personal property, provide that the covenants assumed by the grantee regarding the use, operation and maintenance of the airport and the property transferred shall

be deemed to be covenants running with the land. Accordingly, such covenants continue in full force and effect until released under P.L. 81–311 or other applicable law.

   **b.  Related Personal Property.**  In most cases instruments conveying real property also convey related personal property. Accountability for this property shall be its useful life not to exceed 1 year.

   **c.  Personal Property (Donable).**  The term of a surplus airport property instrument of disposal (SF–123) conveying only personal property extends for the period of time during which it is serviceable and usable with ordinary day–to–day maintenance but no longer than 1 year. Reconstruction, rehabilitation or major repair does not extend its useful life within the meaning of that term as used in surplus property instruments. Surplus personal property that has outlived its useful life should be removed from the inventory. Such property may be disposed of by tradein on new equipment. If this is done, accountability for the new property is not required.

**2–9.–2.10.  RESERVED.**

# SECTION 3.    CONVEYANCES OF NONSURPLUS FEDERAL LAND

**2–11.  BACKGROUND.**  While Federal land which has been declared surplus is conveyed under the Surplus Property Act, federally–owned or controlled land which is not surplus may be conveyed for airport purposes under authority contained in Section 516 of the AAIA. Prior to the effective date of this Act, similar authority existed in Section 16 of the Federal Airport Act and Section 23 of the Airport and Airway Development Act of 1970. Unlike surplus property, this land may not be transferred for the specific purpose of revenue production.

**2–12.  COVENANTS.**  Instruments of conveyance executed under Section 516, Section 23, or Section 16 impose upon the grantees certain obligations regarding the use of the lands conveyed and the airport involved. Covenants included in the deeds or other instruments by which interests in lands are conveyed under these sections require, among other things that:

   **a.**  The grantee will use the property interest for airport purposes, and will develop that interest for airport purposes within 1 year or as set forth in the deed.

   **b.**  The airport, together with its appurtenant areas, buildings and facilities, whether or not on the land being conveyed, will be operated as a public airport on fair and reasonable terms and without discrimination.

   **c.**  The grantee will not grant or permit any exclusive right forbidden by Section 308 of the Federal Aviation Act.

   **d.**  Any subsequent transfer of the property interest conveyed will be subject to the covenants and conditions in the instrument of conveyance.

   **e.**  For Section 16 transfers the whole or any part of the property interest conveyed shall revert to the United States in the event the lands in question are not developed for airport purposes or used in a manner consistent with the terms of the conveyance.

   **f.**  In the event of a breach of any covenant or condition the grantee will, on demand, take such action as may be necessary to evidence transfer of title to the premises to the United States.

In some instances, special conditions or obligations may be imposed upon the grantee by the Government agency issuing the conveyance instrument. Therefore, it will be necessary in each case to consult the particular deed by which the lands are conveyed to determine all the conditions and covenants.

**2–13.  REVERTER PROVISION.**  Section 16/23/516 deeds provide for reversion to the United States in the event the lands are not developed or cease to be used for airport purposes.

   **a.  Section 16 Deeds.**  The Federal Airport Act required that conveyances made under Section 16 "...be made on the condition that the property interest conveyed shall automatically revert to the United States..." if the land is not developed as an airport or ceases to be used for airport purposes. This provision was difficult to administer during the early years since no time limits were specified for beginning use or after ceasing use which would make the reverter operable. Beginning in the early 1960's the deeds provided that the property interest automatically reverts if the land is not developed or used for airport purposes within 3 years or if airport use ceases for a period of 6 months. The 3–year development time was changed to 5 years in 1968. At the same time, the covenants were amended to introduce a right of the Administrator, exercisable 1 year after conveyance, to repossess any part not developed for airport use. In requesting the conveyance of land for approach protection for an existing airport, the provision that the land will revert automati-

cally unless it is used for airport purposes normally was omitted. This exception was made for the reason that immediately upon acquisition the land became a part of the airport and served the approach protection purpose.

**b. Section 23/516 Conveyances.** Section 23/516 does not continue the automatic reversion of property interests contained in Section 16 but places reversion at the option of the Secretary. Section 16 transfers were made under the provisions of Federal Aviation Regulation (FAR) Part 153. The implementing regulations (FAR Part 154) require that the land be developed for airport purposes within 1 year of the conveyance. If the property is not so developed or used in a manner consistent with the terms of the conveyance, the Administrator may, at his discretion, enter and on behalf of the United States take title to all or any part of the property interests conveyed.

**c. Determination as to Exercise of Reverter.** In determining whether the reverter provision has become operable in any particular case (because of failure to develop or use the land for airport purposes or because of cessation of airport use) the deed should be examined to ascertain whether it contains applicable time limitations. If the deed does not contain such time periods, as a general rule, 1 year can be considered a reasonable time for developing or using the property for airport purposes and that 6 months of nonairport use a reasonable time for the exercise of the reverter.

The regional Airports division can justify the allowance of additional time in this connection when the grantee is able to show that definite effort is being made to conform to requirements. Before a region Airports division decides to revert Section 16/23/516 property, they shall contact the Airport Safety and Operations Division (AAS–300) to discuss the proposed reversion. (See Chapter 8 for Reversion Procedures.)

**2–14. DURATION OF COVENANTS AND OBLIGATIONS.** Covenants and other provisions of Section 16/23/516 deeds continue in force and effect so long as the land is held by a public agency grantee, its successors or assigns. The FAA has no authority to release land transferred under Sections 16/23/516. If the land conveyed under a Section 16/23/516 deed is no longer used or needed for any airport purpose, FAA has no recourse but to invoke the reverter provision in accordance with the terms of the deed unless the grantee willingly agrees to its voluntary reconveyance. This does not mean, however, that land transferred for approach protection cannot be used for some secondary nonairport purpose (such as road or highway, farming, etc.) so long as such use does not interfere with the airport purposes for which it is needed. However, if the property is used for some secondary nonaeronautical purpose, a fair market value (FMV) should be received for such use and the proceeds used only for airport purposes.

**2–15.–2–17.   RESERVED**

## SECTION 4.   AP–4 AGREEMENTS

**2–18. BACKGROUND.**

**a.** The Development of Landing Areas National Defense (DLAND) and the Development Civil Landing Areas (DCLA) Programs were authorized by various acts during the period 1939 to 1944.

**b.** Airports developed or improved under these programs were subject to the terms and conditions of an instrument known as an AP–4 Agreement. This was an agreement between the Government and the airport sponsor under which the sponsor provided the land and the Government planned and constructed the airport improvements. Based on consideration of the type of improvements, design standards, construction methods

and normal deterioration, the FAA has administratively determined that the useful life of all AP–4 improvements has expired.

**2–19. CONTINUING   OBLIGATION.** Although all AP–4 Agreements have expired, such airports continue to be subject to the statutory exclusive rights prohibition (Section 308(a), Federal Aviation Act). Termination of the agreement relieves the airport owner of only the contractual obligations imposed by it. Since the airport is still one upon which Federal funds have been expended, it is subject to the exclusive rights prohibition for as long as it is operated as an airport, whether or not it remains under the control and jurisdiction of the same public agency.

# CHAPTER 3.  EXCLUSIVE RIGHTS

## SECTION 1.  BACKGROUND

**3-1.  GENERAL.**  Chapter 4 of this Order describes the responsibilities assumed by the owners of public use airports developed with Federal funds. Among these is the obligation to make all airport facilities and services available on fair and reasonable terms without unjust discrimination. This covenant enjoins the airport owner from granting any special privilege or monopoly in the use of public use airport facilities. The grant of an exclusive right to provide aeronautical services at an airport on which Federal funds have been expended is specifically forbidden by the Federal Aviation Act of 1958. Because of the widespread interest and involvement of this statutory prohibition, this entire Chapter is devoted to guidance on the application of law and FAA policy regarding exclusive rights at public use airports.

**3-2.  LEGISLATIVE HISTORY.**

**a.  Origin.**  The Civil Aeronautics Act of 1938 contained language (Section 303) restricting the use of Federal funds for airport development (other than military) to those landing areas certified by the Administrator as being reasonably needed for air commerce or national defense. The same section of the Act also provided that "there shall be no exclusive right for the use of any landing area or air navigation facility upon which Federal funds have been expended." This identical language has since been incorporated as Section 308(a) of the Federal Aviation Act of 1958. This provision also applies to surplus and nonsurplus property transferred for public use airport purposes.

**b.  Recognition of Statutory Prohibition in Agreements.**  The AP-4 Agreements (see Section 4, Chapter 2) under which many civil airports were improved with Federal funds during the World War II period contained a covenant that such airports would be operated without the grant or exercise of any exclusive right for use of the airport within the meaning of Section 303 of the Civil Aeronautics Act of 1938. Similar language is now used in airport grant agreements to specifically require conformity to this statute as part of the sponsor's assurances. Whether referenced in an agreement or not, the prohibition against exclusive right contained in Section 308 applies to any airport on which any Federal funds have been expended since August 28, 1938, the effective date of the Civil Aeronautics Act.

**c.  Prohibition Applied to Aeronautical Activities.**  In 1941, the Attorney General of the United States was called upon to interpret the application of Sec. 303 of the Civil Aeronautics Act. In an opinion dated June 4, 1941, the Attorney General stated "...it is my opinion that the grant of an exclusive right to use an airport for a particular aeronautical activity, such as an air carrier, falls within the provision of Section 303 of the Civil Aeronautics Act precluding any exclusive right for the use of any landing area." Significantly, the Attorney General did not define what an aeronautical activity was other than to cite as an example one type of activity commonly known in 1941— "such as an air carrier." This opinion, however, made it clear that a monopoly covering one activity would not be tolerated merely because the landing area was also available to those engaged in other types of aeronautical activity.

**d.  Restrictions in Surplus Property Deeds.**  Following World War II, large numbers of former military installations were conveyed without monetary consideration to local public agencies under the provisions of the Surplus Property Act of 1944. Initially the deeds of conveyance included a covenant that there would be no exclusive right contrary to the provisions of Section 303 of the Civil Aeronautics Act. Subsequently, however, in 1947, the Surplus Property Act was amended by P.L. 80-289 to require the following specific language:

> No exclusive right for the use of the airport at which the property disposed of is located shall be vested (either directly or indirectly) in any person or persons to the exclusion of others in the same class. For the purpose of this condition, an exclusive right is defined to mean—(1) any exclusive right to use the airport for conducting any particular aeronautical activity requiring operation of aircraft; (2) any exclusive right to engage in the sale or supplying of aircraft, aircraft accessories, equipment, or supplies (excluding the sale of gasoline and oil), or aircraft services necessary for the operation of aircraft (including the maintenance and repair of aircraft, aircraft engines, propellers, and appliances.

**3-3.  DEVELOPMENT OF AGENCY POLICY.**

**a.  Implementation of Federal Airport Act.**  During the immediate post war years, the CAA (the predecessor of the FAA) was simultaneously engaged in processing the first FAAP development projects and in recommending the conveyance of former military

installations under the surplus property laws. Many of the surplus property conveyances did not literally require conformity to the prohibition against exclusive rights in Section 303 of the Civil Aeronautics Act, but they contained the far more specific restrictions quoted in paragraph 31d above.

**b. Early Interpretations of Aeronautical Activity.** In approving grants of funds for airport development the CAA/FAA has always insisted that there could be no exclusive right for the use of such airports. Any activity which involved use of the landing area (e.g., flight school, airline, charter service, etc.) was considered to be subject to the statutory prohibition. However, a nonaeronautical activity, such as a restaurant or ground transportation service, was viewed as not subject to the prohibition. In early policy interpretations there were many activities which cater to or support flight operations, but which do not actually use the landing area (such as storage hangars, repair services, aircraft parts sales, and especially the sale of fuel

and oil) and were viewed as not being subject to the prohibition. The FAA, as a matter of policy, advised against monopolies for such activities. However, in 1962 the FAA Policy on Exclusive Rights was published in the Federal Register and it declared the exclusive rights of these activities to be in violation of the law.

**c. Definition of Aeronautical Activity.** On July 17, 1962, the FAA issued Order 0A 5250.1 which defined those aeronautical activities prohibited on an exclusive basis by Section 308(a) of the Federal Aviation Act. On October 12, 1965, this Order was superseded by Order 5190.1, Exclusive Rights at Airports, to further clarify the application of the statutory prohibition. Section 2 of this Chapter explains in detail the types of aeronautical activity covered by the prohibition and the FAA policies for interpreting and applying Section 308(a).

**3-4.-3-7. RESERVED.**

# SECTION 2. POLICY

**3-8. BASIS OF POLICY**

**a. Agency Position.** The FAA has concluded that the existence of exclusive right to conduct any aeronautical activity at an airport limits the usefulness of the airport and deprives the using public of the benefits of a competitive enterprise. Apart from legal considerations, the FAA considers it inappropriate to provide Federal funds for improvements to airports where the benefits of such improvements will not be fully realized due to the inherent restrictions of an exclusive monopoly on aeronautical activities.

**b. Application of Law.** The grant of an exclusive right to conduct an aeronautical activity at an airport on which Federal funds have been expended is considered a violation of Section 308(a) of the Federal Aviation Act, whether such exclusive right results from an express agreement, from the imposition of unreasonable standards or requirements, or by any other means. As an exception, the existence of an exclusive right to sell only fuel and oil will not be considered to be in violation of Section 308(a) where such right is specifically exempted from the activities prohibited by a deed under the Surplus Property Act of 1944, as amended (P.L. 80–289). However, presence of such an exclusive right would preclude issuance of a grant under the AAIA Act of 1982, as amended. (See Chapter 6, Section 2.)

**c. Duration of Prohibition Against Exclusive Rights.** Once any Federal funds have been expended

at an airport, including a surplus property conveyance, the exclusive rights prohibition is applicable for as long as it is operated as an airport.

**3-9. INTERPRETATION.**

**a. Single Activity Not Necessarily an Exclusive Right.** The presence on an airport of only one enterprise engaged in any aeronautical activity will not be considered a violation of this policy if there is no understanding, commitment, express agreement, or apparent intent to exclude other reasonably qualified enterprises. In many instances, the volume of business may not be sufficient to attract more than one such enterprise. As long as the opportunity to engage in an aeronautical activity is available to those meeting reasonable qualifications and standards relevant to such activity, the fact that only one enterprise takes advantage of the opportunity does not constitute the grant of an exclusive right.

**b. Single Activity as Treated by Law.** The AAIA (P.L. 97–248) includes the following sponsor assurance under Section 511(a)(2):

"...There will be no exclusive right for the use of the airport by any person providing, or intending to provide, aeronautical services to the public. For purposes of this paragraph, the providing of services at an airport by a single fixed–based operator shall not be construed as an exclusive right if it would be unreasonably costly, burdensome, or impractical for more

than one fixed–based operator to provide such services, and if allowing more than one fixed–based operator to provide such services would require the reduction of space leased pursuant to an existing agreement between such single fixed–based operator and such airport..."

The Chief Counsel rendered an opinion dated December 21, 1982, which concludes that this amendment to Section 308(a) applies to those airports previously obligated under Section 308(a) where a single fixed–based operator (FBO) now exists. This assurance obligates the grant recipients to the same terms and conditions of amended Section 308(a). (Reference Order 5190.1.)

The exclusive rights policies that are outlined herein remain unchanged except for those airports which have a single FBO whose lease agreement with the airport owner must be amended to delete space for a second FBO to do business on the airport. In these cases, it must be determined if it would be unreasonably costly, burdensome, or impractical for more than one FBO to provide such services on the airport. This does not apply where the lease is being amended to delete space due to lack of demonstrable need (see below).

c.  **Single Activity Due to Space Limitation.** The leasing to one enterprise of all available airport land and improvements planned for aeronautical activities will be construed as evidence of an intent to exclude others unless: (1) the lease meets the criteria of and contains the special provisions described in paragraph 6–5c; or (2) it can be demonstrated that the entire leased area is presently required and will be immediately used to conduct the activities contemplated by the lease.

(1)  The complete saturation of space available for the service, storage, and repair of aircraft is prima facie evidence of a serious imbalance in the development of airport facilities. At a new or recently developed airport such saturation reflects poor planning and unrealistic forecasts of need. However, an arbitrary division or restriction to create an opportunity for a competitive enterprise is not required merely to comply with the exclusive rights policy.

(2)  A single aeronautical enterprise although meeting all reasonable standards and qualifications should be limited, as a result of this policy, to the lease of such space as is demonstrably needed. If the need for additional space becomes apparent at a later date, such space, as well as any new areas developed for the service and support of aeronautical activities, must be made available to all qualified proponents or bidders, including the incumbent. The advance grant of options or preferences (including right of first refusal)

on all future sites to the incumbent enterprise must be viewed as an exclusive right. On the other hand, nothing in this policy should be construed as limiting the expansion of such an enterprise when space requirements become critical and where the proposed lease area will be immediately used to conduct activities, even though it could ultimately result in complete saturation of all space by the one enterprise.

d.  **Aeronautical Activities Conducted by the Airport Owner (Proprietary Exclusive).**  The owner of a public–use airport (public or private owner) may elect to provide any or all of the aeronautical services needed by the public at the airport. In fact, the statutory prohibition against exclusive rights does not apply to these owners and they may exercise but not grant the exclusive right to conduct any aeronautical activity. However, these owners must engage in such activities as principals using their own employees and resources. An independent commercial enterprise that has been designated as agent of the owner may not exercise nor be granted an exclusive right. (Reference Chief Counsel opinion dated April 13, 1984.)

(1)  As a practical matter most public agencies recognize that these services are best provided by profit–motivated private enterprise. The exceptions are usually those instances in which a municipality or other public agency elects to provide fuel service or aircraft parking. If it does so, whether on an exclusive or nonexclusive basis, it may not refuse to permit an air carrier, air taxi, or flight school to fuel its own aircraft.

(2)  The airport owner may establish reasonable standards covering the refueling, washing, painting, repairing, etc., of aircraft, but it may not refuse to negotiate for the space and facilities needed to meet such standards by an activity offering aeronautical services to the public. If the airport owner reserves unto itself the exclusive right to sell fuel, it can prevent an airline or air taxi from selling fuel to others but it must deal reasonably to permit such operators to refuel their own aircraft. The self–service fueling by such flight operators, however, must be done with their own employees and equipment.

(3)  An aircraft operator does not have a right to bring a third party, such as an oil company, on the airport to refuel his aircraft. This would be an aeronautical activity undertaken by the fuel company which has only such rights as the airport owner may confer. It should be noted that air carriers invariably insist on a standard condition in their airport contracts reserving the right to obtain fuel from a supplier of their choice. However, this is not a right guaranteed by the terms of a grant agreement.

**e. Restrictions on Self–Service.**

(1) Any unreasonable restriction imposed on the owners or operators of aircraft regarding the servicing of their own aircraft and equipment may be construed as a violation of this policy. Where no attempt has been made to perform such services for others, aircraft owners should be permitted to fuel, wash, repair, paint and otherwise take care of their own aircraft. A restriction which has the effect of diverting such business to a commercial operator amounts to an exclusive monopoly of an aeronautical activity contrary to law.

(2) Servicing one's own aircraft is not an aeronautical activity that can be preempted by the airport owner which elects to exercise the exclusive right to sell fuel. Quite apart from the prohibition against exclusive rights, the sponsor of an obligated airport is required to operate the airport for the use and benefit of the public on fair and reasonable terms. It may not, as a condition for the use of its airport, impose unreasonable requirements on aircraft operators to procure parts, supplies or services from specified sources. It can however, require the self–fueler, both individuals and operators, to pay the same fuel flowage fee as those operators on the airport who provide fueling services to the public. As long as the aircraft operators do not attempt to offer commodities or services to others, they have a right to furnish their own supplies and to do what is necessary to their aircraft in order to use the facilities of a public use airport.

(3) An airport owner is under no obligation to permit aircraft owners to introduce on the airport equipment, personnel or practices which would be unsafe, unsightly, detrimental to the public welfare, or which would affect the efficient use of airport facilities by others. Reasonable rules and regulations should be adopted to confine aircraft maintenance and fueling operations to appropriate locations with equipment commensurate to the job being done. Unless the aircraft owner is in a position to meet such standards with his own equipment and personnel, his right to service his own aircraft does not override the prerogative of the airport owner to control the sources of providing fuel and other aeronautical services. For example, airport agreements do not permit the owner of a private aircraft to contract with an off–airport company to enter upon the airport and refuel his aircraft. This would clearly be the conduct of an aeronautical activity, not by the aircraft owner, but by the fuel company. Also, the airport owner is under no obligation by the terms of the grant assurances to recognize a "CO-OP" (an organization formed by several aircraft owners for the purpose of self fueling) as a single aircraft owner for self fueling purposes. However, fueling activities by a "CO-OP" could be allowed by the air-

port owner provided appropriate agreements (safety standards, fees, conditions, etc.) were consummated. Where the sponsor has retained, on an exclusive basis, this right to fuel or service the aircraft of others it may prohibit such entries. With respect to fuel, therefore, the aircraft owner may assert the right to obtain fuel where he pleases and bring it onto the airport to service his own aircraft, but only with his own employees and only in conformance with the reasonable safety standards or other reasonable requirements of the airport. This policy also applies to aircraft owners who have obtained supplemental type certificates authorizing the use of automotive gasoline (mogas) in their aircraft and who wish to self service their aircraft with mogas.

(4) Local airport regulations may and should include such restrictions as are reasonably necessary for safety, preservation of facilities and protection of the public interest. For example:

(a) The use of paints, dopes, and thinners should be confined to structures meeting appropriate safety criteria.

(b) Storage and transport of aviation fuel, though not procured for resale, should be subject to reasonable restrictions and minimum standards for equipment, location and handling practices.

(c) Restraints should be placed on the use of aircraft washing solvents to protect sewage and drainage facilities.

(d) Weight limitations should be imposed on delivery trucks (including fuel trucks) and special purpose vehicles such as cranes where needed to protect airport roads and paving.

(e) Time limits should be placed on the open storage of nonairworthy aircraft, wreckage, or unsightly major components.

(f) Such restrictions as may be required by appropriate Federal or state agencies to protect the environment and minimize pollution or other adverse effects.

(g) Restraints should be placed on the storage of nonaeronautical vehicles such as boats, cars, trailers and mobile homes, etc., in hangars or on the aeronautical facilitie areas.

**f. Licenses Not Controlled by Airport Owner.** The Federal Communications Commission (FCC) authorizes use of special UNICOM frequencies for air-to–ground communication at airports. The primary purpose of the communications station is to disseminate aeronautical data, such as weather, wind direction, runway information, etc. To preclude the issuance of

conflicting reports, the FCC will not license more than one UNICOM station at the same airport. An aeronautical activity having a UNICOM station or similar exclusive privilege has an advantage over competitors in attracting aeronautical users. However, since such an exclusive right is not subject to the airport owner's control, it does not constitute a grant of exclusive rights to which the statutory prohibition of Section 308(a) applies. Airport owners should be encouraged to obtain the UNICOM license in their own names. Through droplines they can make the facility available to all FBO's on an equal basis.

g. **Flying Clubs.** Flying clubs are nonprofit entities (corporations, associations or partnerships) organized for the express purpose of providing its members with an aircraft or aircraft for their personal use and enjoyment only. The ownership of the aircraft, or aircraft, must be vested in the name of the club (or owned ratable by all its members). The property rights of the members of the club shall be equal and no part of the net earnings of the club will inure to the benefit of any form (salaries, bonuses, etc.). The club may not derive greater revenue from the use of its aircraft than the amount for the operation, maintenance and replacement of its aircraft. A flying club qualifies as an individual under the grant assurances and, as such, has the right to fuel and maintain the aircraft with its members. The airport owner has the right to require the flying club to furnish such documents, insurances policies, and maintain a current list of members as reasonably necessary to assure that the flying club is a nonprofit organization rather than a FBO masquerading as a flying club. (See Appendix 8, Sample Flying Club Lease.)

**3–10. IMPLEMENTATION OF POLICY.**

a. **Voluntary Compliance.** The FAA will consider as a breach of compliance obligations by the airport owner, any grant of an exclusive right in violation of the policy outlined herein at any airport obligated to the United States as a result of a grant agreement (FAAP/ADAP/AIP), AP–4 agreement, or a conveyance of Federal property under the Surplus Property Act, or under Section 16, 23, or 516. Every reasonable effort shall be made to influence a voluntary termination of the objectionable exclusive right using the guidance and techniques suggested in Chapter 5.

b. **Remedies.** At any airport where there has been a grant of an exclusive right contrary to law and this policy, that airport and any other airport owned or controlled by the offending airport owner will be ineligible for assistance under AIP and the FAA will not expend Facilities and Equipment (F&E) funds for installations designed to benefit traffic at such airports unless necessary to remedy a safety problem. See

Chapter 6, Section 2 for discussion of procedural enforcement matters.

c. **Exceptions.** Nothing herein shall be construed as precluding the grant of Federal funds where required for the national defense, or when determined by the Administrator to be essential to the national interest.

**3–11. IMPROVEMENTS BY OTHER FEDERAL AGENCIES.**

a. **Expenditures on Civil Airports.** From time to time various Federal agencies and activities other than the FAA have expended Federal funds to bring about permanent or temporary improvement of civil airports, usually in furtherance of essential Federal programs for which they are responsible. The Chief Counsel of the FAA has determined that any such expenditures which result in the improvement of airport facilities constitute an expenditure of funds within the meaning of the Federal Aviation Act. Consequently, such action has the effect of imposing the prohibition against the grant of exclusive rights at such an airport. In instances of this kind, the Chief Counsel has concluded that the FAA has primary responsibility for enforcing the prohibition regardless of the source of the Federal funds.

b. **Statutory Requirement.** As noted in paragraph 31a of this Order the language of Section 308(a) of the Federal Aviation Act not only prohibits exclusive rights but restricts the use of Federal funds for airport development (other than military) to those landing areas certified by the FAA Administrator as being reasonably needed for air commerce or national defense. FAA approval of the National Plan of Integrated Airport System (NPIAS) satisfies this requirement for federally–funded airport development projects. Federal agencies proposing to expend Federal funds on airport improvements not included in the NPIAS are responsible for obtaining a Certificate of Air Navigation Facility Necessity.

c. **FAA Responsibility.** Whenever consulted, FAA personnel will advise the representatives of other Federal agencies contemplating the improvement of airport facilities as to the applicability of the above described statutory provision. Both the airport owner and the Federal agency involved should understand that the expenditure of such funds will result in the imposition of the prohibition against exclusive rights at such airports.

d. **Federally–Owned Airports.**

(1) **Military and Special Purpose Airports.** The prohibition against exclusive rights contained in the Federal Aviation Act does not apply to the actions

of the Federal Government itself. Most federally-owned airports are maintained and operated with funds appropriated for purposes other than the support of civil aviation, usually to accommodate a military or defense related mission. Many of these installations grant operating rights to airlines and other aeronautical activities in order to meet the transportation and civil aviation requirements of on-base activities and residents. This is a secondary use of the airport facilities incidental to their prime mission.

(2) **Joint-Use Arrangements.** At many locations, arrangements are in effect to accommodate the civil aviation requirements of a local community at a military or other federally-owned airport. These arrangements usually involve a lease of space at the Government installation to a non-Federal public agency or private concern. Such a lessee, in granting privileges to conduct aeronautical activities, is subject to applicable Federal statutes and may not grant an exclusive right in violation of Section 308(a) of the Federal Aviation Act.

(3) **Agency Actions.** If a local public agency which operates civil airport facilities under a joint-use lease at a Federal installation is also a party to an agreement with the FAA for development of such facilities, the FAA has the same monitoring and enforcement responsibilities as at locally owned airports with similar agreements.

**3-12. ADMINISTRATION OF POLICY.** The foregoing policies are not intended to expose purveyors of aeronautical services to irresponsible competition. A prudent airport management should establish minimum standards to be met by all who would engage in a commercial aeronautical enterprise at the airport. It is the prerogative of the airport owner to impose conditions on users of the airport to ensure its safe and efficient operation. Such conditions must, however, be fair, equal and not unjustly discriminatory. That is to say, they must be relevant to the proposed activity, reasonably attainable, and uniformly applied. FAA's position is that the opportunity to offer those aeronautical services not provided by the airport owner must be available to those who meet acceptable standards.

**3-13.-3-16. RESERVED.**

## SECTION 3.  QUALIFICATIONS AND STANDARDS

**3-17. USE OF MINIMUM STANDARDS.**

a.  Airport owners should be encouraged to develop and publish minimum standards to be met by commercial operators in advance of negotiations with any prospective tenant or operator. (See Advisory Circular (AC) 150/5190-1, Minimum Standards for Commercial Aeronautical Activities on Public Airports) This will establish a basis for practical negotiations.

b.  Where minimum standards are proposed, the FAA representative may comment on the relevance and/or reasonableness of the standards. However, it should be made clear that such opinions are not to be construed as an official endorsement of the proposed minimum standards. The FAA should make an official determination only when the effect of a standard denies access to a public-use airport, and the determi-

nation should be limited to a judgment as to whether failure to meet the qualifications of the standard is a reasonable basis for such denial or the standard results in an attempt to create an exclusive right.

c.  In the early stages of airport development the community may encounter difficulty in attracting a competent service agency and it may be necessary to waive standards which, after a period of initial development, would be perfectly reasonable. As a practical matter, the airport owner may quite properly increase the standards from time to time in order to ensure a higher quality of service to the public. Manipulating the standards solely to protect the interest of an existing tenant is incompatible with this objective. A standard which a tenant operator is required to meet must be uniformly applicable to all operators seeking the same franchise privileges.

# CHAPTER 4.   OBLIGATIONS OF AIRPORT OWNERS

## SECTION 1.   GENERAL

**4-1.  PURPOSE.**  This Chapter contains basic guidance for FAA personnel in interpreting and administering the various continuing commitments made to the United States by airport owners as a condition for the grant of Federal funds or the conveyance of Federal property for airport purposes. It does not cover the standards to be met by those airports certificated under FAR Part 139. Generally, it does not apply to special conditions incorporated in a grant agreement since these usually reflect specific actions to be accomplished before a project can be closed out.

**4-2.  ASSIGNMENT OF OBLIGATIONS.**  The airport obligations discussed in this Chapter apply to the recipients including private owners of public use airports that are signatory parties to an agreement with the Federal Government. The actual release of these parties from any such obligations is treated in Chapter 7. However, the various agreements contemplate that under certain conditions there may be a transfer of the obligations to another eligible party.

**a.  Transfer to Another Eligible Recipient**

(1)  Grant agreements provide that the owner/sponsor will not enter into any transaction which would deprive it of any of the rights and powers necessary to perform all of the conditions in the agreement unless the obligation to perform all such conditions is assumed by another recipient. In the case of grant agreements, the recipient must specifically be found eligible by the FAA.

(2)  Surplus property instruments of disposal permit conveyance of the property but only to another transferee who assumes all of the obligations imposed on the original grantee. The airport owner must obtain FAA approval of all such transfers of obligations.

(3)  Deeds of Conveyance under Section 16, 23, or 516 are made to public agencies only, but do not specifically restrict reassignments or retransfers of the property conveyed. The original donor (Federal agency) may reassign or retransfer the property to another public agency for continued airport use. The FAA should assume the lead in coordination between the affected parties.

**b.  Transfer to the United States.**

(1)  The FAA cannot legally prohibit an airport owner from conveying to a Federal agency any airport property which was transferred under the Surplus Property Act of 1944, as amended. The Chief Counsel has indicated that such a conveyance, whether voluntary or otherwise, does not place the conveying airport owner in default of any obligation to the United States. Such a conveyance has the effect of a complete release of the conveying owner. The procedures applicable to such transfers are covered in Chapter 7.

(2)  When such a conveyance is proposed, or has been accomplished without prior notice to the FAA, and it is determined there would be or is an adverse effect on civil aviation, FAA objections should immediately be made known to both the airport owner and the Federal agency involved. If a satisfactory solution to an adverse effect on civil aviation cannot be obtained at the field office level, a full and complete report should be submitted to the Office of Airport Safety and Standards (AAS-1) without delay. The FAA shall make appropriate objection and take timely action with the Federal agency involved.

**c.  Delegation of Obligations.**  Airport owners subject to continuing obligations to the Federal Government may enter into arrangements which have the effect of delegating certain of these obligations to other parties. For example, an airport authority may arrange with the Public Works Department of a local municipality to meet certain of its maintenance commitments, or an airport owner may contract with a utility company to maintain airfield lighting equipment. More prevalent at small airports are arrangements in which the owner relies upon a commercial tenant or franchised operator to cover a broad range of airport operating, maintenance and management responsibilities. None of these contractual delegations of responsibility absolve or relieve the airport owner from the primary obligations to the Government. As principal party to the agreement the owner alone is accountable for conformity to its terms and conditions. Particular attention should be directed to ensure that such delegations to a proprietary enterprise do not result in a conflict of interest or a violation of the statute prohibiting certain exclusive rights. The airport owner shall not delegate its authority to one FBO to negotiate an operating agreement (lease) with another FBO. (See paragraph 6-5.)

**d.  Subordination of Title.**

(1)  The subordination of airport property by mortgage, easement, or other encumbrance will normally be considered as a transaction which would de-

prive the owner of the rights and powers necessary to perform the covenants in the agreement with the Government. However, the prior existence of such an encumbrance may under certain circumstances be considered as not inconsistent with the eligibility requirement for land interest in connection with the development of airport facilities under the grant program.

The Secretary is authorized to determine whether a specific encumbrance might create an undue risk of depriving the potential sponsor of the rights and powers otherwise required. Wherever it is proposed to subsequently encumber obligated airport property, a complete summary of the pertinent facts, together with recommendations of the appropriate regional Airports office, should be forwarded to the regional Airports division for determination on a case-by-case basis. The

determination should be consistent with criteria for determining good land title set forth in appropriate FAA directives (see Order 5100.38, Airport Improvement Program (AIP) Handbook). A legal review of the case may be appropriate.

(2) FAA concurrence as to any such lien, mortgage or other encumbrance of airport obligated property should be predicated on a factually based and thoroughly documented determination. The possibility of foreclosure or other action adverse to the airport should be so remote to reasonably preclude the possibility that such lien, mortgage or other encumbrance will prevent the owner from fulfilling its assurances and obligations under applicable airport instruments.

4-3.--4-4.   RESERVED.

## SECTION 2.   MAINTENANCE AND OPERATION

**4-5.   SCOPE OF MAINTENANCE OBLIGATION.**

**a.   Agreements Involved.** Most airport agreements impose on the airport owner a continuing obligation to preserve and maintain airport facilities in a safe and serviceable condition. An exception is the transfer document conveying Federal lands under the authority of Section 16, 23, or 516. These transfers normally contemplate further development of the property involving a grant agreement imposing maintenance obligations. It is preferred that such obligations be imposed as a contractual commitment rather than a covenant running with the land. However, where a Section 516 conveyance is made under circumstances that do not involve a follow-on development agreement, the maintenance and operation assurances should be incorporated into the transfer document.

**b.   Facilities to be Maintained.** This Section applies to all airport facilities shown on a current Airport Layout Plan (ALP) which were initially dedicated to aviation use (see definition in Appendix 5) by an instrument of transfer or agreement with the United States. This means that the airport owner cannot discontinue maintenance of a taxiway stub or any part of the airport until formally relieved of the maintenance obligation. The obligations of the owner under a grant agreement remain in force throughout the useful life of the facility but no longer than 20 years, except for land which is obligated for the life of the airport. When a facility is no longer needed for the purpose for which it was developed, the regional Airports division may make the determination that its useful life has expired in less than 20 years and authorize its abandonment or conversion to another compatible purpose. For

private airports, the obligation extends for a minimum of 10 years. (The procedure for obtaining release from these maintenance obligations is explained in Chapter 7.)

**4-6.   PHYSICAL MAINTENANCE.**

**a.   Maintenance Procedures.** Generally, airport agreements require the owner or grantee to carry out a continuing program of preventive maintenance and minor repair activities which will ensure that the airport facilities are at all times in a good and serviceable condition for use in the way they were designed to be used. Such requirements may be expressed or implied in the agreement and include such things as:

(1)   All structures should be checked frequently for deteriorations. Where necessary, repairs should be made.

(2)   Runways, taxiways, and other common-use paved areas should be inspected at regular intervals for compliance with operational and maintenance standards. Routine repairs including crack filling and sealing shall be made to prevent progressive deterioration of the pavement.

(3)   Gravel runways, taxiways, and other common-use paved areas should be inspected at regular intervals for compliance with operational and maintenance standards. Routine repairs including hole filling and grading shall be performed to prevent progressive deterioration of the operational areas.

(4)   All turfed areas should be preserved through clearing, seeding, fertilizing and mowing. Turfed landing areas which are used for aircraft oper-

ations should be inspected at regular intervals to assure that there are no holes or depressions.

(5) Field lighting and VASI's must be maintained in a safe and operable condition at all times. The VASI's must be aligned on a regular basis and at times when conditions dictate.

(6) Segmented circles and wind cones should be inspected on a regular basis to ensure proper serviceability.

(7) All drainage structures should be inspected, particularly sub–drain outlets, to ensure unobstructed drainage.

(8) All approaches must be checked to assure conformance with the approach obligations incurred.

**b. Criteria for Satisfactory Compliance.**

(1) What constitutes an acceptable level of maintenance is difficult to express in measurable units. A standard yardstick of satisfactory maintenance effort will not apply in all circumstances. Grass cut to a height of 8 inches may be acceptable at some airports but it could impair safety and efficiency at others. A one–half inch crack in runway paving may be inconsequential under certain circumstances. Depending on its location, the volume of traffic, the age of the pavement, climatic and other conditions, it could be the forerunner of serious pavement failure implying an obligation to apply immediate corrective measures. The degree of maintenance effort required of an airport owner is a matter of professional judgment.

(2) Compliance with this maintenance obligation is considered satisfactory when the airport owner:

(a) Fully understands that airport facilities must be kept in a safe and serviceable condition;

(b) Has adopted and implemented a sufficiently detailed program of cyclical preventive maintenance that in the judgment of FAA is adequate to carry out this commitment; and

(c) Has available the equipment, personnel, funds and other resources including contract arrangements to effectively implement such a program.

**c. Major Repair.**

(1) The obligation to maintain the airport does not extend to major rehabilitation of a facility that has become unusable due to normal and unpreventable deterioration or through acts of God. Therefore, the restoration of a building destroyed by fire or windstorm or a major rehabilitation of a portion of the landing area inundated by floods is not included in the sponsor's maintenance obligations. Likewise, the complete resurfacing of a runway, unless it is the result of obvi-

ous neglect of routine maintenance, is not included in the sponsor's obligations. Failure to perform day–to–day maintenance may have a cumulative effect resulting in major repairs and reconstruction.

(2) The airport owner has a commitment to prevent gross overstressing of the airport pavement. If the owner is not prepared to strengthen the pavement, then its use must be limited to aircraft operations which will preclude overstressing the pavement. Should pavement failure occur because the sponsor failed to take timely corrective action after being advised of the pavement limitations, any cost required to restore the failed pavement to a satisfactory condition will not be eligible for AIP funding. Strengthening of the pavement, after correction of the failure, would be eligible for consideration for AIP funding.

**4–7. REQUIREMENT TO OPERATE THE AIRPORT.**

**a. General.** The owner of an airport developed with Federal assistance is more than a passive landlord of specialized real estate. The obligation to maintain the airport includes the responsibility to operate the aeronautical facilities and common use areas for the benefit of the public. This means, for example, that:

(1) If field lighting is installed, the owner is responsible for making arrangements for it and the associated airport beacon and lighted wind and landing direction indicators to be operated throughout each night of the year or when needed in accordance with subparagraph 4–7e below.

(2) If any part of the airport is closed or hazardous to use, the owner is responsible for providing warning to users, such as adequate marking and issuing a Notice to Airmen (NOTAM) to advise pilots of the condition.

(3) The owner should adopt and enforce adequate rules, regulations, or ordinances as necessary to ensure safety and efficiency of flight operations and to protect the public using the airport.

**b. Local Regulations.** The prime requirement for local regulations is to control the use of the airport in a manner that will eliminate hazards to aircraft and to people on the ground. For example, aircraft themselves become a hazard to other aircraft if allowed to park too close to an active runway. There should be adequate controls such as fencing and other facilities to keep motorists, cyclists, pedestrians, and animals from inadvertently wandering onto the landing area or areas designated for aircraft maneuvering. Frequently local air traffic patterns are needed to establish uniform and orderly approaches and departures from the airport. As in the operation of any public service facil-

Case 5:08-cv-02814-JF    Document 20-9    Filed 08/29/2008    Page 25 of 50

ity, there should be adequate rules covering vehicular traffic, sanitation, security, crowd control, access to certain areas and fire protection. The fueling of aircraft, storing of hazardous materials, spray painting, etc., at a public airport should be controlled by the airport owner in the interests of protecting the public.

**c. Operations in Inclement Weather.** The obligation to maintain the airport does not impose any specific responsibility to remove snow or slush, or to provide sanding of icy pavements. The owner is responsible for providing a safe, usable facility, and where climatic conditions render airport unsafe, the owner will promptly notify airman by proper notices and, if necessary, to close all or a part of the airport until the conditions are corrected. However, the conditions should be corrected within a reasonable amount of time.

**d. Aircraft Rescue and Firefighting Responsibility.** The agreements under which airports are acquired or developed with Federal assistance do not specifically impose a responsibility to provide rescue or firefighting capabilities. Beginning in 1988 aircraft rescue and firefighting (ARFF) equipment became eligible under AIP for airports being served by air carriers using aircraft designed for more than 20 passenger seats and not certificated under FAR Part 139. Such an airport owner acquiring ARFF equipment under AIP must assure that it will maintain sufficiently trained personnel to operate the equipment; have the equipment available during scheduled operations of the air carrier; and to notify the air carriers using the airport when the equipment is not available due to being out of service for maintenance or repair.

**e. Part-Time Operation of Airport Lighting.**

(1) As noted in subparagraph 4-7a above, field lights must be operated whenever needed. This means that the lights must be on during the hours of darkness (dusk to dawn) every night, or be available for use upon demand. One effective arrangement is an attendant with authority and capability to turn on the proper lights when requested to do so by the radio or other signal. An acceptable alternative is the installation of an electronic device which permits remote activation of field lighting by radio equipment in an aircraft. (See AC 150/5340-14, Economy Approach Lighting Aids, and AC 150/5340-27, Air to Ground Radio Control of Airport Lighting Systems.)

(2) At some locations it may not be necessary to operate the lights all night. This might occur where the aeronautical demand is seasonal, or where it ceases after a certain hour each night because the airport's off airway location is not likely to be needed for emergency use. In very rare cases it may be undesirable to

permit use of an airport during certain hours of darkness. An example might be where air traffic control is suspended during some part of the night and the local environment (such as obstructions or heavy enroute traffic) makes use of the airport hazardous during that period. Under such circumstance FAA may consent to a part-time operation of field lights.

**4-8. RESTRICTIONS ON AERONAUTICAL USE OF AIRPORT.**

**a. Safety and Efficiency.**

(1) While the airport owner must allow its use by all types, kinds, and classes of aeronautical activity as well as by the general public (passengers, visitors, etc.), the obligation agreements do provide for exceptions as discussed in this paragraph. When complaints are filed with FAA regarding restrictions imposed by the airport owner in the interest of safety and/or efficiency, assistance of the appropriate local Flight Standards and Air Traffic representatives should be obtained in determining the reasonableness of the restrictions. It may be appropriate to initiate an FAA airspace study to determine the efficiency and utility of the airport when considering the proposed restriction. In all cases the FAA will make the final determination of the reasonableness of the airport owner's restrictions which denied or restricted use of the airport.

(2) In the interest of safety, the airport owner may prohibit or limit any given type, kind, or class of aeronautical use of the airport if such action is necessary for the safe operation of the airport or necessary to serve the civil aviation needs of the public. This allows the imposition of reasonable rules or regulations (see paragraph 4-7b) to restrict use of the airport. For example, they may prohibit aircraft not equipped with a reasonable minimum of communications equipment from using the airport. They may restrict or deny use of the airport for student training, for taking off with towed objects, or for some other purpose deemed to be incompatible with safety under the local conditions peculiar to that airport. Agricultural operations may be excluded due to conflict with other types of operations or lack of facilities to safely handle the pesticides used in this specialized operation. (The regional enforcement office of the Environmental Protection Agency (EPA) should be contacted in cases pesticide use and control problems.) Also, designated runways, taxiways, and other paved areas may be restricted to aircraft of a specified maximum gross weight or wheel loading. Likewise, use of airport facilities by the general public may be restricted by vehicular, security, and crowd control regulations. In cases where complaints are filed with FAA, Flight Standards and Air Traffic should be consulted to help determine the reasonableness of the

airport owner's restrictions. It may be appropriate to initiate an FAA airspace study to determine the efficiency and utility of the airport when considering the proposed restriction. In all cases the FAA will make the final determination of the reasonableness of the airport owner's restrictions which denied or restricted use of the airport.

    **b. Parachute Jumping.** Parachute jumping is an aeronautical use and requests to airport owners from parachute jumping clubs, organizations, or individuals to establish a drop zone within the boundaries of an airport should be evaluated on the same basis as other aeronautical uses of the airport. Any restriction, limitation, or ban against parachute jumping on the airport must be based on the grant assurance which provides that the sponsor may prohibit or limit an aeronautical use "for the safe operation of the airport or when necessary to serve the civil aviation needs of the public" (see paragraph 4–8a). Among the reasonable limitations on parachute jumping that an airport owner might require are:

    (1) The airport owner designate reasonable time periods for jumping and specific areas for drop zones.

    (2) Jumpers (or requesting organization) agree to pay a reasonable fee that is not unjustly discriminatory.

    (3) Jumpers hold a general liability insurance policy that names the airport owner as an additional ensured party, with the amount of insurance to be reasonable and not unjustly discriminatory. The airport owner is not required to permit this activity if, in his judgment, it creates a safety hazard to the normal operations of aircraft arriving or departing from the airport, nor is the airport owner required to close the airport to provide a safe environment for the parachute jumpers. In cases where complaints are filed with FAA, Flight Standards and Air Traffic should be consulted to help determine the reasonableness of the airport owner's restrictions. It may be appropriate to initiate an FAA airspace study to determine the efficiency and utility of the airport when considering the proposed restriction. In all cases the FAA will make the final determination of the reasonableness of the airport owner's restrictions which denied or restricted use of the airport.

    **c. Ultralight Vehicles.** Ultralight vehicle operations are considered an aeronautical activity (FAR Part 103) and, as such, must be normally accommodated on airports which have been developed with Federal assistance. This doesn't necessarily mean that they must be operated on conventional runways if ultralight operations can be safely accomplished at a designated

ultralight operations area on the airport. An airport operator may make the determination that proposed ultralight operations are unsafe and not allow them to conduct flight operations on the airport. In cases where complaints are filed with FAA, Flight Standards and Air Traffic should be consulted to help determine the reasonableness of the airport owner's restrictions. It may be appropriate to initiate an FAA airspace study to determine the efficiency and utility of the airport when considering the proposed restriction. In all cases the FAA will make the final determination of the reasonableness of the airport owner's restrictions which denied or restricted use of the airport.

Another obligation of the airport operator is to ensure that users of the airport contribute a fair share towards the operation of the airport. The operator of an obligated airport should impose a fee for the use of airport facilities by ultralight vehicle operators. This is consistent with FAA policy provided the charges and fees are not discriminatory.

    **d. Congestion.** Where the volume of air traffic is approaching or exceeding the maximum practical capacity of an airport, an airport owner may designate a certain airport in a multiple airport system (under the same ownership and serving the same community) for use by a particular class or classes of aircraft. The owner must be in a position to assure that all classes of aeronautical needs can be fully accommodated within the system of airports under the owner's control and without unreasonable penalties to any class and that the restriction is fully supportable as being beneficial to overall aviation system capacity. For example, a reliever general aviation airport in a community where the same airport sponsor owns and operates another full–service airport could restrict regularly scheduled air carrier services from the general aviation reliever airport. This might be justifiable as a means of ensuring the reliever airport's attractiveness as a general aviation facility.

However, in no case may an airport receiving air carrier service use this concept to support a total ban or prohibition on general aviation access to primary air carrier airport(s). The right for general aviation access at an air carrier airport is a long established interpretation of the assurance relating to the prohibition against discrimination of classes or types of aeronautical activities.

Any application of this specific provision should be coordinated with the Assistant Chief Counsel in the region for applicability, given a specific case under review.

Additionally, an airport does have the right to designate certain runways or other aviation use areas at the

airport to a particular class or classes of aircraft as a means of enhancing airport capacity or ensuring safety. Any such restrictions should be clearly supportable based on operational considerations and not instituted as a means of deliberately discriminating against a particular class.

e.  **Temporary Closing of an Airport.**

(1)  **Closing for Hazardous Conditions.** Airport owners are required to physically mark any temporary hazardous conditions and to adequately warn users through the use of NOTAMS. This implies a duty to provide similar warning notices when an airport is completely closed to air traffic as a result of temporary field conditions that make use of the airport hazardous. The basic obligation requires that prompt action be taken to restore the airport facilities to a serviceable condition as soon as possible.

(2)  **Closing for Special Events.** Section 511 (a) (3) of the AAIA requires that any proposal to temporarily close the airport for nonaeronautical purposes must be approved by the FAA. For example, an airport developed or improved with Federal funds may not be closed for the purpose of using the airport facilities for special outdoor events, such as sports car races, county fairs, parades, etc., without FAA approval. However, in certain circumstances where promoting aviation awareness through such activities as model airplane flying, etc., the FAA does support the limited use of airport facilities so long as there is not total closure of the airport. In these cases safeguards need to be established to protect the aeronautical use of the airport while the nonaeronautical activities are in progress. There will be occasions when airports may be closed for brief periods of time for aeronautical purposes. Examples are: an air show designed to promote a particular segment of aviation; to celebrate an official occasion held in connection with an aviation activity such as exhibits; or annual fly-ins and aviation conventions. In such cases, airport management should be encouraged to limit the period the airport will be closed to the minimum time consistent with the activity. Such closing should be well publicized in advance including issuance of NOTAM to minimize any inconvenience to the flying public.

(3)  **Closing of a Part of an Airport.** In some instances, reasons may be presented to justify the temporary use of a part of an airport for an unusual event of local significance which does not involve closing the entire airport. In such cases, all the following conditions must be met:

(a)  The event is to be held in an area of the airport which is not required for the normal operation of aircraft and where the event would not interfere

with the airport's normal use; or in a limited operational area of an airport having a relatively small traffic volume and where it has been determined that the event can be conducted in the area without interference with aeronautical use of the airport.

(b)  Adequate facilities for the landing and takeoff of aircraft will remain open to air traffic and satisfactory arrangements are made by the owner to ensure the safe use of the facilities remaining open.

(c)  Proper NOTAMS are issued in advance.

(d)  Necessary steps are taken by the airport owner to ensure the proper marking of the portion of the airport to be temporarily closed to aeronautical use.

(e)  The airport owner notifies in advance the appropriate Flight Standards office and any air carrier using the airport.

(f)  The airport owner agrees to remove all markings and repair all damage, if any, within 24 hours after the termination of the event, or issues such additional NOTAMS as may be appropriate.

(g)  The airport owner coordinates beforehand the special activities planned for the event with local users of the airport and with the Department of Defense (DOD) if there are any military activities at the airport.

(h)  No obstructions determined by FAA to be hazards, such as roads, timing poles, or barricades, will be constructed for the remaining operational area of the airport.

f.  **Noise and Environmental Restrictions.** Proposed airport use restrictions are becoming more common as airports respond to community concern over environmental issues and noise problems. Airport owners often propose such restrictions as a means of reducing noise impacts when they are considering alternatives to improve compatibility. This is generally done as part of an FAR Part 150, Airport Noise Compatibility Program study, or in some cases as part of an environmental impact assessment report.

Airport use restrictions: (1) must be reasonably consistent with reducing noncompatibility of land uses around the airport; (2) must not create an undue burden on interstate or foreign commerce; (3) must not be unjustly discriminatory; (4) must not derogate safety or adversely affect the safe and efficient use of airspace; (5) meet both local needs and the needs of the national air transportation system to the extent practicable; and (6) must not adversely affect any other powers or responsibilities of the FAA Administrator prescribed by the law or any other program established in accordance with the law.

Proposed Part 150 airport use restrictions will be reviewed by FAA in Washington for consistency with Federal agreements. Where there is a potential for inconsistency with a Federal agreement, the Community and Environmental Needs Division, APP–600, will coordinate the proposed restriction with AAS–300 for input. A determination on compatibility with Federal agreements will be made by AAS–300 and the Chief Counsel's office.

The airport operator is expected to analyze fully in a Part 150 program the anticipated burden on commerce of a proposed airport use restriction. FAA will make the determination on whether the burden is undue. Similar restrictions may have little impact at one airport and a great deal of impact at others, such as occurs when a restriction adversely affects airport capacity and/or excludes or limits certain users from the airport. The magnitude of both impacts must be clearly presented. An airport owner for certain justifiable environmental reasons may designate a certain airport in a multiple airport system under the same ownership and serving the same community for use by a particular class or classes of aircraft. The same concepts as discussed in subparagraph 4–8d will apply. If this is being contemplated, it must be considered on a case-by-case basis in coordination with APP–600 and AAS–300.

If Airports offices are confronted with a proposed environmental or noise restriction outside of the FAR Part 150 process where those restrictions have the potential to be contrary to a Federal agreement, the proposed restriction must be fully reviewed to determine its compatibility with Federal agreements. If there is any concern about potential incompatibility, coordination with AAS–300 and APP–600 is necessary.

An airport owner subject to Federal agreements cannot simply use environmental or noise reasons as a means not to comply with specific Federal grant agreements.

## SECTION 3.   APPROACH PROTECTION AND COMPATIBLE LAND USE

### 4–9.   PROTECTION OF APPROACHES.

a.   **Obstructions/Airport Hazard.**  The airports developed by or improved with Federal funds are obligated to prevent the growth or establishment of obstructions in the aerial approaches to the airport. The term "obstruction" refers to natural or man made objects which actually penetrate that surfaces defined in FAR Part 77, Objects Affecting Navigable Airspace, or other appropriate citation applicable to the agreement as applied to the particular airport. In agreements issued prior to December 31, 1987, airport owners agreed that insofar as it is within their power and reasonably possible, to prevent the construction, erection, alteration or growth of an obstruction. This was to be done either by obtaining the control of the land involved through the acquisition and retention of easements or other land interests or by the adoption and the enforcement of zoning regulations. Effective with the Airport and Airway Safety and Capacity Expansion Act of 1987 (P. L. 100–223) the standard approach protection assurance was changed to read:

"It will take appropriate action to assure that such terminal airspace as is required to protect instrument and visual operations to the airport (including established minimum flight altitudes) will be adequately cleared and protected by removal, lowering, relocating, marking, or lighting or otherwise mitigation of existing airport hazards and by preventing the establishing or creation of future airport hazards." (See Appendix 5 for "Airport Hazard.")

The airspace allocated will vary from airport to airport. The Regional Air Traffic, Airspace and Procedures Branch, should be contacted for guidance on application of this provision when an issue is raised.

b.   **Preexisting Obstructions.**

(1)   Historically, some airports were developed at locations where preexisting structures or natural terrain (for example, hill tops) would constitute an obstruction by currently applicable standards. If such obstructions were not required to be removed as a condition for a grant agreement, the execution of the agreement by the Government constitutes a recognition that the removal was not reasonably within the power of the sponsor.

(2)   Also, there are many former military airports that were acquired as public airports under the Surplus Property Act, where the existence of obstructions at the time of development was considered acceptable. At such airports where obstructions in the approach cannot feasibly be removed, relocated, or lowered, and where FAA has determined them to be a hazard, consideration may be given to the displacement or relocation of the threshold.

c.   **Zoning Ordinances.**  One method of meeting the obligation to protect airport approaches involves appropriate height restriction zoning. Any airport owner who has the authority to adopt an ordinance restricting the height of structures in the ap-

proaches according to the standards prescribed in FAR Part 77 as applied to the particular airport should do so.

**4-10. COMPATIBLE USE OF ADJACENT LAND.** All grants issued after the enactment of P.L. 80-289 (78 Stat. 161), an amendment to the Surplus Property Act of 1944, contain an assurance that, to the extent reasonable, appropriate action including zoning will be taken to restrict the use of lands in the vicinity of the airport to activities and purposes compatible with normal airport operations.

**4-11.-4-12.  RESERVED.**

## SECTION 4.   AVAILABILITY ON FAIR AND REASONABLE TERMS

**4-13.  GENERAL.**

**a.** The owner of any airport developed with Federal grant assistance is required to operate it for the use and benefit of the public and to make it available to all types, kinds and classes of aeronautical activity on fair and reasonable terms and without unjust discrimination. A parallel obligation is implicit in the terms of conveyance of Federal property for airport purposes under the Surplus Property Act. Land transfers under Section 16, Section 23, or Section 516 are authorized by the same statutes and for the same purposes as grants under FAAP, ADAP, and AIP and the same obligations will apply.

**b.** Grant obligations involve several distinct requirements. First, the airport and its facilities must be available for public use. The terms imposed on those who use the airport and its services, including rates and charges, must be fair, reasonable, and applied without unjust discrimination, whether by the owner or by a licensee or tenant who has been granted rights to offer services or commodities normally required at the airport. The terms and conditions which the owner imposes on those offering services and commodities to the public which are related to aeronautical activity must be fair and reasonable and applied without unjust discrimination. (See paragraph 4-15d.)

**4-14.  TERMS APPLIED TO AIRPORT USERS.**

**a.  Rentals Fees and Charges.** The obligation of airport management to make an airport available for public use does not preclude the owner from recovering the cost of providing the facility through fair and reasonable fees, rentals or other user charges "...which will make the airport as self-sustaining as possible under the circumstances existing at the particular airport...."

(1) Each air carrier using such airport (whether as a tenant, nontenant, or subtenant of another air carrier tenant) shall be subject to such nondiscriminatory and substantially comparable rates, fees, rentals, and charges with respect to facilities directly and substantially related to providing air transportation and other such nondiscriminatory and substantially compa-

rable rules, regulations, and conditions as are applicable to all such air carriers which make similar use of such airport and which utilize similar facilities, subject to reasonable classifications such as tenant or nontenant, and signatory carriers and nonsignatory carriers. Such classification or status as tenant or signatory shall not be unreasonably withheld by any airport provided an air carrier assumes obligations substantially similar to those already imposed on air carriers in such classification or status.

(2) Each FBO at any airport shall be subject to the same rates, fees, rentals, and other charges as are uniformly applicable to all other FBO's making the same or similar uses of such airport utilizing the same or similar facilities.

(3) Each air carrier using such airport shall have the right to service itself or to use any FBO that is authorized by the airport or permitted by the airport to serve any air carrier at such airport.

(4) Normally, the FAA will not question the fairness of rates and charges established by the owner or the comparability of the rates, fees, rentals and other charges as applied to and among air carriers, FBO's and other tenants for the same or similar space and/or services unless complaints have been made alleging that specific practices are unfair or unreasonable. Before an investigation is initiated by the FAA, the charge should be supported by factual evidence produced by the complainant.

(5) The basis for rates and charges is usually related to costs incurred by the airport owner. Rarely can it be established that an actual or proposed rate is so high that it would recover to the owner an amount unreasonable and in excess of costs. More often the FAA will be required to determine whether the rate structure, as applied, will result in discrimination.

(6) In evaluating established fees, rates, and charges for users of an airport no part of the Federal share of an airport development project for which a grant is made shall be included in the rate base.

**b. Methods of Assessing User Charges.** The collection of a fee or charge for public use of a runway, tiedown area, or other facility may be accomplished through a direct toll or landing fee imposed on individual users or through indirect means. The airport owner may find it practical to grant use privileges simultaneously by contract, permit, or the direct assessment of fees. In most instances, an indirect recovery of fair use charges in the form of fuel flowage, hangar rentals, percentages of gross volume of business, or through other arrangements may be the most practical method for many collections. A locally based aviation enterprise may have a lease, or contract, under which it will pay an agreed rental for the hangars and other premises it occupies plus a variable payment (related to fuel gallonage, volume of business, flight operations, etc.) for the use of the landing area by its own aircraft and those of its customers. Other visiting aircraft, such as scheduled or unscheduled air taxis, which are not covered by such a contract may be required to pay a fee or charge to cover their use of public facilities.

**c. Charges Made by Airport Tenants and Concessionaires.** At most airports the provision of fuel, storage, aircraft service, etc., is best accomplished by profit motivated private enterprise. It is the responsibility of the airport owner, in negotiating the privilege to offer these services and commodities at the airport, to retain sufficient control over the operation to guarantee that the patrons will be treated fairly. The owner may not have this control if, by contract or otherwise, he/she surrenders the right to approve rates, fees, and charges imposed for essential aeronautical services. In this connection, note the discussion of leasing principles in Section 1, Chapter 6. It should be understood that the obligation of the airport owner to ensure availability of services to the public on fair and reasonable terms is limited to aeronautical activities. There is no commitment in a grant agreement or deed with the United States that the prices charged by taxis, limousines, restaurants, motels, and other terminal area nonaeronautical concessions will be controlled.

**d. Terms and Conditions Applied to Tenants Offering Aeronautical Services.** Apart from the Civil Rights Assurances and the assurances relating to the offering of aeronautical services to the public, the FAA is not normally involved with the establishment of rates and fees to be paid by a tenant or concessionaire to an airport owner. However, in overseeing the airport owner's implementation of the assurance in subparagraph a. above, the FAA shall ensure that:

(1) At air carrier airports:

(a) As a tenant, the air carrier shall enjoy the same classification and status as any other tenant air carrier serving that airport as to rates, fees, charges, rules, regulations, and conditions covering all aeronautical activities at that airport provided the air carrier assumes obligations similar to those already imposed on the other tenant air carriers.

(b) An air carrier who is willing to sign a contract (signatory carrier) with the airport and assume appropriate financial obligations may be granted a lower fee schedule. If an air carrier is unwilling or if it is infeasible because of infrequent operations or other reasons to sign such a contract, the air carrier may then be charged the higher noncontract rates.

(c) In respect to a contractual commitment, a sponsor may charge different rates to similar users of the airport if the differences can be justified as nondiscriminatory and such charges are substantially comparable. These conclusions must be based upon the facts and circumstances involved in every case.

(d) Differences in values of properties involved and the extent of use made of the common use facilities are factors to be considered. Seldom will each user have properties of the same value nor will their use of the common facilities be the same. However, the airport in order to justify noncomparable rates must show that the differences are substantial.

(e) All leases with a term of 5 years or more should contain an escalation provision for periodic adjustments based on a recognized economic index. Future lessees may expect like treatment in that their leases will have a built-in escalation provision. This is in accordance with the sponsor assurance "...to make the airport as self-sustaining as possible under the circumstances ...."

(f) Each air carrier using the airport shall have the right to service itself or to use any FBO that is authorized by the airport or permitted by the airport to serve any air carrier at the airport.

(2) At general aviation airports:

(a) If one operator rents office and/or hangar space and another builds its own facilities, this would provide justification for different rental and fee structures. These two operators would not be considered essentially similar as to rates and charges even though they offer the same services to the public.

(b) If one FBO is in what is considered a prime location and another FBO is in a less advantageous area, there could logically be a differential in the fees and charges to reflect this advantage of location. This factor would also influence the rental value of the property.

(c) If one FBO is providing primary commercial services (sale of aviation fuel and oil, providing tiedown and aircraft parking facilities, ramp services and some capability for minor aircraft repairs) and another FBO is conducting a flight training program, or aircraft sales, or a specialty such as avionics repair and service, these FBO's may not be considered essentially similar. They may have dissimilar requirements, i.e., space requirements, building construction, or location. Therefore, different rates may be acceptable, although the rates must be equitable.

(d) If the FAA determines that the FBOs at an airport are making the same or similar uses of such airport facilities, then such FBO leases or contracts entered into by an airport owner (subsequent to July 1, 1975) shall be subject to the same rates, fees, rentals and other charges.

(e) As an aid to uniformity in rates and charges applicable to aeronautical activities on the airport, management should establish minimum standards to be met as a condition for the right to conduct an aeronautical activity on the airport (Chapter 3, Section 3).

(f) All leases with a term exceeding 5 years shall provide for periodic review of the rates and charges for the purpose of any adjustments to reflect the then current values, based on an acceptable index. This periodic lease review procedure will facilitate parity of rates and charges between new FBO services coming on the airport and long-standing operators. It will also assist in making the airport as self-sustaining as possible under the circumstances existing at that particular airport.

(g) In the case of a new general aviation airport, it is frequently necessary for the airport owner to offer reduced rental rates and other inducements to obtain an FBO recognizing that it may well be a non-profit venture during the pioneering period. To avoid a depressed rate scale for the future, the airport owner should be encouraged to provide the "incentive rate" only during the pioneer period. The pioneer period should be established for a specific period of time and ending on a specified date. Future operators coming on the airport following the pioneer period may be expected to pay the comparable standard rates and charges based on then current value.

(h) Except for exercise of the proprietary rights by the airport owner, any terms or conditions in an agreement between an airport owner and an aeronautical activity requiring the activity to procure fuel or other supplies and services from a specific source would be an unreasonable restraint on the use of the airport and, in certain cases, could be viewed as a

grant of an exclusive right. Where an airport owner retains for itself the proprietary right to operate the fuel farm, all FBOs may be required to obtain fuel from the airport owner. However, if an FBO is running the fuel farm for the airport owner, another FBO cannot be required to obtain fuel from the airport owner's agent. In neither of these cases is the airport operator or the FBO obligated to sell fuel to an individual, corporate or other type operator performing self-fueling.

4-15. AVAILABILITY OF LEASED SPACE. The prime obligation of the owner of a federally-assisted airport is to operate it for the use and benefit of the public. The public benefit is not assured merely by keeping the runways open to all classes of users. While the owner is not required to construct hangars and terminal facilities, it has the obligation to make available suitable areas or space on reasonable terms to those who are willing and otherwise qualified to offer flight services to the public (i.e., air carrier, air taxi, charter, flight training, crop dusting, etc.) or support services (i.e., fuel, storage, tie down, flight line maintenance, etc.) to aircraft operators. This means that unless it undertakes to provide these services itself, the airport owner has a duty to negotiate in good faith for the lease of such premises as may be available for the conduct of aeronautical activities. Since the scope of this obligation is frequently misunderstood the following guidance is offered:

a. Servicing of Aircraft. All grant agreements contain an assurance that the sponsor will not exercise or grant any right or privilege which would have the effect of preventing the operator of an aircraft from performing any services on its own aircraft with its own employees. This is not to be interpreted as a positive obligation on the sponsor to lease space to every aircraft operator using the airport. It means simply that an aircraft operator, otherwise entitled to use the landing area, may tiedown, adjust, repair, refuel, clean and otherwise service its own aircraft, provided it does so with its own employees in accordance with reasonable rules or standards of the sponsor relating to such work. The assurance establishes a privilege (to service one's own aircraft) but does not, by itself, compel the sponsor to lease such facilities which may be necessary to exercise that right. (See paragraph 3–9e for additional details regarding restrictions on self–service.)

b. Facilities Not Providing Service to the Public. Most airport owners are anxious to lease available property to those willing to construct their own hangars and aircraft support facilities. However, the airport owner is not obligated by agreements with the Government to provide space unless the activity offers services to the public or support services actually needed by those aircraft operators otherwise entitled

to use the public landing areas. Thus, a local company operating its own aircraft for business purposes, a private flying club, or an aircraft manufacturing company seeking a site for a production plant may be a desirable and compatible tenant. However, the airport owner is not obligated to lease airport premises for these purposes if adequate facilities are otherwise available. This problem is rare and usually arises when an aircraft operator, unable to arrange satisfactory terms for hangar space and service with an existing fixed base operator, seeks to construct its own facilities. The obligation to operate an airport for the use and benefit of the public requires that reasonable provision be made for essential support services for those who use it. Therefore, when neither the airport owner nor the tenant FBOs can provide adequate storage, fueling, and other basic services to an airport user, the user may not be denied the right to lease space, if available, on reasonable terms to install such facilities at its own expense.

c. **Activities Offering Services to the Public.** If adequate space is available on the airport, and if the airport owner is not providing the service, it is obligated to negotiate on reasonable terms for the lease of space needed by those activities offering flight services to the public, or support services to other flight operators, to the extent that there may be a public need for such services. A willingness by the tenant to lease the space and invest in the facilities required by reasonable standards shall be construed as establishing the need of the public for the services proposed to be offered.

d. **Air Carrier Airport Access.** Since the passage of the Airline Deregulation Act of 1978, there has been an influx of air carriers into airports. Many of these airports were operating at capacity prior to passage of the Act insofar as counter, gate, and ramp space were concerned. New carriers wishing to serve the airport were faced with the prospect of no facilities being available. In some instances, space was made available from carriers established on the airport. However, in other cases, no space was made available and the carrier was denied access to the airport.

It was determined by the Office of Chief Counsel that a carrier may not be denied access to an airport solely based on the nonavailability of currently existing facilities and that some arrangements for accommodation must be made if reasonably possible. This can result in a complex situation which may not be easily resolved.

If an airport refuses to apply for a FAR Part 139 Airport Operating Certificate when there is clear evidence that an air carrier desires to serve the location, this fact alone does not indicate a violation of the grant agreement assurances. The regional Airports and Legal offices should determine the basis and justification for exclusion of the air carrier in the same manner as they would in other potential violation issue.

In some cases, a recommendation to the airport operator to provide temporary facilities, such as a mobile ticket office and gate facilities might relieve the situation. If it appears that the airport operator cannot possibly provide space, then the FAA in concert with the airport operator must develop a solution to the problem.

Should air carrier access situations develop at airports and where no solution developed at the region is feasible, AAS–300 should be notified. AAS–300 will coordinate with the regional Airports division and Chief Counsel for a viable solution to the problem.

**4-16. CIVIL RIGHTS.** The regional and headquarters Offices of Civil Rights are responsible for matters pertaining to the enforcement of the Civil Rights assurances and provisions included in the all grant agreements. For additional information see AC 150/5100–15, Civil Rights Requirements for the Airport Improvement Program (AIP).

## SECTION 5.    USE OF AIRPORT PROPERTY

**4-17. ADHERENCE TO AIRPORT LAYOUT PLAN AND AIRPORT PROPERTY MAP**

a. **Airport Layout Plan (ALP).** An ALP, which is required by statute (previously required by assurance) depicts the entire property and identifies the present facility and the plans for future development. The FAA requires an approved ALP as a prerequisite to the grant of AIP funds for airport development or the modification of the terms and conditions of a surplus property instrument transfer. The approval must be by the FAA and represents the concurrence of the

FAA in the conformity of the plan to all applicable design standards and criteria. It also reflects the agreement between FAA and the airport owner as to the proposed allocation of areas of the airport to specific operational and support functional usage. The approved ALP thus becomes an important instrument for controlling the subsequent development of airport facilities. Any construction, modification, or improvement that is inconsistent with such a plan requires FAA approval of a revision to the ALP.

**b. Airport Property Map (Exhibit A).** The airport property map, also called the Exhibit A to the grant agreement, is a required document to be submitted with the application for a grant and delineates all the property owned or to be acquired by the airport owner. Whether or not the Federal Government participates in the cost of acquiring any or all such land, it relies on this map in any subsequent grant of funds. Any land identified on the Exhibit A may not thereafter be disposed of or used for other than those purposes without FAA consent.

**c. Land Inventory Map.** There is a need to track land acquired with Federal funds for accountability purposes for compliance matters. If any grant acquired land is found to be excess to airport needs, present and future, the sponsor is required to dispose of the excess land and return the Federal share of the FMV to the Trust Fund. This land identification should show how and under what Federal grant or other Federal assistance program the land was acquired. The inventory will satisfy the FAA's requirement to maintain an inventory of land acquired with Federal assistance. (Appendix 7 is a suggested procedure for maintaining such inventory.) In disposing of such land the requirements of paragraph 7–19b apply. If the Exhibit A discussed above satisfies the land accountability requirement, there is no need for a separate land inventory map. Airport noise compatibility land acquisitions should be identified separately (see paragraph 4–17e).

**d. Grant Land No Longer Needed for Airport Purposes.** With the passage of The Airport and Airway Safety and Capacity Expansion Act of 1987, P.L. 100–223, Section 511a(14) provides: If the airport operator or owner receives a grant before, on, or after December 30, 1987, for the purchase of land for airport purposes (other than noise compatibility purposes).

(1) the owner or operator will, when the land is no longer needed for airport purposes, dispose of such land at FMV;

(2) the owner or operator may trade land no longer needed for airport purposes for land to be used for airport purposes. If the difference in FMV in the two parcels results in a cash difference paid to the airport owner or operator, then that portion of the proceeds of such trade which is proportionate to the United States share of the cost of acquisition of such land will be paid to the Secretary for deposit in the Trust Fund. If additional cost results from the trade it may be eligible under AIP;

(3) such disposition will be subject to the retention or reservation of any interest or right therein necessary to ensure that such land will only be used

for purposes which are compatible with noise levels associated with the operation of the airport;

(4) that portion of the proceeds of such disposition which is proportionate to the United States share of the cost of acquisition of such land will be paid to the Secretary for deposit in the Trust Fund; and

(5) if the old airport is being disposed of as a result the construction of a new airport, the sale land of the old airport will be treated as a "trade–in" on the cost of the new airport. (See paragraph 7–20b.)

Once an airport sponsor accepts any grant containing this assurance, it becomes obligated to this requirement for all grant acquired land, regardless of when it was acquired.

When reviewing the sponsor's request for Federal assistance, or when conducting periodic compliance oversight reviews, the FAA must review the current ALP and the Land Inventory Map (paragraph c above) to determine whether any land acquired with Federal assistance is no longer needed for airport purposes. Airport purposes could include land that, with documentation, can be justified for noise compatibility purposes. The land need not be required for the same aeronautical purpose for which it was originally acquired.

Additionally, land that was acquired for airport development in conjunction with a larger purchase may now be serving related airport support uses (such as a hotel or aviation related commercial uses which have a direct need to be located on the airport) and therefore need not be disposed of. If the land continues to provide aeronautical benefit through noise compatibility (such as within a projected 75Ldn) or where the land is contained within a larger property boundary that clearly is justified for airport purposes, disposition of such land will not be required. Judgment may determine that it is inappropriate to carve small specific parcels out of an airport property that for all reasonable purposes is already functioning as an airport unit.

In all cases the long–term future aeronautical need always must be considered. If the ALP does not reflect a future airport need for the grant acquired land, the airport sponsor should be advised in writing by FAA that the current ALP does not establish an airport purpose (existing or future) for the land acquired by Federal grant funds and reminded of the subject assurance. Before giving notice to dispose of the land the airport owner will be given 90 days to provide sufficient documentation to FAA to justify retention of the land for airport purposes. If such justification (including a revised ALP) is not provided to the FAA within the prescribed 90–day period, the airport owner should be no-

tified in writing of the necessity to dispose of such land at FMV (subject to the provisions contained in the language stated above). There may be compelling reasons such as a depressed real estate market that would justify FAA's concurrence in a delayed disposal. In these cases FAA should obtain a marketing analysis and plan from the sponsor. Subsequent review may be required. (See paragraph 7–19 for disposal procedures.) In complex situations, the airport owner may be given a reasonable extension (up to an additional 90 days) to provide the required justification.

   **e.   Airport Noise Compatibility Land.** With the passage of The Airport and Airway Safety and Capacity Expansion Act of 1987, P.L. 100–223, Section 511a(13) provides: If the airport operator or owner receives a grant before, on, or after December 30, 1987, for the purchase of land for airport noise compatibility purposes.

   **(1)**   the owner or operator will, when the land is no longer needed for such purposes, dispose of such land at FMV at the earliest practicable time;

   **(2)**   such disposition will be subject to the retention or reservation of any interest or right therein necessary to ensure that such land will only be used for purposes which are compatible with noise levels associated with the operation of the airport and any height restrictions that are necessary to protect the airport; and

   **(3)**   that portion of the proceeds of such disposition which is proportionate to the United States share of the cost of acquisition of such land will, at the discretion of the Secretary.

   **(a)**   be paid to the Secretary for deposit in the Trust Fund; or

   **(b)**   be reinvested in an approved noise compatibility project as prescribed by the Secretary. Any airport accepting a grant containing this assurance obligates the airport to this requirement for *all* grant land acquired for noise compatibility regardless of when it was acquired.

When reviewing the airport sponsor's request for Federal assistance, or when conducting periodic compliance oversight reviews, the FAA must review the current ALP, the Land Inventory Map, and any Part 150 study or supporting noise compatibility information to determine whether any grant acquired noise land is no longer needed for such purposes. Land within an existing or projected 75 Ldn noise contour that has been acquired for noise compatibility purposes need not be required for disposal. Generally, because of the high level of noise associated with the contour, there is justification for it to remain under control of the airport

as noise land. Land within a 65 Ldn can be retained only if it can be justified as land need for airport development.

Before giving notice to dispose of the land in accordance with the provisions of the Act (cited above), the airport owner will be advised in writing that the justification is insufficient to support the noise compatible use for the land and be given 90 days to provide sufficient documentation to FAA to justify retention of the land for noise compatibility and sufficient time to complete any Part 150 noise study that is in progress. There may be cases where the land is no longer needed for noise compatibility purposes but is needed for other airport purposes consistent with Order 5100.38 or the guidance provided in paragraph d. above. The FAA may allow retention for these purposes.

Where FAA has determined the land should be disposed of because there is no continuing need to retain fee title ownership, the airport owner should be notified in writing of the necessity to dispose of such land at FMV at the earliest practicable time. See Chapter 7, Section 5 for disposal procedures.

There may be compelling reasons, such as a depressed real estate market, that would justify FAA's concurrence in a delayed disposal. In these cases FAA should obtain a marketing analysis and plan from the sponsor. Subsequent review may be required.

   **f.   Compliance Requirements.** Continued adherence to an ALP is a compliance obligation of the airport owner. The erection of any structure or any alteration in conflict with the plan as approved by the FAA may constitute a violation of these obligations. With the passage of the Airport and Airway Safety and Capacity Expansion Act of 1987 (December 30, 1987), the ALP assurance language was strengthened. If the airport owner makes a change in the airport or its facilities which FAA has determined will adversely affect safety, utility or efficiency of any federally-owned or leased or funded property on or off the airport, and which is not in conformity with the FAA approved ALP, FAA may require:

   **(1)**   the airport eliminate the adverse effect; or

   **(2)**   bear the cost of rectifying the situation.

The airport owner may not abandon or suspend maintenance on any operational facility currently reflected on an approved plan as being available for operational use. The conversion of any area of airport land to a substantially different use than that shown in an approved layout plan could adversely affect the safety, utility, or efficiency of the airport and constitute a violation of the obligation assumed. For example, the con-

struction of a corporate hangar on a site identified on the ALP for future apron and taxiway would be considered as a departure from the controlling ALP which impairs the utility of the airport and a violation of sponsor obligations. When making a periodic compliance review of an ALP, consider whether grant-acquired land is still needed for airport purposes, particularly when it is separated from the airport property by a highway or railway.

**g. Authorization for Interim Use.**

(1) The FAA may approve the interim use of aeronautical property for nonaviation purposes until such time as it is needed for its primary purpose. Such approval shall not have the effect of releasing the property from any term, condition, reservation, restriction or covenant of the applicable compliance agreement. To avoid any misunderstanding, the document issued by the FAA approving interim use must so indicate.

(2) FAA approval for an interim use should be granted only if it is determined that such property will not be needed for any aviation use during the short–term period contemplated. Any option to renew an interim–use lease/agreement should be conditioned on obtaining a new FAA determination that the property will not be needed for any aviation use during the proposed renewal period. Investment by the interim user is at its risk and shall not be a factor in considering any renewal of a lease or use agreement.

(3) FAA shall condition its consent to an interim use on an agreement from the airport owner to apply the income from such use to the development, operation, and maintenance of airport facilities.

**h. Concurrent Use.** Aeronautical property may be used for a compatible nonaviation purpose while at the same time serving the primary purpose for which it was acquired, such as the concurrent use of runway clear zone land for low growing crops. Care must be taken when considering recreational use so as not to create a future 4(f) environmental problem. This is clearly beneficial to the airport. The primary purpose is served and the concurrent use should generate FMV revenue to be used for airport purposes.

**i. Excess Odd Parcels.** Section 16/23/516 deeds as well as grant funded land acquisition may include land in excess of that requested by the airport owner or recommended by the FAA for airport purposes. This usually happens because of property descriptions and title requirements of the controlling agency to avoid severance of odd parcels or areas that would have limited value or use by themselves. Use of such excess areas for nonaviation purposes may be approved as specified in a. and b. above.

**j. Conformance to FAA Criteria and Standards.** Any facilities developed with grant funds must be constructed to the then current applicable FAA design standards and must conform to the approved ALP in effect at the time of the grant. Improvements, alterations or additions to an airport which are accomplished without Federal aid should be designed to FAA standards, but this is not mandatory. However, any improvement or modification, regardless of how it is financed, must conform to the ALP unless the FAA can determine that it does not adversely affect the safety, utility or efficiency of an airport.

**k. LEASING GENERAL AVIATION APRON CONSTRUCTED WITH FEDERAL ASSISTANCE.** The airport owner has the responsibility for the management and operation of the airport and ultimately must assure that it is operated in accordance with all aspects of the grant assurances. The airport owner can not abrogate these responsibilities. Therefore, the airport owner should not enter into unconditional leasing of apron areas constructed with Federal airport grant assistance because this could result in reducing the airport owners ability to carry out their obligations under their agreements with the Federal Government.

(1) **Management Agreements.** The airport owner may in reality only want an FBO to manage tie–down spaces, maintain the apron area, remove snow, and similar functions. Since the relationship between the airport owner and anyone conducting management duties should be that of principal/agent, a management agreement rather than a lease is the appropriate means of accomplishing what the airport owner wants accomplished. Such an agreement should clearly specify the responsibilities and provide for acceptable practices such as nondiscriminatory waiting lists for tie–down spaces and a designated itinerant tie–down area to protect public availability. The tie–down fee schedule should be established by or approved by the airport owner.

(2) **Lease Agreements.** Tie–downs or spaces on the apron can be leased by the airport owner to individual aircraft owners and/or to the FBO for space necessary to serve the needs of their aircraft in their business. Also, the apron area in the immediate vicinity of an FBO can be leased to the FBO to permit the exercise of a proprietorship over the public–use ramp area. Apron areas can be leased provided the terms of the lease will not restrict the airport owner from carrying out their grant obligations. In general the lease should contain provisions which will ensure that the public will be served by the lessee in a manner equal to that which the airport owner is required to provide under the grant agreement. A demonstrated immediate need for the space to be leased

shall be documented by the FBO to preclude attempts to limit competition or to create an exclusive right. Any area to be placed under lease shall not result in an activity or use contrary to the approved airport layout plan (ALP).

(a) Public–use areas such as airport taxiways and self–fueling areas must not be included in the lease area. However, apron taxilanes used only for maneuvering on the leased apron may be included in the lease area. If airport fueling or self–fueling facilities are included within the area to be leased, provisions must be made for the right of public access to both.

(b) The lease shall provide conditions to assure that the area will be suitably maintained in a safe and serviceable condition; that snow or ice will be promptly removed; that services will be provided on a fair, equal and not unjustly discriminatory basis; and that charges for services will be fair, reasonable, and not unjustly discriminatory.

(c) Any lease arrangement shall protect availability for the public use, including nondiscriminatory practices for assignment of tie–down space and provide for the accommodation of itinerant users.

(d) The lease shall preclude the lessee from requiring that users of the leased area must secure goods and services only from that FBO. However, the lease need not require that a competitor must be allowed to enter the leased area to perform a service, including fueling, provided that there is adequate capability for the user to freely secure that service at another location on the airport. The competitor, however, must be allowed to assist the user of a disabled aircraft in placing the aircraft in a condition so as it can be taxied or towed away from the leased area.

(e) In no case shall an FBO be leased more apron space than that for which an immediate demonstrated need has been shown. Where there is only one FBO on an airport and there is more apron space than required for that operation, just that space actually required should be leased to the existing fixed base operator. This will ensure that apron space will be available for a future tenant, if requested.

(f) The person leasing the apron will not prohibit or restrict those using the area for tie–down from servicing their own aircraft. (Assurance 22f reference only.)

**l.   Installation of Portable Hangars and Sun Shades on Federally–Funded Aprons.**   At some locations around the country, airport sponsors have permitted the installation of portable hangars (i.e., hangars which can be readily removed and which do not re-

quire a foundation or footings) and sun shades on aprons constructed with airport grant–in–aid funds. Accordingly, FAA policy is as follows:

(1) The installation of portable hangars and sun shades on an existing federally–funded apron is not permissible except in the instances where, in the judgment of the Airports field office, changes in airport use patterns since construction of the apron are such that the apron or that portion of it proposed for the portable hangar and/or sun shade location is no longer needed for its original purpose. The approved ALP must show the apron area as being appropriately converted to portable hangar and/or sun shade use without having an adverse impact on the safety and efficiency of the airport.

(2) The FAA determination to permit installation of portable hangars and sun shades in exceptional instances will be conditioned on the requirement that any hangar or sun shade installed be removed within 30 days written notice from the FAA and will be based on the following considerations:

(a) The sponsor's proposal should be supported by a use plan for the installation of the portable hangars and/or sun shades.

(b) The proposed portable hangar and/or sun shade area must be in accordance with the approved ALP.

(c) Hangars and/or sun shades will be located so as not to constrain the flow of aircraft traffic any more than would exist in an aircraft tie–down area.

(d) Prior notice on FAA Form 7460–1, Notice of Proposed Construction, or through other similar notice procedure, must be given to the appropriate Airports field office of the intent to erect each structure or group of structures being installed concurrently and FAA concurrence must be received.

(e) Hangars and/or sun shades must be specifically designed for ready removal (no foundation or footings required).

(f) Hangars and/or sun shades will not cause damage to the apron. Any damage beyond normal wear and tear must be repaired by the sponsor at its expense.

(g) Hangar is designed to accommodate one aircraft.

(h) Hangar and/or sun shade design must meet local building codes.

(3) Where portable hangars and/or sun shades have been installed on federally–funded aprons without prior FAA concurrence, Airports field offices, at their

discretion, may either make an after-the-fact determination on the present utility of the affected apron as in paragraph (2) above, or may seek a remedy including:

(a) Requiring the sponsor to have portable hangars and/or sun shades removed from the apron;

(b) Seeking reimbursement for the Federal share of apron construction costs; (i.e., cost of apron replacement); or

(c) Recovering the Federal share of apron construction costs in a future project.

**4-18. USE OF SURPLUS PROPERTY.**

**a. General.** Surplus airport properties conveyed under the authority of the Surplus Property Act, as amended by P.L. 80-289, impose upon the grantee certain continuing obligations that are generally more comprehensive than the covenants and conditions discussed in previous parts of this section. Most of the surplus properties were developed as military installations and comprise a physical plant that frequently exceeds, or at least differs from, the type of development that would be undertaken to meet the demonstrable civil aviation needs of a typical community. P.L. 80-289 authorizes the conveyance of property over and above the required aeronautical facilities in order to permit the grantees to have a source of continuing airport revenue. To assure that this is accomplished, the FAA insists that surplus properties associated with a public airport including revenue generated therefrom be used to support the development, maintenance and operation of the aeronautical facilities. (See paragraph f. below.)

**b. Obligations Run with the Land.** There is a further distinction between the obligations assumed under a grant project and those assumed by the recipient of a surplus airport. Grant agreements are contracts with the Government relating to airport facilities. These run for a maximum specified term of years, or for the time the land is used for an airport, whereas the covenants of a surplus airport conveyance are in fact restrictions and encumbrances which condition the title to the land. Thus, every acre of a surplus airport is held in trust for a specific purpose and usage. The Surplus Property Act provides that property shall not be used, leased, sold, salvaged or disposed of for other than airport purposes without the consent of the Administrator. This reflects a degree of administrative flexibility to adjust the usage in a surplus property deed for specific areas of a surplus airport within the spirit, intent and objectives of the law.

**c. Authorized Land Use.** The FAA is required to assure itself that surplus land conveyed for aeronautical purposes is so used and that land conveyed for revenue purposes is actually used or available to produce revenue for the continued development, maintenance and operation of the aeronautical facilities. With the passage of time the aeronautical needs of any community will change. Therefore, the FAA is authorized to approve changes in the use of surplus airport property, including the conversion of aeronautical to revenue production and vice versa. It may relieve the recipient of its obligation to maintain parts of the airport that are no longer required for aeronautical usage within the foreseeable future. Under certain circumstances, it may grant a complete release for sale or disposal if the resulting proceeds are applied to further develop, maintain and operate the airport or other NPIAS airports which it owns as approved by the FAA. Conditions and procedures governing the release of surplus property from any of the terms and conditions of the deed are contained in Chapter 7.

**d. Reduction or Change in Aviation Use Property.** Changes in aviation needs may make it desirable to convert dedicated aviation use property to revenue-production property. The conversion may receive FAA approval provided the present/future civil aviation needs are met or assured and the public benefit in civil aviation is enhanced. In all such conversions, FAA shall require assurance that all such converted property will be used to produce FMV for civil airport purposes consistent with the original conveyance and in support of the owner's endeavor to make the airport as self-sustaining as possible.

**e. Land Use Plans.** In order to determine that all property on a surplus airport is being used as intended by the applicable law, it is necessary for the recipient to have inventory accountability. The most effective means for maintaining such a current inventory is the "land-use plan." This is a scaled layout of the entire property indicating the current use approved for each identifiable segment or area including that land which FAA has approved for revenue production. If this plan is to serve as the land inventory plan it should indicate the acquisition source of all airport land (i.e., surplus, grant purchase, etc.). For ease, it may be incorporated on an Exhibit A or on an ALP or developed as a separate document.

**f. Leasing of Surplus Airport Properties.** Section 1, Chapter 6 contains guidance on evaluating leases or use agreement covering aeronautical facilities at a public airport. It assists FAA personnel in advising airport owners about contracts or agreements which could affect the owner's prime responsibility to control public facilities and to make them available on fair and reasonable terms without discrimination.

(1) At airports which include Federal surplus property acquired for airport purposes, there is a further obligation to ensure that such property, if not needed to directly support an aviation use, is available for use to produce income for the airport. There is no violation of the covenants in the conveyance document (or deed) if the airport owner is unable to arrange for productive use of such property. However, when used, it must produce income for the airport. This means that any lease or other rental arrangement covering the use of surplus property at an airport must assure that the fair rental value of the property will accrue to the airport and be available to meet airport expenses. Such property may not be rented at a discount to support community nonprofit organizations or to subsidize nonairport objectives.

(2) Where revenue production land has remained undeveloped while comparable off airport land is being developed, reasonable market incentives should be considered to promote interest in developing the property. This would include a reduction in fair rental value for a limited time period or the use of a property development firm to share in the development costs or similar development incentives. In these cases, it is acceptable for the development firm to realize a reasonable share of the revenue. This method should only be used so long as it is necessary to establish the viability of the development.

(3) In determining what is the FMV, consideration should be given to the current market value of the property and to the going rate for rental of equivalent premises. The obligation to obtain fair rental income from the nonaviation use of surplus airport property relates to the property as acquired from the Government. It does not apply to the income producing potential from buildings and improvements constructed thereon without Federal assistance. Fair rental value may need to be reevaluated if airport land remains vacant while other comparable off airport property is being leased. In small communities, a faulty comparable may have been used. Fair rental/market value is clearly tied to demand and in these cases, consideration should be given to doing a market survey.

(4) Provisions should be made for periodic adjustments of the rental terms based on economic conditions.

g. Leases Contemplating Substantial Investment. Where prospective nonaviation tenants plan extensive improvements to leased surplus airport property they will normally seek long–term lease agreements, frequently in excess of 20 years. A fixed rental rate for Federal surplus property may over a period of years become unreasonably less than a fair rental value. FAA should require that leases with a term in excess of 5 years contain a reasonable escalation clause or periodic renegotiation provision to assure that the land is still producing for the airport the income for which it has a potential. The effect of such long–term commitments on defense mobilization requirements for the airport should be considered and, if appropriate, a total release from the NEUP should be obtained. (See Chapter 13, Order 5190.2). In certain circumstances where the land will never be aviation developed a complete release to permit sale of the land may be appropriate.

h. Subordination of Reversionary Interest of the United States. The existence of the contingent right of the United States to revert title for default by the airport owner has in some instances discouraged the leasing of revenue–producing surplus property to an income–producing tenant planning to invest substantial sums in construction on the property. If thoroughly justified on the record, the FAA may approve a lease which would protect the lessee's interests in the event of default and reversion of the airport to the Government.

(1) The FAA may, by letter or other written means, assure the grantee/owner and the prospective lessee that the lease will be honored in accordance with its terms for a period long enough to amortize or retire the invested amount but not for the useful life of the improvements. This assurance may not be given in connection with a lease of any property which may, in the foreseeable future, be required for aeronautical purposes or which is still subject to the NEUP provision.

(2) Whenever such action is contemplated it should be coordinated with the regional Assistant Chief Counsel.

i. Personal Property.   All surplus personal property must be used, or continuously available for use, for airport purposes, during its useful life (not to exceed 1 year). To facilitate accountability the equipment should be clearly marked for identification. FAA provides decals for this purpose. When the personal property is not actually needed at the airport, FAA may consent to its use for another public purpose. It must always be available when needed for the airport. For donable property and related personal property, accountability will terminate 1 year after the transfer or earlier upon determination by FAA that items have outlived their useful life.

4-19.  USE OF LANDS TRANSFERRED FROM THE UNITED STATES.

a. As compared to surplus property, much more stringent use restrictions apply to properties acquired for airport purposes under Section 16/23/516. The appli-

cable regulation defines airport purposes as uses of the property directly related to the actual operation or the foreseeable aeronautical development of a public airport. There is no authority under this legislation to convey property for the purpose of generating income from nonaviation use. Moreover, there is no authority for the FAA to modify the conditions of a conveyance or to grant release from any of its terms and conditions. A grantee who fails to develop a useful and useable airport or unit thereof on the property conveyed by the United States, within a time specified in the instrument or at the option of the FAA, is not in compliance with the terms of the conveyance. Unless the violation can be cured by granting a reasonable extension of time based upon a written and fully supported request of the grantee, the FAA shall declare a default and exercise the Government's option to revert the property. (See Chapter 8 for information on reversion.)

**b.** In some instances, Federal lands may be conveyed in standardized units or sections which could result in the transfer of small parcels of land in excess of that requested, or justified under the applicable regulation. Also, Section 23 and Section 516 authorize the transfer of lands for future airport development. In such instances the FAA may consent to the interim use of land acquired from Federal sources for a nonaviation purpose subject to such restrictions and conditions as may protect the national interest. This would include a requirement that any such nonaviation use must produce revenue for the airport and such proceeds shall be used only for airport purposes. This same policy does not apply in consenting to a concurrent use of Section 16, Section 23, or Section 516 land where such use is subordinate to and compatible with the purpose for which the land was conveyed and where the land continues to be used for aeronautical purpose. Other than interim or concurrent use, the FAA cannot allow the use of any of this property for generating income from nonaviation activities.

**4-20. INCOME ACCOUNTABILITY.**

**a. Basic Policy.** In its administration of airport agreements, the FAA is not normally concerned with the internal management or accounting procedures used by airport owners. While all grant agreements contain a provision obligating the sponsor to furnish the FAA with such annual or special airport financial and operational reports as may be reasonably requested, it is the policy of the FAA not to require such reports unless there is a genuine need for the information sought, a capability to effectively use the information, and the information requested can be reported without superimposing on the airport owner a requirement for additional accounting records over those normally required to operate the airport. However, there are several situations in which the FAA, to carry out its responsibilities under law, may solicit and review certain basic financial data on airport administration and operation.

**(1) Property Acquired Under the Surplus Property Act.** Where an airport includes property acquired from the Federal Government under the Surplus Property Act, the law, and frequently the conveyance document itself, authorize use by nonaviation business activity (see paragraphs 4-18a and 4-18d). Such use is justified only when it produces an income which is applied to any airport operation, maintenance and development. This income can also be used to improve and develop the infrastructure (utilities, roads, basic site preparation, etc.) for airport revenue producing land when a determination is made by FAA that all operational and safety needs of the airport are being adequately met and that near term future aeronautical needs can be achieved. The airport owner should be advised that their decision to use these funds for other than direct aeronautical needs may affect the airports' ability to compete for discretionary grant money under the Airport Grant Program. To ensure that such properties are used as intended, the FAA should periodically review the financial transactions of the airport to the extent necessary to make this determination.

**(2) Section 511(a)(12) of the Airport and Airway Improvement Act of 1982.** To ensure that all revenue generated by a public airport is used as intended (including revenue received as a result of the interim use of land acquired for future airport development), the FAA should periodically review the financial transactions of the airport to the extent necessary to make this determination.

**(a) Grants Issued Before December 30, 1987.** Section 511(a)(12) of the AAIA requires that all revenue generated by the airport, if it is a public airport, be used for the capital or operating costs of the airport, the local airport system, or other local transportation facilities owned or operated by the airport owner or operator and directly related to the actual transportation of passengers or property.

**(b) Grants Issued After December 30, 1987.** Section 511(a)(12) of the AAIA, as amended by the Airport and Airway Safety and Capacity Expansion Act of 1987, requires that all revenue generated by the airport, if it is a public airport, be used for the capital or operating costs of the airport, the local airport system, or other local facilities which are owned or operated by the airport owner or operator and directly and substantially related to the actual air transportation of passengers or property. In addition to limiting such facilities to those related to air transporta-

tion, the 1987 Act also included any local taxes on aviation fuel (other than taxes in effect on or before December 30, 1987 the date of the enactment of the Act).

(c)  **Exception.**

(i)  If the governing statutes controlling the owner or operator's financing in effect before September 3, 1982, provided for the use of any revenue from the airport to support not only the airport but the airport owner's general debt obligations or other facilities, then the limitation on the use of revenue generated by the airport shall not apply.

(ii)  Clearly supportable and documented charges made by a governmental entity to reimburse that entity for payments of capital or operating cost of the airport may be allowed. Any charge must be supported by documented evidence. A flat payment "in lieu of taxes" without such documentation is not acceptable. If an indirect charge is levied against the airport in support of capital or operating expenses, the indirect charge must also be levied against other governmental cost centers in accordance with generally accepted accounting procedures and practices.

(iii)  The Chief Counsel has determined based on legal history that revenue generated by the airport does not include revenue generating facilities which are unrelated to air operations or services which support or facilitate air transportation. This has been interpreted by the Chief Counsel to include royalties and related revenue from natural gas and would also apply to other similar natural resources. It would also apply to revenues generated by a convention center; however, the land rental paid to the airport by the convention center would be airport revenue if the convention center is located on land acquired with Federal funds or under the Surplus Property Program or land acquired without Federal assistance if shown on the Exhibit A as airport land. This would not be applicable if the revenues were generated from Federal surplus property land where the deed restrictions take precedent.

(3)  As noted in paragraph 2–11, Section 16, Section 23, or Section 516 do not permit the conveyance of land for the express purpose of generating revenue. However, if conveyed, they may with FAA consent be used for a nonaviation purpose which is completely subordinate to their prime purpose. As a condition for FAA consent, all income from such use must be applied to airport development and operation and there must be a periodic review of income and expenditure records to confirm that the revenues have been so applied.

(4)  Under the guidelines in Chapter 7, the FAA may grant a release from the airport obligations of surplus properties in order to permit their sale and conversion to operational assets which better serve the purpose for which they were initially obligated. As a consequence of such a release, and until the determined fair value of the released property has been fully expended on approved items of airport development, there must be a continuing accountability to FAA of the proceeds of sale or the amounts obligated for reinvestment in airport development.

(5)  Section 18a(8) of the Airport and Airway Development Act and Section 511(a)(19) of the AAIA require an assurance that sponsors will maintain a fee and rental structure for facilities and services being provided to airport users which will make the airport as self-sustaining as possible. An opinion from Chief Counsel advises that Section 18a(8) of the Airport and Airway Development Act of 1970 does not require periodic statements indicating the degree to which an airport is or is not self-sufficient. The opinion goes on to say that in cases of noncompliance such statements will be required. Airports field offices shall accept at face value a sponsor's assurance that it will strive for financial self-sufficiency and shall not concern themselves in this matter except in cases of a complaint.

b.  **Questionable Financial Data.** When the data provided does not clearly lead to a conclusion or in special circumstances needing audit expertise, the Airports office should request that the Office of the Inspector General (OIG) perform an audit of the airport's books and records or the FAA can contract with an independent Certified Public Accountant (CPA) to perform the audit.

c.  **Disposition of Excess Revenues.** The progressive accumulation of substantial amounts of airport revenues may suggest an inquiry as to the reasonableness of user charges and fees. It may also indicate that the aeronautical facilities available to the public are not being adequate commensurate with the growth of aviation. Unless the sustained accumulation of airport revenues can be viewed as building a reserve for periodic renewal of facilities (seal coating, re-roofing, etc.), the community should be urged to convert a reasonable amount of the airport revenues into improvements that would enhance the value of the airport to the community (T-hangars, aircraft parking areas, terminal buildings, etc.). Such improvements may include types of development that are not eligible for grants of funds under the AIP.

d.  **Diversion of Funds.** FAA consent to use or lease for nonairport purposes any land at surplus property airports (including property conveyed for revenue

production) does not constitute authority to apply the resulting income other than to maintain, operate, and further develop the airport. Even where the proceeds of such use of airport properties exceed the reasonable costs of meeting the owner's maintenance and operating commitment, any diversion of excess airport revenues to a nonairport purpose constitutes a breach of the terms and conditions of the deed of conveyance, unless specifically approved by the FAA. This approval will not be given at surplus property airports that have received a grant since the enactment of the AAIA of 1982 when the revenue assurance first appeared (except as specified in Section 511(a)(12) of the Act). When a surplus property airport has not received a grant under AAIA of 1982, approval will not be given unless:

(1) Maintenance and operation of the airport is and has been at an acceptable level and fully conforms to all established safety and certification requirements,

(2) There are no violations or defaults of the transfer deed or of subsequent agreements with the Government applicable to the airport,

(3) There are no foreseeable improvements, extensions, rehabilitations or additions to the capital plant that would be desirable to improve aeronautical services to the public or improvements to enhance the nonaeronautical use revenue production capabilities of the airport, and

(4) The airport owner is advised that such action may affect their ability to compete for grant funds other than airport entitlements under the Airport Grant Program.

**4-21. MANAGEMENT OF GRANT ACQUIRED PERSONAL PROPERTY.** Under the ADAP and AIP grant programs various items of personal property were eligible for acquisition. Examples of eligible items are ARFF vehicles and auxiliary equipment, security equipment and radios. The airport owner is required to maintain property records of this equipment and reconcile these records at least every 2 years by physical inventory for the first 6 years after the property was acquired.

a. **Requirements of 49 CFR 18.32.** 49 CFR 18.32 sets forth standards governing the use and disposition of federally–financed personal property. The sponsor's property management procedures must provide for accurate records, biannual inventories, adequate maintenance and control, and proper sales procedures.

b. **Sponsor Inventory System.** 49 CFR 18.32 requires sponsors to maintain property records of equipment during its useful life. The inventory should include:

(1) Description of the property;

(2) Manufacturer's serial number;

(3) Other identification numbers;

(4) Acquisition data and cost;

(5) Source of the property;

(6) Percentage of Federal funds used in the purchase of the property;

(7) Location, use, and condition of the property; and

(8) Ultimate disposition data including sales price, or the method used to determine current FMV if the grantee reimburses the grantor agency for its share.

c. **Determine Sponsor's Equipment Usage.** When a field compliance inspection is made, it should be determined if the sponsor is using the property for the purpose for which it was acquired. The primary means for this review will be the airport owner's inventory system. If the equipment is not being so used, action should be taken for disposition or transfer of the equipment. If the equipment is being used for unauthorized purposes, action should be taken to stop such use.

d. **Methods of Disposition.** 49 CFR 18.32 provides for the disposition of personal property acquired under grant agreement when such property is no longer needed. Disposition will be made as follows:

(1) Any personal property with a current per unit FMV of less than $5,000 can be retained, sold or otherwise disposed of. Any proceeds may be retained by the sponsor. The sponsor must inform FAA of disposition.

(2) Personal property with a current per unit FMV in excess of $5,000 may be retained or sold. If the property is sold, any proceeds, less the cost of selling, shall be applied to eligible project and related development in accordance with Order 5100.38.

(3) Personal property may be used as trade–in for other eligible property. No future accountability is required.

## SECTION 6.   USE BY THE GOVERNMENT

**4-22.   JOINT USE BY FEDERAL GOVERN-MENT AIRCRAFT.**   There are three types of agreements under which the Government has the right to joint use of airport facilities, either with or without charges.

  **a.   Grant Agreements.**   The sponsor's assurances, which accompany the project application, provide that all facilities of the airport developed with Federal aid and all those usable for the landing and taking off of aircraft will be available to the United States at all times without charge for use by Government aircraft, in common with others. However, the assurances provide that if such use is deemed substantial, a reasonable share of the cost of operating and maintaining the facilities used, in proportion to the use may be charged. Substantial use is defined in the assurances as:

    **(1)**   Five or more Government aircraft are regularly based at the airport or on land adjacent thereto; or

    **(2)**   The total number of calendar month operations (counting each landing and each takeoff as a separate operation) of Government aircraft is 300 or more; or

    **(3)**   The gross accumulative weight of Government aircraft using the airport in a calendar month (the total operations of Government aircraft multiplied by gross certified weights of such aircraft) is in excess of five million pounds.

  **b.   P.L. 80-289.**   Surplus Airport Property Instruments of Transfer issued under P.L. 80-289 provide that "The United States shall at all times have the right to make nonexclusive use of the landing area (runways, taxiways and aprons) of the airport without charge, except that such use may be limited as may be determined at any time by the Administrator of FAA to be necessary to prevent undue interference with use by other authorized aircraft and provide further that the United States shall be obligated to pay for any damage caused by its use, and if the use is substantial, to contribute a reasonable share of the cost of maintaining and operating the landing area, in proportion to such use." For guidance on substantial use, see a. above.

  **c.   Regulation 16 Transfer.**   Surplus Airport Property Instruments of Transfer issued under WAA Regulation 16 (i.e., prior to the effective date of P.L. 80-289) provide that the Government shall at all times have the right to use the airport in common with others provided that such use may be limited as may be determined by the Administrator of FAA to be nec-

essary to prevent interference with use by other authorized aircraft, so long as such limitation does not restrict Government use to less than 25 percent of the capacity of the airport. They further provide that Government use of the airport to this extent shall be without charge of any nature other than payment for any damage caused.

  **d.   Negotiation Regarding Charges.**   In all cases where the airport owner proposes to charge the Government for use of the airport under the joint-use provision negotiations should be between the airport owner and the using Government agency or agencies.

**4-23.   SPACE FOR AIR TRAFFIC CONTROL ACTIVITIES, COMMUNICATIONS, WEATHER AND NAVAIDS.**   Other than the rights reserved to the Government for joint-use of airport facilities (paragraph 4-22), the only express obligation to provide space for Government activities is contained in grant agreements. The project application incorporates in the sponsor's assurances certain obligations with respect to providing facilities for air traffic control, weather and communication activities. There are subtle differences in the terms of this assurances under the various grant programs. Therefore, when questions arise regarding the use of space, refer to the most current grant agreement.

  **a.**   Under ADAP and AIP space is not required to be furnished rent free. However, the sponsor is required to furnish to the Federal Government without cost such area of land as may be necessary for the construction at Federal expense of facilities to house any air traffic control activities, or weather-reporting activities and communication activities related to air traffic control. This may include utility easements. The airport owner is not required to furnish cost-free-land for parking or roads to serve the facility. (G.C. Opinion dated March 27, 1962)

  **b.**   Under AIP grant agreements, FAA has the right to identify needed land area at any time during the life of the grant. Under ADAP, the grant agreement must identify the needed space.

  **c.**   There is no specific obligation to provide space for other Government activities such as Post Office, Customs, Immigration, etc. However, the leasing of space at nominal rental rate to such activities which complement or support aeronautical operations will not be viewed as a misuse of surplus property conveyed for revenue purposes.

**4-24. GOVERNMENT USE DURING A NATIONAL EMERGENCY OR WAR.**

**a. Airports Subject to Surplus Property Instruments of Transfer.** The primary purpose of each transfer of surplus airport property under Section 13 of the Surplus Property Act of 1944 was to make the property available for public or civil airport needs. However, it also was intended to ensure availability of the property transferred and of the entire airport for use by the United States during a war or national emergency. Most instruments of disposal of surplus airport property reserved or granted to the United States a right of exclusive possession and control of the airport during a war or national emergency.

**b. Airports Subject to Grant Agreements.** Grant agreements do not contain any provision authorizing military agencies to take control of the airport during a national emergency.

**c. Negotiation Regarding Charges.** Any negotiations by the Government for the right of use of an airport under the national emergency use provision of a surplus airport property instrument of transfer should be between the Government agency requiring such use and the airport owner. The only compliance responsibility FAA has with regard to this provision is that of releasing the property from its application when such action is appropriate. (See Chapter 7.)

# CHAPTER 5.    THE AIRPORT COMPLIANCE PROGRAM

**5-1. BASIS AND OBJECTIVES.** The FAA's compliance program has as its base the enforcement of contractual obligations which an airport accepted when receiving Federal grant funds or the transfer of Federal property. These contractual obligations were levied in an effort to protect the public's interest in civil aviation or to achieve compliance with other national laws. Given the magnitude of the number of obligated airports and the variety of obligations applicable at each airport, our compliance program must primarily be centered on assisting airport owners to be knowledgeable about their Federal obligations in an effort to achieve voluntary compliance. This educational approach to achieve voluntary compliance will be supplemented with periodic or "spot" monitoring of obligated airports and a program to vigorously investigate and pursue resolution when complaints about potential violations are registered. Ultimately, when mutual resolution cannot be obtained voluntarily, we must be prepared to resort to enforcement procedures described in Section 2 of Chapter 6.

   **a. Basis.** The various grant, land transfer, and surplus property transfer agreements discussed in previous sections, together with the numerous statutes cited form the basis for the continuing obligations of airport owners to the United States. The responsibility to monitor and enforce compliance with these many obligations rests with FAA.

   **b. Objectives.** The basic objective of the compliance program is to assure a system of safe and properly maintained airports that are operated in a manner which protects the public's interest and investment in aviation. This can best be achieved by a positive, continuing educational program to assist sponsors in knowing what their obligations are and promoting their voluntary compliance with the many obligations.

   **(1) Voluntary Compliance.** Most violations of sponsor obligations are not a deliberate intent to circumvent the terms of deeds or agreements with the Government. Generally, they occur because of a lack of understanding on the part of local officials as to the specific requirements involved or their applicability. Therefore, the basis of this compliance program is an educational effort to ensure that airport sponsors are fully informed of their obligations and their specific applicability to the sponsor's airport.

   **(2) Advisory Services.** While the FAA will not substitute its judgment for that of the airport owner in matters of administration and management of airport facilities, it is in a unique position to assist airport owners in achieving voluntary compliance through prudent advice and counsel. This will be primarily directed in assisting airports to understand the nature and applicability of compliance obligations affecting their airport.

   **(3) Compliance Oversight.** Given the approximately 2800 obligated airports, compliance oversight by an annual visit or review at each airport is not practicable. However, annual periodic or "spot" monitoring of a portion of obligated airports to ascertain individual problems and to track problems which may be indications of system deficiencies is necessary. Similarly, the Airports staff must be vigilant to potential compliance problems at obligated airports, be prepared to actively pursue compliance problems discovered or brought to their attention through a complaint process, and be prepared to take the necessary enforcement action if the issue is not voluntarily resolved to the satisfaction of FAA.

   **(4) Uniform Application of Remedies.** In pursuing resolution through remedial or enforcement action, every effort should be made to obtain voluntary correction of the condition. Only when all appropriate measures of persuasion have been exhausted should the enforcement actions outlined in Section 2 of Chapter 6 be applied. When these are deemed necessary, FAA personnel should act swiftly and in a manner that is fair and uniform.

**5-2. PROGRAM ELEMENTS.** To be effective, a program for carrying out the FAA's continuing responsibilities for airport compliance must rely primarily on an ongoing education program. This will enhance the airport owner's knowledge of Federal compliance obligations and promote an understanding as to how these relate to the airport.

Program efforts to achieve the education of the federally-obligated airport owner will be the primary thrust of the program. Limited surveillance activities designed to detect recurring deficiencies, system weaknesses, or individual abuses need to be accomplished annually to maintain program integrity. To achieve maximum benefit, the findings of these periodic or "spot monitoring" activities need to receive maximum exposure among owners of federally-obligated airports. The investigation of complaints constitutes the third primary program element. Complaint investigation and resolution will continue to be a reasonable way for FAA Airports employees to monitor and achieve compliance with Federal obligations. When efforts to obtain voluntary compliance fail, a program of

**Order 5190.6A**                                                          **10/2/89**

remedial and enforcement actions shall be available as a means of obtaining compliance.

  **a.   Education.** Education of obligated airport owners may take many forms. Education begins when the owner receives the first Federal grant or transfer of Federal property. Airports personnel should discuss with first–time sponsors the impact of specific grant assurances and/or land transfer obligations. Continuing to let them know that FAA personnel are available to discuss their problems (advisory services) is also an important part of their ongoing education. At least once every 3 years, obligated airport owners should be advised in writing to review their grant or land transfer obligations, advised to contact Airports personnel to obtain further information, and should be provided with information or material to aid their understanding of the impact of these obligations. Airports personnel should take opportunities to conduct or participate in periodic seminars or courses for federally–obligated airport owners to further enhance their understanding of Federal obligations.

  **b.   Surveillance.** Surveillance is the process of gathering data on the condition or operation of an airport to determine what the airport owner is doing to achieve and maintain compliance with Federal obligations. This kind of information is available in total or in part from many sources, including: site visits by Airports personnel; site visits by FAA personnel from other offices/services; and site visits by others outside of FAA, but knowledgeable about some aspects of airport compliance (for example, state inspectors performing FAA Form 5010, Airport Master Record, inspections). Surveillance may also be achieved through the conduct of telephone discussions or written correspondence with appropriate airport personnel to ascertain if potential problems exist. Further follow up through on–site surveillance may or may not be necessary depending upon information obtained during the telephone conversation or written response. In all cases, the files should be documented to show the items discussed and the FAA's action taken or conclusions reached.

An alternate acceptable means of surveillance is to provide obligated owners with printed material which identifies and explains the obligations accepted by that airport owner. A duly authorized official of the airport would be required to certify that this individual has read and understands the material and that the airport is being operated in accordance with all obligations. In order to accept the airport owners certification, the airport official should be required to provide an explanation of what procedures or actions are in effect to assure that the airport is operated in accordance with the applicable assurances and obligations. The airport

official must note any discrepancies and, if appropriate, further follow–up surveillance such as telephone calls or an on–site visit will be initiated. Use of this sponsor ''self–certification'' method should not be used where Airports personnel have any reason to believe that the owner is not complying with any aspect of the airport's Federal obligations. In those cases, one of the more direct forms of surveillance shall be used.

Airports personnel shall annually use one or a combination of these methods to conduct spot surveillance of at least 25 percent of their obligated airports. A rotation schedule should be established to ensure that each obligated airport is subject to a surveillance inspection once every 4 years. Generalized findings from these surveillance inspections (not noting specific airports affected) should receive maximum publicity among other obligated airports as an additional means of educating federally–obligated airport owners and in an effort to emphasize the presence of an ongoing spot surveillance program to monitor compliance.

  **c.   Investigations of Complaints.** Airports personnel must be available to investigate complaints from the aviation community that an airport is not living up to any aspect of its compliance obligations. The investigation should be completed in a timely manner with the complainant notified in writing of the outcome of the investigation. In certain circumstances, where several complainants allege the same violation of a grant or land obligation and where no new facts have been provided which indicate another review or investigation is warranted, FAA need not investigate the complaint. However, the complaint should be acknowledged and the complainant provided with a summary of our finding from the previous investigation. When an investigation discovers that a violation of a Federal obligation does exist, Airports personnel will immediately initiate dialogue with the affected airport and attempt to achieve voluntary compliance with the pertinent obligation(s).

  **d.   Remedial    and    Enforcement    Actions.** When a violation of a Federal obligation has been discovered and all reasonable efforts by Airports personnel have failed to achieve voluntary compliance on the part of the airport owner, Airports personnel must initiate remedial and enforcement action in accordance with Chapter 6, Section 2.

**5–3.   PRIORITIES AND EMPHASIS.** All Federal airport obligations are considered equally important when pursuing remedial or enforcement actions. However, consistent with the FAA mission the most important objective in FAA's oversight of the compliance program is to ensure and preserve safety at obligated airports. This includes maintaining runways, taxiways,

and other operational areas in a safe and usable condition, keeping the approaches cleared, providing operable and well maintained marking and lighting, etc. In developing priorities for regional administration of the surveillance portion of the compliance program, it is reasonable to direct priority emphasis to those airports with the largest potential for abuse.

**5-4. RESPONSIBILITIES.**

a. AAS-300 will provide overall guidance and direction for the conduct of the Airports Compliance Program and conduct regional evaluations to determine compliance with this Order and look for opportunities to improve the quality of the program. AAS-300 will be available to assist Airports offices in the interpretation of policy, the applicability of conditions or assurances to a particular airport, and for guidance and assistance, as needed, in pursuing enforcement. AAS-300 will also be responsible for preparing generalized educational material to be used by Airports offices in the conduct of their compliance program.

b. Regional and field Airports offices will be directly responsible for the day-to-day conduct of the Compliance Program in accordance with the direction provided in this Order. This guidance establishes the basic requirements to be achieved in the Compliance Program. However, regions are encouraged to take a more aggressive education and surveillance program as regional resources permit.

**5-5. TYPES OF COMPLIANCE STATUS.** The following types of Compliance status will be used to describe the airport owner's efforts in meeting its Federal obligations:

a. **Compliance.** The airport owner is meeting its commitments under the Federal obligations.

b. **Conditional Compliance.** The airport owner has been notified of compliance deficiencies on the airport and is willing to correct the deficiencies within a specified period of time.

c. **Pending Noncompliance.** The airport owner has not taken or agree to take corrective action on the compliance deficiencies noted above and is now being notified of its rights to a hearing. (See Chapter 6, Section 2.)

d. **Noncompliance and Default.** As a result of the hearing noted above or if no hearing is requested or if the airport owner has no right to a hearing, a determination will be made by the Airports Division Manager that the airport owner is in a status of noncompliance and default with its Federal obligations and appropriate sanctions or civil penalties will be taken. (See Chapter 6, Section 2.)

**5-6. ANALYZING COMPLIANCE STATUS.**

a. **Data Analysis.**

(1) Data accumulated for compliance purposes must be carefully analyzed to evaluate the airport owner's actual compliance performance and to identify appropriate actions to correct any deficiencies noted. More often than not an airport owner, when apprised of a deficiency, will ask for recommendations on how to correct the problem.

(2) Some confusion and lack of uniformity results from the basic problem of what constitutes noncompliance. Certainly, the height of obstructions in an approach and the condition of airfield paving and drainage may be adequate evidence of the airport owner's performance. They are, however, merely evidence. The judgment to be made in all cases is whether the airport owner is reasonably meeting the Federal commitments. It is the FAA's position that the airport owner meets commitments when: (a) the obligations are fully understood, (b) a program (preventive maintenance, leasing policies, operating regulations, etc.) is in place which in FAA's judgment is adequate to reasonably carry out these commitments, and (c) the owner satisfactorily demonstrates that such a program is being carried out.

b. **Follow-up.**

(1) Each Airports field office should develop a system of procedures to ensure continuing follow-up action on any identified compliance deficiencies until compliance with obligations to the Government can be accomplished.

(2) Action must be initiated at those airports that are not being maintained or operated in accordance with their owners' commitments. An effort should be made to help the owner voluntarily meet these commitments. When the owner has demonstrated an unwillingness to correct deficient conditions necessary to obtain compliance with the Federal obligations, the Airports office must pursue corrective enforcement action. (See Chapter 6, Section 2.)

(3) A formal compliance inspection may be undertaken as part of a routine compliance surveillance inspection or initiated as a result of a complaint. It may also be initiated when FAA has any reason to believe that an airport owner may be in violation of one or more of the airport's Federal obligations. Appendix 6 contains the procedures to follow in a formal compliance inspection.

**5-7. COMPLIANCE DETERMINATIONS.** The Airports office must be continuously aware of which airports are not in compliance. Before a Federal airport grant can be issued an official determination must be made that the airport owner is in compliance with its

Federal obligations. This determination of compliance status is a judgment based on a review of all available data concerning the airport and the circumstances of its operation. The review need not include a formal compliance inspection. It should, however, include the review of available data on hand and be supplemented as appropriate with spot surveillance material. At the region's discretion, absent any information to the contrary, it may rely on an airport's "self certification" of compliance (paragraph 5–2b) in making its compliance determination prior to issuance of a grant. It is important that all data used to support this determination be recorded in appropriate files.

When assessment of the airport owner's performance leads to a conclusion that compliance commitments are not being met, the status of PENDING NONCOMPLIANCE must be made and proper notification given (see Chapter 6, Section 2). Failure to declare the PENDING NONCOMPLIANCE hides the fact that discrepancies exist and results in a lack of follow-up leading to correction of the problem. Prompt communication between FAA and the airport owner regarding deficiencies is essential to establish a definite understanding of FAA position and a record for future action.

The owner must, however, be clearly told that based on available data the airport owner is failing to live up to the terms of the Federal agreements. The airport should be informed that these failures could place the FAA in a position which would preclude any further consideration of Federal assistance to the airport (see Chapter 6, Section 2). The actions needed to correct the situation must be spelled out and a reasonable time proposed for their accomplishment. Most importantly, the Airports office must make a timely follow-up review and record the airport owner's response and action.

**5–8. RECORD OF COMPLIANCE STATUS.** The appropriate Airports office shall maintain for each obligated airport under its jurisdiction an individual record which accurately reflects the extent to which the airport owner is complying with its obligations, and the actions carried out under this Chapter to monitor its compliance with these obligations.

**a. Suggested Procedures.** A compliance folder for each obligated airport is a convenient means of accumulating the data needed to support the compliance determination. It should contain, or be cross-referenced to the documents creating obligations and all appropriate correspondence or inspection reports, leases, financial records, etc., that specifically relate to the compliance status of the airport. The folder should contain any surveillance compliance actions taken, complaints received, records on any formal compliance

inspections undertaken, findings from other investigations, and any other pertinent records or correspondence.

**b. Summary Status of Compliance (Figure 1).** The suggested format in Figure 1 is the minimum record of findings and determinations that should be maintained for each airport receiving a surveillance compliance review or compliance determination prior to issuing a letter of tentative allocation under the Federal Airport Grant Program.

**c. Instructions for Completing the Summary.** The record should indicate the name, locations, and sponsor (or grantee) of the airport. Under "Basis of Obligations" enter a check mark immediately over each type of instrument applicable, together with the date of the latest such instrument. For each specific element of compliance identified as (a) through (j), there should be a "yes" or "no" entry indicating whether the airport owner is complying with the applicable obligation. In the three columns to the right of these elements should be entered the date of the inspection, visit, correspondence, or other form of surveillance which support this determination. Supporting evidence to make this determination should be current within the year preceding the date shown at the top of the form. Guidance for making entries against the compliance elements shown are as follows:

(1) **Maintenance.** The owner will be considered in compliance if the physical condition of paving, lighting, grading, runway, marking, etc., meets applicable standards and if the owner is following realistic procedures to preserve these facilities in an acceptable condition.

(2) **Approach Protection.** The owner will normally be considered in compliance if there are no obstructions or where an FAA aeronautical study has determined that an obstruction is not a hazard and the obstruction complies with the conditions of the determination.

(3) **Use of Airport Property.** All airport property, including each area of surplus property, must be reviewed to be sure it is being used or is available for use for the purposes intended by the grant agreement or land conveyance. Also, personal property accountability records are to be verified.

(4) **Use of Revenues.** Income from airport operations and revenue–producing property must be fully accounted for and adequate records kept to evidence its application to or reservation for airport purposes.

(5) **Exclusive Rights.** There must be no evidence of an intent to deny any qualified enterprise the

right to conduct an aeronautical activity. Where there is a history or a possibility of denial, the standards and qualifications which are the basis for such denial must be supportable as identified and discussed in this Order.

(6) **Control and Operations.** The owner is in compliance if the airport is available to the public under fair, equal, reasonable, and nondiscriminatory conditions, and with adequate provisions for the operation of all facilities on a continuing basis. Additionally, the owner must not have entered into any agreements which preclude the owner of its rights and powers and must not be in violation of the exclusive rights provision. The airport owner's fee and rental structure is to be reviewed for conformance with the grant assurances.

(7) **Conformity to ALP.** There should be no actual or proposed development or use of land and facilities contrary to an ALP previously approved by the FAA.

(8) **Continuing Special Conditions.** This refers to special conditions other than those controlled by project payments under ADAP/AIP. It includes specific commitments regarding the disposition of pro-

ceeds from the disposal of surplus property and any other continuing pledges undertaken by the airport owner.

(9) **Narrative Comments.** List any complaints, previously noted violations which continued uncorrected, status of actions taken, and plans and schedules for achieving the correction of deficiencies. A signature will confirm that the compliance status "Finding" and all other entries are known to be as indicated and are based upon the evidence listed.

(10) **Disposal of Grant Acquired Land.** While reviewing airport property (paragraph (3) above) and the ALP (paragraph (8) above) it should be noted whether that all land acquired with grant funding, including land acquired for noise protection, is still being used for the purpose acquired. If there is a question concerning the usage see paragraph 4-17 for guidance. The owner is in compliance if the land is being used for the purpose acquired.

(11) **Compatible Land Usage.** The owner will be considered to be in compliance if it is determined that there are no incompatible land uses in the immediate vicinity of the airport over which the airport owner has jurisdiction.

| SUMMARY STATUS OF AIRPORT COMPLIANCE | | | | | | | As Of: | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | MM | DD | YY |

**Airport Name:**

**Location:** | **Owner:**

**Basis of Obligations:** *(Check box)*
☐ Reg. 16    ☐ P.L. 289    ☐ FAAP/ADAP/AIP    ☐ Section 16/23/516    ☐ Other (List)_____

| | Compliance Status | As Determined By: | | | | | Desk Review * |
|---|---|---|---|---|---|---|---|
| | | Compliance Inspection: | | Airport Visit: | | | |
| | By Items | Inspector's Name | Date | Visitor's Name | Date | | |
| a. Maintenance | ☐ Yes ☐ No | | | | | | ☐ Yes |
| b. Approach Protection | ☐ Yes ☐ No | | | | | | ☐ Yes |
| c. Use of Airport Property | ☐ Yes ☐ No | | | | | | ☐ Yes |
| d. Use of Revenues | ☐ Yes ☐ No | | | | | | ☐ Yes |
| e. Exclusive Rights | ☐ Yes ☐ No | | | | | | ☐ Yes |
| f. Control and Operation | ☐ Yes ☐ No | | | | | | ☐ Yes |
| g. Conformity to ALP | ☐ Yes ☐ No | | | | | | ☐ Yes |
| h. Special Conditions | ☐ Yes ☐ No | | | | | | ☐ Yes |
| i. Disposal of Grant Acquired Land | ☐ Yes ☐ No | | | | | | ☐ Yes |
| j. Compatible Land Use | ☐ Yes ☐ No | | | | | | ☐ Yes |

* Desk Review — if checked "Yes", discuss nature of view on reverse side of this form.

**FINDING: The owner is in a status of**
☐ Compliance    ☐ Conditional Compliance    ☐ Pending Noncompliance    ☐ Noncompliance and Default.**

**Narrative Comment:**

** Determination made by Manager, Airports Division

**Inspector's name and date of inspection:**

_____    _____    _____
Signature                                Title                                Date

FAA Form 5190-8 (10-89)

Figure 1.   Summary Status of Airport Compliance (FAA Form 5190-8)

# CHAPTER 6.   ANALYSIS AND ENFORCEMENT

## Section 1.   Analysis of Leases and Use Agreements

**6-1.   GENERAL.** In analyzing leases and use agreements, it is important to be aware of the interrelationship of material covered in other portions of this Handbook, such as that contained in Chapter 3 on Exclusive Rights; Chapter 4, Section 4, Availability on Fair and Reasonable Terms, and Chapter 4, Section 5, Use of Airport Property. Principles discussed therein have a direct bearing on the material contained in this Section.

**6-2.   BASIC AIRPORT RELATIONSHIPS.** The operation of a public airport involve complex relationships that are frequently misunderstood. One can safely land an aircraft on the airport, but unless there are services and conveniences available to attract and encourage flight activity, the investment may be hard to justify. In most instances the public agency owning the airport must turn to private enterprise to provide those services which will make the use of the airport by the public attractive and convenient.

**a.   Rights Granted by Contract.** Airport use agreements usually reflect a grant of three rights or privileges for an appropriate consideration:

(1)   The right for the licensee or tenant to use the landing area and public airport facilities in common with others so authorized.

(2)   The right to occupy as a tenant and to use exclusively certain designated premises.

(3)   The commercial privilege or the franchise right to offer goods and services to the public who use the airport.

**b.   Consideration for Rights Granted.** The basic obligation of the public airport owner is to make available to the public landing and parking areas. However, a charge or fee may be imposed on users in order to recover the costs of providing these facilities. The charge may be a landing fee (which is similar to the toll charge on a highway, bridge, or tunnel) or an indirect charge. Quite frequently the airport owner recovers this use charge indirectly as part of the consideration received from commercial tenant operators who provide direct services to users of the public areas. It may, for example, take the form of a gallonage fee in which case fuel consumption is regarded as a measure of relative usage or benefit derived from the availability of the public landing area. It may also take the form of a monthly flat charge or a variable charge using the volume of business—rather than fuel gallonage—as the yardstick of benefit derived. In addition to these use charges there is normally an intent to recover some element of rent for the occupancy of specific premises referred to in paragraph a(2) above and also some element of a business franchise fee referred to in paragraph a(3) above. The latter is justified on the basis that, having invested substantial public funds in the capital airport plant, the public owner has thereby created a business opportunity for aviation services which otherwise would not exist.

**c.   Operator/Manager Agreements.** Commercial airport operator agreements become still more complex when the owner, for various reasons, chooses to rely on one of his commercial licensees or tenants to carry out his own obligations with respect to the airport. The airport owner may contract with a commercial tenant to perform all or part of the airfield maintenance. He may delegate to the tenant the responsibility to collect landing fees, publish NOTAMS on his behalf, or even assign to him the full authority of an airport manager. It is highly recommended that the FBO responsibilities and obligations be in a separate agreement from the airport managerial responsibilities.

When all of these relationships are incorporated in a simple agreement granting specified rights for a specified consideration, it becomes difficult to evaluate. For example, an airport owner may grant general FBO rights to an individual for $100 per month. An analysis, in the light of this discussion, however, may reveal that the true intent of the agreement was that the lessee also would perform certain maintenance worth $200 per month to the owner. The total consideration agreed to was $300 of which $100 is for rent for the building space occupied, $100 for landing fees and $100 for a franchise fee. After deduction of the $200 credit for maintenance performed, the monthly agreement was $100. From this illustration, it is apparent that the intended relationship is far more complex than that expressed.

**6-3.   REVIEW OF LEASES AND USE AGREEMENTS.** The FAA should not solicit or retain copies of all lease agreements. However, a compliance inspection should include sufficient discussion and review of the relationships existing at the airport to understand the rights granted for the use of public airport property. Where there is any doubt as to the nature of the arrangements, a review of the actual documents (contracts, leases, permits, etc.) should be made.

# Exhibit H (con't)

Order 5190.6A                                                                    10/2/89

**a. Scope of FAA Interest in Leases.**

(1) As part of spot surveillance and compliance inspections, or when requested by an airport owner, FAA will review lease agreements. This review will be for the following purposes:

(2) To determine whether such arrangements have the effect of granting or denying rights to use airport facilities contrary to the requirements of law and applicable obligations to the Government. The review is also intended to ensure that the airport owner does not surrender by contract his capability to sufficiently control the airport in order to carry out his commitments to the Government.

(3) To identify any terms and conditions of the arrangement which could prevent the realization of the full benefits for which the airport was constructed, or which could develop into a restriction on the owner's ability to meet his obligations to the Government.

**b. Form of Lease or Agreement.** The type of document or written instrument used to grant airport privileges is the sole responsibility of the airport owner. In reviewing such documents, FAA personnel should concentrate on determining the nature of the arrangements established.

**c. Term of Agreement.**

(1) FMV for any lease of nonaeronautical revenue production airport property transferred to under the Surplus Property Act of 1944, as amended, must be established. Appraisals as discussed in paragraph 7–8d(3) is one acceptable method of establishing FMV. However, the FMV requirement does not apply when the land involved was owned in fee by the airport owner, leased to the Federal Government for a term of years and then included with other properties and improvements conveyed back to the owner in a surplus property deed. In this case, there is no requirement that the owner account for the income from this particular property. However, FAA should encourage the use of the money for airport operation and development.

(2) Except for reverter or recapture rights which may be reserved to the Government and as described in subparagraph (4) below, there is normally no compliance requirement restricting the duration or term of an agreement. Where the licensee or tenant is expected to make a substantial investment in property improvements or installed equipment, they will usually seek an agreement for a term of years long enough to amortize the investment. From the airport owner's point of view, the stability of a long–term agreement with key service activities is highly desirable.

(3) All leases for a term of more than 5 years should contain provisions for periodic readjustment of rates.

(4) Terminal side concession agreements (food, convenience or ground transportation) must conform to Department of Transportation OST regulation if the lessee is a minority. (See AC 150/5100–15.)

**d. Notification to Airport Owner.** Since the FAA interest in a lease is confined to its impact on the airport owner's obligations to the Government, the acceptability of the lease for such purposes should in no way be construed as an endorsement of the entire document. When a lease has been referred by an airport owner, reviewed in the appropriate FAA office, and found not to violate any compliance obligation, the owner should be advised that the FAA has no objection to it. The word "approved" should not be used for this purpose.

**6–4. AGREEMENTS COVERING SERVICES TO THE PUBLIC.** In reviewing airport leases and agreements, special consideration must be given to those arrangements conveying the right to offer services and commodities to the public. The FAA is concerned that the airport owner maintain a fee and rental structure for facilities and services that will make the airport as self–sustaining as possible. The airport owner is obligated to the Government to ensure that the facilities of the airport are made available to the public on fair and reasonable terms without unjust discrimination. Any lease or agreement granting the right to serve the public on the premises of an airport so obligated should be subordinate to the authority of the owner to establish sufficient control over the operation to guarantee that patrons will be treated fairly. This applies not only to the purveyors of aeronautical services but to restaurants, shops, parking lots, ground transportation, and any establishment retaining commodities and/or services to the public.

**a. Nonaeronautical Service to the Public.** The lease of premises or an agreement granting rights to offer nonaeronautical services to the public need not incorporate specific language prohibiting unfair practices other than those Civil Rights assurances as outlined in AC 150/5100–15.

**b. Aeronautical Services to the Public.** At airports subject to airport grant agreements, the standard project application requires that in any contractual arrangement to render to the public services or commodities essential to the operation of aircraft the sponsor will insert and enforce specific language as therein indicated. (It has previously been determined by the Chief Counsel that the transportation service offered by a scheduled air carrier is not subject to this provi-

sion) The failure to include the language required by the sponsor's assurances—when the agreement grants the right to offer services and commodities essential to flight operations—is a violation of the grant agreement. In the review of leases and agreements at airports subject to surplus airport property deeds or Section 16 and 23 deeds, the standard contractual language must be included.

## 6-5. USE AGREEMENTS INVOLVING AN ENTIRE AIRPORT.

a. **Contracts to Perform Airport Maintenance or Administrative Functions.** The conditions under which an airport owner may transfer compliance obligations to another qualified party are covered in paragraph 4–2c. The delegation of maintenance and management responsibility is discussed in paragraphs 4–2c and 6–2c. The important point in such arrangements is that the airport owner may delegate or contract with an agent of its choice to perform any element of maintenance or operating supervision but—the owner—is in no way relieved of its own obligations to the Government. When the owner elects to rely upon one of the commercial operators or tenants of airport to carry out the maintenance and operating responsibilities it assumed from the Government, there is a potential conflict of interest. Any agreement conferring such responsibilities on a tenant must contain adequate safeguards to preserve the owner's control over the actions of its agent. It should preferably be in a contract separate from that which leases property or grants airfield use privileges.

b. **Total Delegation of Airport Administration.** In certain cases consideration may be given to entrusting the administration of a publicly-owned airport to a management corporation. Whether the document establishing this kind of a relationship is identified as a lease, concession agreement, management contract, or otherwise, it has the effect of placing a third party in a position of substantial control over a public airport that may be the subject of a grant agreement or other source of obligation. These agreements should be reviewed carefully to ensure that the owners rights are protected.

c. **Restrictions on Lease of Entire Airport.** If it is contemplated that the management corporation may itself engage in one or more aeronautical activities such an arrangement must be carefully evaluated. The leasing of all available land or improvements suitable for aeronautical activity to one person will, under certain conditions, be construed as evidence of an intent to exclude others (Order 5190.1). Such evidence may be overcome—in a lease to a management corporation—if the substance of the following provisions is included:

(1) The lessee (second party, manager, etc.) agrees to operate the airport in accordance with the obligations of the lessor (owner) to the Federal Government under (insert here any existing grant agreements or Surplus Property Deeds outstanding at the time of the execution of the lease; or any outstanding Section 23 or Section 16 deeds, if the airport is not also subject to either a grant agreement or surplus property deed). In furtherance of this general covenant, but without limiting its general applicability, the lessee (second party, manager, etc.) specifically agrees to operate the airport for the use and benefit of the public; to make available all airport facilities and services to the public on fair and reasonable terms and without discrimination; to provide space on the airport, to the extent available; and to grant rights and privileges for use of the landing area facilities of the airport to all qualified persons, firms and corporations desiring to conduct aeronautical operations on the airport.

(2) It is specifically understood and agreed that nothing herein contained shall be construed as granting or authorizing the granting of an exclusive right within the meaning of Section 308a of the Federal Aviation Act.

(3) The lessor (owner) reserves the right to take any action it considers necessary to protect the aerial approaches of the airport against obstruction, together with the right to prevent the lessee from erecting, or permitting to be erected, any building or other structures on the airport which, in the opinion of the lessor, would limit the usefulness of the airport or constitute a hazard to aircraft.

(4) The lessor (owner) reserves the right to develop or improve the airport (landing area of the airport) as it sees fit, regardless of the desires or views of the lessee (second party, manager, etc.), and without interference or hindrance on the part of the lessee (second party, manager, etc.).

(5) This lease (agreement) shall be subordinate to the provisions of any existing or future agreement entered into between the lessor (owner) and the United States to obtain Federal aid for the improvement or operation and maintenance of the airport.

d. It should be made clear to all concerned that the FAA at all times look to the airport owner for effecting such actions as may be required to conform to the owner's compliance obligations. A management corporation with a lease of the entire airport, or a tenant operator authorized to perform any of the owner's management responsibilities, shall be considered as resident agents of the airport owner and not as responsible principals.

**6-6. AGREEMENTS GRANTING ACCESS TO LANDING AREA FROM ADJACENT PROPERTY (THROUGH-THE-FENCE OPERATOR).** There are times when the owner of an airport will enter into an agreement which permits access to the public landing area by aircraft based on land adjacent to, but not a part of, the airport property. In some cases, special taxiways have been built for this purpose. This type of an arrangement has frequently been referred to as a "through-the-fence" operation even though the perimeter fence may be imaginary. In reviewing a lease or contract which proposes this type of arrangement, the following guidance should be followed:

**a. Rights and Duties of Airport Owner.** The obligation to make an airport available for the use and benefit of the public does not impose any requirement to permit access by aircraft from adjacent property. The existence of such an arrangement could place an encumbrance upon the airport property unless the airport owner retains the legal right to, and in fact does, require the off-site property owner or occupant to conform in all respects to the requirements of any existing or proposed grant agreement.

**b. Practical Considerations.** The owner of an airport is entitled to seek recovery of initial and continuing costs of providing a public use landing area. The development of aeronautical enterprises on land uncontrolled by the owner of the public airport can result in a competitive advantage for the "through the fence" operator to the detriment of on airport operators. To equalize this imbalance the airport owner should obtain from any off-base enterprise a fair return for its use of the landing area.

**c. Safety Considerations.** Arrangements that permit aircraft to gain access to a public landing area from off-site properties complicate the control of vehicular and aircraft traffic. Special safety operational requirements may need to be incorporated in the "through-the-fence" agreement.

**d. Agency Position.** As a general principle, FAA will recommend that airport owners refrain from entering into any agreement which grants access to the public landing area by aircraft normally stored and serviced on adjacent property. Exceptions can be granted on a case-by-case basis where operating restrictions ensure safety and equitable compensation for use of the airport. Examples include:

(1) Where a bonafide airport tenant has already leased a site from the airport owner and has negotiated airfield use privileges, but also desires to move aircraft to and from a hangar or manufacturing plant on adjacent, off-airport property. In this case

actual access will be gained through the area provided by the airport owner.

(2) Where an individual or corporation, actually residing or doing business on an adjacent tract of land, proposes to gain access to the landing area solely for aircraft use incidental to such residence or business without offering any aeronautical services to the public. This situation is commonly encountered where an industrial airpark is developed in conjunction with the airport.

**e. Determinations.** The existence of arrangements granting access to a public landing area from off-site locations contrary to FAA recommendations shall be reported to regional Airports divisions with a full statement of the circumstances. If the regional Airports division determines that the existence of such an agreement circumvents the attainment of the public benefit for which the airport was developed, the owner of the airport will be notified that the airport may be in violation of his agreement with the Government.

**6-7. AIR CARRIER AGREEMENTS AND LEASES.** Unless a complaint has been made, the FAA will not attempt to judge or evaluate the fairness of any rental rate or fee structure under consideration for air carriers. However, the rights and privileges granted by contract to air carriers as distinct from the rental rate or fee structure, may involve the compliance obligations of the airport owner. When discussing these agreements, particularly in connection with their impact on other aeronautical tenants, the following considerations should be borne in mind.

**a. Use in Common of Aeronautical Facilities.** While the actual rates for use of the landing area are a matter of negotiation, there should be no discrimination in use rates between air carrier and general aviation using aircraft of the same type and weight.

**b. Discrimination Between Carriers.** Where several air carriers serve the same airport they usually cooperate in developing a consolidated position with respect to negotiations with the airport owner. For this reason, compliance violations by the owner arising from preferential treatment of one carrier are rare. On occasion, however, small local service carriers have complained that the imposition of uniform user charges or landing fees equally applicable to long-haul and short-haul operators is inequitable. Such complaints usually arise when the level of fees has been increased concurrently with the expansion of runways and other airport facilities to accommodate larger aircraft not needed in the short-haul operation. It is the position of the FAA that the requirement for user fees, under a standard schedule uniformly applied to all users, does not violate the owner's obligation to make

Case 5:08-cv-02814-JF    Document 20-10    Filed 08/29/2008    Page 5 of 52

the airport available on fair and reasonable terms with-out discrimination. However, there is no violation if the owner elects to offer each carrier the choice be-tween two or more fee schedules designed to minimize the inequities of such a situation. For example, each carrier may be given the choice of paying a specific amount per 1,000 pounds per take–off weight or a specified percentage of ticket sales to enplaning pas-sengers. (See paragraph 4–14 for additional informa-tion.)

**6–8.–6–20.   RESERVED.**

## SECTION 2.   ENFORCEMENT.

This Section is reserved and will be issued separately for inclusion at a later date. Until then, continue to use the enforcement procedures outlined in Order 5190.6.

# CHAPTER 7.   RELEASE, MODIFICATION, REFORMATION OR AMENDMENT OF AIRPORT AGREEMENTS

## SECTION 1.   GENERAL GUIDANCE

**7-1.  AUTHORITY TO RELEASE, MODIFY, REFORM, OR AMEND.**

　　**a.** The authority of the Administrator to release, modify, reform or amend all or part of any airport agreement and the legislative basis for such authority are discussed in Chapter 1, paragraph 5 of this Order.

　　**b.** The Administrator has delegated to regional Airports Division Managers full authority to take any action with respect to their functions and assigned responsibilities, subject only to the limitations set forth in Order 1100.5, FAA Organization–Regions and Centers, Chapter 2, Section 3.

**7-2.  GENERAL PRINCIPLES.**

　　**a.** Within the specific authority conferred upon the Administrator by law, the FAA will, when requested, act to release, modify, reform or amend any airport agreement to the extent that such action will protect, advance, or benefit the public interest in civil aviation. Such action may involve only relief from specific limitations or covenants of an agreement or a complete and total release which authorizes a subsequent disposal of obligated airport property.

　　**b.** Any property, when described as part of an airport in an agreement with the United States or defined by an ALP, is considered to be "dedicated" or obligated for airport purposes by the terms of the agreement. If any of the property so dedicated is not needed for present or future airport purposes, an amendment to or release from the agreement may be granted in accordance with the guidance contained in this Chapter. The omission of an airport from the NPIAS is not to be construed as a determination by the FAA that such airport has ceased to be needed for present or future airport purposes.

　　**c.** A decision to release, modify, reform, or amend an airport agreement will be based on the guidelines outlined in paragraphs 7–37a and b below and on the specific factors pertinent to the type of agreement as detailed in the following sections of this Chapter. However, any release which has the effect of permitting the abandonment, sale, or disposal of a complete airport (whether or not such action contemplates the development of a replacement airport facility) must be referred to AAS–1 for ARP–1 approval (see Order 1100.5, Chapter 2, Section 3, paragraph 222h(15)).

**7–3.–7–5.  RESERVED.**

## SECTION 2.   SURPLUS PROPERTY AGREEMENTS

**7-6.  GENERAL.**

　　**a.  Basic and General Policies and Procedures.** FAR Part 155 contains procedures which must be followed to release airport property from surplus property disposal restrictions contained in the conveyance instrument. Owners of surplus airport property should be advised to consult this regulation whenever changes in property use are being contemplated. Changes to surplus property instruments, consistent with the purpose of fostering and promoting the development, improvement, operation or maintenance of the airport are encouraged by the FAA.

　　**b.  Authorized Uses of Surplus Property.** Section 13(g) of the Surplus Property Act of 1944 (as amended by P.L. 80–289) authorizes conveyance of surplus federal property for "airport purposes." Refer to paragraph 4–18 and Appendix 5 for a discussion of

both aeronautical property (aviation use)and nonaviation property use for revenue production.

　　**c.  Property Identification.** Very few older deeds of conveyance separately identify nonaviation revenue use property from that transferred for aviation use. The original application for the property and the FAA's (CAA) disposal report initially established these areas. They may now differ however, as the result of changed land use plans approved by the FAA pursuant to the authority of P.L. 81–311 (see paragraph 4–18e). For compliance purposes, it is important to verify changes subsequent to the initial conveyance that has been approved by the FAA.

　　**d.  Land Transferred Under Regulation 16, War Assets Administration.** Prior to the amendment of the Surplus Property Act in 1947 by P.L. 80–289,

surplus Federal properties were conveyed for airport purposes under the procedures of WAA Regulation 16. The conveyance documents under this regulation vary in format but many of them stipulate that existing facilities may be used for compatible nonaviation purposes until such time as the FAA decides they are needed for an aviation purpose. The regulation and the conveyance documents are silent as to the income from such nonaviation use. Income from such property, including the net proceeds of a sale following release, must be applied to the development, improvement, maintenance, or operation of a public airport.

**7–7. RELEASE FROM SPECIFIC CONDITIONS.** The FAA will issue needed releases or corrections to effect the elimination of the restrictions which may have been repealed or modified by laws enacted subsequent to the Act, such as:

**a. Industrial Use Restrictions.** This restriction is contained in certain surplus property conveyances which prohibit the use of the property as an industrial plant, factory or similar facility. P.L. 81–311 repealed this prohibition.

**b. Reservation of Fissionable Material.** This reservation is contained in many surplus property agreements which reserve to the U.S. the right to explore for, mine, and extract fissionable material. Section 68 of the Atomic Energy Act of 1954, as amended, released and quitclaimed to the owner all such rights.

**c. Other Reserved Subsurface Interests.**

**(1) Minerals and Petroleum.** Some surplus property agreements reserve to the U.S. all subsurface minerals and petroleum other than fissionable materials. It has been determined that these reservations may not be released, conveyed or quitclaimed by the FAA under P.L. 81–311. Requests concerning these interests will be referred to the Federal agency controlling or having jurisdiction over them.

**(2) Residual Interest.** Routinely, in disposing of these reserved mineral rights to an approved applicant, the GSA imposes a prohibition against exploring for or extracting such minerals or petroleum in any way that would interfere with the operation and maintenance of the airport. Other Federal agencies would normally do the same. This has the effect of retaining for the Government a residual interest in the subsurface minerals which theoretically could be conveyed to the airport owner under P.L. 80–289. As a matter of policy, the FAA will not recommend to GSA or another Federal agency that the mineral rights reserved to the U.S. (in a surplus airport property deed) be transferred. In those cases where GSA or another Federal agency has already conveyed to other parties the min-

eral rights so conditioned, the FAA will not recommend conveyance of the Government's residual interest to the airport owner.

**d. National Emergency Use Provision (NEUP).**

**(1)** The FAA may grant a release of this provision which is often referred to as the recapture clause. However, concurrence of the DOD must be specifically requested and obtained by the FAA when the airport is listed in the current "Airports Required By Department of Defense for National Emergency Use," (see Chapter 13 of current edition of Order 5190.2, List of Public Airports Affected by Agreements with the Federal Government (RIS: AS 5190–1)).

**(2)** When requesting a release of the recapture clause, the airport listed in Chapter 13 of Order 5190.2 must provide FAA with five scaled drawings and two copies of other exhibits. The regional Airports office will forward the documentation required in paragraph 7–6a to AAS–300 along with four scaled drawings and one copy of the exhibits for processing to DOD.

**(3)** Upon receipt of the DOD concurrence, AAS–300 will forward the determination to the regional Airports office for release of the NEUP.

**e. Release of Reverter Clause.** Frequently, in order to promote private investment in airport facilities, the owners of surplus airports seek the removal of the provision giving the United States the option to revert title in the event of default. This is an important remedy intended to be reserved to the Government and will normally be released. Any such proposal shall be referred to AAS–300 for consideration.

**f. Release of Obligations for Property Not Received.** The FAA may release an airport owner of all inventory accountability obligations for specific items of property when it is determined that the items were not, in fact, received by the owner even though specified in the instrument of disposal.

**7–8. RELEASE FOR SALE OR DISPOSAL.**

**a. General Policy.** A total release, permitting the sale and disposal of real property acquired for airport purposes under the Surplus Property Act, shall not be granted unless it can clearly be shown that the sale of such property will benefit civil aviation.

**(1)** If any such property is no longer needed to directly support an airport purpose or activity (including the generation of revenue for the airport), it may be released for sale or disposal upon a demonstration that such disposal will produce an equal or greater benefit (to the airport or another public airport) than

the continued retention of the land. Such a release has the effect of authorizing the conversion of a real property asset into another form of asset (cash or physical improvements) which better serves the purpose for which the real property was initially conveyed. This objective is not met unless an amount equal to the net sale proceeds based on the current FMV of the property is realized as a consequence of the release and such amount is committed to airport purposes.

(2) In cases where an airport has a large amount of revenue production property that has remained undeveloped due to the lack of demand for this kind of property and where there appears to be no prospect for future development, FAA should fully evaluate the merits of either reversion or complete release for sale. This must be coordinated with AAS–300.

**b. Sponsor Owned Land, Leased to Federal Government During WW II, and Deeded Back Via P.L. 80–289.** The FMV requirement discussed in paragraph 7–8a(1) above does not apply when the release involves land owned in fee, leased to the Federal Government for a term of years and then included with other properties and improvements conveyed back to the owner in a surplus property deed. In this case, there is no requirement that the owner account for the net proceeds from the sale or disposal of this particular property. However, FAA should encourage the use of the money for airport development.

**c. Purpose of Release.**

(1) As indicated in paragraph 7–3b(2), the airport owner requesting a release of surplus airport land must identify and justify the reason for which the release is requested. One such justification could be a showing that the expected net proceeds from the sale of the property at its current market value will be required to finance items of airport development and improvement; the need for which is concurred in by FAA. In approving a release on this basis, consideration will be given to the amount of funds already accumulated from prior airport revenues and the amount of land needed to be disposed of to adequately finance the development or improvement items proposed.

(2) FAA recognizes that in some instances, the conversion of unneeded airport land into a more productive asset may be justified even though no specific items of airport development or improvement are immediately required. This occurs at some airports, for instance, where land in excess of present and future aeronautical requirements does not and cannot generate adequate revenues for the airport from rentals and leases in its existing state. Frequently such land has a potential market value (if developed for specific nona-

viation uses) far exceeding that indicated by its present rental value. As an example, a tract of undeveloped land at an airport may be capable of yielding only nominal income to the airport from agricultural or grazing leases. Because of its location, it might have a much greater value for compatible industrial development. The proceeds from the sale, if invested at current interest could yield considerably more than its annual rental income. Under these circumstances, a release and sale may be justified.

**d. Monetary Consideration.** A sale and disposal of airport property for less than its FMV is inconsistent with the intent of the statute and shall not be authorized except as discussed in paragraph b. above. See paragraph 7–9 for information on application of sale proceeds.

(1) In determining FMV for a proposed nonaviation use of surplus airport property, the consideration need not be monetary. The value of intangible benefits may be used as an offset against FMV in determining the monetary consideration to be received for the property. For example, conveyance of a property interest in a right-of-way over surplus airport land to a railroad or highway may be consistent with the intent of the law if the resulting track or roadway will directly benefit the airport or enhance its efficiency or utility to a degree commensurate with the value of the property involved. Where intangible benefits are included in the FMV determination, the airport owner must submit:

(a) a plan identifying the intangible benefits to be derived by the airport,

(b) the amount attributed to the intangible benefits, and

(c) the merit of its application as an offset against the FMV in arriving at the monetary consideration.

(d) A plan reflecting the current and future needs for AIP funding of projects. FAA will review the information and make a determination as to the reasonableness of the proposal.

(2) **Determining Land Values.** Subject to the conditions in (1) above, the value to be placed on land for which a release has been requested shall be based on the present appraised value (for its highest and best use) of the land itself and any Federal improvements initially conveyed with the property. In many cases, the original buildings and improvements may have outlived their useful life and a determination may have been made by FAA that no further obligation to preserve or maintain them exists. If they have been replaced under such circumstances, or if addition-

al improvements have been added without Federal financing, the value of such improvements need not be included for purposes of determining the financial commitment of a release granted under the guidance in this paragraph.

(3) **Appraisals.** With the exceptions noted in this subparagraph, a release authorizing the sale and disposal of airport land shall not be granted unless the FMV has been supported by at least one independent appraisal report determined to be acceptable by the FAA. Appraisals shall be made by noninterested and qualified real estate appraiser. If any appraiser is involved in negotiations for the purchase or sale of the property or if there is evidence of collaboration between appraisers, such appraisal reports are invalid and shall not be considered by FAA in determining the FMV of the land. The cost of obtaining appraisals shall be borne by the airport owner but may be considered as an offset in determining net proceeds (Appendix 5) realized from the sale. The requirement for an appraisal may be waived if the FAA determines that:

(a) The approximate fair market or salvage value of the property released is less than $25,000, or

(b) The property released is a utility system to be sold to a utility company and will accommodate the continued airport use and operational requirements, or

(c) It would be in the public interest to require public advertising and sale to the highest responsible bidder in lieu of appraisals.

(4) FAA employees must be sensitive to local economic conditions in the airport's geographical area when they are reviewing FMV issues. The fluctuation in economic conditions can cause considerable variation in FMV at a given time and in a given location.

**e. Consent to Divert Excess Revenue from Surplus Property.** See discussion of Income Accountability under paragraph 4–20c and d.

**7–9. APPLICATION OF PROCEEDS.**

**a.** FAR Part 155.7(d) requires that any release of airport land to permit its sale or disposal shall be subject to a written commitment obligating the airport owner with respect to an amount equal to the net proceeds of a sale of the property at its current FMV. FAA shall not issue a release without this commitment.

Following a release by FAA based on such a commitment, the airport owner may discount the selling price or give the land away as a subsidy or inducement to attract industrial development or other purposes, provided they are compatible with the airport operations.

**b.** The net proceeds realized for the sale of surplus property, or the equivalent amount, must be placed in an identifiable interest bearing account to be used for the purposes listed in c. below. The interest and dividends can be used for the operation and maintenance of the aeronautical portion of the airport or, with the concurrence of FAA, the revenue producing property, if it can be clearly shown to enhance the revenue production capability of that property.

**c.** The obligated amount itself must be used for one or more of the following purposes as agreed to by FAA and reflected in the supporting documentation for the deed of release:

(1) Eligible items of airport development set forth in the current Airport Grant Program and reflected in the airport's Capital Improvement Program (CIP).

(2) Any aeronautical items of airport development ineligible under the grant program.

(3) Retirement of airport bonds which are secured by pledges of airport revenue, including repayment of loans from other Federal agencies for such development.

(4) Development of common use facilities, utilities, and other improvements on dedicated revenue production property that clearly enhance the revenue production capabilities of the property.

**d.** All aeronautical improvements funded by proceeds from such sale will be accomplished in accordance with current applicable FAA design criteria or such State standards that have been approved by the FAA.

**7–10. RELEASES INVOLVING PERSONAL PROPERTY, STRUCTURES OR FACILITIES.**

**a. General Requirements.** Surplus airport property in these categories may be released from all inventory accountability (whether or not the airport at which it is located is included in Chapter 13 of the current edition of Order 5190.2) when it has been determined that such property:

(1) has outlived its useful life.

(2) has deteriorated beyond economical repair or rehabilitation.

(3) is no longer needed.

(4) has been replaced.

(5) is to be traded to obtain similar or other property needed for the airport; or

(6) has been destroyed or lost by fire or other uncontrollable cause and the ensured value, if any, has been credited to the airport fund; or

(7) has been, or should be, removed or relocated to permit needed airport improvement or expansion including salvage or other use elsewhere on an airport.

**b. Utility Systems (Includes Railroad Utilities).**

(1) Utility distribution systems may be released to permit demolition or other disposal when they have deteriorated beyond economical repair or are no longer needed for the airport. Also, where an airport owner is unable to maintain a utility system because of lack of adequately skilled personnel, financial ability, etc., it may be released from restrictions of any applicable surplus property instrument of disposal to permit conveyance of the system to a utility company

for continued operation, provided the bill of sale includes the following provisions:

(a) Utility services will be supplied to all present and future occupants of the airport; and

(b) The Government shall have the option to lease or purchase the system under mutually acceptable terms upon military reactivation of the airport, and shall be granted right of entry and use of such system pending its acquisition from the utility company.

(2) In the event the airport or the utility system is subject to the NEUP and the airport is listed in Chapter 13 of the current Order 5190.2, no release of a utility system, whether to permit demolition or a sale to a utility company, shall be granted until the DOD has advised FAA in writing that it has no objection to such release.

**7-11.–7-15.  RESERVED.**

## SECTION 3.   GRANT AGREEMENTS

**7-16.  GENERAL.**  This section covers the requirements and procedures to release, cancel or modify any of the sponsor's conditions or assurances as contained in a FAAP/ADAP/AIP grant agreement.

**7-17.  RELEASE FROM SPECIFIC CONDITIONS OR ASSURANCES.**

**a. Maintenance Obligation Release.**  A release may be granted to an airport owner to remove the obligation to maintain specific areas of an airport. (See paragraph 7-37c(5).)

**b. Consent to Permit Interim Use.**  The FAA may consent to the interim use for nonaviation purposes of dedicated aeronautical property whether or not acquired with grant funds. Such consent or approval must be based upon a determination that the property as a whole has not ceased to be used or needed for airport purposes within the meaning of the applicable statute. Consent to such use may be granted under the guidelines outlined in paragraph 7-37a.

**c. Abandonment, Demolition or Conversion of Grant Funded Improvements, Other Than Land.**

(1) Paragraph 2-3 of this Order points out that the sponsor/owner obligation under a FAAP/ADAP/AIP grant agreement remains in full force and effect throughout the useful life of the facilities improved under such FAAP/ADAP/AIP project, but in any event not to exceed the 20-year life of the grant agreement except for the privately-owned airport

which requires that the useful life of the improvements will be at least 10 years. This does not apply to land purchased or reimbursed under the grant programs, which has no such 20-year limitation. The FAA has legally determined that the useful life of an airport or airport facility may be determined to have expired when it is no longer used or needed for the purpose for which it was developed, or if the physical useful life of the facility has expired.

(2) The physical useful life of such a facility extends only during the time it is serviceable and useable with ordinary day–to–day maintenance, and is not extended by reconstruction, rehabilitation or major repair of that facility. Under the foregoing guidelines, the determinations as to the expiration of the useful life and physical useful life of such facilities (see paragraph 2-3) is a responsibility of the regional Airports offices.

(3) Releases to permit abandonment, demolition or conversion to another compatible use of FAAP/ADAP/AIP developed or improved facilities shall be approved or granted provided the appropriate regional Airports office determines that:

(a) The grant agreement involved has expired, or

(b) the facility in question is no longer needed for the purpose for which it was developed under FAAP/ADAP/AIP, or

(c)  the useful physical life of the facility in question has expired as above defined.

**d.  Release from Obligation to Furnish Rent-Free Space or Cost Free Land.**  A sponsor may be released from its obligation to furnish rent-free space when space or facilities have been constructed at Federal expense and are actually occupied in areas provided by the sponsor in accordance with section 11(5) of the Federal Airport Act. A release may also be granted from the obligation to furnish areas of land, water or estate therein or rights in buildings as provided by section 18a(6) of the Airport and Airway Development Act of 1970 and section 511(a)(7) of the Airport and Airway Improvement Act of 1982. However, prior to such a release, a determination should be made on the basis of all pertinent facts and circumstances that such area is not needed and will not be needed in the foreseeable future. In this regard, internal elements of the FAA and the National Oceanic and Atmospheric Administration must concur in the release. A release under either circumstance may be accomplished either unilaterally by the FAA waiving its rights or by a formal amendment to the grant agreement. See paragraph 4-23 of this Order.

**7-18.  TOTAL RELEASE TO PERMIT SALE AND DISPOSAL.**  All land described in a project application and shown on an Exhibit A constitutes the airport property obligated for compliance under the terms and covenants of a grant agreement. A sponsor is obligated to obtain FAA consent to delete any land so described and shown. FAA consent shall be granted only if it is determined that the property is not needed for present or foreseeable public airport purposes. When obligated land is deleted, the Exhibit A and the approved ALP should be revised as appropriate. Where the action involves the deletion of land not acquired with Federal financial assistance, there is no required disposition of net revenues from sale or disposal. However, in view of the ADAP/AIP requirement that airports become as financially self-sustaining as possible, the FAA should encourage the owner to use any net revenues for needed airport development and to consider an exchange of released property for needed property.

**7-19.  SALE OR OTHER DISPOSAL OF AIRPORT LAND ACQUIRED WITH FAAP/ADAP/AIP FUNDS.**

**a.  Sponsors Not Receiving a Grant After December 30, 1987.**

(1)  **Applicability.**  This paragraph is applicable to any request for release of part or all of an airport which would permit the sale at the current FMV or other disposal of any airport land acquired with FAAP/ADAP/AIP funds. It also applies to an AIP programming request which may commit the FAA to a subsequent release. A sponsor's request in either case must assure that:

(a)  the Government shall be reimbursed (see subparagraph (2) below); or

(b)  the total net proceeds will be reinvested in the airport, in a replacement airport, or in another operating public airport (see subparagraph (3) below).

(2)  **Reimbursement.**  The requirement for reimbursement shall apply only where there is no replacement or operating public airport owned or to be owned by the sponsor (see also paragraph 7-20). However, the sponsor may elect to reinvest the total amount due for reimbursement in any other public airport by a contract between the respective airport owners which has the written concurrence of the FAA. FAA concurrence in such a contract is contingent upon such funds being used for airport development specified in paragraph 7-9c at an airport subject to a grant agreement or equivalent obligation. Except where the applicable grant agreement specifically provides otherwise (a special condition dealing with land acquired for future development or noise), the amount to be reimbursed to the Government shall be a share of the net proceeds of a sale or disposal of the property at its current FMV based on the percentage used to compute the amount of Federal participation under the project(s) in which the land(s) was acquired.

(3)  **Reinvestment.**  Reinvestment of the total net proceeds (Federal and sponsor share) is required if the sponsor continues to own or control, or will own or control in part or in whole, a replacement or an operating public airport. Reinvestment shall be accomplished by a firm agreement to expend within 5 years or a timeframe satisfactory to the Administrator an amount equal to the total net proceeds from the sale or disposal of FAAP/ADAP/AIP acquired land for specified items of airport improvement in the order of priority established for releases of surplus airport property in paragraph 7-9c. Unlike surplus property, the purposes for which land acquisition is authorized under FAAP/ADAP/AIP projects do not include income production. If reinvestment cannot be accomplished within 5 years or if the net proceeds derived exceed the cost of needed airport development, reimbursement of the Federal prorata share of such excess as in (2) above will be required.

**b.  Sponsors Receiving a Grant After December 30, 1987.**

(1)  **Land for Airport Purposes (Other than Noise Compatibility Purposes).**  Once a sponsor

enters into a grant after December 30, 1987, under the AAIA of 1982, as amended by the Airport and Airway Safety and Capacity Expansion Act of 1987, it will dispose of land at FMV when no longer needed for airport purposes (see paragraph 4–17d). This applies to land purchased under FAAP, ADAP, as well as AIP. There will be retained or reserved any interest or right necessary to ensure that the land will only be used for purposes which are compatible with the noise levels generated by the airport. The portion of the proceeds which is proportionate to the Government's share of the cost of acquisition of such land is to be deposited in the Trust Fund.

(2) **Land for Noise Compatibility Purposes.** Once a sponsor enters into a grant after December 30, 1987, under the AAIA of 1982, as amended by the Airport and Airway Safety and Capacity Expansion Act of 1987, it will dispose of land at FMV when the land is no longer needed for noise compatibility purposes. This applies to land purchased under FAAP, ADAP, or AIP (see paragraph 4–17e). There will be retained or reserved any interest or right necessary to ensure that the land will only be used for purposes which are compatible with the noise levels generated by the airport. The portion of the proceeds which is proportionate to the Government's share of the cost of acquisition of such land is to be deposited in the Trust Fund or may be reinvested in an approved noise compatibility project.

**7–20.  RELEASE OF ENTIRE AIRPORT.**

a. **Approval Authority.** The concurrence of the Associate Administrator for Airports (ARP–1) is required before granting any release from the obligations of a grant agreement which would enable a sponsor to abandon or dispose of an entire airport for non-airport purposes. Each request to release an entire airport shall be considered by ARP–1 on a case–by–case basis without limitation to the guidelines contained herein. A copy of the sponsor's request, including exhibits and documents related thereto, and a copy of the regional summary statement (paragraph 7–6a) justifying the action, if recommended, shall be provided.

b. **Replacement Airport.** On receipt of a request to release an entire airport that is to be replaced by another new or existing airport, the applicable requirements of the Airport Improvement Program (AIP) for Authority, Program Policy, Eligibility, and Allowability Criteria, shall be considered in recommending

appropriate action. In this situation, the general policy is to treat the proposal as a trade–in of the land and facilities developed with Federal aid at the old airport toward the acquisition and development of better facilities at the new airport. If an airport which accommodates local civil aviation requirements, as well as or better than an existing FAAP/ADAP/AIP airport can be acquired or developed at a cost less than the present market value of federally–financed land and facilities, a complete release can be granted on the old airport provided that the continuing grant obligations are transferred to the new airport. The release would become effective when the new airport is placed in operation. Development costs for the new airport in excess of the value of existing land and facilities at the old airport would be eligible for AIP assistance. In these circumstances, the availability for public–use of a new and better airport is the basis for determining that the old one is no longer needed and that its useful life having expired, the original grant agreement is terminated.

c. **Nineteen Year Disposals.** Except for ADAP and AIP grants for land, most grant agreements expire 20 years after their execution. Following the expiration of such an agreement, provided no other obligations to the Federal Government are involved, the owner may legally abandon and dispose of the airport. Frequently, due to changes in land use or values, an airport sponsor may look forward to an imminent termination of a grant agreement as an opportunity to realize substantial funds from disposal of the airport. In some instances, the sponsor may seek a release on the old airport before the grant agreement has expired with the intent to use the proceeds of the disposal as matching funds for AIP development of a replacement airport. Obviously, such an arrangement is contrary to the trade–in concept of existing policies. Where such a proposal is made, or where the sponsor is apparently deferring needed airport development or replacement in the hope of realizing a substantial windfall when the old grant agreement expires, he should immediately be notified that such actions may preclude Federal assistance for the development of a replacement airport. AIP funds are not assured for the development of a new airport when the community willfully disposes of an adequate functioning public airport upon the termination of its legal obligation to maintain it.

**7–21.–7–25.  RESERVED.**

## SECTION 4.   AMENDMENT OR MODIFICATION OF SECTIONS 16, 23, AND 516

**7–26.  GENERAL.** Release of the conditions in an instrument of conveyance of any lands pursuant to Section 16, Section 23, or Section 516 (refer to the application FARs as discussed in paragraph 7–27b.) is not authorized. They may, however, with the approval of the controlling Federal agency, be amended or modified to provide for a greater or lesser property interest as dictated by the needs of the airport; e.g., change from easement, right–of–way or permit to fee, or vice versa.

**7–27.  PROCEDURES.**

   **a.** An application with supporting exhibits for amendment or modification of a property interest pre-viously conveyed shall be filed with the FAA. The application should reference the original application and the conveyance instrument.

   **b.** FAR Part 153 (FAAP) shall be followed in requesting changes to Section 16 instruments. FAR Part 154 (ADAP) governs Section 23 conveyances and shall also be followed in making original applications for acquisition under Section 516 as well as when requesting an amendment or modification. (See Order 5170.1, Transfer of Federal Lands, Section 23, of Airport and Airway Development Act of 1970.))

**7–28.–7–35.  RESERVED**

## SECTION 5.   PROCEDURES

**7–36.  DOCUMENTATION.**

   **a.  General Procedures.** FAA release, modification, reformation, or amendment of an airport agreement represents a material alteration of an important contractual relationship that is governed by statutes and which affects the measure of benefits to the public from the operation of a civil airport. All actions must be fully documented. The Airports field office compliance files shall contain the following:

   (1)  The airport owner's justification for release, modification, reformation, or amendment;

   (2)  FAA's determination on the request; and

   (3)  The endorsement of the FAA official authorized to grant the request.

   **b.  Owner Requests.** Any release, modification, reformation or amendment of an airport agreement must be based on a written request signed by a duly authorized official of the airport owner.

   (1)  **Number of Copies.** Normally, the original request and supporting material should be submitted to the Airports District/Field Office by the airport owner. Additional copies of the request and supporting material may be required if action is required by the regional office or headquarters. In addition, where DOD concurrence is required, the additional material outlined in paragraph 7–7d will be provided.

   (2)  **Content of Written Owner Requests.** Although no special form is required, an owner's request must be specific and indicate, as applicable, the following:

   (a)  What agreement(s) with the United States are involved.

   (b)  What is requested.

   (c)  Why the release, modification, reformation or amendment is requested.

   (d)  What facts and circumstances justify the request.

   (e)  What requirements of state or local law should be provided for in the language of an FAA issued document if the request is consented to or granted.

   (f)  What property or facilities are involved.

   (g)  How the property was acquired or obtained by the airport owner.

   (h)  What is the present condition and what present use is made of any property or facilities involved.

   (i)  What use or disposition will be made of the property or facilities.

   (j)  What is the FMV of the property or facilities.

   (k)  What proceeds are expected from the use or disposition of the property and what will be done with any net revenues derived.

   (l)  A comparison of the relative advantage or benefit to the airport from sale or other disposition as opposed to retention for rental income.

(m)  A plan identifying the intangible benefits, if any, accruing to the airport, the amount attributed to the intangible benefits and the merit of their application as an offset against the FMV of the property to be released. The plan should also include as a minimum:

(i)  a statement of the airport's source and application of funds for the preceding 3 years,

(ii)  a statement of future sources and application of funds needed for the continued operation and maintenance of the airport,

(iii)  a statement of the financial capability and intent to accomplish the airport development included in the current NPIAS, and

(iv)  must be shown to be in accordance with the ALP.

(3)  **Exhibits to be Furnished by Owner.**

(a)  Each copy of the request will have attached two scaled drawings (see (4) below) showing all airport property and airport facilities which are currently obligated for airport purposes by agreements with the United States. Other exhibits supporting or justifying the request, such as maps, photographs, plans and appraisal reports, shall be attached, as appropriate.

(b)  Height data computations (see paragraph 7–37c(3)(c) using a fixed height.

(c)  If the release action requested would permit a sale or other disposition of airport property, see paragraphs 7–9 and 7–19.

(4)  **Scaled Drawing.**  The scaled drawing required to support a request for release need not fully meet the criteria for ALP's, although this is desirable. The drawing serves to graphically explain or depict the effect on the airport if the requested release is granted. It is not the document by which the release is granted and no FAA approval shall be given to any drawing inconsistent with the airport owner's current obligations until a release has been executed in accordance with the guidance contained in this Chapter.

**7–37.  FAA ACTION ON OWNER REQUESTS.**

a.  **Evaluation.**  When a request has been received, supported by the appropriate documentation and exhibits, an evaluation of the total effect of the owner's proposal shall be made. This evaluation shall be based on the general policy stated in paragraph 7–2 and shall include consideration of pertinent factors such as:

(1)  The past and present owner's compliance record under all its airport agreements and its actions to make available a safe and usable airport for maximum aeronautical use by the public; and evidence that the owner has taken or agreed to take all actions possible to correct noncompliance situations at the airport, if applicable.

(2)  The reasonableness and practicality of the owner's request in terms of aeronautical facilities which are needed and the priority of the need.

(3)  The net benefit to be derived by civil aviation and the compatibility of the proposal with the needs of civil aviation.

(4)  Consistency with the guidelines for specific types of releases as discussed in this Chapter.

b.  **Determinations.**  The FAA will not release more than that which the owner requests. The decision to grant or deny the request, based on the above evaluation factors, must be guided by the statutes, regulations and policy applicable to the specific types of agreements involved. In addition, it must be determined if an environmental assessment is required under Order 5050.4, Airport Environmental Handbook. Further, it must be determined that either:

(1)  The public purpose for which a term, condition, or covenant of an agreement, or the agreement itself, was intended to serve is no longer applicable, or

(2)  The release, modification, reformation or amendment of an applicable agreement will not prevent accomplishment of the public purposes for which the airport or its facilities were obligated, and such action is necessary to protect or advance the interest of the United States in civil aviation, or

(3)  The release, modification, reformation or amendment will obligate the airport owner under new terms, conditions, covenants, reservations or restrictions determined necessary in the public interest and to advance the interests of the United States in civil aviation, or

(4)  The release, modification, reformation or amendment will conform the rights and obligations of the owner to the statutes of the United States and the intent of the Congress consistent with applicable law.

c.  **Completion of Action on Owner's Request.**  Upon completion of the review, and following concurrence of the regional office, Washington headquarters, or the DOD, as applicable, the Airports field office will advise the airport owner that its request is granted

or denied. Any special conditions, qualifications or restrictions to an approval shall be included.

(1) **FAA Approval Action.** If the request or an acceptable modification of the request is approved, the necessary instruments or documents will be prepared conforming to the extent possible with the guidance of the Chief Counsel memorandum to all regional counsels dated April 30, 1965 (Appendix 4 to this Order). Parallel action will be initiated to amend all related FAA documents, e.g., NPIAS, ALP, land use plans, airport property map, FAA Form 5010, as required, to achieve consistency with the release. The owner shall thereafter provide the FAA with any acknowledgment (such as a notary) or copies of executed instruments or documents as required for FAA record purposes. The approval procedure may include a FAA letter of intent to approve the request, if so, see paragraph c(4) below.

(2) **Content of Release Document.** The formal release by FAA shall cite the agreements thereby affected and should identify specific areas or facilities involved. The owner shall be notified of the binding effect of the revised obligations.

(3) **Content of Release Document for Sale or Disposal.** A total release permitting sale or disposal of obligated land must specify that the owner is obligated to:

(a) Include in any deed, lease or other conveyance of a property interest to others, a reservation assuring the public right to fly aircraft over the land released, and to cause inherent aircraft noise over the land released. The following language shall be used:

"There is hereby reserved to the (grantor) (lessor) its successors and assigns, for the use and benefit of the public, a right of flight for the passage of aircraft in the airspace above the surface of the premises herein (conveyed)(leased). This public right of flight shall include the right to cause in said airspace any noise inherent in the operation of any aircraft used for navigation or flight through the said airspace or landing at, taking off from or operation on the (official name) Airport."

(b) Include in any deed, lease or other conveyance of a property interest to others a restriction:

(i) Prohibiting the erection of structures or growth of natural objects that would constitute an obstruction to air navigation, and

(ii) Prohibiting any activity on the land that would interfere with or be a hazard to the flight of aircraft over the land or to and from the airport or interfere with air navigation and to communication facilities serving the airport, and

(iii) Incorporating the Sponsors' Title VI Civil Rights Assurance obligations into all leases and other conveyances except fee title deeds. Fee title deeds transfer ownership of the property and it no longer serves an airport purpose. Accordingly, the Sponsors' Civil Rights Assurance obligations are not required to be transferred to the new owner. (DOT General Counsel and Acting Departmental Director of Civil Rights' letter of August 21, 1971, to The Secretary regarding Standard DOT Title VI Assurances.)

(c) These restrictions shall set forth in the instrument of release the applicable height limits above which no structure or growth should be permitted. These limits shall be computed according to the currently effective FAA criteria as applied to the airport. Advisory circulars, design manuals, FAR's, or other such documents shall not be incorporated by reference in the instruments or releases issued by the FAA. Neither should this be done in leases, deeds, or conveyances of property interests used by the airport owner. The specification of actual height limits will avoid a burdensome or confusing encumbrance on the title to the land. When the applicable height limits cannot be computed from available data at the Airports field office, the airport owner shall be required to supply any additional data needed to specify the correct computations.

(4) **FAA Consent by Letter of Intent to Release.**

(a) **Basis for Use.**

(i) Release and disposal of facilities developed through Federal assistance is often necessary to finance replacement facilities. Airport owners may have to assure the availability of the old facilities for disposal in order to obtain responsive proposals to acquire or encumber the existing facilities. The owner may therefore request a letter of intent as to such release. Such a letter may be requested merely to permit the owner to determine the market demand for portions of the available surplus revenue producing airport property.

(ii) The FAA may issue such a Letter of Intent (LOI) to release appropriately conditioned and specifically contingent upon adequate replacement facilities being developed and becoming operable.

(b) **Content.** An LOI issued by the FAA represents a binding commitment and an advance decision to release the property when specific conditions have been accomplished. The use of such a letter is not encouraged. It should only be used when all of the required conditions (as pertinent to the type of release sought as outlined in this Chapter) have been met or

are specifically made a condition of the pledge contained in the LOI. In addition, such a letter of intent should cite any specific understandings reached on anticipated problems in achieving the substitution of airport properties (e.g., who pays for relocation of various facilities and equipment, the cost of abating existing leases). A reasonable time limit on the commitment to release should be specified in the letter of intent.

(5) **Release of Maintenance Obligation.** A release may be granted to relieve an airport owner

from a continuing obligation to maintain an improvement to airport property when the improvement is no longer needed for civil aviation requirements, regardless of its existing condition. Such a release:

(a) Does not constitute a release of the land from the other applicable terms and conditions or covenants of the applicable compliance agreements;

(b) Must be conditioned on an agreement to discontinue use when it becomes unsafe for aeronautical purposes.

# CHAPTER 8. REVERSION OF AIRPORT PROPERTY – REVESTMENT OF TITLE IN THE UNITED STATES

## SECTION 1. GENERAL GUIDANCE

**8–1. GENERAL.** This Chapter furnishes FAA program guidance for use in effecting the reversion of airport property to the United States. This process is ordinarily the last resort when a grantee of Federal property for airport purposes continues in default. All other proper and available remedies to correct a default shall be explored prior to exercising the right to revert airport property. Contents of this Chapter reflects information obtained from the Federal agencies that represent four major sources of Federal property for public airport purposes; namely, General Services Administration (GSA), United States Department of Agriculture (USDA), Department of Interior's Bureau of Land Management (BLM), and DOD.

**8–2. RIGHT TO REVERT.** The right to revert airport property and revest title in the United States must be specified in an instrument of conveyance from the Federal Government. This right extends only to the title, right of possession,.or other rights vested in the United States at the time the property described in the instrument of conveyance was transferred to a grantee. The right may be exercised only at the option of the United States, with or without the cooperation of a grantee, against all or part of the property in question.

**8–3. AUTHORITY TO EXERCISE REVERTER.** The statutory authority of the FAA Administrator to exercise the option of the United States to revert property conveyed by the Government for public airport purposes has been delegated pursuant to Order 1100.3. Each revestment of title to airport property is controlled by the instrument of conveyance, applicable laws, Federal regulations, and orders.

**8–4. INSTRUMENTS OF CONVEYANCE INVOLVED.** Instruments of conveyance that typically include a right to revert airport property and to revest title in the United States are issued under authority of one or more of the following:

    **a.** Section 516, Airport and Airway Improvement Act of 1982 (P.L. 97–248, September 3, 1982).

    **b.** Section 23, Airport and Airway Development Act of 1970 (P.L. 91–258, May 21, 1970) (84 STAT 219 and following).

    **c.** Section 16, Federal Airport Act of 1946, as amended (49 U.S.C. 1115).

    **d.** Section 13(g), Surplus Property Act of 1944, as amended (50 U.S.C. app 1622(g), specifically P.L. 80–289 and P.L. 81–311).

    **e.** Section 303(c), Federal Aviation Act of 1958, as amended (49 U.S.C. 1344(c)). Also the precedent Civil Aeronautics Act of 1938, as amended.

    **f.** Special Congressional Legislation. Section 35 of the Alaska Omnibus Act (73 STAT 149) or other enabling Acts authorizing conveyances of Federal property to non–Federal public agencies for public airport purposes.

**8–5. CONSTRUCTIVE SEVERANCE.** There are circumstances when only part of airport land subject to reverter is not used in accordance with the statutes and deed. In this event, consideration should be given to reverting title to only that property where misuse or nonuse comprises of default; however, Chief Counsel should be obtained before proposing measures of this type.

**8–6. FORFEITURE BY VOLUNTARY RECONVEYANCE.** Title to airport property may be revested in the United States by a voluntary reconveyance by a grantee. FAA prefers this method and it is usually in the best interest of all parties. Sometimes a grantee may be unwilling or legally unable to voluntarily reconvey title. However, once the FAA makes the determination to exercise the Government's option to revert airport property there is no alternative but to act to revest title in the United States. Nonetheless, make every effort to secure the cooperation of the grantee to prevent legal and administrative complications. As an example, a grantee for good and sufficient reasons may want to be served with a notice of intent to revert property or notice of reverter (see paragraphs 8–22 and 8–25) before executing a voluntary quitclaim deed or instrument of reconveyance in acknowledgment of receipt thereof.

**8–7. TRANSFER OF TITLE BY GRANTEE.** In lieu of a reverter action, the FAA may concur in an assignment or transfer of title to the property in question from the grantee in default to a willing non–Federal public agency eligible under the current program. The FAA must determine that the assignee is capable of fulfilling all the covenants of the instrument involved and that the transfer of title under these circumstances is essential to the continued operation, mainte-

nance, and development of a public airport and in the interests of the United States in civil aviation. The Federal agency which originally conveyed the property shall be provided a copy of the instrument of such conveyance for record purposes.

**8-8. PIECEMEAL REVERSIONS.** The Government's right of reversion for portions of airport property that are unused or undeveloped, or improperly used, should not be disregarded.

**8-9. EFFECT OF OUTSTANDING LEASES OF AIRPORT PROPERTY.**

   **a.** Any grantee lease of airport property that is subject to one of the instruments of conveyance from the Government, referred to in paragraph 8-4 above, is subordinate and subject to that instrument.

   **b.** It should be noted, however, that in reviewing a lease or use of surplus airport property including a nonaviation revenue producing activity consistent with the objectives of the initial deed of conveyance FAA may assure the grantee/owner and the prospective lessee, in writing, that the lease will be honored. For further details see Chapter 4, paragraph 4-18h, of this Order.

**8-10. LEGAL PROCEEDINGS TO EFFECT REVERSION.** Any legal proceedings to effect involuntary reversion in the event of refusal or resistance on the part of a grantee shall be the responsibility of the Department of Justice with coordination with the Chief Counsel.

**8-11. CONTACT WITH THE REVERSIONER FEDERAL AGENCY.** The issuing Federal agency, or successor, that issued the instrument of conveyance

has a right to receive the Government's estate in reversion. Prior to advising the grantee Federal agency will be fully coordinated with in writing outlining FAA determination of default by providing a copy of the notice of intent to revert property.

**8-12. CONTACT WITH THE GENERAL SERVICES ADMINISTRATION (GSA).** If the reversioner Federal agency is other than GSA or FAA and declines to accept control and jurisdiction upon revestment of title, the GSA will automatically become the reversioner agent to the Government unless FAA is involved as indicated below. The FAA must then advise GSA of the impending reversion to the United States and fully coordinate revestment of title procedures consistent with supplementary guidance and procedures from the GSA.

**8-13. FAA AS REVERSIONER FEDERAL AGENCY.** Where FAA is the reversioner agent of the Government such reversions of airport property will be handled by the regional Acquisitions and Logistics Division. They shall administer the procedures for this action under applicable regulations.

**8-14. REPOSSESSION.** In order for a reversion to take place, there must be a physical taking of property to effect possession and a constructive occupancy through posting. FAA should request sufficient signs from the reversioner Federal agency for posting upon the property by the FAA following recording of the notice of reverter to inform the public that it is U.S. Government property. (See paragraphs 8-27 and 8-28.)

**8-15.-8-20. RESERVED.**

## SECTION 2. GENERAL PROCEDURES

**8-21. DETERMINATION OF DEFAULT.** To revert property conveyed for public airport purposes and revest title in the United States, the FAA shall determine that a grantee is in default under the covenants of the instrument of conveyance. To establish a default, the procedures outlined in paragraph 8-10 must be followed.

**8-22. NOTICE OF INTENT TO REVERT PROPERTY.** This notice is a formal style letter that informs a grantee of an FAA declaration of default and decision to revert title to property under the covenants of an instrument of conveyance. Send notice to the grantee (information copy to grantor agency) by certified or registered mail, return receipt requested. The notice shall include:

   **a.** The prior notice of noncompliance status.

   **b.** The failure of the grantee to correct the deficiencies which are the basis for noncompliance.

   **c.** The resulting default based on the instrument of conveyance involved.

   **d.** The identity of the property to be reverted to the United States.

   **e.** The additional time being allowed for the grantee to cure the default, usually 60 days. The FAA shall define the basis to cure the default. The grantee shall be advised to promptly notify the FAA if it does not intend to act to cure the default and thereby waive the time allowed to cure the default.

**f.** The minimum requirements should be established for curing the default and retain the property.

**g.** It is the policy of the FAA to cooperate with the grantee to the extent reasonable to resolve the matter expeditiously and in the interest of the United States in civil aviation. Failure to resolve the matter in a timely and efficient manner will require the FAA to issue a notice of reverter and revest title to the property involved in the Federal Government.

**h.** Any other relevant facts bearing on the default or potential remedies.

**8–23. VOLUNTARY RECONVEYANCE TO CORRECT A DEFAULT.** Grantees determined to be in default shall be given the opportunity to voluntarily reconvey the property in question to the United States. Where only part of the real property described in the instrument is involved, the FAA shall coordinate with the reversioner Federal agency and supplement the general guidance and procedures for the revestment of good title in the United States. Each voluntary reconveyance shall require the following:

**a.** A resolution of the governing body of the grantee authorizing a reconveyance to the United States and designating an appropriate official to execute an instrument of reconveyance acceptable to the United States. The resolution shall also recite the reason for reconveyance (e.g., not developed, ceased to be used, not needed).

**b.** An instrument of reconveyance that substantially conforms to a format suggested by the cognizant FAA counsel considering Federal, state and local requirements.

**c.** A legal opinion by grantee's attorney which should recite:

    (1) The grantee's legal authority to reconvey the property to the United States.

    (2) The status and validity of title reconveyed to the United States covering the period from the time of acquisition from the Federal Government for public airport purposes and the inclusion of outstanding encumbrances or interests in the title to the property reconveyed must be cited together with the legal and administrative means considered necessary to achieve title status the same as originally conveyed by the Government to the grantee.

    (3) As an alternative to c(1)&(2), the Attorney General of the state may render such opinion, if acceptable to the reversioner Federal agency or the Attorney General of the United States.

**d.** Prepare a Certificate of Inspection and Possession as shown in Appendix 2.

**8–24. VOLUNTARY RECONVEYANCE DOCUMENTATION.** FAA shall submit the necessary documents to the cognizant official of the reversioner Federal agency. Certified or conformed copies required by the reversioner Federal agency shall be obtained by FAA from the grantee.

**8–25. NOTICE OF REVERTER OF PROPERTY AND REVESTMENT OF TITLE IN THE UNITED STATES.** This notice is ordinarily prepared under the direction of the cognizant FAA counsel unless otherwise determined by the Regional Airports Division Manager. The basic elements of this notice are as follows:

    **a.** Identification of the instrument of conveyance from the United States to the grantee.

    **b.** Citation of the statutory authority enabling the original conveyance of Federal property.

    **c.** Legal description of the property conveyed and that part which is reverted to the United States.

    **d.** Statement that the property was conveyed subject to an express provision prescribing for its reversion under certain circumstances, and set forth the reverter clause.

    **e.** Statement that the FAA has determined that the property in question is reverted to the United States for specific reasons consistent with the reverter clause and the specific default of the grantee, and set forth any clause in the instrument of conveyance relevant to the default.

    **f.** Statement that the property interest to which the United States has reverter rights is revested in the United States.

    **g.** Statement identifying the reversioner Federal agency.

    **h.** Reference to the notice of intent to revert property.

**8–26. RECORDING NOTICE OF REVERTER OF PROPERTY AND REVESTMENT OF TITLE IN THE UNITED STATES.** After execution by the authorized FAA official, the original executed copy of the notice shall be duly recorded in the official records of the county in which the property is located. Thereupon, obtain from the Clerk of the Court or other custodian of the official county records the required number of certified copies or certificates of recordation. The number of copies required shall satisfy the needs of the Federal agencies involved. Concurrent with the recordation of the original copy of the notice, send or deliver an executed copy to the grantee. A cover letter shall affirm that pursuant to the execution

of the notice the property involved has reverted to and title thereto revested in the United States. This letter shall advise the grantee that the notice has been recorded in the official records of the country in which the property is located.

**8-27. CERTIFICATE OF INSPECTION AND POSSESSION.** The guidance and procedure set forth in paragraph 8-23d above shall be followed upon conclusion of the foregoing actions by the FAA to revert property and revest title in the United States.

**8-28. POSTING OR MARKING OF PROPERTY.** Concurrent with the physical inspection of the reverted property discussed in paragraph 8-27 above, it shall be posted or marked, as appropriate, to indicate that it is property of the United States. A representative of the reversioner Federal agency may assist the FAA representative if deemed appropriate or necessary by the reversioner Federal agency.

# APPENDIX 1—INSTRUMENT OF RECONVEYANCE

"THIS INDENTURE, made the day of _____ , between _____ ,
_____ , a body politic and corporate under the laws of the _____ , as Party of
the First Part, and the United States of America, as Party of the Second Part.

WHEREAS the Party of the Second Part, acting through the Secretary of the Interior, pursuant to the authority
contained in Section 16 of the Federal Airport Act (60 Stat. 179; 49 U.S.C., 1115), did give and grant on or about
_____ , a patent to the Party of the First Part, and to its successors in function, for the lands
described hereinbelow, subject to certain reservations, exceptions, limitations and conditions, as set out therein, in-
cluding the following express conditions:

That the property interest hereby conveyed shall automatically revert to the United States pursuant to Section 16 of
the Federal Airport Act, supra, in the event that the lands in question are not developed, or cease to be used, for
airport purposes, the _____ , for itself and assigns, agreeing by the acceptance of this patent
or the rights granted herein, that a determination by the Administrator of the Federal Aviation Administration or his
successor in function, that the lands are not developed, or have ceased to be used for airport purposes, shall be
conclusive of these facts:

That the _____ , State of _____ , will develop an airport upon the tract
herein demised;

That such airport will be operated as a public airport upon fair and reasonable terms and without unjust discrimina-
tion;

That any subsequent transfer of the property interest conveyed hereby will be made subject to all of the covenants,
conditions and limitations contained in this instrument;

That in the event of a breach of any condition or covenant herein imposed, the Administrator of the Federal Avia-
tion Administration or his successor in function may immediately enter and possess himself of title to the herein
demised tract for and on behalf of the United States of America;

That in the event of a breach of any condition or covenant herein imposed the said
State of                           , will, upon demand of the Administrator of the Federal Aviation Administra-
tion or his successor in function take such action including the prosecution of suit, or execute such instruments as
may be necessary and required to evidence transfer of title to the herein demised tract to the United States of
America.

WHEREAS the Administrator of the Federal Aviation Administration has determined that the property interest con-
veyed has not been developed [has ceased to be used] for airport purposes;

NOW THEREFORE, WITNESSETH:  That the Party of the First Part, for and in consideration of the premises
and of its being hereby released of its obligation under said patent to [use the lands conveyed thereunder for airport
purposes] [develop and oeprate a public airport on the lands conveyed thereunder] has remised, released and quit-
claimed, and by these present does remise, release and quitclaim unto the Part of the Second Part, and its successors
in interest and assigns forever, all its right, title and interest in said lands referred to in the first Whereas clause
hereof, as heretofore conveyed to the Part of the First Part, under said patent, being also the right, title and interest
in said lands which the Party of the First Part hereby warrants it does not hold therein, said lands being described
as follows:

[Property Description]

TO HAVE AND TO HOLD the property transferred hereby, unto the Party of the Second Part, its successors in
interest and assigns forever.''`

10/2/89

# APPENDIX 2—CERTIFICATE OF INSPECTION AND POSSESSION

## CERTIFICATE OF INSPECTION AND POSSESSION

Re:                                                                    Date:

This is to certify that I, _____ , _____ , _____
_____ , _____ , _____ , did on the
day of _____ , make a physical inspection of the property known as _____ as described in a certain deed from the _____ , to the United States of America, dated _____
_____.

I further certify that I found no tenants or persons claiming or exercising possessory rights on the property.

I found no visible evidence of outstanding easements and no evidence of recent improvements upon the properties which might form the basis of laborer's, material furnisher's or mechanic's liens.

I further certify that based upon my inspection and investigation, there are no adverse interests apparent in conflict with the title and ownership of the United States of America under the deed above referred to. The statements herein made are based upon an inspection of the property after reconveyance to the United States of America referred to.

1

# APPENDIX 3—NOTICE OF REVERSION OF TITLE

## NOTICE OF REVERTER

To the State of Arizona:

THIS NOTICE OF REVERTER, issued this 31st day of January, 1962, by the United States of America to the State of Arizona, WITNESSETH:

THAT, WHEREAS, the United States of America, hereinafter called the Party of the First Part, by a Quit-claim Deed dated November 17, 1949, unrecorded among the land records of the County of Cochise, Arizona, did convey to the State of Arizona, hereinafter called the party of the second part (subject, however, to the easements for all rights-of-way for public roads, highways, utility lines, railways and pipelines of record) certain airport property commonly known as Webb Airport (Douglas Auxiliary No. 3) situated in the County of Cochise, State of Arizona, which said airport property is described in said Quitclaim Deed on Page 1 thereof as follows:

The North One-Half of Section 21, Township 19 South, Range 26 East, Gila and Salt River Base and Meridian, Cochise County, Arizona, containing 320 acres, more or less.

TOGETHER WITH the following listed buildings and improvements located on the above described property and property described as the South One-Half of Section 16, Township 19 South, Range 26 East, Gila and Salt River Base and Meridian, Cochise County, Arizona:

BUILDINGS
    T-3001
    T-3002
    T-3003
    T-3004

IMPROVEMENTS
All runways and taxiways, dust control, clearing and grubbing, field drainage, fences, access road, and electrical distribution system.

AND WHEREAS, said Quitclaim Deed contains among other reservations, restrictions, and conditions, the following paragraphs on Page 3 thereof pertaining to the operation and maintenance obligations of the State of Arizona, which said paragraphs are as follows:

(1) That, except as provided in subparagraph (6) of the next succeeding unnumbered paragraph, the land, buildings, structures, improvements and equipment in which this instrument transfers any interest shall be used for public airport purposes for the use and benefit of the public, on reasonable terms and without unjust discrimination and without grant or exercise of any exclusive right for use of the airport within the meaning of the term "exclusive right" as used in subparagraph (4) of the next succeeding paragraph. As used in this instrument, the term "airport" shall be deemed to include at least all such land, buildings, structures, improvements and equipment.

(2) That, except as provided in subparagraph (6) of the next succeeding paragraph, the entire landing area, as defined in WAA Regulation 5, as amended, and all structures, improvements, facilities and equipment in which this instrument transfers any interest shall be maintained for the use and benefit of the public at all times in good and serviceable conditions, provided, however, that such maintenance shall be required as to structures, improvements, facilities and equipment only during the remainder of their estimated life, as determined by the Civil Aeronautics Administrator or his successor. In the event materials are required to rehabilitate or repair certain of the aforementioned structures, improvements, facilities or equipment, they may be procured by demolition of other structures, improvements, facilities or equipment transferred hereby and located on the above-described premises which have outlived their use as airport property in the opinion of the Civil Aeronautics Administrator or his successor.

1

**AND WHEREAS,** the said Quitclaim Deed contains on Page 5 thereof a paragraph setting forth the reverter rights of the United States which may e exercised at its option in the event of default by the State of Arizona in complying with its obligations, which said paragraph is as follows:

(1) That in the event that any of the aforesaid terms, conditions, reservations, or restrictions are not met, observed, or complied with by the party of the second part or any subsequent transferee, whether caused by the legal inability of said party of the second part or subsequent transferee to perform any of the obligations herein set out, or otherwise, the title, right of possession and all other rights transferred by this instrument of the party of the second part, or any portion thereof, shall at the option of the party of the first part, revert to the party of the first part sixty (60) days following the date upon which demand to this effect is made in writing by the Civil Aeronautics Administration or its successor in function, unless within said sixty (60) days such default or violation shall have been curred and all such terms, conditions, reservations and restrictions shall have been met, observed or complied with, in which event said reversion shall not occur and title, right or possession, and all other rights transferred hereby, except such, if any, as shall have previously reverted, shall remain vested in the party of the second part, its transferees, successors and assigns.

**AND WHEREAS,** there has been placed of record a Quitclaim Deed from the State of Arizona to the United States dated December 12, 1960, and recorded on March 14, 1961, among the land records of Cochise County, Arizona, in Docket No. 270 at Page 53, under which deed all of the premised described in the above-noted Quitclaim Deed to the State of Arizona were quitclaimed to the United States subject to certain reservations, restrictions and conditions and the assumption by the United States of certain obligations;

**AND WHEREAS,** a question has arisen as to the authority of the State of Arizona to reconvey the unencumbered title to the premises described in the aforesaid quitclaim deed to the United States so that there shall be vested in the United States the same title to the said permises which the United States had prior to the conveyance of such property to the State of Arizona;

**AND WHEREAS,** the Federal Aviation Agency (as successor to the Civil Aeronautics Administration) through its duly authorized Agent, Charles S. Benson, Chief, Airports Branch, Aviation Facilities Division, Federal Aviation Agency, Western Region, Los Angeles, California, by letter dated November 8, 1961, did notify the State of Arizona through its State Land Commissioner, Honorable Obed M. Lassen, that the State of Arizona was in default of its obligations under said Quitclaim Deed in that the airport was no longer being operated or maintained as a public airport and had been abandoned for public airport purposes;

**AND WHEREAS,** the State of Arizona continues to be in default of its obligations under said Quitclaim Deed in that the airport has not been operated or maintained as a public airport subsequent to the date of said letter, and has in fact closed and marked as abandoned the property, as such, although, a period of time in excess of sixty (60) days, has elapsed since said date;

**NOW THEREFORE,** the Administrator of the Federal Aviation Agency through its duly authorized Agent, Chief, Airports Division, Western Region, Federal Aviation Agency, does hereby notify the State of Arizona that all of the rights, title, and interest in and to the above-described airport property commonly known as Webb Airport (Douglas Auxiliary No. 3) and as hereinabove described situated in the County of Cochise, Arizona, does by this Notice and as of the date of the recording of this Notice revert to the United States of America.

2

**IN WITNESS WHEREOF**, the UNITED STATES OF AMERICA has caused this Instrument to be executed as of the _____, day of _____, 1961.

UNITED STATES OF AMERICA

The Administrator of the Federal Aviation Agency

By _____

Chief, Airports Division, Western Region

Order 5190.6A
Appendix 3

10/2/89

STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

On this _____ day of _____ , 19___ , before me _____ , a
Notary Public in and for the County of Los Angeles, State of California, personally appeared _____
_ known to me to be the Chief, Airports Division, Western Region, Federal Aviation Agency, and known to me to
be the person whose name is subscribed to the within Instrument and acknowledged that he executed the same on
behalf of the Administrator of Federal Aviation Agency and the United States of America.

WITNESS my hand and official seal.

_____
Notary Public in and for the County
of Los Angeles, State of California

My Commission Expires:

_____

4

# APPENDIX 4—FORM OF RELEASE DEED

SUBJECT:    Form of Release Deed         Date:  April 30, 1965

FROM:      General Counsel

TO:        Director, Alaskan Region
           Director, Central Region
           Director, Eastern Region
           Director, Pacific Region    Attention:  Regional Counsel
           Director, Southern Region
           Director, Southwest Region
           Director, Western Region

As per our memorandum to you dated January 18, 1965, relative to the above, we have now received copies of various Forms of Release, particularly with respect to sale of a portion of an airport property, which are currently in use in the Regions, and we find that these forms are in substantial conformity to the requirements of Public Law 81–311.

In passing Public Law 81–311 Congress included a proviso that any such release authorized by that law may be granted on such conditions as the Administrator of the Federal Aviation Administration deems necessary to protect the interests of the United States in civil aviation. The question has been raised as to whether this proviso contemplated a reverter to the United States upon conveyance by the airport owner which would be in addition to the reverter provided for in Public Law 80–289 under which the Government was originally authorized to convey.

In our consideration and review of this question we have considered the policy and purposes of P.L. 81–311 as set forth in House Report No. 409 and Senate Report No. 609 dated April 7 and July 15, 1949, respectively, on H.R. 3851 which was enacted as P.L. 81–311. We have also considered the provisions of Handbook AS P 5190, Section 1, Chapter 6, which implements congressional policy in connection with such releases.

P.L. 80–289 provides for the conveyance by the United States under appropriate circumstances of real property held by the United States and it is out of such a conveyance that a right of reverter may be created as the United States is the grantor. The purpose of P.L. 81–311 is to unhamper restrictions "in such a way as would best serve the public interest of that public agency" which is the entity owning the airport (see page 4 Senate Report No. 690 dated July 15, 1949, or H.R. 3851, 81st Congress). This P.L. 81–311 contemplates that the Federal Government would utilize the power granted by that Act to remove by an Instrument of Release certain conditions contained in Instruments of Conveyance under P.L. 80–289 so as to unhamper the utility of real estate conveyed pursuant thereto.

While P.L. 81–311 provides that "* * * * any such release * * * * may be granted on, or may be subject to, such terms and conditions as the Administrator * * * * deems necessary to protect or advance the interests of the United States in civil aviation," there is nothing in the legislative history that would contemplate an effort on the part of the United States to obtain a further reverter out of property as to which the United States had previously conveyed all of its title. Therefore, an additional reverter could not have been contemplated because as a matter of law a reverter interest can only run to the grantor which, in the instance under consideration, is the airport owner.

While forms if literally followed often create problems, there does appear to be some benefit to be derived from a Form of Release Deed which can be used as a guide and be used to some extent for the purposes of uniformity. In cooperation with regional personnel a Form of Release Deed has been developed where a portion of an airport property can be sold under circumstances where it is no longer needed for the development, operation, or maintenance of the airport.

1

In line with the general comment that Forms will not serve all purposes, it should be noted that there may be instances where airport owners can justify a release when there is to be no conveyance of a portion of the land for nonairport use, but rather a leasing of such by the airport. In those exceptional cases a release may be made subject to the three desired conditions: (1) that the public should have a right of flight; (2) that no structure or object of natural growth shall be allowed above a certain height; and (3) that no incompatible use shall be made of the leased property. The airport owner in making any such lease should reserve unto itself, its successors and assigns for the use and benefit of the public the right of flight, and should require the lessee to agree for itself, its successors and assigns to both restrict the height of structures and to prevent incompatible use.

The Form of Release in connection with a sale of a portion of airport property as discussed above is enclosed for your guidance and possible use.

/s/ Martin Menter (for)
Nathaniel H. Goodrich

Enclosure

2

# DEED OF RELEASE

This instrument, a Deed of Release, made by the United States of America, acting by and through (_____), Federal Aviation Administration, under and pursuant to the powers and authority contained in the provisions of Public Law 81–311 (63 Stat. 700), as amended, to the (Airport Owner), a body politic under the laws of the State of _____, Witnesseth

**WHEREAS,**

(Here follows the necessary recital of the facts and circumstances involved in each release, including descriptive reference to deed from United States to (Airport Owner) authorized by P.L. 80–289).

**NOW, THEREFORE,**

For and in consideration of the above–expressed recitals and of the benefits to accrue to the United States and to civil aviation, the United States of America, upon inclusion by the (Airport Owner) in the Instrument of Transfer conveying title to the hereinafter described real property of provisions as follows:

(1) That the (Airport Owner) reserves unto itself, its successors and assigns, for the use and benefit of the public a right of flight for the passage of aircraft in the airspace above the surface of the real property hereinafter described, together with the right to cause in said airspace such noise as may be inherent in the operation of aircraft, now known or hereafter used, for navigation of or flight in the said airspace, and for use of said airspace for landing on, taking off from or operating on _____ Airport,

(2) That the Grantee expressly agrees for itself, its successors and assigns to restrict the height of structures, objects of natural growth and other obstructions on the hereinafter described real property to a height of not more than _____ feet above sea level,

(3) That the Grantee expressly agrees for itself, its successors and assigns to prevent any use of the hereinafter described real property which would interfere with landing or taking off of aircraft at the _____ Airport, or otherwise constitute an airport hazard,

(4) (Here may be inserted other conditions that may appear to be necessary),

hereby releases the said real property from the conditions, reservations and restrictions as contained in the above-mentioned Instrument of Transfer from the United States of America to the (airport owner) dated _____, which real property is described as follows:

(Description)

By its acceptance of this Deed of Release the (airport owner) convenants and agrees for itself, its successors and assigns, to comply with and observe all of the conditions and limitations hereof, which are expressly limited to the above–described real property.

**IN WITNESS WHEREOF** the United States of America has caused this Deed of Release to be executed as of the _____ day of _____ 19____.

**UNITED STATES OF AMERICA**

By _____

Federal Aviation Administration

Accepted:
City of _____

By_____
     Title

3

# APPENDIX 5—DEFINITIONS

**a. Aeronautical Activity** – any activity which involves, makes possible, or is required for the operation of aircraft, or which contributes to or is required for the safety of such operations. For example:

   (1) The following are aeronautical activities:

   (a) Air taxi and charter operations.

   (b) Scheduled or nonscheduled air carrier services.

   (c) Pilot training.

   (d) Aircraft rental and sightseeing.

   (e) Aerial photography.

   (f) Crop dusting.

   (g) Aerial advertising and surveying.

   (h) Aircraft sales and service.

   (i) Aircraft storage.

   (j) Sale of aviation petroleum products.

   (k) Repair and maintenance of aircraft.

   (l) Sale of aircraft parts.

   (m) Parachute activies

   (n) Ultralight activies

   (2) The following are not aeronautical activities: ground transportation (taxis, car rentals, limousines); restaurants; in-flight food catering; barber shops; and auto parking lots.

**b. Airport** – an area of land or water which is used, or intended for use, for the landing and takeoff of aircraft, and any appurtenant areas which are used, or intended of use, for airport buildings or other airport facilities or right–of–way, together with all airport buildings and facilities located thereon; and includes any heliport.

**c. Airport Hazard** – any structure or object of natural growth located on or in the vicinity of a public–use airport, or any use of land near such an airport, which obstructs the airspace required for the flight in landing or take off at such airport or is otherwise hazardous to such landing or taking off of aircraft.

**d. Airport Layout Plan (ALP)** – shows the orientation and location of key facilities, such as runways and navigational aids, must be planned with consideration for approach zones, prevailing winds, airspace utilization, land contours and many other special factors. The dimensional relationships, even within the airport boundaries, between operational and support facilities and allocation of reasonable space to allow for orderly expansion of individual functions must be clearly established in advance. This is essential if such facilities are to be subsequently positioned where they can best serve their intended purposes while conforming to applicable safety and construction criteria.

**e. Aviation Use of Real Property (Aeronautical Property)** – all property comprising the land, airspace, improvements and facilities used or intended to be used for any operational purpose related to, in support of, or complementary to the flight of aircraft to or from the landing area. It is not confined to land areas or improvements eligible for development with Federal–aid (FAAP/ADAP/AIP) or to property acquired from Federal sources. In addition to the areas occupied by the runways, taxiways, and parking aprons, aeronautical property includes any other areas used or intended to be used for supporting services and facilities related to the operation of aircraft. It also includes property normally required by those activities which are complementary to flight activity such as convenience concessions serving the public including, but not limited to shelter, ground transportation, food and personal services.

1

Order 5190.6A
Appendix 5

10/2/89

**f. Capital Improvement Program (CIP)** – consists of the 5–year eligible capital requirements at designated airports. It is not a funding plan since the actual funding of development will depend on annual limitations for the AIP as imposed by Congress. The CIP provides a systematic approach to identify unmet needs, determine optimum distribution of available grant funds, foster cooperation among states/local/Federal authorities, advise and inform the public, identify problems and determine their impacts on the system, and provide FAA with a rational, need–based process for distribution of limited airport grant funds. It also provides a basis for responding to new legislative proposals.

**g. Compatible Land Use** – compatibility of land use is attained when the use of adjacent property neither adversely affects flight operations from the airport nor is itself adversely affected by such flight operations. For all practical purposes the adverse effect of flight operations on adjacent land is attributable to noise and vibration (residential, schools, etc.). Land usage which adversely affects flight operations is that which creates or contributes to a flight hazard. For example, any land use which might block the line of sight from the control tower to all parts of the landing area, inhibits pilot visibility (such as glaring lights, smoke, etc. produces electronic aberrations of navigational guidance systems, or which tends to attract birds must be considered an incompatible land usage. Similarly under certain circumstances an exposed garbage dump may not only attract birds but, if open incineration is regularly permitted, can create a smoke hazard.

**h. Concurrent Land Use** – means that the land can be used for more than one purpose at the same time. For example, portions of land needed for clear zone purposes could also be used for agriculture purposes at the same time.

**i. Exclusive Right** – a power, privilege, or other right excluding or debarring another from enjoying or exercising a like power, privilege, or right. An exclusive right may be conferred either by express agreement, by the imposition of unreasonable standards or requirements, or by any other means. Such a right conferred on one or more parties but excluding others from enjoying or exercising a similar right or rights would be an exclusive right.

**j. Fair Market Value (FMV)** – the highest price estimated in terms of money which a property will bring if exposed for sale in the open market allowing a reasonable time to find a purchaser who buys ith knowledge of all the uses to which it is adapted and for which it is capable of being used. It is also frequently referred to as the price at which a willing seller would sell and a willing buyer buy, neither being under abnormal pressure. FMV will fluctuate based on the economic conditions of the area.

**k. Federal Agency** – means an agency of the Federal Government. This does not include the National Guard or the Air Guard when they are not mobilized by the United States into the active military.

**l. Federal Funds** – any airport which consists in whole or in part of property, improvements, or other assets conveyed by the United States Government without monetary consideration for airport purposes, or which was acquired, developed or improved with Federal assistance must be considered as an airport upon which Federal funds have been expended.

**m. Fixed–Base Operator (FBO)** – an individual or firm operating at an airport and providing general aircraft services such as maintenance, storage, ground and flight instructions, etc.

**n. Government Aircraft** – for purposes of the compliance program, Government aircraft is defined as aircraft owned or leased to the Federal Government.

**o. Interim Use of Aeronautical Property for Nonaviation Purposes** – an interim use is defined as a temporary short term (normally not to exceed 3 years) nonaviation use of property conveyed to or acquired by the owner for aviation use.

**p. Landing Area** – any locality, either of land or water, including airports and intermediate landing fields, which is used, or intended to be used, for the landing and takeoff of aircraft, whether or not facilities are provided for the shelter, servicing, or repair of aircraft, or for receiving or discharging passengers or cargo (Definition in Federal Aviation Act, Section 101).

**q. Long Term Lease** – a lease with a term of 5 years or more.

**r. Minimum Standards** – as used herein, this refers to the qualifications which may be established by an airport owner as the minimum requirements to be met as a condition for the right to conduct a commercial aeronautical activity on the airport.

2

s. **Net Proceeds** – net proceeds means the sum derived from a lease sale, salvage or other disposal of airport property at FMV after deductions or allowances have been made for intangible benefits and directly related expenses such as advertising, legal services, surveys, appraisals, taxes, commissions, title insurance, escrow services.

t. **Public Airport** – means any airport which is used or to be used for public purposes, under control of a public agency, the landing area of which is publicly–owned.

u. **Public–use Airport** – means (a) any public airport; (b) any privately–owned reliever airport; or (c) any privately–owned airport which is determined by the Secretary to enplane annually 2,500 or more passengers and receive scheduled passenger service of aircraft, which is used or to be used for public purposes.

v. **Quit Claim Deed** – a deed that transfers the exact interest in real estate of one to another.

w. **Revenue Use of Nonaviation Use Real Property** – is all property described and dedicated in an airport agreement, except aviation use property as defined above. Such property may, with FAA consent, be used for nonaviation activities compatible with airport operations. At airports obligated under surplus property instruments of disposal (Regulation 16 or P.L 80–289) the income from such property must be used to support the maintenance, operation, or development costs of the aeronautical property, since no other usage was contemplated by the statute.

x. **Tenant** – the term tenant shall mean a person or organization occupying space or property on an airport under a lease or other agreement.

# APPENDIX 6—FORMAL COMPLIANCE INSPECTION

1.  Prior to conducting a compliance inspection visit to the airport, the responsible Airports employee shall perform a preinspection office review. It should normally include the following element:

   **a. Preinspection Preparation.** The first step is to review airport data available in the files. The inspector should review all conveyance documents and grant agreements in order to fully understand the specific commitments of the airport owner. This will include any continuing special conditions of grant agreements and the terms and conditions of release granted by the FAA. Previous inspection records should be reviewed to determine the owner's past performance in such matters as operation of the airport. physical maintenance and financial activities. This information will assist in determining whether the existing airport condition is static, improving or deteriorating. If it has not already been done, the inspector will want to draw up a list of leases in effect showing dates of renewal or expiration. The inspector should review recent correspondence with the owner to see what followup may be needed during the inspection. It will also be helpful to study the ALP, property use maps and land–use and operating plans, if any. A review of recent grant-funded projects will also be helpful. A list of known airport obstructions will be useful during the airport visit.

   **b. Compliance Worksheet.** The standard worksheet, Figure A–1, was designed to be used as a simple, concise record of an airport's condition as observed during a "screening" inspection. It is not a statement of the owner's compliance status, but rather is a source of information for determining the compliance status. The actual finding shall be recorded in a format similar to Figure 1 in Chapter 5. The method to be used in collecting essential compliance data must be adapted to the situation. Thus, at larger airports with more complex factors to be considered or at those with a history of poor compliance performance, a screening inspection might be inappropriate. In such cases, a more comprehensive, locally prepared worksheet may be preferable. The choice of whether to use a worksheet at all is left to the discretion of field offices. If one is used, it usually is best not to fill it out in the owner's presence since it may cause unwarranted apprehension, thus restricting the flow of information. Regardless of the method use to collect and record data, adequate records must be maintained to clearly document what was reviewed and what was discovered.

   **c. Use of the Worksheet.** While many of the items included in the worksheet (Figure A–1) are self–explanatory, the following guidance is helpful.

   Item I: Entries here give the inspector's general impression as to whether the airport is developing, deteriorating, or stagnant. Observed changes which are undesirable or have an unsatisfactory general appearance should be explained on the back of the form.

   Item II: Record here an evaluation of the physical condition of the airport's facilities in light of the owner's maintenance effort. This calls for a realistic appraisal of whether the facilities are being properly preserved. Any which are rated unsatisfactory should be explained on the back of the form. Other data sources, such as FAA Form 5010 inspections, other records, or FAR Part 139 inspection findings can be used to further substantiate findings.

   Item III: Any individual approach slope which fails to meet applicable criteria should be identified on the back of the form, together with comments on whether the owner can be required to correct the condition. Similarly, any unmarked obstruction or incompatible activity on adjacent land should be explained. Determine if clear zone interests and zoning, if any, are adequate and if not, what future requirements should be considered.

   Item IV: The operations plan and land–use plan listed here are discussed in paragraph 4–17. Although such plans are not a mandatory requirement, their use will facilitate effective administration of any airport. The inspector should review those that exist, together with airport regulations and minimum standards, to determine whether they can be considered satisfactory in light of the owner's obligations. If such plans are not satisfactory, the owner should be advised of necessary modifications.

   Item V: Observe whether the owner is complying with exclusive rights policy (see Chapter 3) and with civil rights requirements of DOT Regulations, Part 21 (see paragraph 4–16).

   Item VI: This item requires collection of data on new leases or agreements executed since the most recent past compliance inspection. Basic data to include on the back of the form are identity of lessee, date of execution, term of lease, and nature of occupancy or activity covered. If the screening inspector is not qualified to judge the acceptability of the lease or

1

port's power to correct. Still others may have been the subject of an FAA airspace review that determined they were not a hazard or they were not a hazard if marked and lighted in accordance with FAA standards.

(1) **Owner's Status.** Where an approach surface is affected by an obstruction and the owner is obligated to maintain clear approaches, that owner is in noncompliance unless FAA can determine that elimination of the obstruction is not reasonably within the owner's power and/or the obstruction is not a hazard to navigation. The airport owner's primary obligation is to prevent or remove hazards.

(2) **Future Outlook.** Recent trends in uses of adjacent properties should be reviewed to see whether probable developments might pose a threat to any runway approaches. Measures being taken by the owner to protect these approaches should be reviewed. Is the owner doing everything that can reasonably be done to protect them?

(3) **Effect of Obstructions.** If obstructions exist, the records should indicate whether the object has been reviewed by FAA under a coordinated airspace review to determine its effect on the safe and efficient use of airspace. If FAA has determined the object is not a hazard, the airport owner will not be required to move or lower the object.

(4) **Zoning.** Where the airport relies on local zoning ordinances, the review should cover the effectiveness of the ordinances and the status of any legal proceedings involving them. Are the zoned areas appropriate to protect all existing and planned approaches?

c. **Surplus Property Income.** Income from property acquired under P.L. 80-289 and used to produce nonaviation revenues or funds derived from the disposal of such property must be applied to airport purposes. Thus the compliance review of a surplus property airport must include an evaluation of the owner's stewardship of properties conveyed for specific purposes. Most surplus airports conveyed under P.L. 80-289 contain significant areas deeded to the grantee for the purpose of generating revenue to support and further develop the aeronautical facilities. Since no other land uses were intended by the Act, it must be assumed that any property not needed for aeronautical activity was conveyed to produce revenue. There should be an agreement between the FAA and the owner as to which areas are for aeronautical activity and which for revenue production. This agreement should be reflected in the land use plan or property map or other document acceptable to FAA. (See paragraph 4-17).

(1) **Revenue Production.**

(a) If a surplus airport includes revenue production property, a detailed review of available financial records shall be made. As a very minimum, these records should be carefully screened to ensure that the grantee has established an airport fund, or at least a separate airport account in which all transactions affecting the surplus property have been recorded. Where financial records are obscure or inconclusive, the grantee shall be required to produce whatever supplemental data are needed to clearly reveal the disposition of airport revenues.

(b) The grantee must make a reasonable effort to develop a net revenue (i.e., an amount over and above expenses in connection therewith) from such property. However, there is no violation if the property is not used. It may not be donated or leased for nominal consideration, but if used at all must produce a reasonable net revenue. The compliance report must clearly reveal whether the current usage of the property conforms to this criteria. Where excess revenues accumulate, the guidance contained in Chapter 4 shall be followed.

(c) **Proceeds of Disposal.** The law prohibits the sale or other disposal of surplus airport property without the written consent of the FAA. When given, such consent will obligate the owner to expend an amount equal to the FMV of the property for airport purposes (see Chapter 7). Where a transaction of this kind has been authorized by an FAA release, the compliance review shall include a thorough check into the status of the funds involved. Are they fully accounted for, and are the owner's actions to properly apply them satisfactory?

d. **Availability of Airport Facilities.** The reviewer should note whether the full benefits of the airport are being made available to users. This requires more than the opportunity to land an aircraft on a safe, well-constructed runway. To add utility and purpose of flight and to fully realize the intended benefits of airport development, there should be, depending on the type of airport, a reasonable variety of supporting services such as aircraft fuel, storage or tie down and minor repair capabilities. At some locations the availability of a telephone may be all that can be economically justified. There is no criteria for measuring the adequacy of essential supporting services, and the owner of a public airport has not specific obligation to provide any of them. However, there is a basic obligation to ensure that, whatever arrangements are in effect, such services as are provided are available on fair, reasonable, and nondiscriminatory terms.

e. **Adherence to Airport Layout Plan.**

(1) In considering the compliance status of a Federal obligated airport, the FAA approved ALP or land use plan should be consulted. At some airports subject only to surplus property compliance obligations, an FAA approved ALP may not have been required. At these airports, see whether there is any comparable plan or layout, such as a master development plan, which might reveal the ultimate development objectives of the airport owner. Where appropriate, the premises should be inspected to determine whether there have been any improvements, or whether any are being considered, which might be inconsistent with such plans. If an airport includes grant acquired land, specific consideration will be given to whether all of it still is needed for airport purposes (see paragraph 4–17c).

(2) Whenever an actual or proposed variation from an approved ALP is found, determine whether it is significant; violates design or safety criteria; precludes future expansion needed for the foreseeable aeronautical use potential of the airport; or impairs the ability of the airport owner to comply with any of the airport's obligations under agreements with the Government.

(3) The results of these determinations shall be recorded and one of the following actions taken:

(a) Determine that the variation is not significant and requires no further action;

(b) Obtain a modified ALP incorporating required changes; or

(c) Notify the airport owner that unless adherence to the previously approved ALP is effected within a specified, reasonable time, it will be in violation of its agreement with the Government.

(4) There is no obligation to review an ALP to reflect development recommended by the FAA if the airport owner does not propose to carry it out. FAA's opinion of what development is desirable is not incumbent on the owner. However, the ALP must reflect existing conditions and those alterations currently planned by the owner which have received FAA approval and the ALP must be formally approved by the FAA.

| COMPLIANCE WORKSHEET | Name of Airport and Location | Site No. |
|---|---|---|

| Inspected By (Name) | Date Inspected |
|---|---|

| Name of Officials Contacted |
|---|

### I. PHYSICAL/OPERATION CONDITIONS

A. Substantially unchanged since last inspection
☐ Yes ☐ No (If "NO" explain)

B. General appearance is satisfactory
☐ Yes ☐ No (If "NO" explain)

### II. MAINTENANCE (check applicable boxes)

| | PAVING (A) | MARKING (B) | LIGHTING (C) | TURF AREAS (D) | DRAINAGE (E) | FENCING (F) | BEACON (G) | WIND INDICATOR (H) | SEGMENTED CIRCLE (I) | BLDGS (J) | UTILITIES (K) | ACCESS ROAD (L) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 None | | | | | | | | | | | | |
| 2 Satisfactory | | | | | | | | | | | | |
| 3 Unsatisfactory (Explain on reverse) | | | | | | | | | | | | |

INSTRUCTIONS — Explain in spaces below any "NO" answer preceded by a "●". — Enter "NA" if applicable.

| | | | YES | NO | | | YES | NO |
|---|---|---|---|---|---|---|---|---|
| III. APPROACHES | A. Consistent with FAA Design Criteria, or/on Approved ALP | | | ● | D. Compatible Use of Adjacent Land | | | ● |
| | | | | | E. Existing Obstructions Marked/Lighted | | | ● |
| | B. Adequate Clear Zone Interests Held | | | | | | | |
| | C. Adequate Zoning Established | | | | | | | |
| IV. CONTROL AND OPERATION | Satisfactory (Based On) | | | | | | | |
| | 1 Satisfactory Operation Plan | | | | 3 Airport Regulations Published | | | |
| | 2 Satisfactory Land-Use Plan | | | | 4 Minimum Standards | | | |
| V. EXCLUSIVE AND CIVIL RIGHTS | A. Complying with Exclusive Rights Policy | | | ● | B. Complying with Civil Rights Regulations | | | ● |
| VI. LEASES AND AGREEMENTS | A. New Leases Are Acceptable (List leases on reverse side if reviewed with comments) | | | ● | B. Airport Mgmt. Agreement in Effect | | | |
| | | | | | C. Owner Has Retained Adequate Control | | | ● |
| VII. CONFORMANCE TO ALP | A. Plan Is Substantially Up-To-Date and Approved | | | ● | B. Reflects Existing/Planned Facilities | | | ● |
| VIII. SURPLUS PROPERTY | A. Proper Use of Real, Personal Property | | | ● | C. Personal Property Marked/Maintained | | | ● |
| | B. Satisfactory Accounting for Revenues | | | ● | D. Personal Property Inventory Accurate | | | ● |
| IX. AIRPORT FUNDS | A. Financial Report Reviewed | | | | C. Proceeds of Releases Accounted For | | | |
| | B. Report Reflects Observed Conditions | | | ● | | | | |
| X. CONTINUING SPECIAL CONDITIONS | A. Conditions Have Been Satisfied | | | | B. Progress is Satisfactory | | | ● |

FAA Form 5190-7 (10-89)

**Figure A-1.  Compliance Worksheet (FAA Form 5190-7)**

# APPENDIX 7—FEDERAL LAND INVENTORY

**1. BACKGROUND.** Airport Property Maps are identified in AC 150/5070–6, Airport Master Plans, as a component of the ALP. The "Exhibit A" is a component part of the application for grant funds.

The AAIA, as amended in 1987, imposes new obligations on airport sponsors who have received Federal grants for land acquisition. One of these obligations requires the disposal of land no longer needed for airport purposes and returning to the Trust Fund that portion of the proceeds which is proportionate to the U.S. share of the cost of acquisition of such land.

The ALP is the primary vehicle for determining if there are land areas within the airport boundary which are no longer needed for airport purposes. Heretofore, ALP's normally have made no distinction between land acquired with and without Federal funds. Adding graphics to make such distinction on the ALP drawing would tend to "clutter up" the drawing and adversely affect its utilization for other purposes. A separate property map, drawn to the same scale as the ALP drawing, and with appropriate graphics to indicate the type of acquisition of various land areas, will provide the information needed without impairing the legibility of the airport layout drawing. Making this drawing a component part of an ALP drawing set will also tend to make the airport planner more conscious of the need to carefully plan the total airport layout and ensure that land which might be needed in the future is not disposed of prematurely. This drawing will be compared to the "Exhibit A" attached to the latest grant agreement and all future "Exhibit A's."

**2. DEFINITION.** A drawing indicating how various tracts of land within the airport boundaries were acquired (i.e., Federal funds, surplus property, local funds only, etc.). Easement interests in areas outside the fee property line should also be included.

**3. PURPOSE.** The primary purpose of this drawing is to provide an inventory and information for analyzing the current and future aeronautical use of land acquired with Federal funds.

**4. PREPARATION GUIDELINES.**

  **a. Sheet Size.** Same as Airport Layout Drawing.

  **b. Scale.** Same as Airport Layout Drawing.

  **c. Title and Revision Block.** Same as Airport Layout Drawing.

  **d. Legend.** Use drafting symbols (i.e., shading, cross hatching or other tonal effects) and legend table to indicate the type of acquisition involved with each tract or area.

  **e. Data Table.** A data table with a numbering or lettering system should be used to show pertinent data applicable to property acquisitions. As a minimum, the following data should be included:

  (1) Date the property was acquired.

  (2) Federal grant project number under which the property was acquired. Like property interests acquired with Federal funds under the same project may be grouped together and shown as one tract or area.

  (3) Identify the date of deed and federally–assisted program surplus and nonsurplus land was acquired.

  **f. Drawing Details.** Normally limited to existing and future airport features (i.e., runways, taxiways, aprons, clear zones, terminal buildings and NAVAIDS) which would indicate aeronautical need for airport property.

  (1) Details should be subordinated to property lines and tract outlines by half–toning, screening, or other similar techniques.

  (2) A screened reproducible of the Airport Layout Drawing may be used as the base for the ALP property map.

  (3) Airport boundary lines and lines depicting property interest areas should be bold so as to stand out from background details. (See attached sketch.)

**Order 5190.6A**
**Appendix 7**

10/2/89



PROPERTY DATA

| TRACT | DATE ACQUIRED | FEDERAL PROJ. NO |
|-------|---------------|------------------|
| A | 1952 | ADAP 8-20-0017-01 |
| B | 1973 | AIP 3-20-0017-01 |
| C | 1986 | |

LEGEND

Property Line/Tract Boundary
Property Purchased with Federal Funds
Easement Acquired with Federal Funds
Property Purchased with Local Funds Only

2

# APPENDIX 8—FLYING CLUB

The following definition of flying clubs is suggested for inclusion in Minimum Standards applying to federally-obligated airports.

CATEGORY    —    FLYING CLUB

In an effort to foster and promote flying for pleasure, develop skills in aeronautics, including pilotage, navigation, and an awareness and appreciation of aviation requirements and techniques, the category of Flying Clubs is added to the Rules, Regulations and Minimum Standards of the airport.

All flying clubs desiring to base their aircraft and operate on the airport must comply with the applicable provisions of these Standards and Requirements. However, they shall be exempt from regular FBO requirements upon satisfactory fulfillment of the conditions contained herein.

   **a.**   The club shall be a nonprofit entity (corporation, association or partnership) organized for the express purpose of providing its members with an aircraft, or aircraft, for their personal use and enjoyment only. The ownership of the aircraft, or aircraft, must be vested in the name of the flying club (or owned ratably by all of its members). The property rights of the members of the club shall be equal and no part of the net earnings of the club will inure to the benefit of any member in any form (salaries, bonuses, etc.). The club may not derive greater revenue from the use of its aircraft than the amount necessary for the operations, maintenance and replacement of its aircraft.

   **b.**   Flying clubs may not offer or conduct charter, air taxi, or rental of aircraft operations. They may not conduct aircraft flight instruction except for regular members, and only members of the flying club may operate the aircraft. No flying club shall permit its aircraft to be utilized for the giving of flight instruction to any person, including members of the club owning the aircraft, when such person pays or becomes obligated to pay for such instructions, except when instruction is given by a lessee based on the airport and who provides flight training. Any qualified mechanic who is a registered member and part owner of the aircraft owned and operated by a flying club shall not be restricted from doing maintenance work on aircraft owned by the club and the club does not become obligated to pay for such maintenance work except that such mechanics and instructors may be compensated by credit against payment of dues or flight time.

   **c.**   All flying clubs and their members are prohibited from leasing or selling any goods or services whatsoever to any person or firm other than a member of such club at the airport except that said flying club may sell or exchange its capital equipment.

   **d.**   The flying club, with its permit request, shall furnish the airport management a copy of its charter and by-laws, articles of association, partnership agreement or other documentation supporting its existence; a roster, or list of members, including names of officers and directors, to be revised on a semi-annual basis; evidence of insurance in the form of a certificate of insurance in the following minimum amounts: Public Liability ($100,000/$50,000) per person; public liability ($300,000/$100,000) per accident; property damage ($100,000/$20,000), with hold harmless clause in favor of the airport, its officers and employees (10 days prior notice of cancellation shall be filed with airport management); number and type of aircraft; evidence that aircraft are property certificated; evidence that ownership is vested in the club; and operating rules of the club. The books and other records of the club shall be available for review at any reasonable time by airport management or his authorized agent.

   **e.**   A flying club, at any airport controlled by this same airport management shall abide by and comply with all Federal, State and local laws, ordinances, regulations and the rules and regulations of this airport management.

   **f.**   A flying club which violates any of the foregoing, or permits one or more members to do so, will be required to terminate all operations at all airports controlled by this airport management. A public hearing should be held for the purpose of considering such termination.

# INDEX

**–A–**

| | |
|---|---|
| Abandonment | 7–2 |
| Aeronautical | |
|   –activity | 3–3, 3–8, 4–8 |
|   –services | 6–3 |
| Air carrier | 4–8, 6–7 |
| Aircraft rescue and firefighting | 4–7, 4–21 |
| Airline Deregulation | |
|   Act of 1978 | 4–15 |
| Airport | |
|   –hazard | 4–9 |
|   –layout plan | 4–5, 4–17, 4–18, 5–8, 7–37 |
|   –property map | 4–17, 5–8, 7–37 |
| Alaska Omnibus Act | 8–4 |
| Amend | 1–5 |
| Appraisals | 7–8 |
| AP–4 Agreements | 2–18, 3–2, 3–10 |
| Approach protection | 4–9, 5–7, 6–5 |
| Apron | 4–17 |

**–B–**

| | |
|---|---|
| Bureau of Land Management | 8–1 |

**–C–**

| | |
|---|---|
| Capacity | 4–8 |
| Certificate of Air Navigation | |
|   Facility Necessity | 3–11 |
| Certification | 5–2 |
| Charges | 4–14, 4–24, 6–1 |
| Civil Aeronautics Act of 1938 | 3–2 |
| Civil Rights | 4–16, 6–4, 7–37 |
| Clear Zone | 4–17 |
| Closing | 4–8 |
| Compatible | 5–8 |
| Complaints | 5–2 |
| Concession | 6–2 |
| Concurrent Use | 4–17 |
| Conditional compliance | 5–5 |
| Conflict of interest | 6–5 |
| Conveyance | 4–2, 7–26, |

| | |
|---|---|
| | 7–27, 8–2, 8–4 |
| CO–OP | 3–9 |
| Cost Free Land | 4–23 |

**–D–**

| | |
|---|---|
| Deeds | 2–6, 2–13, 4–2 |
| Default | 5–7, 7–7, 8–1, 8–5, 8–11, 8–21, 8–22, 8–23 |
| Department of | |
|   –Agriculture | 8–1 |
|   –Defense | 7–7, 7–10, 7–36, 7–37, 8–1 |
|   –Interior | 8–1 |
|   –Justice | 8–10 |
| Disposition (disposal) | |
|   –complete airport | 7–2, 7–20 |
|   –excess revenues | 4–20 |
|   –land | 4–17, 5–8, 7–37, 7–19 |
|   –Nineteen Year | 7–20 |
|   –personal property | 4–21 |
| Diversion of funds | 4–20 |
| Duration | |
|   –Facilities | 4–5 |
|   –Grant Agreement | 2–2 |
|   –Surplus Property | 2–8 |

**–E–**

| | |
|---|---|
| Education | 5–2 |
| Environmental | |
|   –assessment | 7–37 |
|   –restrictions | 4–8 |
| Excess odd parcel | 4–17 |
| Exclusive Rights | 1–5, 2–12, 2–19, Chap 3, 5–8, 6–1, 6–5 |
| Exhibit A | 4–17, 4–18 |

**–F–**

| | |
|---|---|
| Fair Market Value | 2-14, 4–17, 4–18, 6-3, 7-8, 7–19, 7–36 |
| FAR Part 77 | 4–9 |
| FAR Part 103 | 4–8 |
| FAR Part 139 | 4–7 |
| FAR Part 150 | 4–8 |
| FAR Part 153 | 2-13, 7–27 |
| FAR Part 154 | 2–13, 7–27 |
| FAR Part 155 | 7–6 |
| Federal Aviation Act of 1958 | 3–2, 3–11, 6–5 |
| Fissionable Material | 7–7 |
| Flat Payment | 4–20 |
| Flying Club | 3–9, App.8 |

**–G–**

| | |
|---|---|
| Gallonage fee | 6–2 |
| Government aircraft | 4–22 |
| GSA | 1-5, 2–6, 8–1, 8–12 |

**–H–**

| | |
|---|---|
| Hazard | 6–5 |
| Hazardous condition | 4–8 |
| Height Data | 7–36, 7-37 |

**–I–**

| | |
|---|---|
| Incentive Rate | 4–14 |
| Income | 4–20, 7–6 |
| Incompatible | 5–8 |
| Indirect Charge | 4–20 |
| Industrial Use | 7–7 |
| Interim use | 4–17, 4–19, 4–20, 7–17 |

**–J–**

| | |
|---|---|
| Joint–use | 3–11 |

**–L–**

| | |
|---|---|
| Land inventory map | 4–17 |
| Land–use plan | 4–18, 7–37 |
| Leases | 4–14, 4–15, 4–17, 4–18, |

| | |
|---|---|
| | 4–23, 6–2, 6–3, 6–5 |
| Letter of Intent to Release | 7–37 |
| License | 3–9 |
| Lighting | 4–7 |
| Long–term exclusive | 6–3 |

**–M–**

| | |
|---|---|
| Maintenance | 4–5, 4–6, 4–20, 5–8, 6–5, 7–17, 7–37, 8–7 |
| Minerals | 7–7 |
| Minimum standards | 3–12 |
| Modify | 1–5 |

**–N–**

| | |
|---|---|
| National emergency | 4–24 |
| National Emergency Use Provision (NEUP) | 2–7, 2-8, 4–18, 7–7, 7–10 |
| National Oceanic and Atmospheric Administration | 7–17 |
| National Plan of Integrated Airport Systems | 3–11, 4–18, 7–2, 7–36, 7–37 |
| Noise compatibility | 7–19 |
| Nonaeronautical | |
| –activity | 3–3 |
| –service | 6-4 |
| Noncompliance | 5–5 |
| Notice to Airmen | 4–7, 4–8, 6–2 |

**–O–**

| | |
|---|---|
| Obstructions | 4–9 |
| Odd Parcels | 4–17 |

**–P–**

| | |
|---|---|
| Parachute | 4–8 |
| Pending compliance | 5–5, 5-7 |
| Petroleum | 7–7 |
| Physical Life | 2-3 |
| Pioneering period | 4–14 |
| Portable hangars | 4–17 |
| Property | |
| –Personal | 2–8, 4–18, 4–21, 7–10 |

10/2/89                                                                    Order 5190.6A

| | | Surplus property | 2–6, 2–8, 3–2, |
|---|---|---|---|
| –Real | 2–8 | | 3–10, 4–2, |
| Proprietary rights | 4–14 | | 4–18, 4–24. |
| P.L. 81–311 | 1–5 | | 7–6, 8–9 |
| | | Surplus Property Act | 1–4, 1–5, 2–6, |
| **–R–** | | | 2–11, 3–2, |
| | | | 4–13, 4–18, |
| Rates | 4–14, 6–2, 6-3 | | 4–20, 4–24, |
| Recapture rights | 6–3 | | 7–6, 7–8 |
| Reinvestment | 7–19 | Surveillance | 5–2, 6–3 |
| Rent free space | 4–23 | | |
| Rental fees | 4–14, 6–2, 6–3, | **–T–** | |
| | 6–7 | | |
| Replacement airport | 7–20 | Taxes | 4–20 |
| Residual interest | 7–7 | Towed objects | 4–8 |
| Restrictions | 4–8 | Training | 4–8 |
| Revenue | 2–6, 4–18, | Transfer | 4–2 |
| | 4–19, 4–20, | Through–the–fence | 6–6 |
| | 5–8, 7-6, 7–8, | | |
| | 7–9 | | |
| Revenue–producing | 2–6 | **–U–** | |
| Reverter | 2–13, 2–14, | | |
| | 6–3, 7–7, 8–3, | Ultralight vehicles | 4–8 |
| | 8–5, 8–13, | Unicom | 3–9 |
| | 8–14 | Useful Life | 2–3, 4–5, 4–18, |
| | | | 7–17 |
| **–S–** | | Utility Systems | 7–10 |
| | | | |
| Section 16/23/516 Conveyances | 1–5, 2–11, | **–V–** | |
| | 2–12, 2–13, | | |
| | 3–10, 8–4 | Voluntary compliance | 5–1 |
| Self–certification | 5–2, 5–6 | | |
| Self–service | 3–9 | **–W–** | |
| Single Activity | 3–9 | | |
| Site visits | 5–2 | War Assets Administration | 1–5, 7–6 |
| Special conditions | 5–7 | Weather | 4–7, 4–23 |
| Special events | 4–8 | | |
| Standards | 3–12 | **–Z–** | |
| Student training | 4–8 | | |
| Subordination of Title | 4–2 | Zoning | 4–9 |
| Summary status | 5–8 | | |
| Sun shades | 4–17 | | |

# **<u>Exhibit I</u>**

# United States Code

## Congressional Service

Laws of
80th Congress

First Session

———

Convened January 3, 1947

Adjourned Sine Die December 19, 1947

St. Paul, Minn.              Brooklyn, N. Y.

West Publishing Co.    Edward Thompson Co.

Case 5:08-cv-02814-JF    Document 20-11    Filed 08/29/2008    Page 3 of 8

ary Congressional Avia-
s the "Board") which
te, not more than three
rty, to be appointed by
e Members of the House
hom shall be members
peaker of the House of

carry out the purposes
nt and future needs of
transportation and the
the nature, type, and
ries that are desirable
; methods of encourag-
transportation industry;
f the Government that
ently and in the public
ess, together with such
ore March 1, 1948.
n and a vice chairman
Board shall be filled in

experts, assistants, and
ssary for the perform-
to utilize the services,
rious departments and
such services, informa-
such departments and
rference with the per-
ments and agencies.
earings and to require
witnesses, the produc-
documents, to admin-
ake such expenditures

visions of this Act and
and conduct its studies
manner as it deems
t of the facts.
appropriated such sums,
ble the Board to carry

oyees thereof, shall be
subsistence incurred

LDING SITE—

288

n to acquire certain
ministration facility
urposes.

es of the United States of

thorized and directed
ns' Administration fa-

---

cility at Clarksburg, West Virginia, the tract of land in Harrison County,
West Virginia, situated between the West Fork River and the line of
the Clarksburg and Western Electric Railway and known as the Max-
well estate; (2) to lease to the city of Clarksburg, West Virginia, at
a nominal consideration, so much of the westerly portion of such tract
as is not presently needed for the purposes of such facility, upon con-
dition that such portion be maintained by the city of Clarksburg as
a public park until such time as it may be needed for the purposes
of such facility, and upon such further terms and conditions as may
be agreed upon by the Administrator and such city; (3) to grant to
the State of West Virginia a right-of-way across such tract of land
for a public highway connecting United States Highway Numbered
19 with the highway known as the Clarksburg-Mount Clare Road;
and (4) to enter into an agreement with the State Road Commission of the
State of West Virginia to bear not to exceed 35 per centum of the
costs of construction of such public highway and any necessary bridges
thereon.

Approved July 30, 1947.

## GOVERNMENT SURPLUS AIRPORTS—DISPOSITION

*See Congressional Comment p. 1519*

### CHAPTER 404—PUBLIC LAW 289

[S. 364]

**An Act to expedite the disposition of Government surplus airports,
airport facilities, and equipment and to assure their disposition
in such manner as will best encourage and foster the development
of civilian aviation and preserve for national defense purposes a
strong, efficient, and properly maintained Nation-wide system of
public airports, and for other purposes.**

*Be it enacted by the Senate and House of Representatives of the United States of
America in Congress assembled, That:*

Subsection (c) of section 13 of the Surplus Property Act of 1944 (58
Stat. 765),[64] as amended, is amended to read as follows:

"(c) No harbor or port terminal, including necessary operating equip-
ment, shall be otherwise disposed of until it has first been offered,
under regulations to be prescribed by the Administrator, for sale or
lease to the State, political subdivision thereof, and any municipality,
in which it is situated, and to all municipalities in the vicinity thereof."

Sec. 2. Section 13 of the Surplus Property Act of 1944 (58 Stat.
765), as amended, is hereby amended by adding a new subsection (g)
reading as follows:

"(g) (1) Notwithstanding any other provision of this Act, any dis-
posal agency designated pursuant to this Act may, with the approval
of the Administrator, convey or dispose of to any State, political sub-
division, municipality, or tax-supported institution, without monetary
consideration to the United States, but subject to the terms, conditions,
reservations, and restrictions hereinafter provided for, all of the right,
title, and interest of the United States in and to any surplus real or
personal property (exclusive of property the highest and best use of
which is determined by the Administrator to be industrial and which
shall be so classified for disposal without regard to the provisions of
this subsection) which, in the determination of the Administrator of
Civil Aeronautics, is essential, suitable, or desirable for the develop-
ment, improvement, operation, or maintenance of a public airport as
defined in the Federal Airport Act (60 Stat. 170)[65] or reasonably neces-
sary to fulfill the immediate and foreseeable future requirements of

[64] 50 U.S.C.A. Appendix, § 1622.
[65] 49 U.S.C.A. §§ 1101-1119.

the grantee for the development, improvement, operation, or maintenance of a public airport, including property needed to develop sources of revenue from nonaviation businesses at a public airport.

"(2) Except as provided in paragraph (3) hereof, all property disposed of under the authority of this subsection shall be disposed of on and subject to the following terms, conditions, reservations, and restrictions:

"(A) No property disposed of under the authority of this subsection shall be used, leased, sold, salvaged, or disposed of by the grantee or transferee for other than airport purposes without the written consent of the Administrator of Civil Aeronautics, which consent shall be granted only if the Administrator of Civil Aeronautics determines that the property can be used, leased, sold, salvaged, or disposed of for other than airport purposes without materially and adversely affecting the development, improvement, operation, or maintenance of the airport at which such property is located: *Provided,* That no structures disposed of hereunder shall be used as an industrial plant, factory, or similar facility within the meaning of section 23 of this Act, unless the public agency receiving title to such structures shall pay to the United States such sum as the Administrator shall determine to be a fair consideration for the removal of the restriction imposed by this proviso.

"(B) All property transferred for airport purposes shall be used and maintained for the use and benefit of the public, without unjust discrimination.

"(C) No exclusive right for the use of the airport at which the property disposed of is located shall be vested (either directly or indirectly) in any person or persons to the exclusion of others in the same class. For the purpose of this condition, an exclusive right is defined to mean—

"(1) any exclusive right to use the airport for conducting any particular aeronautical activity requiring operation of aircraft;

"(2) any exclusive right to engage in the sale or supplying of aircraft, aircraft accessories, equipment, or supplies (excluding the sale of gasoline and oil), or aircraft services necessary for the operation of aircraft (including the maintenance and repair of aircraft, aircraft engines, propellers, and appliances).

"(D) The grantee shall, insofar as it is within its powers, adequately clear and protect the aerial approaches to the airport by removing, lowering, relocating, marking, or lighting or otherwise mitigating existing airport hazards and by preventing the establishment or creation of future airport hazards.

"(E) During any national emergency declared by the President or by the Congress, the United States shall have the right to make exclusive or nonexclusive use and have exclusive or nonexclusive control and possession, without charge, of the airport at which the surplus property is located or used, or of such portion thereof as it may desire: *Provided, however,* That the United States shall be responsible for the entire cost of maintaining such part of the airport as it may use exclusively, or over which it may have exclusive possession and control, during the period of such use, possession, or control, and shall be obligated to contribute a reasonable share, commensurate with the use made by it, of the cost of maintenance of such property as it may use nonexclusively or over which it may have nonexclusive control and possession: *Provided further,* That the United States shall pay a fair rental for its use, control, or possession, exclusively or nonexclusively, of any improvements to the airport made without United States aid.

"(F) The United States shall at all times have the right to make nonexclusive use of the landing area of the airport at which the surplus property is located or used, without charge: *Provided, however,* That such use may be limited as may be determined at any time by the Administrator of Civil Aeronautics to be necessary to prevent undue inter-

674

ference with use by other authorized aircraft: *Provided further,* That the United States shall be obligated to pay for damages caused by such use, or if its use of the landing area is substantial, to contribute a reasonable share of the cost of maintaining and operating the landing area, commensurate with the use made by it.

"(G) Any public agency accepting a conveyance or transfer of surplus property under the provisions of this subsection shall release the United States from any and all liability it may be under for restoration or other damages under any lease or other agreement covering the use by the United States of any airport, or part thereof, owned, controlled, or operated by the public agency upon which, adjacent to which, or in connection with which, the surplus property was located or used: *Provided,* That no such release shall be construed as depriving the public agency of any right it may otherwise have to receive reimbursement under section 17 of the Federal Airport Act[66] for the necessary rehabilitation or repair of public airports heretofore or hereafter substantially damaged by any Federal agency.

"(H) In the event that any of the terms, conditions, reservations, and restrictions upon or subject to which the property is disposed of is not met, observed, or complied with, all of the property so disposed of or any portion thereof, shall, at the option of the United States, revert to the United States in its then existing condition.

"(3) In making any disposition of surplus property under this subsection (g), the disposal agency is authorized, upon the request of the Administrator of Civil Aeronautics, the Secretary of War, or the Secretary of the Navy, to omit from the instruments of disposal any of the terms, conditions, reservations, and restrictions required by paragraph (2) hereof, and to include any additional terms, conditions, reservations, and restrictions, if the Administrator of Civil Aeronautics, the Secretary of War, or the Secretary of the Navy determines that such omission or inclusion is necessary to protect or advance the interests of the United States in civil aviation or for national defense.

"(4) The Administrator of Civil Aeronautics shall have the sole responsibility for determining and enforcing compliance with the terms, conditions, reservations, and restrictions upon or subject to which surplus property is disposed of pursuant to this subsection.

"(5) All surplus property within the purview of this subsection which is not disposed of pursuant hereto shall be disposed of as provided elsewhere in this Act or other applicable Federal Statute.

"(6) Notwithstanding the provisions of subsection (f) of this section and subsection (e) of section 18,[67] the disposal of surplus property under this subsection, which is determined by the Administrator to be available for the purposes enumerated in this subsection, shall be given priority immediately following transfers to other Government agencies under section 12."

Approved July 30, 1944.

[66] 49 U.S.C.A § 1116.
[67] 50 U.S.C.A Appendix, § 1627.

GOVERNMENT SURPLUS AIRPORTS—DISPOSITION

### SECTION 6

This section provides for an annual report by the Council, such report to be submitted to the President for transmission to the Congress and to contain such recommendations as the Council deems advisable; and the Council may from time to time submit special reports and recommendations. Annual reports and special reports and recommendations are also to contain the views of the advisory board and minority views and recommendations, if any, of the Council and the board.

### SECTION 7

This section contains a definition of the term "agency of the Government" for purposes of the act.

### SECTION 8

This section grants authority for appropriations.

## GOVERNMENT SURPLUS AIRPORTS—DISPOSITION

*For text of Act see p. 673*

### SENATE COMMITTEE ON ARMED SERVICES

*Senate Report No. 359, June 26, 1947*

𝒯HE Committee on Armed Services, to whom was referred the bill (S. 364) to expedite the disposition of Government surplus airports, airport facilities, and equipment, and to assure their disposition in such manner as will best encourage and foster the development of civilian aviation and preserve for national-defense purposes a strong, efficient, and properly maintained Nation-wide system of public airports, and for other purposes, having considered the same, report favorably thereon with an amendment and recommend that the bill, as amended, do pass.

### PURPOSE OF THE BILL

The purpose of this bill is to encourage and permit the transfer of federally owned surplus airports and airport facilities and equipment to public agencies by the War Assets Administration. Such transfers would be without reimbursement and would include both the aviation and nonaviation facilities connected with the airports. It also provides for the transfer of certain surplus personal property in the custody of the War Assets Administration which may be needed in the administration and operation of airports transferred by this legislation.

### EXPLANATION OF THE BILL

At the termination of the war there were declared surplus to the War Assets Administration a large number of airports. Well over a billion dollars was expended by the Federal Government for the acquisition of the property for these airports and for the construction of the airport facilities. In many of these airports, the land is owned by a State, county, or city (hereafter referred to as public agencies) and in a ma-

1519

## CONGRESSIONAL COMMENTS

jority of the cases it is desirable that these airports be kept in operation and maintained for civilian aviation purposes.

Under the Surplus Property Act of 1944, the War Assets Administration has been disposing of these fields. However, due to the restrictive language of the act, the only transfers that can be made are of the aviation facilities and certain nonaviation facilities which are essential to the operation and maintenance of the airport. None of these airports can be self-sustaining unless, in addition to these facilities, they can secure the nonaviation facilities in the vicinity of the airport which may be used for revenue-producing purposes. Such facilities might include without limitation warehouses, aircraft maintenance shops, administration buildings, recreational facilities, and items of a similar character. This legislation is aimed to permit the transfer of such property by amending the Surplus Property Act of 1944. The bill provides that the Civil Aeronautics Authority will recommend which facilities should be transferred but that the Administrator of War Assets has power of final decision on these matters. However, it is the intention of the committee that the responsibility for the results achieved by this bill should be shared equally by the Administrators of both agencies.

There will be cases where there are large manufacturing plants connected with the airports and which the War Assets Administrator may determine should best be used for industrial purposes. In approving this bill it was the committee's intention that, when a part of a surplus airport was deemed to be industrial in character, it would be disposed of separately from the airport facilities. In making such determinations and disposing of such properties it was considered that the Administrator of War Assets would apply principles uniformly to assure equitable treatment of the various communities and the best possible return to the Federal Government. If such property should be purchased by the public agency securing the airport facilities it could be used for any purpose they so desire.

In order to preclude a public agency from securing the transfer of structures as a part of the airport facilities and then leasing or selling them for industrial purposes, it is the intent of the act that no structures included in the conveyance shall be used for manufacturing purposes. If the public agency desires to use such structures for manufacturing purposes, they may have this restriction removed upon payment of a fair value for its removal. This does not prevent the operation of maintenance shops or minor manufacturing incident thereto.

In its consideration of this bill, your committee took notice of the fact that a large number of airports have been transferred to public agencies under the existing Surplus Property Act. Such transfers could not include the revenue-producing nonaviation facilities which are so necessary to make them self-sustaining. Your committee believes that the language of this bill is sufficiently broad to permit the War Assets Administrator to transfer such items in those cases where the Civil Aeronautics Authority shall determine that such facilities are necessary.

**1520**

in operation

ts Adminis-
to the re-
e made are
which are
. None of
se facilities,
the airport
ch facilities
nance shops,
of a similar
f such prop-
bill provides
ch facilities
Assets has
he intention
achieved by
both agen-

plants con-
istrator may
proving this
surplus air-
be disposed
terminations
he Adminis-
re equitable
le return to
ased by the
sed for any

transfer of
g or selling
no structures
g purposes.
anufacturing
ayment of a
ion of main-

otice of the
ed to public
nsfers could
hich are so
believes that
War Assets
re the Civil
are neces-

Your committee intends that every effort should be made to expedite the disposition of these surplus airports, in order that civilian aviation can be stimulated to the fullest possible degree. Therefore, it feels that the provisions of this bill should be construed liberally by the War Assets Administrator in the preparation of regulations governing this legislation.

The War and Navy Departments both approve this legislation because of its encouragement and development of civilian aviation and because it would keep these airports available for use in time of emergency. The Civil Aeronautics Authority and the War Assets Administrator are strongly in favor of the objective of this bill and jointly submitted amendments which were incorporated in the bill. The Bureau of the Budget has cleared the bill without objection.

## NURSERY STOCK—ENTRY FROM FOREIGN COUNTRIES

*For text of Act see p. 676*

### SENATE COMMITTEE ON AGRICULTURE AND FORESTRY

*Senate Report No. 102, April 16, 1947*

𝕿HE Committee on Agriculture and Forestry, to whom was referred the bill (S. 338) to amend the Plant Quarantine Act approved August 20, 1912, as amended, by adding thereto a new section, having considered same, report thereon with a recommendation that it do pass with amendments.

The bill is amended to include bulbs.

A letter from Secretary Clinton P. Anderson of the Department of Agriculture, dated February 7, 1947, with respect to S. 338 is attached hereto and made a part of said report.

———

FEBRUARY 7, 1947.

Hon. ARTHUR CAPPER,
  *Chairman, Committee on Agriculture and Forestry,*
        *United States Senate.*

DEAR SENATOR CAPPER: This is in reply to your request of January 25 for a report on S. 338, a bill to amend the Plant Quarantine Act approved August 20, 1912, as amended by adding thereto a new section.

The Senate bill S. 338 has been compared with S. 1990 which was introduced in the last session of the Seventy-ninth Congress and has been found to be identical. This report, with the exception of this added paragraph, is the same as that submitted by the Department of Agriculture under date of August 30, 1946 on S. 1990.

This bill would authorize the Secretary of Agriculture to limit the entry of nursery stock from foreign countries to that needed for propagation purposes in order to protect American agricultural, horticultural, and forestry interests from insect pests and plant diseases new to or not widely distributed within the United States under such rules and regulations as he may deem necessary. Furthermore, it authorizes the Secretary of Agriculture to require, if necessary, that such nursery stock be grown under postentry quarantine by or under the supervision of the Department of Agriculture for the purpose of determining whether imported nursery stock may be infested or infected with plant pests not discernible by port

U.S.CONG.SERV. '47—96        1521

# <u>Exhibit J</u>

14 C.F.R. § 155.11

C

**Effective: [See Text Amendments]**

Code of Federal Regulations Currentness
   Title 14. Aeronautics and Space
      Chapter I. Federal Aviation Administration, Department of Transportation
         ⬕ Subchapter I. Airports
            ⬕ Part 155. Release of Airport Property from Surplus Property Disposal Restrictions (Refs & Annos)

→ **§ 155.11 Form and content of requests for release.**

(a) A request for the release of surplus airport property from a term, condition, reservation, or restriction in an instrument of disposal need not be in any special form, but must be in writing and signed by an authorized official of the public agency that owns the airport.

(b) A request for a release under this part must be submitted in triplicate to the District Airport Engineer in whose district the airport is located.

(c) Each request for a release must include the following information, if applicable and available:

   (1) Identification of the instruments of disposal to which the property concerned is subject.

   (2) A description of the property concerned.

   (3) The condition of the property concerned.

   (4) The purpose for which the property was transferred, such as for use as a part of, or in connection with, operating the airport or for producing revenues from nonaviation business.

   (5) The kind of release requested.

   (6) The purpose of the release.

   (7) A statement of the circumstances justifying the release on the basis set forth in § 155.3(a)(1) or (2) with supporting documents.

   (8) Maps, photographs, plans, or similar material of the airport and the property concerned that are appropriate to determining whether the release is justified under § 155.9.

   (9) The proposed use or disposition of the property, including the terms and conditions of any proposed sale or lease and the status of negotiations therefor.

   (10) If the release would allow sale of any part of the property, a certified copy of a resolution or ordinance of the governing body of the public agency that owns the airport obligating itself to use the proceeds of the sale exclusively for developing, improving, operating, or maintaining a public airport.

   (11) A suggested letter or other instrument of release that would meet the requirements of State and local law for the release requested.

   (12) The sponsor's environmental assessment prepared in conformance with Appendix 6 of FAA Order 1050.1C, "Policies and Procedures for Considering Environmental Impacts" (45 FR 2244; Jan. 10, 1980), and FAA Order 5050.4, "Airport Environmental Handbook" (45 FR 56624; Aug. 25, 1980), if an assessment is required by Order 5050.4. Copies of these orders may be examined in the Rules Docket, Office of the Chief Counsel, FAA, Washington, D.C., and may be obtained on request at any FAA regional office headquarters or any airports district office.

[Doc. No. 1329, 27 FR 12361, Dec. 13, 1962, as amended by Amdt. 155-1, 45 FR 56622, Aug. 25, 1980]

SOURCE: Docket No. 1329, 27 FR 12361, Dec. 13, 1962; Amdt. 155-2, 60 FR 67256, Dec. 28, 1995,

14 C.F.R. § 155.11

unless otherwise noted.

AUTHORITY:    49   U.S.C.   106(g),   40113,
47151-47153.

14 C. F. R. § 155.11, 14 CFR § 155.11

      Current through March 6, 2008; 73 FR
12031

       Copr. © 2008 Thomson/
   West

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

**<u>Exhibit K</u>**

14 C.F.R. § 155.3

C

**Effective: [See Text Amendments]**

Code of Federal Regulations Currentness
  Title 14. Aeronautics and Space
    Chapter I. Federal Aviation Administration, Department of Transportation
      Subchapter I. Airports
        Part 155. Release of Airport Property from Surplus Property Disposal Restrictions (Refs & Annos)

➜ **§ 155.3 Applicable law.**

(a) Section 4 of the Act of October 1, 1949 (63 Stat. 700) authorizes the Administrator to grant the releases described in § 155.1, if he determines that--

(1) The property to which the release relates no longer serves the purpose for which it was made subject to the terms, conditions, reservations, or restrictions concerned; or

(2) The release will not prevent accomplishing the purpose for which the property was made subject to the terms, conditions, reservations, or restrictions, and is necessary to protect or advance the interests of the United States in civil aviation.

In addition, section 4 of that Act authorizes the Administrator to grant the releases subject to terms and conditions that he considers necessary to protect or advance the interests of the United States in civil aviation.

(b) Section 2 of the Act of October 1, 1949 (63 Stat. 700) provides that the restrictions against using structures for industrial purposes in any instrument of disposal issued under section 13(g)(2)(A) of the Surplus Property Act of 1944, as amended (61 Stat. 678) are considered to be extinguished. In addition, section 2 authorizes the Administrator to issue any instruments of release or conveyance necessary to remove, of record, such a restriction,

without monetary consideration to the United States.

(c) Section 68 of the Atomic Energy Act of 1954, as amended (42 U.S.C. 2098) releases, remises, and quitclaims, to persons entitled thereto, all reserved rights of the United States in radioactive minerals in instruments of disposal of public or acquired lands. In addition, section 3 of the Act of October 1, 1949 (50 U.S.C. App. 1622b) authorizes the Administrator to issue instruments that he considers necessary to correct any instrument of disposal by which surplus property was transferred to a non-Federal public agency for airport purposes or to conform the transfer to the requirements of applicable law. Based on the laws cited in this paragraph, the Administrator issues appropriate instruments of correction upon the written request of persons entitled to ownership, occupancy, or use of the lands concerned.

SOURCE: Docket No. 1329, 27 FR 12361, Dec. 13, 1962; Amdt. 155-2, 60 FR 67256, Dec. 28, 1995, unless otherwise noted.

AUTHORITY: 49 U.S.C. 106(g), 40113, 47151-47153.

14 C. F. R. § 155.3, 14 CFR § 155.3

Current through March 6, 2008; 73 FR 12031

Copr. © 2008 Thomson/ West

END OF DOCUMENT

# Exhibit L

**ASSURANCES**
**Airport Sponsors**

---

**A.    General.**

**1.**    These assurances shall be complied with in the performance of grant agreements for airport development, airport planning, and noise compatibility program grants for airport sponsors.

**2.**    These assurances are required to be submitted as part of the project application by sponsors requesting funds under the provisions of Title 49, U.S.C., subtitle VII, as amended.  As used herein, the term "public agency sponsor" means a public agency with control of a public-use airport; the term "private sponsor" means a private owner of a public-use airport; and the term "sponsor" includes both public agency sponsors and private sponsors.

**3.**    Upon acceptance of the grant offer by the sponsor, these assurances are incorporated in and become part of the grant agreement.

**B.    Duration and Applicability.**

**1.    Airport development or Noise Compatibility Program Projects Undertaken by a Public Agency Sponsor.**  The terms, conditions and assurances of the grant agreement shall remain in full force and effect throughout the useful life of the facilities developed or equipment acquired for an airport development or noise compatibility program project, or throughout the useful life of the project items installed within a facility under a noise compatibility program project, but in any event not to exceed twenty (20) years from the date of acceptance of a grant offer of Federal funds for the project.  However, there shall be no limit on the duration of the assurances regarding Exclusive Rights and Airport Revenue so long as the airport is used as an airport. There shall be no limit on the duration of the terms, conditions, and assurances with respect to real property acquired with federal funds. Furthermore, the duration of the Civil Rights assurance shall be specified in the assurances.

**2.    Airport Development or Noise Compatibility Projects Undertaken by a Private Sponsor.**  The preceding paragraph 1 also applies to a private sponsor except that the useful life of project items installed within a facility or the useful life of the facilities developed or equipment acquired under an airport development or noise compatibility program project shall be no less than ten (10) years from the date of acceptance of Federal aid for the project.

**3.    Airport Planning Undertaken by a Sponsor.**  Unless otherwise specified in the grant agreement, only Assurances 1, 2, 3, 5, 6, 13, 18, 30, 32, 33, and 34 in section C apply to planning projects.  The terms, conditions, and assurances of the grant agreement shall remain in full force and effect during the life of the project.

**C.    Sponsor Certification.**  The sponsor hereby assures and certifies, with respect to this grant that:

**1.    General Federal Requirements.**  It will comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance and use of Federal funds for this project including but not limited to the following:

**Federal Legislation**

a.    Title 49, U.S.C., subtitle VII, as amended.
b.    Davis-Bacon Act - 40 U.S.C. 276(a), et seq.[1]
c.    Federal Fair Labor Standards Act - 29 U.S.C. 201, et seq.
d.    Hatch Act - 5 U.S.C. 1501, et seq.[2]

e.      Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 Title 42 U.S.C. 4601, <u>et seq.</u>[1] [2]

f.      National Historic Preservation Act of 1966 - Section 106 - 16 U.S.C. 470(f).[1]

g.      Archeological and Historic Preservation Act of 1974 - 16 U.S.C. 469 through 469c.[1]

h.      Native Americans Grave Repatriation Act - 25 U.S.C. Section 3001, <u>et seq.</u>

i.      Clean Air Act, P.L. 90-148, as amended.

j.      Coastal Zone Management Act, P.L. 93-205, as amended.

k.      Flood Disaster Protection Act of 1973 - Section 102(a) - 42 U.S.C. 4012a.[1]

l.      Title 49 ,U.S.C., Section 303, (formerly known as Section 4(f))

m.      Rehabilitation Act of 1973 - 29 U.S.C. 794.

n.      Civil Rights Act of 1964 - Title VI - 42 U.S.C. 2000d through d-4.

o.      Age Discrimination Act of 1975 - 42 U.S.C. 6101, <u>et seq.</u>

p.      American Indian Religious Freedom Act, P.L. 95-341, as amended.

q      Architectural Barriers Act of 1968 -42 U.S.C. 4151, <u>et seq.</u>[1]

r.      Power plant and Industrial Fuel Use Act of 1978 - Section 403- 2 U.S.C. 8373.[1]

s.      Contract Work Hours and Safety Standards Act - 40 U.S.C. 327, <u>et seq.</u>[1]

t.      Copeland Anti kickback Act - 18 U.S.C. 874.[1]

u.      National Environmental Policy Act of 1969 - 42 U.S.C. 4321, <u>et seq.</u>[1]

v.      Wild and Scenic Rivers Act, P.L. 90-542, as amended.

w.      Single Audit Act of 1984 - 31 U.S.C. 7501, <u>et seq.</u>[2]

x.      Drug-Free Workplace Act of 1988 - 41 U.S.C. 702 through 706.

**Executive Orders**

Executive Order 11246 - Equal Employment Opportunity[1]
Executive Order 11990 - Protection of Wetlands
Executive Order 11988 – Flood Plain Management
Executive Order 12372 - Intergovernmental Review of Federal Programs.
Executive Order 12699 - Seismic Safety of Federal and Federally Assisted New Building Construction[1]
Executive Order 12898 - Environmental Justice

**Federal Regulations**

a.      14 CFR Part 13 - Investigative and Enforcement Procedures.

b.      **14 CFR Part 16 - Rules of Practice For Federally Assisted Airport Enforcement Proceedings.**

c.      14 CFR Part 150 - Airport noise compatibility planning.

d.      29 CFR Part 1 - Procedures for predetermination of wage rates.[1]

e.      29 CFR Part 3 - Contractors and subcontractors on public building or public work financed in whole or part by loans or grants from the United States.[1]

f.      29 CFR Part 5 - Labor standards provisions applicable to contracts covering federally financed and assisted construction (also labor standards provisions applicable to non-construction contracts subject to the Contract Work Hours and Safety Standards Act).[1]

g.      41 CFR Part 60 - Office of Federal Contract Compliance Programs, Equal Employment Opportunity, Department of Labor (Federal and federally assisted contracting requirements).[1]

3

      h.      49 CFR Part 18 - Uniform administrative requirements for grants and cooperative agreements to state and local governments.[3]

      i.      49 CFR Part 20 - New restrictions on lobbying.

      j.      49 CFR Part 21 - Nondiscrimination in federally-assisted programs of the Department of Transportation - effectuation of Title VI of the Civil Rights Act of 1964.

      k.      49 CFR Part 23 - Participation by Disadvantage Business Enterprise in Airport Concessions.

      l.      49 CFR Part 24 - Uniform relocation assistance and real property acquisition for Federal and federally assisted programs.[1][2]

      m.      49 CFR Part 26 – Participation By Disadvantaged Business Enterprises in Department of Transportation Programs.

      n.      49 CFR Part 27 - Nondiscrimination on the basis of handicap in programs and activities receiving or benefiting from Federal financial assistance.[1]

      o.      49 CFR Part 29 – Government wide debarment and suspension (non-procurement) and government wide requirements for drug-free workplace (grants).

      p.      49 CFR Part 30 - Denial of public works contracts to suppliers of goods and services of countries that deny procurement market access to U.S. contractors.

      q.      49 CFR Part 41 - Seismic safety of Federal and federally assisted or regulated new building construction.[1]

**Office of Management and Budget Circulars**

      a.      A-87 - Cost Principles Applicable to Grants and Contracts with State and Local Governments.

      b      A-133 - Audits of States, Local Governments, and Non-Profit Organizations

[1]  These laws do not apply to airport planning sponsors.

[2]  These laws do not apply to private sponsors.

[3]  49 CFR Part 18 and OMB Circular A-87 contain requirements for State and Local Governments receiving Federal assistance.  Any requirement levied upon State and Local Governments by this regulation and circular shall also be applicable to private sponsors receiving Federal assistance under Title 49, United States Code.

Specific assurances required to be included in grant agreements by any of the above laws, regulations or circulars are incorporated by reference in the grant agreement.

**2.**      **Responsibility and Authority of the Sponsor.**

      a.      **Public Agency Sponsor:** It has legal authority to apply for the grant, and to finance and carry out the proposed project; that a resolution, motion or similar action has been duly adopted or passed as an official act of the applicant's governing body authorizing the filing of the application, including all understandings and assurances contained therein, and directing and authorizing the person identified as the official representative of the applicant to act in connection with the application and to provide such additional information as may be required.

      b.      **Private Sponsor:** It has legal authority to apply for the grant and to finance and carry out the proposed project and comply with all terms, conditions, and assurances of this grant agreement.  It shall designate an official representative and shall in writing direct and authorize that person

4

to file this application, including all understandings and assurances contained therein; to act in connection with this application; and to provide such additional information as may be required.

**3.  Sponsor Fund Availability.**  It has sufficient funds available for that portion of the project costs which are not to be paid by the United States.  It has sufficient funds available to assure operation and maintenance of items funded under the grant agreement which it will own or control.

**4.  Good Title.**

a.  It, a public agency or the Federal government, holds good title, satisfactory to the Secretary, to the landing area of the airport or site thereof, or will give assurance satisfactory to the Secretary that good title will be acquired.

b.  For noise compatibility program projects to be carried out on the property of the sponsor, it holds good title satisfactory to the Secretary to that portion of the property upon which Federal funds will be expended or will give assurance to the Secretary that good title will be obtained.

**5.  Preserving Rights and Powers.**

a.  It will not take or permit any action which would operate to deprive it of any of the rights and powers necessary to perform any or all of the terms, conditions, and assurances in the grant agreement without the written approval of the Secretary, and will act promptly to acquire, extinguish or modify any outstanding rights or claims of right of others which would interfere with such performance by the sponsor. This shall be done in a manner acceptable to the Secretary.

b.  It will not sell, lease, encumber, or otherwise transfer or dispose of any part of its title or other interests in the property shown on Exhibit A to this application or, for a noise compatibility program project, that portion of the property upon which Federal funds have been expended, for the duration of the terms, conditions, and assurances in the grant agreement without approval by the Secretary.  If the transferee is found by the Secretary to be eligible under Title 49, United States Code, to assume the obligations of the grant agreement and to have the power, authority, and financial resources to carry out all such obligations, the sponsor shall insert in the contract or document transferring or disposing of the sponsor's interest, and make binding upon the transferee all of the terms, conditions, and assurances contained in this grant agreement.

c.  For all noise compatibility program projects which are to be carried out by another unit of local government or are on property owned by a unit of local government other than the sponsor, it will enter into an agreement with that government.  Except as otherwise specified by the Secretary, that agreement shall obligate that government to the same terms, conditions, and assurances that would be applicable to it if it applied directly to the FAA for a grant to undertake the noise compatibility program project. That agreement and changes thereto must be satisfactory to the Secretary. It will take steps to enforce this agreement against the local government if there is substantial non-compliance with the terms of the agreement.

d.  For noise compatibility program projects to be carried out on privately owned property, it will enter into an agreement with the owner of that

5

property which includes provisions specified by the Secretary. It will take steps to enforce this agreement against the property owner whenever there is substantial non-compliance with the terms of the agreement.

e.    If the sponsor is a private sponsor, it will take steps satisfactory to the Secretary to ensure that the airport will continue to function as a public-use airport in accordance with these assurances for the duration of these assurances.

f.    If an arrangement is made for management and operation of the airport by any agency or person other than the sponsor or an employee of the sponsor, the sponsor will reserve sufficient rights and authority to insure that the airport will be operated and maintained in accordance Title 49, United States Code, the regulations and the terms, conditions and assurances in the grant agreement and shall insure that such arrangement also requires compliance therewith.

6.    **Consistency with Local Plans.** The project is reasonably consistent with plans (existing at the time of submission of this application) of public agencies that are authorized by the State in which the project is located to plan for the development of the area surrounding the airport.

7.    **Consideration of Local Interest.** It has given fair consideration to the interest of communities in or near where the project may be located.

8.    **Consultation with Users.** In making a decision to undertake any airport development project under Title 49, United States Code, it has undertaken reasonable consultations with affected parties using the airport at which project is proposed.

9.    **Public Hearings.** In projects involving the location of an airport, an airport runway, or a major runway extension, it has afforded the opportunity for public hearings for the purpose of considering the economic, social, and environmental effects of the airport or runway location and its consistency with goals and objectives of such planning as has been carried out by the community and it shall, when requested by the Secretary, submit a copy of the transcript of such hearings to the Secretary. Further, for such projects, it has on its management board either voting representation from the communities where the project is located or has advised the communities that they have the right to petition the Secretary concerning a proposed project.

10.    **Air and Water Quality Standards.** In projects involving airport location, a major runway extension, or runway location it will provide for the Governor of the state in which the project is located to certify in writing to the Secretary that the project will be located, designed, constructed, and operated so as to comply with applicable air and water quality standards. In any case where such standards have not been approved and where applicable air and water quality standards have been promulgated by the Administrator of the Environmental Protection Agency, certification shall be obtained from such Administrator. Notice of certification or refusal to certify shall be provided within sixty days after the project application has been received by the Secretary.

11.    **Pavement Preventive Maintenance**. With respect to a project approved after January 1, 1995, for the replacement or reconstruction of pavement at the airport, it assures or certifies that it has implemented an effective airport pavement maintenance-management program and it assures that it will use such program for the useful life of any pavement constructed, reconstructed or repaired with Federal financial assistance at the airport. It will provide such

6

reports on pavement condition and pavement management programs as the Secretary determines may be useful.

12.     **Terminal Development Prerequisites.**  For projects which include terminal development at a public use airport, as defined in Title 49, it has, on the date of submittal of the project grant application, all the safety equipment required for certification of such airport under section 44706 of Title 49, United States Code, and all the security equipment required by rule or regulation, and has provided for access to the passenger enplaning and deplaning area of such airport to passengers enplaning and deplaning from aircraft other than air carrier aircraft.

13.     **Accounting System, Audit, and Record Keeping Requirements.**

a.     It shall keep all project accounts and records which fully disclose the amount and disposition by the recipient of the proceeds of the grant, the total cost of the project in connection with which the grant is given or used, and the amount or nature of that portion of the cost of the project supplied by other sources, and such other financial records pertinent to the project.  The accounts and records shall be kept in accordance with an accounting system that will facilitate an effective audit in accordance with the Single Audit Act of 1984.

b.     It shall make available to the Secretary and the Comptroller General of the United States, or any of their duly authorized representatives, for the purpose of audit and examination, any books, documents, papers, and records of the recipient that are pertinent to the grant.  The Secretary may require that an appropriate audit be conducted by a recipient.  In any case in which an independent audit is made of the accounts of a sponsor relating to the disposition of the proceeds of a grant or relating to the project in connection with which the grant was given or used, it shall file a certified copy of such audit with the Comptroller General of the United States not later than six (6) months following the close of the fiscal year for which the audit was made.

14.     **Minimum Wage Rates.**  It shall include, in all contracts in excess of $2,000 for work on any projects funded under the grant agreement which involve labor, provisions establishing minimum rates of wages, to be predetermined by the Secretary of Labor, in accordance with the Davis-Bacon Act, as amended (40 U.S.C. 276a-276a-5), which contractors shall pay to skilled and unskilled labor, and such minimum rates shall be stated in the invitation for bids and shall be included in proposals or bids for the work.

15.     **Veteran's Preference.**  It shall include in all contracts for work on any project funded under the grant agreement which involve labor, such provisions as are necessary to insure that, in the employment of labor (except in executive, administrative, and supervisory positions), preference shall be given to Veterans of the Vietnam era and disabled veterans as defined in Section 47112 of Title 49, United States Code. However, this preference shall apply only where the individuals are available and qualified to perform the work to which the employment relates.

16.     **Conformity to Plans and Specifications.**  It will execute the project subject to plans, specifications, and schedules approved by the Secretary.  Such plans, specifications, and schedules shall be submitted to the Secretary prior to commencement of site preparation, construction, or other performance under this grant agreement, and, upon approval of the Secretary, shall be incorporated into this grant agreement.  Any modification to the approved

7

plans, specifications, and schedules shall also be subject to approval of the Secretary, and incorporated into the grant agreement.

17. **Construction Inspection and Approval.**  It will provide and maintain competent technical supervision at the construction site throughout the project to assure that the work conforms to the plans, specifications, and schedules approved by the Secretary for the project.  It shall subject the construction work on any project contained in an approved project application to inspection and approval by the Secretary and such work shall be in accordance with regulations and procedures prescribed by the Secretary. Such regulations and procedures shall require such cost and progress reporting by the sponsor or sponsors of such project as the Secretary shall deem necessary.

18. **Planning Projects.**  In carrying out planning projects:

    a.   It will execute the project in accordance with the approved program narrative contained in the project application or with the modifications similarly approved.

    b.   It will furnish the Secretary with such periodic reports as required pertaining to the planning project and planning work activities.

    c.   It will include in all published material prepared in connection with the planning project a notice that the material was prepared under a grant provided by the United States.

    d.   It will make such material available for examination by the public, and agrees that no material prepared with funds under this project shall be subject to copyright in the United States or any other country.

    e.   It will give the Secretary unrestricted authority to publish, disclose, distribute, and otherwise use any of the material prepared in connection with this grant.

    f.   It will grant the Secretary the right to disapprove the sponsor's employment of specific consultants and their subcontractors to do all or any part of this project as well as the right to disapprove the proposed scope and cost of professional services.

    g.   It will grant the Secretary the right to disapprove the use of the sponsor's employees to do all or any part of the project.

    h.   It understands and agrees that the Secretary's approval of this project grant or the Secretary's approval of any planning material developed as part of this grant does not constitute or imply any assurance or commitment on the part of the Secretary to approve any pending or future application for a Federal airport grant.

19. **Operation and Maintenance**.

    a.   The airport and all facilities which are necessary to serve the aeronautical users of the airport, other than facilities owned or controlled by the United States, shall be operated at all times in a safe and serviceable condition and in accordance with the minimum standards as may be required or prescribed by applicable Federal, state and local agencies for maintenance and operation.  It will not cause or permit any activity or action thereon which would interfere with its use for airport purposes.  It will suitably

operate and maintain the airport and all facilities thereon or connected therewith, with due regard to climatic and flood conditions. Any proposal to temporarily close the airport for non-aeronautical purposes must first be approved by the Secretary.

In furtherance of this assurance, the sponsor will have in effect arrangements for-

    (1) Operating the airport's aeronautical facilities whenever required;

    (2) Promptly marking and lighting hazards resulting from airport conditions, including temporary conditions; and

    (3) Promptly notifying airmen of any condition affecting aeronautical use of the airport.

Nothing contained herein shall be construed to require that the airport be operated for aeronautical use during temporary periods when snow, flood or other climatic conditions interfere with such operation and maintenance. Further, nothing herein shall be construed as requiring the maintenance, repair, restoration, or replacement of any structure or facility which is substantially damaged or destroyed due to an act of God or other condition or circumstance beyond the control of the sponsor.

    b.    It will suitably operate and maintain noise compatibility program items that it owns or controls upon which Federal funds have been expended.

**20.**     **Hazard Removal and Mitigation.** It will take appropriate action to assure that such terminal airspace as is required to protect instrument and visual operations to the airport (including established minimum flight altitudes) will be adequately cleared and protected by removing, lowering, relocating, marking, or lighting or otherwise mitigating existing airport hazards and by preventing the establishment or creation of future airport hazards.

**21.**     **Compatible Land Use.** It will take appropriate action, to the extent reasonable, including the adoption of zoning laws, to restrict the use of land adjacent to or in the immediate vicinity of the airport to activities and purposes compatible with normal airport operations, including landing and takeoff of aircraft. In addition, if the project is for noise compatibility program implementation, it will not cause or permit any change in land use, within its jurisdiction, that will reduce its compatibility, with respect to the airport, of the noise compatibility program measures upon which Federal funds have been expended.

**22. Economic Nondiscrimination.**

    a.    It will make the airport available as an airport for public use on reasonable terms and without unjust discrimination to all types, kinds and classes of aeronautical activities, including commercial aeronautical activities offering services to the public at the airport.

    b.    In any agreement, contract, lease, or other arrangement under which a right or privilege at the airport is granted to any person, firm, or corporation to conduct or to engage in any aeronautical activity for furnishing services to the public at the airport, the sponsor will insert and enforce provisions requiring the contractor to-

    (1) furnish said services on a reasonable, and not unjustly discriminatory, basis to all users thereof, and

    (2) charge reasonable, and not unjustly discriminatory, prices for each unit or service, provided that the contractor may be allowed to make reasonable and nondiscriminatory discounts, rebates, or other similar types of price reductions to volume purchasers.

c.   Each fixed-based operator at the airport shall be subject to the same rates, fees, rentals, and other charges as are uniformly applicable to all other fixed-based operators making the same or similar uses of such airport and utilizing the same or similar facilities.

d.   Each air carrier using such airport shall have the right to service itself or to use any fixed-based operator that is authorized or permitted by the airport to serve any air carrier at such airport.

e.   Each air carrier using such airport (whether as a tenant, non tenant, or subtenant of another air carrier tenant) shall be subject to such nondiscriminatory and substantially comparable rules, regulations, conditions, rates, fees, rentals, and other charges with respect to facilities directly and substantially related to providing air transportation as are applicable to all such air carriers which make similar use of such airport and utilize similar facilities, subject to reasonable classifications such as tenants or non tenants and signatory carriers and non signatory carriers. Classification or status as tenant or signatory shall not be unreasonably withheld by any airport provided an air carrier assumes obligations substantially similar to those already imposed on air carriers in such classification or status.

f.   It will not exercise or grant any right or privilege which operates to prevent any person, firm, or corporation operating aircraft on the airport from performing any services on its own aircraft with its own employees [including, but not limited to maintenance, repair, and fueling] that it may choose to perform.

g.   In the event the sponsor itself exercises any of the rights and privileges referred to in this assurance, the services involved will be provided on the same conditions as would apply to the furnishing of such services by commercial aeronautical service providers authorized by the sponsor under these provisions.

h.   The sponsor may establish such reasonable, and not unjustly discriminatory, conditions to be met by all users of the airport as may be necessary for the safe and efficient operation of the airport.

i.   The sponsor may prohibit or limit any given type, kind or class of aeronautical use of the airport if such action is necessary for the safe operation of the airport or necessary to serve the civil aviation needs of the public.

23.   **Exclusive Rights.**  It will permit no exclusive right for the use of the airport by any person providing, or intending to provide, aeronautical services to the public.  For purposes of this paragraph, the providing of the services at an airport by a single fixed-based operator shall not be construed as an exclusive right if both of the following apply:

a.   It would be unreasonably costly, burdensome, or impractical for more than one fixed-based operator to provide such services, and

b.   If allowing more than one fixed-based operator to provide such services would require the reduction of space leased pursuant to an existing agreement between such single fixed-based operator and such airport.

It further agrees that it will not, either directly or indirectly, grant or permit any person, firm, or corporation, the exclusive right at the airport to conduct any aeronautical activities, including, but not limited to charter flights, pilot training, aircraft rental and sightseeing, aerial photography, crop dusting, aerial advertising and surveying, air carrier operations,

10

aircraft sales and services, sale of aviation petroleum products whether or not conducted in conjunction with other aeronautical activity, repair and maintenance of aircraft, sale of aircraft parts, and any other activities which because of their direct relationship to the operation of aircraft can be regarded as an aeronautical activity, and that it will terminate any exclusive right to conduct an aeronautical activity now existing at such an airport before the grant of any assistance under Title 49, United States Code.

**24. Fee and Rental Structure.** It will maintain a fee and rental structure for the facilities and services at the airport which will make the airport as self-sustaining as possible under the circumstances existing at the particular airport, taking into account such factors as the volume of traffic and economy of collection. No part of the Federal share of an airport development, airport planning or noise compatibility project for which a grant is made under Title 49, United States Code, the Airport and Airway Improvement Act of 1982, the Federal Airport Act or the Airport and Airway Development Act of 1970 shall be included in the rate basis in establishing fees, rates, and charges for users of that airport.

**25. Airport Revenues.**

    a.   All revenues generated by the airport and any local taxes on aviation fuel established after December 30, 1987, will be expended by it for the capital or operating costs of the airport; the local airport system; or other local facilities which are owned or operated by the owner or operator of the airport and which are directly and substantially related to the actual air transportation of passengers or property; or for noise mitigation purposes on or off the airport. Provided, however, that if covenants or assurances in debt obligations issued before September 3, 1982, by the owner or operator of the airport, or provisions enacted before September 3, 1982, in governing statutes controlling the owner or operator's financing, provide for the use of the revenues from any of the airport owner or operator's facilities, including the airport, to support not only the airport but also the airport owner or operator's general debt obligations or other facilities, then this limitation on the use of all revenues generated by the airport (and, in the case of a public airport, local taxes on aviation fuel) shall not apply.

    b.   As part of the annual audit required under the Single Audit Act of 1984, the sponsor will direct that the audit will review, and the resulting audit report will provide an opinion concerning, the use of airport revenue and taxes in paragraph (a), and indicating whether funds paid or transferred to the owner or operator are paid or transferred in a manner consistent with Title 49, United States Code and any other applicable provision of law, including any regulation promulgated by the Secretary or Administrator.

    c.   Any civil penalties or other sanctions will be imposed for violation of this assurance in accordance with the provisions of Section 47107 of Title 49, United States Code.

**26. Reports and Inspections.** It will:

    a.   submit to the Secretary such annual or special financial and operations reports as the Secretary may reasonably request and make such reports available to the public; make available to the public at reasonable times and places a report of the airport budget in a format prescribed by the Secretary;

    b.   for airport development projects, make the airport and all airport records and documents affecting the airport, including deeds, leases, operation and use

agreements, regulations and other instruments, available for inspection by any
duly authorized agent of the Secretary upon reasonable request;

c.  for noise compatibility program projects, make records and documents relating
to the project and continued compliance with the terms, conditions, and
assurances of the grant agreement including deeds, leases, agreements,
regulations, and other instruments, available for inspection by any duly
authorized agent of the Secretary upon reasonable request; and

d.  in a format and time prescribed by the Secretary, provide to the Secretary and
make available to the public following each of its fiscal years,  an annual report
listing in detail:
(i) all amounts paid by the airport to any other unit of government and the
purposes for which each such payment was made; and
(ii) all services and property provided by the airport to other units of government
and the amount of compensation received for provision of each such
service and property.

27.  **Use by Government Aircraft.**  It will make available all of the facilities of the airport
developed with Federal financial assistance and all those usable for landing and takeoff of
aircraft to the United States for use by Government aircraft in common with other aircraft at
all times without charge, except, if the use by Government aircraft is substantial, charge may
be made for a reasonable share, proportional to such use, for the cost of operating and
maintaining the facilities used.  Unless otherwise determined by the Secretary, or otherwise
agreed to by the sponsor and the using agency, substantial use of an airport by Government
aircraft will be considered to exist when operations of such aircraft are in excess of those
which, in the opinion of the Secretary, would unduly interfere with use of the landing areas
by other authorized aircraft, or during any calendar month that-
a.  Five (5) or more Government aircraft are regularly based at the airport or
on land adjacent thereto; or
b.  The total number of movements (counting each landing as a movement) of
Government aircraft is 300 or more, or the gross accumulative weight of
Government aircraft using the airport (the total movement of Government
aircraft multiplied by gross weights of such aircraft) is in excess of five
million pounds.

28.  **Land for Federal Facilities.**  It will furnish without cost to the Federal Government for use
in connection with any air traffic control or air navigation activities, or weather-reporting
and communication activities related to air traffic control, any areas of land or water, or
estate therein, or rights in buildings of the sponsor as the Secretary considers necessary or
desirable for construction, operation, and maintenance at Federal expense of space or
facilities for such purposes.  Such areas or any portion thereof will be made available as
provided herein within four months after receipt of a written request from the Secretary.

29.  **Airport Layout Plan.**

a.  It will keep up to date at all times an airport layout plan of the airport
showing (1) boundaries of the airport and all proposed additions thereto,
together with the boundaries of all offsite areas owned or controlled by the
sponsor for airport purposes and proposed additions thereto; (2) the
location and nature of all existing and proposed airport facilities and
structures (such as runways, taxiways, aprons, terminal buildings, hangars
and roads), including all proposed extensions and reductions of existing
airport facilities; and (3) the location of all existing and proposed
nonaviation areas and of all existing improvements thereon. Such airport
layout plans and each amendment, revision, or modification thereof, shall

12

be subject to the approval of the Secretary which approval shall be evidenced by the signature of a duly authorized representative of the Secretary on the face of the airport layout plan. The sponsor will not make or permit any changes or alterations in the airport or any of its facilities which are not in conformity with the airport layout plan as approved by the Secretary and which might, in the opinion of the Secretary, adversely affect the safety, utility or efficiency of the airport.

b.    If a change or alteration in the airport or the facilities is made which the Secretary determines adversely affects the safety, utility, or efficiency of any federally owned, leased, or funded property on or off the airport and which is not in conformity with the airport layout plan as approved by the Secretary, the owner or operator will, if requested, by the Secretary (1) eliminate such adverse effect in a manner approved by the Secretary; or (2) bear all costs of relocating such property (or replacement thereof) to a site acceptable to the Secretary and all costs of restoring such property (or replacement thereof) to the level of safety, utility, efficiency, and cost of operation existing before the unapproved change in the airport or its facilities.

**30.    Civil Rights.** It will comply with such rules as are promulgated to assure that no person shall, on the grounds of race, creed, color, national origin, sex, age, or handicap be excluded from participating in any activity conducted with or benefiting from funds received from this grant. This assurance obligates the sponsor for the period during which Federal financial assistance is extended to the program, except where Federal financial assistance is to provide, or is in the form of personal property or real property or interest therein or structures or improvements thereon in which case the assurance obligates the sponsor or any transferee for the longer of the following periods:  (a) the period during which the property is used for a purpose for which Federal financial assistance is extended, or for another purpose involving the provision of similar services or benefits, or (b) the period during which the sponsor retains ownership or possession of the property.

**31.    Disposal of Land.**

a.    For land purchased under a grant for airport noise compatibility purposes, it will dispose of the land, when the land is no longer needed for such purposes, at fair market value, at the earliest practicable time. That portion of the proceeds of such disposition which is proportionate to the United States' share of acquisition of such land will, at the discretion of the Secretary, (1) be paid to the Secretary for deposit in the Trust Fund, or (2) be reinvested in an approved noise compatibility project as prescribed by the Secretary, including the purchase of nonresidential buildings or property in the vicinity of residential buildings or property previously purchased by the airport as part of a noise compatibility program.

b.    For land purchased under a grant for airport development purposes (other than noise compatibility), it will, when the land is no longer needed for airport purposes, dispose of such land at fair market value or make available to the Secretary an amount equal to the United States' proportionate share of the fair market value of the land. That portion of the proceeds of such disposition which is proportionate to the United States' share of the cost of acquisition of such land will, (1) upon application to the Secretary, be reinvested in another eligible airport improvement project or projects approved by the Secretary at that airport or within the national airport system, or (2) be paid to the Secretary for deposit in the Trust Fund if no eligible project exists.

13

    c.    Land shall be considered to be needed for airport purposes under this assurance if (1) it may be needed for aeronautical purposes (including runway protection zones) or serve as noise buffer land, and (2) the revenue from interim uses of such land contributes to the financial self-sufficiency of the airport. Further, land purchased with a grant received by an airport operator or owner before December 31, 1987, will be considered to be needed for airport purposes if the Secretary or Federal agency making such grant before December 31, 1987, was notified by the operator or owner of the uses of such land, did not object to such use, and the land continues to be used for that purpose, such use having commenced no later than December 15, 1989.

    d.    Disposition of such land under (a) (b) or (c) will be subject to the retention or reservation of any interest or right therein necessary to ensure that such land will only be used for purposes which are compatible with noise levels associated with operation of the airport.

**32. Engineering and Design Services.** It will award each contract, or sub-contract for program management, construction management, planning studies, feasibility studies, architectural services, preliminary engineering, design, engineering, surveying, mapping or related services with respect to the project in the same manner as a contract for architectural and engineering services is negotiated under Title IX of the Federal Property and Administrative Services Act of 1949 or an equivalent qualifications-based requirement **prescribed** for or by the sponsor of the airport.

**33. Foreign Market Restrictions.** It will not allow funds provided under this grant to be used to fund any project which uses any product or service of a foreign country during the period in which such foreign country is listed by the United States Trade Representative as denying fair and equitable market opportunities for products and suppliers of the United States in procurement and construction.

**34. Policies, Standards, and Specifications.** It will carry out the project in accordance with policies, standards, and specifications approved by the Secretary including but not limited to the advisory circulars listed in the Current FAA Advisory Circulars for AIP projects, dated _____ and included in this grant, and in accordance with applicable state policies, standards, and specifications approved by the Secretary.

**35.    Relocation and Real Property Acquisition.** (1) It will be guided in acquiring real property, to the greatest extent practicable under State law, by the land acquisition policies in Subpart B of 49 CFR Part 24 and will pay or reimburse property owners for necessary expenses as specified in Subpart B. (2) It will provide a relocation assistance program offering the services described in Subpart C and fair and reasonable relocation payments and assistance to displaced persons as required in Subpart D and E of 49 CFR Part 24. (3) It will make available within a reasonable period of time prior to displacement, comparable replacement dwellings to displaced persons in accordance with Subpart E of 49 CFR Part 24.

**36.    Access By Intercity Buses**. The airport owner or operator will permit, to the maximum extent practicable, intercity buses or other modes of transportation to have access to the airport, however, it has no obligation to fund special facilities for intercity buses or for other modes of transportation.

**37.    Disadvantaged Business Enterprises.** The recipient shall not discriminate on the basis of race, color, national origin or sex in the award and performance of any DOT-assisted contract or in the administration of its DBE program or the requirements of 49 CFR Part 26. The Recipient shall take all necessary and reasonable steps under 49 CFR Part 26 to ensure

14

non discrimination in the award and administration of DOT-assisted contracts. The recipient's DBE program, as required by 49 CFR Part 26, and as approved by DOT, is incorporated by reference in this agreement. Implementation of this program is a legal obligation and failure to carry out its terms shall be treated as a violation of this agreement. Upon notification to the recipient of its failure to carry out its approved program, the Department may impose sanctions as provided for under Part 26 and may, in appropriate cases, refer the matter for enforcement under 18 U.S.C. 1001 and/or the Program Fraud Civil Remedies Act of 1986 (31 U.S.C. 3801).

38.   **Hangar Construction.**  If the airport owner or operator and a person who owns an aircraft agree that a hangar is to be constructed at the airport for the aircraft at the aircraft owner's expense, the airport owner or operator will grant to the aircraft owner for the hangar a long term lease that is subject to such terms and conditions on the hangar as the airport owner or operator may impose.

39. **Competitive Access.**

a.    If the airport owner or operator of a medium or large hub airport (as defined in section 47102 of title 49, U.S.C.) has been unable to accommodate one or more requests by an air carrier for access to gates or other facilities at that airport in order to allow the air carrier to provide service to the airport or to expand service at the airport, the airport owner or operator shall transmit a report to the Secretary that-

1.   Describes the requests;
2.   Provides an explanation as to why the requests could not be accommodated; and
3.   Provides a time frame within which, if any, the airport will be able to accommodate the requests.

b.    Such report shall be due on either February 1 or August 1 of each year if the airport has been unable to accommodate the request(s) in the six month period prior to the applicable due date

# <u>Exhibit M</u>

# United States Code

## Congressional Service

Laws of
78th Congress

Second Session

———

Convened January 10, 1944
Adjourned December 19, 1944

———

St. Paul, Minn.                    Brooklyn, N. Y.
West Publishing Co.        Edward Thompson Co.

### NATIONAL WAR LABOR BOARD—EXEMPTION FROM CERTAIN PENAL PROVISIONS

#### CHAPTER 478—PUBLIC LAW 456

[H. R. 4349]

An Act to exempt certain officers and employees of the National War Labor Board from certain provisions of the Criminal Code.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That:*

Nothing contained in sections 109 and 113 of the Criminal Code (U. S. C., title 18, secs. 198 and 203)[80] shall be deemed to apply to any person heretofore or hereafter appointed to the National War Labor Board or any of its agencies under the authority of the War Labor Disputes Act, any Executive order or regulation issued under the provisions of the Act of October 2, 1942 (56 Stat. 765),[81] or Executive Order Numbered 9017, dated January 12, 1942,[82] as amended from time to time, because of intermittent service as a member of the National War Labor Board or of a regional board, industry commission, tripartite panel or similar agency of the National War Labor Board, or as a hearing officer or arbitrator of such Board, if such person is serving or has served in such capacity without compensation, or with compensation on a per diem when actually employed basis for not in excess of ninety days a year: *Provided, however,* That the provisions of this Act shall not apply to any representation before the National War Labor Board or any of its said agencies while such person is an officer or employee of the National War Labor Board or for a period of one year after the cessation of the service of such person: *And provided further,* That the immunity herein created shall not apply as to any matter on which such person shall have been employed.

Approved, October 2, 1944.

### SURPLUS PROPERTY ACT OF 1944

*See Congressional Comment, p. 1297*

#### CHAPTER 479—PUBLIC LAW 457

[H. R. 5125]

An Act to aid the reconversion from a war to a peace economy through the distribution of Government surplus property and to establish a Surplus Property Board to effectuate the same, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That:*

This Act may be cited as the "Surplus Property Act of 1944".

#### OBJECTIVES

Sec. 2. The Congress hereby declares that the objectives of this Act are to facilitate and regulate the orderly disposal of surplus property so as—

(a) to assure the most effective use of such property for war purposes and the common defense;

(b) to give maximum aid in the reestablishment of a peacetime economy of free independent private enterprise, the development of the maximum of independent operators in trade, industry, and agriculture, and to stimulate full employment;

[80] 18 U.S.C.A. §§ 198, 203.
[81] 50 U.S.C.A. Appendix, §§ 961-971.
[82] 50 U.S.C.A. Appendix, § 1507 note.

ΤΙΟΝ

ιtional War
ι.

*United States of*

al Code (U. S.
to any person
abor Board or
Disputes Act,
ons of the Act
imbered 9017,
because of in-
Board or of a
illar agency of
capacity with-
n actually em-
*vided, however,*
esentation be-
cies while such
Board or for a
person: *And*
ot apply as to

ly through
establish a
other pur-

*United States of*

44".

es of this Act
is property so
r for war pur-
f a peacetime
evelopment of
try, and agri-

(c) to facilitate the transition of enterprises from wartime to peace-time production and of individuals from wartime to peacetime employment;

(d) to discourage monopolistic practices and to strengthen and preserve the competitive position of small business concerns in an economy of free enterprise;

(e) to foster and to render more secure family-type farming as the traditional and desirable pattern of American agriculture;

(f) to afford returning veterans an opportunity to establish themselves as proprietors of agricultural, business, and professional enterprises;

(g) to encourage and foster post-war employment opportunities;

(h) to assure the sale of surplus property in such quantities and on such terms as will discourage disposal to speculators or for speculative purposes;

(i) to establish and develop foreign markets and promote mutually advantageous economic relations between the United States and other countries by the orderly disposition of surplus property in other countries;

(j) to avoid dislocations of the domestic economy and of international economic relations;

(k) to foster the wide distribution of surplus commodities to consumers at fair prices;

(l) to effect broad and equitable distribution of surplus property;

(m) to achieve the prompt and full utilization of surplus property at fair prices to the consumer through disposal at home and abroad with due regard for the protection of free markets and competitive prices from dislocation resulting from uncontrolled dumping;

(n) to utilize normal channels of trade and commerce to the extent consistent with efficient and economic distribution and the promotion of the general objectives of this Act (without discriminating against the establishment of new enterprises);

(o) to promote production, employment of labor, and utilization of the productive capacity and the natural and agricultural resources of the country;

(p) to foster the development of new independent enterprise;

(q) to prevent insofar as possible unusual and excessive profits being made out of surplus property;

(r) to dispose of surplus property as promptly as feasible without fostering monopoly or restraint of trade, or unduly disturbing the economy, or encouraging hoarding of such property, and to facilitate prompt redistribution of such property to consumers;

(s) to dispose of surplus Government-owned transportation facilities and equipment in such manner as to promote an adequate and economical national transportation system; and

(t) except as otherwise provided, to obtain for the Government, as nearly as possible, the fair value of surplus property upon its disposition.

## DEFINITIONS

Sec. 3. As used in this Act—

(a) The term "Government agency" means any executive department, board, bureau, commission, or other agency in the executive branch of the Federal Government, or any corporation wholly owned (either directly or through one or more corporations) by the United States.

(b) The term "owning agency", in the case of any property, means the executive department, the independent agency in the executive branch of the Federal Government, or the corporation (if a Government agency), having control of such property otherwise than solely as a disposal agency.

(c) The term "disposal agency" means any Government agency desig-

765

nated under section 10 to dispose of one or more classes of surplus property.

(d) The term "property" means any interest, owned by the United States or any Government agency, in real or personal property, of any kind, wherever located, but does not include (1) the public domain, or such lands withdrawn or reserved from the public domain as the Surplus Property Board (created by section 5) determines are suitable for return to the public domain for disposition under the general land laws, or (2) naval vessels of the following categories: Battleships, cruisers, aircraft carriers, destroyers, and submarines.

(e) The term "surplus property" means any property which has been determined to be surplus to the needs and responsibilities of the owning agency in accordance with section 11.

(f) The term "contractor inventory" means (1) any property related to a terminated contract of any type with a Government agency or to a subcontract thereunder; and (2) any property acquired under a contract pursuant to the terms of which title is vested in the Government, and in excess of the amounts needed to complete performance thereunder; and (3) any property which the Government is obligated to take over under any type of contract as a result of any change in the specifications or plans thereunder.

(g) The term "care and handling" includes completing, repairing, converting, rehabilitating, operating, maintaining, preserving, protecting, insuring, storing, packing, handling, and transporting, and, in the case of property which is dangerous to public health or safety, destroying, or rendering innocuous, such property.

(h) The term "person" means any individual, corporation, partnership, firm, association, trust, estate, or other entity.

(i) The term "State" includes the several States, Territories, and possessions of the United States, and the District of Columbia.

(j) The term "tax-supported institution" means any scientific, literary, educational, public-health, or public-welfare institution which is supported in whole or in part through the use of funds derived from taxation by the United States, or by any State or political subdivision thereof.

(k) The term "veteran" means any person in the active military or naval service of the United States during the present war, or any person who served in the active military or naval service of the United States on or after September 16, 1940, and prior to the termination of the present war, and who has been discharged or released therefrom under honorable conditions.

### DISPOSITION OF SURPLUS PROPERTY—GENERAL RULE

Sec. 4. Surplus property shall be disposed of to such extent, at such times, in such areas, by such agencies, at such prices, upon such terms and conditions, and in such manner, as may be prescribed in or pursuant to this Act.

### SURPLUS PROPERTY BOARD

Sec. 5. (a) There is hereby established in the Office of War Mobilization, and in its successor, a Surplus Property Board (hereinafter called the "Board"), which shall be composed of three members, each of whom shall be appointed by the President, by and with the advice and consent of the Senate, and shall receive compensation at the rate of $12,000 per annum. The term of office of the members shall be two years, except that the term of office of the members first appointed shall expire two years from the date of the enactment of this Act, and the next succeeding terms shall then begin, and any person appointed to fill a vacancy caused by the death, resignation, or removal of a member prior to the expiration of the term of such member shall be appointed only for such unexpired

766

Oct. 3

! surplus prop-

by the United
operty, of any
lic domain, or
as the Surplus
able for return
d laws, or (2)
nisers, aircraft

rhich has been
of the owning

operty related
: agency or to
i under a con-
e Government.
nance thereun-
ligated to that
i in the specifi-

repairing, con-
ng, protecting,
id, in the case
destroying, or

ation, partner-

ories, and pos-

scientific, lit-
titution which
s derived from
cal subdivision

ive military or
, or any person
: United States
ination of the
herefrom under

AL RULE

extent, at such
pon such terms
in or pursuant

of War Mobili-
ireinafter called
i, each of whom
ice and consent
of $12,000 per
'o years, except
ihall expire two
next succeeding
vacancy caused
o the expiration
such unexpired

term. The president shall designate one of the members of the Board as Chairman.

(b) The Board may, within the limits of funds which may be made available, appoint and fix the compensation of such officers and employees, and may make such expenditures for supplies, facilities, and services, as may be necessary to carry out its functions. Without regard to the provisions of the civil-service laws and the Classification Act of 1923, as amended, the Board may appoint such special assistants, and may employ such certified public accountants, qualified cost accountants, industrial engineers, appraisers, and other experts, and fix their compensation, and may contract with such certified public accounting firms and qualified firms of engineers, as may be necessary to carry out its functions.

## DUTIES AND AUTHORITY OF BOARD

Sec. 6. The activities of the Board shall be coordinated with the programs of the armed forces of the United States in the interests of the war effort. Until peace is concluded the needs of the armed forces are hereby declared and shall remain paramount. The Board shall have general supervision and direction, as provided in this Act, over (1) the care and handling and disposition of surplus property, and (2) the transfer of surplus property between Government agencies.

## COOPERATION WITH INTERESTED GOVERNMENT AGENCIES

Sec. 7. The Board shall advise and consult with other interested Government agencies with a view to obtaining all aid and assistance possible in coordinating the functions of the several agencies affected by the disposition of surplus property.

## DELEGATION OF AUTHORITY

Sec. 8. The head of any Government agency, except the Board, may delegate, and authorize successive redelegations of, any authority conferred upon him or his agency by or pursuant to this Act to any officer, agent, or employee of such agency or, with the approval of the Board, to any other Government agency.

## REGULATIONS

Sec. 9. (a) The Board shall prescribe regulations to effectuate the provisions of this Act. In formulating such regulations, the Board shall be guided by the objectives of this Act.

(b) Regulations issued pursuant to subsection (a) may, except as otherwise provided in this Act, contain provisions prescribing the extent to which, the times at which, the areas in which, the agencies by which, the prices at which, and the terms and conditions under which, surplus property may be disposed of, and the extent to which and the conditions under which surplus property shall be subject to care and handling.

(c) Each Government agency shall carry out regulations of the Board expeditiously and shall issue such further regulations, not inconsistent with the regulations of the Board, as it deems necessary or desirable to carry out the provisions of this Act.

(d) Regulations prescribed under this Act shall be published in the Federal Register.

## DESIGNATION OF DISPOSAL AGENCIES

Sec. 10. (a) Except as provided in subsection (b) of this section, the Board shall designate one or more Government agencies to act as disposal agencies under this Act. In exercising its authority to designate disposal agencies, the Board shall assign surplus property for disposal by the fewest number of Government agencies practicable and, so

767

Ch. 479    LAWS OF 78TH CONGRESS—2ND SESSION    Oct. 3
Pub. 457

far as it deems feasible, shall centralize in one disposal agency responsibility for the disposal of all property of the same type or class.

(b) The United States Maritime Commission shall be the sole disposal agency for surplus vessels which the Commission determines to be merchant vessels or capable of conversion to merchant use, and such vessels shall be disposed of only in accordance with the provisions of the Merchant Marine Act, 1936, as amended,[83] and other laws authorizing the sale of such vessels.

## DECLARATION AND DISPOSITION OF SURPLUS PROPERTY

Sec. 11. (a) Each owning agency shall have the duty and responsibility continuously to survey the property in its control and to determine which of such property is surplus to its needs and responsibilities.

(b) Each owning agency shall promptly report to the Board and the appropriate disposal agency all surplus property in its control which the owning agency does not dispose of under section 14.

(c) Whenever in the course of the performance of its duties under this Act, the Board has reason to believe that any owning agency has property in its control which is surplus to its needs and responsibilities and which it has not reported as such, the Board shall promptly report that fact to the Senate and House of Representatives. Each owning agency and each disposal agency shall submit to the Board (1) such information and reports with respect to surplus property in the control of the agency, in such form, and at such reasonable times, as the Board may direct; (2) such information and reports with respect to other property in the control of the agency, to such extent, and in such form, as the Board may direct and as the agency deems consistent with national security.

(d) When any surplus property is reported to any disposal agency under subsection (b) of this section, the disposal agency shall have responsibility and authority for the disposition of such property, and for the care and handling of such property pending its disposition, in accordance with regulations prescribed by the Board. Where the disposal agency is not prepared at the time of its designation under this Act to undertake the care and handling of such surplus property the Board may postpone the responsibility of the agency to assume its duty for care and handling for such period as the Board deems necessary to permit the preparation of the agency therefor.

(e) The Board shall prescribe regulations necessary to provide, so far as practicable, for uniform and wide public notice concerning surplus property available for sale, and for uniform and adequate time intervals between notice and sale so that all interested purchasers may have a fair opportunity to buy.

(f) No surplus property which was processed, produced, or donated by the American Red Cross for any Government agency shall be disposed of except after notice to and consultation with the American Red Cross. All or any portion of such property may be donated to the American Red Cross, upon its request, solely for charitable purposes.

(g) Each disposal agency shall maintain in each of its disposal offices such records of its inventories of surplus property and of each disposal transaction negotiated by that office as the Board may prescribe. The information in such records shall be available at all reasonable times for public inspection.

## UTILIZATION OF SURPLUS PROPERTY BY FEDERAL AGENCIES

Sec. 12. (a) It shall be the duty of the Board to facilitate the transfer of surplus property from one Government agency to other Government agencies for their use; and the transfer of surplus property under this section shall be given priority over all other disposals provided for in this Act.

[83] 46 U.S.C.A. § 1101 et seq.

768

Oct. 8          **SURPLUS PROPERTY ACT OF 1944**          Ch. 479
Pub. 457

icy responsi-
ilass.
he sole dis-
rmines to be
se, and such
provisions of
ws authoriz-

)PERTY

nd responsi-
to determine
ibilities.
oard and the
ontrol which

es under this
icy has prop-
sibilities and
y report that
rning agency
i information
f the agency,
y direct; (2)
y in the con-
e Board may
curity.
iposal agency
hall have re-
y, and for the
n, in accord-
the disposal
ir this Act to
ty the Board
its duty for
essary to per-

o provide, so
rning surplus
time intervals
ay have a fair

i, or donated
ll be disposed
an Red Cross.
American Red

lisposal offices
each disposal
:escribe. The
able times for

AGENCIES

te the transfer
r Government
rty under this
rovided for in

(b) It shall be the responsibility of all Government agencies, in order to avoid making purchases through commercial channels, continuously to consult the records of surplus property established by the Board and to determine whether their requirements can be satisfied out of such surplus property. It shall also be the responsibility of the head of each Government agency to submit to the Board such estimates of the needs of the agency and such reports in relation thereto as the Board may deem necessary to promote the fullest utilization of surplus property. It shall be the responsibility of the Board to determine whether Government agencies are acquiring surplus property to the fullest possible extent, and to notify agencies whenever, in its judgment, they are not so doing.

(c) The disposal agency responsible for any such property shall transfer it to the Government agency acquiring it at the fair value of the property as fixed by the disposal agency, under regulations prescribed by the Board, unless transfer without reimbursement or transfer of funds is otherwise authorized by law.

### DISPOSAL TO LOCAL GOVERNMENTS AND NONPROFIT INSTITUTIONS

Sec. 13. (a) The Board shall prescribe regulations for the disposition of surplus property to States and their political subdivisions and instrumentalities, and to tax-supported and nonprofit institutions, and shall determine on the basis of need what transfers shall be made. In formulating such regulations the Board shall be guided by the objectives of this Act and shall give effect to the following policies to the extent feasible and in the public interest:

(1) (A) Surplus property that is appropriate for school, classroom, or other educational use may be sold or leased to the States and their political subdivisions and instrumentalities, and tax-supported educational institutions, and to other non-profit educational institutions which have been held exempt from taxation under section 101 (6) of the Internal Revenue Code.

(B) Surplus medical supplies, equipment, and property suitable for use in the protection of public health, including research, may be sold or leased to the States and their political subdivisions and instrumentalities, and to tax-supported medical institutions, and to hospitals or other similar institutions not operated for profit which have been held exempt from taxation under section 101 (6) of the Internal Revenue Code.

(C) In fixing the sale or lease value of property to be disposed of under subparagraph (A) and subparagraph (B) of this paragraph, the Board shall take into consideration any benefit which has accrued or may accrue to the United States from the use of such property by any such State, political subdivision, instrumentality, or institution.

(2) Surplus property shall be disposed of so as to afford public and governmental institutions, non-profit or tax-supported educational institutions, charitable and eleemosynary institutions, non-profit or tax-supported hospitals and similar institutions, States, their political subdivisions and instrumentalities, and volunteer fire companies, an opportunity to fulfill, in the public interest, their legitimate needs.

(b) Under regulations prescribed by the Board, whenever the Government agency authorized to dispose of any property finds that it has no commercial value or that the cost of its care and handling and disposition would exceed the estimated proceeds, the agency may donate such property to any agency or institution supported by the Federal Government or any State or local government, or to any non-profit educational or charitable organization, or, if that is not feasible, shall destroy or otherwise dispose of such property, but, except in the case of property the immediate destruction of which is necessary or desirable either because of the nature of the property or because of the expense or diffi-

culty of its care and handling, no property shall be destroyed until thirty days after public notice of the proposed destruction thereof has been given (and a copy of such notice given to the Board at the beginning of such thirty-day period) and an attempt has been made within such thirty days to dispose of such property otherwise than by destruction.

(c) No airport and no harbor or port terminal, including necessary operating equipment, shall be otherwise disposed of until it has first been offered, under regulations to be prescribed by the Board, for sale or lease to the State, political subdivision thereof, and any municipality, in which it is situated, and to all municipalities in the vicinity thereof.

(d) Whenever any State or political subdivision thereof, or any State or Government agency or instrumentality certifies to the Board that any power transmission line determined to be surplus property under the provisions of this Act is needful for or adaptable to the requirements of any public or cooperative power project, such line and the right-of-way acquired for its construction shall not be sold, leased for more than one year, or otherwise disposed of, except as provided in section 12 or this section, unless specifically authorized by Act of Congress.

(e) In disposing of any surplus real property, as defined in section 23, on or across which highways or streets had been established and constructed and were being maintained by the States or their political subdivisions or instrumentalities at the time such surplus real property was acquired by the Government, and where such highways or streets were vacated, destroyed, or shut off from general public use in order to meet the requirements and serve the purposes of the Government, the States or their political subdivisions or instrumentalities first shall be given a reasonable time, to be fixed by the Board, in which to repurchase the original rights-of-way on which such highways or streets were established and in which to purchase such new or additional rights-of-way as may be required for reestablishing, in whole or in part, such highways or streets of greater width or on new and more adequate locations, at a price not exceeding that paid therefor by the Government.

(f) The disposal of surplus property under this section to States and political subdivisions and instrumentalities thereof shall be given priority over all other disposals of property provided for in this Act except transfers under section 12.

## DISPOSITION BY OWNING AGENCY

Sec. 14. (a) Subject only to the regulations of the Board with respect to price policies, any owning agency may dispose of any property for the purpose of war production or authorize any contractor with such agency or subcontractor thereunder to retain or dispose of any contractor inventories for the purpose of war production. The Board may empower any owning agency, subject to the regulations of the Board, to authorize any contractor with such agency or subcontractor thereunder to retain or dispose of any contractor inventories for any other purpose which in the opinion of the Board is not contrary to the objectives of this Act. Where any owning agency takes possession of any contractor inventory from any contractor with the agency or subcontractor thereunder, such property shall be disposed of only in accordance with the provisions of this Act.

(b) Subject only to subsection (c) of this section, any owning agency may dispose of—

(1) any property which is damaged or worn beyond economical repair;

(2) any waste, salvage, scrap, or other similar items;

(3) any product of industrial, research, agricultural, or livestock operations, or of any public works construction or maintenance project, carried on by such agency;

which does not consist of stategic minerals and metals, as defined in section 22.

770

:oyed until thirty
:hereof has been
the beginning of
vithin such thirty
' destruction.
:luding necessary
l it has first been
, for sale or lease
cipality, in which
:hereof.
eof, or any State
e Board that any
pperty under the
: requirements of
the right-of-way
or more than one
ection 12 or this

ied in section 23,
.blished and con-
ieir political sub-
us real property
;hways or streets
c use in order to
Government, the
:ies first shall be
iich to repurchase
:reets were estab-
l rights-of-way as
such highways or
cations, at a price

ion to States and
: be given priority
Act except trans-

loard with respect
any property for
tractor with such
pose of any con-
The Board may
: of the Board, to
ractor thereunder
iny other purpose
the objectives of
of any contractor
bcontractor there-
:ordance with the

ny owning agency

economical repair;

iral, or livestock
intenance project,

as defined in sec-

(c) Whenever the Board deems such action necessary to effectuate the objectives and policies of this Act, the Board, by regulations, shall restrict the authority of any owning agency to dispose of any class of surplus property under subsection (b) of this section.

## METHODS OF DISPOSITION

Sec. 15. (a) Notwithstanding the provisions of any other law but subject to the provisions of this Act, whenever any Government agency is authorized to dispose of property under this Act, then the agency may dispose of such property by sale, exchange, lease, or transfer, for cash, credit, or other property, with or without warranty, and upon such other terms and conditions, as the agency deems proper: *Provided, however,* That in the case of raw materials, consumer goods, and small tools, hardware, and nonassembled articles which may be used in the manufacture of more than one type of product, no extension of credit under this Act shall be for a longer period than three years.

(b) Any owning agency or disposal agency may execute such documents for the transfer of title or other interest in property or take such other action as it deems necessary or proper to transfer or dispose of property or otherwise to carry out the provisions of this Act, and, in the case of surplus property, shall do so to the extent required by the regulations of the Board.

## DISPOSITIONS TO VETERANS

Sec. 16. The Board shall prescribe regulations to effectuate the objectives of this Act to aid veterans to establish and maintain their own small business, professional, or agricultural enterprises, by affording veterans suitable preferences to the extent feasible and consistent with the policies of this Act in the acquisition of the types of surplus property useful in such enterprises.

## DISPOSITIONS IN RURAL AREAS

Sec. 17. The Board shall devise ways and means and prescribe regulations in cooperation with the War Food Administrator providing for the sale of surplus property in such quantities in rural localities and in such manner as will assure farmers and farmers' cooperative associations equal opportunity with others to purchase surplus property: *Provided, however,* That in cases where a shortage of trucks, machinery, and equipment impairs farm production, a program shall be developed by the Board in cooperation with the Agricultural Adjustment Agency whereby a reasonable portion of the surplus supply will be made available for sale in rural areas to farmers and farmers' cooperative associations.

## SMALL BUSINESS

Sec. 18. (a) It shall be the duty of the Board to devise ways and means and prescribe regulations to prevent any discrimination against small business in the disposal and distribution and use of any surplus property.

(b) The Board shall by regulations determine, or provide for the determination, as to all surplus property in the hands of each disposal agency, the size of lots in which, and the areas in which, the various classes of such property should be offered consistently with the usual and customary commercial practice with respect to such class. The available supply of each class in each area shall be so disposed of as to give to prospective purchasers, within such area, of any particular amount (not smaller than the smallest lot consistent with such commercial practice) preference (by affording them reasonable opportunity to acquire the desired amount) over prospective purchasers of larger amounts.

(c) The Smaller War Plants Corporation is hereby specifically charged

771

with the responsibility of cooperating with the Board and with the owning and disposal agencies, of making surveys from time to time, and bringing to the attention of the agencies and the Board the needs and requirements of small business and any cases or situations which have resulted in or would effect discrimination against small business in the purchase or acquisition of surplus property by them and in the disposal thereof by the agencies.

(d) The Smaller War Plants Corporation is hereby authorized and directed to consult with small business to obtain full information concerning the needs of small business for surplus property.

(e) The Smaller War Plants Corporation shall have the power to purchase any surplus property for resale, subject to regulations of the Board, to small business (and is empowered to receive other property in exchange as partial or full payment therefor), when in its judgment, such disposition is required to preserve and strengthen the competitive position of small business, or will assist the Corporation in the discharge of the duties and responsibilities imposed upon it. The provisions of subsections (a) and (c) of section 12 shall be applicable to purchases made by the Smaller War Plants Corporation under this subsection.

(f) The Smaller War Plants Corporation is hereby authorized, for the purpose of carrying out the objectives of this section, to make or guarantee loans to small business enterprises in connection with the acquisition, conversion, and operation of plants and facilities which have been determined to be surplus property, and, in cooperation with the disposal agencies, to arrange for sales of surplus property to small business concerns on credit or time bases.

## DISPOSAL OF PLANTS

Sec. 19. (a) The Board, in cooperation with the various disposal agencies, shall prepare and submit to the Congress within three months after enactment of this Act, a report as to each of the following classes of surplus property (not including any plant which cost the Government less than $5,000,000): (1) aluminum plants and facilities; (2) magnesium plants and facilities; (3) synthetic rubber plants and facilities; (4) chemical plants and facilities; (5) aviation gasoline plants and facilities; (6) iron and steel plants and facilities; (7) pipe lines and facilities used for transporting oil; (8) patents, processes, techniques, and inventions, except such as are necessary to the operation of the plants and facilities herein listed; (9) aircraft plants and facilities and aircraft and aircraft parts; (10) shipyards and facilities; (11) transportation facilities; and (12) radio and electrical equipment:

(A) Describing the amount, cost, and location of the property and setting forth other descriptive information relative to the use of the property;

(B) Outlining the economic problems that may be created by disposition of the property;

(C) Setting forth a plan or program for the care and handling, disposition, and use of the property consistent with the policies and objectives set forth in this Act.

(b) In the event that it is not possible within such period to prepare and submit a complete report to the Congress as to any class of property, the Board shall submit an interim report three months after the enactment of this Act, and shall submit a complete report as soon thereafter as possible. If the Board determines that it is desirable to alter or change any such plan or program or to prepare a report on any other class of property, it shall prepare in accordance with the provisions of this subsection and submit to the Congress an additional report, setting forth the altered or changed plan or program or a plan or program relating to the new class of property.

(c) Whenever the Board may deem it to be in the interest of the

772

Oct. 8

ith the own-
to time, and
e needs and
which have
iness in the
the disposal

horized and
mation con-

wer to pur-
ions of the
property in
gment, such
etitive posi-
iischarge of
ons of sub-
hases made

iorized, for
to make or
vith the ac-
which have
n with the
small busi-

is. disposal
ree months
ing classes
overnment
(2) mag-
facilities;
plants and
lines and
techniques,
ion of the
ilities and
11) trans-

operty and
se of the

by disposi-

dling, dis-
s and ob-

to prepare
property,
the enact-
thereafter
alter or
any other
visions of
rt, setting
ogram re-

est of the

objectives of this Act it may authorize the disposition of any surplus property listed in classes 9 to 12, inclusive, of subsection (a) of this section. With respect to the property listed in classes 1 to 8, inclusive, no disposition shall be made or authorized until thirty days after such report (or additional report) has been made while Congress is in session, except that the Board may authorize any disposal agency to lease any such property for a term of not more than five years.

(d) The Board may authorize any disposal agency to dispose of any materials or equipment related to any surplus plant covered by this section, if such materials and equipment are not necessary for the operation of the plant in the manner for which it is designed.

(e) This section shall not apply to any Government-owned equipment, structure, or other property operated as an integral part of a privately owned plant and not capable of economic operation as a separate and independent unit.

### APPLICABILITY OF ANTITRUST LAWS

Sec. 20. Whenever any disposal agency shall begin negotiations for the disposition to private interests of a plant or plants or other property, which cost the Government $1,000,000 or more, or of patents, processes, techniques or inventions, irrespective of cost, the disposal agency shall promptly notify the Attorney General of the proposed disposition and the probable terms or conditions thereof. Within a reasonable time, in no event to exceed ninety days after receiving such notification, the Attorney General shall advise the Board and the disposal agency whether, in his opinion, the proposed disposition will violate the antitrust laws. Upon the request of the Attorney General, the Board or other Government agency shall furnish or cause to be furnished such information as it may possess which the Attorney General determines to be appropriate or necessary to enable him to give the advice called for by this section or to determine whether any other disposition of surplus property violates the antitrust laws. Nothing in this Act shall impair, amend, or modify the antitrust laws or limit and prevent their application to persons who buy or otherwise acquire property under the provisions of this Act. As used in this section, the term "antitrust laws" includes the Act of July 2, 1890 (ch. 647, 26 Stat. 209), as amended; the Act of October 15, 1914 (ch. 323, 38 Stat. 730), as amended; the Federal Trade Commission Act; and the Act of August 27, 1894 (ch. 349, secs. 73, 74, 28 Stat. 570), as amended.[84]

### DISPOSAL OF SURPLUS AGRICULTURAL COMMODITIES

Sec. 21. (a) Subject to the supervision of the Board, the War Food Administrator, or his successor, shall be solely responsible for the formulation of policies with respect to the disposal of surplus agricultural commodities and surplus foods processed from agricultural commodities, which shall be administered by the disposal agency or agencies designated by the Board. Such policies shall be so formulated as to prevent surplus agricultural commodities, or surplus food processed from agricultural commodities, from being dumped on the market in a disorderly manner and disrupting the market prices for agricultural commodities.

(b) The Board shall not exercise any of its powers under this Act with relation to disposal of surplus cotton or woolen goods except with the approval in writing of the War Food Administrator or his successor.

(c) Surplus farm commodities shall not be sold in the United States under this Act in quantities in excess of, or at prices less than, those applicable with respect to sales of such commodities by the Commodity Credit Corporation, or at less than current prevailing market prices, whichever may be the higher, unless such commodities are being disposed

84 15 U.S.C.A. § 1 et seq.

773

of, pursuant to this Act, only for export; and the Commodity Credit Corporation may dispose of or cause to be disposed of for cash or its equivalent in goods or for adequately secured credit, for export only, and at competitive world prices, any farm commodity or product thereof without regard to restrictions with respect to the disposal of commodities imposed upon it by any law: *Provided,* That no food or food product shall be sold or otherwise disposed of under this subsection for export (1) if there is a shortage of such food or food product in the United States or if such sale or other disposition may result in such a shortage, or (2) if such food or food product is needed to supply the normal demands of consumers in the United States.

## STOCK PILING

Sec. 22. (a) All Government-owned accumulations of strategic minerals and metals, including those owned by any Government corporation, shall be transferred by the owning agency, when determined to be surplus pursuant to this Act, to the account of the Treasury Procurement Division and shall be added to the stock pile authorized by the Act of June 7, 1939 (53 Stat. 811), as amended,[35] and shall be subject to its provisions: *Provided,* That contractor inventory shall be so transferred only when the owning agency has taken possession of and determined such inventory to be surplus. The minerals and metals may be transferred in any form in which they are held, but the owning agency or the Treasury Procurement Division is authorized either before or after such legal transfer to cause such minerals or metals to be put into forms best suited for storage and use for the common defense. As used in this section the phrase "strategic minerals and metals" means copper, lead, zinc, tin, magnesium, manganese, chromite, nickel, molybdenum, tungsten, mercury, mica, quartz crystals, industrial diamonds, cadmium, fluorspar, cobalt, tantalite, antimony, vanadium, platinum, beryl, graphite (and to which may be added aluminum or any other minerals or metals in such quantities or amounts as the Army and Navy Munitions Board may determine to be necessary for the stock pile authorized by the Act of June 7, 1939[35]), and shall include ores, concentrates, alloys, scrap, and partially and completely fabricated articles of which the principal components by value consist of such minerals and metals, but shall not include such fabricated articles as the Army and Navy determine are not suitable for their use in the form in which fabricated and which may be disposed of commercially at value substantially in excess of the metal market price of the component minerals and metals of such fabricated articles.

(b) Pending a determination by the War Production Board that the supplies of the respective strategic minerals and metals available to industry are sufficient to meet the current requirements of industry, the owning agency subject to the regulations prescribed by the Surplus Property Board shall withhold from transfer under this section an amount of such minerals and metals equal to the deficiency, if any, estimated by the War Production Board as likely to exist for the requirements of industry for a period of six months for purposes other than war production; and may dispose of the minerals and metals so withheld to the extent necessary to meet any such deficiency actually found to exist by the War Production Board, at the market price of the respective minerals and metals.

(c) Any Government-owned accumulations of strategic materials shall at the request of the War and Navy Departments be transferred by the owning agency, when determined to be surplus pursuant to this Act, to the account of the Treasury Procurement Division and shall be added to the stock pile authorized by the Act of June 7, 1939 (53 Stat. 811), as

35 50 U.S.C.A. Appendix, §§ 98–98a.

amended,[85] and shall be subject to its provisions. The materials may be transferred in any form in which they are held and they shall thereafter be put into forms best suited for storage and use for the common defense. The term "strategic materials" as used in this subsection means all materials except strategic minerals and metals as defined in subsection (a) of this section and includes all materials in group A or in group B of the list of strategic and critical materials determined upon by the Army and Navy Munitions Board on March 6, 1944, as amended from time to time, but shall not include any of such materials which the Army and Navy determine do not meet the specifications suitable for common defense or are in excess of the needs thereof. The Army and Navy Munitions Board is authorized to direct the removal from the list of any of the materials as defined in this subsection, in which event they shall be disposed of under the provisions of this Act.

(d). Within three months following the enactment of this Act the Army and Navy Munitions Board shall submit to Congress its recommendations respecting the maximum and minimum amounts of each strategic mineral or metal which in its opinion should be held in the stock pile authorized by the Act of June 7, 1939.[85] After one year from the submission of such recommendations, unless the Congress provides otherwise by law, the Board may authorize the proper disposal agencies to dispose of any Government-owned accumulations of strategic minerals and metals including those owned by any Government corporation when determined to be surplus pursuant to this Act.

### DISPOSAL OF SURPLUS REAL PROPERTY

Sec. 23. (a) As used in this section—

(1) The term "real property" means property consisting of land, together with any fixtures and improvements thereon, located outside of the District of Columbia, but does not include war housing, industrial plants, factories, or similar structures and facilities, or the sites thereof, or land which the Board determines is essential to the use of any of the foregoing;  and

(2) The term "surplus real property" means real property which has been determined under section 11 to be surplus property.

(b) Surplus real property which is not disposed of to Government agencies under section 12 or to States or their political subdivisions or instrumentalities under section 13 shall be disposed of in accordance with this section.

(c) Immediately after the reporting of surplus real property to the Board under section 11, the Board shall classify such property as agricultural, grazing, forest, mineral, or otherwise, as it may deem advisable. The classification may be revised from time to time.

(d) (1) (A) In the case of any surplus real property which was acquired by any Government agency after December 31, 1939, the person from whom such property was acquired shall be given notice, in such manner (which may include publication) as the Board by regulation may prescribe, that the property is to be disposed of by the United States and shall be entitled to purchase such property, in substantially the identical tract as when acquired from such person, at private sale at any time during the period of ninety days following such notice: *Provided*, That such period shall be extended in any case when it appears that such extension is necessary or appropriate to facilitate the sale of any surplus real property under this subsection.

(B) In the case of real property acquired by any Government agency after December 31, 1939, which either—

(i) has not been determined under section 11 to be surplus property, or

(ii) has been disposed of under section 12 or 13, or

85 50 U.S.C.A. Appendix, §§ 98–98a.

775

Case 3:08-cv-02814-JF    Document 20-15    Filed 08/29/2008    Page 15 of 37

(iii) is classified as suitable for a purpose different from that for which it was used when acquired by the Government, and with respect to which the person from whom it was acquired has signified an intention not to exercise the privilege granted under subparagraph (A),

the person from whom such property was acquired may be offered other surplus real property in the same area for purchase at private sale, if such other property is classified as suitable for the purpose for which the property so acquired was used when so acquired, and is otherwise similar to the property so acquired.

(2) In the case of surplus real property which was acquired by any Government agency after December 31, 1939, and which is classified as suitable for agricultural use, if any tenant (who was a tenant at the time of acquisition) of the person from whom such property was acquired, signifies, within a period of ninety days following public notice of sale, his intention to purchase such property, and no person has exercised his privilege under paragraph (1) (A), such tenant shall be entitled to purchase such property, in substantially the identical tract as when acquired by such Government agency, at private sale at any time during such ninety-day period.

(3) The price to be paid for surplus real property sold under this subsection shall be a price not greater than that for which it was acquired by the United States, such acquisition price being properly adjusted to reflect any increase or decrease in the value of such property resulting from action by the United States, or a price equal to the market price at the time of sale of such property, whichever price is the lower.

(4) The Board may by regulation prescribe methods for the identification of persons entitled to exercise the privileges conferred by this subsection.

(e) If any surplus real property is not disposed of under subsection (d)—

(1) such property, if classified as suitable for agricultural use, shall be subdivided, as provided by the Board, whenever practicable into economic family-size units (taking into consideration the variations in sizes of economic units in different localities); and

(2) such property, if not classified as suitable for agricultural use, shall be subdivided into the appropriate units in which the Board deems the property should be disposed of, giving due consideration to the character of the property, the economic use to which it is likely to be put, and the objectives of disposition as set forth in this Act.

(f) (1) Whenever any surplus real property classified as suitable for agricultural, residential, or small business purposes is to be disposed of, except as provided in subsection (d) of this section, veterans shall be granted a preference in the purchase of such property over nonveterans.

(2) The following procedure shall govern the exercise of veterans' preference rights under this subsection: The disposal agency, under regulations prescribed by the Board, shall fix the price of each unit into which the property is subdivided under subsection (e) after taking into consideration the then current market value, the character of the property, and, if income producing property, the estimated earning capacity thereof. Before any such property is disposed of, except under subsection (d), any veteran may apply for the purchase of any or all units offered for sale at the price so fixed. The Board shall prescribe the time within which application shall be made and shall give such notice thereof as it deems reasonable to enable veterans to exercise their rights under this subsection. The Board shall provide for the selection of the purchaser of each unit by lot from among the applicants for the unit. If any applicant is selected as the purchaser of more than one unit, he shall elect which one to take, whereupon the right to purchase the remaining units shall go to the other applicants in the order in which their names were drawn. No veteran may apply for the purchase of any property under the provisions of this subsection if he has previously exer-

Oct. 3

that for
espect to
intention

ed other
e sale, if
vhich the
rise sim-

l by any
isified as
t at the
icquired,
sale, his
ised his
l to pur-
ing such

this sub-
acquired
usted to
esulting
price at

lentifica-
his sub-

ibsection

se, shall
ito econ-
in sizes

iral use,
d deems
he char-
be put,

:able for
disposed
shall be
veterans.
veterans'
der reg-
init into
ing into
he prop-
capacity
subsec-
units of-
the time
: thereof
ts under
the pur-
unit. If
he shall
maining
ich their
ny prop-
ly exer-

cised a preference right under this section and has acquired property pursuant thereto. Sales to veterans under this subsection shall be upon such terms as the Board may prescribe.

(g) In the case of the death of a person entitled under this section to rights as a former owner or veteran, his spouse and children, in that order, shall succeed to such rights of the decedent existing at the time of his death. Any preference right under subsection (f) to which a person would have been entitled except for his death while in the active military or naval service of the United States, shall be extended to his spouse and children, in that order. No preference right may be assigned or exercised by power of attorney or through a power to select except as may be permitted by regulations prescribed by the Board in order to prevent the loss of such right by the holder thereof.

(h) A certificate by the disposal agency that the provisions of subsections (d), (f), and (g) have been complied with in the case of any property and that no qualified applicant has made application to exercise his privilege to purchase within the time limits fixed by or pursuant to this Act, shall terminate all privileges to purchase such property.

(i) In the case of surplus real property which is classified as suitable for agricultural use and which is not disposed of under subsection (d) or (f), such property (after subdivision as provided in subsection (e) (1)) shall be disposed of insofar as possible only to persons who expect to cultivate the land and to operate it for a livelihood. The Department of Agriculture is authorized and directed, within the limits of its current functions under the Bankhead-Jones Farm Tenant Act,[86] to extend needed financial and other assistance to persons eligible for such assistance under the Bankhead-Jones Farm Tenant Act [86] and the Servicemen's Readjustment Act of 1944,[87] in connection with the disposal of surplus agricultural lands pursuant to this subsection.

(j) In the case of sales of real property under this section or under any other provision of this Act, the form of deed or instrument of transfer shall be approved by the Attorney General. Deeds or other instruments containing general or special warranties of title may be issued and delivered to purchasers provided such warranties have been recommended and approved by the Attorney General. In determining whether general or special warranty deeds to properties may be issued and delivered, the Attorney General is authorized to approve the issuance and delivery of warranty deeds where titles are subject to infirmities of such character that in his opinion the interests of the United States will not be jeopardized under its warranty.

## REPORTS TO CONGRESS

Sec. 24. Within three months after the enactment of this Act, and thereafter in January, April, July, and October of each year, the Board shall submit to the Senate and House of Representatives a progress report on the exercise of its authority and discretion under this Act, the status of surplus property disposition, and such other pertinent information on the administration of the Act as will enable the Congress to evaluate its administration and the need for amendments and related legislation.

## TITLE OF PURCHASER

Sec. 25. A deed, bill of sale, lease, or other instrument executed by or on behalf of any Government agency purporting to transfer title or any other interest in property under this Act shall be conclusive evidence of compliance with the provisions of this Act insofar as title or other interest of any bona fide purchasers for value, or lessees, as the case may be, is concerned.

[86] 7 U.S.C.A. §§ 1000–1029.
[87] 38 U.S.C.A. § 693 et seq.

777

Ch. 479
Pub. 457
LAWS OF 78TH CONGRESS—2ND SESSION
Oct. 3

## CIVIL REMEDIES AND PENALTIES

Sec. 26. (a) Where any property is disposed of in accordance with this Act and any regulations prescribed under this Act, no officer or employee of the Government shall (1) be liable with respect to such disposition except for his own fraud or (2) be accountable for the collection of any purchase price which is determined to be uncollectible by the agency responsible therefor.

(b) Every person who shall use or engage in or cause to be used or engaged in any fraudulent trick, scheme, or device, for the purpose of securing or obtaining, or aiding to secure or obtain, for any person any payment, property, or other benefits from the United States or any Government agency in connection with the disposition of property under this Act; or who enters into an agreement, combination, or conspiracy to do any of the foregoing—

(1) shall pay to the United States the sum of $2,000 for each such act, and double the amount of any damage which the United States may have sustained by reason thereof, together with the costs of suit; or

(2) shall, if the United States shall so elect, pay to the United States, as liquidated damages, a sum equal to twice the consideration agreed to be given by such person to the United States or any Government agency; or

(3) shall, if the United States shall so elect, restore to the United States the property thus secured and obtained and the United States shall retain as liquidated damages any consideration given to the United States or any Government agency for such property.

(c) The several district courts of the United States, the District Court of the United States for the District of Columbia, and the several district courts of the Territories of the United States, within whose jurisdictional limits the person, or persons, doing or committing such act, or any one of them, resides or shall be found, shall wheresoever such act may have been done or committed, have full power and jurisdiction to hear, try, and determine such suit.

(d) The civil remedies provided in this section shall be in addition to all other criminal penalties and civil remedies provided by law.

## PRACTICE BY FORMER EMPLOYEES

Sec. 27. No person employed by any Government agency, including commissioned officers assigned to duty in such agency, shall, during the period such person is engaged in such employment or service, or for a period of two years after the time when such employment or service has ceased, act as counsel, attorney, or agent, or be employed as representative, in connection with any matter involving the disposition of surplus property by the agency in which such person was employed, if such person during his employment with such agency ratified, approved, or authorized the disposition of any surplus property pursuant to the provisions of this Act or recommended any such approval, authorization, or ratification as part of his official duties. Any person violating the provisions of this section shall be fined not more than $10,000, or imprisoned for not more than one year, or both.

## STATUTE OF LIMITATIONS

Sec. 28. The first section of the Act of August 24, 1942 (56 Stat. 747), as amended,[38] is amended to read as follows:

"The running of any existing statute of limitations applicable to any offense against the laws of the United States (1) involving defrauding or attempts to defraud the United States or any agency thereof whether by conspiracy or not, and in any manner, or (2) committed in connec-

[38] 18 U.S.C.A. § 590a.

778

Oct. 3

·dance with
ficer or em-
·uch disposi-
·ollection of
the agency

be used or
purpose of
person any
·r any Gov-
·under this
·iracy to do

r each such
·ited States
·ie costs of

the United
·nsideration
·ny Govern-

the United
·ited States
·ven to the
·ty.
·trict Court
·ral district
·risdictional
·r any one
·may have
·hear, try,

·addition to
.w.

·including
during. the
·, or for a
·iervice has
·epresenta-
·of surplus
·d, if such
·proved, or
·the provi-
·ization, or
·g the pro-
·or impris-

(56 Stat.

·ble to any
·lefrauding
·of whether
·in connec-

tion with the negotiation, procurement, award, performance, payment for,
interim financing, cancelation or other termination or settlement, of
any contract, subcontract, or purchase order which is connected with or
related to the prosecution of the present war, or with any disposition of
termination inventory by any war contractor or Government agency, or
(3) committed in connection with the care and handling and disposal of
property under the Surplus Property Act of 1944, shall be suspended un-
til three years after the termination of hostilities in the present war as
proclaimed by the President or by a concurrent resolution of the two
Houses of Congress. This section shall apply to acts, offenses, or trans-
actions where the existing statute of limitations has not yet fully run,
but it shall not apply to acts, offenses, or transactions which are already
barred by provisions of existing law."

### MISCELLANEOUS PROVISIONS

Sec. 29. Surplus property disposals may be made without regard
to any provision in existing law for competitive bidding, unless the Board
shall determine that disposal by competitive bid will in a given case
better effectuate the policy of the Act.

### DISPOSITION OF PROCEEDS

Sec. 30. (a) All proceeds from any transfer or disposition of prop-
erty under this Act shall be covered into the Treasury as miscellaneous
receipts, except as provided in subsections (b), (c), and (d) of this
section.

(b) Where the property transferred or disposed of was acquired by
the use of funds either not appropriated from the general fund of the
Treasury or appropriated from the general fund of the Treasury but by
law reimbursable from assessment, tax, or other revenue or receipts, then
upon the request of the interested agency the net proceeds of the disposi-
tion or transfer shall be credited to the reimbursable fund or appropria-
tion or paid to the owning agency. As used in this subsection the term
"net proceeds of the disposition or transfer" means the proceeds of the
disposition or transfer minus all expenses incurred for care and handling
and disposition or transfer.

(c) To the extent authorized by the Board, any Government agency
disposing of property under this Act (1) may deposit, in a special ac-
count with the Treasurer of the United States, such amount of the pro-
ceeds of such dispositions as it deems necessary to permit appropriate
refunds to purchasers when any disposition is rescinded or does not be-
come final, or payments for breach of any warranty, and (2) may with-
draw therefrom amounts so to be refunded or paid, without regard to the
origin of the funds withdrawn.

(d) Where a contract or subcontract authorizes the proceeds of any
sale of property in the custody of the contractor or subcontractor to be
credited to the price or cost of the work covered by such contract or sub-
contract, the proceeds of any such sale shall be credited in accordance
with the contract or subcontract.

(e) Where the disposal agency acquires or retains any mortgage, lien,
or other interest as security in connection with any transfer or disposi-
tion or property under this Act, the disposal agency shall retain, pre-
serve, and manage such security and may enforce and settle any right of
the Government with respect thereto in such manner and upon such
terms as it deems in the best interest of the Government. The Board
may prescribe regulations to govern the exercise of the authority granted
under this subsection.

### USE OF APPROPRIATED FUNDS

Sec. 31. (a) Any Government agency is authorized to use for the
disposition of property under this Act, and for its care and handling

pending such disposition, any funds heretofore or hereafter appropriated, allocated, or available to it for the purpose of production or procurement of such property.

(b) Any Government agency is authorized to use for the acquisition of any surplus property under this Act any funds heretofore or hereafter appropriated, allocated, or available to it for the acquisition of property of the same kind.

(c) There are authorized to be appropriated such sums as may be necessary or appropriate for administering the provisions of this Act.

## DISPOSITIONS OUTSIDE UNITED STATES

Sec. 32. (a) Nothing in this Act shall limit or affect the authority of commanders in active theaters of military operations with respect to property in their control.

(b) The provisions of this Act shall be applicable to dispositions of property within the United States and elsewhere, but the Board may exempt from some or all of the provisions hereof dispositions of property located outside of the continental United States, its Territories and possessions, whenever it deems that such provisions would obstruct the efficient and economic disposition of such property in accordance with the objectives of this Act.

## RESTRICTIONS ON IMPORTATION OF SURPLUS PROPERTY INTO UNITED STATES

Sec. 33. (a) It is the policy of this Act to prohibit, so far as feasible and necessary to carry out the objectives of this Act, the importation into the United States of surplus property sold abroad or for export. The Board shall prescribe regulations to carry out such policy, and the importation of surplus property into the United States is hereby prohibited to the extent specified in such regulations. The Secretary of the Treasury is authorized and directed to provide for the enforcement of such regulations.

(b) Surplus property sold to members of the armed forces abroad may be brought into the United States without regard to the provisions of subsection (a) if brought in by the original purchaser and upon certificate by him that he is bringing the property into the United States for his personal use.

## SAVING PROVISIONS

Sec. 34. (a) The authority conferred by this Act is in addition to any authority conferred by any other law and shall not be subject to the provisions of any law inconsistent herewith. This Act shall not impair or affect any authority for the disposition of property under any other law, except that the Board may prescribe regulations to govern any disposition of surplus property under any such authority to the same extent as if the disposition were made under this Act, whenever it deems such action necessary to effectuate the objectives and policies of this Act.

(b) Nothing in this Act shall impair or affect the provisions of the Contract Settlement Act of 1944;[89] the Emergency Price Control Act of 1942, as amended;[90] the Act of October 2, 1942 (ch. 578, 56 Stat. 765), as amended;[91] section 301 of the Second War Powers Act, 1942;[92] the Act of March 11, 1941 (55 Stat. 31), as amended;[93] the Tennessee Valley Authority Act of 1933, as amended;[94] Public Law 849,

[89] 41 U.S.C.A. §§ 101–125.
[90] 50 U.S.C.A.Appendix. §§ 901–946.
[91] 50 U.S.C.A.Appendix. §§ 961–971.
[92] 50 U.S.C.A.Appendix. § 633.
[93] 22 U.S.C.A. §§ 411–419.
[94] 16 U.S.C.A. §§ 831–831cc.

Seventy-sixth Congress, as amended,[95] respecting war housing and facilities; the Act of June 7, 1939, relating to the acquisition of strategic and critical materials (53 Stat. 811);[96] the Trading With the Enemy Act, as amended;[97] section 43 of the Bankhead-Jones Farm Tenant Act, as amended;[98] Acts supplemental to any of the foregoing; any law regulating the exportation of property from the United States; the internal-revenue laws; the statutes relating to the public lands; or any criminal law of the United States.

(c) Nothing in this Act shall be deemed to impair or modify any contract, or any term or provision of any contract, without the consent of the contractor, if the contract or the term or provision thereof is otherwise valid.

## TEMPORARY APPLICABILITY OF EXISTING PROCEDURES

Sec. 35. All policies and procedures relating to surplus property prescribed by the Surplus War Property Administration, created by Executive Order Numbered 9425, dated February 19, 1944,[99] or any other Government agency, in effect upon the effective date of this Act, and not inconsistent with this Act, shall remain in full force and effect unless and until superseded by regulations prescribed under this Act.

## TERMINATION INVENTORIES

Sec. 36. (a) The Congress recognizes that upon termination of war contracts, the plants of war contractors will be filled with vast termination inventories which until removed or disposed of will prevent or interfere with the resumption of civilian production and reemployment, and that so far as possible decisions should be made in advance of termination for the disposition and removal of such termination inventories without delay when termination occurs. Measures should be taken to realize the greatest possible value from termination inventories.

(b) In advance of termination, to the maximum extent practicable—

(1) each contracting agency shall advise its war contractors of the classes of termination inventory the contracting agency will wish to retain for military purposes; and

(2) the Board shall establish procedures for advising war contractors as to the care and handling and disposition of termination inventory not required for military purposes, in order to effectuate the policies stated in subsection (a) of this section and the policies of section 11 (a) (3) of the Contract Settlement Act of 1944.[1]

(c) To the extent that it is impracticable so to advise war contractors in advance of termination, the contracting agencies and the Board shall be prepared to give such advice as soon as practicable after termination of the war contract.

(d) The Board and the Director of Contract Settlement shall cooperate in carrying out the provisions of this section.

(e) For the purposes of this section, the terms "contracting agency", "termination inventory", and "war contractor" shall have the meanings assigned to such terms by section 3 of the Contract Settlement Act of 1944.[2]

## INCREASE IN LOAN RATE ON COTTON

Sec. 37. (a) Section 8 (a) (1) of the Stabilization Act of 1942, as amended (relating to loans upon certain agricultural commodities),[3] is

95 46 U.S.C.A. § 1161.
96 50 U.S.C.A. §§ 98-98f.
97 50 U.S.C.A. Appendix, § 1 et seq.
98 7 U.S.C.A. § 1017.
99 50 U.S.C.A. Appendix, § 601 note.
1 41 U.S.C.A. § 111.
2 41 U.S.C.A. § 103.
3 50 U.S.C.A. Appendix, § 963.

781

Case 5:08-cv-02814-JF   Document 20-13   Filed 08/29/2008   Page 21 of 67

amended by striking out "at the rate in the case of cotton of 92½ per centum" and inserting in lieu thereof "at the rate in the case of cotton of 95 per centum".

(b) The amendment made by this section shall be applicable only with respect to crops harvested after December 31, 1943, but shall not apply to crops planted after 1944. In the case of loans made under such section 8 upon any of the 1944 crop of cotton before the amendment made by this section takes effect, the Commodity Credit Corporation is authorized and directed to increase or provide for increasing the amount of such loans to the amount of the loans which would have been made if the loan rate specified in the amendment made by this section had been in effect at the time the loans were made.

### EXPIRATION DATE

Sec. 38. Unless extended by law, this Act shall expire at the end of three years following the date of the cessation of hostilities in the present war. For the purposes of this section the term "date of the cessation of hostilities in the present war" means the date proclaimed by the President as the date of such cessation, or the date specified in a concurrent resolution of the two Houses of Congress as the date of such cessation, whichever is the earlier.

### SEPARABILITY OF PROVISIONS

Sec. 39. If any provision of this Act, or the application of such provision to any person or circumstance, is held invalid, the remainder of this Act or the application of such provision to persons or circumstances other than those as to which it is held invalid, shall not be affected thereby.

Approved October 3, 1944.

## WAR MOBILIZATION AND RECONVERSION ACT OF 1944

*See Congressional Comment, p. 1310*

### CHAPTER 480—PUBLIC LAW 458

[S. 2051]

An Act to amend the Social Security Act, as amended, to provide a national program for war mobilization and reconversion, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

### TITLE I—OFFICE OF WAR MOBILIZATION AND RECONVERSION

Section 101. (a) There is hereby established the Office of War Mobilization and Reconversion, which shall be headed by the Director of War Mobilization and Reconversion (hereinafter called the "Director"). The Director shall be appointed by the President, by and with the advice and consent of the Senate, shall receive compensation at the rate of $15,000 per year, and shall serve for a term of two years.

(b) The following agencies shall be placed within the Office of War Mobilization and Reconversion and shall exercise their functions subject to the general supervision of the Director:

(1) Office of Contract Settlement, created by the Contract Settlement Act of 1944.[4]

(2) Surplus War Property Administration, created by Executive Order Numbered 9425 [5] (if such Administration is in existence after the Office

[4] 41 U.S.C.A. §§ 101-125.
[5] 50 U.S.C.A. Appendix, § 601 note.

782

important pur-
e Coast Guard
respect to the

f actual neces-
in lieu thereof
his provision is
on of members
than on board

aking provision
y or death re-
of the auxiliary
he bill. These
for temporary
sical injury or
uty. This sec-
imbers of the
iing duties to
Coast Guard.
providing that
hts, privileges,
w and in any
benefits upon
intial in order
iership in the
ts, and privi-
of the Coast

rder to adapt
ng the enroll-
ons. Section
be worn by
he fine which
innant or the
auxiliary or
uxiliary.
the bill, since
ie is satisfied
e actual ex-
Coast Guard
The extent
aircraft, and
y the Coast
a very large
Guard safe-

artment and

SURPLUS PROPERTY ACT OF 1944

# SURPLUS PROPERTY ACT OF 1944

*For text of Act see p. 764*

## COMMITTEE OF CONFERENCE

*House Report No. 1890, September 14, 1944*

### STATEMENT OF THE MANAGERS ON THE PART OF THE HOUSE

The managers on the part of the House at the conference on the disagreeing votes of the two Houses on the amendments of the Senate to the bill (H. R. 5125) to provide for the disposal of surplus Government property and plants, and for other purposes, submit the following statement in explanation of the effect of the action agreed upon by the conferees and recommended in the accompanying conference report:

#### ADMINISTRATION

The House bill provided for the administration of the disposition of surplus property by a single Administrator who was to be appointed by the President, by and with the advice of the Senate, and to receive compensation of $12,000 per annum.

The Senate amendment provided for administration by a board of eight members to be appointed by the President, by and with the advice and consent of the Senate, and to receive compensation at the rate of $10,000 per annum. In the selection of members of the Board, the President was directed to give due consideration to the various geographic areas and economic interests of the Nation. The Chairman of the Board was to be elected by the Board itself. In case of a tie vote, the Director of War Mobilization was to have the deciding vote. The Board was authorized to appoint an Administrative Director at a salary of $10,000 per annum and was authorized to delegate any of its "administrative" authority to the Administrative Director.

Both the House bill and the Senate amendment provided for an advisory council consisting of certain named Government officials with which the Administrator (under the House bill) and the Board (under the Senate amendment) were to advise and consult.

Both under the House bill and under the Senate amendment, provision was made for the organizing of industry advisory committees to furnish advice with respect to the disposition of various classes of surplus property.

The conference agreement (sec. 5) creates a Surplus Property Board consisting of three members, to be appointed by the President, by and with the advice and consent of the Senate, and to receive compensation at the rate of $12,000 per annum. The term of office of the members is 2 years. The President is to designate one of the members as Chairman of the Board. The Board is authorized to employ such personnel as may be necessary to carry out its functions. Special assistants, certified public accountants, qualified cost accountants, industrial engineers, appraisers, and other experts, are authorized to be appointed by the Board without regard to the civil-service laws and the

## CONGRESSIONAL COMMENTS

Classification Act of 1923. The Board is given (sec. 6) general supervision and direction over the care and handling and disposition of surplus property and the transfer of surplus property between Government agencies.

The conference agreement does not contain any provision for an advisory council of named Government officials, but does (sec. 7) require the Board to advise and consult with other interested Government agencies affected by the disposition of surplus property. Similarly, no provision is made in the conference agreement directing the organization of industry advisory committees.

### DECLARATION OF SURPLUS PROPERTY

Both under the House bill and the Senate amendment, property could be declared surplus only by the owning agency, and the Administrator (under the House bill) and the Board (under the Senate amendment) were given power only to bring to the attention of Congress any case in which it appeared that an owning agency had property in its control which was, in fact, surplus to its needs and responsibility, but which had not been reported as such by the owning agency. The conference agreement (sec. 11) contains provisions similar to both the House bill and the Senate amendment in this respect.

### UTILIZATION BY OTHER FEDERAL AGENCIES

Both the House bill and the Senate amendment had the effect of providing that surplus property of one Federal agency should first be made available to other Federal agencies for their use prior to its disposition. Under the House bill it was specifically provided that transfers between Government agencies were to be made at the fair value of the property as fixed by the disposal agency, under regulations of the administrative authority, unless transfer without reimbursement or transfer of funds was otherwise authorized by law. There was no comparable provision in the Senate amendment.

The conference agreement (sec. 12) provides that transfers of surplus property between Government agencies are to be given priority over all other disposals provided for in the act; but the provision of the House bill requiring reimbursement or transfer of funds is retained. Thus no Government agency can acquire surplus property of any other Government agency unless it has appropriations available to pay for the property.

### DONATIONS AND PRICE PREFERENCES

Under the House bill only property which had no commercial value could be given away and then only to public and nonprofit educational and charitable organizations. Under the House bill it was provided that the following were, to the extent feasible and to the public interest, to be afforded an opportunity to fulfill their legitimate needs: Public, governmental, educational, charitable, and eleemosynary institutions, States, Territories, their political subdivisions, insular possessions, and the District of Columbia, volunteer fire companies, and cooperative organizations.

1298

## SURPLUS PROPERTY ACT OF 1944

Under the Senate amendment it was provided that surplus property that was appropriate for school, classroom, or other educational use could be donated to the States and their political subdivisions and tax-supported educational institutions, and also to certain nonprofit educational institutions. Similarly, surplus medical supplies and other equipment and property suitable for use in the protection of the public health could be donated to the States and their political subdivisions and to tax-supported medical institutions, as well as certain nonprofit hospitals and other similar institutions. It was also provided in the Senate amendment that any surplus property could be disposed of to States, political subdivisions thereof, tax-supported institutions, peoples' utility districts and rural electrification cooperatives, and certain specified nonprofit institutions at discounts up to 50 percent.

The conference agreement (sec. 13) retains the provision of the House bill with respect to the donation of property having no commercial value. This is the only case in which donation is authorized. The conference agreement further provides that the Board shall prescribe regulations for the disposition of surplus property to States and their political subdivisions and instrumentalities, and to nonprofit institutions, and shall determine on the basis of need what transfers are to be made. In formulating such regulations the Board is to be guided by the objectives of the act and to give effect to the following policies to the extent feasible and in the public interest:

(1) Surplus property appropriate for educational use may be sold or leased to the States and their political subdivisions and to tax-supported educational institutions, as well as to certain other nonprofit educational institutions.

(2) Surplus medical supplies, etc., may be sold or leased to States and their political subdivisions, and to tax-supported medical institutions, as well as to hospitals and other similar nonprofit institutions.

(3) In fixing the sale or lease value of property to be disposed of in each of the above cases, the Board is directed to take into consideration any benefit which has accrued or may accrue to the United States from the use of such property by any such State, political subdivision, instrumentality, or institution.

(4) Surplus property is to be disposed of so as to afford public and governmental institutions, nonprofit or tax-supported educational institutions, charitable institutions, nonprofit or tax-supported hospitals and similar institutions, States, their political subdivisions and instrumentalities, and volunteer fire companies, an opportunity to fulfill, in the public interest, their legitimate needs.

The conference agreement (sec. 13 (c)) provides that no airport and no harbor or port terminal is to be disposed of until it has been first offered for sale or lease to the State, political subdivision, and any municipality in which it is situated, and to all municipalities in the vicinity. It is also provided (sec. 13 (d)) that no power transmission line shall be sold, leased for more than 1 year, or otherwise disposed of, except to another Federal agency, or to a State or political subdivision or instrumentality thereof, unless specifically authorized by an act of Congress if any State or political subdivision thereof, or any State or

**CONGRESSIONAL COMMENTS**

Government agency or instrumentality certifies that it is needful for or adaptable to requirements of a public or cooperative power project.

PRICE

The conference agreement (sec. 2 (t)) provides that it is the objective to obtain, except as otherwise provided in the act, as nearly as possible the fair value of surplus property upon its disposition. What constitutes a fair value must, of course, be determined with reference to the character of the disposition (such as wholesale, as contemplated by the objective to utilize commercial channels of distribution), as well as all other appropriate factors.

The only exceptions in the conference agreement to the fair-value objective are—

(1) a provision (sec. 13 (e)) authorizing States and their political subdivisions to repurchase original rights-of-way on which highways or streets were established at a price not exceeding that paid therefor by the Government, and

(2) a provision (sec. 23 (d)) authorizing the former owner of real property (and his tenant) to reacquire such property at the price paid by the Government, adjusted for any increase or decrease in the value of the property by reason of action by the United States.

The provision (sec. 13 (a) (1) (C)) authorizing the Board to take into consideration any benefit which has accrued or may accrue to the United States from the use of educational property and surplus medical supplies, etc., by States, political subdivisions, instrumentalities, and institutions, described under the heading "Donations and Price Preferences," simply has the effect of treating the benefit so accruing to the United States as a medium of payment.

MERCHANT VESSELS AND NAVAL VESSELS

Both the House bill and the Senate amendment provided that in the case of merchant vessels and vessels capable of conversion to merchant use, the United States Maritime Commission should be the sole disposal agency of such vessels, and that such vessels should be disposed of only in accordance with the Merchant Marine Act, 1936, and other law authorizing the sale of such vessels. The conference agreement (sec. 10 (b)) also contains this provision.

The House bill provided that no combat naval vessels, stations, or establishments should be disposed of except in accordance with existing law specifically authorizing their disposition, and in all cases where such disposition had not been so specifically authorized that no disposition of any combat naval vessel, station, or establishment should be made unless Congress by law so authorized. It was further provided in the House bill that the Navy Department should be the sole disposal agency for such combat vessels, stations, and establishments. The conference agreement (sec. 2 (d)) excludes from the definition of the term "property" naval vessels of the following categories: Battleships, cruisers, aircraft carriers, destroyers, and submarines. This has the effect of excluding vessels of these categories entirely from the operation of any of the provisions of the act, and their disposition, if any is to take place, must take place under provisions of existing law and not under the

1300

needful for
·wer project.

he objective
arly as pos-
What con-
·eference to
·mplated by
·n), as well

·e fair-value

·olitical sub-
·ighways or
·id therefor

·f real prop-
·ce paid by
·n the value

·o take into
·rue to the
·lus medical
·alities, and
·rice Prefer-
·uing to the

that in the
·o merchant
·le sole dis-
·e disposed
·, and other
·agreement

stations, or
·e with ex-
·cases where
·) disposition
·d be made
·ided in the
·osal agency
·conference
·rm "prop-
·s, cruisers,
·ffect of ex-
·tion of any
·take place,
·under the

## SURPLUS PROPERTY ACT OF 1944

provisions of the act. No special provision is made in the conference agreement with respect to naval stations or establishments, and the provision in the House bill making the Navy Department a disposal agency is omitted from the conference agreement.

### DISPOSITIONS TO VETERANS

Under the House bill it was provided that the Administrator in formulating regulations to govern the disposition of surplus property should be guided by the objectives and should give effect to a number of specified policies, among which was the policy to afford returning veterans an opportunity to establish themselves as proprietors of agricultural, business, and professional enterprises and to afford those serving in the Army, Navy, Marine Corps, and all war veterans an opportunity to purchase single units or small lots of surplus property at the same price for which such property has been sold or offered for sale in large lots. Under the Senate amendment it was made one of the functions and duties of the Board to effectuate the objectives of the act to aid honorably discharged veterans to establish and maintain their own small business, professional, or agricultural enterprise by affording such veterans suitable preferences in the acquisition of types of property useful in such enterprises.

The conference agreement (sec. 16) directs the Board to prescribe regulations to effectuate the objectives of the act to aid veterans to establish and maintain their own small business, professional or agricultural enterprises by affording them suitable preferences to the extent feasible in the acquisition of the types of property useful in such enterprises.

The preference to veterans in the purchase of real property is discussed under the heading "Disposition of surplus real property."

### DISPOSITIONS IN RURAL AREAS

The Senate amendment made it one of the functions and duties of the Board to devise ways and means and prescribe regulations in cooperation with the War Food Administrator providing for the sale of surplus property in such quantities in rural localities and in such manner as would assure farmers and farmer's cooperative associations equal opportunity with others to purchase surplus property. It was further provided that in cases where a shortage of trucks, machinery, and equipment impairs farm production that the Board develop a program in cooperation with the War Food Administrator whereby a reasonable portion of the surplus supplies would be made available for sale in rural areas to farmers and farmer's associations. There was no similar provision in the House bill.

The conference agreement (sec. 17) contains provisions similar to those of the Senate amendment in this respect, except that the truck program is to be developed by the Board in cooperation with the Agricultural Adjustment Agency rather than with the War Food Administrator.

### SMALL BUSINESS

The House bill directed the Administrator to provide for the disposal of all surplus property in the smallest practicable lots consistent

**1301**

## CONGRESSIONAL COMMENTS

with the usual and customary commercial practice and provided that so long as an opportunity existed for the disposal of property to prospective purchasers of smaller lots preference was to be given to such purchasers over prospective purchasers of larger amounts. It was also provided in the House bill that in formulating regulations to govern disposition of surplus property the Administrator was to give effect, so far as feasible, to the policy affording business concerns, both small and large, opportunities to purchase surplus property on equal terms and to provide for uniform and wide public notice concerning surplus property available for disposition and providing for adequate time between the notice and disposition so that all interested persons should have a fair opportunity to acquire, and to utilize commercial channels of distribution.

The conference agreement (sec. 18), which follows closely the provisions of the Senate amendment, contains the following provisions relating to small business:

(1) It is made the duty of the Board to devise ways and means and prescribe regulations to prevent any discrimination against small business in the disposition of surplus property.

(2) The Board is to issue regulations determining, or providing for the determination, as to all surplus property in the hands of each disposal agency, the size of lots and the areas in which the various classes of such property should be offered consistently with the usual and customary commercial practices. The available supply of each class in each area is to be so disposed of as to give to prospective purchasers within such area of one or more lots reasonable opportunity to acquire the desired amount in preference to prospective purchasers of a larger number of lots.

(3) The Smaller War Plants Corporation is given the responsibility of cooperating with the Board and with the owning and disposal agencies and bringing to the attention of the agencies and the Board the needs and requirements of small business, and to consult with small business to obtain full information concerning their needs for surplus property.

(4) The Smaller War Plants Corporation is also given the power to purchase surplus property for resale to small business, subject to regulations of the Board, when in the judgment of the Corporation such disposition is required to preserve and strengthen the competitive position of small business. Such purchase by the Smaller War Plants Corporation is to be at the fair value of the property, as in the case of purchase by other Government agencies. The Smaller War Plants Corporation is given power to make or guarantee loans to small business in connection with the acquisition, conversion, and operation of plants and facilities which have been determined to be surplus property and in cooperation with the disposal agencies, to arrange for sales of surplus property to small business concerns on credit or time bases.

## DISPOSITION OF PLANTS

The House bill prohibited the disposition of any surplus Government-owned plant for the production of synthetic rubber or aluminum or

1302

ovided that
rty to pro-
en to such
It was also
govern dis-
effect, so
h small and
terms and
irplus prop-
ne between
uld have a
nels of dis-

the provi-
ovisions re-

means and
all business

oviding for
f each dis-
ious classes
al and cus-
ch class in
purchasers
to acquire
of a larger

isponsibility
oosal agen-
Board the
with small
for surplus

power to
ict to reg-
ration such
ititive posi-
Plants Cor-
he case of
Plants Cor-
all business
of plants
operty and
s of surplus

overnment-
uminum or

any pipe line for the transportation of oil, which cost the Government $5,000,000 or more, until after 6 months from the submission to Congress of a report with respect thereto. If within that time Congress did not provide otherwise by law, disposition was authorized in accordance with a plan or program proposed in such report. It was also provided in the House bill that no Government agency could dispose of any surplus plant of any character which cost the Government $1,000,000 or more without the approval of a majority of the members of the Advisory Board, provided for in the bill, which consisted of certain named Government officials.

The Senate amendment directed the Board to prepare and submit to Congress within 3 months after the enactment of the act a report of each of the following classes of property: (1) Aluminum plants; (2) magnesium plants; (3) synthetic rubber plants; (4) chemical plants; (5) aviation gas and gasoline plants; (6) iron and steel plants; (7) pipe lines for transporting oil; (8) patents, processing techniques, and inventions; (9) aircraft plants, and aircraft and aircraft parts; (10) shipyards; (11) transportation facilities; (12) radio and electrical equipment. The Board was authorized, if it deemed it to be in the interest of the objectives of the act, to provide for the disposition of any surplus property listed in classes (9) to (12), above, but with respect to the property listed in classes (1) to (8), above, no disposition was permitted until 30 days after the report had been made to Congress while Congress was in session.

The conference agreement (sec. 19) contains provisions similar to those contained in the Senate amendment with the following exceptions:

(a) There is excluded from the operation of this section of the conference agreement any plant which cost the Government less than $5,000,000.

(b) The report is limited to surplus property.

(c) With respect to the property listed in classes (1) to (8), above, an exception is made to the limitations on the disposition of such property under which the Board may authorize any disposal agency to lease any such property for a term of not more than 5 years.

(d) The Board is authorized, as under the House bill, to provide for the disposal of any materials or equipment related to any plant covered by this section, if such materials and equipment are not necessary for the operation of the plant in the manner for which it was designed.

(e) A provision is included from the House bill providing that the section is not to apply to any Government-owned equipment, structure or other property operated as an integral part of a privately owned plant and not capable of economical operation as a separate and independent unit:

## DISPOSITION OF SURPLUS REAL PROPERTY

The House bill provided that in formulating regulations to govern the disposition of surplus property, the Administrator was to give effect, to the extent feasible, to the policy of disposing of land in the United States, acquired by the United States after July 2, 1940, which the Administrator deemed suitable for agricultural use, by affording to the person from whom such land was acquired a reasonable opportunity to purchase the land at a price not greater than that at which it was

## CONGRESSIONAL COMMENTS

acquired by the United States, such acquisition price being properly adjusted to reflect any increase or decrease in the value of the land resulting from any action of the United States. If the land was not disposed of to the former owner, and if the Administrator deemed that the land should be disposed of for agricultural uses, then it was the policy of the House bill to dispose of it in parcels not larger than suitable for the needs of a one-family unit.

The Senate amendment contained detailed provisions with respect to the disposition of surplus real property. It provided for establishing a central inventory in the General Land Office of all lands held by the United States and provided that the disposition of all surplus real property was to be either by the Secretary of Agriculture or the Secretary of the Interior, depending upon its classification. The former owner and his lineal heirs were given a right to acquire any surplus real property acquired by the Government after December 31, 1939, at a price equal to the price paid by the United States, adjusted for any increase or decrease in the market value of the land by reason of any improvements or changes made thereon, by reason of the use thereof by the United States, or at the market price—whichever was the lower. Similar privileges were extended to tenants. Veterans were given a preference in the acquisition of surplus real property after the former owner and tenant had been given an opportunity to exercise their preference. The Senate amendment also provided for the disposition of Moore Field, in Cleveland County, Okla., to the former owner. For the purpose of the section of the Senate amendment relating to the disposition of surplus real property, the public domain and lands withdrawn or reserved from the public domain were excluded.

Under the conference agreement (sec. 23), surplus real property which is not disposed of to Government agencies or to States, their political subdivisions or instrumentalities, is to be disposed of giving effect to section 23 of the conference agreement. Surplus real property is defined as real property which has been determined under section 11 to be surplus property, and real property is defined as excluding—

(1) Land located in the District of Columbia;

(2) War housing, industrial plants, factories, and similar structures and facilities; and

(3) The public domain or land withdrawn or reserved from the public domain, except to the extent that the Board determines lands so withdrawn or reserved are not suitable for return to the public domain for disposition under the general land laws.

When an owning agency reports real property to the Board as surplus, the Board is directed to classify the property, and is given power to revise its classification from time to time. The disposition of the property is to be effected by the disposal agency designated by the Board under section 10 of the conference agreement. In the case of surplus real property which was acquired by the Government after December 31, 1939, the former owner, or in the event of his death, his wife or children, in that order, are given the right to purchase the property at a price not greater than that for which it was acquired by the United States, adjusted to reflect any increase or decrease in the value of the property resulting

1304

e being properly
value of the land
land was not dis-
itor deemed that
en it was the pol-
ger than suitable

ons with respect
led for establish-
all lands held by
of all surplus real
lture or the Sec-
on. The former
a any surplus real
er 31, 1939, at
adjusted for any
by reason of any
the use thereof
er was the lower.
ns were given a
after the former
rcise their prefer-
osition of Moore
For the purpose
he disposition of
rawn or reserved

al property which
es, their political
giving effect to
operty is defined
on II to be sur-
—

imilar structures

from the public
es lands so with-
ublic domain for

Board as surplus,
given power to
i of the property
the Board under
i of surplus real
r December 31,
wife or children,
ly at a price not
States, adjusted
roperty resulting

## SURPLUS PROPERTY ACT OF 1944

from action by the United States, or at the market price, whichever is lower. If a former owner's property is unavailable or is classified as suitable for a purpose different from that for which it was used when acquired by the Government, then the former owner may be offered other surplus real property in the same area at a corresponding price.

If the former owner, or in the event of his death, his wife or children, in that order, do not exercise the privilege of repurchase of their property, then any tenant (who was a tenant at the time of acquisition by the Government) is given the right to purchase the property at the price for which it could have been purchased by the former owner.

If any surplus real property is not disposed of to the former owner or his tenant, the property, if classified as suitable for agricultural use, is to be subdivided into family-size units. If it is not classified as suitable for agricultural use, it is to be subdivided into appropriate units for disposition.

In the case of surplus real property classified as suitable for agricultural, residential, or small-business purposes, except as provided in the case of the former owner and the tenant, veterans are to be granted preference in the purchase of such property over nonveterans. In the case of the death of the veteran, his wife and children, in that order, succeed to his preference rights. A certificate by the disposal agency that the provisions of section 23 of the conference agreement relating to preferences have been complied with in the case of any property, and that no qualified applicant has made application to exercise his preference, operates to terminate all such preferences and has the effect of removing any cloud which might otherwise exist on the title of another purchaser.

Surplus real property which is classified as suitable for agricultural use which is not disposed of pursuant to a former owner or veteran preference is to be disposed of insofar as possible only to persons who expect to cultivate and operate it for a livelihood. The Department of Agriculture is authorized, within the limits of its current functions under the Bankhead-Jones Farm Tenant Act, to extend needed financial assistance to persons eligible for such assistance under the Bankhead-Jones Farm Tenant Act and the Servicemen's Readjustment Act of 1944, in connection with the disposal of surplus agricultural lands pursuant to these provisions.

The form of the deed or other instrument of transfer in the case of sales of real property is to be approved by the Attorney General. Specific authority is granted, with the approval of the Attorney General, to deliver to purchasers deeds containing general or special warranties of title.

## AGRICULTURAL COMMODITIES

The House bill provided that surplus farm commodities should not be sold in the United States under the bill in quantities in excess of, or at prices less than, those applicable with respect to sales of such commodity by the Commodity Credit Corporation, unless the commodity were being disposed of pursuant to the bill for export at competitive world market prices. The Senate amendment contained a similar provision with the added limitation that such commodities could not be

CONGRESSIONAL COMMENTS

sold at prices less than the prevailing market prices, if such market prices were higher. The Senate amendment in addition authorized the Commodity Credit Corporation to dispose of or cause to be disposed of for cash, for export only at competitive world prices, any farm commodity or product thereof without regard to restrictions imposed upon it by any law.

The conference agreement (sec. 21) follows the provisions of the Senate amendment with the following exceptions:

(1) In disposing of any farm commodity for export, the Commodity Credit Corporation is authorized to dispose of the commodity not only for cash but for its equivalent in goods or for adequately secured credit; and

(2) It is provided that no food or food products shall be sold or otherwise disposed of under these provisions for export if there is a shortage of such food or food product in the United States, or if such sale or other disposition may result in a shortage, or if such food or food product is needed to supply the normal demands of consumers in the United States.

The Senate amendment also contained a provision making the War Food Administrator solely responsible for the formulation of policies and the carrying out of programs with respect to the disposal of surplus agricultural commodities. The Senate amendment further provided that the Board could not exercise any of its powers with relation to disposal of surplus cotton or woolen goods without approval in writing of the War Food Administrator. There were no comparable provisions in the House bill.

The conference agreement (sec. 21) provides that, subject to the supervision of the Board, the War Food Administrator is to have sole responsibility for the formulation of policies with respect to the disposal of surplus agricultural commodities and surplus foods processed from agricultural commodities. Such policies are to be so formulated as to prevent such commodities and food from being dumped on the market in a disorderly manner and disrupting the prices for the agricultural commodity. The conference agreement also contains the limitations of the Senate amendment on the power of the Board with relation to the disposal of surplus cotton or woolen goods.

STOCK PILING

The Senate amendment directed that all Government-owned accumulations of strategic minerals and metals be transferred, when determined to be surplus, to the account of the Treasury Procurement Division and added to the stock pile authorized by the act of June 7, 1939, and when so added be subject to its provisions. The term "strategic minerals and metals" was defined as all minerals and metals included in either group A or group B on the list of strategic and critical materials determined upon by the Army and Navy Munitions Board on March 6, 1944, and any other minerals and metals which the said Board determined should be added thereto. It included ores, concentrates, alloys, scrap, and partially and completed fabricated articles, of which the principal components by value consisted of such minerals and metals. Exceptions

1306

SURPLUS PROPERTY ACT OF 1944

ch market prices
>rized the Com-
be disposed of
farm commodity
l upon it by any

ions of the Sen-

the Commodity
modity not only
/ secured credit;

be sold or oth-
there is a short-
or if such sale or
or food product
s in the United

making the War
tion of policies
disposal of sur-
further provided
with relation to
roval in writing
rable provisions

oject to the su-
to have sole re-
to the disposal
processed from
formulated as
ed on the mar-
the agricultural
le limitations of
relation to the

nt-owned accu-
ed, when deter-
ocurement Divi-
of June 7, 1939,
term "strategic
tals included in
critical materials
rd on March 6,
pard determined
s, alloys, scrap,
ch the principal
als. Exceptions

were made in the case of fabricated articles which the Army and Navy determined not to be suitable for their use in the form in which fabricated and which could be disposed of commercially at a value substantially in excess of the metal market price of the component minerals and metals of the fabricated articles. It was further provided that transfers to the Treasury Procurement Division of the stock pile should be made without reimbursement or transfer of funds, subject to the exception that if the Reconstruction Finance Corporation or any of its subsidiaries was the owing agency the Secretary of the Treasury was to cancel notes of the Reconstruction Finance Corporation in an amount equal to the cost of the property so transferred. There were no stock-pile provisions of any kind in the House bill.

The conference agreement (sec. 22) provides that all Government-owned accumulations of strategic minerals and metals shall be transferred by the owning agency, when determined to be surplus pursuant to the act, to the account of the Treasury Procurement Division and be added to the stock pile authorized by the act of June 7, 1939, and be subject to its provisions. The provision (contained in the Senate amendment) that such transfer was to be made without reimbursement or transfer of funds is omitted from the conference agreement. Contractor inventories are to be transferred to the stock pile only when the owning agency has taken possession of and determined such inventories to be surplus. The term "strategic minerals and metals" is defined as meaning copper, lead, zinc, tin, magnesium, and a number of other named minerals and metals. The Army and Navy Munitions Board is given power to add to the list of named minerals and metals, aluminum or any other minerals or metals in such quantities or amounts as the Army and Navy Munitions Board determines to be necessary for the stock pile authorized by the act of June 7, 1939.

The term also includes ores, concentrates, alloys, scrap, and partially and completed fabricated articles, of which the principal components by value consist of such minerals and metals but does not include such fabricated articles as the Army and Navy determines are not suitable for their use in the form in which fabricated and which may be disposed of commercially at a value substantially in excess of the metal market price of the component minerals and metals of such fabricated articles. In order to make the provisions relating to the transfer to the stock pile effective, it is also provided in section 14 (b) of the conference agreement that the owning agencies may not dispose of any property under section 14 (b) which, if declared surplus, would be subject to being added to the stock pile under section 22 of the conference agreement.

The conference agreement provides that pending a determination of the War Production Board that the supplies of strategic minerals and metals available to industry are sufficient to meet the current requirements of industry, the owning agency, subject to regulations prescribed by the Surplus Property Board, shall withhold from transfer to the stock pile an amount of such minerals and metals equal to the deficiency, if any, estimated by the War Production Board as likely to exist for the requirements of industry for a period of 6 months for purposes other than war production; and the owning agency may dispose of the minerals and metals so withheld to the extent necessary to meet any such deficiency

1307

## CONGRESSIONAL COMMENTS

actually found to exist by the War Production Board, at the market price.

The conference agreement also provides that any Government-owned accumulation of strategic materials shall, at the request of the War and Navy Departments, be transferred by the owning agency, when determined to be surplus, to the account of the Treasury Procurement Division and be added to the stock pile. For the purposes of this provision the term "strategic materials" is defined as meaning all materials except strategic minerals and metals, and includes all materials in group A or in group B of the list of strategic and critical materials determined upon by the Army and Navy Munitions Board on March 6, 1944, as amended from time to time, but does not include any of such materials which the Army and Navy determine do not meet the specifications suitable for common defense or are in excess of the needs thereof.

Within 3 months following the enactment of the Act, the conference agreement provides that the Army and Navy Munitions Board shall submit to Congress its recommendations respecting the maximum and minimum amounts of each strategic mineral or metal which in its opinion should be held on the stock pile. After 1 year from the submission of such recommendation, unless the Congress provides otherwise by law, the Surplus Property Board may authorize the proper disposal agencies to dispose of any Government-owned accumulations of strategic minerals and metals including those owned by any Government corporation when determined to be surplus pursuant to the Act.

### DISPOSITIONS OUTSIDE UNITED STATES

The conference agreement (sec. 32 (a)) retains the provision found in both the House bill and the Senate amendment, that the act is not to limit or affect the authority of commanders in active theaters of military operations with respect to property in their control.

The House bill provided that in the case of property not located in the 48 States or the District of Columbia, the Administrator might exempt such property from some or all of the provisions of the act whenever he deemed such provisions would obstruct the efficient and economic disposition of such property.

The Senate amendment had a similar provision but confined to property located outside the United States, its Territories and possessions.

The conference agreement (sec. 32 (b)) embodies the policy of the Senate amendment.

### REIMPORTATION OF SURPLUS PROPERTY

The House bill provided that to the extent feasible and in the public interest the reimportation of surplus property sold for export should be prohibited.

The Senate amendment provided that surplus property sold for export or disposed of abroad could not be reimported, and directed the Secretary of the Treasury to prescribe necessary regulations.

The conference agreement (sec. 33) states that it is the policy of the act to prohibit, so far as feasible and necessary to carry out the objectives of the act, the importation of surplus property sold abroad or for export. The Board is to prescribe regulations to carry out this policy.

SURPLUS PROPERTY ACT OF 1944

market price.
nment-owned
of the War
gency, when
Procurement
; of this pro-
all materials
ials in group
s determined
6, 1944, as
uch materials
fications suit-
eof.

e conference
rd shall sub-
im and mini-
1 its opinion
ubmission of
vise by law,
sal agencies
rategic min-
corporation

ion found in
) act is not
aters of mili-

t located in
or might be
e act when-
d economic

ed to prop-
ossessions.
olicy of the

1 the public
port should

sold for ex-
directed the

olicy of the
t the objec-
road or for
this policy,

and the importation of surplus property is prohibited to the extent speci-
fied in such regulations. The Secretary of the Treasury is directed to
provide for the enforcement of such regulations.

The same section of the conference agreement also provides that sur-
plus property sold abroad to members of the armed forces may be brought
in, without regard to the above prohibition, by the original purchaser
upon his certificate that it is brought in for his personal use.

### INCREASE IN LOAN RATE ON COTTON

The conference agreement (sec. 37) retains the provision of the Sen-
ate amendment increasing from $92\frac{1}{2}$ to 95 percent the loan rate on
cotton in the case of crops harvested after 1943, but not in the case of
crops planted after 1944. If a loan on the 1944 crop has been made be-
fore the enactment of this act the loan shall be increased to the amount
which would have been loaned if this provision had been in force at the
time of the loan.

### EFFECT ON OTHER LAWS AUTHORIZING DISPOSAL OF PROPERTY

Both the House bill and the Senate amendment contain provisions to
the effect that the authority conferred by the act was in addition to
any authority conferred by any other law and that the act should not
impair or affect any authority for the disposition of property under any
other law. The conference agreement (sec. 34 (a)) contains similar pro-
visions. As an example of its operation nothing in the act would impair
or affect the provisions of Public Law 587, Sixty-eighth Congress, or sec-
tions 101 and 102, Public Law 346, Seventy-eighth Congress, authoriz-
ing the transfer of necessary lands, buildings, vessels, supplies, equipment,
and material for affording adequate hospital and domiciliary care for
veterans.

### EXCLUSION OF PERMANENT MILITARY RESERVATIONS, POSTS, AND FORTS

The House bill provided that nothing therein was to impair or to affect
so much of the Military Appropriation Act, 1945, as was contained in the
last two provisos of the second paragraph under the heading "Corps
of Engineers," which placed limitations on the disposition of real prop-
erty acquired by the War Department prior to July 2, 1940.

The Senate amendment provided that any real property which is part
of any permanent military reservation, post, or fort should be excluded
from the provisions of the act and not be disposed of except upon au-
thorization hereafter granted by law.

The conference agreement does not contain any provision distin-
guishing between the kinds of property which may be declared surplus
and that which cannot, except in the case of the public domain and
certain naval vessels, discussed above.

### EXPIRATION DATE

The House bill provided for the expiration of the act at the end of
3 years following cessation of hostilities in the present war, as proclaimed

by the President, or upon such date as might be fixed by concurrent resolution of the two Houses of Congress. The Senate amendment provided no expiration date.

The conference agreement (sec. 38) provides that the act shall expire at the end of 3 years following the cessation of hostilities, the date of such cessation to be the date specified by (1) proclamation of the President, or (2) a concurrent resolution of the two Houses of Congress, whichever specified date is the earlier.

CARTER MANASCO,
JOHN J. COCHRAN,
WILL M. WHITTINGTON,
CHARLES L. GIFFORD,
BY C. M.
GEORGE H. BENDER,
BY C. M.
Managers on the part of the House.

# WAR MOBILIZATION AND RECONVERSION ACT OF 1944

*For text of Act see p. 782*

## COMMITTEE OF CONFERENCE

*House Report No. 1902, September 19, 1944*

## STATEMENT OF THE MANAGERS ON THE PART OF THE HOUSE

The managers on the part of the House at the conference on the disagreeing votes of the two Houses on the amendment of the House to the bill (S. 2051) to amend the Social Security Act, as amended, to provide a national program for war mobilization and reconversion, and for other purposes, submit the following statement in explanation of the effect of the action agreed upon by the conferees and recommended in the accompanying conference report:

When the House passed this bill, it struck out all after the enacting clause of the Senate bill and inserted, in lieu thereof, an amendment in the nature of a substitute. This statement indicates the respects in which there were substantial differences between the Senate bill and the House amendment and the action recommended by the conferees with respect thereto.

## TITLE I—OFFICE OF WAR MOBILIZATION AND RECONVERSION

Section 101 of the Senate bill contained a declaration of the objectives of the act. The House amendment contained no comparable provision. The conference agreement follows the House amendment in this respect.

Section 102 of the Senate bill contained the provisions establishing the Office of War Mobilization and Reconversion and prescribing the powers and duties of that Office. The comparable provisions in the House amendment were in section 101. While most of the provisions in these sections were identical in the Senate bill and the House amendment, there were some substantial differences.

1310

## MESSAGES TO CONGRESS

### ARTICLE V

The two Governments agree that in this Agreement:

1. The words "country" or "territories"

(a) in relation to the Government of the United Kingdom of Great Britain and Northern Ireland, include, in addition to the United Kingdom, all British colonies, overseas territories, protectorates, protected States and all mandated territories administered by that Government; and

(b) in relation to the Government of the United States of America, include, in addition to the United States, all territory under the jurisdiction of the United States;

2. The word "nationals" means

(a) in relation to the Government of the United Kingdom of Great Britain and Northern Ireland, all British subjects and British protected persons belonging to the territories referred to in 1 (a) above and all companies incorporated under the laws of any of the above-mentioned territories, and also companies incorporated elsewhere in which the controlling interest is held by any of such nationals;

(b) in relation to the Government of the United States of America, all nationals of the United States including companies incorporated under the laws of the territories referred to in 1 (b) above, and also companies incorporated elsewhere in which the controlling interest is held by any of such nationals;

3. The word "petroleum" means crude petroleum and its derivatives.

### ARTICLE VI

This Agreement shall enter into force upon a date to be agreed upon after each Government shall have notified the other of its readiness to bring the Agreement into force and shall continue in force until three months after notice of termination has been given by either Government or until it is superseded by the International Petroleum Agreement contemplated in Article II.

In witness whereof the undersigned, duly authorized thereto, have signed this Agreement.

Done in Washington, in duplicate, this eighth day of August, one thousand nine hundred and forty-four.

For the Government of the United States of America:

E. R. STETTINIUS, Jr.,
*Acting Secretary of State of*
*the United States of America.*

For the Government of the United Kingdom of Great Britain and Northern Ireland:

BEAVERBROOK
*Lord Privy Seal.*

## SURPLUS PROPERTY ACT OF 1944

The President issued a separated formal statement on October 3rd to accompany his signature of Public Law No. 457, The Surplus Property Act of 1944, which promulgates the regulations for and methods of disposal of $100,000,000,000 worth of materials and plants.

On February 19, 1944, I signed an Executive Order setting up the Surplus War Property Administration to direct and expedite the orderly disposition of surplus war property so far as possible under existing law, pending action by the Congress.

H. R. 5125, the Surplus Property Disposal Act of 1944, which is before me for signature, places the general disposition of surplus war property under a Board of three and provides in considerable detail the methods to be pursued by the Board.

1408

## WAR MOBILIZATION AND RECONVERSION ACT OF 1944

"It is with considerable reluctance that I have decided to sign this bill. While I am in full accord with the declared objectives of the bill which are to aid reconversion from a war to a peace economy and to facilitate the orderly disposal of surplus property, I have considerable doubt whether many provisions of the bill will not make extremely difficult the accomplishment of its objectives. There is danger that the confused methods of disposition and the elaborate restrictions imposed by the bill will in many instances delay rather than expedite reconversion and reemployment. Our surplus property should speedily be placed into channels of disposition which should provide the most jobs and the greatest good for the greatest number.

"But we must be in a position to get on with the organization of our plans for the disposition of surplus war property. I have, therefore, concluded that it would be best to let the bill become law in the hope that after the Surplus Property Board provided for in the bill has had some experience in operating under it, the Congress will give careful consideration to needed changes which may be suggested by the Board.

## WAR MOBILIZATION AND RECONVERSION ACT OF 1944

On October 3rd the President issued the following statement explaining his signature of Public Law No. 458, creating the Office of War Mobilization and Reconversion.

I have signed S. 2051, a bill "to amend the Social Security Act, as amended, to provide a national program for war mobilization and reconversion, and for other purposes."

I have signed the bill because it is important, as this bill provides, that the Office of War Mobilization should be promptly expanded and given clear statutory powers to direct and supervise the tremendous task of reconversion in all of its numerous and related phases.

Last October at my suggestion Justice Byrnes set up a unit in the Office of War Mobilization to deal with war and post war adjustment problems. The work of this unit was placed in charge of Mr. Bernard Baruch. In February of this year, Mr. Baruch and his associate Mr. Hancock made a report recommending that the coordinating powers of the Office of War Mobilization be extended to cover activities relating to reconversion and that separate units be established in that Office to deal with the problems of Contract Settlement, War Surplus Property Disposition and Retraining and Reemployment.

Shortly thereafter by Executive Orders, I set up separate units in the Office of War Mobilization to deal with these problems so far as was practicable under existing law until legislation clarifying the powers of these units and defining the basic policies to be pursued by them could be enacted by the Congress.

Last June the Congress passed legislation establishing the Office of Contract Settlement with adequate powers to supervise and expedite the settlement of war contracts.

Just before its recent adjournment the Congress passed H. R. 5125, setting up a Surplus Property Disposal Board and defining its powers, and S. 2051, the bill now before me, which expands the Office of War Mobilization into an Office of War Mobilization and Reconversion and places within it the Office of Contract Settlement, the Surplus War Property Administration, and the Restraining and Reemployment Administration.

So far as the bill goes, it is quite satisfactory. It applies the lessons which we have learned during the war as to the need of continuing coordination of related activities to the problems of reconversion to peace. It does not and cannot, of course, eliminate the problems and difficulties of reconversion, but it goes far to expedite and facilitate their solution.

But I feel it my duty to draw attention to the fact that the bill does not