1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**E-Filed 2/26/09**

DESIGNATED FOR PUBLICATION

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

MONTARA WATER AND SANITARY
DISTRICT,

Plaintiff,

v.

COUNTY OF SAN MATEO, a political
subdivision of the State of California,

Defendant.

———————————————————

THE UNITED STATES OF AMERICA

Intervenor.

Case Number C 08-2814 JF (RS)

**ORDER RE CROSS-MOTIONS FOR
SUMMARY JUDGMENT**

RE: Docket Nos. 23, 25, 30

This action arises from a dispute over the ownership of three water wells located on the
property of the Half Moon Bay Airport, a public facility owned since 1948 by the County of San
Mateo, California ("the County").  Plaintiff Montara Water and Sanitary District ("Montara")
seeks to take the wells by eminent domain.  The United States, acting through the Federal

Aviation Administration ("the FAA"), has intervened to oppose Montara's efforts.  Each party has filed a motion for summary judgment asserting ownership of the wells.  The United States claims to have retaken the wells pursuant to a reversion clause contained in the deed by which the airport passed from the federal government to the County in 1948.  The United States argues that the reversion was justified by Montara's success in obtaining an interlocutory state-court order authorizing the proposed condemnation and granting Montara current possessory rights over the wells.  Montara disputes the existence of any condition justifying the reversion and asks this Court to uphold the state court's order.  The County argues that Montara's complaint in eminent domain is preempted in the first instance by the original deed of transfer, federal statutes, FAA regulations, and other evidence of congressional intent to preclude dispositions of airport property that the federal government opposes.

The Court concludes that Montara's successful condemnation of the wells clearly would trigger the reversion clause contained in the airport deed.  While Montara has not yet reduced the state court's order to a final judgment permanently divesting the County of its title to the wells, the Court holds that the order effected a transfer of rights sufficient to justify the United States's exercise of its reversionary interest.  Because the United States properly exercised its reversionary interest, it now owns the wells.  In the interest of completeness, the Court also addresses whether the proposed condemnation is preempted by federal law.  In so doing, the Court concludes that even if the reversion clause could not have been triggered until Montara obtained a final judgment and formally divested the County of title, Montara's complaint in eminent domain would be preempted, leaving the County with possession of the wells.[1]

## I. BACKGROUND

The Half Moon Bay Airport was constructed in 1942 for the United States Army, which relinquished the property to the Navy at the end of World War II.  The County acquired the airport from the United States, acting through the War Assets Administration and pursuant to

---

[1] The County has filed a notice of non-opposition to the United States's motion, noting that whether the Court grants the United States's or the County's motion, "the result is the same." County's Statement of Non-Opposition to United States's Mot. for Summary Judgment, at 1.

2

1  the Surplus Property Act of 1944, as amended, by way of a deed dated September 26, 1947 and

2  recorded on May 25, 1948.  The airport provides a variety of law enforcement, medical

3  emergency, and sea-rescue services, and is capable of supporting emergency response operations

4  in the event of a disaster preventing road travel.  The airport also contains the three water wells

5  that are the subject of the instant dispute.  The wells are situated near the airport's eastern

6  boundary; two of the well sites are in close proximity to aircraft parking areas, and one is within

7  the airport's secured area.

8      Montara, which provides water and sanitary services to the unincorporated coastal

9  communities of Montara and Moss Beach, obtains water from one surface source and several

10  wells, including those located on the airport property.  Water has been extracted from the airport

11  wells since approximately 1948.  Montara derives its extraction rights from a Revocable

12  Encroachment Permit issued to its predecessor-in-interest in 2004.  It pays a volume-based

13  extraction fee which in recent years has yielded an annual payment of approximately $60,000.

14  The fees are deposited in the airport's Enterprise Fund, which support's the facility's largely

15  self-funded operation and maintenance.

16      Before instituting this action, Montara offered to purchase the airport wells from the

17  County for approximately $5,000.  The County refused, and on April 19, 2007, Montara's board

18  adopted a resolution authorizing eminent domain proceedings to obtain title to the property

19  comprising the wells.  On May 17, 2007, Montara filed a complaint in eminent domain in the

20  San Mateo Superior Court.  The action was transferred to the Santa Clara Superior Court on

21  June 12, 2007, and removed to this Court on June 15, 2007 pursuant to the Quiet Title Act, 28

22  U.S.C. § 2409a.  On October 9, 2007, this Court granted Montara's motion to remand on the

23  ground that the absence of the United States from the action deprived the Court of jurisdiction

24  under the Quiet Title Act.

25      In November 2007, Montara filed a motion pursuant to § 1255.410 of the California Code

26  of Civil Procedure for an order granting it early possession of the airport wells.  On December

27  19, 2007, the Santa Clara Superior Court granted the motion and issued an Order of Possession

28  giving Montara the right to possess and ultimately condemn the wells.  The court established the

3

1  probable amount of compensation as approximately $6,000.  On December 21, 2007, the FAA,

2  which consistently had opposed the condemnation, issued a notice of its intent to revert the

3  airport wells pursuant to the 1947 deed of transfer.  The FAA executed and recorded the Notice

4  of Reverter on March 21, 2008.  On June 4, 2008, the Superior Court granted the United States's

5  motion to intervene, and on June 5, 2008, the United States removed the action to this Court

6  pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 2409a (Quiet Title Act).

7  Because the United States now was present in the action and expressly claimed title to the wells,

8  the Court denied Montara's second motion to remand.  The parties then filed the instant motions

9  for summary judgment.

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT

11  Summary judgment is appropriate when there are no genuine and disputed issues of

12  material fact and the moving party is entitled to prevail as a matter of law. Fed. R. Civ. P. 56;

13  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d

14  1285, 1288-89 (9th Cir. 1987).  The Court must view the evidence in the light most favorably to

15  the non-moving party, and all reasonable inferences must be drawn in favor of that party.

16  *Torres v. City of Los Angeles*, 540 F.3d 1031, 1039-40 (9th Cir. 2008).  The moving party bears

17  the burden of showing that there is no material factual dispute. Therefore, the court must regard

18  as true the opposing party's evidence, if supported by affidavits or other proper evidentiary

19  material. *Celotex*, 477 U.S. at 324.

## III. DISCUSSION

21  A determination that Montara's action is preempted by federal law might appear to

22  resolve the instant dispute, requiring a declaration that the Superior Court issued the Order of

23  Possession without jurisdiction to do so, and that the County therefore retains title to the wells.

24  Such a result is precluded, however, if the United States validly has exercised its reversionary

25  interest, thus irrevocably altering the parties' rights.  Accordingly, the Court's first task is to

26  determine whether Montara's actions triggered the reversion clause contained in the airport

27  deed.  Because the United States challenges this Court's jurisdiction to address this issue, the

28  Court begins by confirming its jurisdiction.

4

1    **A.      Reversion under the 1947 airport deed**

2         **1.      Subject-matter jurisdiction**

3         The Quiet Title Act provides the exclusive means by which a party may challenge federal

4    ownership of property. *Block v. North Dakota*, 461 U.S. 273, 286 (1983) ("Congress intended

5    the QTA to provide the exclusive means by which adverse claimants could challenge the United

6    States' title to real property."). The United States argues that its re-acquisition of the wells by

7    reversion prevents Montara from seeking title to the property without properly invoking the

8    Quiet Title Act.[2] Montara contends that the dispositive question is whether there has been a

9    "breach" triggering the reversion clause, and submits that this question may be decided as a

10   preliminary jurisdictional matter since a finding of no breach would eliminate the United

11   States's claim to any property interest justifying its presence in the action. While Montara is

12   correct that the ultimate question is whether the United States or some other party *owns* the

13   wells, there is no question that the United States *claims* to own them. Because Montara also

14   seeks a determination that it owns the wells, the instant case falls squarely within the exclusive

15   grant of jurisdiction provided by the Quiet Title Act.[3]

16

17        [2] The United States also argues that the Court should not entertain Montara's claims as a
18   quiet title action because Montara has failed to plead a claim under the Quiet Title Act. The
     Court need not decide whether the United States's purported reversion of the wells, intervention,
19   and removal of this action pursuant to the Quiet Title Act obligated Montara to plead facts giving
     rise to Quiet Title Act jurisdiction. As explained below, the requirements for jurisdiction under
20   the Act clearly are satisfied in this case. Thus, even assuming the existence of a pleading defect,
21   Montara easily could cure it by amendment. In light of the instant disposition, the Court declines
     to order such a pointless exercise.
22

23        [3] The United States argues that *its* motion may be decided without recourse to the Quiet
     Title Act. Relying on a title report that reflects its purported re-acquisition of the airport wells by
24   reversion, the United States contends that the only question raised by this lawsuit is whether a
     state-favored entity may condemn federal property–which under settled principles of
25   constitutional law it may not. *See, e.g., Armstrong v. United States*, 364 U.S. 40, 43 (1960)
     (reaffirming that property owned by the United States "cannot be seized by authority of another
26   sovereign against the consent of the Government"). This argument–and indeed, the United
     States's entire opening brief in support of its motion for summary judgment–rests on the
27   erroneous contention that title reports adjudicate ownership of real property. Title reports and
     the recording system serve no such function; they are designed merely to alert those with an
28

1        The Quiet Title Act provides for a limited waiver of federal sovereign immunity.  *See*

2  *Gardner v. Stager*, 103 F.3d 886, 888 (9th Cir. 1996).  The Ninth Circuit has held that "two

3  conditions must exist before a district court can exercise jurisdiction over an action under the

4  Quiet Title Act: 1) the United States must claim an interest in the property at issue; and 2) there

5  must be a disputed title to real property between interests of the plaintiff and the United States."

6  *Leisnoi, Inc. v. United States*, 267 F.3d 1019, 1023 (9th Cir. 2001).  Under the first requirement,

7  the United States need only *claim some interest* in the subject property.  *See id*.  Under the

8  second requirement, the plaintiff must "claim a property interest to which title may be quieted."

9  *Friends of Panamint Valley v. Kempthorne*, 499 F. Supp. 2d 1165, 1174 (E.D. Cal. 2007)

10  (quoting *Long v. Area Manager, Bureau of Reclamation*, 236 F.3d 910, 915 (8th Cir. 2001)).

11        In the instant case, there is no dispute that the United States's claim of title to the airport

12  wells satisfies the first jurisdictional requirement.  With respect to the second requirement, while

13  the state court's Order of Possession authorizes Montara to enter upon, possess, alter, and

14  ultimately condemn the airport wells, the Untied States argues that Montara lacks the requisite

15  interest in the wells because the order does not give rise to a present claim to *title*.  This

16  argument fundamentally misconstrues the requirements of the Quiet Title Act and interpretive

17  case law.  Consistent with the Act's reference to a putative claimant's "*right, title, or interest*" in

18  property as the appropriate jurisdictional test, *see* 28 U.S.C. § 2409a(c), courts have held that a

19  claimant is required to assert only "some interest in the title to the property." *Kansas v. United

20  States*, 249 F.3d 1213, 1224 (10th Cir. 2001) (emphasis removed).  This requirement serves to

21  limit quiet title actions to those "disputes pertaining to the United States' *ownership of real*

22

23  interest in property to the possibility of rival interests.  Indeed, a county recorder is require by
24  statute promptly to record any title documents that are submitted.  *See* Cal. Gov. Code § 27320.
     The United States's mere recordation of its Notice of Reverter thus does not prove that a breach
25  of the airport deed restrictions actually occurred.  Rather, this is a factual issue that the Court
     must reach before confirming the United States's claim of ownership.  *See Guttman v. Howard*
26  *Homes, Inc.*, 241 Cal. App. 2d 616, 619 (1966) ("It is well settled that a reversion of title for
     breach of a condition subsequent will not be decreed except upon clear and satisfactory evidence
27  of a violation of the condition.") (quoting *City of Palos Verdes Estates v. Willett*, 75 Cal. App. 2d
28  394, 405 (1946)).

*property.*"  *Id.* (emphasis added).  The requirement thus reflects certain well-founded jurisdictional constraints, for example, that members of the public may not assert an "interest in title" to public roads in order to pursue essentially regulatory objectives, *see Sw. Four Wheel Drive Ass'n v. Bureau of Land Mgmt.*, 363 F.3d 1069, 1071 (10th Cir. 2004),[4] or that disputes concerning the status or boundaries of land are not "title" disputes, *see Kansas v. United States*, 249 F.3d at 1225.  It plainly does not mean that the plaintiff must have a present claim to title. Indeed, it is well-settled that a party's inability to claim "complete ownership . . . is inconsequential under § 2409a." *Mafrige v. U.S.*, 893 F. Supp. 691, 698 (S.D. Tex. 1995).  A mere equitable interest, such as that created by an easement of necessity, may suffice*.  See Werner v. United States*, 9 F.3d 1514, 1516-18 (11th Cir. 1993).

Montara derives its "interest in title" to the airport wells from the Order of Possession. Orders of early possession represent a partial exception to the ordinary rule that a public agency "does not take possession and title [to condemned property] until after judgment and full payment has been made." *Escondido Union Sch. Dist. v. Casa Sueños De Oro, Inc.*, 129 Cal. App. 4th 944, 960 (2005).  The early possession procedures "give effect to the fact that . . . a landowner in California is permanently deprived of all of his rights in property sought by a public agency when the agency exercises its option to deposit estimated value and obtain early possession for the intended public use." *Escondido Union School Dist.*, 129 Cal. App. 4th at 960 (citing *Redevelopment Agency v. Gilmore*, 38 Cal. 3d 790, 800-801 (1985)).

Because orders of early possession formerly could be granted on an ex parte basis, the deprivation of property rights was subject to "defenses to the exercise of eminent domain" that might be raised in later proceedings.  *Id*.  In 2006, however, the California legislature largely eliminated the ex parte procedure in favor of an exacting process requiring a noticed motion.

---

[4] The Ninth Circuit has not addressed directly the question of whether the Quiet Title Act permits claims based on a public right or interest.  *See, e.g.*, *Shultz v. Dep't of Army*, 886 F.2d 1157, 1160 (9th Cir. 1989) (considering statute of limitations under Quiet Title Act in claim of access to public road); *see also Friends of Panamint Valley*, 499 F. Supp. 2d at 1177 (following Tenth Circuit case law in rejecting claim of public right-of-way over federally owned roadway as insufficient interest for purposes of Quiet Title Act).

7

*See* Cal. Code Civ. Proc. § 1255.410 (2006).  Simultaneously, the legislature repealed certain provisions that afforded relief from the enforcement of orders of possession.  *See id*. §§ 1255.420, 1255.430.  With these changes, the legislature appears to have intended that any defenses to an eminent domain action be raised through the noticed motion required by revised § 1255.410.  *See* NORMAN E. MATTEONI & HENRY VEIT, CONDEMNATION PRACTICE IN CALIFORNIA § 8.32 (3d ed. Supp. 2007).  While the legislature did not repeal § 1255.440, which allows a court to vacate an order of possession where it determines subsequently that the requirements of § 1255.410 have not been satisfied, this provision now appears to be relevant only in the limited context of emergency utility service, where orders of possession still may be issued on an ex parte basis.  *See* MATTEONI & VEIT, *supra*, § 8.32.

The Order of Possession issued to Montara was subject to the full rigors of revised § 1255.410, meaning that it effectively "deprived [the County] of all of [its] rights in [the] property."  *Escondido Union School Dist.*, 129 Cal. App. 4th at 960.  As such, the order itself provides Montara with a "property interest to which title may be quieted."  *Friends of Panamint Valley*, 499 F. Supp. 2d at 1174.[5]  The passage of actual title is irrelevant to the question of whether a party that has obtained such an order possesses the requisite property interest for purposes of the Quiet Title Act.  Of course, when a party bearing such an order takes actions demonstrating its physical possession of the property, *title* itself will be deemed to have passed.  *See People v. Joerger*, 12 Cal. App. 2d 665, 671 (1936) ("Where there has been a prior physical 'taking,' the subsequent divestiture of title is merely a confirmation of the original 'taking.'"); *see also People ex. rel. Dep't of Public Works v. Peninsula Title Guarantee Co.*, 47 Cal. 2d 29, 32-33 (1956)).  This Court, however, need not decide whether Montara's actions resulted in an early divestiture of title–indeed, the doctrine of early divestiture need not be invoked at all.  The Order of Possession provides Montara with a property interest that is more than sufficient to

---

[5] Even the title report that purportedly demonstrates the United States's exclusive ownership of the airport wells identifies several "matters affecting title to the [United States's] estate or interest in the land," including the fact that Montara is a "current interest holder[] claiming some right, title[,] or interest" in the property.  Half Moon Bay Airport Title Report, Herson-Jones Decl., Ex. 5, at 1, 7.

8

1    satisfy the Quiet Title Act's jurisdictional requirements.  Accordingly, the Court turns to the

2    merits.

3        **2.    Construction of federal land grants**

4        It is well-settled that "the construction of a deed to which the United States is a party is a

5    question of federal law." *Mafrige v. United States*, 893 F. Supp. 691, 698 (S.D. Tex. 1995); *see*

6    *also S. Utah Wilderness Alliance v. Bureau of Land Mgmt.* (*SUWA*), 425 F.3d 735, 762 (10th

7    Cir. 2005) ("The construction of grants by the United States is a federal not a state question."

8    (quoting *United States v. Oregon*, 295 U.S. 1, 27-28 (1935))).  While state law occasionally may

9    "furnish[] an appropriate and convenient measure of the content of . . . federal law," *Wilson v.*

10   *Omaha Indian Tribe*, 442 U.S. 653, 672 n.19 (1979) (quotation marks and citation omitted),

11   "[i]n the specific context of federal land grant statutes, . . . courts may incorporate state law

12   'only in so far as it may be determined as a matter of federal law that the United States has

13   impliedly adopted and assented to a state rule of construction,'" *SUWA*, 425 F.3d at 762-63

14   (quoting *Oregon*, 295 U.S. at 28).  In addition, any such "borrowed" state law "must be in

15   service of 'federal policy or functions,' and cannot derogate from the evident purposes of the

16   federal statute." *Id*. (citing *Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 672 (1979)).  With

17   these principles in mind, the Court examines the 1947 airport deed.

18       **3.    Deed language**

19       The deed conveying the airport property to the County contains the following relevant

20   provisions:  First, the County, "for itself, its successors and assigns," agrees to abide by certain

21   restrictions imposed by the Surplus Property Act of 1944 that run with the land.  The first of two

22   relevant restrictions provides that

23       all of the property transferred hereby . . . *shall be used for public airport purposes,*
         *and only for such purposes* . . . .  As used herein, "public airport purposes" shall
24       be deemed to exclude use of the structures conveyed hereby, or any portion
         thereof, for manufacturing or industrial purposes.  However, until in the opinion
25       of [the] Civil Aeronautics Administration or its successor Government agency, it
         is needed for public airport purposes, any particular structure transferred hereby
26       may be utilized for non-manufacturing or non-industrial purposes in such manner
         as the [County] deems advisable, provided that such use does not interfere with
27       operation of the remainder of the airport as a public airport.

28   Airport Deed, Herson-Jones Decl., Ex. 1, at 4:27-5:9 (emphasis added).  The second restriction

                                              9

provides that

> the property transferred hereby *may be successively transferred only with the approval of the Civil Aeronautics Administration or the successor Government agency* and with the proviso that any such subsequent transferee assumes all the obligations imposed upon the [County] by the provisions of this instrument.

*Id*. at 7:12-16 (emphasis added).  Finally, to ensure enforcement of the foregoing provisions, the deed states that

> *upon a breach of any of the aforesaid reservations or restrictions by the [County] . . . , whether caused by the legal inability of [the County] to perform any of the obligations herein set out . . . or otherwise, the title, right of possession[,] and all other rights transferred to the [County], or any portion thereof, shall at the option of the [United States] revert to the [United States]* upon demand made in writing by the War Assets Administration or its successor Government agency at least sixty (60) days prior to the date fixed for the reverting of such title . . . .

*Id*. at 7:19-29 (emphasis added).

**4.     Interpretation of the airport deed**

It is clear that the grant language requires the occurrence of a "breach of the . . . reservations or restrictions by the [County]" before the United States may exercise its reversionary interest.  The United States argues that Montara's condemnation proceeding constitutes such a breach because the transfer has not been authorized by the federal government–indeed the FAA, which succeeded to the reversionary interest, vigorously opposes Montara's efforts and expressly has withheld approval of any transfer.  *See, e.g.*, Letter dated April 19, 2007 from FAA to Half Moon Bay Airport Manager, Larson Decl. ¶ 11 & Ex. A at 1, 2 ("The Federal Aviation Administration (FAA) is the successor federal agency responsible for the federal oversight of the lands conveyed under the War Assets Administration (WAA) deed dated September 26, 1947 [and] . . . . is not in favor of a sale of the property for the well sites."); Email dated March 21, 2008 from FAA to San Mateo Director of Public Works, Levy Decl. Ex. H at 1, 3-4 (explaining that the agency considered Montara's decision to proceed without federal approval a breach of the deed restrictions, and disclosing the agency's intent to revert the airport wells).  Undoubtedly, the County's voluntary alienation of airport property without the FAA's approval would place it in breach of the deed restrictions.  The only question is whether legal actions taken by Montara can be said to place the County in breach.  Montara observes that the

10

1   deed is silent as to the effect of an involuntary transfer by eminent domain, and contends that the

2   deed is no more than a contract between the federal government and the County restricting the

3   latter's ability voluntarily to transfer the property.

4        Where a covenant deems a property owner to have "breached" when the owner transfers

5   or makes improper use of the property, common sense suggests that the owner's involuntary

6   subjection to eminent domain proceedings will not qualify as a breach.  Montara offers several

7   cases supporting this inference.  In *Romero v. Department of Public Works*, 17 Cal. 2d 189

8   (1941), for example, the court faced a reversionary interest triggered by the property owner's

9   failure to use the property "for railroad purposes."  *Id.* at 194.  The court noted that when the

10  property was condemned, "the condition that it should be used for railroad purposes became

11  impossible of further performance by operation of law."  *Id.*  For this reason, the court held that

12  "the owner of the possibility of a reverter prior to a breach of the condition is not entitled to

13  compensation when the property is taken under the law of eminent domain."  *Id.*

14       Similarly, in *U.S. v. 263.5 Acres of Land*, 54 F. Supp. 692, 693 (N.D. Cal. 1944), the

15  court confronted a grant restriction on the "sale or mortgage" of a property by Marin County,

16  California.  The question was whether the United States's condemnation of the property violated

17  the restriction, subjecting the property to forfeiture.  The court reasoned that while

18  condemnation "undoubtedly is a 'sale' in a certain sense[,] in that it is a compulsory parting with

19  property whereby the condemnor stands towards the owner as buyer towards seller," the grant

20  plainly referred to a "sale" in the ordinary sense of a voluntary act, and thus did not apply to

21  condemnation.  *Id.*  Finally, the court in *State v. Federal Square*, 3 A.2d 109 (N.H. 1938),

22  discussed the distinction between voluntary and involuntary actions with respect to a use-based

23  grant restriction on property owned by a city.  The court noted that although "[t]he city no longer

24  has the use of the property, . . . this is because of the exercise of [a] superior authority to which

25  it has been obliged to submit.  The State has taken the property by eminent domain, and *it is not*

26  *suggested that the city has acted in any way to aid in bringing about the acquisition by the*

27  *State*. Thus the city *has committed no breach* of the conditions, and the reverting clause

28  therefore becomes inapplicable in determination of the controversy."  *Id.* at 113 (emphasis

11

1    added).[6]

2         In contrast to the "use"- or "sale"-based restrictions at issue in the foregoing cases, the

3    airport deed's use of the word "transfer" does potentially broaden the scope of the grant

4    restriction and weaken the inference that a disposition must be voluntary to constitute a breach.

5    Yet the logic of each case at least suggests that a condemnation proceeding will not trigger a

6    reversionary interest based on the owner's "breach" because the owner has taken no action to

7    violate the relevant restriction.  In addition, as Montara notes, reversion clauses generally are

8    disfavored and therefore are interpreted strictly to prevent their exercise.  *See, e.g.*, *Springmeyer*

9    *v. City of S. Lake Tahoe*, 132 Cal. App. 3d 375, 380-82 (1982).

10        Nonetheless, several countervailing factors compel a different interpretation in the instant

11   case.  First, the airport deed explicitly broadens the definition of "breach" to include not only

12   conditions of the County's own making, but those "*caused by the legal inability of [the*

13   *County]*."  Airport Deed, at 7:19-29 (emphasis added).  This language indicates that the County

14   may "breach" the deed restrictions where it becomes legally unable to prevent their violation, as

15   upon "the exercise of [a] superior authority to which [the County] has been obliged to submit."

16   *Cf. Federal Square*, 3 A.2d at 113.  The "legal inability" clause alone suggests that an

17   involuntary sale or transfer may justify reversion.

18        Second, to the extent that Montara's state-law authorities would produce a result hostile

19   to federal interests, the Court must eschew state law in favor of federal law.[7]  In the instant case,

20   _____

21        [6] *Campbell v. Alger*, 71 Cal. App. 4th 200 (1999), which held that an involuntary
     condemnation did not trigger a right of first refusal, is inapposite in that the contract at issue
22   specified that the right "would arise only '[i]n the event ... [the Algers] ... determine[] to sell
     [their] . . . interest . . . to a third party after having received a bona fide and written offer for such
23   purchase, or make [] a bona fide and written offer to sell [their] . . . interest to a third party . . . .
     '"  *Id.* at 207 (amendments in original).  The instrument itself therefore resolved the issue of
24   whether an involuntary disposition could trigger the right in question.

25
          [7] Acknowledging the potential applicability of federal law, Montara relies heavily on
26   *263.5 Acres of Land*, a federal case.  However, even if it is viewed as supportive of Montara's
     position, *263.5 Acres* rested entirely on state-law decisions, including *Federal Square*.  *See 263.5*
27   *Acres of Land*, 54 F. Supp. at 693-94 (citing exclusively to *In re Wilkey's Estate*, 337 Pa. 129, 10
     A.2d 425 (1940), *In re Board of Supervisors of Chenango County,* 6 N.Y.S.2d 732 (N.Y. Co. Ct.
28

                                        12

the relevant federal law consists of the Surplus Property Act of 1944 and its 1947 amendments,

which imposed the applicable deed terms, and the well-established canon that federal land

grants are to be construed in favor of the government, with any doubts resolved in the

government's favor. *See United States v. Union Pacific R.R. Co.*, 353 U.S. 112, 115-16 (1957)

(interpreting land grant to railroad consistent with congressional intent and holding that all

doubts must be resolved in the government's favor); *see also Watt v. Western Nuclear, Inc.*, 462

U.S. 36, 47-60 (1983) (holding that interpretation of terms in federal land grant is controlled by

purposes of federal authorizing statute, and resolving doubt in government's favor); *United

States v. Union Oil Co. of Cal.*, 549 F.2d 1271, 1273 n.5 (9th Cir. 1977) ("To the extent that the

argument rests on the meaning of the word itself, . . . the government is entitled to have the

ambiguity resolved in its favor under [*Union Pacific*]."); *Occidental Geothermal, Inc. v.

Simmons*, 543 F. Supp. 870, 877 (N.D. Cal. 1982) (interpreting federal land grant in light of

authorizing statute's purposes, and applying *Union Pacific* canon to resolve any remaining

doubt).

    The Surplus Property Act of 1944, as amended in 1947, not only authorized but

prescribed the terms of the deed by which the federal government transferred the airport to the

County. *See* Airport Deed at 1:4-8 (stating that the transfer was occasioned by the "UNITED

STATES OF AMERICA, acting by and through the War Assets Administration, under and

pursuant to . . . the powers and authority contained in the provisions of the Surplus Property Act

of 1944, as amended, and applicable rules, regulations[,] and orders . . . "). The 1947

Amendments to the Act established the following two preconditions for transfer of property to a

local government for use as a public airport: the transfer had to be "subject to the terms,

conditions, reservations, and restrictions" contained in the Act; and the property interest

conveyed had to be "essential, suitable, or desirable for the development, improvement,

operation, or maintenance of a public airport . . . [,] or reasonably necessary to fulfill the

immediate and foreseeable future requirements of the grantee for the development,

1938), and *State v. Federal Square Corporation*, 89 N.H. 538, 3 A.2d 109 (1938)).

13

improvement, operation, or maintenance of a public airport, including property needed to

develop sources of revenue . . . . " Act of July 30, 1947, Pub. L. No. 80-289, § 13(g)(1), as

reprinted in 1947 U.S. Congressional Code Service 673, 673-75 [hereinafter Surplus Property

Act Amendments].  Having thus provided that only property suitable for airport use could be

granted in the first instance, Congress declared that

> *[n]o property disposed of under the authority of this subsection shall be used,
> leased, sold, salvaged, or disposed of by the grantee or transferee for other than
> airport purposes without the written consent of the Administrator of Civil
> Aeronautics*, which consent shall be granted only if the Administrator of Civil
> Aeronautics determines that the property can be used, leased, sold, salvaged, or
> disposed of for other than airport purposes without materially and adversely
> affecting the development, improvement, operation, or maintenance of the airport
> at which such property is located . . . .

*Id*. § 13(g)(2)(A).  To enforce these restrictions, Congress required the inclusion of a reversion

clause, providing that "[i]n the event that any of the terms, conditions, reservations, and

restrictions upon or subject to which the property disposed of is not met, observed, or complied

with, all the property so disposed of or any portion thereof, shall, at the option of the United

States, revert to the United States in its then existing condition." *Id*. § 13(g)(2)(H).

The desire of Congress to regulate the successive disposition of airport property stemmed

from its acute concern that the transferred airports remain financially self-sustaining.  That

concern was among the principal reasons for passage of the 1947 amendments to the Surplus

Property Act.  The Senate Report accompanying the 1947 amendments noted that "[n]one of

the[] airports can be self-sustaining unless, in addition to [the core aviation facilities whose

transfer was permissible under the 1944 Act], they can secure the nonaviation facilities in the

vicinity of the airport which may be used for revenue-producing purposes."  Government

Surplus Airports–Disposition, Senate Committee on Armed Services, S. Rep. No. 359, June 26,

1947, as reprinted in 1947 U.S. Congressional Code Service 1519, 1520.  Congress's solution

was to authorize the transfer of "property needed to develop sources of revenue."  Surplus

Property Act Amendments, § 13(g)(1).  The strict set of limitations on the use and disposal of

such property reveals Congress's expectation that the appropriate federal agency would serve as

14

1    a final check on actions potentially harmful to the airports, wielding an effective veto power.[8]

2        The restrictions of the amended 1944 Act now are codified in substantially the same form

3    in 49 U.S.C. §§ 47151-47153, which sets forth the purposes for which federal property may be

4    transferred and the limitations that must accompany any such transfer.  Section 47151 provides

5    that federal agencies may transfer surplus federal property to local governments for airport use

6    *only* where the Secretary of Transportation determines that one of the following conditions is

7    present: (1) the property to be transferred is "desirable for developing, improving, operating, or

8    maintaining a public airport"; (2) the transfer is "reasonably necessary to fulfill the immediate

9    and foreseeable future requirements for developing, improving, operating, or maintaining a

10   public airport"; or (3) the transfer is "needed for developing sources of revenue from

11   nonaviation businesses at a public airport."  49 U.S.C. § 47151(a)(1)(A)-(C).  Critically, §

12   47152(1) provides that an airport owner "may . . . dispose of the [property] for other than airport

13   purposes only after the Secretary of Transportation gives written consent that the interest can be

14   used, leased, salvaged or disposed of without materially and adversely affecting the

15   development, improvement, operation, or maintenance of the airport at which the property is

16   located."  *Id*. § 47152(1).

17       Federal regulations provide further evidence of congressional intent to give the FAA

18   final authority over the use and disposal of property transferred pursuant to the Surplus Property

19   Act.  For example, Part 155 of Title 14 of the Code of Federal Regulations, titled "Release of

20   ───────────────────

21       [8] The Department of Transportation ("DOT"), through the FAA, has effectuated these
     congressional goals by promulgating regulations that condition the receipt of federal funds on
22   compliance with certain fiscal requirements.  One such requirement is that "[e]ach federally
     assisted airport owner/operator . . . have an airport fee and rental structure that will make the
23   airport as self-sustaining as possible under the particular airport circumstances, in order to
     minimize the airport's reliance on Federal funds and local tax revenues." 64 Fed. Reg. 7696,
24   7710 (Feb. 16, 1999).  To this end, FAA Grant Assurances require that the airport "not take or
     permit any action which would operate to deprive [the Airport] of any of the rights and powers
25   necessary to perform any or all of the terms, conditions, and assurances in the grant agreement
     without the written approval of the Secretary [of Transportation]."  FAA Airport Grant
26   Assurances (3/2005), at 4.  An airport therefore may "not sell, lease, encumber, or *otherwise
27   transfer or dispose of* any part of its title or other interests in the property [referenced by] the
     application."  *Id*. (emphasis added).

28

                                    15

1  Airport Property from Surplus Property Disposal Restrictions," requires submission to the FAA

2  of a formal request for release from any deed restrictions.  Specifically, "[a] request for the

3  release of surplus airport property from a term, condition, reservation, or restriction in an

4  instrument of disposal … must be in writing and signed by an authorized official of the public

5  agency that owns the airport."  14 C.F.R. § 155.11(a).  "Each request for a release must include .

6  . . [t]he purpose for which the property was transferred, such as for use as a part of, or in

7  connection with, operating the airport or for producing revenues from nonaviation business," as

8  well as "[a] statement of the circumstances justifying the release on the basis" either that the

9  property *"*no longer serves the purpose for which it was made subject to the terms, conditions,

10  reservations, or restrictions concerned," or that the requested release from those conditions "will

11  not prevent accomplishing the purpose for which the property was made subject to [those

12  conditions]…." 14 C.F.R. § 155.11(c)(4), (c)(7); 14 C.F.R. § 155.3(a)(1)-(2) (emphasis added).

13  The foregoing provisions evince a clear legislative intent to prohibit any "transfer" of

14  airport lands absent the FAA's determination that such transfer will compromise neither the

15  airport's current operations nor its future ability to sustain itself.  The provisions confirm that

16  the airport deed restrictions at issue in the instant case encompass involuntary transfers of

17  airport property.  This reading is supported by the Ninth Circuit's holding in *Public Utility*

18  *District No. 1 of Franklin County v. Big Bend Electric Cooperative, Inc.*, 618 F.2d 601, 602 (9th

19  Cir. 1980), where the court addressed whether a state-favored entity could condemn electric

20  facilities financed by the federal government pursuant to the Rural Electrification Act ("REA").

21  Section 907 of the REA provides that

22      *[n]o borrower of funds under [the Act] shall, without the approval of the*
        *Administrator, sell or dispose of its property* . . . acquired under the provisions of
23      this chapter, until any loan obtained from the Rural Electrification Administration,
        including all interest and charges, shall have been repaid.
24
25  7 U.S.C. § 907 (emphasis added).  While § 907 is silent as to the REA's authority to block an

26  involuntary "s[ale] or disposal of . . . property" effected by eminent domain, the Ninth Circuit

27  construed § 907 as conditioning *any* "transfers" upon REA approval–including those

28  accomplished by eminent domain.  *Big Bend*, 618 F.2d at 602.  The Surplus Property Act

16

contains nearly identical provisions, declaring that

> [n]o [airport] property . . . shall be . . . disposed of by the grantee or transferee
> for other than airport purposes without the written consent of the Administrator
> of Civil Aeronautics, which consent shall be granted only if the Administrator of
> Civil Aeronautics determines that the property can be used, leased, sold, salvaged,
> or disposed of for other than airport purposes without materially and adversely
> affecting the development, improvement, operation, or maintenance of the airport
> at which such property is located . . . .

Surplus Property Act Amendments, § 13(g)(2)(A); see also 49 U.S.C. § 47152(1) (codifying § 13(g)(2)(A) of the Surplus Property Act, as amended).  There is a compelling argument that under Big Bend, the Surplus Property Act vests the FAA with authority to block a proposed condemnation of airport property in the first instance, without recourse to the reversionary interest.  Without deciding whether the Surplus Property Act by its terms confers authority upon the FAA to withhold approval of an involuntary disposition, Big Bend at a minimum supports the conclusion that the "transfer" restrictions in the airport deed must be read to include involuntary dispositions for purposes of the reversion clause.

Even if there remained some doubt as to the proper construction of the airport deed, "[i]t has long been established that, when grants to federal land are at issue, any doubts 'are resolved for the Government, not against it.'"  Andrus v. Charlestone Stone Products Co., Inc., 436 U.S. 604, 617 (1978) (quoting Union Pacific, 353 U.S. at 116).[9]  Here, the airport deed explicitly broadens the term "breach" to encompass situations in which the County's "legal inability" prevents compliance with the deed's transfer restrictions, and the relevant body of federal law requires expressly that the FAA be permitted to exercise its reversionary interest in response to unauthorized condemnations of airport land.  "A fortiori, the Government must prevail in a case such as this, when the relevant statutory provisions, their historical context, [and] consistent administrative . . . decisions . . . all weigh in its favor."  Andrus, 436 U.S. at 617.

---

[9] Even if Springmeyer, 132 Cal. App. at 380-82, which requires strict construction of reversion clauses, supported Montara's position and engaged Union Pacific in a "duel of competing canons," National Rifle Ass'n v. Bentsen, 999 F.2d 772, 773 (4th Cir. 1993), the federal Union Pacific canon undoubtedly would prevail under the Supremacy Clause.

17

1    **4.    Timing of breach**

2    Having determined that an involuntary transfer of airport property without the FAA's

3    approval permits the United States to exercise the reversionary interest contained in the airport

4    deed, the only remaining question in the present case is whether the Order of Possession

5    constituted a transfer of rights sufficient to trigger the interest or, conversely, whether the United

6    States was required to await a final judgment in Montara's favor.  The Order of Possession

7    issued by the state court on December 19, 2007 "authorized and empowered" Montara to "enter

8    upon[,] . . . take possession [of] [,] and use the subject property . . .[,] [and] to remove therefrom

9    any and all persons, obstacles, improvements or structures of every kind or nature thereon

10   situated."  Order of Possession, Fitzgerald Decl., Ex. E, at 2:20-25.  Over the FAA's strenuous

11   objection to any transfer of airport property, the order caused the County to be "permanently

12   deprived of all of [its] rights" in the airport wells.  *Escondido Union School Dist*., 129 Cal. App.

13   4th at 960; *see also supra* Section III.A.1.  This transfer of rights was sufficient to justify the

14   United States's exercise of its reversionary interest.  Accordingly, the United States was correct

15   to conclude that "San Mateo County continues to be in default of its obligations under the

16   [airport deed] in that the property is subject to a condemnation action and thus . . . compliance

17   with covenants of the deed regarding [FAA] approval of any conveyance is . . . impossible."

18   Notice of Reverter, Herson-Jones Decl., Ex. 3, at 4.

19   **A.    Federal preemption**

20   While concluding that the reversion of the wells did cause an immediate transfer of

21   ownership, the Court also addresses the County's thoroughly briefed preemption argument,

22   which relies largely upon the same material that supports the Court's interpretation of the airport

23   deed, and which would have dispositive effect were it not for the valid prior exercise by the

24   United States of its reversionary interest.  As the Court now explains, Montara's action is and at

25   all times has been preempted by federal law.  Thus, even if it were the case that the reversion

26   clause could not have been triggered prior to a final judgment and divestiture of the County's

27

28

18

1  title, Montara would be unable to obtain the wells by eminent domain.[10]

2  **1.    General principles and relation to eminent domain**

3       Preemption is a question of congressional intent and may be express or implied.  *Fidelity*

4  *Fed. Sav. & Loan Ass'n v. Cuesta*, 458 U.S. 141, 152-53 (1982).  Implied preemption occurs

5  when state law or an action authorized by state law "stands as an obstacle to the accomplishment

6  and execution of the full purposes and objectives of Congress," *id*. at 153 (quoting *Hines v.*

7  *Davidowitz*, 312 U.S. 52, 67 (1941)), such as by "injur[ing] the objectives of [a] federal

8  program," *Topa Equities, Ltd. v. City of Los Angeles*, 342 F.3d 1065, 1071 (9th Cir. 2003)

9  (quoting *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 583, (1979)), or by "interfer[ing] with the

10  'methods by which [a] federal statute was designed to reach [its] goal,'" *Ting v. AT&T*, 319 F.3d

11  1126, 1137 (9th Cir. 2003) (quoting *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987)).

12  Federal regulations have the same preemptive force as statutes.  *Fidelity*, 458 U.S. at 153-54.

13       While the power of eminent domain is a core attribute of state sovereignty, *State of*

14  *Georgia v. City of Chattanooga*, 264 U.S. 472, 480 (1924), it is well-settled that a state's power

15  of eminent domain must yield where its exercise would frustrate the purposes of a federal

16  statute.  *See, e.g.*, *City of Morgan v. S. La. Elec. Coop. Ass'n*, 31 F.3d 319, 323 (5th Cir. 1994),

17  *reh'g and reh'g en banc denied*, 49 F.3d 1074 (5th Cir. 1995) (prohibiting exercise of state

18  eminent domain power that would interfere with federal purposes); *see also Fidelity*, 458 U.S. at

19  153 (holding that preemption principles "are not inapplicable . . . simply because real property

20  law is a matter of special concern to the States").  The Ninth and Fifth Circuits have held

21  consistently that a state entity's eminent domain power is preempted under these circumstances.

22  *See Public Utility District No. 1 of Franklin County v. Big Bend Electric Cooperative, Inc.*, 618

23  F.2d 601, 603 (9th Cir.1980); *Public Utility Dist. No. 1 of Pend Oreille County v. United States*,

24  417 F.2d 200, 202 (9th Cir. 1969); *see also City of Morgan*, 31 F.3d at 323; *City of Madison v.*

25  *Bear Creek Water Ass'n*, 816 F.2d 1057 (1987).

26  ──────────────

27       [10] As noted previously, the interests of the County and the United States are aligned to
   such an extent that the County would consider a judgment in either party's favor to produce the

28  same result.  *See supra* note 1.

Case No. C 08-2814 JF (RS)
ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT
(JFLC3)

1       In *Public Utility Dist. No. 1 of Pend Oreille County v. United States*, the Ninth Circuit

2   held that a state-favored entity's attempt to condemn electric facilities receiving federal

3   subsidies pursuant to the Rural Electrification Act was preempted because it would interfere at a

4   broad level with the REA's purpose of promoting rural electrification. 417 F.2d at 202.

5   Reaffirming this rule in *Public Utility District No. 1 of Franklin County v. Big Bend Electric*

6   *Cooperative, Inc.*, the Ninth Circuit held once again that "under the Supremacy Clause of the

7   Constitution[,] a state municipal public utility [cannot] condemn property owned by a federally

8   subsidized public utility where the condemnation would interfere with [a] federal purpose." 618

9   F.2d at 603. More recently, the Fifth Circuit twice has applied *Pend Oreille* and *Big Bend*. *See*

10   *Bear Creek*, 816 F.2d at 1060 (citing *Big Bend*, 618 F.2d 601, in holding that attempted

11   condemnation of water facilities owned by association indebted to federal Farmer's Home

12   Administration was preempted because it would "adverse[ly] effect . . . the remaining customers

13   of Bear Creek[,] . . . [and] undermine Congress's purpose of facilitating inexpensive water

14   supplies for farmers"); *City of Morgan*, 31 F.3d at 323-24 (citing *Pend Oreille*, 417 F.2d at

15   201-02, in holding that state entity's attempt to condemn federally subsidized electric facility

16   was preempted by the REA because it "would 'stand as an obstacle' to the repayment of federal

17   loans, to the financial viability of federally financed electricity cooperatives, and ultimately, to

18   the maintenance of electricity service to rural areas").

19       In cases where the existence of an "obstacle" for preemption purposes turns on the

20   resolution of disputed facts, a court must defer to the reasoned opinions of the agency

21   responsible for administering the relevant statute. *Big Bend*, 618 F.2d at 603. In *Big Bend*, the

22   Ninth Circuit rejected the prospective condemnor's argument that summary judgment based on

23   *Pend Oreille* was inappropriate in light of factual disputes concerning "the wisdom of the

24   taking." *Id*. The court observed that the agency charged with administering the statute had

25   "determined that the [utility's] proposed condemnation would decrease the ability of the

26   [agency] to serve [the congressional] purpose." *Id*. Because the agency in question was

27   "intended by Congress to determine the appropriate course of conduct to accomplish the

28   legislative purpose," it was to be "give[n] wide latitude . . . in [its] area of expertise." *Id.*; *see*

20

1   *also City of Cookville v. Upper Cumberland Elec. Membership Corp.*, 256 F. Supp. 2d 754, 767

2   & n.9 (M.D. Tenn. 2003) (noting that the "Ninth and Fifth Circuits correctly give deference to

3   the [agency's] determination in th[e] area of [its] expertise," and declining to apply *Pend Oreille*

4   only because the relevant federal agency had "not actually [appeared in the case] or otherwise

5   taken a stance on the issue of frustration of the" federal statute).

6              **2.     Preemptive effect of the deed, statutes, and regulations**

7         As explained earlier, *see supra* Section III.A.4, the text and legislative history of the

8   Surplus Property Act, as well as subsequent congressional enactments and federal regulations,

9   leave no doubt that Congress intended the FAA to exercise permanent authority over any

10  proposed alienation of airport property.  Congress provided the FAA with such authority in

11  order to ensure that the airports (1) continue to be self-sustaining, particularly through the use of

12  revenue-generating nonaviation facilities, and (2) remain operationally viable.[11]  It required that

13  any transfer of surplus property by a federal agency be preceded by a determination that the

14  property was suitable for immediate or future airport use, including for nonaviation, revenue-

15  generating purposes.  *See* Surplus Property Act Amendments, § 13(g)(1).  Correspondingly, each

16  _____

17        [11] Montara fails even to address the preemptive effect of the Surplus Property Act of

18  1944, as amended, or subsequent enactments re-codifying the Act.  Instead, Montara points to a
    deed from the federal government to Montara's alleged predecessor-in-interest, the Montara

19  Elementary School District ("District"), as evidence of the federal government's intent to permit
    alienation of the wells.  That deed is dated October 15, 1948, several months after the County

20  accepted the primary deed transferring the airport property in fee simple subject only to a
    reserved access easement for the airport wells.  By the second deed, the federal government

21  conveyed the reserved easement to the District, an act to which Montara now attributes some
    intent to allow condemnation of the wells.  However, when a dispute arose some thirty years later

22  over whether the County or the District's successor-in-interest held the extraction rights to the
    underlying water, the California Court of Appeal held that the second deed conveyed no more

23  than an access easement to the District, and that the County had exclusive rights to the water.
    *See County of San Mateo v. Citizens Utilities Company of California*, No. C 40393, at *3-8 (Cal.

24  App. 1st Dist. Mar. 21, 1978).  With respect to the federal government's intent as to both
    transfers, the court specifically noted that in reserving only an access easement, as opposed to the

25  wells themselves and associated water rights, the government may well have wanted the airport

26  owner "to charge the user of the easement for the water from the wells."  *Id*. at 6 n.4.  In fact, as
    the legislative history of the Surplus Property Act indicates, it is quite likely that this was

27  precisely the United States's intent.

28

                                                  21

1   airport grantee was made subject to conditions governing the use and disposal of the property,

2   including a strict prohibition on the transfer or disposal of any airport property without FAA

3   approval.  *Id*. § 13(g)(2)(A).  Finally, to enforce these provisions, Congress empowered the

4   federal government to retake the property should it deem any subsequent transfer or disposal of

5   airport property harmful to the airport's short- or long-term interests.  *Id*. § 13(g)(2)(H).

6       It is extremely unlikely that Congress would have established such a firm set of

7   limitations on the use and the disposal of airport property, enabling the FAA to ensure the

8   airports' continued viability over time, only to allow state-favored entities to condemn parts of

9   the granted properties with "no requirement that an underlying federal purpose be considered."

10  *Pend Oreille*, 417 F.2d at 201-02.  By the FAA's own reading of the Surplus Property Act, the

11  covenants burdening the deeds of transfer ensure that "every acre of a surplus airport is held in

12  trust for a specific purpose and usage."  FAA Order 5190.6A, Airport Compliance

13  Requirements, dated Oct. 2, 1989, ¶ 4-18(b).  A state or state-favored entity may not violate that

14  trust consistent with the Supremacy Clause.  Montara's successful condemnation of the airport

15  wells would  "interfer[e] with the 'methods by which [the Surplus Property Act] . . . was

16  designed to reach [its] goal.'"  *Ting v. AT&T*, 319 F.3d 1126, 1137 (9th Cir. 2003) (quoting *Int'l*

17  *Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987)).  It would undermine the FAA's ability to

18  accomplish its prospective supervisory function with respect to the granted properties, and

19  therefore would stand as an obstacle to implementation of the Act's careful procedural design.[12]

20  _____

21      [12] This conclusion closely parallels that reached by the Fifth Circuit in *City of Morgan*.
22  As already noted, the REA and the Surplus Property Act of 1944, as amended, contain very
    similar provisions requiring agency approval prior to disposal of land or facilities in which the
22  federal government retains an interest.  Both provisions condition approval on the putative
    transferor's satisfaction of certain terms deemed essential to the integrity of the respective federal
23  programs.  Neither provision, however, speaks to the relevant agency's authority over
24  involuntary transfers.
        In the panel opinion in *City of Morgan*, the court recognized the position–adopted by the
25  Ninth Circuit in *Big Bend*–that § 907 of the REA gives the implementing agency the authority to
26  block even involuntary transfers.  *See supra* Section III.A.4; *see also City of Morgan*, 31 F.3d at
    322.  The panel nonetheless "elect[ed] to . . . . save for another day the issue of whether 7 U.S.C.
27  § 907 by its terms confers authority on the Administrator to withhold approval of an involuntary
28  disposition."  *City of Morgan*, 31 F.3d 319, 322 (5th Cir. 1994).  Instead, the panel "consider[ed]

1    Even if preemption were limited in this case to a finding of conflict between the proposed

2    condemnation and the substantive goals of the Surplus Property Act, deference to the FAA's

3    reasoned position would produce the same result.  Montara disputes whether its condemnation

4    of the wells might impede the airport's operations or development, or deprive it of necessary

5    operating funds.  Montara contends that prior use of the wells under several revocable

6    encroachment permits demonstrates the absence of a conflict.  This contention ignores the

7    impact of the loss of recurrent airport revenue from water sales, the airport's future development

8    needs, and obvious operational differences between permissive use and fee simple ownership of

9    the wells.  However, even if a genuine dispute of fact existed, no further evidence would be

10   required to resolve it.  The FAA, by its prior statements, intervention in this action, and exercise

11   of its reversionary interest, has demonstrated its strenuous opposition to Montara's efforts and

12   has articulated a coherent set of reasons for that opposition.

13   Specifically, the FAA has explained that it is

14   not in favor of a sale of the property for the wells sites [because] . . . . the sale . . .
     would encumber the County's ability to provide for future aviation development

15   should the demand for leasehold occur in the future.  The property in question is
     suitable for aircraft storage . . . , a fixed based operator (FBO) aviation business,

16   or other aviation compatible non-aeronautical business development.  Additional
     airport property would be lost due to the need to install perimeter fencing of the

17   well sites and three separate access right-of-ways [sic] . . . . [,] [since] [t]he
     County must restrict access to the airfield to authorized users/tenants of HAF

18   [Half Moon Bay Airport] to remain in compliance with the grant agreement
     Assurances.

19

20   only whether a conflict exists because the proposed state-law expropriation would frustrate a
     federal purpose."  *Id*.

21   In a second opinion denying panel rehearing and rehearing *en banc*, the court again

22   "declined to decide whether § 907 should be interpreted broadly enough to allow the REA to
     prevent a proposed expropriation."  49 F.3d 1074, 1075 (5th Cir. 1995).  However, the court held

23   that "at the very least, the provision reflects a general federal policy of protecting the integrity of
     the REA's security interests.  *Thus, even a narrow interpretation of § 907 supports the panel's*

24   *preemption analysis.*"  *Id*.  In the instant case, the Surplus Property Act's agency approval
     requirement, which was designed to ensure the continued integrity, viability, and self-sustenance

25   of the transferred airports, similarly confirms that an unauthorized transfer is precluded by the
     obstacle preemption doctrine.  Indeed, the instant case is similar not only to *City of Morgan*, but

26   to *Big Bend*, in which substantially the same considerations supported both a finding of direct

27   federal control and indirect federal authority via obstacle preemption.  *See Big Bend*, 618 F.2d at
     601-03.

28

23

Letter dated April 19, 2007 from FAA to Mark Larson, Half Moon Bay Airport Manager, at 1-2.[13]  The FAA accordingly reiterated that it is

> not in agreement that the land is no longer needed for an airport purpose.  The wells can be capped and relocated to another area.  The surface area may be then returned for airport development as identified above.  Therefore, the land is not considered surplus property and the FAA San Francisco Airports District Office would not recommend a release of the federal agreement obligations to permit the sale of the property. . . .  The FAA has included HAF in the National Plan of Integrated Airport Systems (NPIAS) as a general aviation reliever airport.  The airport is a valuable transportation link for interstate and intrastate air transportation. . . .  *We are of the opinion that the federal interest in the land for air transportation purposes continues to be the primary need for the use of the property.*

*Id*. (emphasis added).  As the successor to the Civil Aeronautics Administration, the FAA is vested with "the sole responsibility for determining and enforcing compliance with the terms, conditions, reservations, and restrictions upon or subject to which surplus property is disposed of pursuant to" the Surplus Property Act.  Surplus Property Act Amendments, § 13(g)(4).  The FAA therefore is the agency "intended by Congress to determine the appropriate course of conduct to accomplish the [Act's] legislative purpose," and its reasonable views must prevail.  *Big Bend*, 618 F.2d at 603.[14]

---

[13] The FAA, through the declaration of the Half Moon Bay Airport's manager, also has provided evidence of past security incidents caused by Montara's presence on the airport property.  *See* Larson Decl., ¶ 5 & Ex. 5 (containing report detailing dangerous airplane take-off and landing conditions created by agents of Montara within the airport's runway safety area); ¶ 6 & Ex. 6 (providing file memo by airport manager recording unauthorized construction activities by agents of Montara outside the fenced well sites, in violation of Montara's Revocable Encroachment Permit).  While the Court sustains Montara's objections to those portions of the Larson Declaration that lack foundation or are hearsay, *see* Larson Decl., ¶¶ 4, 7, & 8, the documented incidents amply support the FAA's views and make the FAA's concerns regarding operational safety and security anything but "hypothetical."  *Cf. Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 130-31 (1978) (finding hypothetical conflict insufficient to warrant preemption).

[14] *Big Bend* requires deference to an agency's predominantly factual determinations in its area of expertise.  *See* 618 F.2d at 603 (citing § 706 of the Administrative Procedure Act).  This standard is distinct from the less deferential treatment given to an agency's legal determinations as to whether a particular state law would "stand an obstacle" to federal purposes.  In *Geier v. American Honda Motor Co.*, 529 U.S. 861, 883-86 (2000), the Supreme Court discussed the level of deference due to an agency's informal views on the objectives of a regulation it had

24

1

## III. CONCLUSION

2          The airport deed, by its plain terms, in light of its statutory context, and read in

3 accordance with settled federal rules of construction, permits the United States to retake airport

4 property that is subjected to unauthorized condemnation proceedings.  In addition, because

5 Congress sought to provide the FAA with prospective oversight powers in furtherance of

6 specific statutory purposes, Montara's attempt to condemn the wells against the FAA's wishes is

7 hostile to the purposes of the controlling federal statutes.  As a result, the condemnation is–and

8 at all times has been–preempted.  However, because the FAA properly exercised its reversionary

9 interest when Montara obtained an order of early possession, the United States now owns the

10 wells.  Accordingly, the United States's motion for summary judgment will be granted, the

11 County's motion will be denied as moot, and Montara's motion will be denied because federal

12 property may not be taken without the consent of the sovereign.[15]

13

14
**IT IS SO ORDERED.**
15

16

17 DATED: 2/26/09                                         _____

18                                                        JEREMY FOGEL
                                                         United States District Judge
19

20

21

22
_____
23 promulgated and its position that a state lawsuit would "stand as an obstacle" to those objectives.
The Court "place[d] some weight" on the agency's primarily legal views–an approach which the
24 Third Circuit analogized to *Skidmore* deference.  *See Fellner v. Tri-Union Seafoods, L.L.C.*, 539
F.3d 237, 249-50 (3d Cir. 2008) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)).  *Geier* is
25 inapplicable in the instant case, where the FAA's views pertain solely to whether the proposed
condemnation would interfere with certain key aspects of the airport's long-term viability and
26 operational integrity.

27
      [15] On November 12, 2008, Montara filed an ex parte motion once again seeking early
28 possession of the wells.  In light of the instant disposition, that motion also must be denied.

25

This Order has been served electronically upon the following persons:

Charles Michael O'Connor Charles.OConnor@usdoj.gov, charles.o'connor@usdoj.gov

Christine Carin Fitzgerald fitzgeraldlaw@sbcglobal.net

David A. Levy dlevy@co.sanmateo.ca.us, lcervantes@co.sanmateo.ca.us

David E. Schricker dschricker@schrickerlaw.com

Glenn Michael Levy glevy@co.sanmateo.ca.us, alihalakha@co.sanmateo.ca.us

Herman H. Fitzgerald fitzgeraldlaw@sbcglobal.net

This Order has been delivered by other means to the following persons:

Thomas F. Casey, III
County Counsel's Office
County of San Mateo
Hall of Justice & Records
400 County Center, 6th Floor
Redwood City, CA 94063

Case No. C 08-2814 JF (RS)
ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT
(JFLC3)